## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LONGVIEW POWER, LLC, *et al.*[1] | ) | Case No. 13-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF JEFFERY L. KEFFER
## IN SUPPORT OF FIRST DAY MOTIONS

I, Jeffery L. Keffer, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of Longview Intermediate Holdings C, LLC, one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have served in this capacity since 2011, and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above 18 years of age, and I am competent to testify.

2.      I am authorized to submit this Declaration on behalf of the Debtors.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[1]      The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors").  The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541.  The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

**Preliminary Statement**

3.    The Debtors operate an integrated power generation enterprise and are at the forefront of the clean coal movement.  The Debtors operate through two distinct business units: Longview Power, LLC ("Longview Power") and Mepco Holdings, LLC and its subsidiaries (collectively, "Mepco").  Longview Power was formed for the specific purpose of constructing and operating a 700 net megawatt supercritical coal-fired power generation facility located in Maidsville, West Virginia (the "Power Facility").  Longview Power took possession of, and commenced operating, the Power Facility in December 2011.  The Power Facility uses equipment, processes, designs, and technology that were developed specifically for use at the Maidsville site.  When able to operate at full capacity, the Power Facility is one of the most efficient coal-fired power plants in the country and has one of the lowest air emissions profiles of any such power plant in operation in the United States.  The Power Facility was built at a cost of approximately $2 billion, which was funded through the proceeds of a $1 billion equity investment from an affiliate of First Reserve Corporation ("First Reserve"), the Debtors' equity sponsor, among others, and funded debt totaling approximately $1.2 billion arising under the Longview Credit Facility (as defined herein).[2]  As of the date hereof (the "Petition Date"), approximately $1 billion remains outstanding under the Longview Credit Facility.

4.    Mepco was founded more than 50 years ago and is one of the largest independent coal companies in Northern Appalachia.  Mepco has been managed by three generations of the Laurita family, including Mepco's current Chief Executive Officer, James Laurita, Jr., and Mepco is a proud partner with its employees in operating mines and related processing plants in northern West Virginia and southwestern Pennsylvania.  Approximately half of Mepco's annual

---

[2]    This equity investment and the Longview Credit Facility have also provided Longview Power with working capital in the ordinary course of business.

K&E 27326239
RLF1 9307692v.1

coal production is sold to Longview Power pursuant to an intercompany supply contract. None of Mepco's employees are represented by a collective bargaining unit. Mepco and its subsidiaries are parties to the Longview Credit Agreement (as defined herein).

5.        Facing an impending interest payment due on August 30, 2013, and with a need to protect valuable estate assets—in the form of $59 million in letters of credit—which are part of the collateral package for the Debtors' lenders under the Longview Credit Agreement, the Debtors have sought chapter 11 protection. The Debtors' need to restructure their debt obligations has been brought to a head in large part because the Power Facility has been plagued by design, construction, and equipment defects and failures (collectively, the "Contractors' Failures") since Longview Power took possession of the Power Facility in December 2011. Because of the Contractors' Failures, the Power Facility has only had a capacity factor[3] of 68 percent since Longview Power took possession, due to numerous forced outages, extended planned outages, and generation derating[4]—including three material forced outages to address boiler tube leaks at the Power Facility in the last four months alone. The Contractors' Failures and the delays caused by Siemens Energy, Inc. ("Siemens"), Foster Wheeler North America Corporation ("Foster Wheeler"), and Kvaerner North American Construction Inc. ("Kvaerner," and collectively, the "Contractors") during the Power Facility's construction have already led to arbitration among the parties before an arbitration panel (the "Arbitration Panel"), which is discussed later in this Declaration.

---

[3]    Generally, "capacity factor" is a measure of a power plant's actual energy output over time versus the power plant's maximum capacity. Typically, capacity factor is measured over a 30-day period. For example, a 700 megawatt power plant operating at a 100 percent capacity factor would be producing 700 megawatts, 24 hours per day, for 30 days.

[4]    Generally, "generation derating" is a term used to describe a situation where a power plant is operating at less than its rated maximum capacity.

K&E 27326239
RLF1 9307692v.1

6.      At the same time, the Debtors are subject to a significant funded debt balance, including the maturity of approximately $557 million of these obligations in February 2014. Due to, among other things, the Power Facility's operational issues, the Debtors do not expect to be able to satisfy all of their obligations under the Longview Credit Agreement.  Thus, the Debtors have sought to proactively right-size their capital structure and position themselves for ongoing success in the current industry and economic environment.  In this process, the Debtors continue to review strategic alternatives in their efforts to maximize stakeholder value.  To this end, the Debtors determined it was in their best interests to explore debt restructuring options with a steering committee of the lenders under the Longview Credit Agreement (the "Steering Committee"), and the Debtors began negotiations with the Steering Committee over all aspects of a potential restructuring starting in the fall of 2012.

7.      These negotiations remain ongoing.  Importantly, significant progress has recently been made as the Debtors work towards a consensual restructuring, and the Debtors are hopeful that they will be able to reach an agreement on a plan of reorganization with their stakeholders. The Debtors, of course, would have preferred to finalize a plan of reorganization before filing for chapter 11.  But circumstances have required that the Debtors seek chapter 11 relief at this time. As noted above, the Debtors face an interest payment due on August 30, 2013 under the Longview Credit Agreement.  Failure to make this payment would cause a default under the Longview Credit Agreement.  Moreover, the Debtors currently face the prospect that $59 million of estate assets (i.e., letters of credit issued for the Debtors' benefit), and which are part of their lenders' collateral package, could be involuntarily stripped away pursuant to a request made by the Contractors to the Arbitration Panel.  At the same time, the Debtors' liquidity position has continued to erode, due in no small part to the continued operational challenges arising from the

K&E 27326239
RLF1 9307692v.1

Contractors' Failures.   Together, these were facts that the Debtors, as fiduciaries for these estates, simply could not afford to ignore.   Considering all of the circumstances and their duty to maximize value, the Debtors, in consultation with their advisors, elected to commence these chapter 11 cases in order to provide a platform for continued negotiations and to protect their assets.   The Debtors will continue their efforts to consensually resolve open issues and to reach a plan of reorganization that maximizes stakeholder value.

8.     To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized in three parts.   Part I describes the Debtors' business and their capital structure.   Part II details the circumstances surrounding the commencement of these chapter 11 cases.   Part III sets forth the relevant facts in support of each of the pleadings filed in connection with these chapter 11 cases (collectively, the "First Day Motions").

