**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LONGVIEW POWER, LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 13-12211-BLS<br><br>(Joint Administration Pending)<br><br>**Hearing Date: September 3, 2013 at 12:00 p.m. (noon) (E.T.)**<br><br>**Related to Docket No. 25** |

**FOSTER WHEELER NORTH AMERICA CORPORATION'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION TO THE ADEQUATE PROTECTION PARTIES, (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(B), AND (D) GRANTING RELATED RELIEF**

Foster Wheeler North America Corporation ("Foster Wheeler"), a creditor and party in interest in the above-captioned chapter 11 cases, hereby files this objection (the "Objection")[1] to the motion of the debtors (the "Debtors" or "Longview"), for entry of interim (the "Interim Order") and final orders (A) authorizing postpetition use of cash collateral, (B) granting adequate protection to certain Adequate Protection Parties, (C) scheduling a final hearing pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 4001(B), and (D) granting related relief [Docket No. 25] (the "Motion"). In support of the Objection, Foster Wheeler respectfully submits as follows:

---

[1] Contemporaneously filed herewith and appended hereto as Exhibit A is the *Declaration of Byron Roth in Support of Foster Wheeler North America Corporation's Objection to Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Adequate Protection Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), and (D) Granting Related Relief* (the "Roth Declaration"). The Roth Declaration supports the factual assertions contained in this Objection.

{00781378;v1 }                                          1

**PRELIMINARY STATEMENT**

1.     By the Motion, the Debtors state that they intend to draw on the Foster Wheeler LCs[2] during the week of September 25, 2013, which funds from such draw the Debtors will use after the Final Hearing.  *See* Motion at 5 n.4.  The Debtors' state that they "presently intend to draw on the Foster Wheeler LCs following the commencement of these chapter 11 cases" to "provide the estates with the liquidity necessary to continue operations to fund these chapter 11 cases and make needed repairs to the Power Facility."  *See* Keffer Declaration at ¶ 38.

2.     Any such draw by the Debtors of the Foster Wheeler LC's would be fraudulent.  The Debtors' right to draw the Foster Wheeler LCs has been hotly contested since at least 2009, when Kvaerner demanded that the Debtors transfer the Foster Wheeler LCs to the Kvaerner/Siemens consortium (the "Kvaerner/Siemens Consortium" or the "Consortium") so the Consortium could draw on them.  The Debtors refused.  The Debtors could not make the required certification that a Foster Wheeler performance failure had caused Debtors any quantifiable damages and it took no action to draw on the Foster Wheeler LCs on its own behalf or for the benefit of the Consortium.  Thereafter, over two years ago, the parties agreed to arbitrate all their disputes, including, any rights to draw on the Foster Wheeler LCs, before an Arbitration Panel with specific expertise in the highly technical field of power plant construction.

3.     In connection with the Arbitration, millions of pages of documents have been produced, over a hundred pleadings submitted, and industry experts (such as MIT faculty) have been retained for the purpose to decide, among other things, whether the Debtors may or may not draw on the Foster Wheeler LCs.  In fact, the Arbitration Panel was poised to rule tomorrow, September 4, 2013, whether the Foster Wheeler LCs should be placed in escrow pending a

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the *Declaration of Jeffery L. Keffer in Support of First Day Motions* [Docket No. 4] (the "Keffer Declaration").

resolution of the Debtors' right to draw thereunder.

4. Notably, the Debtors' pleadings in the Arbitration, and indeed, in any of the pleadings filed in these cases to date, assert no direct claims against Foster Wheeler. Thus, the Debtors' statement and pleadings conclusively demonstrate that the Debtors could not in good faith make the necessary certifications to draw on the Foster Wheeler LCs today – or at any time prior to a full and final determination of the highly technical and interrelated claims pending in the Arbitration.

