## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In                                             re: | Chapter 11 |
| LONGVIEW POWER, LLC, et al.,[1] | Case No. 13-12211 (BLS) |
| Debtors. | **Hearing Date: October 7, 2013, at 9:00 a.m. EST**<br>**Debtors' Response Deadline: September 27, 2013** |

## KVAERNER NORTH AMERICAN CONSTRUCTION INC.'S OMNIBUS OPENING BRIEF IN SUPPORT OF (I) MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO CONTINUE THE PREPETITION ARBITRATION BETWEEN THE ARBITRATION PARTIES; (II) OBJECTION TO THE DEBTORS' PROPOSED DEMAND AND DRAW ON THE LETTERS OF CREDIT AS PROPERTY OF THE LONGVIEW ESTATE; AND (III) OBJECTION TO THE DEBTORS' USE OF THE PROCEEDS OF THE LETTERS OF CREDIT AS CASH COLLATERAL

**DORSEY & WHITNEY (DELAWARE) LLP**

Eric Lopez Schnabel (DE Bar No. 3672)
Robert W. Mallard (DE Bar No. 4279)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177

**DORSEY & WHITNEY LLP**

Neil E. McDonell, Esq.
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9200
Facsimile: (212) 953-7201

Jocelyn L. Knoll, Esq.
Eric Ruzicka, Esq.
50 South Sixth Street
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Kvaerner North American Construction Inc.*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors"). The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541. The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

# TABLE OF CONTENTS

**Page**

I.    Procedural History ........................................................................................1

II.    Summary of the Arguments ...........................................................................3

    A.    The Arbitration Motions ....................................................................3

        1.    The Court Does Not Have Jurisdiction to Hear the Arbitration Claims Including the Letter of Credit Issues and Related Kvaerner Application....................................................................3

        2.    Cause Exists to Grant Relief From the Automatic Stay at This Time and Allow the Arbitration to Continue, Including Resolving the Kvaerner Application and Related Letters of Credit Issues..................5

        3.    Should this Court Determine It Can Decide the Arbitration Claims, including the Letters of Credit Issues, the Court Should Decline to Exercise Its Discretion to Hear the Arbitration Claims and Related Letters of Credit Issues ................................................................6

    B.    Objection to the Debtors' Proposed Demand and Draw on the Letters of Credit as Property of the Longview Estate ..............................................7

    C.    Kvaerner's Limited Objection to the Debtors' Use of Cash Collateral on a Final Basis...........................................................................................8

III.    Statement of the Facts .................................................................................10

    A.    The Power Facility Agreements.........................................................10

    B.    The Coordination Agreement and Longview's Outright Assignment of Its Rights to the Letters of Credit to the Consortium...................................11

    C.    The Letters of Credit ......................................................................13

    D.    The Foster Wheeler May 2011 Delaware TRO ....................................14

    E.    The Arbitration and Arbitration Claims...............................................15

    F.    The Cash Collateral Motion..............................................................19

IV.    Argument In Support Of Motion For Relief From The Automatic Stay To Continue The Prepetition Arbitration Between The Arbitration Parties And Objection To The Debtors' Proposed Demand And Draw On The Letters Of Credit As Property Of The Longview Estate .....................................................21

i

A.     The Bankruptcy Court Lacks Subject Matter Jurisdiction Over the Claims in the Arbitration, Including, Without Limitation, the Letters of Credit Issues .................................................................................................... 21

     1.     The Bankruptcy Court Lacks Subject Matter Jurisdiction Over the Arbitration Claims Because the Arbitration Claims Do Not Derive Exclusively From the Bankruptcy Code .................................................... 24

     2.     Enforcement of the Arbitration Agreements by the Bankruptcy Court Would Not Jeopardize the Purposes of the Bankruptcy Code or Conflict With the Policy of the Bankruptcy Code ................................ 27

     3.     The Court Lacks Jurisdiction Over the Letters of Credit Issues ............... 32

          (a)     The Debtors Cannot Meet Their Burden to Prove the Letters of Credit Issues Arise Exclusively From the Bankruptcy Code ........................................................ 33

          (b)     Determination of Rights to the Letters of Credit by the Arbitration Tribunal Would Not Jeopardize the Purposes of the Bankruptcy Code or Conflict With the Policy of the Bankruptcy Code ........................................................ 35

     4.     Should this Court Determine it has Jurisdiction Over the Arbitration Claims, the Court Should Decline to Exercise Its Discretion to Hear the Arbitration Claims in Favor of Referring Them to the Tribunal ............................................................................... 36

B.     Cause Exists to Grant Relief From the Automatic Stay at This Time and Allow the Arbitration to Continue, Including Resolving the Kvaerner Application and Related Letters of Credit Issues ................................................... 37

     1.     Cause Exists to Lift the Automatic Stay to Allow the Entire Arbitration to Proceed at This Time ........................................................ 39

     2.     Cause Exists to Lift the Automatic Stay on a Limited Basis to Allow the Tribunal to Rule on the Letters of Credit Issues ...................... 42

C.     Objection to the Debtors' Proposed Demand and Draw on the Letters of Credit Because the Letters of Credit Are Not Property of the Longview Estate .................................................................................................... 44

     1.     Longview Made an Outright Assignment of the Letters of Credit to the Consortium ............................................................................... 44

     2.     As a Result of the Outright Assignment, the Letters of Credit and Proceeds Therefrom are Property of the Consortium, Not the Longview Estate .................................................................................. 48

V.      Argument in support of Kvaerner's Limited Objection to the Debtors' Use of
        Cash Collateral on a Final Basis ........................................................................................49

VI.     Conclusion .........................................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bigelow v. Green Tree Financial Serv. Corp.*,
   2000 WL 33596476 (E.D. Cal. Nov. 30, 2000) ...................................................... 39

*Cohen v. Ernst & Young, LLP (In re Friedman's, Inc.)*,
   372 B.R. 530 (Bankr. S.D. Ga. 2007) ................................................................. 39

*First Fidelity Bank v. McAteer*,
   985 F. 2d 114 (3d Cir. 1993) ........................................................................... 48

*General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*,
   891 F. Supp. 946 (S.D.N.Y. 1995) ..................................................................... 39

*Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   885 F.2d 1149 (3rd Cir. 1989) ..................................................................... 23, 33

*In the Matter of Gandy*,
   299 F.3d 489 (5th Cir. 2002) ........................................................................... 28

*In re American Classic Voyages*,
   298 B.R. 222 (D. Del. 2003) ....................................................................... 27, 28

*In re Anchorage Nautical Tours, Inc.*,
   102 B.R. 741 (9th Cir. 1989) ........................................................................... 49

*In re Candy Lane Corp.*,
   38 B.R. 571 (Bankr. S.D.N.Y. 1984) ................................................................. 46

*In re Carbone*,
   395 B.R. 631(Bankr. N.D. Ohio 2008) ......................................................... 50, 51, 52

*In re Cont'l Airlines*,
   91 F.3d 553 (3d Cir. 1996) ............................................................................. 50

*In re Cooley*,
   362 B.R. 514 (N.D. Ala. 2007) ..................................................................... 24, 31

*In re Cooper Mfg. Corp.*,
   344 B.R. 496 (S.D. Tex. 2006) ..................................................................... 45, 46

*In re Dewey Ranch Hockey, LLC*,
   414 B.R. 577 (Bankr. D. Ariz. 2009) ................................................................. 53

*In re DVI, Inc.*,
   305 BR 414 (Bankr. D. Del. 2004) ................................................................... 48

*In re Electric Mach. Enterprises, Inc.*,
    479 F.3d 791 (11th Cir. 2007) ........................................................................23

*In re Farmland Indus., Inc.*,
    309 B.R. 14 (W.D. Mo. 2004) ..............................................................25, 27, 28

*In re Fleming Cos., Inc.*,
    2007 WL 788921 (D. Del. Mar. 16, 2007) .........................................22, 23, 26, 36

*In re Freuhauf Trailer Corp.*
    2007 WL 676248 (Bankr. D. Del. Mar. 2, 2007).........................................25, 26

*In re Jason Realty, LP*,
    59 F. 3d 423 (3d Cir. 1995).................................................................47, 48

*In re Levitz Furniture Corporation*,
    267 B.R. 516 (Bankr. D. Del. 2000) .......................................................41

*In re Loewen Group Int'l, Inc.*,
    344 B.R. 727 (Bankr. D. Del. 2006) ................................................. passim

*In re Magness*,
    972 F.2d 689 (6th Cir. 1992) ..............................................................53

*In re Majestic Star Casino, LLC*,
    716 F.3d 736 (3d Cir. 2013)...............................................................26

*In re Moskowitz*,
    14 B.R. 677 (Bankr. S.D.N.Y. 1981)....................................................47

*In re New Century TRS Holdings, Inc.*,
    407 B.R. 558 (Bankr. D. Del. 2009) ......................................................24

*In re Olympus Healthcare Group, Inc.*,
    352 B.R. 603 (D. Del. 2006)......................................................25, 26, 33, 35

*In re Pursuit Athletic Footwear, Inc.*,
    193 B.R. 713 (Bankr. D. Del. 1996) ......................................................51

*In re Rexene Prods. Co.*,
    141 B.R. 574 (Bankr. D. Del. 1992) .................................................38, 41

*In re Roth American, Inc.*,
    975 F.2d 949 (3d Cir. 1992)................................................................19

*In re The SCO Group, Inc.*,
    395 B.R. 852 (Bankr. D. Del. 2007) ......................................................38

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999)..................................................................37

*In re TEU Holdings, Inc.*,
    287 B.R. 26 (Bankr. D. Del. 2002) .......................................................34

*In re White Mountain Mining Co.*,
    403 F.3d. 164 (4th Cir. 2005) ...............................................................27

*In re Winimo Realty Corp.*,
    270 B.R. 108 (2d Cir. 2001) ............................................................24, 28

*In re Wire Comm Wireless, Inc.*,
    2008 WL 4279407 (E.D. Cal. Sept. 16, 2006).............................31, 33, 34

*Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.* (*In re Nat'l Gypsum*),
    118 F.3d 1056 (5th Cir.1997) ........................................................23, 24, 27

*Leon v. Martinez*,
    84 N.Y.2d 83 (App. Ct. 1994) ...............................................................46

*McMahan Securities Co. L.P. v. Forum Capital Markets L.P.*,
    35 F.3d 82 (2d Cir. 1994)......................................................................39

*MFS Holding Ltd. v. Fiduciary Trust Co. Int'l*,
    435 F. Supp. 2d 285 (S.D.N.Y. 2006)...............................................45, 46

*Mintze v. American General Financial Services, Inc.*,
    434 F.3d 222 (3d Cir. 2006)............................................................. passim

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)............................................................................22, 36

*National Cable Television Cooperative, Inc. v. Broadstripe, LLC* (*In re Broadstripe, LLC*),
    2009 WL 774401 (D. Del. March 26, 2009)......................................26, 52

*Olde Discount Corp. v. Tupman*,
    1 F.3d 202 (3d Cir.1993).................................................................22, 36

*Pardo v. Akai Electric Co., Ltd.*,
    00-6793-LTS, 2001 WL 984678 (S.D.N.Y. 2001) ............................24, 28

*Penn Cent. Transp. Co. v. Irving Trust Co.*,
    594 F.2d 952 (3d Cir. 1979)..................................................................49

*Peterson v. Cundy (In re Peterson)*,
   116 B.R. 247 (D. Colo. 1990) .......................................................................41

*Shearson/American Express Inc. v. McMahon*,
   482 U.S. 220 (1987) ............................................................22, 25, 33, 36

*Tawil v. Finkelstein Bruckman Wohl Most & Rothman*,
   646 N.Y.S.2d 691 (App. Ct. 1996) ..............................................................47

*Worldcrisa Corp. v. Armstrong*,
   129 F.3d 71 (2d Cir. 1997) .........................................................................39

## STATUTES

9 U.S.C. § 2 ...............................................................................................21

9 U.S.C. § 3 .........................................................................................21, 22

9 U.S.C. § 4 ...............................................................................................22

11 U.S.C. 363(e) .................................................................................. passim

11 U.S.C. § 105 ...........................................................................................2

11 U.S.C. § 362(d) ...................................................................2, 37, 38, 41

11 U.S.C. § 541 .....................................................................................48, 49

11 U.S.C. § 541(a) .....................................................................................48

11 U.S.C. § 546(b)(2) .................................................................................10

11 U.S.C. § 549 .........................................................................................19

N.Y.U.C.C. § 5-114 ...................................................................................45

N.Y.U.C.C. § 5-114(b) ...............................................................................45

N.Y.U.C.C. § 5-114, cmt. 3 .......................................................................45

Section 5-1401 of the New York General Obligations Laws. .....................11

## OTHER AUTHORITIES

3 *Collier on Bankruptcy* ¶ 363.05[2] (15th ed. 2007) ................................54

Federal Rules of Bankruptcy Procedure Rules 4001 and 9014 .....................2

Local Rule 4001-1 .......................................................................................2

Kvaerner North American Construction Inc. ("Kvaerner"), [2] by and through the undersigned counsel, submits this omnibus opening brief (the "Opening Brief") in support of Kvaerner's (I) Motion for Relief from the Automatic Stay to Continue the Prepetition Arbitration Between the Arbitration Parties; (II) Objection to the Debtors' Proposed Demand and Draw on the Letters of Credit as Property of the Estates; and (III) Objection to the Debtors' Use of the Proceeds of the Letters of Credit as Cash Collateral.  In support hereof Kvaerner respectfully states as follows:

## I.       PROCEDURAL HISTORY

On August 30, 2013 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Court held a hearing on September 3, 2013 to consider the Debtors' first day motions (the "First Day Hearing").  On September 4, 2013, the Court entered an order directing the joint administration of these cases [Docket No. 95] under the above-captioned lead case number.  A committee of unsecured creditors has not been appointed in these cases [Docket No. 163].

On the Petition Date the Debtors filed their Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Adequate Protection Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief [Docket No. 25] (the "Cash Collateral Motion").  On September 3, 2013, Kvaerner filed its limited objection to the Cash Collateral Motion (the "Limited Objection") as well as a Cross-Motion for Limited Relief from the Automatic Stay to

---

[2] Unless otherwise defined herein or as defined below, capitalized terms shall have the meaning ascribed to them in the First Day Declaration or the Cash Collateral Motion.

1

Compel Arbitration on the Issues Regarding the Letters Of Credit (the "Cross-Motion") [Docket No. 57].

