## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LONGVIEW POWER, LLC, <u>et al.</u>,[1] | ) | Case No. 13-12211 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 25, 55, 57, 62, 157, 200, 202,** |
| | ) | **204, 205, 208, 211, 287, 310 & 319** |
| KVAERNER NORTH AMERICAN | ) | |
| CONSTRUCTION INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 13-52255 (BLS) |
| | ) | |
| LONGVIEW POWER, LLC, | ) | **Re: Docket No. 3, 15 & 18** |
| | ) | |
| Defendant. | ) | |
| FOSTER WHEELER NORTH AMERICA | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 13-52256 (BLS) |
| | ) | |
| LONGVIEW POWER, LLC, | ) | **Re: Docket No. 3, 13 & 16** |
| Defendant. | ) | |

## DEBTORS' OMNIBUS RESPONSE TO CONTRACTORS' (I) MOTIONS TO LIFT THE STAY TO PROCEED WITH ARBITRATION, (II) OBJECTIONS TO ENTRY OF FINAL CASH COLLATERAL ORDER, (III) MOTIONS FOR PRELIMINARY INJUNCTIVE RELIEF, AND (IV) LIMITED OBJECTIONS TO ENTRY OF FINAL ORDER AUTHORIZING DEBTORS TO CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification are fully set forth in footnote 1 of the accompanying ; Declaration of Jeffrey L. Keffer in Support of Debtors' Omnibus Responses to Contractors' Filings (hereinafter the "<u>Oct. 17 Keffer Decl.</u>")

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ v

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 4

      A.      Longview Paid $2 Billion for a Power Plant That Does Not Work.................. 4

      B.      The Relevant Agreements and the Letters of Credit........................................ 8

           1.      The Boiler Agreement.................................................................... 8

           2.      The Letters of Credit .................................................................. 10

           3.      Longview's Agreements with the Consortium Members and the Coordination Agreement................................................................ 11

      C.      The Purported Assignment. ........................................................................... 12

      D.      The Consortium's Conduct Confirms The Absence of an Outright Assignment of the Letters of Credit............................................................... 14

      E.      Longview Has Been Damaged by Foster Wheeler's Numerous Breaches of its Obligations Under the Boiler Agreement ............................. 15

      F.      The Current Arbitration and the Arbitration Provisions at Issue................... 16

ARGUMENT .................................................................................................................... 17

    I.      Longview is the Sole Beneficiary of The Letters of Credit and Owns the Exclusive Right to Draw and the Proceeds Thereof ............................................. 17

      A.      Longview is the Owner and Beneficiary of the LCs and Has The Absolute Right to Draw on The Letter of Credit Upon Submission of a Conforming Draw Request ........................................................................... 17

      B.      Resolution of the Contractual Disputes Subject to the Arbitration is Irrelevant to Longview's Rights Under the Letters of Credit ........................ 18

    II.      Longview Did not Transfer the Letters of Credit or Assign Their Proceeds to the Consortium....................................................................................................... 22

      A.      Transfer and Assignment of Letters of Credit Under the UCP and the UCC .............................................................................................................. 23

      B.      There Has Been No Valid Transfer of The Letters of Credit ........................ 24

           1.      Under UCP 500, Restrictions on Transfer of Letters of Credit are Enforceable and Strictly Construed ............................................. 24

           2.      The Letters of Credit Contain Explicit Restrictions on Transfer— None of Which Have Been Complied With ............................. 24

      C.      There Has Been No Assignment of Proceeds of The Letters of Credit .......... 25

    III.      The Contractors Are Not Entitled to the Extraordinary Remedy of Injunctive Relief................................................................................................... 28

A.     The Standard for Granting a Preliminary Injunction ...................................... 29

B.     The Contractors Cannot Demonstrate a Likelihood of Success on the Merits .......................................................................................................... 30

    1.     The Relevant Merits for the Court to Consider are the Contractors' Entitlement to Permanent Injunctive Relief............................................. 30

    2.     The Contractors Have No Likelihood of Success on the Merits Because they Cannot Demonstrate Fraud in the Transaction .................. 32

       a)     The Court Need Not and May Not Analyze All of the Arbitration Issues ................................................................... 34

       b)     Longview's Draw Does Not Require an Adjudication of Foster Wheeler's Liability ................................................................. 35

          (1)     Foster Wheeler's Failure to Perform Under the Boiler Agreement is More than Colorable and Amply Supported by Facts ............................................................ 37

          (2)     Foster Wheeler Has Been Notified in Writing of its Failures and Has Not Fixed the Defective Boiler ....................... 37

          (3)     Longview's Entitlement to Costs and Damages in the Full Amount of the LCs is Colorable and Supported by Ample Factual Bases ......................................................... 38

          (4)     Longview Has Not Assigned the Right to Draw Under the LCs or Their Proceeds ................................................... 39

          (5)     The Claims Asserted by Longview are Irrelevant to its Rights under the LCs ................................................... 40

          (6)     The Coordination Agreement Does Not Affect Longview's Ability to Determine that Foster Wheeler Failed to Perform Under the Boiler Agreement ....................................... 40

C.     The Contractors Cannot Establish that They Will be Irreparably Harmed............................................................................................................ 41

D.     Granting a Preliminary Injunction Will Result in Greater Harm to Longview than the Contractors ...................................................................... 44

IV.     The Bankruptcy Court is the Proper Forum to Resolve the LC Dispute ............. 45

A.     The Interplay Between the Federal Arbitration Act and the Bankruptcy Code ......................................................................................................... 50

B.     The First Prong of the *Mintze* Test is Satisfied:  The Determination of Whether the LCs Are Property of the Estate is a Statutory Claim Created by the Bankruptcy Code ................................................................ 52

    1.     A Determination of Whether the LCs are Property of the Estate is a Proceeding "Arising Under" the Bankruptcy Code, and as such, is a Cause of Action Created by the Bankruptcy Code ............................... 53

2.       Determination of Ownership Issues in the LCs is a Fundamental Proceeding Under the Bankruptcy Code ................................................... 55

3.       The Contractors Misstate the First Prong of the *Mintze* Analysis ............ 56

       a)    The Determination of Whether the LCs Are Property of the Estate Does Not "Derive Exclusively" from State Law, and In Any Event, Whether State Law Issues Are Decided is Irrelevant .......................................................................................... 57

       b)    The Issue of Whether the Property of the Estate Issues are "Debtor-Derived" is a Not Relevant to the Current Dispute .............. 59

C.     The Second Prong of the *Mintze* Test is Satisfied:  Arbitration of Whether the LCs are Property of the Estate Inherently Conflicts with, and Seriously Jeopardizes the Objectives of the Bankruptcy Code ................ 61

1.       Arbitration of Whether the LCs Are Property of the Debtors' Estate Strips All Parties-In-Interest of Their Legal Rights to Be Heard, Including the Lenders Who Have a Property Interest in the LCs ...................................................................................................... 62

2.       Arbitration of Whether the LCs Are Property of the Debtors' Estate Will Result in Piecemeal Litigation ................................................ 66

3.       Arbitration of Whether the LCs Are Property of the Debtors' Estate Violates the Fundamental Purpose of the Bankruptcy Code by Interfering with This Court's Ability to Exercise Jurisdiction Over the Debtors' Assets and Arrange for the Equitable Distribution to All Creditors ................................................................... 68

4.       Arbitration of Whether the LCs Are Property of the Debtors' Estate Will Substantially Interfere with the Debtors' Reorganization ........................................................................................ 71

V.     The Debtors Have Agreed to Immediate Limited Stay Relief ............................. 73

VI.   The Contractors' Limited Objections to the Debtors' Use of Cash Collateral Should Be Denied ............................................................................. 73

CONCLUSION .................................................................................................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1234 Broadway LLC v. West Side SRO Law Project,*
    86 A.D.3d 18 (N.Y. App. Div. 2011) ...............................................................56, 57

*3Com Corp, v. Banco do Brasil, S.A.,*
    171 F.3d 739 (2d Cir. 1999)..........................................................................45

*410 Sixth Ave. Foods, Inc. v. 410 Sixth Ave., Inc.,*
    197 A.D.2d 435 (N.Y. App. Div. 1993) ........................................................45, 59

*A. O. Smith Corp. v. F.T.C.,*
    530 F.2d 515 (3d Cir. 1976)..........................................................................68

*Ace Am. Ins. Co. v. Bank of the* Ozarks,
    No. 11 Civ. 3146 (PGG), 2012 U.S. Dist. LEXIS 110891 *13 (S.D.N.Y. Aug. 3,
    2012) ........................................................................................... *passim*

*Acierno v. New Castle Cnty.,*
    40 F.3d 645 (3d Cir. 1994)............................................................................69

*Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.,*
    982 F.2d 813 (2d Cir. 1992).................................................................44, 46, 48

*Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.,*
    748 F. Supp. 177 (S.D.N.Y. 1990) .................................................................50

*Borman v. Raymark Indus., Inc.,*
    946 F.2d 1031 (3d Cir. 1991).........................................................................74

*Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ (Brenntag III),*
    70 F. Supp. 2d 399 (S.D.N.Y. 1999)........................................................45, 59, 70

*Brenntag Int'l Chems., Inc. v. Bank of India (Brenntag II),*
    175 F.3d 245 (2d Cir. 1999)...........................................................................70

*Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ (Brenntag I),*
    9 F. Supp. 2d 331 (S.D.N.Y. 1998) .............................................................70, 71

*Canadian Imperial Bank of Commerce v. Pamukbank Tas,*
    166 Misc. 2d 647 (N.Y. Sup. Ct. 1994) ...........................................................44

*Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,*
    443 F.2d 867 (2d Cir. 1971)......................................................................69, 70

*CE Casecnan Water & Energy Co. v. Korea First Bank,*
    248 A.D.2d 330 (N.Y. App. Div. 1998) ...............................................................66

*Cent. Va. Cmty. Coll. v. Katz,*
    546 U.S. 356 (2006)...............................................................................................22, 31

*Centrifugal Casting Machine Co. v. Am. Bank & Trust Co.,*
    966 F.2d 1348 (10th Cir. 1992) ..........................................................................47, 48

*Chiat/Day Inc. v. Kalimian,*
    105 A.D.2d 94 (N.Y. App. Div. 1984) ...................................................45, 60, 64

*Cipriani 200, LLC v. 200 Fifth Ave. Owner, LLC,*
    No. 0602657/2007, 2007 WL 3325862 (N.Y. Sup. Ct. Oct. 31, 2007) ..................65

*Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.,*
    10 A.D.2d 372 (N.Y. App. Div. 1960) ................................................................54

*CRP/Extell Parcel I, L.P. v. Cuomo,*
    394 Fed. App'x 779 (2d Cir. 2010)..........................................................69, 71, 72

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
    952 F.2d 802 (4th Cir. 1991) ..............................................................................56

*Emery-Waterhouse Co. v. R.I. Hosp. Trust Nat'l Bank,*
    757 F.2d 399 (1st Cir. 1985)................................................................................47

*Figueroa v. Precision Surgical, Inc.,*
    423 Fed. App'x 205 (3d Cir. 2011).................................................................57, 59

*First Commercial Bank v. Gotham Originals,*
    64 N.Y.2d 287 (1985) ..........................................................................................45

*Ford Motor Credit Co., LLC v. Roberson,*
    No. WDQ-10-1041, 2010 WL 4286077 (D. Md. Oct. 29, 2010) ...........................41

*Grant River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007)...................................................................................68

*Ground Air Transfer, Inc. v. Westate's Airlines, Inc.*
    899 F.2d 1269 (1st Cir. 1990)..................................................................60, 63, 65

*Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,*
    527 U.S. 308, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999).....................................58

*Hanson Trust PLC v. ML SCM Acquisition, Inc.,*
    781 F.2d 264 (2d Cir. 1986)................................................................................56

*Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  885 F.2d 1149 (3d Cir. 1989) ............................................................................... *passim*

*IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*,
  250 F. App'x 476 (3d Cir. 2007) ...............................................................................56

*In re Aegis Mortg. Corp.*,
  No. 08-50237, 2008 WL 2150120 (Bankr. D. Del. May 22, 2008) (Shannon, J.) .................20

*In re Aleris Int'l, Inc.*,
  456 B.R. 35 (Bankr. D. Del. 2011) (Shannon, J.) ...........................................................74, 75

*In re APF Co.*,
  264 B.R. 344 (Bankr. D. Del. 2001) ........................................................................39

*In re Becker*,
  136 B.R. 113 (Bankr. D.N.J. 1992) ..........................................................................25

*In re Broadstripe, LLC*,
  402 B.R. 646 (Bankr. D. Del. 2009) ........................................................................57

*In re Cox*,
  433 B.R. 911 (Bankr. N.D. Ga. 2010) ......................................................................23

*In re EXDS, Inc.*,
  316 B.R. 817 (Bankr. D. Del. 2004) ........................................................................28

*In re Hemphill Bus Sales, Inc.*,
  259 B.R. 865 (Bankr. E.D. Tex. 2001) ....................................................................34, 41

*In re Huffman*,
  486 B.R. 343 (Bankr. S.D. Miss. 2013) ...................................................................33

*In re Loewen Group Int'l, Inc.*,
  344 B.R. 727 (Bankr. D. Del. 2006) .....................................................................26, 28

*In re Martin*,
  387 B.R. 307 (Bankr. S.D. Ga. 2007) ....................................................................29, 41

*In re Mirant Corp.*,
  316 B.R. 234 (Bankr. N.D. Tex 2004) ............................................................24, 25, 31, 33

*In re National Gypsum Co.*,
  118 F.3d 1056 (5th Cir. 1997) ....................................................................17, 24, 39

*In re Oakwood Homes Corp.*,
  No. 04-56928PBL, 2005 WL 670310 (Bankr D. Del. Mar. 18, 2005) ...................................28

*In re Olympus Healthcare Group, Inc.*,
    352 B.R. 603 (Bankr. D. Del. 2006) ..........................................................................26, 27, 28

*In re PRS Ins. Group, Inc.*,
    No. 02-1977 (MFW), 2003 WL 21262446 (Bankr. D. Del. May 30, 2003) ...........................30

*In re Quad Sys. Corp.*,
    No. 00-35667F, 2001 WL 1843379 (Bankr. E.D. Pa. Mar. 20, 2001) .............................35, 36

*In re Reliance Group Holdings, Inc.*,
    273 B.R. 374 (Bankr. E.D. Pa. 2002) ...................................................................................22

*In re Rushing*,
    443 B.R. 85 (Bankr. E.D. Tex. 2010) ....................................................................................30

*In re Salander-O'Reilly Galleries, LLC*,
    475 B.R. 9 (S.D.N.Y. 2012)...............................................................................20, 21, 30, 31

*In re Sanders-Langsam Tobacco Co., Inc.*,
    224 B.R. 1 (Bankr. E.D.N.Y. 1998).......................................................................................46

*In re SemCrude, L.P.*,
    428 B.R. 82 (Bankr. D. Del. 2010) ........................................................................................20

*In re TEU Holdings, Inc.*,
    287 B.R. 26 (Bankr. D. Del. 2002) ........................................................................................26

*In re Thorpe Insulation Co.*,
    671 F.3d 1011 (9th Cir. 2012) .........................................................................................34, 38

*In re Towner Petroleum Co.*,
    48 B.R. 182 (Bankr. W.D. Okla. 1985) .................................................................................75

*In re United States Lines, Inc.*,
    197 F.3d 631 (2d Cir. 1999).............................................................................................29, 30

*In re W.R. Grace & Co.*,
    Case No. 01-01139, 2007 WL 1129170 (Bankr. D. Del. Apr. 13, 2007) ...............................75

*In re White Mountain Mining Co.*,
    403 F.3d 164 (4th Cir. 2005) .......................................................................................... *passim*

*In re Wire Comm Wireless, Inc.*,
    No. 2:07-cv-02451-MCE, 2008 WL 4279407 (E.D. Cal. Sept. 16, 2006) .............................25

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989).....................................................................................56, 58, 68

*Itek Corp. v. First Nat'l Bank*,
    730 F.2d 19 (1st Cir 1984) .......................................................................47, 48, 60

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
    596 F.2d 70 (2d Cir. 1979) ...................................................................................68

*KMW Int'l v. Chase Manhattan Bank, N.A.*,
    606 F.2d 10, 15-17 (2d Cir. 1979) ............................................................48, 59, 60

*Kos Pharms. Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)............................................................................56, 57

*Kvaerner U.S., Inc. v. Merita Bank PLC*,
    288 A.D.2d 6 (N.Y. App. Div. 2001) ...................................................................63

*Lenox Hill Hosp.*,
    No. 602635/2008, 2008 N.Y. Misc. LEXIS 6357, at *7 (Sup. Ct. Oct. 20, 2008) .................61

*Lincoln-Mercury, Inc. v. Ford Motor Co.*,
    562 F.3d 553 (3d Cir. 2009)..................................................................................57

*Midlantic Nat'l Bank v. Bridge (In re Bridge)*,
    18 F.3d 195 (3d Cir. 1994)....................................................................................37

*Miller v. Wells Fargo Bank Int'l Corp.*,
    540 F.2d 548 (2d Cir. 1976)..................................................................................53

*Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*,
    434 F.3d 222 (3d Cir 2006)............................................................................ *passim*

*MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*,
    435 F. Supp. 2d 285 (S.D.N.Y. 2006) *aff'd on other grounds*, 235 F. App'x 827 (2d
    Cir. 2007) ...............................................................................................................44

*New England Dairies, Inc. v. Dairy Mart Convenience Store, Inc. (In re Dairy Mart
    Convenience Stores, Inc.)*,
    351 F.3d 86 (2d Cir. 2003)....................................................................................79

*Newman Grill Sys., LLC v. Ducane Gas Grills, Inc. (In re Ducane Gas Grills, Inc.)*,
    320 B.R. 341 (Bankr. D.S.C. 2004) ......................................................................38

*Nissho Iwai Europe v. Korea First Bank*,
    99 N.Y.2d 115 (2002) ...........................................................................................45

*Nutrasweet Co. v. Vit-Mar Enters., Inc.*,
    176 F.3d 151 (3d Cir. 1999)............................................................................57, 59

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
    143 F.3d 800 (3d Cir. 1998)................................................................................69

*Pension Benefit Guaranty Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*,
    138 B.R. 442 (D. Del. 1992)...............................................................................21

*PGA Mktg. Ltd. v. Windsor Plumbing Supply, Inc.*,
    124 A.D.2d 577 (N.Y. App. Div. 1986) ..............................................................63

*Rafool v. Evans (In re Central Ill. Energy, L.L.C.)*,
    482 B.R. 772 (Bankr. C.D. Ill. 2012)..................................................................78

*Raytheon Co. v. AES Red Oak, LLC*,
    824 N.Y.S.2d 766 (Sup. Ct. 2005)................................................................62, 79

*Recon/Optical Inc. v. Gov't of Israel*,
    816 F.2d 854, 858 (2d Cir. 1987)........................................................................63

*Rockwell Int'l Sys. Inc v. Citibank, N.A.*,
    719 F.2d 583 (2d Cir. 1983)...................................................................48, 55, 71

*Roman Ceramics Corp. v. Peoples Nat'l Bank*,
    714 F.2d 1207 (3d Cir. 1983)..........................................................................60, 65

*Ross Bicycles, Inc. v. Citibank, N.A.*,
    161 A.D.2d 473 (N.Y. App. Div. 1990) ..............................................................62

*S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*,
    274 F.3d 771 (3d Cir. 2001)................................................................................56

*Sabratek Corp. v. Lasalle Bank, N.A. (In re Sabratek Corp.)*,
    257 B.R. 732 737 (Bankr. D. Del. 2009) ................................................... *passim*

*Semetex Corp. v. UBAF Arab Am. Bank*,
    853 F. Supp. 759 (S.D.N.Y. 1994) *aff'd*, 51 F.3d 13 (2d Cir. 1995)....................46, 48, 55, 59

*Shearson/Am. Express Inc. v. McMahon*,
    482 U.S. 220 (1987)................................................................................ *passim*

*Shields v. RLI Ins. Co. (In re Williams)*,
    No. 10-70005-CMS, 2010 WL 2670801 (Bankr. N.D. Ala. June 30, 2010) ...................58, 59

*Sztejn v. J. Henry Shroeder Banking Corp.*,
    31 N.Y.S.2d 631 (Sup. Ct. 1941)........................................................................48

