## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LONGVIEW POWER, LLC, et al.,[1] | ) | Case No. 13-12211 (BLS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Hearing Date: Nov. 20, 2013, at 9:30 a.m. (ET)** |
|  | ) | **Objection Deadline: Nov. 14, 2013, at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION FINANCING ON A PRIMING BASIS, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE ADEQUATE PROTECTION PARTIES, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (the "Motion")[2] for entry of a final order[3] (the "Final DIP Order"):  (I) authorizing

the Debtors to (a) obtain postpetition financing on a senior, secured, and priming basis pursuant

to the DIP Facility[4] contemplated by the term sheet annexed hereto as **Exhibit A** (the "Financing

---

[1]   The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number
     are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008)
     (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate
     Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC
     (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco
     Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy,
     LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors").   The
     Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541.  The
     Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

[2]   The Debtors respectfully submit that subject to the Court's approval of the relief requested by this Motion, the
     relief requested on a final basis pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (A)
     Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Adequate Protection
     Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), and (D) Granting Related
     Relief* [Docket No. 25] is moot.

[3]   The Debtors anticipate filing a proposed form of the Final DIP Order within one week of filing this Motion.

[4]   Capitalized terms used but not defined herein shall have the meanings set forth in the Financing Term Sheet (as
     defined herein), the Plan Term Sheet (as defined herein), or the *Interim Order (A) Authorizing Postpetition Use
     of Cash Collateral, (B) Granting Adequate Protection to the Adequate Protection Parties, (C) Scheduling a
     Final Hearing, and (D) Granting Related Relief* [Docket No. 117] (the "Interim Cash Collateral Order"), as
     applicable.

Term Sheet") and enter into the commitment letter annexed hereto as **Exhibit B** (the

"Commitment Letter") and the fee letter with the Administrative Agent annexed hereto as

**Exhibit C** (the "Administrative Agent Fee Letter"),[5] (b) enter into the Replacement L/C Facility,

(c) use Cash Collateral subject to the terms set forth in the Final DIP Order, and (d) grant certain

adequate protection to the Adequate Protection Parties; and (II) granting related relief.   In

support of this Motion, the Debtors respectfully state as follows:[6]

### Preliminary Statement

1.    The Debtors are pleased to file the Motion with the Court.  The relief sought in

the Motion provides a comprehensive capital solution for the Debtors' reorganization and the

framework for a plan of reorganization that the Debtors expect to file by November 12, 2013.

As noted by this Court recently, these cases are not solely about resolving issues related to the

Debtors' pending arbitration with the Contractors (as defined herein), but rather, they involve

significant operational and financial issues that will need to be addressed, especially in light of

the Debtors' liquidity issues.  This restructuring process involves more than $1.0 billion in

prepetition debt and a 700 megawatt power plant that has been plagued by material operational

deficiencies since the Debtors first took possession of that facility in December 2011.  As the

Court is aware, the Debtors initially sought to fund this process by utilizing cash collateral,

including $59 million of proceeds from the Foster Wheeler LCs.  As the Court is also aware, the

Contractors have sought to block these efforts by attempting to strip the Foster Wheeler LCs

from the Debtors' estates and by seeking to bar the Debtors' access to cash collateral.

---

[5]    The Debtors intend to file a form of credit agreement memorializing the DIP Facility contemplated by the
Financing Term Sheet not later than 10 days from the date hereof.

[6]    In further support of the relief requested by this Motion, the Debtors anticipate submitting one or more
declarations from Lazard Frères & Co., LLC, the Debtors' retained investment banker.

2.     The Debtors presently expect to have less than a sufficient amount of cash on hand to effectively and safely operate their businesses by early to mid-December.  Rather than permit these chapter 11 cases to become mired in the same litigation that frustrated their restructuring efforts prior to the Petition Date, the Debtors have therefore continued to seek alternative sources of capital necessary to fund a comprehensive operational and balance sheet solution.

3.     To this end, the Debtors and their advisors have engaged in arm's length and hard fought negotiations with a group consisting of many of the largest lenders under the Longview Credit Agreement (the "<u>Backstoppers</u>")[7] to build consensus around the path forward. Obligations arising under the Longview Credit Agreement are the overwhelmingly largest component of the Debtors' capital structure.  These negotiations involved, among other things, the parties' efforts to come to terms around both the Debtors' near term cash needs and a longer-term solution for the Debtors' operational and financial requirements, including the capital required to repair the Power Plant and the terms of a plan of reorganization.  These negotiations were successful.

4.     By working together to create a roadmap for moving the Debtors out of chapter 11 through committed financing necessary to ensure that much needed operational repairs can be performed, the Debtors submit that their negotiations with the Backstoppers to date have been very successful.  The Debtors and the Backstoppers have negotiated:  (a) an up to $150 million senior, secured, priming multi-draw term loan facility, including an up to $30 million replacement letter of credit subfacility, which subfacility may be used to renew or replace existing letters of credit or to issue new letters of credit in the ordinary course of business; (b) a

---

[7]     The Backstoppers consist of lenders holding in the aggregate approximately 60% of the outstanding debt under the Longview Credit Agreement.

conversion feature, allowing the DIP Facility to convert into the Exit Facility (in the same amount) upon consummation of a chapter 11 plan; and (c) the material terms providing for the Debtors' emergence from chapter 11, which are set forth on the term sheet attached to the Financing Term Sheet as **Exhibit 1** (the "Plan Term Sheet").  As the Debtors are prepared to demonstrate at the Court's hearing on this Motion, this facility has been sized to meet both the Debtors' working capital needs, the costs of these chapter 11 cases, and the cost of repairs necessary to fix the Power Plant.  The DIP Facility is fully backstopped by the Backstoppers, although each lender under the Longview Credit Agreement will also be offered the opportunity to participate in the DIP Facility.[8]

5.      The DIP Facility is, in turn, linked to the Debtors' ability to successfully prosecute a chapter 11 plan in accordance with the Plan Term Sheet.  Among other things, the Plan Term Sheet provides:[9]

- In exchange for the Longview Credit Agreement Claims, and depending upon how much of the Financing Facility is used, each holder of such claim shall receive its pro rata share of up to 90% of the new common equity interests (the "New Common Interests");

- The remaining New Common Interests shall be issued to the DIP Lenders as part of the DIP Lender Fee;

- The Debtors shall obtain approval of the proposed DIP Facility by November 21, 2013; and

- The following case milestones:

  - Filing of Plan and Disclosure Statement:          November 12, 2013

---

[8]     Participation in the DIP Facility will be available to all lenders under the Longview Credit Agreement on a pro rata basis and syndication will take place after the date of the filing of this Motion and before the date of the final hearing to approve the Motion.

[9]     The summary of the Plan Term Sheet provided herein is presented for illustrative purposes only and is qualified in its entirety by reference to the Plan Term Sheet.  In the event of any inconsistency between this summary and the Plan Term Sheet, the Plan Term Sheet shall control in all respects.

- Filing of motion to draw down on
  Foster Wheeler LCs:                                    November 28, 2013

- Filing of Claims Estimation Motion:                    December 11, 2013

- Entry of an order approving
  Disclosure Statement:                                  December 22, 2013

- Commencement of hearing
  with regard to Claims Estimation Motion:               February 8, 2014

- Commencement of hearing
  to confirm Plan:                                       February 12, 2014

- Entry of Confirmation Order:                           February 19, 2014

- Effective Date:                                        March 7, 2014

In short, the relief requested by this Motion presents a tremendous step towards the achievement of a cohesive operational and balance sheet solution for these chapter 11 cases.

6.     Any DIP Facility must be tailored to the Debtors' facts and circumstances, and much like any case, the Motion contemplates senior, secured financing. Thus, the DIP Facility will prime all junior interests in the Debtors' assets. The Debtors believe that the priming of the Longview Lenders' liens will be consensual. It is the Debtors' hope that no party will object to this critical financing, as this path provides a bridge to the Debtors' reorganization while deferring, at least for a time, any disputed letter of credit issues. The Debtors believe that financing necessary to fund these chapter 11 cases and to provide a bridge to the Debtors' emergence is not available absent the priming required by the Backstoppers nor can the Debtors adequately operate the business, fix the Power Plant, or fund a chapter 11 plan without the liquidity provided by the proposed DIP Facility—particularly if the Contractors are permitted to deprive these estates of the Foster Wheeler LCs.