## Part I.
## General Background

### I.     The Debtors' Businesses

9.     The Debtors are privately held and operate in two distinct, but related, lines of business:  (a) the generation of electric power and sales of electric power services undertaken by Longview Power; and (b) coal mining, processing, and waste disposal operations undertaken by Mepco.   In the twelve months ended June 30, 2013, the Debtors generated revenues totaling approximately $255 million on a consolidated basis (excluding intercompany revenues), consisting of:  (a) revenues totaling approximately $106 million arising from Longview Power's power generation and sales; and (b) revenues totaling approximately $149 million arising from Mepco's coal mining, processing, waste disposal, and sales operations.

K&E 27326239
RLF1 9307692v.1

A. **Longview Power**

10.     Longview Power was formed in 2003 for the purpose of constructing and operating the coal-burning Power Facility.  Located in Monongalia County, West Virginia, the Power Facility is subject to a ground lease between Longview Power, the Monongalia County Development Authority (the "MCDA"), and the County Commission of Monongalia County, West Virginia (the "Commission"), which lease permits Longview Power to construct and operate the Power Facility on ground currently owned by the MCDA.  As noted above, the Power Facility was capitalized with a combination of debt financing provided under the Longview Credit Facility and equity funded by an affiliate of First Reserve, its equity sponsor.

11.     Construction on the Power Facility began in 2007, and Longview Power took possession of the Power Facility in December 2011.  The Power Facility utilizes advanced power generation technology to meet the highest environmental standards and a supercritical pulverized-coal fired boiler to generate electric power.  When operational, the Power Facility is one of the lowest cost coal-fired producers of power in the Pennsylvania-Jersey-Maryland ("PJM") Regional Transmission Organization.[5]  Electricity generated by the Power Facility is sold to PJM in the day-ahead or real-time markets.  Longview Power's marketing activities with PJM are undertaken on Longview Power's behalf by Tenaska Power Services, Co. ("Tenaska"), a third party services provider, pursuant to an agreement between Longview Power and Tenaska.

12.     Longview Power does not directly operate the Power Facility in this process. Instead, pursuant to that certain Operation and Maintenance Agreement, dated June 20, 2011 (the "O&M Agreement"), between Longview Power and GenPower Services, LLC ("GenPower Services"), its non-Debtor affiliate, GenPower Services provides the Debtors with

---

[5]     PJM's coverage area includes Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia.

6

K&E 27326239
RLF1 9307692v.1

approximately 94 employees to manage, operate, and maintain the Power Facility.  None of these employees are represented by a collective bargaining unit.  Longview Power's corporate officers, including Longview Power's Chief Executive Officer and Chief Financial Officer, are also officers of GenPower Services.  GenPower Services is a lateral affiliate of the Debtors and is wholly-owned by GenPower Holdings (Delaware) L.P. ("GenPower Holdings"), the Debtors' ultimate parent.  GenPower Holdings and GenPower Services are not debtors in these chapter 11 proceedings.

### B.     Mepco

13.     As noted above, Mepco and its predecessors have engaged in coal mining and processing operations in and around West Virginia for more than 50 years.  Currently, Mepco owns or operates three active underground coal mines and one active surface mine located in northern West Virginia and southwestern Pennsylvania.  In addition to these four active mines, Mepco has one inactive underground mine and three additional mines which are in various stages of reclamation (i.e., the process by which the mining holes are refilled and replanted) to satisfy applicable environmental regulations.  Mepco's activities also include coal transportation, processing, treatment, and waste disposal.  In its various operations, Mepco employs approximately 550 individuals, including independent contractors.  None of Mepco's employees are represented by a collective bargaining unit.

14.     Mepco and its related operations were purchased by GenPower Holdings in 2007 to, among other things, provide the Power Facility with the coal necessary to support the Power Facility's operations.  In 2011, GenPower Holdings contributed Mepco to Longview Intermediate Holdings C, LLC, the direct parent of Longview Power and an above-captioned Debtor.  Mepco currently produces approximately 4 million tons of coal per year.  Approximately half of this volume is purchased by Longview Power through an intercompany

7

supply agreement, and this coal is delivered directly to the Power Facility on a 4-mile long conveyer belt stretching between Mepco's Four West Mine operations located near Bobtown, Pennsylvania and ending at the Power Facility. Mepco's remaining production is sold to third parties pursuant to long term supply contracts and, when the market is available, on a spot basis.

C.    **Dunkard Creek/AMDRI**

15.    The Debtors critically require water and waste water disposal services in their power generation and coal mining operations. Longview Power is a party to a water supply agreement with Dunkard Creek Water Treatment System, LLC ("Dunkard Creek")[6] and AMD Reclamation, Inc. ("AMDRI"), to fulfill these needs at Dunkard Creek's water treatment facility and at AMDRI's mine water treatment facility, both located in Greene County, Pennsylvania. In this process, Dunkard Creek supplies Longview Power with the water required to operate the Power Facility. AMDRI pumps and treats mine pool water from certain abandoned mines that, unless drained, flood the mines operated by Mepco; AMDRI also treats discharged water from the Power Facility and Dunkard Creek. The Debtors also hold an option exercisable at any time to purchase the Dunkard Creek water treatment facility and related operations at a purchase price equal to the balance of Dunkard Creek's outstanding indebtedness. As with GenPower Services, Longview Power's corporate officers, including Longview Power's Chief Executive Officer and Chief Financial Officer, are also officers of Dunkard Creek.

16.    Neither Dunkard Creek nor AMDRI is an obligor or guarantor under the Longview Credit Agreement. Rather, Dunkard Creek is a party to two separate credit facilities comprised of:  (a) approximately $130 million pursuant to a credit agreement, dated as of

---

[6]    Dunkard Creek is a wholly-owned subsidiary of GenPower Holdings, the Debtors' non-debtor parent. AMDRI is a non-profit entity organized under the laws of the Commonwealth of Pennsylvania. AMDRI's day-to-day operations are controlled by Dana Mining Company of Pennsylvania, LLC ("Dana PA"), an above-captioned Debtor, pursuant to a management services agreement between AMDRI, GenPower Services, and Dana PA.

8

May 18, 2009; and (b) approximately $25 million pursuant to a bridge loan agreement, dated as of May 18, 2009 (together, the "Dunkard Creek Facilities").  There is an aggregate indebtedness totaling approximately $125 million outstanding under the Dunkard Creek Facilities as of June 30, 2013.  Approximately $83.7 million of obligations arising under the Dunkard Creek Facilities are collateralized by letters of credit issued under the Longview Credit Facility.