5. In fact, the Debtors have not demonstrated a need to draw on the Foster Wheeler LCs at all as the Budget shows that the cash balance at the end of the Budget period, without the draws on the Foster Wheeler LCs, amount to $25 million, which is an <u>increase</u> of $3 million over the beginning of the six-week Budget period, without giving effect to any draws on the Foster Wheeler LCs. As Fed. R. Bankr. P. 4001 provides that the Court may approve only the amount necessary for the interim period, there is no need to include reference to the Foster Wheeler LCs in the Interim Order at all. Thus, to approve the use of cash collateral under the Interim Order, the Court need only review and approve the funds necessary for the Budget period. Thus, the Debtors attempt to draw on the Foster Wheeler LCs is no more than a strategy to gain a litigation advantage that they could not obtain outside of bankruptcy, rather than based on a valid liquidity concern or other economics of the case, under the cover of the respectability of this Court pursuant to its entry of the Interim Order.

6. Given that the Debtors' Budget clearly demonstrates that the Debtors will have sufficient cash flow to operate without the proceeds of the Foster Wheeler LC's until at least the week of October 11, 2013, the status quo of this charged and extensively litigated issue of the Debtor's ability to draw the Foster Wheeler LC's should be maintained until the Court hears and

determines whether the stay should be lifted so that the expert Arbitration Panel can decide the highly technical disputes of performance failures and delays to the Project's critical path in respect of the Power Facility, which are required to be determined before the Debtors may draw the Foster Wheeler LC's.[3]

## STATEMENT OF FACTS AND HISTORY OF ARBITRATION

I.  **The Factual and Legal Disputes That Must Be Resolved Before Any Draw on the Foster Wheeler LC's First Arose in 2008 and Are Presently Pending in a Multi-Party Intensive Arbitration That Was Commenced More Than Two Years Ago.**

   A. **The Debtors' Rights Under the Boiler Agreement and Foster Wheeler LC's Have Been Disputed Since Work on the Power Facility Began.**

7.  The Debtors' misrepresentations concerning the status of the Boiler Agreement and their right to draw on the Foster Wheeler LC's began as early as 2007. From the inception of the project, the Debtors surreptitiously assigned the Boiler Agreement and the Foster Wheeler LC's to the Kvaerner/Siemens Consortium which was unquestionably prohibited by the terms of the Boiler Agreement and created an hopelessly incurable conflict of interest. Moreover, when Foster Wheeler first became suspicious that assignments had occurred and questioned Longview, Longview consistently denied assigning the Boiler Agreement and LCs, culminating in a January 28, 2009 letter in which Longview stated:

> With respect to Foster Wheeler's concern that Longview [] has assigned the Boiler Island Supply Contract, Longview [] confirms that it has not assigned such contract to any party…
>
> The Boiler [Agreement] has not been assigned to [Kvaerner or Siemens] under the Coordination Agreement, nor has it been assigned to any other party under any other contract (other than the explicitly permitted assignment to lenders of Longview).

*See* Roth Declaration at Exhibit 1.

---

[3] Foster Wheeler submits that it will promptly file a motion seeking relief from the automatic stay in order to proceed with the Arbitration.

8.  Later Longview acknowledged that it did in fact purport to assign its right and duties under the Boiler Agreement and the Foster Wheeler LCs, including the duty to exercise its personal discretion.  Notably, the issue of which party has the rights to the Foster Wheeler LC's was argued in literally hundreds of letters from 2007 through 2011, during the course of the construction of the Power Facility.  The disputes ranged from scope, site conditions, labor productivity, and delays, to highly technical issues associated with heat transfer, heat flux, combustion properties and steam and fluid flow characteristics.  All of these factual and legal issues are now pending before an expert panel of arbitrators, i.e. the Arbitration Panel, who were specifically selected based upon their understanding and expertise in resolving complex engineering and construction disputes.

9.  When Longview's declining financial position and scheduled debt service obligations suggested that Longview may attempt to draw on the Foster Wheeler LCs without an appropriate basis to do so, Foster Wheeler immediately acted by filing a motion for a temporary restraining order in the Delaware Chancery Court on May 16, 2011, *Foster Wheeler North America Corporation v. Longview Power, LLC*, CA No. 6488-VCP.  Before the Chancery Court heard the motion, Longview and Foster Wheeler executed a settlement agreement requiring Longview to provide Foster Wheeler with seven days written notice prior to any draw or transfer of the Foster Wheeler LCs.  Shortly thereafter, on June 24, 2011, Kvaerner and Siemens initiated the pending Arbitration against Longview and Foster Wheeler, A.A.A. Case No. 50 158 T 00411 11 (the "Arbitration").  The four parties (the "Parties") then painstakingly negotiated the scope of the Arbitration and the method for selecting expert neutral arbitrators to preside over the Arbitration proceedings.