Subsequent to the First Day Hearing, the Court entered an order approving the Cash Collateral Motion on an interim basis [Docket No. 117] (the "Interim Cash Collateral Order"). The Interim Cash Collateral Order prevents the Debtors from making a draw on the Letters of Credit during the pendency of the Interim Cash Collateral Order until further order of the Court. The Interim Cash Collateral Order also contains a broad reservation of Kvaerner's rights with respect to the Letters of Credit, the Intercreditor Agreement, the Arbitration, the Disputed Mechanics' Liens, and the rights of offset or recoupment of any party. *See* Interim Cash Collateral Order, ¶¶ 26-27.

Also subsequent to the First Day Hearing, the Debtors, Steering Committee and Contractors agreed on a briefing schedule [Docket No. 157] (the "Briefing Schedule") for the parties to fully brief the objections and issues regarding: (a) whether or not the Court should lift the automatic stay to allow the Arbitration to immediately proceed in its entirety, including the Letters of Credit Issues and the related Kvaerner Application; (b) Kvaerner's objection to the Debtors' proposed demand and draw on the Letters of Credit as purported property of the Longview estate (the "Property of the Estate Objection"); and (c) Kvaerner's objection to entry of a final order granting the Cash Collateral Motion to the extent such cash collateral consists of the proceeds of the Letters of Credit (the "Final Objection").

On September 18, 2013, Kvaerner filed its motion pursuant to Sections 105 and 362(d) of the Bankruptcy Code, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Bankruptcy Court Local Rule 4001-1, for relief from the automatic stay for purposes of continuing the prepetition Arbitration between Debtor Longview Power,

LLC ("Longview") and the Contractors (the "Motion," and together with the Cross-Motion, the "Arbitration Motions").

This is Kvaerner's omnibus Opening Brief in support of the Arbitration Motions, the Property of the Estate Objection and Final Objection.

## II.    SUMMARY OF THE ARGUMENTS

### A.    The Arbitration Motions

#### 1.    The Court Does Not Have Jurisdiction to Hear the Arbitration Claims Including the Letter of Credit Issues and Related Kvaerner Application

1.    The Debtors commenced these cases in an apparent effort to forum-shop and avoid any rulings by the Tribunal in the complex Arbitration.  The Arbitration has been ongoing for over two years and involves the production of millions of pages of documents, numerous fact witnesses and construction industry experts, and hundreds of filings.  The Debtors should not be allowed to use the Bankruptcy Code and this Court to gain a tactical advantage and circumvent Arbitration, when, as discussed below, Congress, the United States Supreme Court and the Third Circuit each have established a strong policy in favor of arbitration, even in the context of a bankruptcy case.

2.    The Debtors are unable to meet their burden set forth in *Mintze v. American General Financial Services, Inc.*,[3] and as such the Court does not have subject matter jurisdiction, and therefore does not have discretion, to decide the Arbitration Claims.  First, the Arbitration Claims derive exclusively from state law, including, *inter alia*, numerous breach of contract claims governed by the laws of the State of New York.  *See supra*, Section III.E.  The mere possibility that the Arbitration Claims may now involve some aspects of bankruptcy law as a result of the bankruptcy filing does not mean the Arbitration Claims derive exclusively from

---

[3] 434 F.3d 222, 231 (3d Cir. 2006).

the Bankruptcy Code.    Second, the fact that a resolution of the Arbitration Claims by the Tribunal may involve property of the estate issues or claims by and against Longview does not mean that proceeding in arbitration would substantially conflict with any policies of the Bankruptcy Code.    As a result of the Debtors' inability to meet their burden, this Court does not have jurisdiction over any of the Arbitration Claims, and thus lacks discretion to hear such claims.

       3.    With respect to the limited question of whether or not the Court has jurisdiction to decide the Letter of Credit Issues, and in particular the Kvaerner Application, the answer is no. The Debtors freely admit they timed the filing of these chapter 11 cases because they did not want to take a risk that the Tribunal would act expeditiously and issue a ruling on Kvaerner's Application.    This is because such a ruling could have placed the Letters of Credit in escrow in order to protect the interests of the Consortium, as well as Foster Wheeler who joined in Kvaerner's Application.    The same legal analysis outlined above with respect to the Debtors' burden set forth in *Mintze* applies to the Letters of Credit.    First, notwithstanding that the Letters of Credit Issues may include a determination of whether the Letters of Credit are property of the Longview estate, the Letters of Credit issues, including the related Kvaerner Application (collectively defined as the "Letters of Credit Issues") do not derive exclusively from the Bankruptcy Code, but instead derive from state law.    Second, for these same reasons, allowing the Tribunal to resolve the Letters of Credit Issues, including whether they are property of the Longview estate, would not substantially conflict with the purposes of the Bankruptcy Code. Thus, the Court does not have jurisdiction or discretion to decide the Letters of Credit Issues.

**2.    Cause Exists to Grant Relief From the Automatic Stay at This Time and Allow the Arbitration to Continue, Including Resolving the Kvaerner Application and Related Letters of Credit Issues**

4.    The Court should grant the Motion and immediately allow the Arbitration to continue to a full resolution of all Arbitration Claims.  In the alternative, the Court should lift the stay to allow resolution of the Letters of Credit Issues by the Tribunal.  First, the Debtors will not suffer any prejudice, other than a perceived tactical disadvantage, as a result of all of the Arbitration Claims moving forward in the Arbitration at this time rather than resolving the Arbitration Claims on a piecemeal basis at some point in the future.  As discussed in detail in this Opening Brief, the Arbitration has already been ongoing for over two years.  Fact discovery, which included millions of pages of documents, is nearing completion; and the expert discovery and fact witness deposition phase was set to commence on an aggressive schedule.  Proceeding in the Bankruptcy Court would not lessen the complexity of the claims or reduce the amount of work required of all the Arbitration Parties, including Longview.  While the Arbitration is complex and involves substantial claims, in the overall context of these over $1 billion cases, proceeding with Arbitration would not present a roadblock or substantial impediment to the Debtors' attempts to restructure or otherwise resolve these bankruptcy cases.[4]  To the contrary, proceeding in Arbitration now would provide a benefit to the Debtors and would assist reorganization by determining the root cause of the Power Facility issues so appropriate steps can be taken to make the Power Facility operational and assess liability to the appropriate parties.

---

[4]  The Debtors listed four issues to be resolved in order to effectuate their operational and financial restructuring: (1) fix the plant; (2) resolution or settlement of the Arbitration; (3) resolution of Dunkard Creek issues; and (4) de-levering the companies.  *See* First Day Hr'g Tr. 14:6-16:11.  The Arbitration is only one of these four issues, and the Debtors can formulate a plan of reorganization that includes a placeholder for resolution of Arbitration in the event such resolution is not completed prior to confirmation of a plan.  Thus, resolution of the Arbitration by the Bankruptcy Court is not required in order for the Debtors to successfully reorganize.  In addition, there are numerous other ways under the Bankruptcy Code to conclude these bankruptcy cases—including without a reorganization.

5.      Second, continued enforcement of the automatic stay would result in considerable hardship to Kvaerner and the other non-debtor Arbitration Parties.  Like the other Arbitration Parties, Kvaerner has retained numerous experts in connection with the Arbitration.  These experts scheduled their time based on the current Arbitration schedule.  Any delay in this schedule, including delaying the Power Facility site visit in late October 2013, will create a hardship to Kvaerner if its experts are not able to inspect the Power Facility until at least May or June 2014, and who may be unavailable if the Court determines to lift the stay at some unknown point in the future.  Thus, a delay or piecemeal resolution of the Arbitration Claims would overwhelmingly prejudice Kvaerner and the other Arbitration Parties.

6.      Finally, there is a good probability of success—certainly more than the "slight" possibility courts require—that the Arbitration Claims will be decided in Kvaerner's favor. Furthermore, and in the face of any contentions to the contrary, based on the language of the relevant agreements, Kvaerner's claims cannot be called frivolous.  For these reasons cause exists to lift the automatic stay at this time to proceed with the entire arbitration.

7.      If the Court determines that the stay should not be lifted for the entire Arbitration, however, the same factors discussed above provide cause to lift the stay on a limited basis to allow the Tribunal to rule on the Letters of Credit Issues.  This would, *inter alia*, preserve the Arbitration Parties' status quo until the Tribunal can resolve whether the Letters of Credit are property of the Longview estate and then resolve the remaining underlying, intertwined disputes.

   **3.      Should this Court Determine It Can Decide the Arbitration Claims, including the Letters of Credit Issues, the Court Should Decline to Exercise Its Discretion to Hear the Arbitration Claims and Related Letters of Credit Issues**

8.      If this Court concludes it has jurisdiction over the Arbitration Claims or the Letters of Credit Issues, the Court should nonetheless decline to exercise its discretion and should instead refer such claims to the Arbitration.  In this case, the Federal policies, including

policies of the Supreme Court, the Third Circuit, and this District, in favor of arbitration would be well-served by this Court refusing to exercising its discretion and referring the Arbitration Claims and Letters of Credit Issues to the Arbitration.  As discussed herein, the procedural posture of the Arbitration is advancing through a very intensive fact discovery stage, and was set to proceed through a stage of expert discovery, including highly technical and complex issues. Resolution of the Arbitration Claims in this Court would not have a positive impact on the Debtors' reorganization efforts.  Instead, resolution of the Arbitration Claims in this Court would greatly distract the parties and this Court from resolution of the most integral issues to the bankruptcy proceedings, chiefly, the Debtors' operational and financial restructuring of these cases.  For these reasons, even if this Court finds it has jurisdiction over the Arbitration Claims, including the Letters of Credit Issues, the Court should decline to exercise its discretion and instead refer such claims to Arbitration.

**B.     Objection to the Debtors' Proposed Demand and Draw on the Letters of Credit as Property of the Longview Estate**

9.     If the Court finds that it has jurisdiction over the Letters of Credit Issues and exercises its discretion to resolve the Letter of Credit Issues rather than proceeding in the Arbitration, Kvaerner objects to the Debtors' proposed demand and draw on the Letters of Credit because the Letters of Credit are not property of the Longview estate.  First, the language of Section 8.2 of the Coordination Agreement unambiguously makes an outright assignment to the Consortium of Longview's rights to the Letters of Credit.   The Letters of Credit and Coordination Agreement are each governed by the laws of the State of New York.  In addition, the Letters of Credit are governed by the Uniform Customs and Practice for Documentary

Credits (the "UCP 500," attached as J.A. Ex. 7)[5] and New York law (including the New York

UCC). The language of Section 8.2 and the Letters of Credit is unambiguous in providing for an

outright assignment of Longview's rights, and even uses the phrase "expressly assigns."

Pursuant to New York law and the UCP 500, this demonstrates an undeniably clear intent on the

part of Longview to "assign a present right," and indicates an equally clear intent to make a

present assignment, which constitutes an outright assignment.

10.     The outright assignment occurred upon execution of the Coordination Agreement

on January 26, 2007. At that time, Longview transferred all of its rights, title, and interests in the

Letters of Credit to the Consortium. Thus, prior to the Petition Date, Longview did not have any

property interests in the Letters of Credit. The bankruptcy filing does not change this fact. For

these reasons, Longview does not have any interests in the Letters of Credit that would allow the

Debtors to demand and draw down the proceeds.

**C.     Kvaerner's Limited Objection to the Debtors' Use of Cash Collateral on a Final Basis**

11.     Kvaerner submits its Final Cash Collateral Objection on two limited bases. First,

Kvaerner objects to the Debtors' use of cash collateral to the extent such usage is conditioned on

a requirement that the Debtors' demand and draw on the Letters of Credit. Pursuant to Section

363(e) of the Bankruptcy Code, the Lenders are only entitled to "adequate" protection on

account of any diminution in the value of their cash collateral. As a condition for the Debtors'

use of cash collateral, the Lenders have demanded a cash-liquidity covenant that requires a

demand and draw in full on the Letters of Credit. The $59 million equity cushion created as a

result of the required demand and draw exceeds what the Lenders are entitled to as "adequate"

protection. The interim budget shows the Debtors will have a positive cash accrual continuing

---

[5] Kvaerner and Foster Wheeler, contemporaneously with the filing of their respective Opening Briefs, will file a Joint Appendix of exhibits. Exhibit contained in the Joint Appendix will be referred to herein as "J.A. Ex. __".

through the term of the six week budget in the amount of approximately $3 million. *See* Interim Cash Collateral Order, Ex. A. As a result of this positive cash accrual and the provision of adequate protection liens and superpriority claims, the Lenders are adequately protected without requiring the Debtors to demand and draw on the Letters of Credit. Given the Debtors' budget projections, it seems highly unlikely that their cash needs would change so drastically that the Debtors would need to demand and draw down the $59 million on an expedited basis. For these reasons, the Court should deny the Debtors' use of cash collateral on a final basis to the extent such use is conditioned by the Lenders on a demand and draw of the Letters of Credit because to permit such a demand and draw would provide the Lenders' with protections that far exceed what is "adequate" to protect their interests.

12. Second, the Debtors now seek this Court's imprimatur to demand and draw down the Letters of Credit so that they can meet the artificial cash-liquidity covenant imposed by the Lenders. Although the extent of the Consortium's interests in the Letters of Credit is in dispute, by the Debtors' own admission, Longview assigned an interest in the Letters of Credit to the Consortium. *See infra*, Section III.D. These competing interests are part of the Arbitration Claims that were scheduled to be resolved by the Tribunal when the bankruptcy filing imposed the automatic stay.

13. The Consortium, as a third party with an interest in the Letters of Credit, is entitled to the protections of § 363(e). There are no material unencumbered assets in these chapter 11 estates. *See* First Day Hr'g Tr. 42:23-43:3. As a result, there is no adequate protection the Debtors can provide to the Consortium to protect against the diminution in value of the proceeds of the Letters of Credit should the Debtors demand, draw and then exhaust the proceeds, and subsequently it is determined that the Debtors had no right to demand and draw in

the first place.  For these reasons, the Court should deny the Debtors' request for approval of Cash Collateral on a final basis to the extent the Lenders' condition the Debtors' use of Cash Collateral on a demand and draw of the Letters of Credit.