*Tenn. Student Assistant Corp. v. Hood*,
    541 U.S. 440 (2004).......................................................................................23, 31

*Twp. of Burlington v. Apple Bank for Sav.*,
    No. 94 Civ. 6116 (JFK), 1995 U.S. Dist. LEXIS 8878 (S.D.N.Y. June 27, 1995).................46

*WFC Realty Co. v. Monzack (In re Goodrich)*,
    170 B.R. 31 (Bankr. D.R.I. 1994) ....................................................................................37, 38

*Wood v. Wood*,
    825 F.2d 90 (5th Cir. 1987) ..............................................................................................20, 21

*Zilkha Energy Co. v. Leighton*,
    920 F.2d 1520 (10th Cir. 1990) ................................................................................................38

## RULES & STATUTES

Fed. R. Civ. P. 64 ...............................................................................................................58

Fed. R. Civ. P. 65 ...............................................................................................................58

Fed. R. Bankr. P. 7064 .......................................................................................................58

Fed. R. Bankr. P. 7065 .......................................................................................................58

9 U.S.C. § 3 .........................................................................................................................17

9 U.S.C. § 4 .........................................................................................................................17

11 U.S.C. § 361 ...................................................................................................................79

11 U.S.C. § 362(d)(1) .........................................................................................................74

11 U.S.C. § 363(c)(2)(A) ....................................................................................................79

11 U.S.C. § 363(e) ..............................................................................................................79

11 U.S.C. § 363(p)(2) .........................................................................................................79

11 U.S.C. § 541 ........................................................................................................... *passim*

11 U.S.C. § 544 ........................................................................................................... *passim*

11 U.S.C. § 544(b) ..............................................................................................................27

11 U.S.C. § 547 ...................................................................................................................28

11 U.S.C. § 548 ...................................................................................................................28

11 U.S.C. § 1107(a) ............................................................................................................38

11 U.S.C. § 1109 ...........................................................................................................32, 34

11 U.S.C. § 1109(b) ........................................................................................................33

28 U.S.C. § 157 ..............................................................................................................20

28 U.S.C. § 157(b)(1) .....................................................................................................20

28 U.S.C. § 1331 .............................................................................................................21

28 U.S.C. § 1334 .............................................................................................................20

28 U.S.C. § 1334(b) ........................................................................................................20

28 U.S.C. § 1334(c)(1) ....................................................................................................26

28 U.S.C. § 1334(e) ..................................................................................................17, 23

U.C.C. § 5-109 cmt. 4 .....................................................................................................61

UCC Art. 5 ................................................................................................................50, 53

UCC § 5-109 ................................................................................................55, 56, 59, 60

UCC § 5-109(4) ..............................................................................................................60

UCC § 5-109(b) ..............................................................................................................55

UCC § 5-109(b)(3) ..........................................................................................................56

UCC § 5-109 cmt. 1 ...............................................................................59, 60, 61, 65

UCC § 5-112 ............................................................................................................50, 52

UCC § 5-114 ............................................................................................................50, 53

UCC § 5–109(b)(4) .........................................................................................................59

**OTHER AUTHORITIES**

(Adv. Pro. No. 13-52256, ECF No. 1, Compl; Adv. Pro. No. 13-52255, ECF No. 1,
    Compl, ECF No. 9 Mot. to Intervene.) ...................................................................58

5-544 Collier on Bankruptcy P 544.02 ..........................................................................37

Uniform Customs and Practice for Documentary Credits, 1993 Revision, International
    Chamber of Commerce Publication No. 500................................................... *passim*

## PRELIMINARY STATEMENT

This dispute arises from the Debtors' intent to draw under two letters of credit (the "LCs"), of which Debtor Longview Power, LLC ("Longview") is the beneficiary.  The Debtors' rights under the LCs are governed by clear principles of law, designed to promote simplicity and certainty.  These principles lead to a series of conclusions that support the Debtors' right to draw on the LCs and mandate denial of the Contractors' numerous requests for relief:

First, Longview as beneficiary of the LCs has an absolute right to draw under them.  Longview is the owner of a $2 billion power plant that is plagued by failures caused by a defective boiler.  The LCs were issued to Longview at the request of Foster Wheeler—the manufacturer of the defective boiler—as a source of liquid funds in the event that Foster Wheeler failed to perform its obligations.  Due to the boiler defects and other economic factors, Longview has been forced to seek this Court's protection to reorganize its debts and to obtain some breathing room from the Arbitration in order to fix the Plant.  Longview has refrained from drawing on the LCs until now in the hope that Foster Wheeler would fix the defective boiler.  Foster Wheeler, however, has failed to take responsibility for its breaches.[2]  Longview must, therefore, bear the burden of diagnosing and fixing the defective boiler.  It is entitled to and must have the LC proceeds to do so.

Second, the Contractors are not entitled to the extraordinary remedy of enjoining Longview's draw under the LCs.  Under applicable law such an injunction may only be issued where it is clear that a draw would be fraudulent or there has been fraud in the transaction.  The

---

[2] Although this brief is focused on claims asserted against Foster Wheeler for breaches of the Boiler Agreement, Longview has also asserted numerous claims against the members of the Consortium for breaches of the relevant agreements.  Nothing herein asserting liability against Foster Wheeler should be construed as a waiver of any claims Longview has asserted or may assert against Siemens, Kvaerner, or other parties arising from the design and construction of the Plant.

Contractors cannot meet this burden because it requires a showing that Longview would have no colorable right to draw under the LCs or that such a draw would have no factual basis.  As set forth more fully herein and in the accompanying October 17 Keffer Declaration, Longview's draw under the LCs is amply supported by facts, which Longview determined through its own detailed systematic investigation into the cause of the boiler failures.  This Court need not—and in fact under applicable law cannot—adjudicate the underlying contractual dispute as this is distinct from and irrelevant to Longview's rights under the LCs.  The commercial purpose of letters of credit is dependent on this "separateness" to ensure that the beneficiary's access to funds is not delayed by litigation.

Third, Longview did not assign the LCs, the right to draw under them, or their proceeds to the Consortium.  The conditions for transfer of the LCs or an assignment of proceeds are clear under the terms of the LCs themselves and governing law.  None of these conditions has occurred.  The members of the Consortium are sophisticated parties, who were represented by counsel during negotiation and execution of the Coordination Agreement and who have ample experience dealing with letters of credit in construction contracts.  Had the Consortium bargained for ownership of the LCs, the right to draw thereunder, or their proceeds, this could have easily been accomplished simply by following the provisions in the LCs themselves.  The fact that this did not occur is an accurate reflection of the parties' understanding that the LCs were always intended to benefit Longview in the event that Foster Wheeler failed to supply a working boiler. In fact the LCs were not issued until more than one month after the purported assignment occurred.  Had the Consortium bargained for the rights it now claims in the LCs, the LCs would have named the Consortium members as the beneficiaries rather than Longview.  Whatever lesser rights in the LCs the Consortium obtained under the Coordination Agreement, if any, it is

clear from the numerous reservations, qualifications, and reversionary interests that this was not

an absolute or outright assignment and the Consortium obtained no rights in the proceeds of the

LCs.

Fourth, this is not a dispute over the Debtors' use of cash collateral.  Because none of the

Contractors even claim a security interest in the LC proceeds, they have no standing to object to

Longview's use of the proceeds as "cash collateral."  The Consortium alleges outright ownership

of the proceeds rather than a security interest.  It is clear, however, that this is not true.  Instead,

Longview owns the proceeds of the LCs, subject to the first-priority security interest of its

Lenders.  The Lenders are the only parties entitled to adequate protection and the only parties

who would have standing to object to the Debtors' use of cash collateral on the grounds that the

Debtors' use of the LCs deprives them of adequate protection..

Finally, this Court is the only forum with jurisdiction over all parties who have rights in

the LCs and their proceeds.  This dispute cannot be decided by the Arbitration Tribunal because

the Lenders, who have a first-priority security interest in substantially all of Longview's assets,

are not parties to the arbitration clause.  ███████████████████████████████

███████████████  (Declaration of Philip R. White in Support of Debtors' Omnibus

Response (the "White Decl.") Ex. B; Joint Appendix of Foster Wheeler North America Corp.

and Kvaerner North American Construction Inc. ("Joint App."), Ex. 17, 91:16-21, ECF No. 214.)

The Lenders' absence from the Arbitration notwithstanding, this Court may and should exercise

its discretion to decide this dispute.  Determination of the Debtor's property rights in the LCs is

statutorily derived from the Bankruptcy Code and sending this dispute to the Arbitration—where

it may not be decided until 2015—conflicts with the purpose of the Bankruptcy Code and

threatens to derail this reorganization in its nascent stage.  The Debtors, however, have agreed to

limited relief from the automatic stay to permit the Arbitration to continue with respect to all issues other than the LCs, through the First Memorial, as described in the procedural orders entered in the Arbitration (the "First Memorial").

The Debtors immediate goals are fixing the Plant and restructuring the balance sheet.[3] The LC proceeds are vital to these immediate goals and the Debtors' request to use them, with the consent of its lenders, reflects a proper exercise of their business judgment and a means to achieve those goals. Furthermore, an adjudication of the Debtors' rights in the LCs must occur before December 15, 2013, when they currently expire by their own terms. Therefore, the Debtors request that this Court overrule the Contractors' objections to the Debtors' Motion to Use Cash Collateral on a final basis, determine that the LCs and their proceeds are property of the estate, and deny the Contractors unfounded requests to enjoin a draw.

## STATEMENT OF FACTS

### A.    Longview Paid $2 Billion for a Power Plant That Does Not Work.

In 2007, Longview hired Siemens Power Generation, Inc. ("Siemens"), Kvaerner North American Construction, Inc.[4] ("Kvaerner" and together with Siemens, the "Consortium"), and Foster Wheeler North America Corp. ("Foster Wheeler" and together with the Consortium, the "Contractors") to design and build a 700 net megawatt supercritical coal-fired power generation facility located in Maidsville, West Virginia (the "Plant"). (Declaration of Jeffrey L. Keffer in Support of First Day Motions ("Aug. 30 Keffer Decl."), ¶¶ 3, 5 ECF No. 4.) The Plant is designed—when it operates at full capacity—to be one of the most efficient coal-fired power

---

[3] The Debtors and the Steering Committee are cognizant of the remarks made by this Court at the pretrial conference on October 9, 2013 about advancing these bankruptcy cases beyond the disputes regarding the LCs. To that end, the Debtors and the Steering Committee continue discussions regarding an operational and financial restructuring of the Debtors.

[4] Kvaerner is formerly known as Aker Kvaerner Songer, Inc.

plants in the country and to have one of the lowest air emissions profiles of any such power plant operation in the United States. (*Id.* at ¶ 3.) The Contractors, however, failed to deliver a "functionally and operationally complete" Plant as they were required to under their contracts with Longview. (*E.g.*, Joint App. Ex. 1, ¶ 2.1, ECF No. 214.) Instead, Foster Wheeler and the other Contractors abandoned Longview with an incomplete Plant that does not meet the contractual specifications, does not operate reliably, cannot operate at full capacity, and is plagued with numerous defects. (Aug. 30 Keffer Decl. ¶ 5; Oct. 17 Keffer Decl. ¶ 4; Joint App., Ex. 14.) Rather than fix the deficiencies, the Contractors engaged in a campaign of finger pointing, culminating in Foster Wheeler's June 3, 2010 notification to Longview that it was withdrawing its contractual warranty of the boiler. (Oct. 17 Keffer Decl. ¶¶ 5-6 and Ex. 1.)

Problems with the boiler persisted during commissioning, in particular an unusually high number of tube leaks. (*Id.* at ¶ 9.) Ultimately, Longview was forced to issue Foster Wheeler Provisional Acceptance, "subject to completion and/or remediation of the Deferred Requirements which included the deficiencies with the boiler known at that time, such as the alignment and dimensional issues, poor weld quality, failed boiler tubes, excessive boiler repairs and the deficient incorporation of T-23 material." (*Id.* at ¶ 11; Joint App. Ex. 23.) To date, Foster Wheeler has failed to acknowledge its responsibility to remedy the Deferred Requirements and, in fact, has rejected any responsibility. (*Id.* at ¶ 12 and Ex. 2.)

After providing a qualified "Provisional Acceptance," Longview took possession of the plant and commenced operations. The boiler continued to experience boiler tube failures and other deficiencies to other equipment supplied by Foster Wheeler, resulting in numerous forced outages and extended planned outages. Longview ended up issuing 155 warranty claims to Foster Wheeler with respect to the constant failures of the boilers. (*Id.* at ¶¶ 13-14 and Exs. 3

and 4.)  By and large, Foster Wheeler has either expressly declined or failed to otherwise address

the claims relating to boiler tube leaks and failures, and, as a result, Longview has paid at least

$7.6 million for these warranty repairs (which amount does not include all the costs of outages

caused by these leaks and failures).  (*Id.* at ¶ 14.)  Meanwhile, the problems with the boiler

continued to mount.  During 2013, the boiler experienced an accelerated rate of tube failures,

resulting in frequent unplanned outages.  Because of the high frequency of forced outages,

Longview has canceled the October 2013 planned outage and will be conducting necessary

maintenance and repair work during unplanned outages, as they arise.  (*Id.* at ¶ 15.)

None of the Contractors can dispute that the Plant—and the boiler, in particular—is

defective.  This is clear from their papers filed with this Court.  Each one, however, points the

finger at everyone but themselves.  As a result, Longview has been forced to expend $2.5 million

on experts that have spent the better part of the past two years diagnosing the root cause of the

chronic tube failures with a view toward identifying and quantifying the steps necessary to fix

the boiler without the Contractors.  (*Id.* at ¶¶ 9-10, 16-17 and 20.)  During this process, the

experts determined that there are several mechanisms causing tube failures attributable to Foster

Wheeler and its scope of work.  (*Id.* at ¶ 17.)  Although the process of identifying specific

defects and their causes is ongoing, Longview has obtained cost estimates for the major repairs

that it currently understands are needed in the boiler and for other items within Foster Wheeler's

scope of work, all of which involve areas for which Foster Wheeler had been issued one or more

warranty claims.  Those current repair estimates, which continue to accumulate, total

approximately $48,297,793 (plus or minus 20%) and will not be completed until the Spring of

2015 if started now. (*Id.* at ¶¶ 18-20.)[5]  Needless to say,  Longview needs to commence these

repairs immediately if the Debtors have any hope of emerging from bankruptcy with a viable

business.[6] (Aug. 30. Keffer Decl. ¶ 34.)

Longview cannot sustain the costs of repairs and the significant lost revenues due to Plant

outages indefinitely.  Accordingly, it is vital to Longview's continued viability that the Plant be

fixed immediately.  Because Longview's debt structure is already over-leveraged, Longview

cannot afford to fund the additional costs to diagnose and repair the boiler.  Nonetheless, there is

a source of funds that will likely cover a significant portion of the cost of necessary repairs,

which will significantly buoy Longview's prospects of successfully reorganizing through this

case and emerging as a healthy and viable business.  Specifically, Longview is the beneficiary of

the LCs[7] posted by Foster Wheeler to ensure that Longview has immediate access to funds if it

believes that Foster Wheeler has failed to meet its obligations under the Boiler Agreement.

Together these LCs total approximately $59 million.

As detailed below, such letters of credit are customarily given by contractors to project

owners as a means of ensuring that in the event of a breach or a dispute, the owner has access to

funds to preserve or complete the project immediately, without having to obtain and collect on a

---

[5]  Not included in this estimate is the replacement of the upper furnace, which may need to be done at  substantial additional cost. (Oct. 17 Keffer Decl. ¶ 19.)  In addition to the estimated repair costs, which will continue to accumulate with the passage of time, Foster Wheeler is also responsible for liquidated damages for the delay caused by the problems experienced with the boiler. (*Id.* at ¶¶ 20-21.)

[6]  A detailed description of the various entities that comprise the Debtors and their corporate structure is set forth in Paragraphs 9 to 16 of the August 30, 2013 Declaration of Jeffery Keffer.

[7]  Longview initially financed the construction of the Plant with a February 28, 2007 Credit Agreement.  As amended, the Longview Credit Agreement provides Longview with two separate term loan facilities, a revolving credit facility, a synthetic letter of credit facility, and a synthetic revolving credit facility (the "Longview Credit Facility").  The outstanding balance of the Longview Credit Facility is currently in excess of $1 billion.  Longview's obligations under the Longview Credit Facility are secured by liens on substantially all of Longview's assets, including the $59 million in LCs that Foster Wheeler seeks to enjoin Longview from drawing upon and Kvaerner and Siemens seek to place beyond the reach of Longview and the Lenders. (Aug. 30 Keffer Decl. ¶¶ 18-19.)   In sum, the Lenders hold a perfected first priority security interest in the LCs.

judgment first.  The utility of letters of credit in such transactions is derived from their simplicity

and certainty.  Once posted, the issuing bank's obligations to the beneficiary, in this case

Longview, are separate and distinct from any other contracts and the only precondition to a draw

is the submission of certain documents.  Thus the very purpose of letters of credit such as those

at issue in this case is to allocate who gets to hold and use money while a dispute is pending.  In

this instance, Longview bargained for and obtained the right to draw on the LCs if in its

determination, Foster Wheeler failed to provide the boiler that Longview contracted for.

Although a dispute has been pending for several years, Longview has, to date, refrained

from drawing under the LCs.  This was motivated by the hope that a constructive resolution

could be reached where Foster Wheeler—the party in the best position to do so—fixed the

defective boiler.  To date that has not happened and the chronic boiler failures and other

economic forces have forced Longview into a corner where it can no longer afford to operate

with such an acute handicap, and must draw under the LCs to stem its losses and fund repairs to

the boiler.

### B.    The Relevant Agreements and the Letters of Credit

#### 1.    The Boiler Agreement

Longview's purchase of the boiler from Foster Wheeler is memorialized by the

Agreement for Boiler Island Equipment (the "Boiler Agreement").  Pursuant to the terms of the

Boiler Agreement, Foster Wheeler was to supply Longview with "a complete and operable coal

fired boiler for erection and installation. . . ." (Joint App. Ex. 2 at Art. 2(A).)  The Boiler

Agreement further required Foster Wheeler to supply all that is "necessary for the safe and

reliable operation of the [boiler] or are normally and customarily provided by a boiler supplier in

conjunction with the supply of a supercritical coal-fired boiler." (*Id.*)  The Boiler Agreement

also obligated Foster Wheeler to provide "technical field assistance to advise and consult with [Longview] and [the Consortium] on the erection, commissioning, testing, operating and maintenance of the [boiler]" and "provide technical and commercial support" to the Consortium during the implementation of the project.  (*Id.* at Arts. 2(B) and (C).)  Additionally, Foster Wheeler provided to Longview various guarantees and warranties, including a warranty that the boiler would be "free from defects in design, materials and workmanship."  (*Id.* at Art. 15(E)(1).)

As security for its performance, and in lieu of Longview's retention of cash pending final delivery of a fully operating and performing boiler as warranted, Foster Wheeler agreed to provide Longview with an irrevocable letter of credit in amount equal to 20% of the purchase price ($39,800,000) (the "Performance LC")  (*Id.* at Art. 6(F).)  Pursuant to this obligation, on February 28, 2007 Foster Wheeler delivered a letter of credit from BNP Paribas (the "Issuer"), numbered 91895015.  (Joint App. Ex. 16.)

Longview also permitted Foster Wheeler to provide a letter of credit in lieu of cash that Longview was entitled to retain from its milestone payments (the "Retention LC").  (Joint App. Ex. 2 at Art. 6(B).)  Foster Wheeler elected to receive the cash and therefore delivered a letter of credit in lieu of retainage from the Issuer, numbered 91895023, on February 28, 2007 in the amount of $203,000.  As the project progressed the Retention LC was progressively increased to its current amount of approximately $19 million to account for the milestone payments made by Longview.  (Joint App. Ex. 16.)