7.      Regardless, the Debtors believe priming financing is warranted under the facts of these chapter 11 cases and applicable law.  Moreover, the financing is not otherwise available. On the one hand, the Contractors do not hold any valid claims against either the Power Plant, in particular, or these estates in general.  Each of the Contractors is obligated to the Debtors for material damages resulting from the Contractors' design, construction, and equipment defects and failures with respect to the Power Plant.

8.      On the other hand, and assuming solely for the sake of argument that the Contractors are found to have a valid, senior lien on the Power Plant on account of their disputed claims, the Power Plant's value supports an equity cushion well in excess of both the total claims asserted by the Contractors and the DIP Facility.[10]  Such an equity cushion—coupled with the Debtors' proposed use of both the DIP Facility and cash from operations to operate and repair the Power Plant—adequately protects the Contractors' interests in such facility.  See In re Fortune Smooth (U.S.) Ltd., No. 93-40907 (JLG), 1993 WL 261478, at *6 (Bankr. S.D.N.Y. July 6, 1993) ("[I]n appropriate circumstances an equity cushion in and of itself can constitute adequate protection."); In re Las Torres Development, LLC, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("Given the sufficient equity cushion on this case, the Court concludes that it may authorize the Debtors to use the Lender's cash collateral . . . .").  As will be set forth in the Final DIP Order, as further adequate protection for the Contractors, to the extent their Mechanics' Liens are found to be valid, the Debtors will also grant the Contractors additional and replacement liens and security interests in the collateral subject to their Mechanics' Liens.

---

[10]   To the extent the Contractors seek to challenge any valuation with respect to the Power Plant, the Debtors respectfully submit that any such arguments shall constitute judicial admissions by the Contractors with respect to, among other things:  (a) damages incurred by the Debtors as a result of the Contractors' design, construction, and equipment defects with respect to the Power Plant; and (b) the aggregate value of the Contractors' claims for all purposes (including estimation, allowance, and discharge).  In addition, any such challenge will implicitly subject the contractors to this Court's jurisdiction with regard to the validity, priority, and amount of their claims.

9.      In sum, the relief requested by this Motion is a significant step towards the ultimate resolution of these chapter 11 cases.  The DIP Facility provides the Debtors with the liquidity necessary to fund repairs necessary for the Power Plant and to consensually restructure approximately $1.0 billion of prepetition debt.  The DIP Facility provides the Debtors with a clear path to exit chapter 11 in the first quarter of 2014.  At the same time, the relief requested by this Motion is also narrowly tailored to address the Debtors' business needs and adequately protect the interests of affected parties, such as they are.  On this record, and as the Debtors are prepared to demonstrate at the Court's hearing on this Motion, the relief requested herein presents a sound exercise of business judgment and should be approved.

### Jurisdiction

10.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## **Relief Requested**

13.    By this Motion, the Debtors respectfully request that the Court grant the following

relief (which will be provided in the Final DIP Order):

- **The DIP Facility and Replacement L/C Facility**: authorizing the Debtors to obtain senior secured postpetition financing up to an aggregate principal amount of $150 million of a multiple delayed draw term loan (the "Term Loan"), including a Replacement L/C Facility in an amount not to exceed $30 million.

- **Termination of Synthetic L/C Facility:** authorizing the Debtors to terminate the Synthetic L/C Facility so as (a) to permit cash held in the Synthetic L/C Deposit Account (as defined in the Longview Credit Agreement) in excess of Synthetic L/C Exposure (as defined in the Longview Credit Agreement) to be returned to the Longview Lenders in accordance with the terms of the Longview Credit Agreement and (b) to permit cash otherwise collateralizing Synthetic Letters of Credit (as defined in the Longview Credit Agreement) to be returned to the Longview Lenders in accordance with the terms of the Longview Credit Agreement as such Synthetic Letters of Credit are reissued or replaced with letters of credit issued under the Replacement L/C Facility.

- **Backstop Commitment Fee:** In consideration for providing a backstop of the Financing Facility, each Backstopper will receive a fee in the amount of its pro rata share (based on commitments for the Financing Facility on the date of the filing of this Motion) of 3% of the total committed amount of the Financing Facility to be paid in cash or OID at the election of each Backstopper.

- **DIP Commitment Fee:** In consideration for providing the DIP Facility, each DIP Lender will receive a fee to be paid upon the Debtors' exit from chapter 11 in the amount of (a) 10% of the equity of the Reorganized Debtors so long as the total funded amount of the Financing Facility is less than $100 million, and (b) up to an additional 5% of the equity of the Reorganized Debtors if any amount greater than $100 million is funded, interpolated for any dollar funded over $100 million, to be paid upon the Debtors' exit from chapter 11.[11]

- **Unused Line Fee**:  Notably, the Financing Term Sheet does not require, and the Debtors do not expect the Final DIP Order to require the Debtors to pay the DIP Lenders any unused line fee notwithstanding that the DIP Loans are structured as a delayed draw multi-tranche term loan.[12]

---

[11]    It is possible that a reserve will be established on the Effective Date to be used as compensation for any amount funded after the Effective Date.

[12]    Indeed, the DIP Lenders are committing capital in return for no such fee and, as a result, are not being compensated for this commitment.

- **Commitment Letter and Administrative Agent Fee Letter**: authorizing the Debtors to enter into the Commitment Letter and the Administrative Agent Fee Letter with respect to the DIP Facility and Exit Facility.[13]

- **DIP Liens**: authorizing the Debtors to grant a first-priority, fully perfected lien on all assets subject only to (a) the Carve Out, (b) valid, perfected, enforceable and unavoidable liens in existence as of the Closing and which are senior to the liens and security interests securing the obligations under the Longview Credit Agreement, (c) valid, enforceable and unavoidable liens in existence as of the Closing that are perfected subsequent to Closing as permitted by section 546(b) of the Bankruptcy Code and which are senior to the liens and security interests securing the obligations under the Longview Credit Agreement, and (d) other liens and encumbrances that will permitted by the DIP Loan Documents.  For the avoidance of doubt, the liens granted to secure the DIP Facility shall prime the Disputed Mechanics' Liens in all respects.

- **Adequate Protection**: approval of the form and manner of adequate protection to be provided to the Adequate Protection Parties pursuant to sections 361 and 363(c) of the Bankruptcy Code.

- **DIP Claims**: authority to grant a superpriority administrative claim with respect to all loans made and obligations incurred by the Debtors on or after the Petition Date pursuant to the DIP Credit Agreement, subject only to the Carve-Out set forth in the Final DIP Order, pursuant to section 364(c)(1) of the Bankruptcy Code.

- **Cash Collateral**: authority to use Cash Collateral on a final basis pursuant to the terms of the Final DIP Order.

### The Debtors' Prepetition Capital Structure

14.    As of the Petition Date, the Debtors' funded debt and secured claims asserted against their estates included:  (a)(i) approximately $1 billion of indebtedness outstanding under the Longview Credit Agreement, including approximately $95 million in letters of credit issued and outstanding under a synthetic letter of credit facility and synthetic revolving facility provided under the Longview Credit Facility, and (ii) obligations under certain interest rate and electricity pricing hedges which constitute obligations secured by liens granted under the Longview Credit

---

[13]    The Debtors have sought authority to file the Commitment Letter and the Administrative Agent Fee Letter under seal pursuant to the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to File Under Seal Exhibits to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing on a Priming Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Adequate Protection Parties, and (IV) Granting Related Relief and (b) Granting Related Relief* filed contemporaneously herewith.

Agreement; and (b) other secured claims including (i) obligations arising under various capital leases entered into by certain of the Mepco Debtors, and (ii) miscellaneous secured claims arising in the Debtors' ordinary course of business.  These asserted claims are described more fully in the Cash Collateral Motion and incorporated herein by reference.

15.     In addition, and as the Court is aware, the Debtors' prepetition capital structure at least nominally includes approximately $360 million in claims, in the aggregate, asserted (in varying amounts) by each of Kvaerner North American Construction, Inc., Siemens Energy, Inc. and Foster Wheeler North America Corp (collectively, the "Contractors") against the Power Plant and related assets (collectively, the "Disputed Mechanics' Lien Claims").  The claims underlying the Disputed Mechanics' Lien Claims arise from obligations the Contractors allege are owed in connection with the Power Plant's construction.  The Disputed Mechanics' Lien Claims do not extend to the Debtors' other assets (such as the Mepco Debtors' coal mining assets).