## II.    The Debtors' Corporate and Capital Structure

17.    The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit A**.  As set forth on **Exhibit A**, Longview Power is wholly-owned by Longview Intermediate Holdings C, LLC.   In addition, Longview Intermediate Holdings C, LLC beneficially owns or controls 92.2 percent of the equity interests in Mepco Holdings, LLC, Mepco's holding company.   The remaining 7.8 percent of the equity interests in Mepco Holdings, LLC is owned by James Laurita, Jr., Mepco Holdings, LLC's President and Chief Executive Officer.  As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $1.1 billion and consisted of, among other things, funded debt under the Longview Credit Facility, obligations under an interest rate swap and electricity price hedges, and capital leases.   The primary components of the Debtors' consolidated funded debt obligations are described below.

### A.    The Longview Credit Agreement

18.    Each Debtor is party to that certain Credit Agreement, dated as of February 28, 2007 (as amended from time to time and with all supplements and exhibits thereto, the "Longview Credit Agreement"), by and between the Debtors and, among others, Citicorp North America, Inc., as administrative agent (the "Administrative Agent") and Union Bank, N.A., as collateral agent (the "Collateral Agent").  As amended, the Longview Credit Agreement provides the Debtors with two separate term loan facilities, a revolving credit facility, a synthetic

letter of credit facility, and a synthetic revolving credit facility, subject to the terms and conditions set forth therein (collectively, the "Longview Credit Facility").  As of the Petition Date, the balances outstanding under the Longview Credit Facility are summarized as follows:

| Subfacility | Maturity | Balance |
|---|---|---|
| Term Facility | February 2014 | $426 million |
| Term Facility | October 2017 | $473 million |
| Revolving Facility | February 2014 | $36.5 million |
| Synthetic L/C Facility | February 2014 | $69.5 million |
| Synthetic-Revolving Facility | February 2014 | $25 million |
| | Total | $1,030 million |

As part of the Longview Credit Facility, the Debtors have issued approximately $95 million of undrawn letters of credit, including letters of credit used to provide credit support for the Dunkard Creek Facilities.

19.    Obligations arising under the Longview Credit Facility were initially secured by liens on substantially all of Longview Power's assets.  The Longview Credit Agreement was subsequently amended pursuant to that certain First Amendment to Credit Agreement and Resignation and Appointment Agreement, dated as of June 20, 2011, by and between the Debtors and, among others, the Collateral Agent (the "First Amendment").  Pursuant to the First Amendment, the Debtors' lenders were granted a first priority lien in substantially all of Mepco's assets in exchange for, among other things, an extension of the date certain for completion of construction of the Power Facility from August 2011 to December 2011 due to the Contractors' construction delays and providing up to an additional $75 million under the Longview Credit Facility, including up to $25 million in availability for the revolving facility due in February 2014 and an additional $50 million for the term facility due in February 2017.  As a result, the Longview Credit Facility is secured by liens on substantially all the Debtors' assets, subject to customary exceptions and exclusions.

K&E 27326239
RLF1 9307692v.1

### B.    Hedging Obligations

20.    Longview Power is a party to an interest rate swap agreement with J. Aron & Company (the "Swap Counterparty"), pursuant to that certain ISDA Master Agreement, dated as of February 28, 2007 (the "Swap").  Swap Counterparty, Longview Power, and Union Bank, N.A. are also parties to that certain Accession Agreement, dated as of December 21, 2012 (the "Swap Counterparty Accession Agreement").  Pursuant to the Swap Counterparty Accession Agreement, obligations arising under the swap (collectively, the "Swap Obligations") constitute First-Lien Asset Secured Obligations secured by the Debtors' assets to the extent provided by the Longview Credit Agreement.

21.    Longview Power is also a party to electricity price hedges with:  (a) BP Energy Company ("BP Energy") pursuant to that certain ISDA Master Agreement, dated as of March 29, 2011, and a confirmation dated May 29, 2012 (collectively, the "BP Electricity Hedging Agreement"); and (b) EDF Trading North America, LLC ("EDF") pursuant to that certain ISDA Master Agreement, dated as of March 2, 2012, and certain confirmations entered into in June 2012 (collectively, the "EDF Hedging Agreement," and together with the BP Hedging Agreement, the "Electricity Hedge Agreements," and together with the Swap, the "Hedging Agreements").  BP Energy, Longview Power, and the Collateral Agent are also party to that certain Accession Agreement, dated as of June 20, 2011 (the "BP Electricity Hedge Accession Agreement"), and EDF, Longview Power, and the Collateral Agent are party to that certain Accession Agreement, dated as of March 2, 2012 (the "EDF Electricity Hedge Accession Agreement," and together with BP Electricity Hedge Accession Agreement, collectively, the "Electricity Hedge Accession Agreements").  Pursuant to the Electricity Hedge Accession Agreements, obligations arising under the Electricity Hedge Agreements constitute First-Lien

K&E 27326239
RLF1 9307692v.1

Asset Secured Obligations secured by the Debtors' assets to the extent provided by the Longview Credit Agreement.

22.     The Debtors estimate that, as of the Petition Date, their total exposure arising in the event of termination of the Hedging Agreements is approximately $5.4 million in the aggregate.

### C.     The Debtors' Other Obligations

#### 1.     The Mepco Capital Leases

23.     Mepco is party to approximately forty-five capital leases, pursuant to which Mepco makes monthly payments to the applicable lease counterparty and in return, Mepco is able to operate the machinery covered by the lease (collectively, the "Capital Leases").  The Debtors estimate that the obligations outstanding under the Capital Leases total approximately $27 million in the aggregate over the lifetime of the Capital Leases.

#### 2.     Alleged Mechanics' Liens

24.     Each of the Contractors has asserted mechanics' liens on the Power Facility and related properties (collectively, the "Alleged Mechanics' Liens"), which the Contractors assert arise from obligations the Contractors claim are owed in connection with the Power Facilities' construction.   The Debtors dispute the validity, perfection, and priority of the Alleged Mechanics' Liens and the Contractors' underlying claims in all respects.

#### 3.     Other Secured Claims

25.     In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert liens against the Debtors and their property (such as equipment) if the Debtors fail to pay for the goods delivered or services rendered.   These parties perform various services for the Debtors, including

K&E 27326239
RLF1 9307692v.1

manufacturing and repair of equipment and component parts necessary for the Debtors' mining, transporting, and energy production equipment.

## Part II.
## Events Leading to the Chapter 11 Cases

### I.      Power Facility Challenges

26.      The Contractors' Failures are the primary driver for the Debtors' operational and balance sheet challenges.  The Power Facility was constructed pursuant to a series of agreements under which Siemens was to lead a team of engineering, procurement, and construction contractors and deliver a fully integrated and complete facility that met all of the contractual specifications by a guaranteed completion date.  The primary pieces of equipment for this project consisted of a supercritical boiler designed and supplied by Foster Wheeler and a turbine island, automated computerized controls, and an air pollution control system designed and supplied by Siemens.  Kvaerner was the constructor of the Power Facility.