10. The agreed scope of the Arbitration is broad – and expressly includes all issues related to the Foster Wheeler LC's:

> The [P]arties may initiate and defend against claims arising out of any existing Letters of Credit in a judicial proceeding until such time as the Panel is confirmed, at which time *any claims and defenses arising out of any existing Letters of Credit shall be brought **only** before the Panel in the Arbitration and determined by the Panel*.

*See* Roth Declaration at Exhibit 2, Provision 6(c) (emphasis added).

### B. The Arbitration Governing the Parties' Rights and Obligations is Massive, Complex, and Has Been Ongoing for More Than Two Years.

11. On June, 24, 2011, approximately one month after Foster Wheeler's motion for a temporary restraining order was filed in the Chancery Court, Kvaerner and Siemens commenced the pending Arbitration against Longview and Foster Wheeler. Each of the Parties have filed comprehensive statements of claims involving hundreds of pages of narrative, multiple requests for productions of documents and for third party subpoenas, applications for rulings, and numerous procedural and substantive motions. The Pleadings Index, *see* Roth Declaration at Exhibit 3, demonstrates that 110 pleadings have been thus far filed in the Arbitration, including numerous omnibus rulings by the Panel addressing pre-hearing procedures, discovery disputes, trade secret issues, site inspections, and destructive testing of various material samples from the boiler. In sum, the Arbitration has been pending for over 2.5 years, and has been the subject of 32 million pages of documents, hundreds of claims, scores of witnesses, and dozens of experts, and involves highly technical engineering, chemical, and intellectual property matters, and more than $600 million dollars in dispute.

**II.     Foster Wheeler Will Ask This Court to Lift the Automatic Stay to Permit the Arbitration to Continue.**

12.     Foster Wheeler will promptly seek relief from stay to permit the Parties to continue in the Arbitration. The Arbitration Panel was painstakingly selected by agreement of all Parties after months of deliberation. The three arbitrators selected are among the most prominent lawyers in the construction bar, with over one hundred years of combined experience in resolving complex construction and engineering disputes. Arbitrator John Hinchey is arguably the nation's most prominent construction arbitrator. Arbitrators Alan Harris and Roy Mitchell have long been leaders of the construction bar; and all are members of the American College of Construction Lawyers.

13.     The three arbitrators, as the attached Pleadings Index shows, have been deeply involved in the Arbitration. The Panel has conducted two separate, all-day, in-person hearings in New York on various substantive issues and motions, and has conducted numerous, all-Party meetings and hearings by conference call. The Parties have also paid the arbitrators and the AAA hundreds of thousands of dollars to date for these services.

14.     The above-described issues undoubtedly lend themselves to review and analysis by experienced members of the construction bar, the very reason the Parties chose to proceed with an arbitration process and the selected arbitrators.[4]

---

[4] As will be described and fully briefed in Foster Wheeler's motion for relief from the automatic stay in order to proceed in Arbitration, in addition to being unauthorized by the terms of the Boiler Agreement and Foster Wheeler LCs, the Debtors attempt to circumvent the full, final, and fair litigation of the very issues relating to a draw on the Foster Wheeler LCs which are more appropriately before the Arbitration Panel. There is no dispute that the Parties have agreed to, and are subject to, valid and binding arbitration provisions governing any and all claims arising out of the Foster Wheeler LCs. As acknowledged by the Third Circuit, the Federal Arbitration Act (the "FAA") establishes "a strong policy in favor of arbitration . . . [which] requires rigorous enforcement . . . ." *Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222, 229 (3d Cir. 2006); *see also* 9 U.S.C. § 3 (requiring suits involving issues subject to an arbitration clause be stayed ". . . until such arbitration has been had in accordance with the terms of the agreement . . . ."). The FAA's mandate to enforce arbitration may be overridden only if "a party opposing arbitration can demonstrate that 'Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue,'" which, as will be described in Foster Wheeler's subsequent briefings, is not present here. Because there is no preclusion of a waiver in this case, this Court has no discretion and must allow Arbitration to

### III. The Arbitration Panel Is Able And Ready To Hear The Letter Of Credit Issue Immediately, And Had Already Scheduled The Hearing On This Very Issue For Wednesday, September 4, 2013.