## III.    STATEMENT OF THE FACTS

Prior to the Petition Date, Kvaerner (formerly known as Aker Kvaerner Songer, Inc. and Aker Construction, Inc.) provided construction labor, services, and materials, along with Siemens and Foster Wheeler (collectively defined by the Debtors as the "Contractors") in connection with the Debtors' construction of the Power Facility located in Maidsville, West Virginia.  Longview has a real property interest in the parcels of real estate located in Cass District, Monongalia County, West Virginia (the "Longview Property"), upon which Longview constructed the Power Facility.[6]  The Power Facility, owned by Longview, is the largest privately-funded project in West Virginia history, with original overall costs exceeding $2 billion.

### A.    The Power Facility Agreements

On January 26, 2007, Longview and Kvaerner finalized the Construction Services Agreement (the "Services Agreement").  Pursuant to the Services Agreement, Kvaerner agreed to, among other things, construct the Power Facility, which construction included the installation of the boiler island equipment and the turbine island equipment.  Article 18.2 of the Services Agreement provides that "any dispute" not resolved by mediation "shall be subject to binding arbitration."

---

[6] The Longview Property is more particularly described in the Notice of Mechanic's Lien filed by Kvaerner on February 8, 2012, in Monongalia County, West Virginia (the "Notice of Mechanic's Lien"), which is attached as Exhibit 1 to the Notice of Kvaerner North American Construction Inc.'s Maintenance and Continuance of Mechanic's Lien Pursuant To 11 U.S.C. § 546(b)(2), filed on September 3, 2013 [Docket No. 54].

On January 26, 2007, Longview and Siemens finalized the Turbine Island Equipment Supply Agreement ("Equipment Supply Agreement").  Pursuant to the Equipment Supply Agreement, Siemens agreed to, among other things: (a) design and supply the turbine island and related equipment and services; and (b) design, engineer, procure, commission, start-up, and test the Power Facility.  Article 18.2 of the Equipment Supply Agreement provides that "any dispute" not resolved by mediation "shall be subject to binding arbitration."

On January 26, 2007, Longview and Foster Wheeler finalized the Agreement for Boiler Island Equipment (the "Boiler Contract") (together with the Services Agreement and the Equipment Supply Agreement, the "Construction Agreements").  Pursuant to the Boiler Contract, Foster Wheeler agreed to, among other things, design and supply the Power Facility boiler and related equipment and services including, without limitation: (a) all equipment and materials, (b) technical field assistance, and (c) technical and commercial support as reasonably required by the Contractors or Longview during implementation of the Power Facility project. Article 34 of the Boiler Contract provides that Foster Wheeler consents to "joinder" in "any" arbitration arising under the Services Agreement or the Equipment Supply Agreement.  Foster Wheeler further agreed to arbitration, along with Longview and the Consortium, in the January 10, 2012 Arbitration Agreement, which describes all of the disputes to be resolved in the Arbitration.

**B.      The Coordination Agreement and Longview's Outright Assignment of Its Rights to the Letters of Credit to the Consortium**

Longview, on the one hand, and Siemens and Kvaerner (together, the "Consortium"), on the other hand, also entered into the Coordination Agreement, dated January 26, 2007 (the "Coordination Agreement," and together with the Construction Agreements, the "Power Facility

Agreements"). [7] Article 2.14 of the Coordination Agreement, provides that "any disputes" under the Services Agreement, Equipment Supply Agreement, or the Coordination Agreement "shall be resolved" in accordance with "Article 18" of the Services Agreement and the Equipment Supply Agreement in a "single proceeding" and each party may be "joined in such proceeding." A copy of the Coordination Agreement is attached hereto as J.A. Ex. 1.

Pursuant to the Coordination Agreement, the Consortium agreed to take certain responsibilities for the power island supply, construction, commissioning, start-up and management of the Boiler Contract based, in significant part, on contractual obligations that Longview accepted vis-à-vis the Consortium in the Coordination Agreement.

To effectuate the agreement that the Consortium would manage Foster Wheeler, Longview's chosen boiler-supplier/designer, Longview agreed that it would assist with the Consortium's responsibility to manage Foster Wheeler, including, *inter alia*, by cooperating with the Consortium in connection with the administration and enforcement of the Boiler Contract. *See id*. § 8.2. Thus, Longview had affirmative obligations to assist in the management of Foster Wheeler, the boiler-designer/supplier Longview chose for the project. Longview repeatedly breached its express obligations to the Consortium, making it extremely difficult for the Consortium, including Kvaerner, to try to manage Foster Wheeler, whose boiler design the Debtors now single out as a chief failure leading to the Debtors' present problems. *See* First Day Affidavit, ¶¶ 5, 7, 26. As a result of the foregoing affirmative obligations, Longview did not have the passive role that the Debtors would now suggest to this Court it had. Instead, the Debtors attempted to sidestep Longview's own liability by opting for a new forum—this Court,

---

[7] Each of the Project Facility Agreements are to be governed by the laws of the State of New York, without reference to its conflicts of laws except Section 5-1401 of the New York General Obligations Laws. *See* Boiler Contract, Article 39; Coordination Agreement, § 11.9; Equipment Supply Agreement, § 19.10; Services Agreement, § 19.10, attached as J.A. Exs., 1 – 4.

which has not had the benefit of substantial time to study and contemplate the Arbitration Claims (compared to the Tribunal who first began a substantive review of the Arbitration Claims in November 2012).

In addition to its other retained contractual obligations to the Consortium, Longview contracted and agreed to, *inter alia*, assign and delegate its rights and obligations under the Boiler Contract to the Consortium—an outright assignment made and effective at the outset of the project.

Section 8.2 of the Coordination Agreement provides that:

> [Longview] expressly assigns and delegates to [the Consortium] . . . **all** rights and obligations of [Longview] under the Boiler Contract including the rights . . . to exercise the rights and remedies of [Longview] with respect to the Boiler Contract, **including** the right to make demand under any letter(s) of credit provided thereunder and any other security provided by [Foster Wheeler] under the Boiler Contract and initiate, prosecute and/or defend any arbitration or legal proceedings against [Foster Wheeler].

J.A. Ex. 1, at § 8.2 (emphasis added).  This broad language is an outright assignment to the Consortium of Longview's property interests in the Letters of Credit.

When a month later Longview closed on the Longview Credit Agreement, the Lenders were in possession of all of the previously executed Power Facility Agreements, including the Coordination Agreement.  As a result, the Lenders knew, or should have known, that the Letters of Credit had been assigned to the Consortium.  On the other hand, the Consortium was not in possession of all of Longview's and the Lenders' financing documents.  So the Consortium was never in a position to know what assets, or purported assets, Longview had pledged as collateral to secure the Longview Credit Facility.

## C.    The Letters of Credit

At the request of Foster Wheeler, on February 28, 2007, BNP Paribas issued two irrevocable letters of credit numbered 91895023 and 91895015 (the "Letters of Credit") for the

benefit of Longview.  The Letters of Credit were issued pursuant to the Boiler Contract, which is referenced in the opening paragraph of each Letter of Credit.  The Letters of Credit are governed both by the 1993 revision of the UCP 500 and New York law (including New York's UCC).  *See* J.A. Ex. 16, § 9.  The Letters of Credit were assigned outright, by contract, to the Consortium. *See*  J.A. Ex. 1, § 8.2.  As a result of the outright assignment, Longview no longer has any right to make demand and draw on the Letters of Credit.  Further, as a result of the outright assignment, even if Longview made a purportedly conforming presentment to BNP Paribas, such purported presentment would be void *ab initio*.

Consistent with this outright assignment, the Consortium, in March 2011, requested that Longview sign and deliver a Transfer Certificate relating to Letter of Credit No. 91895015 (the "Performance Letter of Credit").  *See*  J.A. Ex. 8, p. 450-53.  In August and November 2011, the Consortium again requested that Longview sign and deliver Transfer Certificates relating to each of the Letters of Credit.  *See id*. p. 454-57, 459-60.  Longview, however, refused to cooperate in the administration and enforcement of the Consortium's rights to the Letters of Credit and unjustifiably and unlawfully denied the Consortium's multiple requests, thus materially breaching the Coordination Agreement.  *See id*. p. 458, 461.

### D.    The Foster Wheeler May 2011 Delaware TRO

On May 16, 2011, shortly after Longview refused the Consortium's first request to sign a Transfer Certificate relating to the Performance Letter of Credit, Foster Wheeler commenced an action for a temporary restraining order against Longview in the State of Delaware Court of Chancery (the "TRO Action").[8]  Through the TRO Action, Foster Wheeler sought an order restraining Longview from drawing on the Letters of Credit, claiming that, *inter alia*, the Boiler Contract prohibited the assignment of such contract, including Longview's assignment of rights

---

[8] *Foster Wheeler North America Corporation v. Longview Power, LLC*, CA No. 6488-VCP.

to the Letters of Credit to the Consortium, and that Foster Wheeler would suffer irreparable harm due to Longview's inability to repay such money and the reputational harm to Foster Wheeler.

In its opposition to Foster Wheeler's motion for a TRO, Longview affirmatively argued that it "assigned the right to make a demand under FW's letters of credit" to the Consortium. *See* J.A. Ex. 9, p.4. This is directly contrary to the Debtors' representations to this Court during the First Day Hearing that the Letters of Credit "were never assigned. The steps needed to assign [the Letters of Credit] never occurred" and "nobody has complied with those terms in order to effect an assignment." *See* First Day Hr'g Tr. 88:6-9; 94:2-3. This is another example of the Debtors talking out of both sides of their mouths depending on which position best suits their needs.

Shortly after Foster Wheeler commenced the TRO Action, Foster Wheeler and Longview entered into a May 23, 2011, Settlement Agreement (the "<u>TRO Settlement Agreement</u>"); and, as a result, the TRO Action was dismissed. The TRO Settlement Agreement provides, in pertinent part, that Longview: (I)(a) would not draw on the Letters of Credit before July 1, 2011, and (b) shall give Foster Wheeler seven calendar days' written notice of any draw after July 1, 2011; and (II)(a) would not transfer the Letters of Credit to either of the Consortium members before July 1, 2011; and (b) shall give Foster Wheeler seven calendar days' notice of any transfer to the Consortium following July 1, 2011. *See* TRO Settlement Agreement, attached as J.A. Ex. 10. In entering into the TRO Settlement Agreement with Foster Wheeler, Longview impermissibly attempted to modify the Boiler Contract.

### E.    The Arbitration and Arbitration Claims

Execution of the Power Facility project presented enormous, unforeseeable challenges for Kvaerner that resulted in Kvaerner incurring staggering cost overruns and delays for which Longview and its chosen boiler supplier, Foster Wheeler, are responsible. As a result, on

June 24, 2011, Kvaerner commenced an arbitration proceeding with Siemens as co-claimant, against Longview and Foster Wheeler (Kvaerner, Siemens, Foster Wheeler and Longview together are the "Arbitration Parties"), seeking a determination of the Consortium's various claims against Longview and Foster Wheeler arising from the Power Facility project (the "Arbitration").[9]

In connection with the Arbitration, the Arbitration Parties entered into an Agreement Regarding the Selection of Neutral Arbitrators on January 10, 2012 (the "Arbitration Agreement") (*see* J.A. Ex. 15), whereby the Arbitration Parties agreed, *inter alia*, upon a process to select the arbitrators.  The Arbitration tribunal panel (the "Tribunal") is comprised of a three-person panel of highly experienced and respected construction law attorneys (*see* J.A. Ex. 18), all of whom were carefully vetted by each of the Arbitration Parties, including Longview.  After their selection in September 2012, the Tribunal began a substantive review of the Arbitration Claims beginning in November 2012.  The Tribunal is thus well along in the learning curve and best situated to reach a resolution that is fair to all the Arbitration parties.  The Arbitration Agreement further recognized that the parties thereto, including Longview, agreed that all disputes regarding the Power Facility, including all disputes arising from the performance of the applicable Power Facility Agreements, would be submitted to binding arbitration (the "Arbitration Claims").  Kvaerner, Siemens and Longview also agreed that any future court actions to foreclose on any mechanic's lien would be stayed pending completion of the Arbitration.  *See id.*

The Arbitration Claims are asserted amongst the various Arbitration Parties as follows:

---

[9] The Arbitration is captioned *Kvaerner North American Construction Inc. and Siemens Energy. Inc. v. Longview Power, LLC and Foster Wheeler North America Corporation*, AAA Case No. 50 158 T 00411 11.  The Arbitration was stayed as to the Debtors upon the commencement of the instant chapter 11 cases.

- Kvaerner asserts claims against Longview directly, and against Longview and Foster Wheeler jointly and severally. These claims arise out of, *inter alia*, changes in the scope and design of the project, force majeure events, provision of deficient designs and materials, failure to provide materials in a pre-assembled and/or modularized manner, material substitutions, failure to provide technical field assistance, material damage, interruption of steam blow and commissioning activities, deficient operation of the boiler, failure to disclose material information during the bid phase, unpaid milestone invoices; and an improper draw on a letter of credit issued by Kvaerner pursuant to the Services Agreement. *See* Claimant Kvaerner North American Construction Inc.'s Statement of Claim, pp. 2-4, 36-44, attached as J.A. Ex. 11.

- Siemens asserts claims against Longview for alleged breaches under the Equipment Supply Agreement and the Coordination Agreement. Siemens, as a party to the Coordination Agreement, also asserted claims against Foster Wheeler arising out of Foster Wheeler's numerous breaches under the Boiler Contract. Siemens also joined in Kvaerner's Force Majeure claims and claims against Longview and Foster Wheeler for delays in the Power Facility Project. *See* Siemens Energy, Inc.'s Preliminary Statement of Claim, pp. 21-25, attached as J.A. Ex. 12.

- Longview asserts claims against Kvaerner and Siemens for alleged breaches under the Services Agreement and the Equipment Supply Agreement. Longview did not assert any direct claims against Foster Wheeler. Instead, in the event Longview is found liable to Kvaerner and/or Siemens for damages related to Foster Wheeler's performance under the Boiler Contract, Longview asserted contingent cross-claims against Foster Wheeler for those damages. Longview also asserted a contingent cross-claim against Foster Wheeler in the event that the assignment under the Boiler Contract to the Consortium was ineffective and Foster Wheeler is liable directly to Longview for damages. *See* Respondent Longview Power, LLC's First Amended Answer, Counterclaims and Cross-Claims, pp. 42-44, attached as J.A. Ex. 14.

- Foster Wheeler asserts claims against Longview for Longview's breaches under the Boiler Contract. While Foster Wheeler did not assert claims against Kvaerner or Siemens, it reserved the right to assert claims jointly and severally against Kvaerner and Siemens in the event that the Boiler Contract assignment to the Consortium is valid and enforceable. *See* Foster Wheeler North America Corporation's Statement of Claim and Response to Kvaerner North American Construction Inc.'s Statement of Claim, attached as J.A. Ex. 13.