The LCs were also periodically amended to extend their expiration dates to account for project delays. Currently, the LCs provide Longview with a combined $59 million to secure Foster Wheeler's performance of its obligations.[8] (*Id.*)

### 2.    The Letters of Credit

Both LCs were issued one month <u>after</u> Longview and the Consortium entered into the Coordination Agreement, are intended to be drawn upon for precisely the circumstances Longview encounters—to compensate Longview for the costs incurred and damages suffered as a result of Foster Wheeler's failure to perform its obligations under the Boiler Agreement. Both "irrevocable" LCs, issued by BNP Paribas and established for the benefit of Longview, provide that Longview only needs to provide two documents to draw on them:

> A DRAWING HEREUNDER MAY BE MADE BY [LONGVIEW] . . . BY DELIVERING TO BNP PARIBAS . . . (I) A DRAWING STATEMENT EXECUTED BY [LONGVIEW] IN THE FORM ANNEXED 1 . . . AND (II) A DRAFT IN THE FORM OF ANNEX 2 . . . . UPON SUCH PRESENTATION, THE PAYMENT OF A DRAWING SHALL BE MADE IN ACCORDANCE WITH THE TERMS HEREIN.

(*Id.* at ¶ 1.) The Drawing Statement consists of a Certification from an authorized representative of Longview that Foster Wheeler "failed to perform" its obligations to supply Longview with a working boiler as part of the plant, and that Foster Wheeler is responsible for the costs and damages incurred by Longview as a result. (*Id*. at Annex 1.) The Draft sets forth the amount to

---

[8]  Foster Wheeler contends that the face amount of the LCs have been reduced because Foster Wheeler achieved "Provisional Acceptance" under the Boiler Agreement, and points to a December 16, 2011 letter (Joint App. Ex. 23) as evidence that Longview acknowledged as much. (Foster Wheeler North America Corporation's Mot. to Lift Stay to Compel Pending Arbitration to Proceed In Its Entirety and For Interim Equitable Relief Maintaining Status Quo Pending Resolution of the Arbitration Issues (hereinafter, "<u>Foster Wheeler Br.</u>") 9-10, ¶¶ 17-18, ECF No. 208.) Foster Wheeler knows this statement is false, and, in an effort to mislead this Court into thinking the face amount of the Performance LOC had been reduced by $10 million under the terms of the Boiler Agreement, omits the most pertinent part of the quoted sentence. The full sentence reads: "Accordingly, Longview accepts that Provisional Acceptance occurred on November 28, 2011, **subject to the completion and/or remediation of the Deferred Requirements**, which Longview has placed on the Foster Wheeler punchlist." (Joint App. Ex. 23 (emphasis added).) The Deferred Requirements remain outstanding. (Oct. 17 Keffer Decl. ¶ 12.)

be drawn on the Letter of Credit.  (*Id.* at Annex 2.)  Longview is not obligated to prove Foster

Wheeler's liability or the amount of its damages in order to draw down on the LCs; contrary to

Foster Wheeler's motion papers, submission of the above documentation is all the contract and

law requires.

The LCs can be "transferred" to any person or entity, but only upon submission to BNP

Paribas of a signed transfer certificate and payment by Longview of the appropriate transfer fee.

(Joint App. Ex. 16, LCs ¶ 8.)  In addition to a "transfer," the proceeds of the LCs can be

assigned.  Unlike a "transfer," which is expressly permitted to any person, the LCs require that

the issuer consent to an assignment of proceeds and the manner in which such assignment is

effected.  (*Id.* at ¶ 2.)  The Issuer expressly consents to an assignment of proceeds to the Lenders

and related parties:  "an assignment of the proceeds of this Letter of Credit is permitted to any

lender to the beneficiary or any agent or trustee of such lender and defined as such in the request

for an assignment of proceeds."  (*Id.* at ¶ 10.)  Longview never "transferred" the LCs and,

contrary to Kvaerner's and Siemens' motion papers, Longview did not assign either the LCs or

their proceeds.

### 3.    Longview's Agreements with the Consortium Members and the Coordination Agreement

In addition to the Boiler Agreement, Longview entered into an agreement with Kvaerner

to construct the Plant, including the Foster Wheeler boiler, and an agreement with Siemens to

design and commission the Plant as a system.  Contemporaneously with execution of the primary

agreements between Longview, Siemens, and Kvaerner, they collectively entered into a

Coordination Agreement.  The stated purpose of the Coordination Agreement was "[t]o facilitate

the coordinated, design and construction of the Plant[.]"  (Joint App. Ex. 1, § 8.1.)  Pursuant to

the Coordination Agreement, the Consortium assumed joint and several responsibility to

Longview, to provide "a functionally and operationally complete Plant," including the boiler.[9]

(*Id.* at § 2.2.)

The Coordination Agreement authorized the Consortium to manage the Boiler Agreement

and its performance under the Boiler Agreement as if Foster Wheeler were their subcontractor.

To that end, the Coordination Agreement provides that, except in the event of Foster Wheeler's

bankruptcy, " [Kvaerner] and [Siemens] are fully liable for the performance by [Foster Wheeler]

of its obligations under the [Boiler Agreement.]" (*Id.* at § 8.8.)  In furtherance of the

Consortium's contractual responsibilities under the Coordination Agreement, Longview

delegated and assigned to the Consortium certain rights and obligations under the Boiler

Agreement.  (*Id.* at § 8.2.)

Longview, however, retained significant obligations to Foster Wheeler under the Boiler

Agreement, including its obligation to make payments thereunder and the obligation to enforce

certain of Foster Wheeler's warranties, including that its work was free from defects in design,

materials and workmanship after Substantial Completion.  (*Id.* at §§ 8.1, 8.6.)

## C.    The Purported Assignment.

In furtherance of the Consortium's obligations under the Coordination Agreement,

Longview assigned and delegated to the Consortium "all rights and obligations of the Owner

under the Boiler Contract," including "the right to make demand under any letters of credit

provided thereunder. . . ."  (*Id.* at § 8.2.)  This assignment, however, was subject to numerous

---

[9]  Foster Wheeler was well aware of this management arrangement, as evidenced by the reference to the
Coordination Agreement in the preamble to the Boiler Agreement (Joint App. Ex. 2, p. 1) and Article 47, which
expressly provides that Siemens was appointed Longview's agent for purposes of the Boiler Agreement and that
Siemens had "the authority to exercise each and every of [Longview's] rights under the Agreement on behalf of
[Longview] without ratification or approval by [Longview]."

qualifications, reservations and limitations.  It did not completely divest Longview of its rights

under the Boiler Agreement or its control thereof and certainly did not constitute an outright

assignment.  Longview expressly retained the right to exercise "any rights or remedies assigned

and delegated" to the Consortium.  (*Id.*)  Longview retained the right to enforce Foster Wheeler's

warranties—one of the Foster Wheeler obligations secured by the LCs.  (*Id.* at § 8.6.)  Longview

expressly retained a reversionary interest in all rights assigned or delegated under the

Coordination Agreement.  (*Id.* at § 8.1.)  Longview retained certain rights in the event of Foster

Wheeler's bankruptcy.  (*Id.* at § 8.7.)  And, any assignment or delegation of Longview's rights

pursuant to Article 8 of the Coordination Agreement was qualified by the express limitation that

the Consortium may not exercise such rights to the extent that they adversely affect Longview.

(*Id.* at § 8.2.)

　　　　Recognizing that, in its role under the Coordination Agreement, the Consortium would be

in the best position to determine a breach under the Boiler Agreement, Longview provided to the

Consortium a contingent, qualified, and nonexclusive assignment of the right to "make demand"

under any letters of credit provided pursuant to the Boiler Agreement.  (*Id.* at § 8.2.)  This

limited assignment, however, did not convey any direct interest in the LCs themselves, nor did it

convey Longview's right to request a draw from the Issuer, and it certainly did not constitute an

assignment of proceeds.

　　　　Consistent with the absence of an "outright assignment," Section 8.2 does not provide for

any "transfer" of the LCs, as Kvaerner concedes (Kvaerner North American Construction Inc.'s

Omnibus Opening Br.  (hereinafter, "<u>Kvaerner Br.</u>") 45, n. 23, ECF No. 213), nor any

"assignment of their proceeds."  It also does not contain an agreement that Longview will cause

Foster Wheeler to have the LCs issued for the benefit of the Consortium in the first instance, nor

- 13 -

does it require Longview to execute the requisite "transfer" documents upon issuance of the LCs. Similarly, the LCs, which were issued on February 28, 2007—one month after the execution of the Coordination Agreement—do not even expressly permit Longview to assign the proceeds to the Consortium.  (Joint App. Ex. 16 at LCs ¶ 10.)

**D.** **The Consortium's Conduct Confirms The Absence of an Outright Assignment of the Letters of Credit**

Although the Contractors allege that the Coordination Agreement effected an "outright assignment" of the LCs, this is clearly not true based upon the language of the agreement itself as well as the conduct and admissions of the parties.  Significantly, the purported assignment occurred over one month <u>before</u> the LCs were issued.  (Joint App. Ex. 16.)  Despite their issuance <u>after</u> this purported assignment, however, the LCs both name Longview as the exclusive beneficiary.  They both impose significant procedural restrictions on transfer, none of which have happened here.  (*Id.* at ¶ 8.)  And they both restrict assignments of proceeds, except to Longview's lenders or their agents.  (*Id.* at ¶ 10.)

Despite what it now contends is an outright assignment of the LCs, the Consortium did not demand that it be named the beneficiary, even though Siemens received a copy of the Retainage LC on March 1, 2007 (*see* Oct. 17 Keffer Decl. at Ex. 5), and the Consortium admittedly received a copy of both LCs on May 7, 2010.  (*See* Joint App. Ex. 16.)  The Consortium did not demand that any of the conditions precedent for a transfer to take place.  Nor did it require that Longview assign the proceeds to the Consortium or that the terms of the LCs even permit an assignment to the Consortium.  In fact, the Consortium did not make any request or demands with respect to the LCs for approximately four years after they were supposedly assigned.

The LCs have been amended numerous times to increase their amount in exchange for cash milestone payments to Foster Wheeler, or to extend the expiration date.  Far from asserting their rights as the rightful holder of the LCs, the Consortium facilitated these extensions, as evidenced by Siemens requesting January 2011, as Longview's "agent," that Foster Wheeler extend the LCs.  (Oct. 17 Keffer Decl. Exs. 7 and 8.)  Foster Wheeler similarly treated Longview as the rightful holder and beneficiary of the LCs, as evidenced by the fact that Foster Wheeler sent the original LCs and all amended LCs directly to Longview.  (*E.g., id.* at Exs. 9-11.)  Had the Consortium seriously believed that it was entitled to the LCs or their proceeds, it seems implausible that they would have allowed Longview to hold the LCs all those years, particularly given the Consortium's contention that Foster Wheeler was responsible for the boiler defects.

On March 9, 2011—recognizing and acknowledging their lack of rights to the LCs—the Consortium requested that Longview transfer the LCs to them as joint beneficiaries.  Longview refused to execute such a transfer because the Consortium had not bargained for such rights under the Coordination Agreement.  (Joint App. Ex. 24.)  To do so would have left Longview without the protection of the LCs it had bargained for under the Boiler Agreement.  Since the March 9, 2011, request, the Consortium has requested that Longview transfer the LCs to it on several more occasions.  Each time Longview has refused for the same reasons.

### E.    Longview Has Been Damaged by Foster Wheeler's Numerous Breaches of its Obligations Under the Boiler Agreement

As set forth above, and as detailed in the October 17, 2013 Keffer Declaration, Longview has recently determined that the defects in the boiler experienced to date result from, among other things, Foster Wheeler design defects that impacted several material components of the boiler.  Longview identified those issues in the Deferred Requirements and issued 155 warranty claims to Foster Wheeler with respect to the constant failures of the boiler.  By and large, Foster

Wheeler has either expressly declined or failed to otherwise address the claims relating to boiler

tube leaks and failures.  Longview's estimated damages attributable to Foster Wheeler are

substantial.  (Oct. 17 Keffer Decl. ¶¶ 14, 18-21.)  They include, at a minimum:

- $7.6 million in warranty repairs;

- $48,297,793 (plus or minus 20%) to repair and/or replace major components of
  the boiler (excluding a potential replacement of the upper furnace);

- $2.5 million in expert costs; and

- upwards of $76 million in Liquidated Damages.  (*Id.*)

### F.        The Current Arbitration and the Arbitration Provisions at Issue

The disputes among Longview and the Contractors are currently subject to a pending

arbitration (the "Arbitration").  Kvaerner initiated the Arbitration in June 2011.  Thereafter, the

parties entered into an Agreement Regarding Selection of Neutral Arbitrations (the "Arbitration

Agreement") pursuant to which they further defined the scope of claims subject to arbitration.

(Joint App. Ex. 15.)   Among other things, Longview and the Contractors agreed that "any claims

and defenses arising out of any existing LCs shall be brought only before the Panel in the

Arbitration and determined by the Panel."  (*Id.*)  As discussed more fully below, however, the

LCs and their proceeds are subject to a perfected, first-priority security interest held by

Longview's secured lenders (the "Lenders"), who are not parties to the Arbitration Agreement.

Despite the interests in the LCs of parties who are not bound by the Arbitration Agreement, the

Contractors have sought to adjudicate the rights to the LCs in the Arbitration and have requested

the equivalent of provisional relief enjoining Longview's draw or use of the proceeds pending

resolution of the Arbitration, which is currently not scheduled to occur until some time in 2015.

Accordingly, Longview—in furtherance of its fiduciary duties to all creditors—seeks to have this Court determine its rights to the LCs and their proceeds, subject to the security interest of the Lenders, as this Court is the only forum where all parties with an interest in the LCs may be present and heard.

**ARGUMENT**

I.    **LONGVIEW IS THE SOLE BENEFICIARY OF THE LETTERS OF CREDIT AND OWNS THE EXCLUSIVE RIGHT TO DRAW AND THE PROCEEDS THEREOF**

   A.    **Longview is the Owner and Beneficiary of the LCs and Has The Absolute Right to Draw on The Letter of Credit Upon Submission of a Conforming Draw Request**

The LCs are irrevocable standby letters of credit.   They are identical in their terms except for their respective amounts.  Both specifically incorporate the terms of the Uniform Customs and Practice for Documentary Credits, 1993 Revision, International Chamber of Commerce Publication No. 500 (hereinafter "UCP 500"), and both provide that "[t]o the extent that the provisions of this letter of credit are not covered by [the UCP 500], this letter of credit shall be governed by and enforced and construed in accordance with the laws of the State of New York."[10]  (Joint App. Ex. 16, ¶ 9.)  As the named beneficiary, Longview is entitled under the terms of the LCs to draw on them solely on submission of a conforming "Drawing Statement" and "Draft."  (*Id.* at ¶ 1.)[11]

---

[10]  Under New York law, incorporation of UCP 500 is wholly permissible and deemed to have binding force.  *See, e.g., Canadian Imperial Bank of Commerce v. Pamukbank Tas*, 166 Misc. 2d 647, 654 (N.Y. Sup. Ct. 1994) ("[w]hen the UCP is incorporated into a letter of credit, the UCP provisions have binding force"); *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 293 (S.D.N.Y. 2006) *aff'd on other grounds*, 235 F. App'x 827 (2d Cir. 2007) (enforcing incorporation of UCP 500 and New York law to matters not covered thereby); *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 816 (2d Cir. 1992) ("Although it is not law, the UCP applies to most letters of credit . . . because issuers generally incorporate it into their credits").

[11]  "A DRAWING HEREUNDER MAY BE MADE BY BENEFICIARY . . . BY DELIVERING TO [THE ISSUER] . . . (I) A DRAWING STATEMENT EXECUTED BY BENEFICIARY IN THE FORM OF ANNEX 1 HERETO, PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF BENEFICIARY AND

Under the UCP 500, and general principles of letter-of-credit law, only the letter of credit documents are relevant to a draw request. UCP 500 Article 4 ("In Credit operations all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents relate."); *Ace Am. Ins. Co. v. Bank of the* Ozarks, No. 11 Civ. 3146 (PGG), 2012 U.S. Dist. LEXIS 110891, at *15 (S.D.N.Y. Aug. 3, 2012) ("'[i]f the documents . . . comply with the terms of the credit, the issuer's duty to pay is absolute,' regardless of what occurs in the related transaction.") (quoting *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 816 (2d Cir. 1992)). Thus, Longview has an absolute right to payment by the Issuer upon submission of a conforming drawing statement and draft request. *Id.* As set forth below, this absolute right is entirely separate and distinct from any rights, obligations, or disputes between Longview and the Contractors.

**B.    Resolution of the Contractual Disputes Subject to the Arbitration is Irrelevant to Longview's Rights Under the Letters of Credit**

In a futile effort to obfuscate this Court's relevant inquiry, the Contractors argue that it is necessary to decide each party's contractual liability in the Arbitration. This argument, however, ignores not only the plain terms of the LCs themselves—which do not require a judgment or arbitral award as a precondition to drawing—it also contravenes the fundamental principles that govern letters of credit.

A letter of credit is a commercial instrument that provides a beneficiary with a guaranteed means of payment from a third party. *See, e.g. Nissho Iwai Europe v. Korea First Bank*, 99 N.Y.2d 115, 119 (2002); *3Com Corp, v. Banco do Brasil, S.A.*, 171 F.3d 739, 741 (2d Cir. 1999). A fundamental precept of letter-of-credit transactions is the separateness principle, which

(II) A DRAFT IN THE FORM OF ANNEX 2 HERETO, PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF BENEFICIARY. UPON SUCH PRESENTATION, THE PAYMENT OF A DRAWING SHALL BE MADE IN ACCORDANCE WITH THE TERMS HEREIN."

requires that "the issuing bank's obligation to honor drafts . . . is separate and independent from

any obligation of its customer to the beneficiary under the . . .contract. . . ." *3Com Corp*, 171

F.3d at 741 (quoting *First Commercial Bank v. Gotham Originals*, 64 N.Y.2d 287, 294 (1985));

*Brenntag Int'l Chemicals, Inc. v. Norddeutsche Landesbank GZ (Brenntag III)*, 70 F. Supp. 2d

399, 410 (S.D.N.Y. 1999) ("independence principle" makes conduct in underlying transaction

"irrelevant" to determining the parties' rights under letter of credit ); *410 Sixth Ave. Foods, Inc.

v. 410 Sixth Ave., Inc.*, 197 A.D.2d 435 (N.Y. App. Div.1993) (right to payment under letter of

credit independent of underlying contractual dispute); *Chiat/Day Inc. v. Kalimian*, 105 A.D.2d

94, 95-100 (N.Y. App. Div. 1984).  As the Second Circuit has explained:

> The fundamental principle governing documentary letters of credit
> and the characteristic which gives them their international
> commercial utility and efficacy is that the obligation of the issuing
> bank to [honor] a draft on a credit when it is accompanied by
> documents which appear on their face to be in accordance with the
> terms and conditions of the credit is independent of the
> performance of the underlying contract for which the credit was
> issued. . . . This independence principle infuses the credit
> transaction with the **simplicity and certainty that are its
> hallmarks**. The letter of credit takes on a life of its own as
> manifested by the fact that **in credit operations all parties
> concerned deal in documents, not in goods, services, and/or
> other performances to which the documents may relate**.

*Alaska Textile Co.*, 982 F.2d at 815–16 (emphasis added) (internal quotation marks omitted); *see

also In re Sanders-Langsam Tobacco Co., Inc.*, 224 B.R. 1, 10 (Bankr. E.D.N.Y. 1998) ("for

reasons of policy, banks must be 'ignorant as to the specifics of the transaction' and must 'decide

quickly and reliably whether to pay by simply looking at the documents and determining whether

they comply with the letter of credit's requirements'").

        This principle "is predicated upon the fundamental policy that a letter of credit would

lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of

the credit to the underlying contractual controversy between its customer and the beneficiary."
*Ace Am. Ins. Co. v. Bank of the* Ozarks, No. 11 Civ. 3146 (PGG), 2012 U.S. Dist. LEXIS
110891, at \*13 (quoting *Twp. of Burlington v. Apple Bank for Sav.*, No. 94 Civ. 6116 (JFK),
1995 U.S. Dist. LEXIS 8878, at \*5 (S.D.N.Y. June 27, 1995)); *Semetex Corp. v. UBAF Arab Am.
Bank*, 853 F. Supp. 759, 770 (S.D.N.Y. 1994) *aff'd*, 51 F.3d 13 (2d Cir. 1995) (the independence
principle is universally viewed as essential to the proper functioning of letters of credit and to
their particular value).  Accordingly, "[t]he central purpose of the letter-of-credit mechanism
would be defeated if courts felt free to examine the merits of underlying contract disputes in
order to determine whether letters of credit should be paid." *Semetex*, 853 F. Supp. at 770 (citing
*Centrifugal Casting Machine Co. v. Am. Bank & Trust Co.*, 966 F.2d 1348, 1352 (10th Cir.
1992)).