### Concise Statement of the Material Terms of the Financing Term Sheet

16.     The following summarizes the material terms of the Financing Term Sheet and the relief the Debtors expect to request be provided in the Final Order[14] in accordance with Bankruptcy Rule 4001(b), (c), and (d) and Local Rule 4001-2(a)(ii):

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| **DIP Credit Agreement Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Longview Power, LLC, as borrower.  In addition, Mepco Holdings, LLC (and its affiliated Mepco entities) may also be borrowers.<br><br>All of the Debtors other than the Borrower, and any other affiliates that become chapter 11 debtors) (collectively, the "Guarantors") will guarantee the DIP Facility.<br><br>Certain lenders party to that certain Credit Agreement (the "Longview Credit | pp. 1-2 |

---

[14]   The summary of the Financing Term Sheet is qualified in all respects by reference to the Financing Term Sheet, and to the extent of any inconsistency between this Motion and the Financing Term Sheet, the Financing Term Sheet shall govern.

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | Agreement"), dated as of February 28, 2007, among the Borrower, as borrower, certain other entities, as guarantors, the lenders party thereto (the "Longview Lenders"), Citicorp North America, Inc., as Administrative Agent (the "Agent"), Citibank, N.A., as Funded L/C Issuing Bank and Funded 2014 Revolving L/C Issuing Bank, and Union Bank, N.A., as Revolving L/C Issuing Bank, Synthetic L/C Issuing Bank, Synthetic-Revolving Bank, Swingline Lender and Collateral Agent, or their affiliates that subscribe to a commitment under the DIP Facility (the "DIP Lenders"). <br><br> The Bank of Nova Scotia (in its capacity as administrative agent and collateral agent under the DIP and Exit Facilities, the "Administrative Agent"). | |
| **Entities with an Interest in Cash Collateral** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B)(i) | 1. The Longview Lenders <br><br> 2. Citicorp North America, Inc., as administrative agent under the Longview Credit Agreement. <br><br> 3. Union Bank, N.A., as collateral agent under the Longview Credit Agreement. | N/A |
| **Maturity** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | All DIP Loans shall become due and payable on the DIP Facility Termination Date and will be repaid in cash (or, if occurring prior to the Scheduled Termination Date (as defined herein), rolled into the Exit Facility). <br><br> The "DIP Facility Termination Date" shall be the earliest of (a) the Scheduled Termination Date, (b) the consummation of any sale of a material portion of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, (c) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a plan of reorganization and which for purposes hereof shall be no later than the Effective Date of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Court and (d) the acceleration of the loans and the termination of the commitment with respect to the DIP Facility in accordance with the DIP Loan Documents (as defined below). <br><br> "Scheduled Termination Date" means the date that is the 24 month anniversary of the date upon which the Closing (as defined below) occurs. | p. 4 |
| **Purpose/Use of Funds** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B)(ii) and (c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | In accordance with the Long Term Budget reasonably acceptable to the Backstoppers, proceeds of the DIP Loans and the Exit Loans will be used for general corporate purposes of the Loan Parties during the Cases (including payment of fees and expenses in connection with the transactions contemplated hereby, adequate protection payments and working capital), general corporate purposes of the Loan Parties after the conclusion of the Cases, transaction fees, costs and expenses and certain other costs and expenses with respect to the administration of the Cases and legal fees, costs, and expenses benefiting from the Carve-Out. | p. 4 |
| **Budget** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | The DIP Facility may be used by the Borrowers to fund their operations, chapter 11 cases, pending litigation, and any necessary construction of the Power Plant consistent with Longview's 24 month budget (such budget, in form and substance reasonably satisfactory to the Backstoppers, the "Long Term Budget"). <br><br> The Debtors shall comply with a weekly budget in form and substance reasonably satisfactory to the Backstoppers (the "13 Week Budget"), which 13 Week Budget will be periodically updated with the consent of the Backstoppers; provided that any variance testing under the 13 Week Budget shall exclude professional fees (including professional fees payable by the Debtors to or on behalf of the Backstoppers) and restructuring charges. | pp. 2-3, 11, 14 |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| **Interest Rates**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | The DIP Loans will bear interest at LIBOR plus 7.50% with a LIBOR floor of 1.50% or the Base Rate plus 6.50% with a Base Rate floor of 2.50%.<br><br>During the continuance of an Event of Default (as defined in the DIP Loan Documents), the DIP Loans will bear interest at an additional 2% *per annum*. | p. 5 |
| **DIP Commitments**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | The Steering Group and certain other Longview Lenders, if any, to be identified to the Debtors prior to the filing of the DIP motion shall backstop the entire Financing Facility, on a *pro rata* basis among the Backstoppers relative to their holdings as a percentage of the total aggregate amount of the funded and unfunded exposure of the Backstoppers under the Longview Credit Agreement. The Backstoppers' agreement to backstop the Financing Facility shall continue to be in effect until the closing of such facility and funding of the initial loans thereunder. | p. 2 |
| **Letters of Credit**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | The DIP Facility shall provide for a letter of credit subfacility in an amount not to exceed $30 million.  The Replacement L/C Facility may be used by the Debtors to renew or replace existing letters of credit or to issue new letters of credit in the ordinary course of business.<br><br>The Debtors expect that the Final DIP Order shall authorize the Debtors to terminate the Synthetic L/C Facility so as (i) to permit cash held in the Synthetic L/C Deposit Account (as defined in the Longview Credit Agreement) in excess of Synthetic L/C Exposure (as defined in the Longview Credit Agreement) to be returned to the Longview Lenders in accordance with the terms of the Longview Credit Agreement and (ii) to permit cash otherwise collateralizing Synthetic Letters of Credit (as defined in the Longview Credit Agreement) to be returned to the Longview Lenders in accordance with the terms of the Longview Credit Agreement as such Synthetic Letters of Credit are reissued or replaced with letters of credit issued under the Replacement L/C Facility. | p. 3 |
| **Funding Conditions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Del. Bankr. L.R. 4001-2(a)(ii) | The closing date (the "Closing") under the DIP Facility shall be subject to, among others, the following conditions (in addition to the conditions precedent for each Loan):<br><br>A. The Debtors will file a motion seeking approval of entry into the DIP Facility no later than November 1, 2013, which motion and all supporting documentation shall be in form and substance reasonably acceptable to the Backstoppers and the Debtors.<br><br>B. All documentation relating to the DIP Facility (and any tax structuring related thereto) shall be in form and substance consistent with this term sheet and otherwise reasonably satisfactory to the Backstoppers and the Debtors.<br><br>C. The Final DIP Order (which shall include the provision of adequate protection to the Longview Lenders and Agent under the Longview Credit Agreement) shall be in form and substance consistent with the Financing Term Sheet and otherwise reasonably satisfactory in all respects to the Administrative Agent and the Backstoppers.<br><br>D. The Final DIP Order shall contain provisions, among other things, (i) acknowledging the validity and enforceability of the Longview Credit Agreement and other loan documents, the debt outstanding thereunder and the liens granted in connection therewith, and (ii) waiving Bankruptcy Code sections 506(c) and the "equities of the case" exception of section 552 as such may pertain to the claims and liens of the Agent and Longview Lenders under the Longview Credit Agreement.<br><br>E. All reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of outside counsel, financial advisors, and consultants) of the Agent, the Administrative Agent and the Backstoppers on or before the | pp. 9-12 |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | Closing shall have been paid, and the Debtors shall have executed the Administrative Agent's Fee Letter.<br><br>F. There shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrower's or the Guarantors' debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder on a postpetition basis.<br><br>G.  The absence of a material adverse change, or any event or occurrence, other than the commencement and continuation of the Chapter 11 Cases, and any outages which have occurred at the Power Plant as of October 1, 2013, and which have been fully explained to the Backstoppers and their advisors which could reasonably be expected to result in a material adverse change, in (i) the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Debtors, taken as a whole, since October 1, 2013, (ii) the ability of the Borrower or the Guarantors to perform their respective material obligations under the DIP Loan Documents or (iii) the ability of the Administrative Agent and the DIP Lenders to enforce the DIP Loan Documents (any of the foregoing being a "<u>Material Adverse Change</u>").<br><br>H. The Administrative Agent, on behalf of itself and the DIP Lenders shall have a valid and perfected first priority lien on and security interest in the Collateral; if requested by the Administrative Agent, the Loan Parties shall have delivered uniform commercial code financing statements, mortgages, and shall have executed and delivered intellectual property security agreements, in each case, in suitable form for filing; and provisions reasonably satisfactory to the Backstoppers for the payment of all fees and taxes for such filings shall have been duly made.<br><br>I. The Administrative Agent shall have received endorsements (to the extent such endorsements can be delivered prior to Closing after the exercise of commercially reasonable efforts) naming the Administrative Agent, on behalf of itself and the DIP Lenders, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the Collateral.<br><br>J. The Backstoppers will have received the Long Term Budget, which Long Term Budget will be in form and substance reasonably satisfactory to the Backstoppers.  The Backstoppers shall be reasonably satisfied with the Borrower's plans to fix the Power Plant, including timetable, costs, choice of subcontractor (to the extent such choice has been made prior to the Closing), etc.  The Backstoppers will have received all information (financial or otherwise) reasonably requested from the Debtors.<br><br>K. At the sole cost and expense of the Debtors, the Debtors shall use commercially reasonable best efforts to obtain a public facility level rating and a public recovery rating (including a DIP recovery rate) from each of Standard & Poor's and Moody's.  If the Debtors are unable to do so prior to the Closing Date, it shall be a condition subsequent to the Closing Date that such ratings are received within fifteen business days of the Closing Date.  Failure to receive such ratings within such time frame will result in an Event of Default.<br><br>L. The Debtors shall file with the Court (i) the finalized financial projections provided to the Backstoppers, in form, substance and level of detail materially consistent with financial projections customarily filed with a disclosure statement, and (ii) such other information to be mutually agreed between the Debtors and the Backstoppers, each in their reasonable discretion.<br><br>M. The Debtors will appoint a person or entity reasonably acceptable to the | |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | Backstoppers and the Debtors (the "Engineering and Contracting Executive"), at the expense of the Debtors (but with economic terms and conditions of employment to be mutually agreed to by the Backstoppers and the Debtors), who will, under the supervision of Charles W. Huguenard (in Mr. Huguenard's capacity as Senior Vice President & General Manager of Longview Power, LLC), work with Mr. Huguenard, the Debtors' other consultants and employees, and the Backstoppers' consultants with regard to the repair of the Power Plant, including, among other things, participation in the selection of any subcontractors who will complete the repair, the negotiation of any agreements under which the repair will be completed (including the agreements of any of the Debtors' consultants), any design and engineering necessary to be completed, and who will, subject to such supervision, have full access to the Debtors' resources (including personnel, third parties, the Power Plant, and information) reasonably necessary to complete all of the Engineering and Contracting Executive's responsibilities (which responsibilities shall include, among other things, reporting to the Backstoppers on a schedule to be agreed). The Engineering and Contracting Advisor will work with Mr. Huguenard, the Debtors' other consultants and employees and the Backstoppers' consultants to enter into, modify, and cancel any such agreements (to the extent necessary) in the future. The costs and expenses incurred by the Engineering and Contracting Executive in undertaking the foregoing tasks shall be in the Long Term Budget and approved by the Backstoppers.