27.      The Debtors believe this project was fundamentally mismanaged. Longview Power was not able to take over the Power Facility until December 2011— approximately nine months after the guaranteed completion date—and the Power Facility has been plagued by unscheduled outages, extended planned outages, generation derating, and material repair obligations since that time.  These issues have prevented the Debtors from operating the Power Facility at full capacity and from selling electricity on anything other than a day-ahead basis, limiting the Debtors' sales and ability to sell higher-margin energy services, and reducing the revenue stream from Power Facility operations while increasing volatility around their cash flows.

K&E 27326239
RLF1 9307692v.1

II.     **The Arbitration Proceeding**

28.     As a result of the Contractors' Failures, Longview Power is party to a pending arbitration with the Contractors arising from the Power Facility's design and construction and the significant damages incurred by the Debtors as a result.  The Power Facility is subject to the Alleged Mechanics' Liens, which have been asserted by each of the Contractors on account of claims arising from the Power Facility's construction.  The Debtors, however, believe that they suffered significant damages as a result of, among other things, the Contractors' Failures, including the Contractors' failure to timely deliver the completed Power Facility that complies with the requirements of the applicable contracts.  At this time, the Debtors do not anticipate that the arbitration proceeding before the Arbitration Panel will conclude until the first quarter of 2015 at the earliest.  Given this timeframe and the complications the Alleged Mechanics' Liens have caused in the Debtors' capital structure, the Debtors may seek an expedited ruling on certain or all of the matters related to the arbitration proceeding in this Court.

29.     In connection with the construction of the Power Facility, the Debtors are the beneficiaries of two irrevocable letters of credit totaling in the aggregate approximately $59 million related to Foster Wheeler's agreement (the "Boiler Agreement") with Longview Power to provide the supercritical boiler and related equipment for the Power Facility (the "Foster Wheeler LCs").  The lenders under the Longview Credit Agreement have a first priority perfected security interest in the Foster Wheeler LCs.  The Debtors are permitted to draw on the Foster Wheeler LCs under certain circumstances, including if Foster Wheeler fails to perform its obligations pursuant to the terms of the Boiler Agreement.  Siemens and Kvaerner have also asserted an interest in the Foster Wheeler LCs under their contractual arrangements with Longview Power.

K&E 27326239
RLF1 9307692v.1

30.    The Debtors have sought to protect their assets, including the Foster Wheeler LCs, in a manner consistent with their fiduciary duties.  In 2011, Foster Wheeler sought a temporary restraining order against the Debtors to keep the Debtors from drawing on the Foster Wheeler LCs.  This action was resolved when the Debtors and Foster Wheeler entered into a settlement agreement, whereby the Debtors agreed to provide Foster Wheeler with seven days notice before making a draw request on the Foster Wheeler LCs, and the Debtors agreed not to transfer the Foster Wheeler LCs to either Kvaerner or Siemens.  Recently, however, Kvaerner, Siemens, and Foster Wheeler have requested that the Arbitration Panel compel the Debtors to escrow the Foster Wheeler LCs in an effort to block the Debtors from being able to draw on the Foster Wheeler LCs.  The Debtors have disputed these efforts, and have requested that the Arbitration Panel not escrow the Foster Wheeler LCs.[7]  As part of the proceedings before the Arbitration Panel, the Debtors agreed to not draw on the Foster Wheeler LCs until the earlier of September 13, 2013 or the date the Arbitration Panel issued its ruling on whether the Foster Wheeler LCs must be escrowed.  The Debtors will not draw on the Foster Wheeler LCs until after September 13, 2013, in accordance with their representations to the Arbitration Panel.

## III.    Economic Environment

31.    The Debtors' ability to manage through the challenges arising from the Contractors' Failures have also been affected by the current economic environment.  Wholesale electricity prices have fallen significantly since construction on the Power Facility began in 2007 as a result of, among other things, the broader recession that commenced around that time,

---

[7]    Importantly, even though the Foster Wheeler LCs are part of the lenders' collateral package, the Debtors' lenders are not party to the arbitration proceedings and are unable to protect any interest they have in the Foster Wheeler LCs in that forum.

K&E 27326239
RLF1 9307692v.1

resulting in reduced electricity demand and substantial reductions in natural gas prices. Lower natural gas prices have been caused, at least in part, by the rapid expansion of natural gas production and natural gas inventories arising from the discovery of new shale deposits and the development of new extraction techniques.[8] The presence of low-price natural gas reduces the variable costs of natural-gas fired power facilities and reduces the wholesale market price for all generators. Year-to-date, the average price per megawatt for electricity sold into the PJM on a day-ahead basis was approximately $33 per megawatt-hour—approximately 52 percent of the average power price forecasted for 2013 when construction began on the Power Facility in 2007.

32.     Wholesale coal prices have also continued to fall as global markets face oversupply and as U.S. power generators have continued to shift away from coal fired technologies. The Debtors believe this shift results from, among other things, increased costs associated with environmental and regulatory compliance and pressures resulting from fierce industry competition with natural gas-fired power facilities.[9] The coal industry as a whole has idled mines and reduced production in order to compete.

33.     Moreover, the power generation and coal production industries are highly competitive on both a regional and national level. For example, Mepco does not compete solely with other regional mines, but also competes against national and international competitors that transport coal into the region. Similarly, Longview Power competes to deliver electricity to PJM against other coal-fired power generation stations as well as natural gas-fired power, nuclear

---

[8]     See Johnsson & Chediak, *Electricity Declines 50% as Shale Spurs Natural Gas Glut: Energy*, Bloomberg (Jan. 17, 2012), available at http://www.bloomberg.com/news/2012-01-17/electricity-declines-50-in-u-s-as-shale-brings-natural-gas-glut-energy.html (last visited Aug. 18, 2013).

[9]     See U.S. Energy Info Admin., Short-Term Energy Outlook (Aug. 6, 2013), available at http://www.eia.gov/forecasts/steo/report/coal.cfm (last visited Aug. 14, 2013).

K&E 27326239
RLF1 9307692v.1

power, and renewable energy, among other sources.  This competitive environment has added an additional layer of complexity to the Debtors' existing challenges.

34.     The Debtors, however, believe they can compete effectively once they are no longer hamstrung by the Contractors' Failures.  As noted above, the Power Facility uses designs, equipment, processes, and technology that have made it one of the most efficient coal-fired power plants in the country—when the Power Facility can operate at full capacity.  In addition, the Power Facility's air emissions profile will allow it to compete more effectively against other power plants because it complies with current federal regulations that have caused other coal-fired power plant operators to incur significant costs in upgrading their facilities or to shut down.  In other words, the Debtors believe that the Power Facility will be able to compete, regardless of whether the current market trends continue, when it is fully operational and when the Debtors have  been able to restructure their balance sheet.