15. Longview filed its petition in this case – at least in part – to avoid, rather than obtain a prompt and informed decision with respect to its rights under the Foster Wheeler LCs. Kvaerner filed a motion to transfer the Foster Wheeler LCs to escrow on August 9, 2013. Foster Wheeler and Siemens each joined in the request for the transfer of the Foster Wheeler LCs and requested an expedited briefing schedule due to concern of a Longview bankruptcy filing and/or draw. Longview specifically represented to the Parties and the Arbitration Panel that it would not draw on or take any other action affecting the Foster Wheeler LCs until mid-September or after the Arbitration Panel ruled. The Arbitration Panel accepted these representations and set a hearing for tomorrow, September 4, 2013, at 10:00 am E.S.T. to hear argument on the Foster Wheeler LCs issues. The Arbitration Panel also stated that it understood the urgency of the situation and would issue a prompt ruling.

---

continue.

Additionally, as will be briefed more fully in Foster Wheeler's motion for relief from stay to continue with the Arbitration, the Arbitration Panel will resolve all claims and disputes between and among Longview and the major contractors (Foster Wheeler, Kvaerner, and Siemens) who designed, supplied, managed, erected, and commissioned the Power Facility. Notably, the Arbitration Panel is set to resolve, (a) which party among Longview and the Consortium has title to the Foster Wheeler LCs, and (b) whether the conditions are present to allow any party to draw on the Foster Wheeler LCs and in what amount. In connection therewith hundreds of interrelated issues must be resolved, which are based on highly technical engineering issues related to construction and operation of the Power Facility and, notably, whether Longview itself is responsible for any of the Project delays or construction failures.

The finder of fact will receive reports and hear substantial testimony from many of the world's leading experts – in both the industry and academia – to resolve these complex, interrelated, and highly technical issues. Critical path scheduling analysis, productivity analysis, fuel chemistry, water chemistry, and highly technical welding qualification and analysis are but a few examples of the diverse technical matters directly related to each of the factual claims that must be decided to determine who may draw on the Foster Wheeler LCs and in what amount – if any. The Arbitration Panel has put in place a detailed procedure, which Longview wholeheartedly supported as recently as one-month ago, to fairly and efficiently develop these claims and corresponding defenses and to decide these issues as quickly and economically as is reasonably possible.

IV. **Longview Has Acknowledged To The Arbitrators On The Record That Is Has No Design Claims Against Foster Wheeler At This Time And Has Filed No Direct Claims Against Foster Wheeler In Its Pleadings and, Therefore, Has No Basis to Draw on the Foster Wheeler LCs.**

16. Notably, Longview has asserted no direct claims against Foster Wheeler in the Arbitration. *See* Roth Declaration at Exhibit 4. Instead, as recent as July 26, 2013, its arbitration counsel has admitted on the record that Longview does not have a good faith basis to make any design-related claims against Foster Wheeler to permit a draw on the Foster Wheeler LCs:

> ARBITRATOR HARRIS: Can you address their point, which is, until Longview alleges that there is something negligent in the design by Foster Wheeler, all this discussion we've had here [with respect to a discovery dispute] is not relevant to the arbitration?
>
> MR. WHITE: It's kind of an interesting question, Mr. Harris. It's like a chicken and an egg thing, right? I have to have a good faith basis for saying that. Until I have the ability to compare A with B, right, and say that you've departed from what are the requirements for a safe operation of this boiler, right, I can't make that claim in good faith.

*See* Roth Declaration at Exhibit 5, 83:10-25.