In connection with the Arbitration, each of the Arbitration Parties has filed comprehensive statements of claims and cross-claims (listed above), multiple requests for productions of documents and for third-party subpoenas, applications for rulings, and numerous

procedural and substantive motions.    To date, hundreds of filings have been made in the Arbitration, including numerous omnibus rulings by the Tribunal addressing pre-hearing procedures, discovery disputes, trade secret issues, site inspections, and destructive testing of various material samples from the boiler.    Over 32 million pages of documents have been produced to date and scores of fact witnesses have been identified.    The Arbitration includes dozens of industry experts and involves highly technical engineering, chemical, and intellectual property matters, and millions of dollars in dispute.    Fact witness depositions and expert discovery were set to commence on an aggressive schedule until the Arbitration was stayed by the Debtors' bankruptcy filing.

The Arbitration Parties' competing claims to the proceeds of the Letters of Credit directly relate to and constitute important components of the Arbitration Claims.    As discussed in the Limited Objection and at the First Day Hearing on August 9, 2013, Kvaerner applied to the Arbitration Tribunal for the Letters of Credit to be placed into escrow with the Tribunal. Kvaerner made this request in order to preserve the status quo pending a determination of the various parties' rights to the Letters of Credit (the "Kvaerner Application").[10]  *See* J.A. Ex. 8. The Tribunal established a briefing schedule for the parties to respond to Kvaerner's Application.[11]    The deadline for Longview to file its response in the Arbitration was August 30, 2013, the same date as the Petition Date.    It was expected that the Tribunal would promptly rule on the Kvaerner Application once Longview filed its response, and after a telephonic hearing on September 4, 2013, where all parties could be heard.

---

[10] Kvaerner requested this relief because, as a result of the Outright Assignment, Longview's property interests in the Letters of Credit transferred to the Consortium at the time of the assignment under the Coordination Agreement.

[11] In this context, as the Court is aware, on or about August 17, 2013, Longview specifically agreed that it would "not draw down or take any prejudicial action to further encumber the referenced Letters of Credit in Kvaerner's Application to Transfer, Etc., for a period of 30 days or until the Tribunal has ruled on this issue, whichever occurs first."  *See*  J.A. Ex. 6.

The Arbitration Parties had scheduled a site visit in late October 2013, when the Power Facility would go into a pre-planned maintenance shut-down, which would allow the industry experts to perform their due-diligence, inspect the Power Facility, and prepare their expert reports.  This inspection is aimed, according to Longview, at investigating the cause of the Power Facility operational problems as well as finding the appropriate fix.  The next planned Power Facility maintenance shut-down is not scheduled until at least May or June 2014.  The industry experts Kvaerner retained in connection with the Arbitration scheduled and committed their time based on the Arbitration schedule in place as of the Petition Date.  Any delay in this schedule will create a hardship to Kvaerner if its experts are unavailable if the Court determines to lift the stay at some unknown future date.

Before the imposition of the Automatic Stay, the Arbitration schedule included a final hearing slated to commence in October 2014.  Given the complexity of the Arbitration, the number of claims and facts involving Longview as the owner of the Power Facility, and the many technical issues to be considered, the time scheduled for final resolution of the Arbitration is as aggressive as possible.  It is now apparent that the Debtors' view of Longview's prospects in the Arbitration, after reviewing the results of document discovery and evaluating Longview's potential liability, has led to the Debtors' present forum-shopping.

### F.        The Cash Collateral Motion

The Debtors assert that the Letters of Credit are valuable estate assets and part of the Lenders' pre-petition collateral package.[12]  *See* First Day Affidavit, ¶ 5.  The Debtors have

---

[12] The Debtors argued that "exercising our rights under [the Letters of Credit] is an ordinary course proposition," and they do not need Court approval to draw down on the Letters of Credit.  *See* First Day Hr'g Tr. 86:18-20.  This argument is without merit.  Longview did not take any steps to demand and drawn on the Letters of Credit for at least the last two years, and only makes this argument now that the Debtors have filed for bankruptcy.  For the Debtors to now say they can demand and draw on the Letters of Credit strains credibility because it is not of the type or nature of transactions that Longview would likely enter in the course of its normal, daily business.  *See In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992).  The Debtors' thus cannot demand and draw on the Letters of

further represented that they must draw on the Letters of Credit to "provide the estates with the liquidity necessary to continue operations to fund these chapter 11 cases and make needed repairs to the Power Facility." *See* First Day Affidavit, ¶ 38.  As the Court correctly noted at the First Day Hearing, the Debtors have been suffering a liquidity crisis for several years.  The Court also noted the Debtors' situation has not changed and the issues with the Power Facility are not new or a surprise.  *Id*. 92:4-10.  Yet, in the past two years, if not longer, the Debtors have neither transferred the Letters of Credit to the Consortium nor made a demand and draw on the Letters of Credit despite now claiming they have the right to do so at any time.  *Id*. 92:11-24.  The Debtors' answer to the Court's questions of why they had not made a demand and drawn in the past and why they need the proceeds now was twofold, i.e., "things have changed" and a possible "emergency."  *Id*. 93:3-4.  Neither of which provides justification for the Debtors' sudden about-face.

The Court enjoined the Debtors from demanding and drawing on the Letters of Credit without further order of the Court.  As result of the Court's order, the Lenders agreed to delay the timing of the Debtors' required demand and draw on the Letters of Credit from the week of September 25 to October 9, 2013.  However, as a condition for the Debtors' use of cash collateral on a final basis, the Lenders cash-liquidity covenant requires the Debtors to demand and draw on the Letters of Credit.  *See* First Day Hr'g Tr. 89:6-18.  The interim budget shows that the Debtors will have a positive cash accrual continuing through the term of the six week budget in the amount of approximately $3 million.  *See* Interim Cash Collateral Order, Ex. A.

---

Credit absent a motion, notice and court approval.  The Debtors' Cash Collateral Motion should be deemed a request for approval to demand and draw on the Letters of Credit and the Court should deny that request.  In that event, until the Letters of Credit Issues, including whether they are property of the Longview estate and the presentment predicates have been met, are resolved by the Tribunal or a final non-appealable order of this Court, or any court or forum of competent jurisdiction, any demand and draw on the Letters of Credit without court approval would be void *ab initio* and recoverable pursuant to 11 U.S.C. § 549.

Contrary to counsel to the Debtors' statements at the First Day Hearing (*See* First Day Hr'g Tr. 108:22-109:3), the cash accrued during the interim budget period is sufficient to pay the Debtors' employees and make other payments contemplated by the orders approving the First Day Motions.  The Lenders are thus requiring the Debtors to maintain an equity cushion of $59 million regardless of the Debtors' actual cash needs.

As a result of the positive cash accrual and the adequate protection liens and superpriority claims, the Lenders are adequately protected without permitting the Debtors to demand and draw on the Letters of Credit.  Other than some statements on the record at the First Day Hearing about potential emergencies, the Debtors have not provided any facts in support of their actual operational needs that allegedly require a demand and draw on the Letters of Credit.[13]

## IV.    ARGUMENT IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO CONTINUE THE PREPETITION ARBITRATION BETWEEN THE ARBITRATION PARTIES AND OBJECTION TO THE DEBTORS' PROPOSED DEMAND AND DRAW ON THE LETTERS OF CREDIT AS PROPERTY OF THE LONGVIEW ESTATE

### A.    The Bankruptcy Court Lacks Subject Matter Jurisdiction Over the Claims in the Arbitration, Including, Without Limitation, the Letters of Credit Issues

Under Section 2 of the FAA, Congress made clear that agreements that require parties to arbitrate disputes arising out of such agreement are generally "valid, irrevocable, and enforceable."  9 U.S.C. § 2 (2012).  Congress further mandated that a court must, upon application of a party, stay trial of an action and refer to arbitration any issues referable to arbitration pursuant to an agreement in writing.  *Id.* § 3.  The statute provides in full:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the

---

[13]  Pursuant to the Briefing Stipulation, the Debtors will not produce a draft of their final budget to Kvaerner until September 27, after which the parties will engage in discovery regarding the Debtors' actual cash flow and operational cash needs.  Kvaerner will thus update the pertinent facts regarding the budget and cash collateral in its October 2, 2013 reply and/or prior to the October 7 hearing.

> issue involved in such suit or proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties stay the trial of the action
> until such arbitration has been had in accordance with the terms of the agreement,
> providing the applicant for the stay is not in default in proceeding with such
> arbitration.

*Id.*   Additionally under the FAA, a court may compel arbitration where a party fails,

neglects, or refuses to comply with an arbitration agreement.  *Id.* § 4.

Assessing Sections 2 through 4 of the FAA, the United States Supreme Court held

in *Shearson/American Express Inc. v. McMahon* that pre-dispute arbitration agreements

were enforceable where the party objecting to arbitration could not show any applicable

congressional intent to override the FAA.  482 U.S. 220, 238, 242 (1987).  The Court

acknowledged strong federal policy in favor of arbitration and the burden on the party

opposing arbitration to demonstrate that Congress intended to preclude arbitration in

favor of other statutory rights.  *Id.* at 226.  The Court states:

> The Arbitration Act, standing alone, therefore mandates enforcement of
> agreements to arbitrate statutory claims.  Like any statutory directive, the
> Arbitration Act's mandate may be overridden by a contrary congressional
> command.  The burden is on the party opposing arbitration, however, to show that
> Congress intended to preclude a waiver of judicial remedies for the statutory
> rights at issue.  If Congress did intend to limit or prohibit a waiver of a judicial
> forum for a particular claim, such an intent "will be deductible from [the statute's]
> text or legislative history," *ibid.*, or from an inherent conflict between arbitration
> and the statute's underlying purposes.

*Id.* at 227 (internal citations omitted).

Accordingly, the United States Supreme Court, the Third Circuit, and the District of

Delaware have repeatedly voiced their strong favor of arbitration as a matter of policy.  *See id.*;

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Mintze v. Am.*

*Gen. Fin. Servs., Inc.*, 434 F.3d 222, 231 (3d Cir. 2006); *Olde Discount Corp. v. Tupman*, 1 F.3d

202, 213 (3d Cir.1993); *In re Loewen Group Int'l, Inc.*, 344 B.R. 727, 731 (Bankr. D. Del. 2006)

("'arbitration will further the goals of the Bankruptcy Code by providing the parties with a quick

and efficient resolution'"); *In re Fleming Cos., Inc.*, 2007 WL 788921, at *3 (D. Del. Mar. 16, 2007).

In the Third Circuit, bankruptcy courts generally do not have "the discretion to deny enforcement of an otherwise applicable arbitration clause."  *Mintze*, 434 F.3d at 229; *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156-57 (3rd Cir. 1989); *see also In re Fleming Cos., Inc.*, 2007 WL 788921, at *3 ("'in the context of arbitration, a litigant's procedural right to the agreed forum is raised to a substantive right by the FAA'").

In *Hays and Company v. Merrill Lynch, Pierce, Fenner & Smith*, the United States Court of Appeals for the Third Circuit established that bankruptcy courts lack authority to deny enforcement of arbitration clauses absent a showing that "the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause."  885 F.2d 1149, 1156 (3d Cir.1989) (pertaining to a non-core proceeding).  The decision of the Third Circuit in *Hays* "applies equally to core and non-core proceedings."  *Mintze*, 434 F.3d at 231[14]; *see also In re Electric Mach. Enterprises, Inc.*, 479 F.3d 791, 798-99 (11th Cir. 2007) (finding a bankruptcy court erred in denying a motion to compel arbitration solely on the basis that the proceeding at issue was a core proceeding, without assessment of whether enforcement of the arbitration agreement "would inherently conflict with the underlying purposes of the Bankruptcy Code.").

---

[14] The *Mintze* court said:

> The core/non-core distinction does not, however, affect whether a bankruptcy court has the discretion to deny enforcement of an arbitration agreement.  *See Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.* (*In re Nat'l Gypsum*), 118 F.3d 1056, 1068 (5th Cir.1997) (quoting *In re Statewide Realty Co.*, 159 B.R. 719, 722 (Bankr.D.N.J.1993)).  It merely determines whether the bankruptcy court has the jurisdiction to make a full adjudication.  Because this distinction does not affect whether the Bankruptcy Court had the discretion to deny arbitration, we will accept the parties' stipulation that the proceeding was a "core" proceeding for the purposes of deciding whether the Bankruptcy Court had discretion.

434 F.3d at 229.

Whether a court should enforce an otherwise applicable arbitration provision "turns on the underlying nature of the proceedings, *i.e.* whether the proceeding derives exclusively from the provisions of the Bankruptcy Code, and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." *Nat'l Gypsum Co. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.*, 118 F.3d 1056, 1067 (5th Cir. 1997) (cited by *Mintze*, 434 F.3d 222). Under Third Circuit precedent, the party seeking to overcome arbitration in a bankruptcy case has the burden to show both that (i) "the proceeding derives exclusively from the provisions of the Bankruptcy Code," and (ii) arbitration would have "a sufficiently adverse effect on the underlying purposes of the Bankruptcy Code" to create a conflict between arbitration and the Bankruptcy Code. *Mintze*, 434 F.3d at 231-232 (citing *In re APF*, 264 B.R. 344, 362 (Bankr. D. Del. 2001)); *In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 570 (Bankr. D. Del. 2009).

It is only after a party makes this two part showing that a bankruptcy court has jurisdiction and thus can exercise its "discretion to refuse enforcement of a provision requiring arbitration." *In re New Century TRS Holdings, Inc.*, 407 B.R. at 570. However, absent such two part showing, a bankruptcy court has no jurisdiction, and thus no discretion and must compel arbitration of the arbitrable issues. *See Mintze*, 434 F.3d at 231-232; *In re New Century TRS Holdings, Inc.*, 407 B.R. at 570; *In re Winimo Realty Corp.*, 270 B.R. 108, 124 (2d Cir. 2001). In these cases, the Debtors cannot meet this burden and avoid the Arbitration.