 The principle that obligations under a letter of credit are independent and distinct from
rights under any other contract has been incorporated into the UCP 500, which governs the LCs.
UCP 500 Art. 3.  UCP 500 provides in relevant part:

> Credits by their nature, are separate transactions from the sales or
> other contract(s) on which they may be based and banks **are in no
> way concerned with or bound by such contract(s),** even if any
> reference whatsoever to such contract(s) is included in the Credit.
> Consequently, the undertaking of a bank to pay, accept and pay
> Draft(s) or negotiate and/or to fulfill any other obligation under the
> Credit, is **not subject to claims or defenses by the** Applicant
> [Foster Wheeler] resulting from his relationships with the Issuing
> Bank or the Beneficiary.

UCP 500 Art. 3(a) (emphasis added).

 Because the right of the beneficiary is distinct from any other contractual rights, letters of
credit are important means of allocating funds during the pendency of a dispute. *See, e.g.*, *Itek
Corp. v. First Nat'l Bank*, 730 F.2d 19, 24 (1st Cir. 1984) ("Parties to a contract may use a letter

- 20 -

of credit in order to make certain that contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party."); *Centrifugal Casting*, 966 F.2d at 1352; *Emery-Waterhouse Co. v. R.I. Hosp. Trust Nat'l Bank*, 757 F.2d 399, 404 (1st Cir. 1985); *Ace Am. Ins. Co.*, No. , 2012 U.S. Dist LEXIS 110891, at *15. "Parties insist upon receiving [LCs] specifically so that they will not have to wait for payment, or even worse, sue and wait for payment." *Sabratek Corp. v. Lasalle Bank, N.A. (In re Sabratek Corp.)*, 257 B.R. 732 737 (Bankr. D. Del. 2009). Thus, "examining the rights and wrongs of a contract dispute to determine whether a letter of credit should be paid risks depriving its beneficiary of the very advantage for which he bargained, namely that the dispute would be resolved while he is in possession of the money." *Itek*, 730 F.2d at 24 (citing *KMW Int'l v. Chase Manhattan Bank*, 606 F.2d 10, 15-17 (2d Cir. 1979)).

Accordingly, the Contractors' contention that resolution of the contractual disputes in the Arbitration is necessary or even relevant to Longview's rights under the LCs is false as a matter of law and nothing more than a transparent tactic to complicate a transaction that is characterized by simplicity and certainty. *See Alaska Textile Co.*, 982 F.2d at 815–16. Had the parties intended that a final judgment or binding arbitration award be a precondition to a draw under the LCs, such documentary requirements could have been incorporated into their terms. Instead, Longview bargained for and obtained the right to realize and use the proceeds of the LCs during the pendency of any dispute with Foster Wheeler. Examining the underlying contractual dispute would deprive Longview of this right and contravene the terms of the LCs themselves, the UCP 500, and well settled, binding case law. Accordingly, this Court need not and, indeed, may not look beyond the clear documentary requirements under the LCs in determining Longview's right to payment thereunder, and thus none of the issues identified by Foster Wheeler (Foster Wheeler

Br. 18-19, ¶ 33) need to be resolved to permit a draw.  *Semetex*, 853 F. Supp. at 770 (citing

*Centrifugal Casting*, 966 F.2d at 1352); UCP 500 Article 3(a).[12]

## II.    LONGVIEW DID NOT TRANSFER THE LETTERS OF CREDIT OR ASSIGN THEIR PROCEEDS TO THE CONSORTIUM

The Contractors claim that Longview may not draw under the LCs or that it has no

interest in their proceeds because Longview purportedly assigned them to the Consortium in the

Coordination Agreement.  It is clear, however, from the plain language of the Coordination

Agreement, that Longview did not convey its sole right to draw under the LCs, nor its ownership

of their proceeds.  The transfer of letters of credit and assignment of proceeds are both familiar

terms of art within letter-of-credit transactions. Had the parties intended either of these

conveyances to occur, the Coordination Agreement would have clearly said so.

The Consortium and Foster Wheeler are each sophisticated parties that were represented

by experienced counsel in negotiating the relevant agreements.  Both the LCs themselves and the

law that governs them explicitly state the steps that the Consortium needed to take in order to

acquire the proceeds of the LCs or the ability to draw on them.  Despite the sophistication of the

parties, however, and the veritable roadmap provided in the LCs to transfer or assign them, the

parties took none of the necessary steps.  The reason is clear:  The Consortium did not expect,

---

[12]  Relying primarily upon *Sztejn v. J. Henry Shroeder Banking Corp.*, 31 N.Y.S.2d 631 (Sup. Ct. 1941) and *Rockwell International Systems Inc v. Citibank, N.A.*, 719 F.2d 583, 589 (2d Cir. 1983), Foster Wheeler contends that courts will always look beyond the face of the drawing documents when faced with a factual dispute as to the proprietary of the draw, and contends that its allegation that there was "fraud in the transaction" is enough to trigger such an inquiry.  (Foster Wheeler Br. 47-49.)  Not so.  *Sztejn* and *Rockwell* involve extreme circumstances of fraud. In *Sztejn*, the seller was trying to pass off a shipment of "worthless material and rubbish" as genuine merchandise, and then attempting to draw on a letter of credit for payment.  In *Rockwell*, the Iranian government frustrated the performance of the contractor, and then sought to draw down the letter of credit based on the failure to perform.  In both, allowing the draw would reward the party whose wrongful conduct caused the default that triggered the facial right to make a demand.  As discussed in Point III.B.2, *infra*, the Contractors have a "high burden" to enjoin a draw based on allegations of a "fraud in the transaction," and the circumstances presented here fall woefully short.

bargain for, or receive Longview's ability to draw under the LCs or an assignment of their proceeds.

Longview and the Consortium executed the Coordination Agreement, which contains the purported assignment, over a month <u>before</u> BNP Paribas issued the LCs.  Had the parties intended the Consortium to possess the draw rights and proceeds of the LCs, the Consortium would have been named the beneficiary.  Once again this step was never taken and under the clear terms of the LCs, Longview remains the only party entitled to draw and the owner of the proceeds, subject to the Lenders' security interest.

### A.    Transfer and Assignment of Letters of Credit Under the UCP and the UCC

The UCP 500, which governs the LCs, distinguishes between a "transfer" of a letter of credit and an assignment of proceeds.  UCP 500 Articles 48, 49; *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.*, 748 F. Supp. 177, 181-82 (S.D.N.Y. 1990).  A transfer of a letter of credit conveys all rights of the beneficiary and effectively substitutes the transferee for the initial beneficiary.  UCP 500 Article 48; *Algemene Bank*, 748 F. Supp. at 182.  After a transfer, only the transferee may present the documentation necessary to effect a draw.  UCP 500 Article 48; *Algemene Bank*, 748 F. Supp. at 182.  By contrast, an assignment of proceeds only changes the party entitled to receive the proceeds, but the transferor-beneficiary remains the only party entitled to request a draw.  UCP 500 Article 49; *Algemene Bank*, 748 F. Supp. at 182; *see also* UCC § 5-114.  Neither the UCP nor the UCC include provisions to transfer the right to submit a draw request separate and apart from the right to proceeds.  *See generally*, UCP 500; UCC Article 5.

### B.    There Has Been No Valid Transfer of The Letters of Credit

Although the Consortium claims that they are entitled both to perform under the LCs and
to the proceeds, the acquisition of any such rights would require a transfer of the LCs rather than
a mere assignment.  *See* UCP 500 Art. 48, 49; UCC §§ 5-112, 5-114.  Yet, the Consortium
readily concedes that no such transfer has occurred.  (Kvaerner Br. 45, n.23.)  As discussed
above, section 8.2 of the Coordination Agreement does not effect a transfer of the LCs.  This is
underscored by the fact that under the terms of the LCs themselves and the law that governs
them, specific conditions are required to effect a valid transfer—none of which have occurred.

Even if the parties had intended to effectuate a "transfer" through an "outright assignment
under other law," such a transfer has not been effected.

### 1.    Under UCP 500, Restrictions on Transfer of Letters of Credit are Enforceable and Strictly Construed

Under the UCP 500, a letter of credit is not transferable unless it is expressly designated
as transferable by the issuing bank.  UCP 500 Art. 48(b).  The issuing bank is under no
obligation to honor such transfer "except to the extent and in the manner expressly consented to
by such bank."  *Id.* at 48(c).  And, a letter of credit "can be transferred **only** on the terms and
conditions in the original [letter of credit]," except for certain exceptions that do not apply.  *Id.* at
48(h) (emphasis added).

### 2.    The Letters of Credit Contain Explicit Restrictions on Transfer— None of Which Have Been Complied With

The LCs both provide that they may only be transferred:

(1)    upon presentation to the issuing bank of a signed Transfer
Certificate in the form of Annex 3 to the LCs, executed by the transferee
as beneficiary [Longview];

(2)    accompanied by the Letter of Credit; and

- 24 -

(3)    payment of any applicable transfer fee.

(Joint App. Ex. 16, ¶ 8.)  None of these three conditions precedent to a valid transfer have

occurred.  Consequently, under UCP 500—which has the effect of binding law—there has been

no effective transfer of the LCs.  The Consortium has conceded as much in its prior requests to

Longview to transfer the LCs.  Once again, given the high degree of commercial sophistication

of the Consortium and the fact that they were represented by sophisticated counsel in negotiating

the Coordination Agreement it is clear that the Consortium knew that the LCs had not already

been transferred to it.

### C.    There Has Been No Assignment of Proceeds of The Letters of Credit

As discussed above, the Consortium's contention that it is both entitled to draw on the

LCs and to the proceeds would require a valid transfer, which has not taken place.  *See* UCP 500

Art. 48, 49; UCC §§ 5-112, 5-114; (Kvaerner Br. 45, n.23.)  Moreover, even if a mere

assignment is all that is required, no valid assignment occurred.  Nothing in Section 8.2 of the

Coordination Agreement purports to assign the proceeds of the LCs.  But even if it had, a valid

assignment of proceeds has not occurred under applicable law.

First, the LCs themselves require that the Issuer consent to an assignment of proceeds and

the manner in which it was effected.  (Joing App. Ex. 16 ¶ 2.)  By contrast, the LC's expressly

permit transfer to any person, if the appropriate steps are taken.  (*Id.* at ¶ 8) ("This letter of credit

may be transferred to any person . . . *including without limitation* . . .") (emphasis added).  This

consent requirement for assignments of proceeds  is supported by UCC section 5-114(c), which

states that an issue may require its consent to an assignment.  UCC § 5-114(c).  The LCs further

provide that "an assignment of proceeds of this Letter of Credit is permitted to any lender to the

beneficiary [Longview] or any agent or trustee of such lender and defined as such in the request

for assignment of proceeds." (Joint App. Ex. 16, ¶ 10.) Thus, the Issuer has expressly consented

to an assignment of proceeds to Longview's Lenders. By contrast, however, no one claims or

has submitted any evidence that the Issuer has consented to an assignment of proceeds to the

Consortium. Based on the plain language of paragraph 10 of the LCs and, when read in context

with Paragraph 8, it is clear that the Lenders and their agents or trustees are the only parties to

which the proceeds of the LCs could have been effectively assigned.

Although UCP 500 does not prohibit assignments of proceeds, it places no restrictions on

conditions to an effective assignment. Had the Consortium expected or bargained for an

assignment of proceeds of the LCs it would have required an amendment to the LCs to express

the issuer's consent to such an assignment. The Consortium's failure to do so not only renders

any purported assignment ineffective, but proves that the Consortium did not expect to receive,

and Longview did not intend to grant, an assignment of proceeds to the Consortium.

Second, notwithstanding the assignment conditions in paragraph 10 of the LCs, under

applicable law, the language in section 8.2 of the Coordination Agreement does not effect a valid

assignment of proceeds. To the extent not covered by UCP 500, under New York law, letters of

credit are governed by Article 5 of the Uniform Commercial Code (the "UCC").[13] Like UCP

500, Article 5 of the UCC generally permits an assignment of proceeds. In order to be effective,

however, the Issuer must consent to the assignment. UCC § 5-114. Here, the conditions to

assignment contained in paragraph 10 of the LCs demonstrate that, not only has the Issuer not

consented to an assignment of proceeds to the Consortium, it has explicitly forbidden it under the

terms of the LCs themselves.

---

[13]  All citations to the UCC are to New York's codification thereof.

Under UCC section 5-114, the granting of an assignment of proceeds is governed by "other law," which in this case would be New York's common law of assignment.  Under New York law, however, it is clear that section 8.2 of the Coordination Agreement did not effect an assignment of Longview's rights to the proceeds of the LCs or the right to draw.  Under New York law an effective assignment must demonstrate an intent by the assignor to <u>divest itself entirely of control over or any interest</u> in the thing assigned.  *See, e.g.*, *Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548, 557 (2d Cir. 1976) ("The New York cases make clear that an assignment [must] . . . 'show an intention of transferring . . . when the assignor is divested of all control and right to [the thing assigned] and the assignee is entitled to control it and receive its fruits'"); *Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*, 10 A.D.2d 372, 376 (N.Y. App. Div. 1960) ("An assignment at law contemplates a completed transfer of the *entire interest* of the assignor in the particular subject of assignment, whereby the assignor is *divested of all control over the thing assigned.*") (emphasis added).

Here, the thing purportedly assigned by section 8.2 is not an absolute right in the proceeds, but merely the right, in furtherance of the Consortium's contractual duties under the Coordination Agreement, to "make demand" under the LCs.  In addition to this qualification, Longview's express reservations of rights with respect to the LCs further proves that there was no assignment of proceeds, because Longview did not completely divest itself of control over or its interests in the right to draw under the LCs and their proceeds.

First, Longview's assignment to the Consortium of the right to "make demand" is only to the extent that the exercise of such right is "[i]n furtherance of" the terms of the Coordination Agreement.  (Joint App. Ex. 1 at § 8.2.)  In addition to this qualification, Longview expressly retained numerous rights in the LCs, including:

- the right to exercise any purportedly assigned rights in the event that the Consortium failed to do so in the appropriate circumstances (*Id.*);

- all rights with respect to the LCs in the event that Foster Wheeler became bankrupt (*Id.* at § 8.7);

- all assigned rights with respect to warranty claims after Substantial Completion (*Id.* at § 8.6);

- a reversionary interest in all rights assigned or delegated to the Consortium (*Id.* at § 8.1); and

- any delegation of rights with respect to the LCs was qualified by the limitation that any exercise of those rights not adversely affect Longview.  (*Id.* at § 8.2.)

Each one of these limitations, reservations, and qualifications is independently sufficient to demonstrate that Longview did not completely divest itself of control over or of all rights in the LCs or their proceeds.  When viewed in the aggregate, it is therefore even more apparent that no effective assignment of Longview's rights to draw under the LCs or their proceeds has occurred.

## III. THE CONTRACTORS ARE NOT ENTITLED TO THE EXTRAORDINARY REMEDY OF INJUNCTIVE RELIEF

As discussed in detail above, Longview is the beneficiary of the LCs and therefore has an absolute right to receive payment from the Issuer upon submission of conforming documents. *See, e.g., Semetex*, 853 F. Supp. at 770.  To prevent Longview from exercising these rights the Contractors must demonstrate an entitlement to injunctive relief.  As discussed more fully below, the single, limited exception to the rule that a court will not enjoin a draw by the beneficiary of a letter of credit is where the documents submitted are fraudulent or there is material and pervasive fraud in the transaction.  *See, e.g. Rockwell Int'l Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 588–89 (2d Cir. 1983) ("The 'fraud in the transaction' defense marks the limit of the generally accepted principle that a letter of credit is independent of whatever obligation it secures."); *Semetex*, 853 F. Supp. at 773 (collecting authorities).  The fraud exception, however, is a narrow

one and courts have found outright fraudulent practices only rarely.  *Semetex*, 853 F. Supp. at 773–74.

The UCP does not specifically provide for a fraud in the transaction defense.  *Id.* at 773. It has, however, been codified in section 5-109 of the UCC, which permits a court to temporarily or permanently enjoin a draw under a letter of credit where there are substantiated allegations of forged documents or material fraud.  UCC § 5-109(b).  Among the conditions to enjoining a draw under UCC section 5-109, all of the conditions that entitle a person to injunctive relief under the laws of the applicable state must be met.  *Id.* at § 5-109(b)(3).  Thus, the requirements for injunctive relief under New York law have been incorporated into the substantive standard for relief under the UCC.  This Court's grant of an injunction, however, is a procedural matter and is, therefore, governed by federal law.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989) (although rights at issue may be created by state law, federal courts apply federal standard to applications for injunctive relief) ; *see also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) ("The grant of preliminary injunctions . . . is subject to federal standards.").  Consequently, to the extent the requirements differ, the Contractors must demonstrate an entitlement to injunctive relief under both New York law and the standard used by federal courts in the Third Circuit.

### A.    The Standard for Granting a Preliminary Injunction

Under either New York law, or the law of the Third Circuit, a preliminary injunction is considered an extraordinary remedy.  *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*, 250 F. App'x 476, 478 (3d Cir. 2007) (preliminary injunction denied); *S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771, 777 (3d Cir. 2001) (injunction denied); *Hanson Trust PLC v. ML*

*SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) ("the preliminary injunction . . . is one

of the most drastic tools in the arsenal of judicial remedies"); *1234 Broadway LLC v. West Side*

*SRO Law Project*, 86 A.D.3d 18, at *23 (N.Y. App. Div. 2011) ("A preliminary injunction

substantially limits a defendant's rights and is thus an extraordinary provisional remedy requiring

a special showing").

      Under New York law, the party seeking a preliminary injunction must demonstrate (1) a

likelihood of success on the merits, (2) irreparable injury if the preliminary injunction is

withheld, and (3) a balance of equities tipping in favor of the moving party. *1234 Broadway*

*LLC*, 86 A.D.3d at *23-24 (collecting authorities). In the Third Circuit, the party seeking a

preliminary injunction must demonstrate (1) a substantial likelihood of success on the merits; (2)

that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief

will not result in even greater harm to the nonmoving party; and (4) that the public interest favors

such relief. *Kos Pharms.*, 369 F.3d at 708; *Figueroa v. Precision Surgical, Inc.*, 423 Fed. App'x

205, 208 (3d Cir. 2011); *Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir.

2009); *In re Broadstripe, LLC*, 402 B.R. 646, 655 (Bankr. D. Del. 2009); *IDT Telecom*, 250 Fed.

App'x at 479. "The burden lies with the plaintiff to establish **every** element in its favor, or the

grant of a preliminary injunction is inappropriate." *Figueroa*, 423 Fed. App'x at 209 (emphasis

added); *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

    **B.**    **The Contractors Cannot Demonstrate a Likelihood of Success on the Merits**

        **1.**    **The Relevant Merits for the Court to Consider are the Contractors'**
              **Entitlement to Permanent Injunctive Relief**

      To succeed in demonstrating a likelihood of success on the merits, the Contractors must

demonstrate that they are likely to prevail in obtaining a permanent injunction against

Longview's draw under the LCs from this Court. *Sabratek*, 257 B.R. at 735 ("To succeed in

obtaining a preliminary injunction, the [movants] must establish that they are likely to convince the Court to issue a permanent injunction."); *Shields v. RLI Ins. Co. (In re Williams)*, No. 10-70005-CMS, 2010 WL 2670801, at *2 (Bankr. N.D. Ala. June 30, 2010) (same).