<br><br>"Conditions Precedent to Each DIP Loan" On the funding date of each DIP Loan, including the initial DIP Loan, (i) there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, and (iv) the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the reasonable consent of the Backstoppers and the Debtors. | |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | In consideration for providing a backstop of the Financing Facility, each Backstopper will receive a fee in the amount of its pro rata share (based on commitments for the Financing Facility on the date of the filing of any motion to approve the DIP Facility) of 3% of the total committed amount of the Financing Facility, to be paid in cash or OID, at the election of each Backstopper. Such fee will be fully earned upon filing of the DIP Financing Motion, and shall be payable upon the closing of the DIP Facility and initial funding thereunder, pursuant to the Final DIP Order.<br><br>In consideration for providing the DIP Facility, each DIP Lender will receive a fee in the amount of its pro rata share (based on commitments for the DIP Facility on the date of entry of the Final DIP Order) of (a) 10% of the equity of the Reorganized Debtors so long as the total funded amount of the Financing Facility is less than $100 million, and (b) up to an additional 5% of the equity of the Reorganized Debtors if any amount greater than $100 million is funded, interpolated for any dollar funded over $100 million, to be paid upon the Debtors' exit from chapter 11. Such fee (the "DIP Lender Fee") will be fully earned upon entry of the Final DIP Order, but shall only be payable upon the occurrence of the effective date of the Plan of Reorganization. | p. 18 |
| **Liens, Priorities, and Adequate Protection**<br><br>Fed. R. Bankr. P. | All amounts owing by the Borrower under the DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to the Carve-Out (as defined below) by (i) a first priority perfected pledge of (x) all promissory notes | pp. 5-6 |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| 4001(b)(1)(b)(i), (ii) and (c)(1)(B)(iv); Del. Bankr. L.R. 4001-2(a)(ii) | owned by the Borrower and the Guarantors and (y) all capital stock owned by the Borrower and the Guarantors and (ii) a first priority perfected security interest in all other assets owned by the Borrower and the Guarantors, including, without limitation, accounts, cash, inventory, equipment, investment property, letters of credit, instruments, chattel paper, deposit accounts, owned and leased real estate, contracts, patents, copyrights, trademarks, other general intangibles and proceeds of avoidance actions, in each case, subject to the Carve-Out (all aforementioned collateral, the "Collateral"). | |
| | The liens granted under the DIP Facility will prime and be senior to the liens and security interests in the Collateral securing the Longview Credit Agreement, and shall be junior only to (i) the Carve-Out, (ii) valid, perfected, enforceable and unavoidable liens in existence as of Closing and which are senior to the liens and security interests securing the obligations under the Longview Credit Agreement, (iii) valid, enforceable and unavoidable liens in existence as of Closing that are perfected subsequent to Closing as permitted by section 546(b) of the Bankruptcy Code and which are senior to the liens and security interests securing the obligations under the Longview Credit Agreement, and (iv) other liens and encumbrances permitted by the DIP Loan Documents.  For the avoidance of doubt, and notwithstanding the above, the liens granted under the DIP Facility will prime and be senior to the liens and security interests, if any, that have been asserted by the EPCs and that are currently disputed by, among others, the Debtors. | |
| | The DIP Lenders will be granted in the Final DIP Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Facility with priority above all other administrative claims, subject to the Carve-Out. | |
| **Carve-Out**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | For purposes of the Final DIP Order, the "Carve-Out" shall mean the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) subject to the Committee Monthly Cap with respect to Professional Fees (as defined herein) incurred by Professional Persons (as defined herein) retained by a creditors' committee of unsecured creditors (any such committee, the "Creditors' Committee"), if any, and subject to any Professional Fees permitted to be incurred under the Investigation Budget, to the extent allowed at any time, whether by interim order, procedural order or otherwise, all fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professional Persons") at any time before or on the first business day following delivery by the Agent of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"); and (iv) after the first business day following delivery by the Agent of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (x) all Professional Fees of Professional Persons retained by the Debtors and (y) all Professional Fees of Professional Persons incurred by the Creditors' Committee in an aggregate amount for clauses (x) and (y) not to exceed $1,250,000 incurred on and after the Trigger Date (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"); provided that nothing herein shall be construed to impair the ability of any party to object to the reasonable fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds.  On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice also (x) shall constitute a demand to the Debtors to utilize all | pp. 6-9 |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an aggregate amount equal to the accrued and unpaid Pre-Trigger Date Fees, and (y) shall constitute an irrevocable notice from the Debtors to the DIP Lenders to fund a DIP Loan, and an obligation of the DIP Lenders to fund a DIP Loan, to the Debtors in an amount equal to the balance of accrued and unpaid Pre-Trigger Date Fees, if any, after the Debtors' funding of the reserve in clause (x) immediately preceding this clause (y); *provided* that, in each case, the Debtors shall deposit and hold any such amounts in a segregated account at the Agent in trust (the "Carve-Out Reserve") (it being understood that the Secured Parties shall have a first priority lien and security interest on any residual amounts in such segregated account, and the segregated account itself, after all obligations arising under the Carve-Out have been satisfied). After the Carve-Out Reserve has been fully funded, the Debtors may, subject to the consent of the Backstoppers, the Agent, and the Administrative Agent, escrow additional monies in an amount not to exceed the amount of projected Professional Fees reasonably and in good faith anticipated by the Debtors to be incurred by the Debtors for the immediately succeeding 30-day period ("Additional Reserved Funds"), and such Additional Reserved Funds (x) shall not be available to the parties receiving adequate protection under the Final DIP Order or to the DIP Lenders other than with respect to such parties' residual interest in the Additional Reserved Funds for application to the obligations under the DIP Facility, (y) shall reduce on a dollar for dollar basis the Post-Carve Out Trigger Notice Cap, and (z) shall be held in trust exclusively for payment of the Professional Fees.  Notwithstanding the foregoing, (x) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Backstoppers, the DIP Lenders, the Administrative Agent, or the Secured Parties, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Loan Documents in favor of the Secured Parties (whether in such capacity or otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable nonbankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Backstoppers, the DIP Lenders, the Administrative Agent, or the Secured Parties hereunder; (c) attempts to prevent, hinder or otherwise delay any of the Backstoppers', the DIP Lenders', the Administrative Agent's, or the Secured Parties' assertion, enforcement or realization upon any Collateral in accordance with the Loan Documents and the Final DIP Order other than to seek a determination that an Event of Default has not occurred or is not continuing; or (d) paying any amount on account of any claims arising before the commencement of the Chapter 11 Cases unless such payments are approved by an order of the Court, and (y) so long as the Carve-Out Trigger Notice shall not have been delivered, the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by the Court.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Administrative Agent, the Agent, or counsel to the Backstoppers to the Debtors, the Debtors' counsel and their co-counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, delivered upon the occurrence and during the continuance of a Termination Event, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Loan Documents, the Carve-Out shall be senior to all liens and claims securing the Loan Documents, the Adequate Protection Liens and the Superpriority Claim, and any and all other forms of adequate protection, liens or claims securing the First-Lien Asset Secured Obligations.  Further, for the avoidance of doubt and notwithstanding anything herein to the contrary, following a Termination Event, | |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | the Adequate Protection Parties shall not sweep or foreclose on cash (including cash received as a result of the sale of any assets) of the Debtors until the Carve-Out Reserve has been fully funded, but shall have a first priority, fully perfected, non avoidable security interest in any residual interest in the Carve-Out Reserve, with any excess paid to the Administrative Agent for application in accordance with the Loan Documents or, after payment in full of the Obligations, to the Adequate Protection Parties, as the case may be. | |
| **Payments on Prepetition Debt; Cross-collateralization**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | None, other than replacement liens as adequate protection. | N/A |
| **Covenants**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Loan Documents will contain affirmative covenants customarily found in loan agreements for similar debtor in possession financings and other affirmative covenants deemed by the Backstoppers and agreed to by the Debtors to be reasonably appropriate to this specific transaction, subject to, where appropriate, materiality thresholds, carve-outs and exceptions to be agreed (which will be applicable to the Loan Parties), in all cases, as mutually agreed by the Debtors and the Backstoppers.<br><br>The DIP Loan Documents will contain negative covenants customarily found in loan agreements for similar debtor in possession financings and other negative covenants deemed by the Backstoppers to be appropriate to this specific transaction and where appropriate, subject to materiality thresholds, carve-outs and exceptions to be agreed (which will be applicable to the Loan Parties).<br><br>For the avoidance of doubt, the DIP Loan Documents will contain, among others, the following negative covenants:<br><br>(1) Limitations on the Debtors' authority to take certain actions outside the ordinary course of business without consulting with the Backstoppers and providing the Backstoppers adequate (and no less than five business days') notice (and the opportunity to review and comment on any motions) prior to any motions to be filed by the Debtors with regard to actions taken outside the ordinary course of business.<br><br>(2) Limitations on transactions with affiliates without the reasonable consent of the Backstoppers, including without limitation, transactions with GenPower Holdings (Delaware) L.P., First Reserve, and Dunkard Creek (and each of their affiliates).<br><br>(3) Compliance with the 13 Week Budget, which 13 Week Budget will be periodically updated with the consent of the Backstoppers; provided that any variance testing under the 13 Week Budget shall exclude professional fees (including professional fees payable by the Debtors to or on behalf of the Backstoppers) and restructuring charges.<br><br>(4) The Debtors shall not choose a subcontractor to conduct the repair of the Power Plant without the reasonable consent of the Backstoppers, nor will the Debtors enter into any agreements relating to this repair (including, without limitation, any agreements with the Debtors' consultants or any employment agreements) without the reasonable consent of the Backstoppers. The Debtors shall not make any expenditures with regard to the repair of the Power Plant that have not been reasonably consented to by the Backstoppers.<br><br>(5) The Debtors will comply with the timeline relating to the repair of the Power Plant, such timeline to be reasonably consented to by the | pp. 13-15 |