## IV.    Prepetition Lender Negotiations

35.     As noted above, approximately $557 million of obligations under the Longview Credit Facility will mature in February 2014.  At the same time, the Debtors recognize that the operational issues that have continuously arisen at the Power Facility have made it practically impossible for the Debtors to refinance this debt when it matures, or to sustain this level of debt moving forward—especially in light of current market conditions.  Recognizing this fact, the Debtors, their advisors, and their lenders, represented by the Steering Committee, have been engaged in ongoing, arm's length negotiations ahead of this maturity.

36.     In October 2012, the Debtors began discussions with the Steering Committee regarding the potential restructuring of the Debtors' balance sheet.  Both sides in this negotiation discussed transaction structures in an effort to reach a consensual resolution.  The arbitration and

K&E 27326239
RLF1 9307692v.1

related Alleged Mechanics Liens, however, created material uncertainty around the Debtors' post-restructuring capital structure.

37.      The Debtors have also recognized that they face an interest payment due on August 30, 2013 under the Longview Credit Agreement, which would reduce the Debtors' available liquidity and add distress on their business operations.  Thus, over the course of the past weeks, the Debtors and the Steering Committee have had significant negotiations over all aspects of a restructuring, and the Debtors and the Steering Committee have made considerable progress.  Although no deal has been reached, the Debtors remain confident that the parties will reach agreement on the terms of a plan of reorganization.  Such an agreement will allow the Debtors to continue to focus on providing clean, efficient electricity to the market.  In order to provide the Debtors with the tools necessary to continue negotiations and consummate a prospective restructuring, the Debtors have sought chapter 11 protection.

38.      The Debtors presently intend to draw on the Foster Wheeler LCs following the commencement of these chapter 11 cases.  The Debtors believe that it is proper to draw on the Foster Wheeler LCs to provide the estates with the liquidity necessary to continue operations and fund these chapter 11 cases and make needed repairs to the Power Facility.

**Part III.**
**First Day Motions**[10]

39.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I

---

[10]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

K&E 27326239
RLF1 9307692v.1

believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

## I.   Administrative and Procedural Pleadings

### A.   Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("Joint Administration Motion")

40.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order: (a) directing procedural consolidation and joint administration of these chapter 11 cases; and (b) granting related relief. Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the case of Longview Power, LLC. Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than Longview Power, LLC to indicate the joint administration of the chapter 11 cases.

41.     Given the integrated nature of the Debtors' operations, it is my understanding that joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

42.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

K&E 27326239
RLF1 9307692v.1

Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

**B.      Debtors' Application for Entry of an Order Approving the Employment and Retention of Donlin, Recano & Company, Inc. as the Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date ("Donlin & Recano Retention Application")**

43.      Pursuant to the Donlin & Recano Retention Application, the Debtors seek entry of an order: (a) approving the services agreement between the Debtors and Donlin, Recano & Company, Inc. and the Debtors' appointment and retention of Donlin Recano as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware, effective nunc pro tunc to the Petition Date; and (b) granting related relief. The Debtors will have thousands of potential creditors in these chapter 11 cases. Accordingly, Donlin & Recano's engagement is an effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of and developments in the Debtors' chapter 11 cases. Additionally, Donlin & Recano will significantly reduce the administrative burden on the clerk's office in connection with, among other things, the claims administration process. It is my understanding that Donlin & Recano is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in these chapter 11 cases and processing the claims filed in the Debtors' cases. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Donlin & Recano Retention Application should be granted.

**C.      Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("Creditor Matrix Motion")**

44.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate

K&E 27326239
RLF1 9307692v.1

mailing matrices for each Debtor; and (b) granting related relief.  The Debtors propose to retain Donlin & Recano as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices.  With such assistance, the Debtors will be prepared to file a computer-readable consolidated list of creditors upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have hundreds of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

45.    I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Donlin & Recano to promptly notice those parties. Maintaining electronic-format lists of creditors rather than preparing and filing separate matrices will maximize efficiency and accuracy and reduce costs.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be granted.

## II.    Operational Motions Requesting Immediate Relief

### A.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Adequate Protection Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), and (D) Granting Related Relief ("Cash Collateral Motion")

46.    The Debtors seek entry of an interim order and a final order:  (a) authorizing the Debtors to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code, subject to the terms and conditions set forth in the Cash Collateral Orders; (b) granting certain adequate protection to the Adequate Protection Parties; (c) scheduling a final hearing on the Cash Collateral Motion; and (d) granting related relief.

47.     The Debtors have set forth the material terms of the Interim Cash Collateral Order in compliance with the Local Rules in the Cash Collateral Motion.  As further described in the Cash Collateral Motion, the Debtors' access to Cash Collateral is absolutely necessary for preserving and maximizing value for the Debtors' stakeholders.  The Debtors use Cash Collateral in the ordinary course of their business to procure goods and services from vendors, to pay their employees, and to satisfy other working capital needs.  The Debtors seek to use Cash Collateral for these purposes, all in accordance with the budget annexed to the Interim Cash Collateral Order attached to the Cash Collateral Motion, with the understanding that the initial Budget will extend no further than the first business day that is 45 days from the Petition Date.

48.     Absent the Debtors' use of the Cash Collateral, the Debtors will be effectively unable to generate revenue, operate their businesses, or pay the hundreds of individuals who report to work each day.  In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible, and I believe that immediate and irreparable harm to the Debtors and their estates would occur.

49.     Thus, to prevent immediate and irreparable harm to the Debtors' businesses, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary for the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Collateral Motion should be granted.

**B.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management Systems, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Waiving the Deposit and Investment Requirements of Section 345(b) of the Bankruptcy Code, and (III) Granting Related Relief ("<u>Cash Management Motion</u>")**

50.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (I) authorizing the Debtors to (a) continue to operate their Cash Management Systems, (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue to perform intercompany transactions consistent with historical practice; (II) waiving the deposit and investment requirements of section 345(b) of the Bankruptcy Code; and (III) granting related relief.

51.     The Longview Debtors and the Mepco Debtors maintain two distinct cash management systems.  In the ordinary course of business, cash regularly flows between the Longview Cash Management System and the Mepco Cash Management System, and these flows are monitored and accounted for by the Debtors' treasury departments.