**ARGUMENT**

I. **The Debtors' Draw on the Foster Wheeler LCs Would Be Fraudulent.**

17. By the Motion, the Debtors seek to utilize funds resulting from a draw on the Foster Wheeler LCs, anticipated to be during the week of September 25, 2013, which the Debtors will use after the Final Hearing. *See* Motion at 5 n.4. The Debtors' state that they "presently intend to draw on the Foster Wheeler LCs following the commencement of these chapter 11 cases" to "provide the estates with the liquidity necessary to continue operations to fund these chapter 11 cases and make needed repairs to the Power Facility." *See* Keffer Declaration at ¶ 38. For a number of reasons, described more fully herein, any draw on the Foster Wheeler LCs by Longview would be fraudulently made and, otherwise, appears to be

made prior to the Debtors' cash requirements without any basis for such a premature draw. Thus, any rush to draw by the Debtors on the Foster Wheeler LCs under the cover of the respectability of this Court, through a Court order, would nonetheless be void, and are wholly unrelated to liquidity concerns. For these reasons, the Debtors should not be permitted to make any draws on the Foster Wheeler LCs until the Debtors right to do so has been adjudicated in the appropriate forum.

### A. The Debtors Have No Right to Draw on the Foster Wheeler LCs.

18.  As previously stated, the Debtors intend to draw on the Foster Wheeler LCs to fund their bankruptcy cases and make repairs to the Power Facility. *See* Keffer Declaration at ¶ 38. However, in lacking a right under state law to draw on the Foster Wheeler LCs, the Debtors have no right to make such draws and, if they chose to do so, would be drawing fraudulently.

19.  Irrespective of the commencement of the Debtors' bankruptcy cases, Longview's right to draw on the Foster Wheeler LCs remains subject to the state law-based contract that created this right. *See Butner v. U.S.*, 440 U.S. 48, 56 (1979) (noting that the holder of a property interest "is afforded in federal bankruptcy court the same protection he would have had under state law if no bankruptcy had ensued"); *see also In re Majestic Star Casino, LLC*, 716 F.3d 736, 751 (3d Cir. 2013) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" (quoting *Butner*, 440 U.S. at 54).). The filing of the Debtors' bankruptcy cases does not provide the Debtors an opportunity to circumvent state law to create new property rights where there were none, "for to do so would . . . allow a party to receive 'a windfall merely by reason of the happenstance of bankruptcy.'" *See In re Jason Realty, L.P.*, 59 F.3d 423, 427 (3d Cir. 1995) (quoting *Butner*, 440 U.S. at 56). Thus, the Debtors may not use this classification to create a new right for themselves to draw from these

funds when under the state law governing Foster Wheeler LCs, they would not be entitled to do so.

20. Longview has no legal right to draw on the Foster Wheeler LCs to fund the Debtors' bankruptcy case. Pursuant to Articles 6(B) and (F) of the Boiler Agreement, the Foster Wheeler LCs may be drawn upon <u>only</u> under the following certain circumstances:

> (i) if [Foster Wheeler] fails to perform its obligations pursuant to the terms of [the Boiler] Agreement, in which event [Longview] may draw the amount of costs and/or damages for which [Foster Wheeler] is responsible to [Longview] under this Agreement as a result of such failure; or
>
> (ii) the letter of credit has an expiration date prior to the date [Foster Wheeler] is obligated to maintain is in effect and [Foster Wheeler] fails to extend or replace the letter of credit at least twenty-one (21) days prior to the expiration date of the letter of credit. . . .

*See* Roth Declaration, Exhibit 6, at Art. 6(B) & 6(F). It is undisputed that the Foster Wheeler LCs have been extended and remain in effect. Accordingly, pursuant to Articles 6(B) and (F), the Debtor may only draw on the Foster Wheeler LCs upon Foster Wheeler's "fail[ure] to perform its obligations pursuant to the terms of the [Boiler] Agreement." *See id.* at Art. 6(B)(i) & 6(F)(i).

21. Additionally, as set forth in the Foster Wheeler LCs, in order to effectuate a draw on the Foster Wheeler LCs, Longview must certify the following to the issuing bank:

> FOSTER WHEELER NORTH AMERICA CORP. HAS FAILED TO PERFORM ITS OBLIGATION(S) PURSUANT TO THE TERMS OF THE AGREEMENT FOR BOILER ISLAND EQUIPMENT (THE "CONTRACT").
>
> THE UNDERSIGNED HAS NOTIFIED FOSTER WHEELER NORTH AMERICA CORP. IN WRITING OF SUCH FAILURE AND FOSTER WHEELER NORTH AMERICA CORP. HAS NOT RECTIFIED SUCH FAILURE AS REQUIRED AND TO THE EXTENT PERMITTED BY THE CONTRACT.
>
> AS A RESULT OF SUCH DEFAULT OR FAILURE TO PERFORM, THE UNDERSIGNED IS ENTITLED TO COSTS AND/OR DAMAGES FOR