### 1. The Bankruptcy Court Lacks Subject Matter Jurisdiction Over the Arbitration Claims Because the Arbitration Claims Do Not Derive Exclusively From the Bankruptcy Code

Under the precedent of *Mintze* and *National Gypsum*, courts routinely determine that they lack jurisdiction and thus lack discretion to refuse enforcement of arbitration agreements where claims at issue do not derive exclusively from the Bankruptcy Code and arise prior to the debtor's filing of a petition for bankruptcy. *See In re Winimo Realty Corp.*, 270 B.R. at 124; *In*

*re Loewen Group Int'l, Inc.*, 344 B.R. 727, 731-32 (Bankr. D. Del. 2006); *Pardo v. Akai Electric Co., Ltd.,* 00-6793-LTS, 2001 WL 984678, at *6 (S.D.N.Y. 2001); *In re Cooley*, 362 B.R. 514, 520, 522 (N.D. Ala. 2007) ("[I]f the debtor brought the cause of action, contested matter or other dispute underlying the proceeding with him when he filed bankruptcy, no inherent conflict is likely to be found with the enforcement of contractual arbitration. However, if such cause of action, contested matter or other dispute could only exist after the bankruptcy case was commenced, then an inherent conflict exception under the *McMahon* standard is more likely to be found."); *In re Farmland Indus., Inc.*, 309 B.R. 14, 20 (W.D. Mo. 2004).

This Court found itself obligated to enforce an arbitration provision that was "clearly triggered" in the case of *In re Freuhauf Trailer Corp.* 2007 WL 676248, at *7 (Bankr. D. Del. Mar. 2, 2007). In that case, the debtor and the defendant-insurance companies contracted for a cash collateral insurance program in an indemnity agreement containing a provision to refer to arbitration any disputes and differences arising from interpretation of the indemnity agreement. *Id.* at *1, *6. The program provided for the debtor to reserve cash collateral as protection in the event of the debtors' default in reimbursing the defendants for amounts paid pursuant to workers compensation insurance policies. *Id.* at *1. During the bankruptcy proceedings, the parties disputed how to calculate cash collateral the debtor owed the defendants under the indemnity agreement. *Id.* at *6. After concluding that the debtors did not demonstrate a congressional intent to preclude arbitration as to the interpretation of the relevant portion of the indemnity agreement, this Court directed the parties to arbitrate the claims in accordance with their agreement. *Id.* at *7.

Additionally, in *In re Olympus*, this Court referred to arbitration a dispute between the debtors' liquidating supervisor and the defendant insurance company as to whether the defendant

25

possessed an excess of unliquidated funds rightfully belonging to the bankruptcy estate. 352 B.R. 603, 610 (Bankr. D. Del. 2006).  This Court declined to find that a turnover claim was a proper remedy and held that the claims were subject to arbitration because they arose from an alleged breach of contract and were debtor-derived.  *Id.* at 607, 611.  Upon finding no indication that Congress intended to preclude a waiver of arbitration and no conflict between arbitration and the Bankruptcy Code, this Court enforced the arbitration provision of the parties' agreement.  *Id.* at 611.

The Arbitration Claims arise out of the Power Facility Agreements, which are governed by New York law.  Each applicable Power Facility Agreement contains a binding arbitration clause for the resolution of "any dispute" arising under the respective Agreement.  None of the Arbitration Claims submitted to the Tribunal prior to the filing of these bankruptcy cases arise from the Bankruptcy Code.  Further, filing of the Debtors' petition did not create new property rights in the Arbitration Claims.  *See In re Majestic Star Casino, LLC*, 716 F.3d 736, 750-51 (3d Cir. 2013) (the "[f]iling for bankruptcy does not create new property rights or value where there previously were none.").  The possibility that funds available from the Letters of Credit could comprise cash collateral does not convert the Arbitration Claim to claims predicated on the Bankruptcy Code.  *See In re Freuhauf Trailer Corp.*, 2007 WL 676248, at *7 (Bankr. D. Del. Mar. 2, 2007).

Additionally, the Debtors' bankruptcy filing does not relieve them, or their estates, of their obligations to resolve disputes in arbitration pursuant to the Power Facility Agreements.  *See National Cable Television Cooperative, Inc. v. Broadstripe, LLC (In re Broadstripe, LLC)*, 2009 WL 774401, at *5 (D. Del. March 26, 2009) (bankruptcy filing does not change the terms of an executory contract).  Even if the Debtors were to reject the Power Facility Agreements, the

Agreements' arbitration provisions would survive as valid and enforceable.  *In re Fleming Cos., Inc.*, 2007 WL 788921 at *3 (D. Del. Mar. 16, 2007) (quoting *Megafoods Stores, Inc. v. Flagstaff Realty Assocs.*, 60 F.3d 1031, 1034 (3d Cir.1995) (rejection of an executory contract "does not alter the substantive rights of the parties" to the contract) and *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007)).

> **2.    Enforcement of the Arbitration Agreements by the Bankruptcy Court Would Not Jeopardize the Purposes of the Bankruptcy Code or Conflict With the Policy of the Bankruptcy Code**

A determination of whether arbitration would jeopardize the objectives of the Bankruptcy Code involves a consideration of "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation and the undisputed power of a bankruptcy court to enforce its own orders."  *Nat'l Gypsum Co. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.*, 118 F.3d 1056, 1067 (5th Cir. 1997).   In considering these important issues, courts are obligated to perform a detailed evaluation of policy concerns.  *See In re American Classic Voyages,* 298 B.R. 222, 226 (D. Del. 2003).

Courts have considered the following non-exhaustive factors in performing this evaluation: (a) the relevant strain on the debtor's resources for resolution of claims in arbitration, as compared to resolution in a bankruptcy court; (b) whether state law governs a forum selection clause in the agreements; (c) whether the agreement's express terms govern the disputed claims; (d) whether arbitration would affect the allocation of assets among creditors; (e) whether resolution of claims in arbitration presents a risk of dichotomous obligations to the parties; (f) whether arbitration would make it difficult for the debtor to attract funding; (g) whether arbitration would undermine creditor confidence in the debtor's ability to reorganize or continue business; and (h) the impact of the claims' resolution on the bankruptcy estate and subsequent administration of claims.  *In re Loewen Group Int'l, Inc.,* 344 B.R. 727, 731-32 (Bankr. D. Del.

2006); *In re White Mountain Mining Co.*, 403 F.3d. 164, 170 (4th Cir. 2005); *In re Farmland Indus., Inc.*, 309 B.R. 14, 18-21 (W.D. Mo. 2004);[15] *Pardo v. Akai Electric Co., Ltd.*, 00-6793-LTS, 2001 WL 984678, at *6 (S.D.N.Y. 2001); *In the Matter of Gandy*, 299 F.3d 489, 498 (5th Cir. 2002).

In this context it is not enough for a court to simply focus on expediency and efficiency. For example, in *In re American Classic Voyages*, the United States District Court for the District of Delaware held that the bankruptcy court erred in failing to engage in a balancing test to determine whether enforcement of an arbitration clause would jeopardize the objectives of the Bankruptcy Code. In that case, the bankruptcy court considered only the efficiency of resolving the entirety of the matter in one venue.[16]

The facts of this case support at least six of the above factors that weigh in favor of resolution of the Arbitration Claims by the Tribunal. First, not only would Arbitration be more expedient and efficient than litigating the Arbitration Claims in this Court, but the relevant strain on the Debtors' resources would not be any greater in Arbitration. The Arbitration Parties have developed the claims and prepared to resolve them in the Arbitration proceeding for over two

---

[15] In *In re Farmland Industries, Inc.*, the parties' dispute surrounded an agreement for the engineering and construction of a gasification plant. 309 B.R. at 16. The parties submitted their dispute to arbitration and advanced to the selection of a three-judge panel when the debtor filed a chapter 11 petition. *Id.* at 17. The district court lifted an automatic stay and compelled arbitration after an analysis of eight separate considerations that emphasized that the issues raised were matters of contract and state law. *Id.* at 18-21.

[16] 298 B.R. 222, 226 (D. Del. 2003). Similarly, in *In re Winimo Realty Corp.*, the United States District Court for the Southern District of New York reversed a bankruptcy court's refusal to compel arbitration because the bankruptcy court failed to "explain *how* arbitration" would adversely affect administration of the bankruptcy estate or conflict with Bankruptcy Code policy. 270 B.R. 108, 124 (Bankr. S.D.N.Y. 2001). In response, the District Court declared:

> Under the Bankruptcy Court's reasoning, the simple declaration that arbitration *might* be slower than trial creates a conflict that would allow the court to exercise such discretion in every case. If the presumption in favor of arbitration means anything, the mere possibility of delay cannot alone provide the Bankruptcy Court with discretion to deny arbitration.

*Id.* at 125. The District Court ultimately found that since the claims at issue were "simply contractual claims derivative of pre-bankruptcy agreements," they did not present an inherent conflict with the Bankruptcy Code because they did not arise out of "'rights conferred or obligations imposed by the Bankruptcy Code.'" *Id.* at 124 (internal citations omitted).

years.  Beginning in at least November 2012, the Tribunal has become well versed in the highly complex and technical construction law and breach of contract claims.

A second and third factor are met because the Power Facility Agreements are governed by New York law and require arbitration of the Arbitration Claims.  At issue are arbitrable claims arising under the Power Facility Agreements surrounding, *inter alia*, the construction, design, and operation of the Power Facility.  Resolution of the Arbitration Claims necessitates analysis of boiler operation, the sufficiency of construction materials, destructive testing of material samples, site conditions, labor productivity, and technical aspects of the Power Facility boiler, such as heat transfer, heat flux, combustion properties, and steam and fluid flow characteristics.  Further, the Arbitration Parties, through the Arbitration Agreement specifically agreed to arbitration all of their claims arising under the Power Facility Agreements.

At least a fourth and fifth factor are met because Arbitration would not have a substantial or negative impact on the Debtors' ability to reorganize and make distributions to creditors, undermine creditor confidence or impact claims administration.  These factors weigh in favor of arbitration because until the issuance of the automatic stay, the Arbitration was scheduled to proceed to the point of final determination beginning in October 2014.  The parties have produced in excess of 32 million pages of documents in fact discovery.  Fact deposition and expert discovery was set to commence on an aggressive schedule.  The Arbitration Parties have procured numerous experts and expert witnesses in preparation for the Arbitration.  Among those witnesses are industry experts in engineering, chemistry, and intellectual property who were set to begin expert due-diligence to prepare for expert reports and depositions.

Resolution of the Arbitration Claims by the Tribunal, which is uniquely qualified to evaluate and render decisions upon the highly technical facts and circumstances of the disputes

arising from the Power Facility Agreements, will yield a fair outcome to all parties. Furthermore, resolution of the Arbitration Claims by the Tribunal will not impair the Debtors' ability to reorganize and continue operations, and will not impede this Court's ability to resolve pure bankruptcy issues, including non-arbitrable claims.

Should the Court determine it possesses jurisdiction over the Arbitration Claims and chooses to exercise its discretion to decide the Arbitration Claims, the Arbitration Parties would be faced with the costly and time-consuming effort necessary to begin litigation before this Court, which could entail re-performing at least some of the document discovery since the rules of discovery in federal courts varies from the discovery rules established in the Arbitration Agreement.  This effort would be unnecessary because the Tribunal is already well versed in all of these issues.  Litigation of the Arbitration Claims, which would comprise a relatively small share of the Debtors' over $1 billion cases, would disproportionately tax the attention and resources of the Court.  Thus, resolution of the Arbitration Claims in the Arbitration would streamline the process in a manner that avoids piecemeal litigation and waste of judicial resources.  This would also prevent the waste of resources the Arbitration Parties have already expended in the Arbitration and would further expend if the Arbitration Claims were to be resolved in a new venue.  Moreover, continuation of the considerably advanced Arbitration proceedings will allow the Debtors and the Court to resolve claims and issues in connection with the Debtors' other three enumerated issues requiring resolution in order to reorganize these cases.

A sixth factor is met because resolution of the Arbitration Claims by the Tribunal would have no material impact on the bankruptcy case, since the financial and temporal impact of resolving the Arbitration Claims in the Arbitration would be less than if this Court were to

resolve the claims.  *See supra* n.4; *In re Cooley*, 362 B.R. 514, 520, 522 (N.D. Ala. 2007) (concluding that resolution of claims in arbitration would yield no different result in the distribution of claims than resolution by the court).  The bottom line is that some legal venue must resolve the claims, and given the over two-year history and current status of the Arbitration, it would prejudice all parties to change course at this time.

Finally, any argument that the Arbitration Claims must be resolved in this Court because of some asserted interest the Lenders may have in the outcome should not be relevant to the Court's determination for two reasons.  None of the Lenders, or any other creditors outside the Contractors, has standing as parties to the Project Facility Agreements to participate in the resolution of Arbitration Claims.  *See In re Wire Comm Wireless, Inc.*, 2008 WL 4279407, at *3-4 (E.D. Cal. Sept. 16, 2006) (citing *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156-57 (3rd Cir. 1989)) ("The fact that the Trustee or other creditors may not have been parties to the agreement to arbitrate is also not dispositive, and does not carry with it the risk of inconsistent rulings . . . . The bankruptcy estate is bound by the actions of the debtor prior to bankruptcy, including his or her waiver of the right to litigate by agreeing to arbitration. The estate stands in the shoes of the debtor and is subject to defenses that could have been asserted against the debtor, including a contractual right to arbitration.").  Moreover, the Lenders cannot be deemed to now have standing as a result of the Debtors' forum-shopping and desire to have the Arbitration Claims decided in this forum.

In addition, to the extent that the Lenders may have a debtor-derived interest in the outcome of the Arbitration, those interests are protected by the proceedings in this Court.  The Debtors agreed to keep the Lenders informed of the Arbitration proceedings, and to confer with the Lenders as to actions the Debtors may take in the Arbitration.  *See* Cash Collateral Motion, p.

18.   Moreover, as a practical matter, for bankruptcy courts to deny enforcement of arbitration provisions between the debtor and parties to an enforceable arbitration agreement, based on alleged debtor-derived interests of other creditors or lenders would defeat the mandate of the FAA and the policies of the United States Supreme Court, the Third Circuit and this District in favor of arbitration.   Looking at this from a non-bankruptcy perspective, the lack of standing of the Debtors' equity holders pre-petition in the Arbitration was and would never be a concern or factor –the fact that the stakeholders are now creditors changes nothing.

In short, when the factors courts consider in determining whether or not arbitrable claims must be referred to arbitration are applied to the facts of this case, the only conclusions to draw are that (a) enforcement of the applicable arbitration agreements would not jeopardize the purposes of the Bankruptcy Code; and (b) Arbitration would not conflict with the policy of the Bankruptcy Code.   For these reasons, this Court lacks jurisdiction over the Arbitration Claims, and thus lacks discretion to hear such claims.