The Consortium incorrectly argues that the appropriate merits for this Court to consider are those that go to its likelihood of obtaining escrow of the LCs before the Arbitration Tribunal. (Kvaerner's Mem. of Law in Supp. of Mot for Prelim. Inj. 7.)[14] This is incorrect as a matter of law and nothing more than an attempt to (i) circumvent the legal standard that governs this Court's authority to grant injunctive relief and (ii) circumvent the black letter law that courts cannot enjoin conforming draw requests unless there has been fraud in the transaction. The Contractors have each filed, or joined in, adversary proceedings seeking to enjoin Longview from drawing under the LCs and have sought preliminary injunctions pending resolution of those adversary proceedings. (Adv. Pro. No. 13-52256, ECF No. 1, Compl. Adv. Pro. No. 13-52255, ECF No. 1, Compl. ECF No. 9 Mot. to Intervene.) The grant of injunctive relief is a procedural remedy and, therefore, this Court's discretion to grant the Contractors' injunctions is governed by Delaware and Third Circuit federal law, not the AAA Construction Industry Rules. *Instant Air Freight*, 882 F.2d at 799. Consequently, in considering whether to preliminarily enjoin Longview from drawing under its LCs, the Court must consider the Contractors' probability of successfully obtaining a permanent injunction from this Court enjoining Longview from

---

[14] Longview contends that if this Court declines to exercise its jurisdiction over Longview's rights to the LCs in deference to the Arbitration Tribunal, granting of a temporary injunction would be inconsistent with such deference. To the extent the Court considers such relief, however, Longview contends that is must be analyzed as a preliminary injunction, in which case, the applicable merits are this Court's likelihood of granting a permanent injunction enjoining a draw. To grant injunctive relief over Longview's property pending resolution by an arbitral is tantamount to the extraordinary remedy of a pre-judgment attachment, which none of the Contractors have demonstrated an entitlement to. *See, e.g. Sabratek*, 257 B.R. at 738 ( "The injunctive relief which the Committee seeks is in the nature of a prejudgment sequestration or attachment under *Federal Rules of Civil Procedure 64* and *65*, as incorporated in the *Federal Rules of Bankruptcy Procedure 7064* and *7065*. Such relief is an extraordinary remedy and should be granted sparingly. *See Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 340, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999)* ("[a] preliminary asset-freeze order . . . would rank and operate as an extraordinary remedy")).

drawing, which may be obtained only if there has been fraud in the transaction. *Sabratek*, 257

B.R. at 735 (on request for temporary restraining order court considers likelihood of entitlement

to permanent injunction); *Shields*, 2010 WL 2670801, at *2 (same); *Semetex*, 853 F. Supp. at

773–74 (describing narrow fraud exception to no-injunction rule).

> **2.     The Contractors Have No Likelihood of Success on the Merits
> Because they Cannot Demonstrate Fraud in the Transaction**

As discussed above, there is no dispute that Longview is the beneficiary of the LCs and

that upon presentment by Longview of conforming documents, the Issuer is absolutely obligated

to pay it the proceeds, irrespective of any underlying contractual dispute. *See 410 Sixth Ave.*

*Foods, Inc.*, 197 A.D.2d 435; *Brenntag III*, 70 F. Supp. 2d at 410 (the "independence principle"

made plaintiff's conduct in the underlying transaction "irrelevant" to determining the parties'

rights under the letter of credit).   The only narrow exception to this no-injunction rule is if the

Contractors can prove "fraud in the transaction." *KMW Int'l*, 606 F.2d at 16; *Semetex*, 853 F.

Supp. at 773–74; UCC § 5-109 cmt. 1.   Unless the Contractors can demonstrate a likelihood of

meeting the very high burden of entitlement to this narrow exception, they cannot prevail on the

first prong and may not obtain a preliminary injunction. *Id.*; *Figueroa*, 423 Fed. App'x at 209;

*Nutrasweet Co.*, 176 F.3d at 153.

As noted above, the UCP does not expressly provide for a fraud in the transaction

defense, but it has been codified in section 5-109 of the UCC. *Semetex*, 853 F. Supp. at 773–74;

UCC § 5-109.   UCC section 5–109(b)(4) provides that a court "may temporarily or permanently

enjoin the issuer from honoring a presentation [of a letter of credit] or grant similar relief against

the issuer or other persons only if the court finds," *inter alia*, that: "[o]n the basis of the

information submitted to the court, the applicant is <u>more likely than not</u> to succeed under its

claim of forgery or material fraud[.]"  UCC § 5-109(4) (emphasis added).  Section 5-109 is clear,

however, that any alleged fraud must be "material," meaning that "the beneficiary has <u>no</u>

<u>colorable right to expect honor</u> and where there is <u>no basis in fact</u> to support such a right to

honor."  UCC § 5-109 cmt. 1 (emphasis added).

This standard is consistent with and indorses prior case law to this effect.  *Id.*; *see also,*

*e.g. Roman Ceramics Corp. v. Peoples Nat'l Bank*, 714 F.2d 1207, 1209-19 (3d Cir. 1983).  The

comments to UCC section 5-109 quote and indorse the following passage as an accurate

summary of the law on this issue:

> We have said throughout that courts may not "*normally*" issue an
> injunction because of an important exception to the general "no
> injunction" rule. The exception, as we also explained in *Itek*, 730
> F.2d at 24-25, concerns "fraud" so serious as to make it obviously
> pointless and unjust to permit the beneficiary to obtain the money.
> Where the circumstances "*plainly*" show that the underlying
> contract forbids the beneficiary to call a letter of credit, *Itek*, 730
> F.2d at 24; where they show that the contract deprives the
> beneficiary of even a "*colorable*" right to do so, *id.*, at 25; where
> the contract and circumstances reveal that the beneficiary's demand
> for payment has "absolutely no basis in fact," *id.*; see *Dynamics
> Corp. of America*, 356 F.Supp. at 999; where the beneficiary's
> conduct has "so vitiated the entire transaction that the legitimate
> purposes of the independence of the issuer's obligation would no
> longer be served," *Itek*, 730 F.2d at 25 (quoting *Roman Ceramics
> Corp. v. Peoples National Bank*, 714 F.2d 1207, 1212 n.12, 1215
> (3d Cir.1983) (quoting *Intraworld Indus.*, 336 A.2d at 324-25));
> *then* a court may enjoin payment.

UCC § 5-109, cmt. 1 (quoting *Ground Air Transfer, Inc. v. Westate's Airlines, Inc.* 899 F.2d

1269, 1272-73 (1st Cir. 1990)).  Under New York law, injunctive relief enjoining a draw is only

permitted where there is a "'clear showing of the active intentional fraud complained of' not

merely anticipated fraud[.]"  *KMW*, 606 F.2d at 15 (citation omitted); *Chiat/Day,* 105 A.D.2d at

97 ("Fraud in the transaction" sufficient to enjoin payment on a Letter of Credit requires a

showing of "active intentional fraud.").  Thus, the contractors can only succeed in enjoining

Longview from drawing under its LCs if they can clearly show active and intentional fraud and that the circumstances plainly show that Longview has no colorable right to draw and that its draw would have no basis in fact. *See* UCC § 5-109, cmt. 1. Here, none of the Contractors' allegations—even if factually true—would rise to the level of fraud in the transaction and they, therefore, cannot demonstrate a likelihood of success on the merits.

Foster Wheeler advances several arguments in support of its contention that there has been fraud in the transaction. (Foster Wheeler Br. § II.A.) As detailed below, each of these arguments lack merit, and fails to carry the high burden necessary to enjoin a draw on a letter of credit. *Lenox Hill Hosp.*, No. 10-70005-CMS, 2008 N.Y. Misc. LEXIS 6357, at *7 (Sup. Ct. Oct. 20, 2008) ("The standard for an injunctive relief is high, and the burden remains on the applicant to show, by evidence and not mere allegation, that such relief is warranted") (quoting U.C.C. § 5-109 cmt. 4).

### a)    The Court Need Not and May Not Analyze All of the Arbitration Issues

First, Foster Wheeler incorrectly argues that the Court must decide all of the underlying issues in the arbitration. However, as set forth at length in Section III.B., this completely ignores the universally recognized independence principle, which commands that a beneficiary's right to draw on a letter of credit is entirely dependent on submission of conforming documents and entirely distinct from any underlying contractual dispute. *See, e.g.,* UCP 500 Article 4 ("In Credit operations all parties concerned deal with documents, and not  . . . other performances to which the documents relate."); *Ace Am. Ins. Co.* 2012 U.S. Dist. LEXIS 110891, at *15 ("The central purpose of the letter-of-credit mechanism would be defeated if courts felt free to examine

the merits of underlying contract disputes in order to determine whether letters of credit should be paid.").

In support of this contention, which is belied by the law, Foster Wheeler mis-cites two cases, both of which are inapposite and neither of which involved an application to enjoin a draw on a letter of credit. *Ross Bicycles, Inc. v. Citibank, N.A.* affirmed a trial court's denial of summary judgment on a claim by a beneficiary against the issuer bank for wrongful dishonor, where the bank's defenses included fraud in the transaction. 161 A.D.2d 473 (N.Y. App. Div. 1990). Thus, *Ross Bicycles* is inapposite because it did not involve a request to enjoin a draw under a letter of credit but instead involved the issuer's potential liability for wrongful dishonor. *Id.* at 473–74.

Likewise, Foster Wheeler patently misrepresents *Raytheon Co. v. AES Red Oak, LLC* as involving a customer's attempt to restrain an anticipated draw. 824 N.Y.S.2d 766 (N.Y. Sup. Ct. 2005). It did not. *Id.* at *7. Instead, *Raytheon* involved motions for summary judgment on various tort and contract claims asserted by a customer after a draw had occurred. *Id.* at *5. Thus, Foster Wheeler's assertion that courts can look past the documents in a letter of credit to the underlying agreements is unsupported by the very authority it cites and belied by the vast weight of authority. *E.g., Ace Am. Ins. Co.* 2012 U.S. Dist. LEXIS 110891, at *15; *Sabratek*, 257 B.R. at 738 ("[T]he rule is pay first, litigate later.").

> **b)**    **Longview's Draw Does Not Require an Adjudication of Foster Wheeler's Liability**

Second, Foster Wheeler argues that Longview must receive a definitive adjudication of Foster Wheeler's breaches under the Boiler Agreement and a judgment or arbitral award fixing

the damages.  (Foster Wheeler Br. § II.(A)(iii).)  Once again, this erroneous assertion is belied by

both the plain terms of the LCs and the overwhelming weight of authority.

Nowhere in the LCs is Longview required to certify that it has obtained an adjudication

of Foster Wheeler's liability.  Instead, the draw certificates merely require Longview to certify

its belief that (i) Foster Wheeler has failed to perform its obligations under the Boiler Agreement,

(ii) Longview has notified Foster Wheeler in writing of such failure and Foster Wheeler has

failed to rectify it, and (iii) that as a result of the failure, Foster Wheeler is responsible under the

Boiler Agreement in the amount of the draw request.  (Joint App. Ex. 16, Annex 1, ¶ 2.)  As set

forth above, in order to demonstrate that Longview's certification of these beliefs constitutes

fraud in the transaction, Foster Wheeler would have to demonstrate that Longview has no

colorable right to do so and that these beliefs have no basis in fact.  Courts have universally held

that where a draw request requires the beneficiary to certify that a party has breached a contract,

a draw may only be enjoined where such a claim is clearly untenable.  *See, e.g.*, *Recon/Optical*

*Inc. v. Gov't of Israel*, 816 F.2d 854, 858 (2d Cir. 1987) (draft not fraudulent because "[w]hether

or not [the beneficiary's] view of the merits of these disputes is correct, there is no evidence [of]

bad faith"); *Westate's Airlines*, 899 F.2d at 1272-73 (draft not fraudulent because claim of

default at least "colorable"); *Kvaerner U.S., Inc. v. Merita Bank PLC*, 288 A.D.2d 6 (N.Y. App.

Div. 2001) (affirming refusal to enjoin bank preliminarily from honoring demand on letter of

credit, where record did not support plaintiff's claim that defendant had fabricated defects in

mine construction; record at best supported allegations of breach of contract, not fraud); *PGA*

*Mktg. Ltd. v. Windsor Plumbing Supply, Inc.*, 124 A.D.2d 577, 578 (N.Y. App. Div.1986)

(affirming denial of motion for preliminary injunction where the movants' defenses sounded in

breach of contract as "[s]uch defenses do not bar payment of a letter of credit, as long as the

letter of credit is valid on its face and any required documents conform to the requirements, if any, in the letter of credit").

### (1) Foster Wheeler's Failure to Perform Under the Boiler Agreement is More than Colorable and Amply Supported by Facts

Here, there is no dispute that Longview's Plant is defective and suffers from repeated and frequent forced outages due to failures of the boiler that Foster Wheeler designed and manufactured.  The finger pointing among the Contractors is beside the point.  As Foster Wheeler designed and supplied the boiler, it is simply untenable that Longview has no factual basis for concluding that Foster Wheeler has breached the Boiler Agreement, particularly given Foster Wheeler's failure to satisfy the Deferred Requirements.  In any event, evidence that tends to show the contractual preconditions to making a draw demand have not been met is an insufficient basis to enjoin a draw because it is not evidence of "fraud," but, at most, a breach of contract.  *Chiat/Day*, 105 A.D.2d at 97 ("case law distinguishes between mere disputes about performance of a contract or breach of warranty and the active intentional fraud which rises to the level of fraud in the transaction").

### (2) Foster Wheeler Has Been Notified in Writing of its Failures and Has Not Fixed the Defective Boiler

Foster Wheeler also cannot claim that it has not been notified in writing of Longview's beliefs that it has failed to perform the Boiler Agreement.  Foster Wheeler has been on notice since at least since Longview notified Foster Wheeler that it would only grant Provisional Acceptance subject to the Deferred Requirements.  Moreover, Foster Wheeler has been on notice of the continuing defaults as evidenced by its receipt of 155 warranty claims.  (Oct. 17 Keffer

Aff. ¶ 16.)  As of the filing of this Memorandum, Foster Wheeler has not fixed the boiler,

attempted any repairs, or addressed the Deferred Requirements.

### (3) Longview's Entitlement to Costs and Damages in the Full Amount of the LCs is Colorable and Supported by Ample Factual Bases

Likewise, the Contractor's assertion that Longview cannot prove that it has been

damaged by Foster Wheeler's breach in the full amount of the LCs is wrong but, more

importantly, irrelevant.  The proper inquiry is merely whether Longview's assertion that it has

been damaged has no basis in fact or is clearly untenable.  UCC § 5-109 cmt. 1; *Roman

Ceramics*, 714 F.2d at 1209-19; *Westate's Airlines*, 899 F.2d at 1272-72.  The only case cited by

Foster Wheeler in support of this erroneous assertion is clearly distinguishable.  In *Cipriani 200,

LLC v. 200 Fifth Ave. Owner, LLC*, the letter of credit required the landlord-beneficiary to certify

that the amount being drawn represented an application of the security deposit in accordance

with the lease.  No. 0602657/2007, 2007 WL 3325862 (N.Y. Sup. Ct. Oct. 31, 2007).  Although

the landlord admitted that defaults in the lease only amounted to $6,137.42, it submitted a sight

draft in the full amount of the letter of credit—$200,000.  *Id.*  Accordingly the amount of default

to which the beneficiary was required to certify was liquidated and known to be vastly less than

the amount of the draw request.

Here, Longview has incurred millions of dollars in costs due to the defects in the boiler

including $7.8 million in warranty repairs and $2.75 million in expert fees to diagnose the defect,

and estimates it will incur close to $50 million in repairs.  These costs and damages are exclusive

of liquidated damages and other substantial and expensive repairs Longview may need to

perform.  Accordingly, Longview's certification that it has been damaged by Foster Wheeler's

breach in the full amount of the LCs has ample basis in fact and rather than being clearly

untenable, it is highly probable that Longview has been damaged well in excess of the full

amount of the Letters of Credit. *CE Casecnan Water & Energy Co. v. Korea First Bank*, 248

A.D.2d 330, 331 (N.Y. App. Div. 1998) (allegations that fraudulent representations of a default

were made in a certification in support of a draw demand are insufficient to raise a triable issue

of fact as to the beneficiary's right to draw when the beneficiary has a "colorable right" to make

demand).

### (4) Longview Has Not Assigned the Right to Draw Under the LCs or Their Proceeds

As discussed in detail above, the Contractors' argument that Longview's draw under the

LCs or use of their proceeds would constitute fraud because of the purported assignment to the

Consortium fails because no such assignment has occurred. (*See, supra* section II.C.) Longview

remains the beneficiary under the LCs, the only party entitled to submit a draw request and to

their proceeds. (*See, supra* section I.) Furthermore, Foster Wheeler's contention that

Longview's course of conduct was consistent with an outright assignment of the LCs until the

filing of the Interim Budget, knowingly ignores or misrepresents facts of which Foster Wheeler

is aware. (Foster Wheeler Br. ¶ 119.) Longview has always acted consistently with its current

position that it did not assign the LCs themselves, the right to draw, or the proceeds. (*See* Joint

App. Ex. 9, at 4.) In fact, as long ago as 2011, the Consortium made several requests that

Longview transfer the LCs to them and Longview has always refused this request on the basis

that it did not convey the LCs, the draw rights, or the proceeds to the Consortium. (*Id.*)

Accordingly, there is ample basis in fact and law for Longview's contention that it is entitled to

draw under the LCs and the owner of their proceeds.

### (5) The Claims Asserted by Longview are Irrelevant to its Rights under the LCs

Foster Wheeler's argument that a draw by Longview would be fraudulent because Longview has not asserted direct claims against it once again ignores the distinction between Longview's rights under the LCs themselves and any underlying contractual dispute.  As discussed more fully above, Longview's right to draw under the LCs is entirely dependent on submission of conforming documents, none of which require Longview to prove or certify that it has asserted claims against Foster Wheeler in a judicial or arbitral proceeding or obtained a judgment.  This argument is simply disingenuous as it ignores, among other things, the fact that Longview advised Foster Wheeler that it was responsible to remedy the Deferred Requirements. (Joint App. Ex. 23) and that Longview issued 155 warranty claims to Foster Wheeler, most of which remain unsatisfied (Oct. 17 Keffer Decl. ¶¶ 13-14.)  Consequently, although Longview's assertion of direct claims against Foster Wheeler is irrelevant, an examination of the various claims asserted therein by Longview and the Consortium clearly demonstrates an ample factual basis for Longview's certification in a draw request that Foster Wheeler has failed to perform under the Boiler Agreement.

### (6) The Coordination Agreement Does Not Affect Longview's Ability to Determine that Foster Wheeler Failed to Perform Under the Boiler Agreement

Finally, Foster Wheeler strains the limits of credulity by arguing that by virtue of Longview's assignment in the Coordination Agreement of certain rights and obligations under the Boiler Agreement Longview cannot certify in good faith its belief that Foster Wheeler failed to perform and that Longview has been damaged.  Again, this argument ignores the distinction between Longview's rights as beneficiary under the LCs and rights arising from the underlying contracts.  More significantly, however, there is no dispute that Longview is the owner and

operator of the Plant, which is not functioning properly because of numerous repeated failures in the boiler that Foster Wheeler designed and manufactured. Based on these facts alone, Longview has ample factual bases for concluding that the party it hired to design and manufacture its boiler is responsible for its repeated, continuing failures.

### C.    The Contractors Cannot Establish that They Will be Irreparably Harmed

Just as the Contractors' request for a preliminary injunction fails for a lack of likelihood of success on the merits, it further fails for the independent reason that they cannot demonstrate irreparable harm if an injunction is not granted. In the Third Circuit, irreparable harm has been defined as "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight*, 882 F.2d at 801. As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). Such a loss must be not merely economic but "of a peculiar nature, so that compensation in money cannot atone for it." *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976). "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent[.]" *Grant River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). "That damages are difficult to measure does not necessarily make otherwise compensable harm irreparable." *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. App'x 779, 781-82 (2d Cir. 2010).

The Contractors raise two purported grounds to establish irreparable harm. First, they contend that irreparable harm is established because Longview is a debtor in a chapter 11 reorganization. Second, Foster Wheeler argues that damage to its goodwill and reputation would

constitute irreparable harm.  Both of these grounds, however, fail to meet the Contractors'
burden for establishing irreparable harm.

First, Foster Wheeler's argument that it will be irreparably harmed because a draw under
the LCs would cause damage to its goodwill and reputation fails as a matter of law.  Although
the Third Circuit has recognized that damage to goodwill and reputation can constitute
irreparable harm under the appropriate circumstances, "case law . . . indicates that such harm is
limited to 'the special problem of confusion that exists in cases involving trademark
infringement and unfair competition." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-54 (3d
Cir. 1994) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.
1998)).  Thus, "[a]s the harm claimed by [Foster Wheeler] is not analogous to the harm caused
by consumer confusion, the line of cases recognizing loss of goodwill or reputation as irreparable
harm is not applicable." *IDT Telecom*, 250 Fed. App'x at 479-480.