17

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | Backstoppers, and the Debtors will comply with all reasonable requests made by the Engineering and Contracting Executive for information and full access to personnel, files, the Power Plant, third parties, and documents.<br><br>The DIP Loan Documents will contain a minimum EBITDAR covenant applicable to the Loan Parties, the terms of which will be as mutually agreed by the Debtors and the Backstoppers.<br><br>The DIP Loan Documents will contain reporting requirements customarily found in loan documents for similar debtor in possession financings (or exit financings) and other reporting requirements deemed by the Backstoppers appropriate to this transaction, in all cases, as mutually agreed by the Debtors and the Backstoppers.<br><br>It is acknowledged and agreed that the reporting requirements will be substantially similar to the reporting requirements contained in the Interim Cash Collateral Order. | |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)(iii); Del. Bankr. L.R. 4001-2(a)(ii) | The DIP Loan Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default deemed by the Backstoppers to be reasonably appropriate to this transaction (which will be applicable to the Loan Parties).<br><br>In addition, there shall be events of default under the DIP Facility related to any adverse determination of the Mechanics' Lien Claims, as determined by the Backstoppers, and agreed to by the Loan Parties, each in their reasonable discretion.<br><br>In addition, there shall be events of default under the DIP Facility related to any termination of the material contracts related to the repair of the Power Plant, work stoppages and other delays in such repair process (except as otherwise consented to by the Backstoppers within five business days of the occurrence of such event), failure to meet an agreed upon timeline for repairs (subject to a grace period to be mutually agreed), and failure of the Debtors to provide full access to information, personnel, third parties, documents, etc. requested by the Engineering and Contracting Executive. | pp. 15-16 |
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(vi) and (c)(1)(B) | For the avoidance of doubt, the DIP Loan Documents will contain the following milestones, for which the failure to reach will constitute an Event of Default, and which dates may be waived or modified (but only to provide for more, as opposed to less, time) by the Backstoppers (it is understood and agreed that any milestone dates contained in the Financing Term Sheet are, where applicable, subject to the availability of the Court) in their reasonable consent.  For the avoidance of doubt, the Debtors will file a motion to approve the DIP Financing by November 1, 2013, and it shall be an Event of Default if the Court has not entered the Final DIP Order, in form and substance consistent with this term sheet and otherwise reasonably satisfactory to the Backstoppers, by November 20, 2013.<br><br>November 12, 2013:  Filing by the Debtors of the Plan and Disclosure Statement, and motion to approve the adequacy of the Disclosure Statement, all in form and substance reasonably satisfactory to the Backstoppers.<br><br>November 21, 2013:  Entry of the Final DIP Order by the Court, in form and substance reasonably satisfactory to the Backstoppers.<br><br>November 28, 2013:  Filing by the Debtors of a motion to draw down on the $59 million of Letters of Credit, or, in the alternative, to draw down on such Letters of Credit and move such proceeds into escrow, pending final resolution of any determination as to whether the Letters of Credit constitute "property of estate." | pp. 16-17 |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| | <u>December 11, 2013</u>:  Filing by the Debtors of the Claims Estimation Motion, in form and substance reasonably satisfactory to the Backstoppers.  The Claims Estimation Motion shall include a request for a hearing with regard thereto within 60 days from the date of the filing of the Claims Estimation Motion.  The Claims Estimation Motion shall request that the Mechanics' Lien Claims be estimated for all purposes, including, without limitation, for plan and voting purposes.<br><br><u>December 22, 2013</u>: Entry of an order approving the Disclosure Statement, in form and substance reasonably satisfactory to the Backstoppers.<br><br><u>February 8, 2014</u>: Commencement of a hearing with regard to the Claims Estimation Motion.<br><br><u>February 12, 2014</u>:  Commencement of a hearing to confirm the Plan.<br><br><u>February 19, 2014</u>: Entry of the Confirmation Order, in form and substance reasonably satisfactory to the Backstoppers.<br><br><u>March 7, 2014</u>:  Effective Date of the Plan. | |
| **Findings of Validity, Perfection, or Amount of Prepetition Liens**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | The Debtors expect that, subject to a challenge period substantially similar to the challenge period in the Interim Cash Collateral Order, as part of the Final DIP Order, the Debtors will agree and stipulate that the Longview Lenders' liens on the Prepetition Collateral are valid, binding, perfected, enforceable, first priority liens and security interests, subject in each case to permitted exceptions and the existence, validity and actual priority of the Disputed Mechanics' Lien Claims with respect to the Disputed Mechanics' Liens, as determined by a final order of a Court of competent jurisdiction.  The Debtors shall also provide releases substantially similar to those provided in the Interim Cash Collateral Order. | The Debtors expect this to be provided in the Final Order. |
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The Debtors expect that the Final Order will provide that the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated an modified without the need for any further order of the Court to require mandatory prepayments in accordance with the requirements of the DIP Documents and, subject to a notice period acceptable to the Backstoppers, to provide that following an Event of Default under the DIP Documents, the DIP Lenders be permitted to exercise their rights and remedies under the DIP Documents. | The Debtors expect this to be provided in the Final Order. |