52.     Given the complexity of the Debtors' business operations, any disruption to the Cash Management Systems would unnecessarily disrupt the Debtors' day-to-day operations and thereby impede the prospects of a successful reorganization.  The Cash Management Systems are comparable to the centralized cash management systems used by similarly situated companies to manage the cash of numerous operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management Systems in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury departments maintain daily oversight over the Cash Management Systems and implement cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions.  Additionally, the

23

Debtors' corporate accounting, cash forecasting, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

53.     The Cash Management Systems are comprised of approximately 34 bank accounts at various financial institutions.   The Cash Management Systems are designed to effectively manage the inflow of revenue and disbursements for operating expenses.   It is critical that the Cash Management Systems remain intact to ensure seamless payments to vendors and continued collection of revenues for the Debtors' estates.

54.     In the ordinary course of business, the Debtors and certain non-Debtor affiliates maintain business relationships with each other resulting in intercompany receivables and payables in the ordinary course of business.   Such Intercompany Transactions are frequently conducted:  (a) between the Longview Debtors, on the one hand, and the Mepco Debtors, on the other hand; (b) among the Longview Debtors; (c) among the Mepco Debtors; and (d) between the Debtors and certain non-Debtor affiliates, including GenPower Services, Dunkard Creek, and AMDRI pursuant to prepetition service contracts.

55.     The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.   The Debtors, with their advisors, have also put in place monitoring systems to be able to track postpetition intercompany transfers.   If the Intercompany Transactions were to be discontinued, the Cash Management Systems and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors and their creditors and other stakeholders.

56.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges, and other fees, costs, and expenses.   Historically, it is my understanding that the Longview Debtors and the

K&E 27326239
RLF1 9307692v.1

Mepco Debtors estimate that they paid approximately $25,000 and $1,000, respectively, in Bank Fees each month, depending on transaction volume.   I also understand that the Longview Debtors and the Mepco Debtors estimate that there was approximately $25,000 and $5,000, respectively, in prepetition Bank Fees outstanding on the Petition Date.  To maintain the integrity of their Cash Management Systems, the Debtors request authority to pay the Prepetition Bank Fees, in addition to any other prepetition Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition.  The Debtors also request that their banks be authorized to charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business.

57.     As part of their Cash Management Systems, the Debtors utilize numerous preprinted business forms in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

58.     Given the complexity of the Debtors' business operations, I believe that any disruption to the Cash Management Systems could impede a successful reorganization of the Debtors' businesses.  I believe that the relief requested in the Cash Management Motion is in the

K&E 27326239
RLF1 9307692v.1

best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

  **C.**  **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, And Reimbursable Expenses, (B) Continue Ordinary Course Incentive Programs for Non-Insiders, and (C) Continue Employee Benefits Programs And (II) Granting Related Relief ("<u>Wages Motion</u>")**

  59. Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (I) authorizing, but not directing, the Debtors to:  (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, (b) pursuant to the Debtors' proposed final order, continue ordinary course incentive programs for non-insiders, and (c) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (II) granting related relief.

  60. It is my understanding that the Mepco Debtors employ approximately 550 individuals, including independent contractors, and that none of the Mepco Debtors' employees are represented by a collective bargaining unit.  The Longview Debtors do not directly employ any individuals.  Instead, pursuant to the O&M Agreement between Longview Power and GenPower Services, LLC, its non-Debtor affiliate, GenPower Services provides the Debtors with approximately 94 employees to manage, operate, and maintain the Power Facility. None of these employees are represented by a collective bargaining unit.  Employee-related expenses incurred by GenPower Services pursuant to the O&M Agreement are effectively pass-through expenses for the Longview Debtors.  The Longview Debtors reimburse GenPower Services on a monthly basis at cost (i.e., without a profit component) for all actual payroll costs, payroll taxes, reimbursable expenses, and costs associated with any employee benefit plan related to the management of the Power Facility.

K&E 27326239
RLF1 9307692v.1

61.    The Debtors' employees, including those employed by GenPower Services for whom the Longview Debtors reimburse GenPower Services pursuant to the O&M Agreement, perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization.    Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.    In many instances, the Debtors' employees include highly trained personnel who cannot be easily replaced.    Without the continued, uninterrupted services of their employees, effective reorganization of the Debtors will be materially impaired.

62.    I believe the vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.    Thus, employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their employees compensation, providing their employees benefits, and maintaining certain programs benefiting their employees.    Moreover, if the Debtors are unable to satisfy such obligations, employee morale and loyalty will be jeopardized at a time when employee support is critical.    In the absence of such payments, I believe that the Debtors' employees may seek alternative employment opportunities.    Further, it is my opinion that loss of valuable employees and the recruiting efforts that would be required to replace such employees would be distracting at a time when the Debtors should be focusing on maintaining their operations.

63.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages Motion should be granted.

### D. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (B) Granting Related Relief ("Critical Vendors Motion")

64.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of an interim and final order:  (a) authorizing, but not directing, the Debtors to pay prepetition claims held by Critical Vendors in an amount not to exceed $500,000 on an interim basis and $1.6 million on a final basis; and (b) granting related relief.

65.     In the Debtors' ordinary course of business, they rely on a range of vital raw materials, equipment, and services that are necessary for their electric power generation, coal mining and processing, and waste disposal operations —as well as the health and safety of their workers and employees.  The Debtors purchase such supplies, equipment, and services from a limited number of vendors and independent contractors.  Replacing such vendors—even when possible, which is often not the case—could also result in substantially higher costs for the Debtors and their estates.

66.     With the assistance of their advisors, the Debtors spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and/or impair going-concern viability.

67.     The Debtors seek to pay all or part of the Critical Vendor Claims up to the applicable Critical Vendor Cap to ensure that the Critical Vendors provide necessary goods and services to the Debtors on a postpetition basis.  The Debtors do not, however, seek to pay any

K&E 27326239
RLF1 9307692v.1

prepetition obligations of Critical Vendors arising under enforceable, long-term contractual relationships.

68.    Accordingly, the relief requested in the Critical Vendors Motion is narrowly tailored to facilitate the Debtors' restructuring efforts.  By contrast, the harm suffered by the estates if essential goods and services provided by the Critical Vendors are withheld would be irreparable to the Debtors' reorganization efforts and the successful emergence from these chapter 11 cases, and so I submit that payment of the Critical Vendor Claims is a sound exercise of business judgment and necessary to preserve the value of the Debtors' businesses.

69.    The Debtors' Critical Vendors are comprised of, among others, Health and Safety Suppliers and Servicers and Equipment and Raw Material Suppliers and Servicers.  These categories are discussed in turn.