> WHICH FOSTER WHEELER NORTH AMERICA CORP. IS RESPONSIBLE TO THE UNDERSIGNED UNDER THE CONTRACT IN AN AMOUNT EQUAL TO OR GREATER THAN THE AMOUNT OF ITS DEMAND BELOW.
>
> THE UNDERSIGNED HEREBY MAKES DEMAND UNDER THE ABOVE REFERENCED LETTER OF CREDIT FOR [$_____], WHICH IS NOT IN EXCESS OF THE STATED AMOUNT.

*See* Roth Declaration, Exhibit 7, at Annex 1, ¶ 2.[5] As set forth in Articles 6(B)(i) and 6(F)(i) of the Boiler Agreement (quoted above), the specific amount of damages to which the Debtors must certify is limited to only those damages resulting directly from Foster Wheeler's alleged failure to perform its obligations under the Boiler Agreement. *See* Roth Declaration, Exhibit 7, at Annex 1, at ¶ 2; *see also* Roth Declaration, Exhibit 6, Art. 6(B)(i) & 6(F)(i).

22.  There has been no demonstration, in the Motion or otherwise, that Foster Wheeler has failed to perform its obligations pursuant to the terms of the Boiler Agreement or the Foster Wheeler LCs, that Longview notified Foster Wheeler in writing of such failure to perform under the Boiler Agreement, or that Longview notified Foster Wheeler of the amount of direct damages resulting from Foster Wheeler's alleged failure to perform, *i.e.* the specific amount Longview wishes to draw from the Foster Wheeler LCs. Notably, in the papers, pleadings, and documents filed by Longview in these cases and in the Arbitration, there has been no assertion by Longview that they have specific and quantifiable claims against Foster Wheeler, that they have notified Foster Wheeler of such claims and that Foster Wheeler has failed to rectify such claims.

23.  Longview is in no position to make the required statements of default and

---

[5] Foster Wheeler LCs are comprised of a performance letter of credit pursuant to Article 6(B) of the Boiler Agreement (the "Performance LC") and a retention letter of credit (the "Retention LC") pursuant to Article 6(F) of the Boiler Agreement. With respect to the Retention LC, such letter of credit was initially executed in the amount of $203,975.00 and was subsequently amended and extended to include increases to the letter of credit such that the current amount of the subject letter of credit is valued at $19,023,489.50. The language set forth in Paragraph 19 below is found both of the Foster Wheeler LCs. *See* Roth Declaration at Exhibit 7.

certification of amount of damages. In fact, Longview has admitted that Kvaerner and Siemens are responsible for proper administration of the Boiler Agreement under the terms of a certain coordination agreement, including determinations of whether liquidated damages are due from Foster Wheeler. Thus, any certification of a draw upon the Foster Wheeler LCs by Longview would certainly be fraudulent, as Longview has repeatedly admitted that it lacks knowledge sufficient to certify that Foster Wheeler has failed to perform its obligations and has not cured such failure. As discussed above, as late as five weeks ago, on July 26, 2013, Longview's arbitration counsel stated that it does not have a design claim against Foster Wheeler. *See*, *infra*, ¶ 16.

24. Given the Debtors' lack of assertion of any quantifiable claims for failure to perform under the Boiler Agreement, and, indeed, their inability to certify critical information necessary to draw upon the Foster Wheeler LCs, the Debtor should not be allowed "to take unconscientious advantage of the situation and run off with [Foster Wheeler's] money on a pro forma declaration which has *[a]bsolutely no basis in fact*." *Intraworld Indus., Inc. v. Girard Trust Bank*, 336 A.2d 316, 325 (Pa. 1975) (emphasis in original) (internal quotations and citations omitted). The Debtors should not be permitted to make a draw on the Foster Wheeler LCs until it is shown that they have a right to do so. No such proof has yet been provided.