### 3.   The Court Lacks Jurisdiction Over the Letters of Credit Issues

As the Court is aware, a significant dispute exists over ownership of and rights to the Letters of Credit and whether the Debtors have the right to demand and draw on the Letters of Credit.   With respect to the Cross-Motion on the limited question of whether or not the Court has jurisdiction to decide the issues regarding the Letters of Credit, the answer is no.   The Debtors freely admit they timed the filing of these chapter 11 cases to avoid Arbitration and protect their alleged interests in the Letters of Credit.   The Debtors engaged in forum-shopping because they were afraid the Tribunal would act expeditiously and issue a ruling in favor of Kvaerner's Application.   Such a favorable ruling would have placed the Letters of Credit in escrow and fairly protected the Consortium, as well as Foster Wheeler, who joined in Kvaerner's Application.

### (a)  The Debtors Cannot Meet Their Burden to Prove the Letters of Credit Issues Arise Exclusively From the Bankruptcy Code

While the determination of who has rights to the Letters of Credit may have bankruptcy implications, those rights and obligations do not derive exclusively from the Bankruptcy Code in a manner that provides this Court jurisdiction over these issues. *See In re Olympus Healthcare Group, Inc.*, 352 B.R. 603, 611 (D. Del. 2006). The filing of the Debtors' bankruptcy petition does not change the determination of whether or not the Letters of Credit are property of the estate into a purely bankruptcy issue. *See In re Wire Comm Wireless, Inc.*, 2008 WL 4279407, at *4 (E.D. Cal. Sept. 16, 2006). A determination of whether or not the Letters of Credit constitute property of the Longview estate is purely a state law issue. *See In re Loewen Group Int'l, Inc.*, 344 B.R. 727, 731-32 (Bankr. D. Del. 2006). Likewise, a determination of the various parties' competing interests in the Letters of Credits and proceeds therefrom, include the predicates necessary to demand and draw, are rooted in New York State law. *See id.*

In *In re Wire Comm Wireless, Inc.*, the District Court for the Eastern District of California reversed a bankruptcy court's decision refusing to refer claims to arbitration upon finding that an underlying objective in the bankruptcy proceeding was not a sufficient basis for the bankruptcy court to retain jurisdiction over claims for the recovery of unpaid commissions relating to an agreement for sales of cellular phone equipment and services. 2008 WL 4279407 (E.D. Cal. Sept. 16, 2006). Similar to the case here, the parties in *Wire Comm* had made substantial progress in an arbitration proceeding when the debtor filed for bankruptcy, and the creditor filed a proof of claim in the bankruptcy proceeding. *Id.* at *1. Citing to *McMahon*,[17] *Hays*,[18] and *Mintze*[19] in its analysis, the court concluded that the underlying claims for breach of

---

[17] 482 U.S. 220 (1987).
[18] 885 F.2d 1149 (3d Cir. 1989).
[19] 434 F.3d 222 (3d Cir. 2006).

contract were "unquestionably not predicated on federal bankruptcy law" and were instead "rooted in state law." 2008 WL 4279407, at *3.  The Court stated, "the fact that allowance of the claim and counterclaim in bankruptcy required bankruptcy court approval does not change" the analysis of the underlying contract claims.  *Id.* at *4; *see also In re TEU Holdings, Inc.*, 287 B.R. 26, 37 (Bankr. D. Del. 2002) (enforcing arbitration clauses based on state law claims because "[t]he claims could have arisen outside the bankruptcy case in a state court of competent jurisdiction.  If TEU had never filed for Chapter 11 protection, the claims for breach and negligence could have still been brought against [the movant].").

In *In re Loewen Group International, Inc.*, this Court granted a motion for abstention and referral to arbitration after considering a set of factors that included the effect of referral on the administration of the estate, the predominance of state law issues, and the likelihood of forum-shopping.  344 B.R. 727 (Bankr. D. Del. 2006).  The Court considered the strong federal policy in favor of arbitration, that the existence of a pending arbitration proceeding weighed in favor of referral to arbitration, and the policy to "enforce freely entered into agreements," in addition to recognizing "the speed and efficiencies attendant to arbitration proceedings."  *Id.* at 730-31.  The Court dismissed an argument that the Court should retain jurisdiction because the claims involved violation of sale orders issued by the Court, as the dispute "only encompasse[d] common law causes of action."  *Id.* at 731.

As was the case in *Wire Comm* and in *Loewen Group*, resolution of the Letters of Credit Issues in the Arbitration will yield limited implications in the bankruptcy proceedings.  Nonetheless, the Debtors cannot forum-shop in order to circumvent the fact that the issue of rights to or obligations under the Letters of Credit are exclusively derived from and governed by

state contract law.  For this reason, the Court lacks jurisdiction over determination of rights and obligations under the Letters of Credit.

**(b)** **Determination of Rights to the Letters of Credit by the Arbitration Tribunal Would Not Jeopardize the Purposes of the Bankruptcy Code or Conflict With the Policy of the Bankruptcy Code**

For the same reasons set forth above, allowing the Tribunal to resolve the issues with respect to the Letters of Credit, including whether they are property of the Longview estate, would not substantially conflict with the purposes of the Bankruptcy Code.

In *In re Olympus Healthcare Group, Inc.*, this Court referred claims to arbitration over the objections of the bankruptcy estate's liquidating supervisor that arbitration jeopardized objectives of the Bankruptcy Code.  352 B.R. 603, 611 (Bankr. D. Del.)  The liquidating supervisor argued that referral to arbitration "would disrupt the Code's objectives of equality of distribution and efficient resolution of claims," that arbitration would give the aggrieved creditor an "exalted status over all other creditors," that arbitration would delay distribution of claims, and that the Court was better suited to resolve the issues.  *Id.* at 612.  The Court dismissed the liquidating supervisor's arguments as vague and enforced arbitration because the liquidating supervisor failed to direct the Court to a demonstrated "specific intent" in the Bankruptcy Code to preclude a waiver of judicial remedies.  *Id.*

*In re Olympus* demonstrates the high standard that a party objecting to enforcement of an arbitration provision must meet in order to overcome the strong federal policy in favor of arbitration acknowledged by the Court, the District of Delaware, the Third Circuit, and the Supreme Court of the United States.  In this case, the Debtors simply cannot meet that standard; because referral by the Court of the determination of rights under the Letters of Credit presents no adverse implications to these bankruptcy proceedings.  Determination of the parties' rights and obligations under the Letters of Credit by the Tribunal would be more efficient and

expedient than a determination by the Court, especially as the Arbitration Tribunal was prepared to and would have decided the matter but for the Debtors' filing their chapter 11 petitions. As is the case with all of the Arbitration Claims, determination of the Arbitration Parties' competing rights and obligations under the Letters of Credit will have little impact on the Court's administration of the Debtors' estates. Thus, the Court does not have jurisdiction or discretion to decide the Letters of Credit issues.

### 4. Should this Court Determine it has Jurisdiction Over the Arbitration Claims, the Court Should Decline to Exercise Its Discretion to Hear the Arbitration Claims in Favor of Referring Them to the Tribunal

In the unlikely event that this Court concludes it has jurisdiction over the Arbitration Claims or the Letters of Credit Issues, the Court should nonetheless decline to exercise its discretion and should instead refer the claims to the Arbitration because Federal policies in favor of arbitration would be well-served by resolving the Arbitration Claims or Letters of Credit Issues in the Arbitration. The Supreme Court, the Third Circuit, and this District share a strong policy in favor of arbitration. *See Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 238, 242 (1987); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Mintze v. Am. Gen. Fin. Servs., Inc.*, 434 F.3d 222, 231 (3d Cir. 2006); *Olde Discount Corp. v. Tupman*, 1 F.3d 202, 213 (3d Cir.1993); *In re Loewen Group Int'l, Inc.*, 344 B.R. 727, 731 (Bankr. D. Del. 2006); *In re Fleming Cos., Inc.*, 2007 WL 788921, at *3 (D. Del. Mar. 16, 2007). That policy stems from deference to the FAA, and courts' desire to enforce freely entered into agreements, and also promote the efficient resolution of claims.[20]

Resolution of the Arbitration Claims would greatly distract the parties and the Court from resolution of the most integral issues to the bankruptcy proceedings, chiefly, the Debtors'

---

[20] *See McMahon*, 482 U.S. 220 at 238, 242; *Mintze*, 434 F.3d at 231; *In re Loewen Group Int'l, Inc.*, 344 B.R. at 731.

operational and financial restructuring of these cases.  The schedule of discovery and proceedings in the Arbitration shows that not only has the litigation been ongoing for over two years, but the Arbitration is on an aggressive schedule for targeted resolution beginning in October 2014.  The Tribunal and Arbitration Parties planned to visit the Power Facility for a two day site visit in October 2013 during a pre-scheduled maintenance shut-down.  Subpoenas for document discovery remained to be served on 26 entities.  Fact depositions were scheduled to occur between October to December 2013 and February to April 2014.  Expert depositions were set to occur from April to June, 2014.  Hearings were scheduled to span five to eight weeks in late 2014 and early 2015.  The Tribunal planned for each party to present evidence for 75 hours. A final decision by the Tribunal will be forthcoming after post-trial briefing is concluded.

The Debtors' bankruptcy filing is, at least in part, an effort to forum-shop, escape obligations Longview has to arbitrate these claims, and avoid an unfavorable ruling by the Tribunal on the Kvaerner Application.  It is Kvaerner's position that resolution of the Arbitration Claims in a forum other than the Arbitration would disserve the Court and the Consortium, as it would undermine the well-settled policies in favor of arbitration and reward the Debtors' blatant forum-shopping efforts.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 158 (3d Cir. 1999).

Should the Court find that it retains jurisdiction over the Arbitration Claims, for the reasons set forth above, Kvaerner submits the Court should refuse to exercise its discretion and instead should allow the Arbitration Claims, including the Letters of Credit Issues, to proceed to a full resolution by the Tribunal.

**B.    Cause Exists to Grant Relief From the Automatic Stay at This Time and Allow the Arbitration to Continue, Including Resolving the Kvaerner Application and Related Letters of Credit Issues**

Section 362(d) of the Bankruptcy Code provides, in relevant part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating annulling, modifying or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d).

Although the Bankruptcy Code does not define "cause," the legislative history of section 362 explains that "cause may be established by a single factor such as 'a desire to permit an action to proceed . . . in another tribunal,' or 'lack of any connection with or interference with the pending bankruptcy case.'" *In re Rexene Prods. Co.*, 141 B.R. 574, 546 (Bankr. D. Del. 1992) (internal citations omitted). The legislative history further states that "it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum." *Id*. (internal citations omitted).

In the case of a party moving to compel a pending arbitration, courts invariably find that cause is established by the strong federal policy favoring the arbitration of disputes. *See Mintze*, 434 F.3d at 229. In determining whether there is "cause" to modify the automatic stay, courts consider whether: (a) any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; (b) the hardship to the movant by maintenance of the stay considerably outweighs the hardship to the debtor; and (c) the movant has a probability of prevailing on the merits. *Rexene*, 141 B.R. at 576; *see also In re The SCO Group, Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007).

An analysis of the above three factors shows that cause exists to (a) modify the automatic stay to allow the continuance of the Arbitration[21] for the purposes of liquidating the respective claims of the Arbitration Parties, including resolving the Letters of Credit Issues; or (b) if the Court determines that the stay should not be lifted for the entire Arbitration, lift the stay on a limited basis to allow the Tribunal to rule on Kvaerner's Application with respect to placing the Letters of Credit in escrow to preserve the status quo.  In either event, Kvaerner will not seek to proceed against property of the Longview estate in order to execute on any monetary awards made by the Tribunal in its favor on account of a judgment against Longview, without leave of the Court.

## 1.    Cause Exists to Lift the Automatic Stay to Allow the Entire Arbitration to Proceed at This Time

With respect to the first factor, any argument that the Debtors will be prejudiced if the automatic stay is lifted at this time, or unless Arbitration Claims are resolved by the Bankruptcy Court, is without merit.  The Arbitration Claims are complex construction law claims before the Tribunal of construction law experts.  The Arbitration Parties have already engaged in lengthy and intense arbitration proceedings, including the exchange of millions of pages of documents, identification of fact witnesses, and the retention of experts and expert witnesses.  One fundamental issue that must be resolved in order for all of the Arbitration Claims to be resolved

---

[21] As set forth more fully *supra* in Section IV.A, the Bankruptcy Court does not have subject matter jurisdiction to resolve the Arbitration Claims, including, without limitation, the Debtors' rights to demand, subsequently draw and utilize the Letters of Credit proceeds.  *See also McMahan Securities Co. L.P. v. Forum Capital Markets L.P.,* 35 F.3d 82 (2d Cir. 1994); *Worldcrisa Corp. v. Armstrong*, 129 F.3d 71, 74-75 (2d Cir. 1997); *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 891 F. Supp. 946, 951 (S.D.N.Y. 1995) (FAA "leaves no place for exercise of discretion … but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issue as to which an arbitration agreement has been signed.") (emphasis in original); *Cohen v. Ernst & Young, LLP (In re Friedman's, Inc.)*, 372 B.R. 530, 544 (Bankr. S.D. Ga. 2007) (standing alone, deviation from Bankruptcy Code's goal of centralized forum is insufficient to find inherent conflict and would create exception that swallows rule favoring arbitration); *Bigelow v. Green Tree Financial Serv. Corp.*, 2000 WL 33596476, *6 (E.D. Cal. Nov. 30, 2000) (referring claims to arbitration if arbitration does not have an adverse effect on the purpose of the Bankruptcy Code).

is what went wrong with the boiler.  This determination will require a very detailed technical investigation that was well underway pursuant to the agreement of all Arbitration Parties.  To this end, the Arbitration Parties scheduled a site visit in October 2013, when the Power Facility goes into a pre-planned maintenance shut-down in October 2013, to allow the experts to inspect the Power Facility.  Following these inspections and subsequent expert reports, the Arbitration was on an expedited path to a final hearing slated to commence in October 2014.  Given the complexity of the Arbitration, the number of claims and facts involving Longview, as the owner of the Power Facility, and the many technical issues to be considered, the time scheduled for final resolution of the Arbitration is as aggressive as possible.  If the Court were to lift the automatic stay at this time, the foregoing detailed technical investigation and the balance of the schedule could proceed with no significant delay.