Second, although insolvency can—in certain circumstances—support a finding of
irreparable harm, there is no *per se* rule that insolvency or a chapter 11 reorganization
necessitates a finding of irreparable harm.  In fact, in *Carter-Wallace, Inc. v. Davis-Edwards
Pharmacal Corp.*, 443 F.2d 867 (2d Cir. 1971), the Second Circuit affirmed a finding that there
was no showing of irreparable harm where the party sought to be enjoined was a debtor in
chapter 11 reorganization proceedings and plaintiffs could not demonstrate that their potential
claims would have no source of recovery.  *Id.*  As in *Carter-Wallace*, Longview is not the subject
of a straight liquidation proceeding in which it is clear that creditors would receive very little
return on their claims.  Instead, Longview is a going concern that is undergoing a reorganization.

Each of the cases cited by the Contractors for their incorrect assertion that bankruptcy
necessarily establishes irreparable harm is distinguishable and inapposite to the facts of this case.

For instance, in *Brenntag Int'l Chems., Inc. v. Bank of India (Brenntag II)*, 175 F.3d 245 (2d Cir. 1999), there was no dispute that the beneficiary, Petro, fraudulently requested a draw under a letter of credit given as part of an international sales transaction even though it had never actually shipped any goods. *Id.* at 247–48. Under these circumstances—where there was no dispute regarding success on the merits because the draw was concededly fraudulent—the District Court found that there was a sufficient showing of irreparable harm because the beneficiary was subject to receivership in Singapore. *Id.*; *see also Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ (Brenntag I)*, 9 F. Supp. 2d 331, 333 (S.D.N.Y. 1998) ("The parties here agree that the underlying business transaction . . . was a fraud. . . . Petro Pharma, a Singapore corporation now in receivership, never shipped the chemicals to its customer . . . and yet represented to [the issuer] that it had."). Because, in *Brenntag II*, there was no dispute that a draw would be fraudulent, even the slightest probability of an inability to collect a resulting judgment would have resulted in irreparable harm. *Id.* By contrast, the Contractors cannot demonstrate a likelihood of success on the merits as Longview clearly has a colorable basis for drawing under the LCs and the prospect of non-payment is, therefore, of less import than in *Brenntag II*. Furthermore, unlike Longview, which is a going concern, reorganizing under chapter 11, the beneficiary in *Brenntag* had ceased to operate and was the subject of receivership in a foreign jurisdiction. *Brenntag I*, 9 F. Supp. 2d at 333. Thus, while any judgment in *Brentagg II* was almost certainly uncollectable, there is a far greater prospect that the Contractors could be compensated by the Longview estate in the unlikely event that Foster Wheeler is absolved of responsibility for the defects in the boiler it designed and manufactured.

In *Rockwell International Systems*, the court examined the relationship between a contractor and the government of Iran immediately after the Iranian Revolution. 719 F.2d 583.

The court noted that the beneficiary, the Iranian government, "has, for its own reasons, frustrated completion of the contract by suspending Rockwell's performance" and should not be permitted to both cause Rockwell's default and then use that default as grounds for entitlement to payment under a letter of credit. *Id.* at 589. The court also expressed concern that, should Rockwell bring a subsequent claim for wrongful draw, no forum existed with the requisite jurisdiction to hear the claim. *Id.* at 586. The factual differences between Rockwell and this case are immediately apparent; Longview is not in the position of having deliberately caused Foster Wheeler's breach as the Iranian government did by refusing to all allow further performance. Moreover, there are fora in which the parties could subsequently bring suit for the wrongful draw.

Lastly, Kvaerner and Foster Wheeler both cite *CRP/Extell* for the proposition that "a finding of irreparable harm may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." 394 Fed. App'x at 781-82. Longview does not dispute this point; a finding of irreparable harm may lie in connection with an action involving an insolvent party. There is, however, no *per se* rule that this is the case.

**D.      Granting a Preliminary Injunction Will Result in Greater Harm to Longview than the Contractors**

While the potential harm to the Contractors if an injunction is not granted is purely economic, the potential harm to Longview is an inability to continue as a going concern. Longview has been hamstrung since the Plant was first commissioned by operational issues due to construction, manufacturing, and design defects. As a result, the Plant's revenue generation potential has been severely limited and, combined with other factors, has rendered Longview unable to service its long-term debt at its current operational levels. Although one component of this reorganization is right-sizing the balance sheet, the other key requirement is pinpointing the

defects in the boiler and fixing them so that it can operate at its full potential.  Depriving

Longview of this source of funding—to which it is absolutely entitled—would threaten to stall

these reorganization proceedings in their nascent stages.  Without a source of funding to pay for

repairs and to stem revenue gaps, Longview's ability to confirm a plan of reorganization would

be severely limited.  Accordingly, the potential harm to Longview greatly exceeds the potential

for harm to the Contractors.

Finally, granting a preliminary injunction enjoining Longview from drawing under

LCs—of which it is the undisputed beneficiary and where there has been no showing or even

allegations that rise to the level of fraud in the transaction—would contravene the commercial

purpose of letters of credit.  As Judge Walrath noted in *Sabratek*, enjoining a draw under a letter

of credit "does not promote letter of credit transactions since they are used to avoid litigation. . . .

[T]he rule is 'pay first, litigate later. . . .' We, therefore, conclude that the public policies behind

letter of credit transactions do not favor issuance of an injunction."  257 B.R. at 738.  As in

*Sabratek*, granting a preliminary injunction would deprive Longview of the benefit of the LCs—

immediate access to the proceeds to address defaults while the contractual dispute slowly winds

its way through the arbitration process.  Accordingly, public interest does not favor granting a

preliminary injunction.

## IV.    THE BANKRUPTCY COURT IS THE PROPER FORUM TO RESOLVE THE LC DISPUTE

The Contractors accuse the Debtors of "forum shopping."  But the Debtors have been

pointedly blunt about their motivations for filing their chapter 11 petition when they did.

Longview has $59 million in LCs and, as discussed above, has a present right to draw on them.

The Debtors intend to use those proceeds to facilitate their reorganization and allow them to fund

the necessary repairs to the boiler now, while the Contractors spend the next year or two fighting over which of them ultimately is responsible to pay for those repairs.

Kvaerner and Siemens, however, want security for any Judgment they obtain over Foster Wheeler, and thus asked the Tribunal to take away Longview's LCs and place them in escrow pending resolution of the Arbitration sometime in 2015. Knowing that the LCs were among Longview's key assets, that those assets were pledged to the Lenders, and knowing that the Lenders were not a party to the Arbitration or subject to any agreement to arbitrate, Longview had a fiduciary obligation to provide its Lenders with a forum to protect their security interest. Far from forum-shopping to obtain a "tactical advantage," the Consortium's actions forced the Debtors to file the petition when they did and to bring this dispute before this Court.

There is no doubt that this Court is the only forum with exclusive jurisdiction over the LCs, and the only forum where all parties claiming an interest in the LCs can be heard. *See* 28 U.S.C. § 1334(e) (Bankruptcy Court has "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate[.]") As the Supreme Court has noted, Bankruptcy Court jurisdiction "is principally *in rem* jurisdiction." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 369 (2006). This Court's *in rem* jurisdiction is critical in this case because it permits the Court to "determine all claims that anyone, whether named in the action or not, has to the property or the thing in question. The proceeding is 'one against the world.'" *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004). In some sense, the entire purpose of a bankruptcy proceeding is to adjudicate conflicting claims to a *res*. That is what the Debtors are asking the Court to do here—exercise the Court's exclusive *in rem* jurisdiction over the Debtors' property, and adjudicate conflicting claims to the LCs.

In contrast, the Arbitration Panel's authority is wholly derived from the consent of the parties to be bound by the Panel's determination of disputes. Not everyone claiming an interest in the LCs, however, is a party to the Arbitration Agreement. The Lenders did not sign the Arbitration Agreement, and are not bound by any determination of rights in the LCs issued by the Panel. ████████████████████████████████████████████████████ ████████████████████████████████████ (*See* White Decl. Ex. B.) The Panel's fundamental inability to bind all parties that claim an interest in the LCs should be fatal to the Contractors' request to send this dispute to Arbitration.

Even if the Panel's determination of the parties' conflicting claims to the LCs could bind the Lenders, any such determination would be fundamentally unfair, because the Lenders are not a party to the Arbitration, and, in fact, are barred from participating in that proceeding. The Arbitration is by design a private tribunal. The Lenders cannot appear before the Panel, and cannot properly protect their interest in the LCs. Even if the Consortium and Longview agreed to permit the Lenders to participate in the Arbitration for the purpose of protecting their interest in the LCs, it is unlikely that the Lenders would choose to participate, and they cannot be forced to be a party to the Arbitration (and be bound by the Panel's determinations) without their consent. *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989) ("The Supreme Court has made it clear that it is the *parties* to an arbitration agreement who are bound by it and whose intentions must be carried out."). This Court is the only forum where all parties can effectively participate, all parties can be properly represented and all parties can be bound by the Court's adjudication of their respective interest in the LCs (or lack thereof).

Assuming for the sake of argument that the Court sends the LC dispute to Arbitration, there are only two possible outcomes.  The first is that the Panel finds that the Debtors own the LCs and are entitled to draw down on them.  Of course, while this would constitute a "win" for the Debtors, such a determination may take several months or even years, delaying the resolution of this issue, and the successful conclusion of these chapter 11 cases.  The second possibility is that the Panel (erroneously) determines that the purported assignment of the LCs to the Consortium is valid.  In that event, all parties will be forced to come back to this Court on a number of issues.  First, the Consortium will be required to "confirm" the arbitration award, which would be subject to significant challenge by the Debtors.  *See* 9 U.S.C. §§ 9-13.  Second, the Lenders will almost certainly not accept the Panel's determination, and seek to have this Court exercise control over the LCs, or issue a determination of their rights in the LCs in another fashion.  Third, the Debtors will seek to avoid the Consortium's purported interest in the LC's under section 544 of the Bankruptcy Code.  *See* Section IV(C)(2) below.  Far from simplifying or expediting the resolution of the LC dispute, Arbitration of the dispute will, in the event of an erroneous, unfavorable determination from the Panel, result in complex, piecemeal litigation that wastes the estate's resources, and potentially results in conflicting and inconsistent rulings.

Put simply, the Arbitration Panel cannot fully resolve all issues regarding the LCs because they cannot issue rulings binding the Lenders, and, assuming the Consortium is able to obtain a favorable ruling from the Panel, the only conceivable result is that the Debtors will be subjected to endless, duplicative, wasteful litigation over the same issues in multiple forums.  It is better to fully and finally resolve the issues regarding the Consortium's claims to the LCs now, especially given the Debtors' entitlement to them and need for them.

Considering, then, that this Court is the only forum that has exclusive jurisdiction over the LCs, is the only forum where all parties can be heard and that this is the only forum that can bind all parties with conflicting claims to the LCs, the Contractors cannot seriously contend that the Arbitration is the best forum to resolve the dispute regarding the LCs. Thus, it is clear that the Contractors are the ones who are actually engaged in forum shopping. The Contractors want to remove the LC dispute from this Court, which has extensive experience resolving conflicting claims in property, and send it to a private tribunal that is not required to follow the law.[15] *J.B. Harris, Inc. v. Razei Bar. Indus., Ltd.*, 1999 U.S. App. LEXIS 8577 (2d Cir. May 4, 1999) ("Arbitrators are presumptively free from principles of substantive law or rules of evidence.") (quotations omitted). The Contractors correctly presume their only chance of prevailing on the LC dispute is ask the Panel to decide this issue. This Court should not be swayed by such a transparent effort to evade this Court's exclusive, core jurisdiction and the Debtors' clear legal entitlement to the LCs.

---

[15] Foster Wheeler claims the arbitrators are "deeply involved" in the Arbitration (Foster Wheeler Br. at ¶ 32) and Kvaerner maintains that the arbitrators are "well along in the learning curve and best situated to reach a resolution that is fair to all the Arbitration parties" (Kvaerner Br. at p. 16). Both point to the volume of the pleadings and procedural orders in support, and both emphasize the aggressive schedule set to get the case ready for an October 2014 hearing date, including a January 31, 2014 date to assert detailed memorials on each parties' affirmative claims.

A.    **The Interplay Between the Federal Arbitration Act and the Bankruptcy Code**

The Contractors assert that the existence of the Federal Arbitration Act ("FAA") and the

Third Circuit case *Mintze v. American General Financial Services, Inc. (In re Mintze)*, 434 F.3d

222 (3d Cir. 2006) require that the Court send all disputes with the Contractors to Arbitration.

The Debtors do not dispute the general proposition that when a dispute is covered by a valid

arbitration clause, the FAA generally requires a court that otherwise has jurisdiction[16] over a

dispute to send that dispute to arbitration upon the request of a party.  *See* 9 U.S.C. §§ 3, 4; *see*

*also Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987).  However, the

FAA's dictates are not absolute.  "Like any statutory directive, the [FAA's] mandate may be

overridden by a contrary congressional command."  *Id*. at 226.

The Third Circuit addressed the interplay between the FAA and the Bankruptcy Code in

two cases—*Hays* and *Mintze*.  In *Hays*, a securities broker moved to compel arbitration of

various securities law claims as well as certain fraudulent transfer and constructive trust claims

brought by the trustee of an entity in bankruptcy.  885 F.2d at 1149-50.  The *Hays* court found

that the then-recent *McMahon* case's analysis applied to the intersection between the FAA and

the Bankruptcy Code.  885 F.2d 1149.  That analysis is as follows:

> The Arbitration Act, standing alone, therefore mandates
> enforcement of agreements to arbitrate statutory claims.  Like any
> statutory directive, the Arbitration Act's mandate may be
> overridden by a contrary congressional command.  The burden is
> on the party opposing arbitration, however, to show that Congress
> intended to preclude a waiver of judicial remedies for the statutory

---

[16]  Kvaerner suggests that the issue regarding the interplay between the Bankruptcy Code and the FAA is jurisdictional.  (*See, e.g.,* Kvaerner Br. 24 ("Under the precedent of *Mintze* and *National Gypsum*, courts routinely determine that they lack jurisdiction and thus lack discretion to refuse enforcement of arbitration agreements . . . .").)  However, not a single case cited by Kvaerner discusses, let alone holds, that a court might not have jurisdiction because of the FAA.  The FAA mandates that courts enforce arbitration agreements, and mandates certain remedies.  It does not divest a court of jurisdiction.

> rights at issue.  If Congress did intend to limit or prohibit waiver of
> a judicial forum for a particular claim, such an intent will be
> deducible from the statute's test or legislative history, or from an
> inherent conflict between arbitration and the statute's underlying
> purposes.

*Hays*, 885 F.2d at 1156 (quoting *McMahon*, 482 U.S. at 226-27) (citations and internal quotation

marks omitted).  The *Hays* court found this analysis required it to overrule its prior jurisprudence

that found the FAA was "impliedly modified" by the Bankruptcy Code.  *Id.* at 1160.  "The

message we get from these recent cases is that we must carefully determine whether any

underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an

arbitration clause and that we should enforce such a clause unless that effect would seriously

jeopardize the objectives of the Code."  *Id.* at 1161.

Seventeen years later, the Third Circuit revisited the interplay between the FAA and the

Bankruptcy Code in *Mintze*.  At issue in *Mintze* were Truth In Lending Act and other federal and

state consumer protection laws asserted by a debtor in a chapter 13 proceeding against a lender.

*Mintze,* 434 F.3d at 226.  According to the Third Circuit in *Mintze*, lower courts were

misinterpreting its decision in *Hays*.  After *Hays*, bankruptcy courts applied the *Hays* analysis

only to non-core proceedings.  *See Mintze*, 434 F. 3d at 230.  *Mintze* rejected this approach,

finding "that the standard we articulated in *Hays* applies equally to core and non-core

proceedings." *Id.* at 231.  "Where an otherwise applicable arbitration clause exists, a bankruptcy

court lacks the authority and discretion to deny its enforcement, *unless* the party opposing

arbitration can establish congressional intent, under the *McMahon* standard, to preclude waiver

of judicial remedies for the statutory rights at issue." *Id.*  The *Mintze* court then turned to the

case at hand:

> [T]o override the FAA's mandate for enforcement of arbitration,
> the *McMahon* standard requires congressional intent "to preclude a

> waiver of judicial remedies for the *statutory rights* at issues."
> *McMahon*, 482 U.S. at 227 (emphasis added).   The statutory
> claims that Mintze has raised are based on TILA and several
> federal and state consumer protection laws.   *Mintze* has failed to
> raise any statutory claims that were created by the Bankruptcy
> Code.   With no bankruptcy issue to be decided by the Bankruptcy
> Court, we cannot find an inherent conflict between arbitration of
> *Mintze*'s federal and state consumer protection issues and the
> underlying purposes of the Bankruptcy Code.

434 F.3d at 231-32.  *Mintze*, then, posits a two-part test to determine if a bankruptcy court has

discretion to deny a request to arbitrate, provided that a valid arbitration clause exists that

governs the dispute between the parties:

> (1)    Are the claims/causes of action at issue "statutory claims that were created
>
>         by the Bankruptcy Code"?
>
> (2)    Is "there is an inherent conflict between arbitration and the Bankruptcy
>
>         Code"?

*Id.* at 231.  If the answer to both parts of the *Mintze* test are answered in the affirmative, then the

court has the discretion to deny a request to arbitrate.  Both parts of the *Mintze* analysis are

satisfied in this case.

> **B.      The First Prong of the *Mintze* Test is Satisfied:  The Determination of
>          Whether the LCs Are Property of the Estate is a Statutory Claim Created by
>          the Bankruptcy Code**

Under *Mintze*, the first part of the determination of whether the Court has discretion to

deny a request to arbitrate is whether the claims at issue are "statutory claims that were created

by the Bankruptcy Code."  *Mintze*, 434 F.3d at 231-32.  A determination of whether certain

property constitutes property of the estate pursuant to section 541 of the Bankruptcy Code is just

such a "statutory claim[] . . . created by the Bankruptcy Code."

    **1.**    **A Determination of Whether the LCs are Property of the Estate is a Proceeding "Arising Under" the Bankruptcy Code, and as such, is a Cause of Action Created by the Bankruptcy Code**

Although *Mintze* requires that a party seeking to avoid arbitration assert "statutory claims that were created by the Bankruptcy Code," the Third Circuit provided little guidance on what that test requires, other than the fact that Truth In Lending Act and other federal and state consumer protection laws do not qualify. *Mintze*, 434 F.3d at 231. However, the phrasing used by the Third Circuit suggests that the first part of the *Mintze* analysis is satisfied by any *cause of action created by the Bankruptcy Code*; in other words, an "arising under" proceeding or cause of action. *See* 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ."); 28 U.S.C. § 1334(b) ("the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11").

Courts have long recognized that "'arising under' proceedings consist of any causes of action created by Title 11[.]" *In re Salander-O'Reilly Galleries, LLC*, 475 B.R. 9, 27 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also In re SemCrude, L.P.*, 428 B.R. 82, 93 (Bankr. D. Del. 2010) (noting that "matters 'arising under title 11'" are those in which the "cause of action is created by title 11"); *In re Aegis Mortg. Corp.*, No. 08-50237, 2008 WL 2150120, at *4 (Bankr. D. Del. May 22, 2008) (Shannon, J.) ("'Arising under' proceedings are matters invoking a substantive right created by the Bankruptcy Code."). The Fifth Circuit, in *Wood v. Wood*, explained the terms of art used in 28 U.S.C. §§ 157 and 1334:

> Congress used the phrase "arising under title 11" to describe those proceedings that *involve a cause of action created or determined by a statutory provision of title 11.* Apparently, the phrase was taken from 28 U.S.C. § 1331, conferring federal question jurisdiction in which it carries a similar and well-accepted

meaning. The meaning of "arising in" proceedings is less clear, but seems to be a reference to those "administrative" matters that arise only in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.