| Material Terms | Summary of Material Terms | Page of Financing Term Sheet |
|---|---|---|
| **Waivers and Consents**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(v)-(x) | The Debtors will indemnify the Administrative Agent, the DIP Lenders, and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates) that relates to the Financing Facility or the transactions contemplated thereby; *provided* that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from its gross negligence, willful misconduct or material breach of its obligations under the DIP Facility.  In addition, (a) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel, financial advisors, and consultants) of the Administrative Agent and the Backstoppers in connection with the Financing Facility and the transactions contemplated thereby shall be paid by the Debtors from time to time and (b) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel) of the Administrative Agent, the Backstoppers, and the DIP Lenders, for enforcement costs and documentary taxes associated with the Financing Facility and the transactions contemplated thereby will be paid by the Debtors.<br><br>The Debtors expect that the Final DIP Order will provide for waivers of rights of the Debtors' estates under section 506(c) of the Bankruptcy Code. | p. 17 |
| **Liens on Chapter 5 Actions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(xi) | The Debtors expect that the Final DIP Order will provide that the Adequate Protection Liens granted to the Longview Lenders shall attach to any proceeds or property recovered in respect of any Avoidance Actions and to the Avoidance Actions themselves. | The Debtors expect this to be provided in the Final Order. |

## Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i)

17.      Local Rule 4001-2(a)(i) requires a debtor to:  (a) recite whether the proposed form of order underlying a request to use cash collateral or to obtain financing contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in such proposed order; and (c) justify the inclusion of such provisions in such proposed order.  See Del. Bankr. L.R. 4001-2(a)(i).   The Debtors hereby identify the certain highlighted provisions in accordance with Local Rule 4001-2(a)(i) (collectively, the "Highlighted Provisions"):

A.  **Provisions that Grant Cross Collateralization (Del. Bankr. L.R. 4001-2(a)(i)(A)).**  The Debtors anticipate that the Final DIP Order will not provide for cross-collateralization, other than replacement liens as adequate protection.

B.  **Findings of Fact (Del. Bankr. L.R. 4001-2(a)(i)(B)).**  The Debtors anticipate that pursuant to the Final DIP Order, subject in each case to permitted exceptions and the actual validity, priority and amount of the Disputed Mechanics' Lien Claims with respect to the Disputed Mechanics' Liens, as determined by a final order of a Court of competent jurisdiction, the Debtors will agree and stipulate that the Longview Lenders' liens on the Prepetition Collateral are valid, binding, perfected, enforceable, first priority liens and security interests.[15]

C.  **506(c) Rights (Del. Bankr. L.R. 4001-2(a)(i)(C)).**  The Debtors anticipate that the Final DIP Order will provide for waivers of rights of the Debtors' estates under section 506(c) of the Bankruptcy Code.

D.  **Liens on Avoidance Actions (Del. Bankr. L.R. 4001-2(a)(i)(D)).**  The Debtors anticipate that pursuant to the Final DIP Order, the Adequate Protection Liens granted to the Longview Lenders shall attach to any proceeds or property recovered in respect of any Avoidance Actions and to the Avoidance Actions themselves.

E.  **Provisions Deeming Prepetition Debt to be Postpetition Debt (Del. Bankr. L.R. 4001-2(a)(i)(E)).**  The Debtors anticipate that the Final DIP Order will not deem prepetition secured debt to be postpetition debt.

F.  **Carve-Out (Del. Bankr. L.R. 4001-2(a)(i)(F)).**  Professional Persons retained by any Creditors' Committee that may be appointed[16] will be included in the Carve-Out up to the Committee Monthly Cap.  As discussed above, the Adequate Protection Liens are subject and subordinate to the Carve-Out.

G.  **Non-Consensual Priming (Del. Bankr. L.R. 4001-2(a)(i)(G)).**  The Final DIP Order will provide for non-consensual priming liens with respect to any interest in the Power Plant held by the Contractors (which, for the avoidance of doubt, are contested in all respects by the Debtors) on account of their Disputed Mechanics' Liens Claims.

---

[15]  Pursuant to the Interim Cash Collateral Order, the Debtors have previously stipulated to these findings.

[16]  To date, no Creditors' Committee has been appointed.

## Basis for Relief

**I.    The Debtors Should be Authorized to Obtain Postpetition Financing in Accordance with the Financing Term Sheet and Commitment Letter**

**A.    The Proposed DIP Facility
Reflects a Sound Exercise of Business Judgment**

18.    The determination to obtain postpetition financing is a question of business judgment.  See In re YL W. 87th Holdings I, LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").  Thus, the "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest."  In re Barbara K Enters., Inc., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

19.    To determine whether this standard is met, the Court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (internal citation omitted).

20.    And, in exercising its business judgment, courts recognize that a debtor is entitled (if not required) to consider non-economic benefits offered by a proposed postpetition facility:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.

In re ION Media Networks, Inc., No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).

21.    The Debtors' determination to enter into the DIP Facility is an exercise of their sound business judgment and should be approved. The Debtors, the Backstoppers (which hold approximately 60% of the debt under the Longview Credit Agreement), which are the largest economic stakeholders in these chapter 11 cases by an overwhelming margin, and their respective advisors have analyzed the Debtors' projected financing needs during the pendency of these chapter 11 cases and after. These parties have determined the Debtors will require additional liquidity to support their operational and restructuring activities—including required repairs for the Power Plant. To support these costs, the Backstoppers have committed to fund the entire DIP Facility as an integral part of a consensual restructuring of the Debtors' prepetition financial obligations. Accordingly, the Debtors negotiated the DIP Facility with the Backstoppers in good faith, at arm's-length, and with the assistance of their advisors. The DIP Facility provides the Debtors with the capital necessary to meet their working capital needs, the costs of these chapter 11 cases, and the costs of repairs to fix the Power Plant. The DIP Facility also provides the Debtors with a path towards exiting chapter 11 in the first quarter of 2014. This determination reflects the quintessential exercise of business judgment and is entitled to deference from the Court. See In re Trans World Airlines, Inc., 163 B.R. at 974 (finding that the debtor's entry into the financing that served as the "framework" and "cornerstone" for the

debtor's plan of reorganization reflected exercise of the debtor's "sound and prudent business judgment").

22.     Indeed, the Debtors negotiated the DIP Facility in conjunction with their overall efforts to reach a global resolution to these chapter 11 cases.  There can be no reasonable dispute that the DIP Facility is an important step toward achieving this goal:  the DIP Facility will support not only the Debtors' near term liquidity needs, but will also fund the Debtors' ultimate reorganization through a plan supported by the Backstoppers.  Accordingly, the DIP Facility reflects an exercise of sound business judgment that should be approved.  See ION Media, 2009 WL 2902568, at *4 ("[C]ooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.").

### B.    The Debtors Should be Authorized to Obtain
### Postpetition Financing on a Senior Secured and Superpriority Basis

23.     Section 364(c) of the Bankruptcy Code authorizes a debtor to incur credit with priority over administrative claims or secured by junior liens on encumbered property or first priority liens on unencumbered property.  To incur credit on this basis, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id.  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

24.     The Debtors' prepetition lenders are secured by substantially all the Debtors' assets.  As a result, the Debtors do not have material, unencumbered assets available to support a postpetition credit facility.   The Debtors do not believe financing would be available on commercially reasonable terms solely on an administrative priority basis.  Therefore, the Debtors believe their ability to secure the DIP Facility with superpriority administrative claims, priming liens on encumbered property, and first priority liens on the Debtors' unencumbered property (if any) is appropriate under the circumstances of these chapter 11 cases**.**

### C.     The Debtors Should be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens

25.     Section 364(d)(1) authorizes the Debtors to obtain postpetition credit secured by a lien that is senior to existing liens on the encumbered property, without the consent of the existing lienholders, if the Debtors cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).  Here, the DIP Facility would prime both:  (a) the Debtors' prepetition lending facility; and (b)  interests held by the Contractors, if any, in the Power Plant on account of the Disputed Mechanics' Liens.[17]

26.     Courts have identified a number of factors that support a debtor's determination to obtain credit secured by a "priming" lien, including:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

---

[17]   For the avoidance of doubt, the Debtors' proposed DIP Facility will not prime the Carve-Out or valid perfected enforceable liens that were senior to liens arising under the Longview Credit Agreement other than the Disputed Mechanics' Liens.  The Debtors believe the value of these senior liens is de minimis.