### 1.    Health and Safety Suppliers and Servicers

70.    In order to ensure their employees' safety and comply with applicable government regulations, the Debtors purchase specific equipment, materials, and services from certain vendors to maintain safe working conditions at the Debtors' mines.  Because of the highly industry-specific nature of these and similar goods and services, as well as the strict regulatory conditions under which the Debtors and their vendors operate, the Debtors work with a limited number of safety-related vendors for whom there are few, if any, ready substitutes in the market.  Without the goods and services of the Debtors' health and safety vendors, the Debtors would be forced to discontinue their business operations or risk both the health and safety of their employees and noncompliance with important environmental regulations. Preserving the Debtors' access to these goods and services is therefore critically important to the Debtors' business operations and restructuring efforts.

K&E 27326239
RLF1 9307692v.1

71.     It is my understanding that some of these vendors will refuse to perform postpetition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations or otherwise endangering the health and safety of the Debtors' workers.  Any such potential violation of applicable governmental laws and regulations could cause governmental entities to attempt to levy fines or penalties against the Debtors or potentially require the closure of facilities, which could result in a shutdown of the Debtors' energy production and mining operations.  In addition, proper disposal of the regulated waste and chemicals on an uninterrupted basis will help to protect the environment and benefit the public health, including the health and safety of the Debtors' employees.

72.     Because the Debtors must comply with applicable governmental laws and regulations on a postpetition basis and cannot afford the potentially irreparable damage to their businesses that would be caused by adverse governmental action for regulatory noncompliance, I believe that the Debtors' ability to pay these vendors is essential to the Debtors' reorganization efforts.

## 2.     Equipment and Raw Material Suppliers and Servicers

73.     The Debtors rely on a number of Critical Vendors to supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods and services required to operate the Debtors' plants and ensure continuous business operations.  Such vendors are typically the only existing supplier, or one of a limited number of suppliers, for a particular part, supply, or service.

74.     In some cases, other suppliers cannot supply the required goods or services in sufficient quantity, quality, or reliability, or on a cost-efficient and timely basis in the appropriate geographic areas.  In other cases, even if a replacement vendor exists, the process of transitioning

K&E 27326239
RLF1 9307692v.1

the Debtors' business would take a great deal of time and would significantly disrupt the Debtors' businesses. I also believe that replacement limited-source vendors (with which the Debtors have no current relationship or course of dealing) may be unwilling to offer the Debtors acceptable credit or payment terms, given the Debtors' current financial situation and such vendors' lack of any relationship or history with the Debtors.

75.    Since the Debtors do not have viable alternatives to obtain substitute goods or services from other suppliers, they have determined that they must be able to satisfy the prepetition claims of these vendors, in the Debtors' discretion, to ensure the continued delivery of goods and provision of services to their operational locations without interruption.

76.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Critical Vendors Motion should be granted.

**E.    Debtors' Motion For Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Claims Of Shippers and Miscellaneous Lien Claimants, (B) Pay Section 503(b)(9) Claims, and (C) Grant Administrative Expense Priority to All Undisputed Obligations for Goods Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business and (II) Granting Related Relief ("Shippers and Lien Claimants Motion")**

77.    Pursuant to the Shippers and Lien Claimants Motion, the Debtors seek entry of an order: (I) authorizing the Debtors to (a) pay prepetition claims held by Shippers in an amount not to exceed $1.5 million and Lien Claimants in an amount not to exceed $2.3 million, absent further order of the Court, (b) pay Section 503(b)(9) Claims in an amount not to exceed $2.4 million absent further order of the Court, and (c) grant administrative expense priority to all undisputed obligations for goods and raw materials ordered prepetition and delivered postpetition and satisfy such obligations in the ordinary course of business; and (II) granting related relief.

31

### 1.    Shippers

78.    The Debtors' ability to produce and deliver coal and electricity in a timely manner depends on their prompt receipt of fuel, raw materials, and parts used in these operations, as well as the seamless interaction with various third-party service providers.  To that end, the Debtors heavily rely upon truckers, shippers, and other transportation service providers (collectively, the "Shippers") to ship, transport, and deliver raw materials and other goods used in the Debtors' mining, coal processing, waste hauling, and electricity generation activities.  Generally, the Shippers transport and deliver raw materials, parts, and components to the Debtors, as well as certain waste products generated from their mining operations to landfills.  The Debtors rely heavily on raw materials such as fuel oil, coal, and bulk chemicals and typically do not carry more than a half day of such supplies at any given time.  Absent access to these materials, the Debtors cannot mine coal or generate electricity.

### 2.    Lien Claimants

79.    The Debtors also routinely transact business with a number of third-party contractors and vendors who can assert liens against the Debtors and their property (such as equipment) if the Debtors fail to pay for the goods delivered or services rendered (collectively, the "Lien Claimants").  These Lien Claimants perform various services for the Debtors, including manufacturing and repair of equipment, and manufacturing component parts necessary for the Debtors' mining, transporting, and energy production equipment.

80.    The Debtors' staffing model places a great deal of importance on the services provided by these third-party equipment maintenance providers.  Unlike other energy companies, the Debtors' power plant and mining operations utilize minimal in-house maintenance staffing.  Although these employees are capable of performing routine maintenance, the Debtors supplement such employees' services with the highly specialized and qualified maintenance and

repair services provided by third parties on a regular or as-needed basis for the Debtors' specific equipment.

81.     Although the Debtors generally make timely payments to their vendors, as of the Petition Date, a substantial number of vendors may not have been paid for certain prepetition goods or services.  As a result, many of the Lien Claimants may have a right to assert and perfect mechanics' or artisans' liens against the Debtors' relevant facilities or the Debtors' goods or equipment, notwithstanding the automatic stay under section 362 of the Bankruptcy Code. Unless the Lien Claimants are paid for outstanding prepetition amounts, I believe Lien Claimants may refuse to perform their ongoing obligations with the Debtors, including installation, servicing, and warranty obligations, or may refuse to release finished goods in their possession. Moreover, the value of the materials in the possession of the Lien Claimants generally exceeds the value of their respective prepetition claims.

82.     The Debtors intend to pay prepetition Lien Charges only where they believe, in their business judgment, that the benefits to their estates from making such payments would exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

### 3.     503(b)(9) Claimants

83.     The Debtors may have received certain goods or other materials from various vendors within the 20 days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts; rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant might be able to refuse to supply new orders without payment of its prepetition claims.  I also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.  The Debtors do not seek to

accelerate or modify existing payment terms.  Rather, the Debtors will pay the 503(b)(9) Claims as they come due and in the ordinary course of business.

### 4.      Outstanding Orders

84.      Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods which will not be delivered until after the Petition Date.  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, I believe certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.