25. Challenges to the Debtors' right to draw on the Foster Wheeler LCs based in fraud need not require proof of actual fraud; rather, such challenges can include basic noncompliance with the required terms of the documents. *See Mennen v. J.P. Morgan & Co., Inc.*, 91 N.Y.2d 13, 21-22 (1997); *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 722 (N.Y. Cty. 1941).

26. In light of the foregoing, it is clear that the Debtors lack the authority to make

draws under the Foster Wheeler LCs and any such draw would be fraudulent.[6] Accordingly, the Debtors should not be able to use these bankruptcy cases, and this Court, to do what cannot be done under applicable non-bankruptcy law, *i.e.* draw on the Foster Wheeler LCs. Thus, the Motion must be denied to the extent it seeks to make such draws under the guise of the relief requested from this Court.

   **B. Foster Wheeler Will be Irreparably Harmed if the Debtors are Permitted to Draw on the Foster Wheeler LCs Prior to Adjudication Whether the Debtors Even Have Such a Right**

   27.   Should the Debtors be permitted to draw on the Foster Wheeler LCs to fund the Debtors' bankruptcy cases, Foster Wheeler will be irreparably harmed by (A) the Debtors likely inability to refund the drawn amounts, once such amounts are utilized by the Debtors as "cash collateral" to fund the Debtors' operations in their bankruptcy cases and (B) the irreparable damage to Foster Wheeler's business reputation if a wrongful draw upon the Foster Wheeler LCs occurs. Foster Wheeler will be looked upon by the power industry as having defaulted on its performance under the Boiler Agreement, which could compromise Foster Wheeler's ability to obtain work on future power plant projects. Again, the Debtors have not provided any reason for need to rush the draw on the Foster Wheeler LCs, other than the assumed attempt to moot the adjudication as to the propriety of such draws by the Debtors under the cover of a Court order approving the Motion. Moreover, as previously stated, the Budget reflects that there will be no decrease in the Debtors' cash balances but, rather, that the Debtors' cash balances will actually <u>increase</u> by $3 million during the Budget period and will, in fact, be at a healthy total of over $24

---

[6] As will be fully briefed in Foster Wheeler's motion for relief from stay to continue the Arbitration, based on the Debtor's series of fraudulent misrepresentations, Foster Wheeler was fraudulently induced by the Debtor to execute the Foster Wheeler LCs. Such fraudulent misrepresentations overshadow and "so vitiate[] the entire transaction that the legitimate purposes of the independence of the issuer's obligation [to honor a draw] would no longer be served." *Intraworld*, 336 A.2d at 324-25. Thus, any draw by the Debtors on the Foster Wheeler LCs, despite the Debtors' attempts to act under the cover of the respectability of this Court, would be fraudulent because such letters of credit were obtained fraudulently.

million. Without any need for this self-imposed haste, the Debtors attempt to draw on the Foster Wheeler LCs is no more than a strategy to gain a litigation advantage that they could not obtain outside of bankruptcy, rather than based on a valid liquidity concern or other economics of the case, under the cover of the respectability of this Court pursuant to its entry of the Interim Order.

### III.     At the Very Least, Preservation of the Status Quo Pending Resolution of the Arbitration is Necessary and Appropriate.

28.     Unless the Debtors agree that the Foster Wheeler LCs shall not be drawn until the Debtors' right to do so is adjudicated in the appropriate forum, Foster Wheeler respectfully requests that the Court modify the Interim Order so that the status quo regarding the Foster Wheeler LCs be maintained until the Parties can thoroughly brief, and the Court can adequately consider, whether relief should be granted so that Arbitration may continue.

29.     By the Debtors' admission, in both the Motion and the Budget proposed therein, the amount of funds from a draw on the Foster Wheeler LCs are not needed to fund their operations at all.  In fact, as previously stated, the Budget reflects that there will be no decrease in the Debtors' cash balances but, rather, that the Debtors' cash balances will actually <u>increase</u> by $3 million during the Budget period and will, in fact, be at a healthy total of over $24 million. Thus, the Debtors would not be prejudiced by the preservation of the status quo pending resolution of the whether relief should be granted so that the Arbitration may continue.