On the other hand, if the stay is not lifted, the entire proceeding will be delayed for at least six months until the next planned Power Facility shut-down in May or June 2014.  Kvaerner is not asking this Court to turn over the restructuring of these cases to the Tribunal.  These are $1 billion plus cases with the main problem being too much debt.  In this overall context, Kvaerner's claims are relatively small and if resolved in the Arbitration would not impede the overall restructuring of these cases.  *See supra*, n.4.  Thus, lifting the automatic stay to allow the entire Arbitration to continue would not result in any prejudice to the Debtors.

In support of the second factor, continued enforcement of the automatic stay would result in considerable hardship to Kvaerner and the other non-debtor Arbitration Parties.  Kvaerner has expended significant time and resources in preparing its Arbitration case over the past two years.  Kvaerner has also retained numerous experts in connection with the Arbitration who have all scheduled their time based on the current Arbitration schedule.  These experts were scheduled to

begin their due diligence, inspect the Power Facility site and prepare expert reports. Fact witness depositions were also slated to begin along the same timelines. Determination of what problems are caused by which party is fundamental to a fair outcome and resolution of the Arbitration Claims. Any delay in this schedule will create a hardship to Kvaerner if its experts are not able to inspect the Power Facility site until at least May or June 2014, because such experts may otherwise be unavailable if the Court determines to lift the stay later in the bankruptcy proceedings. Kvaerner would be prejudiced if Longview was able to resolve its claims against Kvaerner on a piecemeal basis in the bankruptcy case, when the parties had agreed to resolve all of their claims in one Arbitration proceeding. Thus, the Bankruptcy Court should not condone the Debtors' attempts to forum-shop and evade the Arbitration in order to attempt to obtain a more favorable outcome from the Bankruptcy Court.

With regard to the third factor – probability of success – it does not require anything more than a "very slight" showing. *Rexene*, 141 B.R. at 578. The movant need only demonstrate that the claim is not frivolous. *In re Levitz Furniture Corporation*, 267 B.R. 516, 523 (Bankr. D. Del. 2000) (citing *Rexene*, 141 B.R. at 578). This standard does not require a review of the merits of the claim. Courts have held that, "there is good reason not to require a merits analysis under these circumstances . . . . [O]ne of the primary purposes in granting relief from the stay . . . is to economize judicial resources. To require a merits analysis in every case would in large part defeat this objective and frustrate the effort to resolve § 362(d) motions expeditiously." *Peterson v. Cundy (In re Peterson)*, 116 B.R. 247, 250 (D. Colo. 1990) (emphasis added). Here, the Arbitration Parties have asserted numerous claims and counter-claims against each other. There is more than a "slight" chance Kvaerner will be successful on the merits of its claims. Furthermore, and despite Longview's contention to the contrary,

Kvaerner's claims cannot be called, and are not, frivolous.  Finally, the Tribunal is well along in the learning curve for this complex Arbitration and is best situated to reach a resolution fair to all the Arbitration Parties and conserve valuable judicial resources.  Thus, Kvaerner has met this third factor in support of lifting the automatic stay.

> ## 2.      Cause Exists to Lift the Automatic Stay on a Limited Basis to Allow the Tribunal to Rule on the Letters of Credit Issues

If the Court determines that the stay should not be lifted for the entire Arbitration, cause exists to lift the stay on a limited basis to allow the Tribunal to rule on the Letters of Credit Issues, which would include a ruling on Kvaerner's Application to place the Letters of Credit in escrow to preserve the Arbitration Parties' status quo.  Preserving the status quo will allow the Tribunal to resolve the underlying, intertwined disputes involved in the Arbitration Claims and preserve the Arbitration Parties'—including the Debtors'—respective rights to the Letters of Credits and their proceeds.

Application of the same three factors *supra* Section IV.B, as well as the facts discussed *supra* Section IV.A, result in a finding that the stay should be lifted.  First, the Debtors will not suffer any great prejudice by allowing the Tribunal to rule on Kvaerner's Application.  Prior to the Petition Date, Longview had already agreed to the Tribunal deciding these issues.  The Debtors admit they timed the commencement of these cases to protect the Letters of Credit from a potentially adverse ruling by the Tribunal.  *See* First Day Declaration, ¶ 28.  It should therefore come as no surprise that these bankruptcy cases were filed on the very day Longview's response to Kvaerner's Application to secure the Letters of Credit was due in the Arbitration.  The Debtors will not suffer any prejudice if the Tribunal decides these issues in the Arbitration.  The Debtors should not now be allowed to claim they will suffer any prejudice by being forced to comply with their contractual obligations, especially when the determination of the rights to the

Letters of Credit by Tribunal are so intertwined with the resolution of the overall Arbitration Claims.

The Letters of Credit were provided under the Boiler Contract for specific limited purposes, and not to fund Longview's general operations or to finance the Power Facility project needs.  If the stay remains in place, Kvaerner and the other Contractors will suffer hardship due to the Debtors' insistence that they have full ability to demand and draw on the Letters of Credit and use the proceeds as cash collateral to fund the operations and reorganization of these cases. The multiple competing claims in the Arbitration must be resolved before any party makes a demand and draws on the Letters of Credit; otherwise parties who are ultimately determined to have the rights to demand and draw on the Letters of Credit will be irreparably harmed.  Finally, with respect to the third factor, and as discussed above, while Kvaerner as the movant needs to show a probability of success on the merits, case law shows that the probability need only be "slight."  The very language of the Coordination Agreement assigning the Letters of Credit to the Consortium, as well as Longview's own statement in the TRO Action that it assigned the right to demand to the Consortium means there is much more than a "slight" probability of success.[22] These same facts also show that Kvaerner's claims are not frivolous.

As set forth above, cause exists to lift the automatic stay to allow the continuation of the Arbitration until the Tribunal issues a ruling liquidating all of the Arbitration Parties' respective claims; if, however, the Court determines that the stay should not be lifted for the entire Arbitration, the Court should lift the stay on a limited basis to allow the Tribunal to rule on Kvaerner's Application with respect to placing the Letters of Credit in escrow to preserve the status quo.

---

[22] Longview would not have filed bankruptcy when it did if it had no concern that the Tribunal might put the Letters of Credit into escrow because Longview believed that, after all the Tribunal has considered to date, the Tribunal thought Kvaerner's claims are frivolous and undeserving of protection.

**C.      Objection to the Debtors' Proposed Demand and Draw on the Letters of Credit Because the Letters of Credit Are Not Property of the Longview Estate**

As fully set forth above, pursuant to United States Supreme Court and Third Circuit law, this Court lacks subject matter jurisdiction to determine any issues with respect to the Arbitration Claims, including whether or not the Letters of Credit and rights thereto are property of the Longview estate.   In the event, however, that the Court ultimately determines that it has jurisdiction, and also exercises its discretion, to decide the Letters of Credit Issues, including whether or not the Letters of Credit and rights thereto are property of the Longview estate, Kvaerner objects to the Debtors' proposed demand and draw on the Letters of Credit as property of the Longview estate.

The applicable facts and law set forth below show that: (a) Longview made an outright assignment of the Letters of Credit and its rights thereto to the Consortium; and (b) as a result of the outright assignment, the Letters of Credits and rights thereto, including the right to make a demand and receive the proceeds, are property of the Consortium.

**1.      Longview Made an Outright Assignment of the Letters of Credit to the Consortium**

Section 8.2 of the Coordination Agreement provides:

[Longview] expressly assigns and delegates to [the Consortium] . . . **all** rights and obligations of [Longview] under the Boiler Contract including the rights . . . to exercise the rights and remedies of [Longview] with respect to the Boiler Contract, **including** the right to make demand under any letter(s) of credit provided thereunder and **any other** security provided by [Foster Wheeler] under the Boiler Contract and initiate, prosecute and/or defend any arbitration or legal proceedings against [Foster Wheeler].

J.A. Ex. 1, at § 8.2 (emphasis added).   Application of the relevant law leads to the inescapable conclusion that this language effectuated an outright assignment of the Letters of Credit to the Consortium.   The Letters of Credit are governed both by the 1993 revision of the UCP 500, a copy of which is attached as J.A. Ex. 7 and the New York UCC.   *See* J.A. Ex. 16, § 9.

UCP 500 establishes rules for both transfers[23] (UCP 500 Art. 48) and assignments[24] of proceeds (UCP 500 Art. 49).  Regarding assignments, the UCP indicates that beneficiaries are generally free to assign rights with respect to a letter of credit in accordance with "applicable law."  *See, e.g., MFS Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 298 (S.D.N.Y. 2006) ("UCP [500] follows common-law principles that credits are freely assignable 'in accordance with the provisions of the applicable law'") (quoting *Nassar v. Fla. Fleet Sales, Inc.*, 79 F. Supp. 2d 284, 293 (S.D.N.Y. 1999) (other citations omitted)).  Section 5-114 of New York's UCC governs assignments with respect to letters of credit.  N.Y.U.C.C. § 5-114.  Under Section 5-114, "[t]he mode of creating and perfecting a security interest in or granting an assignment of a beneficiary's rights to proceeds is governed by Article 9 or other law."  N.Y.U.C.C. § 5-114(b).  *See also In re Cooper Mfg. Corp.*, 344 B.R. 496, 506 (S.D. Tex. 2006) ("a letter of credit beneficiary may either create a security interest in the proceeds or assign that right absolutely to a third party.").  If the beneficiary makes an outright assignment of the proceeds, then "'other law,' namely the common law of assignment, applies."[25]  *Cooper*, 344 B.R. at 506.

---

[23] Under UCP 500, a letter of credit can be transferred or assigned by a beneficiary of the letter of credit.  There is a significant difference between the two.  A transfer is effectuated by the first beneficiary signing a transfer certificate in favor of the second beneficiary, and then the transfer certificate is provided to the issuing bank.  Kvaerner is not arguing that the assignment language of Section 8.2 of the Coordination Agreement effectuated a "transfer" of the letters of credit pursuant to UCP 500.  Kvaerner is arguing such language is an outright assignment under other law.

[24] An assignment can take the form of a security interest or an outright assignment.  Although this distinction is not discussed within the actual text of § 5-114, it is discussed by UCC commentary, which states "[t]he mode of creating and perfecting a security interest in *or* granting an assignment of a beneficiary's rights to proceeds is governed by Article 9 or other law."  N.Y.U.C.C. § 5-114, cmt. 3.  Regarding when an assignment or security interest is valid, UCC commentary provides that the rights and obligations arising upon the grant of a security interest or an assignment are "governed by Article 9 [of the UCC] or other law."  *Id.*  Kvaerner is not arguing that the assignment language of Section 8.2 of the Coordination Agreement effectuated a security interest in the letters of credit pursuant to the UCC.  Kvaerner is arguing such language is an outright assignment under other law.

[25] Section 8.2 of the Coordination Agreement makes an additional reference to "any other security" when discussing the letters of credit.  However, this is in reference to what security was provided to Longview under the Boiler Contract *by Foster Wheeler*, not what "security" is being provided by Longview.  In addition, as discussed previously, there is language in Sections 8.2 and 8.6 which discuss the reversionary interests of Longview.  If the

Regarding the validity of a letter of credit assignment, "the question of whether a contract effectuates an assignment involves the construction of the contract." *MFS Holding*, 435 F. Supp. 2d at 301. Under New York law, "[w]hen the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Id.* at 302 (citation omitted).

*In re Cooper Mfg. Corp.* examined the issues of whether an assignment was valid in the context of a letter of credit. *Cooper*, 344 B.R. 496. In *Cooper*, a bankruptcy trustee brought adversary proceedings to recover transfers as preferential, including assignments of letter of credit rights. The court found that letter of credit proceeds were "freely assignable" and that "[n]o words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient." *Id.* at 508.

Although *Cooper* applied Texas law, Texas law is consistent with New York law in looking to the intent of the parties to determine if there was a valid assignment. Under New York law, "[n]o particular words are necessary to effect an assignment." *Leon v. Martinez*, 84 N.Y.2d 83, 88 (App. Ct. 1994). Instead, "[a]ll that is required is that the property must be sufficiently identifiable and there must be an intent to assign a present right in the subject matter of the assignment, divesting the assignor of all control over that which is assigned." *In re Candy Lane Corp.*, 38 B.R. 571, 575 (Bankr. S.D.N.Y. 1984) (citations omitted) (discussing whether an assignment effectuated an outright assignment of the right to proceeds of condemnation proceedings which were ongoing at the time of assignment).

This language is unambiguous in providing for an outright assignment of Longview's rights, and even uses the phrase "expressly assigns." This demonstrates an undeniably clear

---

Coordination Agreement only contemplated a security interest in Longview's rights under the Boiler Contract rather than an outright assignment, any discussion of "reversion" would be nonsensical since Longview would continue to retain these rights.

intent on the part of Longview to make an outright assignment.  *See, e.g.*, *In re Jason Realty, LP*, 59 F. 3d 423, 427 (3d Cir. 1995) (finding that "hereby grants, transfers and assigns to the Assignee the entire lessor's interest in and to those certain leases" to be a present assignment); *Tawil v. Finkelstein Bruckman Wohl Most & Rothman*, 646 N.Y.S.2d 691, 692 (App. Ct. 1996) (finding "hereby assign all [assignors'] right, title and interest" to be a present assignment).

Longview's counsel recently stated in the hearing before this Court that the Letters of Credit "[were] never assigned" because "[t]he steps needed to assign it never occurred."  First Day Hr'g Tr. 88:6-9; 94:2-3.  The Debtors also argued that the Letters of Credit had "very specific terms regarding assignment" and that there was no assignment because the steps that would effectuate an assignment under these terms had not been taken.  *Id.* at 96, 97.  However, as previously discussed, during the TRO Action, Longview admitted that it had "assigned the right to make a demand under [the Letters of Credit]."  *See*  J.A. Ex. 9, at 4.

The Section 8.2 assignment included *all* of Longview's rights under the Boiler Contract and expressly provided the Consortium with the ability to exercise Longview's rights and remedies against Foster Wheeler *including* "the right to make demand under any letter(s) of credit provided thereunder" (*including* rights with respect to "any security provided by [Foster Wheeler]," e.g., letters of credit provided by Foster Wheeler).  *See*  J.A. Ex. 1, § 8.2; s*ee In re Moskowitz*, 14 B.R. 677, 681 (Bankr. S.D.N.Y. 1981) (language of the assignment was broad enough to include proceeds from all insurance carriers).  Although the Consortium later requested that Longview sign Transfer Certificates, this was intended to further protect the Consortium's *existing* interest in the Letters of Credit (which they received pursuant to Section 8.2) rather than act as the sole source of the Consortium's interest.