As defined above, the phrases "arising under" and "arising in" are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

825 F.2d 90, 96 (5th Cir. 1987) (emphasis added).[17]

Courts have also recognized that proceedings to determine whether certain property is property of the bankruptcy estate under section 541 are proceedings "arising under" Title 11. *Salander-O'Reilly Galleries*, 475 B.R. at 29 ("A bankruptcy estate is a construct of Section 541, and thus a proceeding to determine the bounds of the estate "*arises under*" title 11") (emphasis added); *Pension Benefit Guaranty Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 138 B.R. 442, 445 (D. Del. 1992) ("The determination of the property of the estate is one of the core proceedings *arising under* title 11.") (emphasis added); *In re Reliance Group Holdings, Inc.*, 273 B.R. 374, 394 (Bankr. E.D. Pa. 2002) ("the issues at the heart of the actions '*arise under*' title 11

---

[17] The distinction between "arising under" and "arising in" proceedings also helps explain what likely would not meet the first prong of *Mintze*. As noted by Kvaerner, *Mintze* rejected the core/non-core distinction in deciding whether to enforce an arbitration clause. *Mintze*, 434 F.3d at 229. Instead, *Mintze* requires a bankruptcy court to determine whether the claims at issue are created by the Bankruptcy Code, *i.e.* whether they "arise under" the Bankruptcy Code. Core proceedings, of course, encompass both "arising under" and "arising in" proceedings. As such, it appears that the effect of *Mintze* was to require the arbitration of all "arising in" proceedings in situations where a valid arbitration clause governs the dispute.

by requiring a determination of whether the assets in dispute are property of the Debtor's bankruptcy estate as defined in Bankruptcy Code § 541") (emphasis added).

In sum, a proceeding to determine whether certain property is property of the estate pursuant to section 541 is a proceeding that "arises under" the Bankruptcy Code.  A proceeding that "arises under" the Bankruptcy Code is synonymous with a cause of action created by the Bankruptcy Code.  Accordingly, a proceeding under section 541 is a  "statutory claim[] . . . created by the Bankruptcy Code," and satisfies the first prong of the *Mintze* analysis.  *Mintze*, 434 F.3d at 231.

### 2.    Determination of Ownership Issues in the LCs is a Fundamental Proceeding Under the Bankruptcy Code

That the determination of the Debtors' interest in the LCs is a "statutory claim[] . . . created by the Bankruptcy Code," *Mintze*, 434 F.3d at 231, is also supported by the fundamental nature of proceedings to determine the extent and nature of the Debtors' estate to the bankruptcy process.  Indeed, Bankruptcy Court jurisdiction "is principally *in rem* jurisdiction."  *Katz*, 546 U.S. at 369.

The Bankruptcy Court's *in rem* jurisdiction is critical to the Bankruptcy Code's remedial scheme to allow for the adjustment and discharge of the debtor's debts.  "A bankruptcy court's *in rem* jurisdiction permits it to determine all claims that anyone, whether named in the action or not, has to the property or the thing in question.  The proceeding is 'one against the world.'" *Hood*, 541 U.S. at 448.  The Court's *in rem* jurisdiction allows the Court to determine all parties' rights to all of the debtor's estate, even if those parties do not participate in the proceeding.  *Id.* at 447-48.  In order to effectuate the remedial nature of the statute, the Bankruptcy Court has

exclusive jurisdiction over a debtor's property, wherever located, and over the bankruptcy estate. 28 U.S.C. § 1334(e).

However, in order for the Bankruptcy Court to effectuate its jurisdiction, and to decide the rights of the debtors' creditors to the debtors' estate, the Bankruptcy Court must determine the nature and extent of that estate.  As one court noted, "the Court cannot engage in two of the fundamental purposes of a bankruptcy court—the exercise of jurisdiction over the estate of the debtor and the equitable distribution of the estate's property among creditors—without first determining whether this property belongs to the estate.  The Court, therefore, can see no proceeding more necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts than making this determination."  *In re Cox*, 433 B.R. 911, 919 (Bankr. N.D. Ga. 2010) (internal quotation marks omitted).

Given the fundamental nature of the determination of what the Debtors' estate is, and whether the LCs are a part of that estate or not, that must be a "statutory claim[] . . . created by the Bankruptcy Code," and accordingly satisfy the first part of the *Mintze* analysis.  *Mintze*, 434 F.3d at 231.

### 3.    The Contractors Misstate the First Prong of the *Mintze* Analysis

In an effort to distract from the inescapable conclusion that a determination of the Debtors' interest in the LCs is a "statutory claim[] . . . created by the Bankruptcy Code," the Contractors misstate the first prong of the *Mintze* analysis, and discuss a line of cases that  are wholly irrelevant to the analysis of this issue.

      a)      **The Determination of Whether the LCs Are Property of the Estate Does Not "Derive Exclusively" from State Law, and In Any Event, Whether State Law Issues Are Decided is Irrelevant**

As an initial matter, Kvaerner misstates the first prong of the *Mintze* analysis. Specifically, Kvaerner claims that the *Mintze* analysis is as follows: "the party seeking to overcome arbitration in a bankruptcy case has the burden to show both that (i) '*the proceeding derives exclusively from the provisions of the Bankruptcy Code*,' and (ii) arbitration would have a 'sufficiently adverse effect of the underlying purposes of the Bankruptcy Code' to create a conflict between arbitration and the Bankruptcy Code." (Kvaerner Br. 24) (emphasis added).[18] As discussed above, the correct statement of law is whether the claims at issue are "statutory claims that were created by the Bankruptcy Code." *Mintze*, 434 F.3d at 231. The language cited by Kvaerner is actually the test in the Fifth Circuit, under *National Gypsum*. *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997). Although *National Gypsum* was cited with approval in *Mintze*, the Third Circuit uses different language.

Moreover, even if the *National Gypsum* standard were applicable, it has not been interpreted as strictly as Kvaerner argues. For instance, in *In re Mirant Corp.*, a claimant sought relief from the automatic stay to liquidate its claim against the debtor pursuant to an arbitration clause. 316 B.R. 234, 236-37 (Bankr. N.D. Tex 2004). The claimant argued that because the liquidation of the claim turned on state law, the court had no discretion to deny arbitration. However, the court disagreed:

> The court disagrees with PEP's interpretation of the first part of the *Nat'l Gypsum* test. PEP reads *Nat'l Gypsum* as requiring that the substantive issues raised in a claim objection derive exclusively

---

[18] To recognize Kvaerner's misstatement of the law, the Court need only examine the papers filed by Foster Wheeler, which accurately state the law on this point. (Foster Wheeler Br. 27.)

> from the Code before the bankruptcy court has any discretion to
> deny arbitration.   While the substance of a dispute may be
> governed by law peculiar to bankruptcy, the court does not
> perceive the first part of the *Nat'l Gypsum* test to *require* that the
> *substantive* issues in dispute be derived from the Code.   Many
> issues in bankruptcy cases arise under state law but *must* be subject
> to the bankruptcy court's jurisdiction for it to do its job.   Issues of
> lien perfection or contractual cure amounts must be addressed
> under state law to decide whether a secured creditor should be
> granted relief from the stay or if a plan of reorganization should be
> confirmed, for example.   The vast majority of claims in any
> bankruptcy case will be premised on or implicate state law, to one
> degree or another.

*Id.* at 238; *see also In re Becker*, 136 B.R. 113, 116 (Bankr. D.N.J. 1992) ("Property interest are

generally created and defined by state law.  However, the question of what constitutes property

of a bankruptcy estate is ultimately a federal question.") (citations omitted).  Regardless, as

discussed above, determination of property of the estate is a statutory claim created by the

Bankruptcy Code, and none of the cases cited by the Contractors is to the contrary.[19]

---

[19]   Kvaerner primarily relies on three cases to support its assertion that the determination of whether the LCs are property of the estate is not a statutory claim created by the Bankruptcy Code.  (Kvaerner Br. 33-34.)  All three are inapposite here.

Kvaerner relies on *In re Wire Comm Wireless, Inc.*, No. 2:07-cv-02451-MCE, 2008 WL 4279407 (E.D. Cal. Sept. 16, 2006).  In that case, the court reversed the bankruptcy court's denial of a motion to arbitrate a two party dispute that involved claims resolution. The creditor filed a claim in the case, and the debtors asserted a counterclaim. *Id.* at *1.  The district court found that this case should be arbitrated because "most significantly . . . there was no showing that enforcing arbitration would conflict with the purposes of the Bankruptcy Code."  *Id.* at *4.  In the instant case, there are significant conflicts with the Code, as discussed in Section IV(C) below, and accordingly the case is easily distinguished.

Kvaerner also cites *In re TEU Holdings, Inc.*, 287 B.R. 26 (Bankr. D. Del. 2002).  That case is readily distinguishable because the claims at issue were non-core claims.  *Id.* at 37.  Virtually all courts that have looked at the issue have concluded that a bankruptcy court has no discretion to deny arbitration of non-core claims governed by a valid arbitration clause.

Finally, Kvaerner relies on *In re Loewen Group International, Inc.*, 344 B.R. 727 (Bankr. D. Del. 2006), an abstention case under 28 U.S.C. § 1334(c)(1). The court did not discuss or address *McMahon*, *Hays* or *Mintze* and the factual circumstances are vastly different than those at issue here.  Accordingly, *Loewen Group* should not be persuasive.  *Loewen Group* addressed claims arising from a breach of an asset purchase agreement signed several years earlier.  *Id.* at 728-29.  The court noted that "state law issues predominate over this adversary proceeding, which is extremely attenuated from the underlying chapter case."  *Id.* at 732.  As discussed at length herein, whether the LCs are property of the estate is a central issue in this case, and will have a significant impact on these chapter 11 cases.

**b)** **The Issue of Whether the Property of the Estate Issues are "Debtor-Derived" is a Not Relevant to the Current Dispute**

Foster Wheeler misstates the effect of whether a claim is "debtor-derived," which has no bearing on this dispute.  Specifically, in the section of their brief arguing that the Debtors cannot meet the *Mintze* standard, Foster Wheeler argues that "[c]ourts must analyze the underlying claims and determine whether such claims derive from the prepetition debtor (as opposed to the debtor in possession or the trustee) or from the Bankruptcy Code."  (Foster Wheeler Br. 29, ¶ 59.)  Foster Wheeler then quotes Judge Gross's decision in *In re Olympus Healthcare Group, Inc.*, 352 B.R. 603 (Bankr. D. Del. 2006) for the proposition that "[f]or claims that are derivative of the debtor, the Court does not have discretion and such claims are subject to mandatory enforcement of the arbitration agreement."  (*Id.* at 29 (quoting *Olympus*, 352 B.R. at 610.))  This quote is not a correct statement of the law from *Olympus*, because a mere two pages later in the opinion, after concluding that the causes of action at issue were "debtor-derived," Judge Gross found the following:  "[T]he Court finds that the claims asserted by the Liquidating Supervisor in the Complaint are claims derived from Debtors.  As such, the claims are mandatorily subject to the arbitration provision ***unless there is congressional intent to preclude the waiver of judicial remedies for the statutory rights at issue***."  *Olympus*, 352 B.R at 611-12 (emphasis added). Foster Wheeler's attempt to misquote *Olympus* should not distract this Court.  If the claims are "debtor-derived" (which they are), the Court may still exercise its discretion to deny arbitration if the *Mintze* test is satisfied.[20]

---

[20]  The Debtors do not dispute that the determination of whether the LCs are property of the estate under section 541 is a "debtor-derived" action.  However, to the extent the Debtors are required to bring an action under section 544 to avoid any purported interest Kvaerner has in the LCs, any such action would not be "debtor-derived" and the arbitration clause would not apply.  *See Hays*, 885 F.2d at 1155.

The "debtor-derived" / not debtor-derived distinction is from a line of cases that determine whether the bankruptcy estate should be bound by an arbitration agreement entered into by a pre-petition debtor, where the claims are not derivative of the pre-petition debtor. *Hays* is instructive on this point. In *Hays*, the lower court held that the trustee of the bankruptcy estate was not bound by a pre-petition arbitration clause because the trustee was not a party to the agreement. *Hays*, 885 F.2d at 1152. The Third Circuit disagreed with respect to claims and causes of action that the trustee succeeds to as "successor to the debtor's interest under section 541," finding that trustee remained bound by the arbitration clause. *Id.* at 1154. However, with respect to the claims asserted by the trustee under section 544(b), the Third Circuit held that those claims are "not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to assert on their behalf. . . . Thus there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it. . . . It follows that the trustee cannot be required to arbitrate its section 544(b) claims . . . ." *Id.* at 1155. As the cases cited by Foster Wheeler reflect, in addition to claims asserted under section 544, courts have found that claims under sections 547 and 548 are also not derivative of the debtor in possession, but actually creditor claims that the trustee or debtor in possession may assert. *See In re Oakwood Homes Corp.*, No. 04-56928PBL, 2005 WL 670310, at *4 (Bankr D. Del. Mar. 18, 2005); *In re EXDS, Inc.*, 316 B.R. 817, 826 (Bankr. D. Del. 2004).

Regardless, the Debtors do not dispute that the determination of whether the LCs are property of the estate pursuant to section 541 is "debtor-derived." Accordingly, the Debtors are bound by the Arbitration Agreement, which contains the relevant arbitration provisions. But the mere fact that a claim is debtor-derived, and that the debtor in possession or trustee is bound by the arbitration clause, does not end the inquiry. *Olympus*, 352 B.R at 611-12. Instead, the Court

must then apply the *Mintze* test to determine if the Court has the discretion to deny arbitration. The Debtors submit the *Mintze* test is satisfied here and that the Court should deny arbitration.

      C.    **The Second Prong of the *Mintze* Test is Satisfied:  Arbitration of Whether the LCs are Property of the Estate Inherently Conflicts with, and Seriously Jeopardizes the Objectives of the Bankruptcy Code**

Under *Mintze*, the second part of the determination of whether the Court has discretion to deny a request to arbitrate is whether "there is an inherent conflict between arbitration and the Bankruptcy Code." *Mintze*, 434 F.3d at 232.[21]  This test was similarly stated in *Hays* as the court should enforce an arbitration clause unless the court determines there is underlying purpose of the Bankruptcy Code that "would be adversely affected by enforcing an arbitration clause" and that such effect "would seriously jeopardize the objectives of the Code."  885 F.2d at 1161; *see also*, *In re United States Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999) ("The Arbitration Act as interpreted by the Supreme Court dictates that an arbitration clause should be enforced 'unless [doing so] would seriously jeopardize the objectives of the Code.'") (quoting *Hays*, 885 F.2d at 1161).  Arbitration of whether the LCs are property of the Debtors' estate inherently conflicts with, and seriously jeopardizes the objectives of the Bankruptcy Code for several reasons:  (1) Arbitration will strip all parties-in-interest of their legal rights to be heard on whether the LCs are property of the Debtors' estate, including the Steering Committee, who has a security interest in the LCs; (2) arbitration may result in piecemeal and duplicative litigation; (3) arbitration of property of the estate issues violates a fundamental purpose of the Code; and (4) arbitration of the ownership of the LCs will substantially interfere with the Debtors' reorganization.

---

[21]  The Court should not be distracted by Kvaerner's lengthy discussion of the abstention analysis in *Loewen Group*, 344 B.R. at 731-32.  (*See* Kvaerner Br. 27-32.)  As discussed in note 18, the abstention analysis does not apply, as the Third Circuit has instructed that the relevant analysis for determining whether a matter should be arbitrated is the *McMahon/Mintze* analysis.

1.      **Arbitration of Whether the LCs Are Property of the Debtors' Estate
Strips All Parties-In-Interest of Their Legal Rights to Be Heard,
Including the Lenders Who Have a Property Interest in the LCs**

The Arbitration proceeding is a private tribunal that, by design, bars any person or entity other than Longview and the Contractors from participating.  Arbitration of who owns the LCs conflicts with, and seriously jeopardizes, the objectives of the Bankruptcy Code because all parties-in-interest in these chapter 11 cases will have their rights to be heard under section 1109 stripped away.  This is particularly true for the Lenders, and the Steering Committee that represents a significant contingent of the Lenders.  Not only do the Lenders, like all creditors, have a general interest in the determination and marshaling of the Debtors' assets, the Lenders have a lien on the LCs.  The purported adjudication of that interest, in a private tribunal, without the right of the Lenders to be heard is contrary to the Bankruptcy Code's objective of centralized dispute resolution and resolution of all issues regarding the Debtors' interest in property in a single forum.

Allowing creditors to be heard and to vindicate their rights in the Debtors' property is a critical procedural objective of the Bankruptcy Code.  Those rights will be jeopardized if the LC dispute is sent to Arbitration since no party other than Longview or the Contractors may appear.  For example, in *In re White Mountain Mining Company*, 403 F.3d 164 (4th Cir. 2005), a dispute arose between the debtor's equity holders as to whether certain funds contributed by one of the debtor's principals constituted debt or equity contributions.  Because the equity holders were party to an agreement containing an arbitration clause requiring arbitration in London, the equity holder sought to compel arbitration.  The Fourth Circuit affirmed the lower court's denial of the motion to arbitrate because, among other reasons, "allowing the adversary proceeding to go

forward would allow all creditors, owners and parties in interest to participate in a centralized proceeding at a minimum of cost." *Id*. at 170 (internal quotation marks omitted).

Similarly, in *Mirant*, the court found that stripping creditors of their right to be heard on the quantification of a key claim in the bankruptcy case conflicted with the purposes of the Code. The *Mirant* court first noted that "[p]ursuant to section 1109(b) of the Code, any party in interest is entitled to be heard in the resolution of this contested matter." 316 B.R. at 243. Both of the appointed official committees in the case—the unsecured creditors committee and the equity committee—filed responses objecting to the motion to arbitrate. *Id* at 244. The court noted that "[t]he Mirant Committee, Equity Committee and any other party in interest not a party to the . . . Agreement [containing the arbitration clause] cannot be compelled to take part in arbitration proceedings." *Id.* "If the court were to defer to arbitration proceedings . . . the court would effectively eliminate the Code-created rights of parties in interest, other than [the parties to the arbitration agreement], to appear and be heard regarding quantification of Claim 6261. It goes without saying that to prevent a party from exercising rights expressly granted by the Code would contradict the purposes of the Code." *Id.*; *see In re Huffman*, 486 B.R. 343, 364-65 (Bankr. S.D. Miss. 2013) (declining to send debtors' causes of action against debt relief agency to arbitration, noting that "[t]he Court has discretion to deny enforcement of arbitration agreements when arbitration, as a practical matter, would result in the loss of a party's legal rights. . . . Protecting the creditors of the debtor is one of the chief objective of the bankruptcy process. A number of legal, practical, and equitable considerations convince the Court that the creditors would not be adequately protected by arbitrating this proceeding."); *In re Hemphill Bus Sales, Inc.*, 259 B.R. 865, 873 (Bankr. E.D. Tex. 2001) ("[D]eterminations respecting such an asset are of too great an importance to the creditors of this estate to be conducted absent

representation of those creditors' interests.  The creditors of this estate whose interests are

paramount in the bankruptcy court are not parties to the Distribution Contract or the arbitration

clause. . . .  [T]he bankruptcy court is better equipped than an arbitration panel to take

cognizance of the interests, in a reorganization, of both the debtor and the creditors.") (citations

omitted).

Despite the Contractors' arguments to the contrary, the LCs, and the Debtors' rights to

access approximately $59 million in cash is a significant asset of the estate.  Pursuant to section

1109, all parties-in-interest have a right to be heard on whether the LCs are property of the

Debtors' estates.  Stripping away creditors' rights to be heard by sending the LC dispute to a

private tribunal at which no parties other than Longview and the Contractors can appear conflicts

with the purposes of the Bankruptcy Code.

More significantly, the Lenders, have a perfected, first-priority security interest in the

LCs, and their proceeds.  Allowing the Arbitration Panel to adjudicate conflicting claims to the

LCs, without all parties that have an interest in them being present conflicts with the Bankruptcy

Code's key objective of centralizing dispute resolution, and may subject the Debtors to multiple

proceedings related to the ultimate ownership of the LCs.  *See In re Thorpe Insulation Co.*, 671

F.3d 1011, 1022-23 (9th Cir. 2012) ("[T]he purposes of the Bankruptcy Code include

centralization of disputes concerning a debtor's legal obligations and protecting creditors and

reorganizing debtors from piecemeal litigation.  Arbitration of a creditor's claim against a debtor,

even if conducted expeditiously, prevents the coordinated resolution of debtor-creditor rights and

can delay the confirmation of a plan of reorganization.") (citations and internal quotation marks

omitted); *White Mountain*, 403 F.3d at 170 ("[T]he London arbitration was inconsistent with the

purpose of the bankruptcy laws to centralize disputes about a chapter 11 debtor's legal obligation so that reorganization can proceed efficiently.").