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s);

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

- whether the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003); Barbara K. Enter., No. 08-11474, 2008 WL 2439649 at *13 (Bankr. S.D.N.Y. Jun. 16, 2008); see also 3 Collier on Bankruptcy ¶ 364.05 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

27.    The Debtors respectfully submit the DIP Facility is appropriate under this analysis and the facts of these chapter 11 cases.  First, on information and belief, the Backstoppers hold approximately 60 percent of the debt outstanding under the Longview Credit Agreement and, therefore, have affirmatively consented to the priming feature of the DIP Facility.  The Debtors, therefore, submit that such treatment is appropriate with respect to such parties.

28.    Second, the Debtors require the DIP Facility to provide adequate liquidity for the operation, maintenance, and repair of their assets, including assets which the Contractors believe are encumbered by the Disputed Mechanics' Liens.  Absent such relief, the Debtors cannot ensure they will have the ability to operate with an appropriate level of cash on hand, and value may be lost if there are unexpected or unforced outages and the Debtors are not able to operate or maintain their assets in the ordinary course, which will threaten the Debtors' significant going concern value.  Conversely, the Debtors' access to liquidity will benefit all stakeholders— including the Contractors (to the extent such parties are determined to have valid claims)—by facilitating the Debtors' efforts to preserve and enhance the Power Plant's value and to facilitate

the Debtors' ultimate emergence from chapter 11.  See In re Trans World Airlines, Inc., 163 B.R. at 974.

29.    Third, the Debtors and their advisors determined that the DIP Facility is the only alternative readily available for such liquidity.  As noted above, the Debtors do not believe the financing necessary to fund these chapter 11 cases is available from other parties on comparable terms, particularly given that the Debtors lack material, unencumbered collateral with which to support third party financing.  Nor do the Debtors currently have access to the Foster Wheeler LCs given the Contractors' efforts to remove such assets from these chapter 11 estates.

30.    Fourth, as described in greater detail above and as the Debtors are prepared to demonstrate at the Court's hearing on this Motion, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arm's-length.  The Debtors' entry into the DIP Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

31.    Fifth, and as discussed more fully below, the Debtors will provide adequate protection for the Longview Lenders' and the Contractors' interests in the Prepetition Collateral that will be subject to priming liens arising under the DIP Facility.

II.    **The Debtors' Proposed Adequate Protection Should be Approved**

32.    Parties with an interest in cash collateral or collateral that may be used to secure postpetition financing are entitled to adequate protection.  See 11 U.S.C. § 363(e).  In addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  11 U.S.C. § 364(d)(1)(B).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate

protection on a case-by-case basis.  See, e.g., In re Satcon Tech. Corp., No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012).   At the same time, it is well-recognized that "adequate protection" is not equivalent to "absolute protection."  In re Beker Indus., Inc., 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard.").

### A.    The Debtors' Proposed Adequate Protection Is Appropriate Here

33.    The Debtors expect that the Final DIP Order will provide for Adequate Protection for the Adequate Protection Parties consisting of:

- **Equity Cushion.**  The Power Plant has a value that implies an equity cushion sufficient to adequately protect the claims asserted by the Contractors.  The Debtors also intend to use the proceeds of the DIP Facility to improve the Power Plant, which in and of itself provides adequate protection and which will further increase the equity cushion;

- **Superpriority Claims**.  Subject to the Carve-Out and the Claims of the DIP Lenders, and subject to a determination as to the validity, priority, and amount of the Contractors' claims, the obligations due to the Adequate Protection Parties in respect of the Adequate Protection they are provided shall constitute joint and several superpriority claims against the Debtors as provided in section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses and all other claims asserted against the Debtors;

- **Adequate Protection Liens**.  Subject to the Carve-Out and the liens granted in favor of the DIP Lenders, the Debtors propose to grant the Adequate Protection Parties, to the extent they have valid claims, first priority liens on, and security interests in, unencumbered Prepetition Collateral, and junior replacement liens on, and security interests in, all property of the Debtors and their estates which they had valid liens on during the prepetition period; provided that, for the avoidance of doubt, in no case shall the Disputed Mechanics' Lien Claims extend to assets other than the Power Plant (such as the Mepco Debtors' coal mining assets); and

- **Additional Adequate Protection**.   The Debtors propose to: (a) pay customary fees and expenses for the steering group of lenders, the Administrative Agent, and the Collateral Agent; (b) comply with the 13 Week Budget (including permitted variances), in form and substance reasonably satisfactory to the Backstoppers; and (c) comply with additional reporting and disclosure obligations.

34.     The Debtors submit that the foregoing adequate protection package is consistent with what is customarily granted to parties whose prepetition liens on a debtor's assets are primed by liens granted to lenders providing debtor-in-possession financing.

### B.     The Contractors are Adequately Protected by a Significant Equity Cushion

35.     The Debtors believe a significant equity cushion exists with respect to the Power Plant after accounting for both the total indebtedness projected to be drawn under the DIP Facility and the aggregate value of the Disputed Mechanics' Lien Claims (although the Debtors dispute such claims in all respects).[18]   In addition, the Debtors submit that their proposed use of the DIP Facility (which includes, among other things, operating, maintaining, and repairing the Power Plant) itself adequately protects the Contractors' interests, if any. See In re Salem Plaza Assocs., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).[19]

36.     Regardless, this equity cushion adequately protects the Contractors' interest (if any) in the Power Plant as of the Petition Date.   See In re Fortune Smooth (U.S.) Ltd., No. 93-40907 (JLG), 1993 WL 261478, at *6 (Bankr. S.D.N.Y. July 6, 1993) ("[I]n appropriate circumstances an equity cushion in and of itself can constitute adequate protection."); In re Las Torres Development, LLC, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("Given the sufficient

---

[18]   As noted above, the Debtors intend to file the Lazard Declarations in support of their proposed Financing Facility, including with respect to the equity cushion provided by the Power Plant, not less than 10 days from the date hereof.

[19]   As a general matter, continued operations are far more likely to maintain or increase underlying collateral values as compared with the catastrophic loss of value that could result from a debtor's inability to operate in the ordinary course.   See In re Jim Kelly Ford of Dundee, Ltd., 14 B.R. 812 (N.D. Ill. 1980) (lender was adequately protected and debtor was authorized to use cash collateral to fund operations because the lender benefited from the difference between the average sale price of car sold at retail and the average sale price if the same vehicle was sold at a wholesale auction).

equity cushion on this case, the Court concludes that it may authorize the Debtors to use the Lender's cash collateral . . . .").

### III. The Debtors' Request to Use Cash Collateral on a Final Basis Is Appropriate

37.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996).

38.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral on a final basis.  First, the Backstoppers have consented to the Debtors' use of the Cash Collateral on a final basis subject to the conditions set forth in the DIP Documents.  The Debtors have no reason to believe the remaining lenders under the Longview Credit Agreement will object.  Second, the Adequate Protection Parties' interests in the Cash Collateral are adequately protected.  As described above, the Debtors are providing the Adequate Protection Parties with the Adequate Protection, which is fair and reasonable, and adequately protects the Adequate Protection Parties' interests in the Prepetition Collateral from diminution, including by the Debtors' use of the Cash Collateral pursuant to the terms the Debtors expect to be included in the Final DIP Order.  Accordingly, the Court should authorize the Debtors to use on a final basis the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**IV.    The Debtors Should be Authorized to Pay the**
**Fees Required by the DIP Lenders and the Administrative Agent**

39.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the DIP Facility.  Specifically, the Debtors will pay to the Backstoppers a Backstop Commitment Fee of 3% of the total committed amount of the Financing Facility and to the DIP Lenders a fee of: (a) 10% of the equity of the Reorganized Debtors so long as the total funded amount of the Financing Facility is less than $100 million, and (b) up to an additional 5% of the equity of the Reorganized Debtors if any amount greater than $100 million is funded, interpolated for any dollar funded over $100 million.