85.      Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Shippers and Lien Claimants Motion should be granted.

### F.      Debtors' Motion for Entry of an Order (A) Authorizing but not Directing the Payment of Certain Prepetition Taxes, Governmental Assessments, and Fees and (B) Granting Related Relief ("Taxes Motion")

86.      Pursuant to the Taxes Motion, the Debtors seek entry of an order:  (a) authorizing, but not directing, the Debtors to remit and pay certain prepetition taxes, governmental assessments, and fees in an amount not to exceed $2.6 million absent further order of the Court; and (b) granting related relief.

87.      In the ordinary course of their business, the Debtors collect, withhold, and incur production taxes, excise taxes, environmental and safety fees and assessments, sales taxes, use taxes, franchise taxes and fees, and property taxes, as well as other taxes, fees, assessments, and charges described in the Taxes Motion.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.

88.      The Debtors believe that many of the Taxes and Fees collected prepetition are not property of the Debtors' estates, but are rather held in trust and must, for that reason, be turned over to the applicable Governmental Authorities.  To the extent that such funds are not actually

34

property held in trust for the Governmental Authorities, they may well give rise to priority claims that must be paid in full eventually. Moreover, the Debtors also seek to pay certain prepetition Taxes and Fees in order to forestall Governmental Authorities from taking actions that might interfere with the Debtors' successful reorganization, which may include bringing personal liability actions against directors, officers and other key employees, whose full-time attention to the Debtors' reorganization efforts is required to avoid business disruptions. Any business disruptions resulting from such lawsuits could negatively impact the Debtors' restructuring prospects. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be granted.

G. **Debtors' Motion for Entry of Interim and Final Orders (A) Determining Adequate Assurance of Payment of Future Utility Services, (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief ("Utilities Motion")**

89.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) prohibiting utility companies from altering, refusing, or discontinuing services; (c) establishing procedures for determining adequate assurance of payment; and (d) granting related relief.

90.    In the ordinary course of their businesses, the Debtors incur utility expenses for electricity, natural gas, telephone, water, waste disposal, and other similar services from a number of utility companies or their brokers. On average, the Debtors pay approximately $800,000 each month for third party Utility Services, calculated as a historical average over a twelve-month period.

91.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption in utility services, even for a brief period of time, would disrupt the Debtors' ability

K&E 27326239
RLF1 9307692v.1

to continue operations and service their customers.  I believe this disruption would adversely impact customer relationships resulting in a decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that utility services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

   **H.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Honor Their Prepetition Insurance Premium Financing Agreements, and (C) Renew Their Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief ("Insurance Motion")**

   92.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders:  (I) authorizing the Debtors to (a) continue insurance coverage entered into prepetition; (b) honor their prepetition insurance premium financing agreements in an amount no greater than $680,000, absent further order of the Court; and (c) renew their premium financing agreements in the ordinary course of business; and (II) granting related relief.

   93.    In the ordinary court of business, the Debtors maintain insurance policies that are administered by multiple third-party insurance carriers.  These policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, marine liability, terrorism, pollution liability, umbrella coverage, and excess liability.  As I understand, generally the Debtors' Insurance Policies are financed through premium financing agreements with First Insurance Funding Corp. and Aon Premium Finance, LLC, with the exception of the Mepco Debtors' general liability, auto, property, and longshore and harbor workers' Insurance Policies.

   94.    I believe that continuation of the Insurance Policies and of the Premium Financing Agreements, and having the ability to renew or enter into new Insurance Policies and

36

Premium Financing Agreements, is essential to the preservation of the value of the Debtors' businesses, properties, and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

## I.    Debtors' Motion to Approve Continuation of Surety Bond Program ("Surety Bond Motion")

95.    Pursuant to the Surety Bond Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to continue and renew, in their sole discretion, their Surety Bond Program on an uninterrupted basis, including the maintenance and posting of collateral, subject to consultation with the Steering Committee and in accordance with applicable agreements; and (b) granting related relief.

96.    In the ordinary course of their businesses, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.  These include, among others: (a) obligations owed to municipalities; (b) obligations related to environmental regulatory agencies; and (c) obligations relating to obtaining permits or licenses.  Often, statutes or ordinances require the Debtors to post surety bonds to secure such obligations.  Failure to provide, maintain, or timely replace these surety bonds would prevent the Debtors from undertaking essential functions related to their mining operations.  As of the Petition Date, the Debtors have approximately $9.8 million in outstanding surety bonds.

97.    To continue their business operations during the reorganization process, the Debtors must be able to provide financial assurances to local governments, regulatory agencies,

and other third parties.  This in turn requires the Debtors to maintain the existing Surety Bond Program, including the existing cash collateral arrangements with the Sureties, and potentially to acquire additional bonding capacity as needed in the ordinary course of the Debtors' businesses.

98.     Continuing the Surety Bond Program is thus necessary in order to maintain the Debtors' current terms and existing relationships with their Sureties.  Based on the Debtors' current circumstances, I do not believe that it is likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties. The process of establishing a new surety bond program, moreover, would be highly burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the surety bonds in time to avoid defaults or other consequences of the applicable obligations.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Surety Bond Motion should be granted.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

.

K&E 27326239
RLF1 9307692v.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 30, 2013

Jeffery L. Keffer
Longview Intermediate Holdings C, LLC
President and Chief Executive Officer

## EXHIBIT A

**Corporate Organizational Chart**

GenPower Holdings GP, Ltd.
GP Interest
GenPower Holdings (Delaware), L.P.
100%
90.9% - 1,000 Class B Interests
100%
100%
Siemens Financial Services, Inc.
GenPower Services, LLC
Longview Intermediate Holdings A, LLC
Mepco SM, LLC
DCWTS Holdings, LLC
93%
100%
9.1% - 100 Class A Interests
7%
Longview Intermediate Holdings B, LLC
Dunkard Creek Water Treatment System, LLC
100%
James Laurita
Longview Intermediate Holdings C, LLC (DE)
92.2% - 59,104 Class B Interests
100%
7.8% - 5,000 Class A Interests
Mepco Holdings, LLC (DE)
Longview Power, LLC (DE)
Legend:
Debtor
Non-Debtor
100%
100%
Alternate Energy, LLC (DE)
Mepco Intermediate Holdings A, LLC (DE)
100%
Mepco Intermediate Holdings, LLC (DE)
100%
Mepco, LLC (DE)
Coresco, LLC (DE)
Dana Mining Company of Pennsylvania, LLC (DE)
Dana Mining Company, LLC (DE)
Mepco Conveyor, LLC (DE)
Shannopin Materials LLC (DE)
Border Energy, LLC (DE)