30.     Moreover, there is no need to include reference to the Foster Wheeler LCs in the Interim Order at all. Fed. R. Bankr. P. 4001 states that "the court may authorize the use of <u>only</u> that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(2) (emphasis added). Thus, to approve the use of cash collateral under the Interim Order, the Court need only review and approve the funds necessary for the Budget period.  Further, the Debtors expressly state that any funds

resulting from a draw on the Foster Wheeler LCs will not be used until after the Final Hearing and their Budget reflects that their cash flow will, in fact, <u>increase</u>.  Therefore, due to the lack of necessity under the applicable rules, and the express articulation by the Debtors that such funds will not be used on an interim basis, should the Court wish to approve the Motion on an interim basis, the Interim Order need not, and should not, include any references to the funds resulting from a draw on the Foster Wheeler LCs.

31.     Thus, in light of the foregoing, Foster Wheeler objects to the Motion to the extent that the proposed Budget and requested relief includes a draw by the Debtor on the Foster Wheeler LCs to fund the Debtors' bankruptcy cases and requests that, to the extent the Court intends to approve the Motion, it be limited to not include any draws by the Debtors on the Foster Wheeler LCs, such that the following modifications be made to the Interim Order approving the Debtors' Motion:

- Include the following proposed provisions:

  - Notwithstanding any provisions contained in this Interim Order to the contrary, the Debtors shall not make any draws on the Foster Wheeler LCs until further order of this Court and no amounts thereon constitute Cash Collateral or Prepetition Collateral of any kind.

  - The Debtors, Foster Wheeler, Siemens, and Kvaerner shall maintain the status quo pending the resolution of the issue as to whether relief shall be granted so that the Arbitration may proceed which includes, but is not limited to, the forbearance by the Debtors, Siemens, and Kvaerner from exercising any alleged rights to draw on the Foster Wheeler LCs or collect such funds thereon.

- Expressly remove from the Budget to be approved by the Interim Order any reference to funds from attempted draws on the Foster Wheeler LCs.

**IV**.   **Additional Objection to the Entry of the Interim Order**

32.     As the Debtors admit, *see* Motion at ¶19, Foster Wheeler is a holder of second

liens on the equity collateral under the Intercreditor Agreement and is, therefore, an Adequate Protection Party, as defined in and provided for under the Motion and Interim Order, and is entitled to adequate protection therewith.  Thus, Foster Wheeler demands to be included as an Adequate Protection Party.

## CONCLUSION

33.     Foster Wheeler does not object to the Debtors' attempts to reorganize under chapter 11 of the Bankruptcy Code or to their use of their cash collateral.  Rather, for the reasons described above, Foster Wheeler objects to the Motion to the extent draws on the Foster Wheeler LCs are contemplated in the Budget approved in connection with the relief sought by the Debtors in the Motion.  Any issues pertaining to the Foster Wheeler LCs should continue to be litigated through the pending Arbitration and, until the Court determines whether relief should be granted so that the Arbitration may continue, the status quo should be preserved by and between the Parties thereon.

Dated: September 3, 2013                              **ASHBY & GEDDES, P.A.**

　

　　　　　　　　　　　　　　　　　　　　　　　　*/s/ Karen B. Owens*
　　　　　　　　　　　　　　　　　　　　　　　　William P. Bowden (I.D. #2553)
　　　　　　　　　　　　　　　　　　　　　　　　Karen B. Skomorucha Owens (I.D. #4759)
　　　　　　　　　　　　　　　　　　　　　　　　500 Delaware Avenue, 8th Floor
　　　　　　　　　　　　　　　　　　　　　　　　P.O. Box 1150
　　　　　　　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19899
　　　　　　　　　　　　　　　　　　　　　　　　Telephone:  (302) 654-1888
　　　　　　　　　　　　　　　　　　　　　　　　Facsimile:  (302) 654-2067

　　　　　　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　　　　　　**WINSTON & STRAWN LLP**
　　　　　　　　　　　　　　　　　　　　　　　　Lawrence A. Larose, Esq.
　　　　　　　　　　　　　　　　　　　　　　　　Samuel S. Kohn, Esq.

Carrie V. Hardman, Esq.
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Counsel for Foster Wheeler North America Corp.*
*and Foster Wheeler AG*