47

Any arguments that the words "the right to make demand" in the broad express assignment language in Section 8.2 was intended to somehow limit the Consortium's rights to the Letters of Credit that were assigned by Longview would be nonsensical. The language of Section 8.2 effectuated an outright assignment and thus all rights and title that Longview had in the Letters of Credit passed to the Consortium upon execution of the Coordination Agreement.

### 2.   As a Result of the Outright Assignment, the Letters of Credit and Proceeds Therefrom are Property of the Consortium, Not the Longview Estate

Under § 541 of the Bankruptcy Code, when a bankruptcy case is commenced, an estate is created, consisting of "all legal and equitable interests of the debtor in property." 11 U.S.C. § 541(a). However, "[t]he estate in bankruptcy only includes property to which the debtor would have had a right if the debtor were solvent." *First Fidelity Bank v. McAteer*, 985 F. 2d 114, 117 (3d Cir. 1993) (citation omitted).

Under New York law, an assignment of an assignor's rights under a contract that is intended to be a "complete and immediate transfer of the interest at the time of the assignment" represents a complete assignment of those rights. *Jaffie Contracting*, 1995 WL 489465, at *3 (citing *Davis & Warshow, Inc. v. S. Iser, Inc.*, 220 N.Y.S.2d 818, 834-35 (Sup. Ct. 1961)). In the context of bankruptcy, an absolute/outright assignment of a debtor's right immediately transfers this right to the assignee upon its execution. *See, e.g., In re Jason Realty, LP*, 59 F. 3d 423, 427 (3d Cir. 1995) (affirming the lower court's conclusion that rents that had been assigned by the debtor "were not property of the estate"); *In re DVI, Inc.*, 305 BR 414 (Bankr. D. Del. 2004) (holding that since a debtor's rights in loan agreements and leases had been sold prepetition, they were not property of the estate and the court had no "related to" bankruptcy jurisdiction). If an assignor later receives proceeds of an assigned right, it effectively holds them "in constructive

trust for the assignee," because in an outright assignment, the rights of the assignor "[a]re fully extinguished." *In re Anchorage Nautical Tours, Inc.*, 102 B.R. 741, 744 (9th Cir. 1989).

The assignment of Longview's property interest in the Letters of Credit for purposes of Section 541 occurred as of the date of the Coordination Agreement—January 26, 2007. As a result, the Debtors' cannot now benefit from a demand and draw on the Letters of Credit by calling them property of the Longview estate. *See Penn Cent. Transp. Co. v. Irving Trust Co.*, 594 F.2d 952, 957-58 (3d Cir. 1979) (holding that because an escrow fund could not benefit the debtor's estate, it was not property of the estate). In addition, neither the Letters of Credit nor the proceeds thereof would be property of the estate because they could not benefit the Debtors' estates due to the outright assignment.

For all of the reasons outlined above, the rights to the proceeds of the Letters of Credit were never property of the Longview estate, but instead have been and remain the property of the Consortium.

## V.     ARGUMENT IN SUPPORT OF KVAERNER'S LIMITED OBJECTION[26] TO THE DEBTORS' USE OF CASH COLLATERAL ON A FINAL BASIS

Kvaerner objects to the final entry of the Cash Collateral Order on a limited basis for two reasons. First, Kvaerner objects to the Debtors' use of cash collateral to the extent such usage is conditioned on a cash-liquidity covenant imposed by the Lenders that requires the Debtors' to demand and draw on the Letters of Credit. The $59 million equity cushion created as a result of the Lenders' cash-liquidity covenant far exceeds what the Lenders are entitled to as "adequate" protection. Second, Kvaerner objects to the Debtors' use of cash collateral to the extent such

---

[26] Assuming the final Cash Collateral Order contains the same reservation of rights with respect to Kvaerner's Disputed Mechanic's Lien and other rights as contained in paragraph 27 of the Interim Cash Collateral Order, Kvaerner does not object on those grounds. However, if the final Cash Collateral Order does not contain the reservation of rights contained in paragraph 27 of the Interim Cash Collateral Order, Kvaerner renews its Limited Objection with respect to those issues.

cash collateral includes the proceeds of the Letters of Credit because the Debtors cannot adequately protect the interests of the Consortium in the Letters of Credit if a demand is made and the proceeds are drawn and subsequently depleted.

Pursuant to 11 U.S.C. 363(e) a secured creditor is entitled to adequate protection to protect against diminution in the value of its interest in collateral during the period of a debtor's use.  Such protection, however, is limited to what is "adequate" and not excessive, protection. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996); *In re Carbone*, 395 B.R. 631(Bankr. N.D. Ohio 2008).  A debtor has the burden of proving adequate protection by a preponderance of the evidence standard.  *See In re Carbone*, 395 B.R. at 636.

In the *Carbone* case, the Debtor moved for use of cash collateral and offered to provide replacement liens on the Debtor's post-petition assets as adequate protection to its secured lender.  The secured lender objected, contending it was not adequately protected and sought liens on potential avoidance actions.  At the contested cash collateral hearing, the Debtor came forward with evidence consisting of financial projections which showed a net increase in accounts receivable and cash over the budgeted period, resulting in an increase of cash collateral. As a result, the court found the bank to be adequately protected because its cash collateral would not diminish during the debtors' proposed use; rather, the cash increased over the budgeted period.  In this case, as a condition for the Debtors' use of cash collateral on an interim and final basis, the Lenders insist that the Debtors demand and draw down the proceeds of the Letters of Credit.[27]

---

[27] Subsequent to the First Day Hearing, the Interim Cash Collateral Order enjoined the Debtors from drawing on the Letters of Credit without further order of the Court during the pendency of the Interim Cash Collateral Order. *See* Interim Cash Collateral Order, ¶ 26.  As result of this order, the Lenders agreed to delay the timing of the Debtors' required demand and draw on the Letters of Credit from the week of September 25 to October 9, 2013.

While this condition is not explicitly stated in the Cash Collateral Motion, the Debtors and Lenders made it clear at the First Day Hearing and in the budget that the Lenders require the demand and draw on the Letters of Credit, to do otherwise would result in a default. The interim budget shows that the Debtors will have a positive cash accrual continuing through the term of the six week budget in the amount of approximately $3 million. *See* Interim Cash Collateral Order, Ex. A. Other than some statements on the record at the First Day Hearing about potential emergencies, the Debtors have not provided any facts to support the assertion that their actual operational needs would require a demand and draw on the Letters of Credit.

Contrary to counsel to the Debtors' statements at the First Day Hearing (*See* First Day Hr'g Tr. 108:22-109:3) the cash accrued during the interim budget period is sufficient to meet the Debtors' operational needs for the foreseeable budgeted period. As a result of this positive cash accrual, the Lenders are adequately protected without requiring the Debtors to demand and draw on the Letters of Credit. Any additional protections by the Lenders exceeds what is "adequate." Thus, as part of their adequate protection package, the Lenders require the Debtors to maintain an equity cushion of $59 million regardless of the Debtors' actual cash needs. *See* First Day Hr'g Tr. 89:6-18.

This situation is similar to the *Carbone* case where that court found that the secured lender was not entitled to additional adequate protection because of the debtor's positive cash accrual during the budget period. *See also In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716-18 (Bankr. D. Del. 1996) (finding that a secured creditor was adequately protected where (1) the creditor's collateral—which included cash and amounted to virtually all the debtor's prepetition assets—had not diminished in value; (2) the debtor had operated profitably since the petition date; and (3) based on the debtor's credible projections, the debtor could continue to

operate profitably).    Given the Debtors' budget projections shown to the Court to date—developed in consultation with the Lenders—which show a positive cash accrual, it seems highly unlikely that their cash needs would change so drastically that the Debtors would need to draw down the $59 million quickly.[28]    In fact, and also similar to the *Carbone* case, the positive increase in the Debtors' cash actually results in a negative diminution in value of the Lenders' cash collateral.    For these reasons, the Court should deny the Debtors' use of cash collateral on a final basis to the extent such use is conditioned by the Lenders on a draw of the Letters of Credit because to do so would provide the Lenders with protections that far exceed what is "adequate" to protect the Lenders.

As discussed above, by requesting approval of the use of cash collateral, the Debtors implicitly request this Court to approve draws on the Letters of Credit as part of the budget notwithstanding the multitude of competing interests in the Letters of Credit.    As set forth at length in this Opening Brief, the Letters of Credit were established pursuant to the Boiler Contract to provide a source of funds so that a potential judgment against Foster Wheeler, Longview's chosen boiler-supplier, could be satisfied.    The language of the Coordination Agreement unambiguously assigns "all rights and obligations" of Longview under the Boiler Contract "including the right to demand" under the Letters of Credit to the Consortium.    *See infra*, Section III.B.    The Boiler Contract and Letters of Credit contain terms that must be satisfied before demand can be made on the Letters of Credit.    The bankruptcy filing does not change or alter these contractual terms.    *See National Cable Television Cooperative, Inc. v.*

---

[28] Pursuant to the Briefing Stipulation, the Debtors will not produce a draft of their final budget to Kvaerner until September 27, after which the parties will engage in discovery regarding the Debtors' actual cash flow and operational cash needs.  Kvaerner will thus update the pertinent facts regarding the budget and cash collateral in its October 2, 2013 reply.

*Broadstripe, LLC (In re Broadstripe, LLC)*, 2009 WL 774401 (D. Del. March 26, 2009) (bankruptcy filing does not change the terms of an executory contract).

In this Court, the Debtors, including counsel that represented Longview during the TRO Action, argued that the Letters of Credit "were never assigned. The steps needed to assign [the Letters of Credit] never occurred" and "nobody has complied with those terms in order to effect an assignment." *See* First Day Hr'g Tr. 88:6-9. In its opposition to Foster Wheeler's motion for a TRO, however, Longview affirmatively argued that it "assigned the right to make a demand under FW's letters of credit." *See* J.A. Ex.9, p.4. This statement is an affirmative admission that Longview assigned rights to the Letters of Credit to the Consortium. While the parties may argue over the extent of the assignment, it is uncontroverted that Longview assigned an interest in the Letters of Credit to the Consortium.

The Debtors now seek this Court's imprimatur to draw down the Letters of Credit so that they can meet an artificial cash-liquidity covenant imposed by the Lenders even though (i) the extent of the Consortium's rights to the Letters of Credit are the subject of the Arbitration;[29] (ii) the conditions for a draw down have not occurred; and (iii) such proceeds are not needed for the Debtors' operations. It is the Consortium, as a third party with an interest in the Letters of Credit, which is entitled to the protections of § 363(e). *See In re Magness,* 972 F.2d 689, 697 (6th Cir. 1992) ("The interest of the persons presently involved in this orderly succession cannot adequately be protected in any manner except by prohibiting the sale and assignment of the membership."); *In re Dewey Ranch Hockey, LLC,* 414 B.R. 577, 579 (Bankr. D. Ariz. 2009) (NHL's interest in league bylaws restricting franchise moves could not be adequately protected

---

[29] As the Court aptly pointed out at the First Day Hearing, the issues of the right to demand and draw upon the Letters of Credit and the conditions for such a draw have already been teed up by the Tribunal. The Court commented that the arbitrators' analysis would not include whether the Debtors' Lenders demanded that Longview draw down on the Letters of Credit to allow the Debtors to maintain a cash reserve. *See* First Day Hr'g Tr. 107:6-108:12.

such that court could not approve sale which would move franchise from Phoenix to Hamilton). The requirement of adequate protection in Section 363(e) is mandatory. If adequate protection cannot be provided, such use or sale must be prohibited. *See* 3 *Collier on Bankruptcy* ¶ 363.05[2], p. 363-42 (15th ed. 2007).

In this case the Debtors told this Court that there are no material unencumbered assets. *See* First Day Hr'g Tr. 42:23-43:3. As a result, there is no adequate protection the Debtors can provide to the Consortium to protect against the diminution in value of the proceeds of the Letters of Credit should the Debtors draw, exhaust the proceeds, and then it is subsequently determined that the Debtors had no right to draw in the first place. Even assuming the Debtors have any rights to demand and draw down on the Letters of Credit, which they do not, ramifications to the Consortium that would occur from an improper demand and draw down by the Debtors include, *inter alia:* (a) damages resulting from the breach of the Coordination Agreement; and (b) loss of the security provided to the Consortium under the Coordination Agreement before a full and final decision could be made by the Arbitrators. For these reasons the Court should deny the Debtors' request for approval of Cash Collateral on a Final Basis to the extent the Lenders' condition the Debtors' use of Cash Collateral on a demand and draw on the Letters of Credit.

## VI.    CONCLUSION

Kvaerner respectfully requests entry of orders (a) finding that the Court does not have jurisdiction to decide the Arbitration Claims, including the Letter of Credit issues; (b) modifying the automatic stay to allow the continuance of the Arbitration for the purposes of liquidating the respective claims of the Arbitration Parties, including resolving the Letters of Credit Issues; or if the Court determines that the stay should not be lifted for the entire Arbitration, lift the stay on a limited basis to allow the Tribunal to rule on Kvaerner's Application with respect to placing the

Letters of Credit in escrow to preserve the status quo; (c) in the alternative, denying the Debtors' proposed demand and draw on the Letters of Credit because the Letters of Credit are not property of the Longview estate; and (d) denying the Debtors' use of Cash Collateral to the extent such use is conditioned by the Lenders on the Debtors making a demand and drawing on the Letters of Credit and because there is no adequate protection the Debtors can provide to the Consortium to protect against the diminution in value of the proceeds of the Letters of Credit should the Debtors draw, exhaust the proceeds, and then it is subsequently determined that the Debtors had no right to draw in the first place.

Dated:  September 18, 2013

**DORSEY & WHITNEY (DELAWARE) LLP**

/s/  Eric Lopez Schnabel
Eric Lopez Schnabel (DE Bar No. 3672)
Robert W. Mallard (DE Bar No. 4279)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177
E-mail:  schnabel.eric@dorsey.com
         mallard.robert@dorsey.com

**DORSEY & WHITNEY LLP**
Neil E. McDonell, Esq.
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
E-mail:  mcdonell.neil@dorsey.com

Jocelyn L. Knoll, Esq.
Eric Ruzicka, Esq.
50 South Sixth Street
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868
E-mail:  knoll.jocelyn@dorsey.com
         ruzicka.eric@dorsey.com

*Attorneys for Kvaerner North American Construction Inc.*