Foster Wheeler asserts that the Lender's interest in the LCs should have no impact on whether the LC dispute should be arbitrated.  First, Foster Wheeler claims that the Lenders are not "necessary" to the determination of rights in the LCs because the Lenders' rights in the LCs are "derivative of Longview's rights" and only "becomes a ripe issue if a draw by Longview is permitted."  (Foster Wheeler Br. 34.)  Assuming *arguendo* that Foster Wheeler is correct on this point, it demonstrates exactly why the Lenders' cannot adequately protect their interest in the LCs in Arbitration.  Simply put, Foster Wheeler's argument suggests that the Lender's rights in the LCs are at risk of being extinguished in Arbitration, without them having the right to be heard.

Second, Foster Wheeler asserts that courts do not give any weight to the argument that arbitration is inappropriate because creditors are unable to be heard in such a proceeding.  (Foster Wheeler Br. 35.)  Despite this sweeping statement, Foster Wheeler only cites a single unpublished decision, *In re Quad Systems Corp.*, No. 00-35667F, 2001 WL 1843379 (Bankr. E.D. Pa. Mar. 20, 2001), in support.  In that case, however, the arbitration panel had already conducted an 11 day trial, and the debtors had spent over $650,000 on the trial alone.  *Id*. at *2. After filing a petition on the eve of the arbitration panel's ruling, the unsecured creditors' committee argued that unsecured creditors may be affected by the arbitration without the opportunity to participate.  *Id.* at *9.

In *Quad Systems*, the unsecured creditors had no specific interest in the claims resolution at issue in the arbitration, other than the general interest that all creditors have in a bankruptcy estate.  In contrast, the Lenders have a security interest in the LCs, a specific, identifiable interest

that may be jeopardized in the Arbitration, without a right to be heard. Foster Wheeler's suggestion that it is appropriate to attempt to resolve conflicting claims to the LCs in Arbitration without all parties present—simply because the Debtors have similar interests to the Lenders—cannot adequately protect the Lender's rights under the Bankruptcy Code. Accordingly, there is an inherent conflict with the Bankruptcy Code and arbitration should be denied.

> **2.    Arbitration of Whether the LCs Are Property of the Debtors' Estate Will Result in Piecemeal Litigation**

Yet another reason that arbitration of the LC dispute conflicts with, and seriously jeopardizes, the objectives of the Bankruptcy Code is that allowing the LC dispute to be arbitrated would be wasteful, and subject the Debtors to piecemeal litigation over the extent and nature of their bankruptcy estate. Specifically, assuming *arguendo* that this Court were to decide to send the LC dispute to arbitration, and that the Arbitration Panel (erroneously) determines that the LCs were assigned to the Consortium pursuant to the Coordination Agreement, the ultimate resolution of who owns the LCs would simply come back to this Court to decide several issues. First, the Consortium will be required to "confirm" the arbitration award, which would be subject to significant challenge by the Debtors. *See* 9 U.S.C. §§ 9-13. Second, the Lenders will almost certainly refuse to accept the Panel's determination since the Lenders may not be bound by such determination, and seek to have this Court exercise control over the LCs, or issue a determination of their rights in the LCs in another fashion. ████████████████████████

████████████████████████████████████

████████████████████ (*See* White Decl. Ex. B.) Third, the Debtors may seek to

avoid the Consortium's purported interest in the LCs under section 544 of the Bankruptcy Code.[22]

Post-*McMahon* case law is clear that exposing debtors to piecemeal litigation that prevents the coordinated resolution of key issues in the bankruptcy case conflicts with, and seriously jeopardizes, the objectives of the Bankruptcy Code. *See Thorpe Insulation*, 671 F.3d at 1022-23 ("[T]he purposes of the Bankruptcy Code include centralization of disputes concerning a debtor's legal obligations and protecting creditors and reorganizing debtors from piecemeal litigation. Arbitration of a creditor's claim against a debtor, even if conducted expeditiously, prevents the coordinated resolution of debtor-creditor rights and can delay the confirmation of a plan of reorganization."); *White Mountain*, 403 F.3d at 170 ("[T]he London arbitration was inconsistent with the purpose of the bankruptcy laws to centralize disputes about a chapter 11 debtor's legal obligation so that reorganization can proceed efficiently."); *National Gypsum*, 118 F.3d at 1069 ("[A] bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders."); *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001) ("staying the subject adversary proceeding in favor of arbitration seriously jeopardizes Bankruptcy Code objectives. Of primary concern is the preservation of the Debtors estate by not requiring Plaintiffs to expend limited resources and energies pursuing similar cases in several geographically diverse forums. Doing so inherently

---

[22] Section 544 allows the trustee or debtor-in-possession to exercise the rights of hypothetical judicial lien creditors and bona fide purchasers in real property in order to cut off any unrecorded, unperfected or otherwise incomplete and inchoate interests in property. 11 U.S.C. § 544; *see also*, 5-544 Collier on Bankruptcy P 544.02. As to the instant case, courts have found that incomplete "assignments," such as the one the Consortium asserts occurred under the Coordination Agreement, may be avoided by the trustee or debtor in possession under section 544. *See WFC Realty Co. v. Monzack (In re Goodrich)*, 170 B.R. 31, 32 (Bankr. D.R.I. 1994).

conflicts with the fundamental tenet of centralized resolution of purely bankruptcy issues.  No

competing federal policy favors the use of arbitration provisions to sidestep a bankruptcy court's

conventional jurisdiction.").

In this case, if the Arbitration Panel were allowed to determine whether the Consortium

has some interest in the LCs, and erroneously determined that the LCs were assigned to the

Consortium, the parties will soon be back in this Court on a number of issues.  At the very least,

the Court will be asked to "confirm" the Arbitration Panel's determination, which will be subject

to challenge and further litigation.  Moreover, since the Lenders are not a party to the Arbitration

Agreement, they will likely contend they are not bound by any determination by the Arbitration

Panel, especially since the Lenders are unable to participate in such proceeding.  Thus, the

Lenders may ask this Court to exercise control over the LCs, or issue a determination of their

rights in the LCs that is potentially inconsistent with the Arbitration Panel's determination.  And

finally, the Debtors would likely ask this Court to determine whether the Consortium's interest

may be avoided pursuant to section 544.  Allowing for duplicative and circular proceedings

regarding the ownership of the LCs is wasteful and harmful to the Debtors and their estate.

Subjecting the Debtors to piecemeal litigation conflicts with the objectives of the Bankruptcy

Code, and makes little sense in this situation.

### 3. Arbitration of Whether the LCs Are Property of the Debtors' Estate Violates the Fundamental Purpose of the Bankruptcy Code by Interfering with This Court's Ability to Exercise Jurisdiction Over the Debtors' Assets and Arrange for the Equitable Distribution to All Creditors

Courts have found that certain features of the bankruptcy process are so fundamental that

any interference with those elements is a conflict.  *See In re Martin*, 387 B.R. 307, 321 (Bankr.

S.D. Ga. 2007) (noting that one of the facts that supports a finding of a conflict between the FAA

and the Bankruptcy Code is where arbitration "violate[s] a fundamental purpose of the Bankruptcy Code"). For instance, in *United States Lines*, the Second Circuit found that declaratory judgment actions brought by the debtors against their pre-petition insurers should not be arbitrated as "the declaratory judgment proceedings are integral to the bankruptcy court's ability to preserve and equitably distribute the Trust's assets. . . . The bankruptcy court was not clearly erroneous in finding that arbitration of the disputes raised in the Complaint would prejudice the Trust's efforts to preserve the Trust as a means to compensate claimants." 197 F.3d at 641 (internal quotation marks omitted). Likewise, the court in *Rushing* held that arbitration of automatic stay violation claims was inappropriate, finding that "[e]ntitlement to remedies by those protected constituencies for violation of the essential protections provided by the automatic stay goes to the heart of the bankruptcy process and should be safeguarded in a centralized forum." *In re Rushing*, 443 B.R. 85, 97 (Bankr. E.D. Tex. 2010).

In the few reported cases on the issue, courts have generally refused to allow arbitration of property of the estate issues.[23] The *Salander-O'Reilly Galleries* case is instructive. In that case, the debtor operated an art gallery that also sold artwork on consignment. 475 B.R. at 16. A British Virgin Islands entity, Kraken, entered into a consignment arrangement with the debtor to offer a certain artwork for sale at the gallery. That consignment agreement contained an arbitration clause to arbitrate any dispute in Jersey. *Id*. at 16. After the debtor filed for bankruptcy, Kraken moved for relief from stay to arbitrate the dispute as to who owned the

---

[23] *But see*, *In re PRS Ins. Group, Inc.*, No. 02-1977 (MFW), 2003 WL 21262446 (Bankr. D. Del. May 30, 2003). In *PRS*, the court exercised discretion to send a property of the estate dispute to arbitration. However, the case does not cite or mention the *McMahon* or *Hays* analysis, and accordingly, does not engage in an analysis of whether there is an inherent conflict with the Bankruptcy Code. Moreover, because *PRS* pre-dates *Mintze*, the court concluded that because the dispute was a core proceeding, the court had discretion to decide whether to refer the matter to arbitration. *Id.* at *2. The court, however, decided to exercise its discretion in favor of arbitration. Thus, *PRS* is a case where the court determined that it had discretion to deny arbitration, but decided to send the dispute to arbitration.)

consigned artwork in Jersey.  One of the issues regarding the dispute over ownership of the artwork was whether Kraken had properly perfected his consignor interest in the artwork.  The Southern District of New York affirmed the bankruptcy court's denial of the motion for relief from stay, finding it was inappropriate to arbitrate determinations with respect to property of the estate:  "this case presents a classic example of the compelling policy in support of a uniform Bankruptcy Code.  If every dispute as to whether property was part of the bankruptcy estate or could be reached by the debtor's creditors were sent to arbitration pursuant to a pre-petition arbitration agreement, unreasonable delay, costs, and duplication of effort would result for all parties involved in the bankruptcy as well as the courts."  *Id*. at 30.

As discussed above, the principal basis of the Bankruptcy Court's power is its *in rem* jurisdiction over all property of the Debtors' Estate.  *Katz*, 546 U.S. at 369.  The Court's *in rem* jurisdiction is critical to the Court's ability to adjust and discharge the Debtors' debts, and to bind all of the Debtors' creditors to a plan—even if they do not participate in this case.  *See Hood*, 541 U.S. at 447-48.  Conversely, arbitration over the LCs has the ability to bind only the Debtors and the Contractors.  Arbitration cannot bind any of the Debtors' other creditors, including the Lenders, which have a perfected, first-priority security interest in the LCs.

The Contractors cannot dispute that a fundamental purpose of the Bankruptcy Code is the adjustment of the Debtors' debts and the equitable distribution of the Debtors' assets.  Arbitration over whether the LCs are property of the Debtors' estate interferes with those goals, divesting the Court of its ability to determine the extent and nature of the Debtors' estates.  Frustrating these fundamental purposes of the Code is an inherent conflict.  *See Mirant*, 316 B.R. at 242 and n.15 (allowing arbitration would "conflict with the purposes of the Code by robbing this court of its ability to deal with the adjustment of the debtor-creditor relationship,

another key function of the bankruptcy court. . . .  This court's ability to effect this public

regulatory scheme and reorder the debtor-creditor relationship in this case would be . . .

frustrated were PEP able to use a standard arbitration provision common in the power industry to

divest this court of its *in rem* authority.")

  **4.**  **Arbitration of Whether the LCs Are Property of the Debtors' Estate Will Substantially Interfere with the Debtors' Reorganization**

   Contrary to Kvaerner's suggestion that arbitration of the dispute over the LCs "presents

no adverse implications to these bankruptcy proceedings[,]" arbitration of the LC dispute will

substantially interfere with the Debtors' reorganization.  (Kvaerner Br. 35.)  Simply put, the

Debtors need cash to fund these chapter 11 cases and to repair the Plant.  Repairing the Plant is a

key piece of these chapter 11 cases.  Absent the Debtors' ability to repair the Plant, the Debtors'

reorganization may be jeopardized.

   Several courts have found that if an arbitration will substantially interfere with the

debtor's reorganization, that interference creates an inherent conflict with, and seriously

jeopardizes the objectives of, the Bankruptcy Code.  Again, the *White Mountain* case is

instructive.  As noted above, that case involved whether a dispute over the proper

characterization of funds contributed by the debtor's principal should be arbitrated.  403 F.3d at

166-67.  The Fourth Circuit agreed with the findings of the bankruptcy court, that the resolution

of the recharacterization dispute was critical to the debtors' ability to reorganize, noting that:

> The bankruptcy court concluded that ordering arbitration and
> staying the adversary proceeding would substantially interfere with
> White Mountain's efforts to reorganize.  The court found than an
> ongoing arbitration proceeding in London would (1) make it very
> difficult for the debtor to attract additional funding because of the
> uncertainty as to whether Phillip's claim was debtor or equity, (2)
> undermine creditor confidence in the debtor's ability to reorganize,
> (3) undermine the confidence of other parties doing business with

the debtor, and (4) impose additional costs on the estate and divert the attention and time of the debtor's management . . . .  The bankruptcy court noted that because resolution of the debt-equity issue was critical to the debtor's ability to formulate a plan of reorganization, the court would resolve the adversary proceeding on an expedited basis.

*White Mountain*, 403 F.3d at 170; *see also*, *Hemphill Bus Sales*, 259 B.R. at 871-72 (finding that arbitration over whether distribution agreement was validly terminated was inappropriate where agreement represented over 90% of debtors' sales: "without the Distribution Contract, the estate is eviscerated and reorganization would be impossible. . . .  Resolution of the issues, for which arbitration has been requested, is absolutely essential to Debtor's successful completion of its reorganization.") (internal quotation marks omitted).

Similarly, in this case, arbitration of whether the LCs are property of the estate would substantially interfere with the Debtors' ability to reorganize.  First, the Debtors need cash to fund these chapter 11 cases.[24]  The Debtors' Cash Collateral Budget projects that the Debtors will have a negative cash position the end of the budget period, December 27, 2013.  (*See* ECF No. 297-1.)  Moreover, the Plant is wildly unreliable due to problems with the boiler, and is subject to frequent, unplanned outages.  (Oct. 17 Keffer Aff.  ¶¶ 15-16.)  Absent a sufficient working capital cushion from drawing down the LCs, the Debtors may find themselves without sufficient cash to continue operations in the near term.

Second, as discussed at the first day hearing, one of the key components of these cases is that the Debtors need to fix the Plant.  Over the past two years, the Debtors retained engineering

---

[24] Foster Wheeler argues that a draw on the LCs "is not critical to the Debtors' ongoing operations" and "is simply an attempt to avoid pursuing typical debtor-in-possession financing from its lenders[.]"  (Foster Wheeler Br. 36.) This argument misses the mark.  First, the mere fact that the Debtors' budget does not show the Debtors bank accounts going to zero over the coming weeks does not mean that the Debtors have no need for additional working capital.  Second, Foster Wheeler fundamentally misunderstands its role in this case.  The determination of how to fund the Debtors' reorganization is made by the Debtors, through the exercise of their reasonable business judgment and consistent with their fiduciary duties to all stakeholders.  Foster Wheeler does not get to dictate how these cases are funded.

experts to evaluate the issues with the boiler and conduct a root-cause analysis to determine how to remedy the problems.  (Oct. 17 Keffer Aff. ¶¶ 8-10.)  The Debtors compiled cost estimates for the major repairs to the boiler that it currently understands are needed.  The repairs may cost in excess of $50 million and will not be completed until the Spring of 2015, if started immediately.  The Debtors cannot commence repairs without financing, which the $59 million LCs are designed to provide.

The Debtors need to draw down the LCs for working capital purposes and fund the repairs necessary to the boiler in order improve its operational performance.  Absent working capital to continue operations and fix the Plant, the Debtors' reorganization will be substantially jeopardized.  Accordingly, an inherent conflict between arbitration and the Bankruptcy Code exists, and this Court has the discretion to deny arbitration regarding the LCs.

## V.    THE DEBTORS HAVE AGREED TO IMMEDIATE LIMITED STAY RELIEF

Although the discussion in Section IV hereof is equally applicable to the Arbitration generally, in addition to the LC issues, there is no need at this time for the Court to address the Contractors requests for stay relief to permit the Arbitration to continue in its entirety.  This is because the Debtors have agreed to limited stay relief to permit the Arbitration to continue as to all issues except those relating to the LCs, through the First Memorial.  The Debtors reserve the right, however, to seek further relief from the Court at that juncture to re-impose or continue the stay.

## VI.    THE CONTRACTORS' LIMITED OBJECTIONS TO THE DEBTORS' USE OF CASH COLLATERAL SHOULD BE DENIED

In a final attempt to obfuscate the simple and clear principles that govern Longview's rights with respect to the LCs, the Contractors conflate the standard necessary to enjoin a draw

under a letter of credit with the standard a debtor must meet to use cash collateral.  Nowhere in

the cash collateral motion did the Debtors seek authority from the Court to draw on the letters of

credit or use their proceeds for two simple reasons:  First, as the beneficiary of the LCs,

Longview has an absolute right to draw thereunder and ownership of the proceeds, which as a

debtor in possession, it may exercise in the ordinary course of business.  *See, e.g.*, *Rafool v.*

*Evans (In re Cent. Ill. Energy, L.L.C.)*, 482 B.R. 772, 790 (Bankr. C.D. Ill. 2012).  Second, the

Contractors have no interest in the Debtors cash collateral generally, and no interest in the

proceeds of the letters of credit, specifically.  Consequently, the Contractors cannot object to the

Debtors' use of the LC proceeds on the grounds that it is their cash collateral.

Under section 363(p)(2), "[i]n any hearing under [section 363] . . . the entity asserting an

interest in property has the burden of proof on the issue of validity, priority, or extent of such

interest" 11 U.S.C. § 363(p)(2).  As set forth more fully above (s*ee, supra* section II), the

Consortium has no interest in the LCs and certainly not their Proceeds.  Because Foster Wheeler

does not assert any direct claim in the LCs or their proceeds, it has not even alleged an interest.[25]

Even if this Court were to hold that the Consortium has some rights in the LCs, however, it is

certainly not a security interest.  The adequate protection provisions of section 361, which apply

to a Debtor's request to use cash collateral only protect secured creditors.  *New England Dairies,*

*Inc. v. Dairy Mart Convenience Store, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351

F.3d 86, 90–91 (2d Cir. 2003) (listing authorities).  None of the Contractors have alleged an

actual security interest in the proceeds of the letters of credit and, even if they had, they cannot

carry their burden of demonstrating one.  Accordingly, the Consortium is not entitled to adequate

---

[25]  Even if all of Foster Wheeler's allegations were true, they do not state any direct interest in the proceeds of the
LCs.  Foster Wheeler's remedies in the event that it is adjudicated not liable for breaches under the Boiler
Agreement is in the nature of a contract claim, not a specific claim against the proceeds themselves.  *See, generally*
1-2 Burton V. McCullough, Letters of Credit § 2.05[2] (Bender 2013).                               .

protection under section 363(e).  The only party with an interest in the proceeds of the LCs other than Longview is the Lenders and Longview anticipates that under the final cash collateral order any use of the proceeds will be consensual under section 363(c)(2)(A).

## **CONCLUSION**

For the reasons stated herein, the Debtors respectfully request that the Court overrule the Contractors' objections to the Debtors' Motion to Use Cash Collateral on a final basis, determine that the LCs and their proceeds are property of the estate and that the Debtors are entitled to draw on them and use their proceeds, and deny the Contractors requests to enjoin a draw under the LCs and permit limited stay relief to allow the Arbitration to continue as to all issues other than the LCs through the First Memorial.

Dated:  October 18, 2013
       Wilmington, Delaware

/s/ Marisa A. Terranova
Daniel J. DeFranceschi (DE Bar No. 2732)
Paul N. Heath (DE Bar No. 3704)
Zachary I. Shapiro (DE Bar No. 5103)
Marisa A. Terranova (DE Bar No. 5396)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:     defranceschi@rlf.com
      heath@rlf.com
      shapiro@rlf.com
      terranova@rlf.com

*Co-Counsel for the Debtors and Debtors in Possession*

- and -

Philip R. White (admitted *pro hac vice*)
D. Farrington Yates (admitted *pro hac vice*)
Scott E. Koerner (admitted *pro hac vice*)
David A. Pisciotta (admitted *pro hac vice*)
**DENTONS US LLP**
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone:     (212) 786-6700
Facsimile:     (212) 768-6800
Email:     phil.white@dentons.com
      farrington.yates@dentons.com
      scott.koerner@dentons.com
      david.pisciotta@dentons.com

*Special Litigation Counsel for the Debtors and Debtors in Possession*

81284436\V-1