40.    The fees the Debtors have agreed to pay to the Backstoppers and the DIP Lenders, together with the other provisions of the DIP Documents, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases.  Indeed, the DIP Facility provides that the DIP Lender Fee is payable in the form of reorganized equity—thereby decreasing the Debtors' near term cash needs, and aligning the DIP Lenders' incentives with those of the Debtors—i.e., a desire for a quick and successful reorganization.  Moreover, the DIP Lender Fee is open to every prepetition secured lender on a pro rata basis.

41.    The Debtors also submit that the fee set forth in the fee letter in respect of fees payable to the Administrative Agent are in line with transactions of this type, and should be approved under the circumstances.

**V.    The DIP Lenders Should be Deemed Good Faith
        Lenders under Section 364(e) of the Bankruptcy Code**

42.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and the lender's right in any lien securing those loans, even

if the debtor's authority to obtain such credit is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred,
> or any priority or lien so granted, to an entity that extended such credit in good
> faith, whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or
> lien, were stayed pending appeal.

11 U.S.C. § 364(e).

43.    As explained in detail herein, the DIP Documents are the result of the Debtors'

reasonable and informed determination that the DIP Lenders offered the most favorable terms on

which to obtain needed postpetition financing, and of extended arm's-length, good faith

negotiations between the Debtors and the DIP Lenders.  As set forth in the Financing Term

Sheet, the DIP Facility's terms and conditions are fair and reasonable, and the proceeds of the

DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.

Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the

meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections

afforded by that section.

**VI.   The Highlighted Provisions Are Appropriate and
        Justified Under the Circumstances of These Chapter 11 Cases**

44.    The Debtors believe that each of the Highlighted Provisions are justified and

necessary in the context and circumstances of these chapter 11 cases.

A.      **The Scope of the Carve-Out Is Appropriate**

45.      The Carve-Out includes the unpaid fees and expenses of professional persons retained by the Debtors or the Creditors' Committee.   Local Rule 4001-2(a)(i)(F) requires disclosure of disparate treatment between the professionals retained by the Debtors and the professionals retained by the Creditors' Committee with respect to a professional fee carve-out. See Del. Bankr. L.R. 4001(2)(a)(i)(F).   Here, the Carve-Out is capped with respect to the fees and expenses of Professional Persons retained by the Creditors' Committee at an amount per month to be agreed upon by the Debtors, the Administrative Agent, and the Steering Group. Particularly since prepetition, unsecured debt represents a very small portion of the Debtors' prepetition capital structure (which is further evidenced by the fact that no Creditors' Committee has been appointed in these chapter 11 cases), the Debtors respectfully submit such bifurcation is fair and reasonable on the record here.

46.      Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. See Ames Dep't Stores, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").   Additionally, the Carve-Out provides protection in the case of administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the U.S. Trustee fees and professional fees of the Debtors and any Committee, notwithstanding the grant of superpriority and administrative liens and claims the Debtors expect to be included in the Final DIP Order.

**B.    The Adequate Protection Liens on the**
**Proceeds of the Avoidance Actions Are Appropriate**

47.    Local Rule 4001-2(a)(i)(D) requires explicit disclosure of provisions that immediately grant to the prepetition secured creditors liens on a debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.  See Del. Bankr. L.R. 4001-2(a)(i)(D).  Here, the Adequate Protections Liens attach to the Avoidance Actions and any proceeds and property recovered in respect thereof.  The Debtors submit that this provision is appropriate in order to incentivize the DIP Lenders and the Adequate Protection Parties to provide the financing necessary to fund these chapter 11 cases.

**C.    The Findings of Validity, Perfection, or**
**Amount of Prepetition Liens and Challenge Period Are Appropriate**

48.    Local Rule 4001-2(a)(i)(B) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditor's committee, if any, at least 60 days from the date of its formation to investigate such matters.  Del. Bankr. L.R. 4001-2(a)(i)(B).  Here, the Interim Cash Collateral Order provides and the Final DIP Order will provide any Committee appointed in these chapter 11 cases and other parties in interest with sufficient time within which to investigate and/or challenge the Obligations or the Prepetition Liens.  Particularly given that these chapter 11 cases have been pending since August 30, 2013 and no party has sought to challenge the Prepetition Liens, the Debtors respectfully submit such relief is appropriate here.

**D.** **The Non-Consensual Priming of**
**the Disputed Mechanics' Liens Should be Approved**

49.     Local Rule 4001-2(a)(i)(G) requires explicit disclosure of provisions that prime any secured lien without the lienor's consent.  As discussed above, the Debtors respectfully submit that the estimated value in the Power Plant provides the Contractors with an equity cushion that is more than sufficient to adequately protect the Contractors' interest (if any) in the Power Plant as of the Petition Date.  The Debtors respectfully submit the Contractors' interests, if any, in the Power Plant will be adequately protected.

**VII.    The Replacement L/C Facility Should be Approved**

50.     Among other business needs, the Debtors believe that access to the Replacement L/C Facility is necessary.  As with many companies, the Debtors utilize letters of credit to collateralize, among other things, regulatory and remediation obligations.  In addition, the Longview Debtors may be required to post letters of credit in order to hedge against the risk of electricity price fluctuations.  The Debtors have determined, after consultation with their advisors, that access to the Replacement L/C Facility will provide the Debtors with the ability to continue operating in the normal course of business throughout these chapter 11 cases and beyond and therefore respectfully submit that they should be authorized to enter into the Replacement L/C Facility, including by replacing existing letters of credit (and collateralizing associated obligations, including prepetition obligations) with letters of credit issued under the Replacement L/C Facility.

**VIII.    The Automatic Stay Should be Modified on a Limited Basis**

51.     The Debtors anticipate that the proposed Final DIP Order will provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Administrative Agent and the Collateral Agent to file any financing statements, notice of liens,

or similar instruments in order to validate and perfect the liens and security interests granted to them under the Final DIP Order.  The Debtors expect that the proposed Final DIP Order will further provide that the automatic stay will be modified and vacated to the extent necessary to permit the Secured Parties to exercise, upon the occurrence of the Termination Date, certain rights and remedies provided for in the Final DIP Order.  The Debtors expect that the Final DIP Order will provide that the Secured Parties, must, however, provide the counsel to the Debtors and the U.S. Trustee with three (3) Business Days' written notice prior to:  (a) setting off any amounts necessary for payment of the Adequate Protection Obligations or (b) exercising the rights and remedies available under the Loan Documents, the Final DIP Order, or applicable law.

52.    Stay modifications of this kind are ordinary and standard features of secured parties' consents to use cash collateral and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  See, e.g., In re Peak Broad. LLC, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); In re TMP Directional Mktg., LLC, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); In re Broadway 401 LLC, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); In re Haights Cross Commc'ns, Inc., No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same); In re Stallion Oilfield Servs. Ltd., No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).

**Notice**

53.    The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Administrative Agent; (d) counsel for the Administrative Agent; (e) the Collateral Agent; (f) counsel for the Collateral Agent; (g) counsel

for the Steering Group; (h) the United States Environmental Protection Agency; (i) the United States Attorney's Office for the District of Delaware; (j) the Office of the Attorney General for the State of West Virginia; (k) the Internal Revenue Service; (l) the cash management banks with whom the Debtors maintain their bank accounts; (m) the Contractors; (n) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>Prior Request</u>**

54.    Other than with respect to the relief requested by the Cash Collateral Motion, no prior motion for the relief requested herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Final DIP Order:  (I) authorizing the Debtors to (a) obtain postpetition financing on a senior, secured, and priming basis pursuant to the DIP Facility contemplated by the Financing Term Sheet and to enter into the Commitment Letter and the Administrative Agent Fee Letter, (b) enter into the Replacement L/C Facility, (c) use Cash Collateral subject to the terms set forth in the Final DIP Order; and (d) grant certain adequate protection to the Adequate Protection Parties; and (II) granting related relief.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Wilmington, Delaware
Dated:  November 1, 2013

*/s/* Marisa A. Terranova

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Marisa A. Terranova (No. 5396)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        defranceschi@rlf.com
              heath@rlf.com
              shapiro@rlf.com
              terranova@rlf.com

- and -

Richard M. Cieri (admitted *pro hac vice*)
Paul M. Basta, P.C. (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        richard.cieri@kirkland.com
              paul.basta@kirkland.com
              ray.schrock@kirkland.com

- and -

Ryan Preston Dahl (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        ryan.dahl@kirkland.com

*Co-Counsel for the*
*Debtors and Debtors in Possession*