**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LONGVIEW POWER, LLC, et al.,[1] | ) | Case No. 13-12211 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Richard M. Cieri (admitted *pro hac vice*)
Paul M. Basta, P.C. (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Ryan Preston Dahl (admitted *pro hac vice*)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Marisa A. Terranova (No. 5396)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701

Dated:  November 13, 2013

This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court.  This is not a solicitation of acceptance or rejection of the Plan.  Acceptance or rejection may not be solicited until a disclosure statement has been approved by the Bankruptcy Court.  The information in the Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.

---

[1]   The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors").  The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541.  The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE LIKELIHOOD THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW. THE DEBTORS WILL INSTEAD RELY UPON (A) THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND (B) TO THE EXTENT THAT THE EXEMPTION PROVIDED BY SECTION 1145 IS EITHER NOT PERMITTED OR NOT

APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER.  NO LEGAL OR TAX ADVICE IS PROVIDED BY THIS DISCLOSURE STATEMENT.  THE DEBTORS ARE NOT CURRENTLY A REPORTING CORPORATION UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT") AND THE REORGANIZED DEBTORS MAY NOT BE A REPORTING CORPORATION AS OF THE EFFECTIVE DATE UNDER THE EXCHANGE ACT AND THE NEW COMMON EQUITY WILL NOT BE LISTED ON ANY NATIONAL SECURITIES EXCHANGE.  THE DEBTORS DO NOT ANTICIPATE THAT THERE WILL BE A PUBLIC MARKET FOR THE SECURITIES ISSUED HEREUNDER.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE OWNERSHIP AND TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT.  SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.  MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR EXPECTED FUTURE RESULTS AND OPERATIONS. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE

EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS, WITH THE REASONABLE CONSENT OF THE BACKSTOPPERS, RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE VIII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

K&E 28166809

**TABLE OF CONTENTS**

Page

**ARTICLE I. INTRODUCTION**....................................................................................................1

**ARTICLE II. TREATMENT OF CLAIMS AND INTERESTS** ..............................................2

**ARTICLE III. SOLICITATION AND VOTING PROCEDURES**...........................................4
    A.    Solicitation Packages. ............................................................................................4
    B.    Voting Deadline. ....................................................................................................4
    C.    Voting Procedures..................................................................................................4
    D.    Plan Objection Deadline. .......................................................................................5
    E.    Confirmation Hearing. ...........................................................................................6

**ARTICLE IV. THE DEBTORS' BACKGROUND**....................................................................6
    A.    The Debtors' Business. ..........................................................................................6
    B.    Summary of Prepetition Capital Structure. ...........................................................8
    C.    The Debtors' Management. ..................................................................................10
    D.    Events Leading to the Chapter 11 Cases. ............................................................12
    E.    Prepetition Restructuring Efforts. ........................................................................14

**ARTICLE V. EVENTS OF THE CHAPTER 11 CASES** ......................................................15
    A.    First Day Pleadings and Other Case Matters.......................................................15
    B.    Statements and Schedules and Claims Bar Date. ................................................18
    C.    Mr. Laurita's Resignation. ..................................................................................18
    D.    Pending Litigation Proceedings. ..........................................................................18
    E.    Debtors' Cash Collateral Motion and the Interim Cash Collateral Relief.......................................18
    F.    The Arbitration and the Contractors' Motions to Lift the Automatic Stay. ..........20
    G.    DIP Facility..........................................................................................................20
    H.    The Debtors' Plan Process. ..................................................................................20
    I.    First Reserve Settlement. .....................................................................................21
    J.    Estimation Process for the Disputed Mechanics' Lien Claims. ...........................21

**ARTICLE VI. SUMMARY OF THE PLAN**...........................................................................22
    A.    Administrative Claims and Priority Tax Claims. .................................................22
    B.    Classification and Treatment of Claims and Interests..........................................24
    C.    Means for Implementation of the Plan. ...............................................................31
    D.    Treatment of Executory Contracts and Unexpired Leases. .................................37
    E.    Provisions Governing Distributions. ....................................................................40
    F.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims. ..................44
    G.    Settlement, Release, Injunction, and Related Provisions. ....................................45
    H.    Conditions Precedent to Confirmation and Consummation of the Plan. ..............49
    I.    Modification, Revocation, or Withdrawal of the Plan. ........................................51
    J.    Retention of Jurisdiction. .....................................................................................52
    K.    Miscellaneous Provisions.....................................................................................54

**ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** .......................56
    A.    Confirmation Hearing. .........................................................................................56
    B.    Confirmation Standards. .......................................................................................57
    C.    Acceptance by Impaired Classes..........................................................................60
    D.    Confirmation without Acceptance by All Impaired Classes. ...............................61

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**............................62
    A.    Risk Factors that May Affect the Debtors' Ability to Consummate the Plan. ......................62

(i)

B.    Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and Allowed Interests Under the Plan. .................................................................. 63
C.    Risk Factors that Could Negatively Affect the Debtors' Business. ................................. 64
D.    Risks Related to the New Common Equity ..................................................................... 69
E.    Liquidity Risks. ............................................................................................................... 70
F.    Risks Associated with Forward Looking Statements. ..................................................... 71
G.    Disclosure Statement Disclaimer. ................................................................................... 71
H.    Liquidation Under Chapter 7. ......................................................................................... 73

**ARTICLE IX. SECURITIES LAW MATTERS** ...................................................................... **73**
A.    New Common Equity and Section 1145 of the Bankruptcy Code. ................................. 73
B.    New Second Lien Notes .................................................................................................. 74

**ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ......................... **74**
A.    Certain U.S. Federal Income Tax Consequences of the Debtors and Holders of Existing Interests. ........................................................................................................... 75
B.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Claims Entitled to Vote. .................................................................................................. 76
C.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims ................................................................................................. 78
D.    Information Reporting and Backup Withholding ............................................................ 80

**ARTICLE XI. RECOMMENDATION OF THE DEBTORS** .................................................. **81**

K&E 28166809

## **EXHIBITS**

EXHIBIT A        Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code

EXHIBIT B        Financial Projections

EXHIBIT C        Liquidation Analysis

EXHIBIT D        Debtors' Corporate Structure as of the Petition Date

K&E 28166809

# ARTICLE I.
## INTRODUCTION

This disclosure statement (this "Disclosure Statement") provides information regarding the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), which the Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. All capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan. The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors are privately held and operate in two distinct, but related, lines of business: (a) the generation and sale of electric power by the Longview Debtors; and (b) coal mining, processing, and related disposal operations undertaken by the Mepco Debtors. Due to events more fully described below, including, but not limited to, design, construction, and equipment defects at the Debtors' Power Facility and the related Arbitration (as defined below) with respect to the responsibility for such defects, the Debtors filed for bankruptcy protection on August 30, 2013. The Debtors entered chapter 11 in order to protect their assets and to formulate a balance sheet restructuring and deleveraging of the Debtors' current capital structure, all with the goal of ultimately having a reliable and fully operational Power Facility. To that end, the Debtors engaged in negotiations, both pre- and post-petition, with certain of the Longview Lenders under the Longview Credit Agreement on all aspects of a reorganization of the Debtors' businesses. These negotiations have ultimately been successful, and the Debtors now seek the Bankruptcy Court's approval of the Plan.

If confirmed and consummated, the Plan will eliminate more than $1 billion in debt from the Debtors' balance sheet and will provide the Debtors with the capital necessary to fund distributions to the Debtors' creditors pursuant to the Plan, repair the Power Facility, and provide the Debtors with working capital necessary to fund ongoing operations. To effectuate the Plan, the Debtors will cancel the Existing Interests in the Debtors and will issue the New Common Equity to the Longview Lenders, the Holders of Swap and Hedge Claims, and the DIP Lenders. In addition, the Debtors will exercise their option to acquire any and all assets owned by Dunkard Creek, a non-debtor affiliate, that are necessary and critical to their ongoing operations. The Plan maximizes recoveries for the Debtors' stakeholders, right-sizes the Debtors' balance sheet, and preserves the Debtors' ongoing operations, including the jobs for the Debtors' approximately 650 employees.

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article IV hereof);

- events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (Article IV hereof);

- significant events in the Chapter 11 Cases (Article V hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article VI hereof);

- certain important effects of Confirmation of the Plan (Article VI hereof);

- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article VI hereof);

- the statutory requirements for confirming the Plan (Article VII hereof);

- certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article VIII hereof); and

- certain United States federal income tax consequences of the Plan (Article X hereof).

In light of the foregoing, the Debtors believe the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors' Boards of Managers have approved the Plan and the Restructuring Transactions contemplated therein and believe the Plan is in the best interests of the Debtors' Estates. As such, the Debtors' Boards of Managers recommend that all Holders entitled to vote, accept the Plan by returning their Ballots (as defined herein), so as to be **actually** **received** by the Debtors' Notice and Claims Agent no later than **January 27, 2014, at 5:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time, with the reasonable consent of the Backstoppers, prior to the Effective Date (subject to the terms of the Plan).

## ARTICLE II.
## TREATMENT OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant hereto. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan. The treatment and the projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only. To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Unclassified Claim | Plan Treatment | Range of Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|
| Administrative Claims | Unimpaired | $[____] | 100% | 100% |
| Professional Fee Claims | Unimpaired | $[____] | 100% | 100% |

2

| Unclassified Claim | Plan Treatment | Range of Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|
| DIP Facility Claims[2] | Unimpaired | $[____] | 100% | 100% |
| Priority Tax Claims | Unimpaired | N/A | 100% | 100% |

The table below summarizes the classification and treatment of all classified Claims and Interests against each Debtor (as applicable) under the Plan. The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. In particular, recoveries available to the Holders of General Unsecured Claims are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceed the estimates provided below. In such an instance, the recoveries available to the Holders of General Unsecured Claims could be materially lower when compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests | Estimated Range of % Recovery Under Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| Class 1 (all Debtors) | Other Secured Claims | Unimpaired | N/A | 100% | 100% |
| Class 2 (all Debtors) | Other Priority Claims | Unimpaired | N/A | 100% | 100% |
| Class 3 (all Debtors) | Longview Credit Agreement Claims | Impaired | $1,036,100.00 | [__]% | [__]% |
| Class 4 (Longview Power only) | Foster Wheeler Mechanics' Lien Claims | Impaired | $0 | 0% | 0% |
| Class 5 (Longview Power only) | Kvaerner Mechanics' Lien Claims | Impaired | $0 | 0% | 0% |
| Class 6 (Longview Power only) | Siemens Mechanics' Lien Claims | Impaired | $0 | 0% | 0% |
| Class 7 (all Debtors) | General Unsecured Claims | Impaired | $[___] | [__]% | 0% |

---

[2]    The Debtors have sought authority to obtain secured postpetition financing pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing on a Priming Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Adequate Protection Parties, and (IV) Granting Related Relief*, filed on November 1, 2013 [Docket No. 392] (the "DIP Financing Motion").

3

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests | Estimated Range of % Recovery Under Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| Class 8 (all Debtors) | Intercompany Claims | Unimpaired | N/A | 0% | 0% |
| Class 9 (all Debtors) | Intercompany Interests | Unimpaired | N/A | 0% | 0% |
| Class 10 (all Debtors) | Existing Interests | Impaired | N/A | 0% | 0% |

# ARTICLE III.
## SOLICITATION AND VOTING PROCEDURES

A.    *Solicitation Packages.*

On December [__], 2013, the Bankruptcy Court entered the Disclosure Statement Order.  For purposes of this Article III hereof, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  Pursuant to the Disclosure Statement Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials including (the "Solicitation Package"):

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan and the exhibits to the Plan);

- the Solicitation Procedures;

- the Confirmation Hearing Notice;

- an appropriate Ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

- a cover letter from the Debtors: (1) describing the contents of the Solicitation Package; and (2) urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan; and

- any supplemental documents the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

The Solicitation Package may also be obtained:  (a) from the Debtors' Notice and Claims Agent by (i) visiting http://www.donlinrecano.com/longview, (ii) writing to Longview Power, LLC, c/o Donlin, Recano & Company, Inc., 419 Park Avenue South, New York, New York 10016, or (iii) calling (800) 967-4614; or (b) for a fee via PACER (except for ballots) at http://www.deb.uscourts.gov.

B.    *Voting Deadline.*

The deadline to vote on the Plan is January 27, 2014, at 5:00 p.m., prevailing Eastern Time (the "Voting Deadline").  All votes to accept or reject the Plan must be received by the Notice and Claims Agent by the Voting Deadline.

C.    *Voting Procedures.*

The Debtors are distributing this Disclosure Statement, accompanied by a ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan.  If you are a Holder of

4

a Claim in Class 3 (Longview Credit Agreement Claims), Class 4 (Foster Wheeler Mechanics' Lien Claims), Class 5 (Kvaerner Mechanics' Lien Claims), Class 6 (Siemens Mechanics' Lien Claims), or Class 7 (General Unsecured Claims), you may vote to accept or reject the Plan by completing the ballot and returning it in the envelopes provided.

The Debtors have retained Donlin, Recano & Company, Inc. to serve as the Notice and Claims Agent. The Notice and Claims Agent is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
| --- |
| Ballots must be actually received by the Notice and Claims Agent by the Voting Deadline, which is January 27, 2014, at 5:00 p.m., prevailing Eastern Time, at the following address: <br><br> **Longview Power, LLC** <br> c/o Donlin, Recano & Company, Inc. <br> 419 Park Avenue South, New York, New York 10016 <br><br> If you have any questions on the procedure for voting on the Plan, please call the Debtors at: <br><br> (800) 967-4614 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot. All ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each ballot; (b) overnight delivery; or (c) personal delivery, so that the ballots are **actually received** by the Notice and Claims Agent no later than the Voting Deadline at the return address set forth in the applicable ballot. Any ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder. By signing and returning a ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim has been cast or, if any other ballots have been cast with respect to such Claim, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

D.      *Plan Objection Deadline.*

The Bankruptcy Court has established January 27, 2014, at 4:00 p.m., prevailing Eastern Time, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be filed with the Bankruptcy Court and served on the Debtors, counsel to the Backstoppers, and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

K&E 28166809

E.    *Confirmation Hearing.*

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek confirmation of the Plan at a hearing to be scheduled on February 10, 2014, [_]:00 [_].m., prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (each such hearing, a "Confirmation Hearing").  A Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

## ARTICLE IV.
## THE DEBTORS' BACKGROUND

A.    *The Debtors' Business.*

1.    The Debtors' Business and Corporate History.

The Debtors operate through two primary business units:  (a) the Longview Debtors, whose primary asset is a 700 net megawatt supercritical coal-fired power facility (the "Power Facility") located in Maidsville, West Virginia; and (b) the Mepco Debtors, a vertically integrated coal miner and processor with facilities located in southwestern Pennsylvania and northern West Virginia.  In the twelve months ended June 30, 2013, the Debtors generated revenues totaling approximately $255 million on a consolidated basis (excluding intercompany revenues), consisting of:  (a) revenues totaling approximately $106 million arising from the Longview Debtors' power generation and sales; and (b) revenues totaling approximately $149 million arising from the Mepco Debtors' coal mining, processing, waste disposal, and sales operations.

(a)    The Longview Debtors.

The Longview Debtors were formed in 2003 for the purpose of constructing and operating the Power Facility.  Located in Monongalia County, West Virginia, the Power Facility is subject to a ground lease between Longview Power, the Monongalia County Development Authority (the "MCDA"), and the County Commission of Monongalia County, West Virginia (the "Commission"), which lease permitted the Longview Debtors to construct and permits the Longview Debtors to operate the Power Facility on ground currently owned by the MCDA.  The Power Facility was built at a cost of approximately $2 billion, which was funded through the proceeds of a $1 billion equity investment from affiliates of First Reserve, among others, and funded debt totaling approximately $1.2 billion issued under the Longview Credit Agreement.  This equity investment and the Longview Credit Facility have also provided the Longview Debtors with working capital in the ordinary course of business.

Construction on the Power Facility began in 2007, and, after a delay of several months, the Longview Debtors took possession of the Power Facility in December 2011.  The Power Facility utilizes advanced power generation technology to meet the highest environmental standards and a supercritical pulverized-coal fired boiler to generate electric power.  As discussed more fully below, the Power Facility has been hampered by operational issues caused by design, construction, and equipment defects related to its construction.  When operational, the Power Facility is one of the lowest cost coal-fired producers of power in the Pennsylvania-Jersey-Maryland ("PJM") Regional Transmission Organization.  Electricity generated by the Power Facility is sold to PJM in the day-ahead or real-time markets.  The Longview Debtors' marketing activities with PJM are undertaken on the Longview Debtors' behalf by Tenaska Power Services, Co., a third party services provider, pursuant to an agreement between Longview Power and Tenaska.

The Longview Debtors do not directly operate the Power Facility in this process.  Instead, pursuant to that certain Operation and Maintenance Agreement, dated June 20, 2011, between Longview Power and GenPower Services, LLC ("GenPower Services"), its non-Debtor affiliate, and an indirect wholly owned subsidiary

6

of First Reserve, GenPower Services provides the Longview Debtors with approximately 94 employees to manage, operate, and maintain the Power Facility.  The Longview Debtors' corporate officers, including the Longview Debtors' Chief Executive Officer and Chief Financial Officer, are also officers of GenPower Services.  GenPower Services is a lateral affiliate of the Debtors and is wholly-owned by GenPower Holdings (Delaware) L.P. ("GenPower Holdings"), the Debtors' ultimate parent, and an indirect wholly owned subsidiary of First Reserve. GenPower Holdings and GenPower Services are not debtors in the Chapter 11 Cases.

> (b)    The Mepco Debtors.

The Mepco Debtors were founded more than 50 years ago and are one of the largest independent coal companies in Northern Appalachia.  The Mepco Debtors and their related operations were purchased by GenPower Holdings in 2007 to, among other things, provide the Power Facility with the coal necessary to support the Power Facility's operations.    In 2011, GenPower Holdings contributed the Mepco Debtors to Longview Intermediate Holdings C, LLC, the direct parent of Longview Power and a debtor in the Chapter 11 Cases.  The Mepco Debtors are parties to the Longview Credit Agreement.

The Mepco Debtors' activities include coal mining, transportation, processing, treatment, and waste disposal.  Currently, the Mepco Debtors own or operate three active underground coal mines and one active surface mine located in northern West Virginia and southwestern Pennsylvania.  In addition to these four active mines, the Mepco Debtors have one inactive underground mine and three additional mines which are in various stages of reclamation (i.e., the process by which the mining holes are refilled and replanted) to satisfy applicable environmental regulations.

The Mepco Debtors currently produce approximately 4 million tons of coal per year.  Approximately half of this volume is purchased by the Longview Debtors through an intercompany supply agreement, and this coal is delivered directly to the Power Facility on a 4-mile long conveyer belt stretching between the Mepco Debtors' Four West Mine operations located near Bobtown, Pennsylvania and ending at the Power Facility.    The Mepco Debtors' remaining production is sold to third parties pursuant to long term supply contracts and, when the market is available, on a spot basis.

In its various operations, the Mepco Debtors employ approximately 550 individuals, including independent contractors.

> (c)    The Debtors' Non-Debtor Affiliates.

> (i)    GenPower Services.

As noted above, GenPower Services provides the Debtors with employees to manage, operate, and maintain the Power Facility, including Longview Power's Chief Executive Officer and Chief Financial Officer and Mepco's Chief Executive Officer and Chief Financial Officer.  As also noted above, GenPower Services is a wholly owned subsidiary of GenPower Holdings, the Debtors' non-debtor parent , which, in turn, is an indirect wholly owned subsidiary of First Reserve.

> (ii)    Dunkard Creek and AMDRI.

Dunkard Creek Water Treatment System, LLC ("Dunkard Creek") is a wholly-owned subsidiary of DCWTS Holdings, LLC, which in turn is a wholly-owned subsidiary of GenPower Holdings, the Debtors' non-debtor parent.  Dunkard Creek owns a water treatment facility located in Greene County, Pennsylvania.

AMD Reclamation, Inc. ("AMDRI") is a non-profit entity organized under the laws of the Commonwealth of Pennsylvania.  AMDRI's day-to-day operations are controlled by Dana Mining Company of Pennsylvania, LLC ("Dana PA"), one of the Mepco Debtors, pursuant to a management services agreement between AMDRI, GenPower Services, and Dana PA.  AMDRI operates a mine water treatment facility located in Greene County, Pennsylvania.

7

Longview Power is party to water supply agreements with Dunkard Creek and AMDRI to provide the Debtors with critical water and waste water disposal services necessary for the Debtors' power generation and coal mining operations. In this process, Dunkard Creek supplies Longview Power with the water required to operate the Power Facility. AMDRI pumps and treats mine pool water from certain abandoned mines that, unless drained, flood the mines operated by Mepco; AMDRI also treats discharged water from the Power Facility and Dunkard Creek. The Debtors also hold an option exercisable at any time to purchase the Dunkard Creek water treatment facility and related operations at a purchase price equal to the balance of Dunkard Creek's outstanding indebtedness. As with GenPower Services, Longview Power's corporate officers (who are employees of GenPower Services), including Longview Power's Chief Executive Officer and Chief Financial Officer, are also officers of Dunkard Creek.

Dunkard Creek is a party to two separate credit facilities comprised of: (a) approximately $130 million pursuant to a credit agreement, dated as of May 18, 2009; and (b) approximately $25 million pursuant to a bridge loan agreement, dated as of May 18, 2009 (together, the "Dunkard Creek Facilities"). As of the Petition Date, letters of credit issued in the amount of approximately $83.7 million were outstanding under the Longview Credit Facility to provide credit support for the obligations arising under the Dunkard Creek Facilities. Dunkard Creek's lenders drew on these letters of credit on September 5, 2013. As of September 30, 2013, Dunkard Creek's outstanding obligations under the Dunkard Creek Facilities totaled approximately $42.6 million, which obligations come due on February 28, 2014.

    2.   The Debtors' Organizational Structure.

A diagram presenting the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit D**. As set forth on **Exhibit D**, Longview Power, LLC is wholly-owned by Longview Intermediate Holdings C, LLC. In addition, Longview Intermediate Holdings C, LLC beneficially owns or controls 92.2 percent of the equity interests in Mepco Holdings, LLC, the Mepco Debtors' holding company. The remaining 7.8 percent of the equity interests in Mepco Holdings, LLC is owned by James Laurita, Jr. Longview Intermediate Holdings C, LLC is indirectly owned by affiliates of First Reserve, the Debtors' equity sponsor.

B.    *Summary of Prepetition Capital Structure.*

As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $1.1 billion and consisted of, among other things, funded debt under the Longview Credit Facility, obligations under an interest rate swap and electricity price hedges, and capital leases. The primary components of the Debtors' consolidated funded debt obligations are described below.

    1.   The Longview Credit Agreement.

Each Debtor is party to the Longview Credit Agreement. As amended, the Longview Credit Agreement provides the Debtors with two separate term loan facilities, a revolving credit facility, a synthetic letter of credit facility, and a synthetic revolving credit facility, subject to the terms and conditions set forth therein (the "Longview Credit Facility"). As of September 30, 2013, the balances outstanding under the separate facilities issued under the Longview Credit Facility are summarized as follows:

| Subfacility | Maturity | Balance |
|---|---|---|
| Term Facility | February 2014 | $426.4 million |
| Term Facility | October 2017 | $473.3 million |
| Revolving Facility | February 2014 | $36.5 million |
| Synthetic L/C Facility | February 2014 | $69.5 million |
| Synthetic-Revolving Facility | February 2014 | $25 million |
| | **Total** | $1,030.7 million |

Obligations arising under the Longview Credit Facility were initially secured by liens on substantially all of Longview Power's assets. The Longview Credit Agreement was subsequently amended pursuant to that certain First Amendment to Credit Agreement and Resignation and Appointment Agreement, dated as of June 20, 2011, by and between the Debtors and, among others, the Collateral Agent (the "First Amendment"). Pursuant to the First

8

Amendment, the Longview Lenders were also granted a first priority lien on substantially all of the Mepco Debtors' assets in exchange for, among other things, an extension of the date for completion of construction of the Power Facility from August 2011 to December 2011 due to construction delays at the Power Facility and providing up to an additional $75 million under the Longview Credit Facility, including up to $25 million in availability for the revolving facility due in February 2014 and an additional $50 million for the term facility due in February 2017. As a result, the outstanding liabilities under the Longview Credit Agreement are secured by liens on substantially all the Debtors' assets, subject to customary exceptions and exclusions.

The Longview Credit Agreement was subsequently further amended pursuant to that certain Waiver and Second Amendment to Credit Agreement, dated as of April 29, 2013, by and between the Debtors and, among others, the Longview Lenders and the Administrative Agent (the "Second Amendment"). Pursuant to the Second Amendment, the Debtors caused the Agent Account (as defined in the Second Amendment) to be funded for the benefit of the Administrative Agent and the ratable benefit of the Longview Lenders on account of the Debtors' obligations under the Longview Credit Agreement, including with respect to the payment of the fees and expenses of the Administrative Agent (the "Agent Account"). The amounts in the Agent Account are property of the Longview Lenders and are not property of the Debtors' estates.

　　2.　Hedging Agreements.

As of the Petition Date, Longview Power was a party to an interest rate swap agreement with J. Aron & Company (the "J. Aron"), pursuant to that certain ISDA Master Agreement, dated as of February 28, 2007 (the "Swap"). J. Aron, Longview Power, and Union Bank, N.A. are also parties to that certain Accession Agreement, dated as of December 21, 2012 (the "Swap Counterparty Accession Agreement"). Pursuant to the Swap Counterparty Accession Agreement, obligations arising under the swap (collectively, the "Swap Obligations") constitute First-Lien Asset Secured Obligations secured by the Debtors' assets to the extent provided by the Longview Credit Agreement.

Also as of the Petition Date, Longview Power was a party to electricity price hedges with: (a) BP Energy Company ("BP Energy") pursuant to that certain ISDA Master Agreement, dated as of March 29, 2011, and a confirmation dated May 29, 2012 (collectively, the "BP Electricity Hedging Agreement"); and (b) EDF Trading North America, LLC ("EDF") pursuant to that certain ISDA Master Agreement, dated as of March 2, 2012, and certain confirmations entered into in June 2012 (collectively, the "EDF Hedging Agreement," and together with the BP Hedging Agreement, the "Electricity Hedge Agreements," and together with the Swap Obligations, the "Hedging Agreements"). BP Energy, Longview Power, and the Collateral Agent were also party to that certain Accession Agreement, dated as of June 20, 2011 (the "BP Electricity Hedge Accession Agreement"), and EDF, Longview Power, and the Collateral Agent are party to that certain Accession Agreement, dated as of March 2, 2012 (the "EDF Electricity Hedge Accession Agreement," and together with BP Electricity Hedge Accession Agreement, collectively, the "Electricity Hedge Accession Agreements"). Pursuant to the Electricity Hedge Accession Agreements, obligations arising under the Electricity Hedge Agreements constituted First-Lien Asset Secured Obligations secured by the Debtors' assets to the extent provided by the Longview Credit Agreement.

The Debtors estimate that, as of the September 30, 2013, their total exposure arising upon termination of the Hedging Agreements is approximately $5.4 million in the aggregate. These Claims, however, have not been liquidated at this time. J. Aron, BP Energy, and EDF may each assert that Claims arising from or related to the Hedging Agreements may be higher than the Debtors' estimates.

　　3.　The Mepco Debtors' Capital Leases.

The Mepco Debtors are party to approximately forty-five capital leases, pursuant to which the Mepco Debtors make monthly payments to the applicable lease counterparty and in return, the Mepco Debtors are able to operate the machinery covered by the lease (collectively, the "Capital Leases"). As of the Petition Date, the Debtors estimate that the obligations outstanding under the Capital Leases totaled approximately $27 million in the aggregate over the lifetime of the Capital Leases.

4.    The Disputed Mechanics' Liens.

Each of Siemens Energy, Inc. ("Siemens"), Foster Wheeler North America Corporation ("Foster Wheeler"), and Kvaerner North American Construction Inc. ("Kvaerner," and collectively, the "Contractors") has asserted a mechanics' lien on the Power Facility and related properties (collectively, the "Disputed Mechanics' Liens"), which the Contractors assert arise from obligations the Contractors claim are owed in connection with the Power Facilities' construction.  Specifically, on February 8, 2012, Kvaerner asserted mechanics' liens in the aggregate amount of $242.2 million against the Power Facility.  Additionally, on February 17, 2012, Siemens asserted mechanics' liens in the aggregate amount of $93.5 million against the Power Facility.  Finally, Foster Wheeler asserted mechanics' liens in the amount of $8.8 million on February 23, 2012, and $151,390 and $14.7 million on May 10, 2012, respectively, each against the Power Facility.  The aggregate amount of the Disputed Mechanics' Lien Claims is approximately $360 million.  The Debtors dispute the amount, validity, perfection, and priority of each of the Disputed Mechanics' Liens and the Contractors' underlying claims in all respects.

5.    Trade Debt.

In the ordinary course of operating their businesses, the Debtors historically purchased raw materials, equipment, and services that are necessary for their electric power generation, coal mining and processing, and waste disposal operations.  As of the Petition Date, the Debtors' estimate that there was approximately $8 million in General Unsecured Claims related to such trade debt, of which the Debtors' have paid $3 million pursuant to "first day" relief authorized by the Bankruptcy Court described more fully below.

C.    *The Debtors' Management.*

1.    The Debtors' Board Members and Executives.

As of the date hereof, set forth below are the names, position(s), and biographical information of the current Board of Directors of Longview Intermediate Holdings C, LLC and the Board of Managers of Mepco Holdings, LLC as well as current key executive officers for both the Longview Debtors and the Mepco Debtors.  The Boards oversee the business and affairs of the Debtors.  The Mepco Debtors' Board of Managers oversees the business and affairs of Mepco Holdings, LLC and each of its subsidiaries.  The Longview Debtors' Board of Directors oversees the business and affairs of Longview Intermediate Holdings C, LLC, and each of its subsidiaries, including Longview Power and each of the Mepco Debtors.

| Name | Position |
|---|---|
| Jeffery Keffer | President, Chief Executive Officer, and Secretary of the Longview Debtors |
| Mark Joensen | Chief Financial Officer of the Longview Debtors |
| Charles Huguenard | Senior Vice President and General Manager of the Longview Debtors |
| William Pardini III | Chief Financial Officer of the Mepco Debtors |
| James Grady | Deputy Chief Financial Officer of the Debtors |
| Richard Newsted | Director of the Longview Debtors and Manager of the Mepco Debtors |
| Ryan Shockley | Director of the Longview Debtors and Manager of the Mepco Debtors |
| William Brown | Director of the Longview Debtors and Manager of the Mepco Debtors |
| Yuri Larrabee | Manager of the Mepco Debtors |

10

*Jeffery Keffer*.  Mr. Keffer has more than 25 years of experience in the power generation industry, with specific emphasis in the development, management, and financing of various solid fuel and alternative power projects.  He oversees the strategic management and business operations of Longview Power.  Prior to joining the Longview Debtors, he was a partner at Brown Rudnick LLP in Boston, Massachusetts.  Mr. Keffer graduated from Middlebury College with a Bachelor of Arts degree and earned a Juris Doctor from Boston College Law School.

*Mark Joensen*.  Mr. Joensen has more than 15 years of financial management experience in the power generation industry, with specific emphasis in strategic planning, market modeling and analysis, and reporting.  He oversees all financial activity at Longview Power.  Prior to joining the Longview Debtors, he held positions at Allegheny Power, most recently as the divisional chief financial officer for the company's regulated operations segment, and Consad Research Corporation, as vice president of the Pittsburgh, Pennsylvania-based public policy research and consulting firm.  Mr. Joensen graduated from Iowa State University with a Bachelor of Science in Electrical Engineering and earned a doctorate in Theoretical High Energy Physics from Carnegie Mellon University.

*Charles Huguenard*.  Mr. Huguenard has more than 30 years of experience in the power generation industry and a background in plant asset management, operations and maintenance, environmental permitting, and labor agreements.  He is responsible for developing the Longview Power operations team.  Prior to joining the Longview Debtors, Mr. Huguenard held managerial positions at Southern Company and Southern Energy/Mirant.  Mr. Huguenard graduated from Auburn University with a Bachelor of Science in Mechanical Engineering.

*William "Bill" Pardini III*.  Mr. Pardini has more than 15 years of experience in various accounting, information systems, and financial roles with companies in the coal and energy industry.  Mr. Pardini joined the Mepco Debtors in June 2013, and oversees all financial activity at the Mepco Debtors.  Prior to joining the Mepco Debtors, Mr. Pardini held Chief Financial Officer and/or Controller positions at Somerset Regional Water Resources, LLC, Parkwood Resources, Inc., Genesis, Inc., and PBS Coals, Inc.  Mr. Pardini graduated from Penn State University with a Bachelor of Science and holds a Certificate of Accounting from the University of Pittsburgh.

*James Grady*.  Mr. Grady was appointed Deputy Chief Financial Officer of the Debtors on the Petition Date.  Mr. Grady is a Senior Director with Alvarez & Marsal, LLC.  Mr. Grady focuses on developing and implementing strategic financial and operations turnaround plans and developing and analyzing operating budgets and financial projections.  Mr. Grady has nearly 15 years of experience assisting clients in the construction, engineering, education, mining, and manufacturing industries.  Mr. Grady earned a Bachelor of Science in Accountancy from the University of Illinois at Urbana-Champaign and holds a Master in Business Administration from Lewis University.

*Richard Newsted*.  Mr. Newsted is a director at the Longview Debtors and a manager at the Mepco Debtors.  Mr. Newsted is also the sole member of the Debtors' Restructuring Committee.  Mr. Newsted joined the boards of both the Longview Debtors and the Mepco Debtors on August 17, 2013.  In addition to the Debtors, Mr. Newsted has served on the boards of approximately 14 companies, including during chapter 11 proceedings.  Mr. Newsted also served as President and Chief Executive Officer of Meridian Automotive Systems, Inc. ("Meridian") from October 2005 to September 2009, where Mr. Newsted developed and executed an orderly wind down of Meridian's business.  Mr. Newsted received a Bachelor of Science from Ball State University and a Master in Business Administration from the University of Notre Dame.

*Ryan Shockley*.  Mr. Shockley is a director at the Longview Debtors and a manager at the Mepco Debtors.  He is a director at First Reserve, where he focuses on investments in the power, equipment, manufacturing, and services sectors.  Prior to joining First Reserve in 2004, Mr. Shockley was an analyst at J.P. Morgan Securities in its Financial Sponsors Group.  Mr. Shockley graduated from Kalamazoo College with a Bachelor of Arts and earned a Master in Business Administration from the Kellogg School of Management at Northwestern University.

*William Brown*.  Mr. Brown is a director at the Longview Debtors and a manager of the Mepco Debtors.  He is a vice president at First Reserve, where he focuses on investments in the power, equipment, manufacturing, and services sectors.  Before joining First Reserve in 2006, Mr. Brown was an investment banking analyst for Banc of America Securities LLC.  Mr. Brown holds a Bachelor of Science from Duke University and a Master in Business Administration from the Columbia Business School.

11

*Yuri Larrabee*.  Mr. Larrabee is a manager at the Mepco Debtors and was appointed to such role on October 22, 2013.  He is an associate at First Reserve, where he focuses on financial modeling, due diligence, execution, and monitoring with respect to all aspects of First Reserve's investments.  Prior to joining First Reserve in 2013, Mr. Larrabee was an analyst in the Global Energy Group, Investment Banking Division, at Credit Suisse.  Mr. Larrabee holds a Bachelor of Arts from Princeton University.[3]

    2.   Restructuring Committee.

In connection with the Debtors' proposed DIP Facility and the restructuring transactions contemplated by the Plan, the Board of Directors at Longview Intermediate Holdings C, LLC and the Board of Managers at Mepco Holdings, LLC each formed Restructuring Committees (collectively, the "Restructuring Committee").  Richard Newsted was appointed as the sole member of the Restructuring Committee.  The Restructuring Committee is tasked with, among other things, exploring, considering, and approving strategic and/or financial alternatives as well as approving the filing of a plan of reorganization and a disclosure statement to solicit acceptances for such a plan.

D.    *Events Leading to the Chapter 11 Cases.*

A number of factors contributed to the Debtors' decision to commence the Chapter 11 Cases, including, among other issues, operational issues related to the construction of the Power Facility, the current economic environment surrounding the coal industry, the Debtors' unsustainable capital structure, and the need to protect valuable estate assets.  Each of these issues will be addressed in turn.

    1.   The Power Facility's Design and Construction Defects.

In 2007, Longview entered into contracts with Kvaerner, Foster Wheeler and Siemens, as applicable, regarding the construction and commissioning of the Power Facility.  During the course of construction and commissioning of the Power Facility, issues arose that resulted in both significant delays to substantial completion of the Power Facility and still-ongoing problems with the Power Facility's performance.  A primary driver for the Debtors' operational and balance sheet challenges have been losses caused by design, construction, and equipment defects and failures that have plagued the Power Facility since the Longview Debtors took possession of the Power Facility in December 2011 (the "Construction and Design Defects").[4]  The Power Facility had an initial completion date of April 2011, yet the Longview Debtors were unable to take over the Power Facility until December 2011 due to construction delays.  Then, even after delivery, the Power Facility has been plagued by unscheduled forced outages, extended planned outages, generation derating,[5] and material repair obligations.  The Construction and Design Defects have impaired the Debtors' ability to run the Power Facility at full capacity.  The Power Facility has

---

[3]   Mr. Larrabee replaced Brendan Fairbanks on October 22, 2013.  Mr. Fairbanks was removed from the Board of Managers of Mepco Holdings, LLC after he left First Reserve to pursue other employment opportunities.

[4]   When the Debtors took possession of the Power Facility, they did so subject to the Contractors remedying certain then-known defects, which the Debtors called the "Deferred Requirements."  To date, the Contractors have failed to complete the Deferred Requirements.

[5]   Generally, "generation derating" is a term used to describe a situation where a power plant is operating at less than its rated maximum capacity.

K&E 28166809

only had a capacity factor[6] of 68 percent since the Longview Debtors took possession versus designed levels of approximately 90 percent. Because the Construction and Design Defects have prevented the Debtors from operating the Power Facility at full capacity, the Debtors have been forced to sell electricity only on a day-ahead basis, limiting the Debtors' sales and ability to sell higher-margin energy services, and reducing the revenue stream from Power Facility operations while increasing volatility around the Debtors' cash flows.

The Construction and Design Defects and the delays caused by the Power Facility's delayed delivery has led to a dispute between the Longview Debtors and the Contractors, which dispute was subject to arbitration (the "Arbitration") pursuant to the arbitration provisions in the relevant contracts. The Arbitration, which is currently before an arbitration panel (the "Arbitration Panel") under an arbitration captioned Kvaerner North American Construction Inc. v. Longview Power, LLC, et al., No. 50 158 T 00411, is not scheduled to conclude until the first quarter of 2015 at the earliest. Prior to the commencement of the Arbitration, each of the Contractors filed a notice of mechanic's lien with the West Virginia Secretary of State in the amounts set forth in Article IV.B.4 against the Power Facility on account of claims arising from the Power Facility's construction. The Contractors then commenced actions in various state courts seeking to enforce their respective mechanics' liens. Those actions, however, were either dismissed by mutual agreement of the applicable parties or stayed pending the Arbitration. The Debtors dispute all of the Contractors' claims raised in those actions and the Arbitration, challenge the basis, validity, priority, secured status, and amount of each of the Mechanics' Lien Claims, and believe that they suffered significant damages as a result of, among other things, the Construction and Design Defects.

On the Petition Date, the Arbitration was stayed due to the imposition of the automatic stay arising from the Debtors' bankruptcy filing pursuant to section 362 of the Bankruptcy Code. A more detailed discussion regarding the status of the Arbitration following the commencement of the Chapter 11 Cases is set forth in Article V.F hereof.

2. Economic Environment.

The Debtors' ability to manage through the challenges arising from the Construction and Design Defects were also affected by the economic environment surrounding the power and coal industries. Wholesale electricity prices have fallen significantly since construction on the Power Facility began in 2007 as a result of, among other things, the broader recession that commenced around that time, resulting in reduced electricity demand and substantial reductions in natural gas prices. Lower natural gas prices have been caused, at least in part, by the rapid expansion of natural gas production and natural gas inventories arising from the discovery of new shale deposits and the development of new extraction techniques. The presence of low-price natural gas reduces the variable costs of natural-gas fired power facilities and reduces the wholesale market price for all generators. Year-to-date, the average price per megawatt for electricity sold into the PJM on a day-ahead basis was approximately $33 per megawatt-hour—approximately 52 percent of the average power price forecasted for 2013 when construction began on the Power Facility in 2007.

Wholesale coal prices have also continued to fall as global markets face oversupply and as U.S. power generators have continued to shift away from coal fired technologies. The Debtors believe this shift results from, among other things, increased costs associated with environmental and regulatory compliance and pressures resulting from fierce industry competition with natural gas-fired power facilities. The coal industry as a whole has idled mines and reduced production in order to compete. And, although Mepco's third party coal sales are undertaken pursuant to long term contracts with affiliates of FirstEnergy Corporation ("FirstEnergy"), in July 2013,

---

[6]   Generally, "capacity factor" is a measure of a power plant's actual energy output over time versus the power plant's maximum capacity. Typically, capacity factor is measured over a 30-day period. For example, a 700 megawatt power plant operating at a 100 percent capacity factor would be producing 700 megawatts, 24 hours per day, for 30 days.

13

FirstEnergy announced the closure of its Hatsfield Ferry power plant, which accounted for 25 percent of the Debtors' coal sales. This power plant ultimately closed in October 2013.

Moreover, the power generation and coal production industries are highly competitive on both a regional and national level. For example, the Mepco Debtors do not compete solely with other regional mines, but also compete against national and international competitors that transport coal into the region. Similarly, the Longview Debtors compete to deliver electricity to PJM against other coal-fired power generation stations as well as natural gas-fired power, nuclear power, and renewable energy, among other sources. This competitive environment added an additional layer of complexity to the Debtors' existing challenges.

    3.   Debt Obligations.

As of the Petition Date, the Debtors were subject to more than $1 billion in funded debt, of which approximately $557 million of these obligations were scheduled to mature in February 2014. Due to, among other things, the Power Facility's operational issues and the current economic environment, the Debtors determined that they would be unable to satisfy all of their obligations under the Longview Credit Agreement when due. The Debtors also faced an interest payment due on August 30, 2013, under the Longview Credit Agreement, which the Debtors recognized would reduce their available liquidity and negatively impact their business operations. The failure to make this interest payment outside chapter 11 would have caused a default under the Longview Credit Agreement.

    4.   The Foster Wheeler LCs.

In connection with the construction of the Power Facility, the Debtors are the beneficiaries of two irrevocable letters of credit totaling in the aggregate approximately $59 million related to Foster Wheeler's agreement (the "Boiler Agreement") with Longview Power to provide the supercritical boiler and related equipment for the Power Facility (the "Foster Wheeler LCs"). The Longview Lenders have a first priority perfected security interest in the Foster Wheeler LCs. The Debtors are permitted to draw on the Foster Wheeler LCs under certain circumstances, including if Foster Wheeler fails to perform its obligations pursuant to the terms of the Boiler Agreement. Siemens and Kvaerner have also asserted an interest in the Foster Wheeler LCs under their contractual arrangements with Longview Power.

In 2011, Foster Wheeler sought a temporary restraining order against the Debtors to keep the Debtors from drawing on the Foster Wheeler LCs. This action was resolved when the Debtors and Foster Wheeler entered into a settlement agreement, whereby the Debtors agreed to provide Foster Wheeler with seven days notice before making a draw request on the Foster Wheeler LCs, and the Debtors agreed not to transfer the Foster Wheeler LCs to either Kvaerner or Siemens. In August 2013, however, Kvaerner, Siemens, and Foster Wheeler requested that the Arbitration Panel compel the Debtors to escrow the Foster Wheeler LCs in an effort to block the Debtors from being able to draw on the Foster Wheeler LCs. As part of the proceedings before the Arbitration Panel, the Debtors agreed not to draw on the Foster Wheeler LCs until the earlier of September 13, 2013, or the date the Arbitration Panel issued its ruling on whether the Foster Wheeler LCs must be escrowed. The Debtors, in an effort to maximize value for all of their stakeholders, sought to protect their rights to these valuable estate assets by filing for chapter 11, which the Debtors believed could have been improperly removed from their control.

E.     *Prepetition Restructuring Efforts.*

Faced with these issues, the Debtors sought to proactively right-size their capital structure and position themselves for ongoing success in the current industry and economic environment. To this end, the Debtors, their advisors, and a steering group of certain of the Longview Lenders (the "Steering Group"), began negotiations over all aspects of a potential restructuring starting in October 2012.

Both sides in these negotiations discussed transaction structures, exchanged term sheets and otherwise worked diligently in an effort to reach a consensual resolution. Although the Debtors and the Steering Group made significant progress negotiating all aspects of a restructuring, the parties were unable to reach an agreement on a restructuring proposal prior to August 30, 2013—the date by which the Debtors faced an interest payment under the

14

Longview Credit Agreement.  Thus, in order to, among other things, (1) preserve the Debtors' liquidity, (2) protect the Debtors' interest in the Foster Wheeler LCs, (3) address the issues related to Arbitration and the related Disputed Mechanics' Lien Claims, and (4) provide the Debtors with the tools necessary to continue negotiations and consummate a prospective restructuring, the Debtors filed the Chapter 11 Cases on the Petition Date.

## ARTICLE V.
## EVENTS OF THE CHAPTER 11 CASES

A.      *First Day Pleadings and Other Case Matters.*

      1.      First and Second Day Pleadings.

      To facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Petition Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings included the following:

- Cash Collateral.  On September 5, 2013, the Bankruptcy Court entered an interim order, consensually reached between the Debtors and the Steering Group, approving the use of cash collateral to fund operations and restructuring costs [Docket No. 117] (the "Interim Cash Collateral Order").  The Interim Cash Collateral Order, among other things, describes the terms and conditions for the use of the Longview Lenders' cash collateral and provides adequate protection to the Longview Lenders for such use of cash collateral.  This relief was necessary to ensure that the Debtors could continue to operate in the ordinary course during the Chapter 11 Cases.  The Interim Cash Collateral Order approved an initial 6-week budget governing the Debtors' use of cash collateral during the interim period, which budget has been consensually extended on an interim basis.  At this time, the Debtors continue to operate under the Interim Cash Collateral Order, but the Debtors expect to operate in accordance with the Final DIP Order and the associated 13-week budget and 24-month longer term budget once the Bankruptcy Court grants the relief requested in the DIP Financing Motion.  Proceedings related to the Debtors' use of cash collateral and the Debtors' request for authority to obtain postpetition financing are discussed in greater detail below in Article V.E herein.

- Cash Management.  On September 4, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to continue using their existing cash management system, existing bank accounts, and existing business forms [Docket No. 96].  Certain of the Debtors' accounts are with financial institutions that have not executed the Uniform Depository Agreement (a "UDA") with the United States Trustee for the District of Delaware (the "U.S. Trustee").  The U.S. Trustee generally requires banks to execute a UDA prior to approving a debtor's continuing use of its existing bank accounts.  The Debtors have worked diligently with their financial institutions to execute UDAs.  The Debtors and the U.S. Trustee continue to work towards reaching a consensual resolution on the use of the Debtors' cash management system on a final basis.

- Critical Vendors.  On September 4, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to satisfy, solely in the Debtors' discretion, the prepetition claims of certain critical vendors and suppliers of goods and services that are essential to the Debtors' day-to-day business operations and the health and safety of the Debtors' employees [Docket No. 98].  On September 24, 2013, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 249].

- Insurance.  On September 4, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to continue operating under insurance coverage for their business entered into prepetition, honor prepetition insurance premium financing agreements, and renew their premium financing agreements in the ordinary course of business [Docket No. 100].  On September 24, 2013, the

15

Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 259]. In addition, on November 6, 2013, the Debtors' filed the *Debtors' Motion for Entry of an Order Pursuant to Section 364(d) of the Bankruptcy Code (I) Authorizing the Longview Debtors to Enter into a Premium Financing Agreement and Honor Their Obligations Thereunder and (II) Granting Related Relief* [Docket No. 400] (the "PFA Motion"), pursuant to which the Debtors sought authorization for the Longview Debtors to enter into a premium financing agreement with Aon Premium Finance, LLC to finance certain insurance premiums on a first priority secured basis for the policy year 2013 through 2014 and to honor their obligations thereunder. The hearing to consider the PFA Motion is scheduled for November 21, 2013.

- Section 503(b)(9) Claims and Shippers and Lien Claims. On September 4, 2013, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay certain prepetition claims of shippers, lien claimants, and claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.

- Surety Bonds. On September 4, 2013, the Bankruptcy Court entered a Final Order authorizing the Debtors to continue and renew their surety bond program, whereby the Debtors provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, which surety bonds are generally required pursuant to statutes or ordinances [Docket No. 103].

- Taxes. On September 4, 2013, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay certain prepetition sales, use, franchise, and other taxes in the ordinary course of business [Docket No. 101]. Such payments only affect the timing of payment for the vast majority of the amounts at issue.

- Utilities. On September 4, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to establish procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide any additional adequate assurance [Docket No. 102]. On September 25, 2013, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 272].

- Wages. On September 4, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay all employees their wage Claims in the ordinary course of business, (b) pay and honor employee medical and similar benefits, and (c) continue their prepetition benefit programs, including, among others, medical, dental, and 401(k) benefits [Docket No. 99]. On September 24, 2013, the Bankruptcy Court entered a Final Order granting such relief on a final basis and authorizing the Debtors to continue their prepetition employee incentive programs for non-insiders on a postpetition basis [Docket No. 254].

2.    Procedural and Administrative Motions.

To facilitate the efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the Chapter 11 Cases [Docket No. 95];

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code [Docket No. 258];

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 50 largest creditors [Docket No. 104];

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 252]; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases [Docket No. 250].

3. Retention of Chapter 11 Professionals.

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include: (a) Kirkland & Ellis LLP, as co-counsel to the Debtors; (b) Richards, Layton Finger, P.A., as co-counsel to the Debtors; (c) Dentons US LLP, as special litigation counsel to the Debtors; (d) Lazard Frères & Co., LLC ("Lazard"), as investment banker to the Debtors; (e) Donlin, Recano & Company, Inc., as the Notice and Claims Agent and administrative advisor for the Debtors; (f) Ernst & Young LLP, as tax advisor on select issues to the Debtors; and (g) Alvarez & Marsal North America, LLC ("A&M"), as restructuring advisor to the Debtors in connection with the Debtors' engagement of James Grady of A&M as the Deputy Chief Financial Officer to the Debtors.

4. No Appointment of Any Statutory Committees.

On September 11, 2013, the U.S. Trustee received only two unsecured creditor questionnaires regarding the Chapter 11 Cases. Due to a lack of interest, the U.S. Trustee did not appoint an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

5. Key Employee Retention Program.

On October 29, 2013, the Bankruptcy Court entered that certain *Order (A) Authorizing and Approving the Debtors' Key Employee Retention Program for Certain Non-Insider Employees and (B) Granting Related Relief* [Docket No. 377], which Final Order authorizes the Debtors to implement a retention-based award program for certain "non-insider" employees (the "Key Employee Retention Program"). The Debtors believe that the Key Employee Retention Program is a critical aspect of their ability to stabilize their operations and maintain a highly motivated workforce for the duration of the Chapter 11 Cases.

6. Key Employee Incentive Plan.

As discussed more fully in Article V.G of this Disclosure Statement, the Debtors have reached an agreement with the holders of approximately 60 percent of the debt outstanding under the Longview Credit Agreement, represented by the advisors to the Steering Group (the "Backstoppers"), on the terms of the Debtors' proposed DIP Facility and related restructuring transactions. In connection with such agreement, the Debtors reached an agreement with the Backstoppers on a term sheet for a key employee incentive plan for the Debtors' management team (the "Key Employee Incentive Plan") to motivate the Debtors' management to outperform during the Chapter 11 Cases. The Key Employee Incentive Plan for the Longview Debtors' management was designed to account for the Power Facility's operational issues and to reflect the Backstoppers desire for an expeditious chapter 11 process to limit the administrative cost of the Chapter 11 Cases. As such, the Key Employee Incentive Plan for the Longview Debtors' management team requires such key employees to expeditiously guide the Debtors through the chapter 11 process and to consummate a plan of reorganization on an aggressive timeline given the complexities of the Debtors' capital structure and the conditions precedent to consummation of the Plan. The Debtors continue to negotiate the structure of the Key Employee Incentive Plan for the Mepco Debtors' management. The Debtors expect to file a motion seeking Bankruptcy Court approval of the Key Employee Incentive Plan prior to the hearing to approve the DIP Facility.

7. Rejection of the Hedging Agreements.

On August 30, 2013, the Debtors filed a motion seeking Bankruptcy Court authority to reject the Hedging Agreements effective nunc pro tunc to the Petition Date [Docket No. 19] (the "Hedging Agreement Rejection

17

Motion"). On September 13, 2013, both BP Energy and EDF filed objections to the Hedging Agreement Rejection Motion. In addition, the Debtors have sought to address certain informal objections raised by J. Aron regarding the relief requested in such motion.

As of the date hereof, the Bankruptcy Court has not entered an order granting the relief requested in the Hedging Agreement Rejection Motion, and the issue has yet to be heard by the Bankruptcy Court. The Debtors intend to continue to work with the BP Energy, EDF, and J. Aron to resolve issues related to the Hedging Agreement Rejection Motion.

B.       *Statements and Schedules and Claims Bar Date.*

On November 12, 2013, the Debtors filed their schedules of assets (the "Schedules") and liabilities and statement of financial affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code. The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case. Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim. The Schedules identify the Contractors' Disputed Mechanics' Lien Claims as contingent, unliquidated, and disputed and assign $0.00 as the value of each of those Claims.

On October 31, 2013, the Debtors filed a motion requesting the Bankruptcy Court to enter an order approving: (a) December 23, 2013, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the Chapter 11 Cases; (b) February 26, 2014, at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the Chapter 11 Cases; (c) procedures for filing proofs of claim; and (d) the form and manner of notice of the applicable bar dates [Docket No. 388] (the "Bar Date Motion"). The Bar Date Motion is pending as of the date hereof and is presently scheduled for a hearing on November 21, 2013.

C.       *Mr. Laurita's Resignation.*

On November 10, 2013, James L. Laurita, the Mepco Debtors' President and Chief Executive Officer, resigned from his positions with the Mepco Debtors. At that time, Mr. Laurita also resigned from the Board of Managers of Mepco Holdings, LLC. The Mepco Debtors are implementing a management restructuring related to Mr. Laurita's departure. The Debtors expect to engage a Chief Restructuring Officer, and will file any pleadings in the Bankruptcy Court necessary to implement such an engagement.

D.       *Pending Litigation Proceedings.*

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Other than the Arbitration, the Debtors do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

E.       *Debtors' Cash Collateral Motion and the Interim Cash Collateral Relief.*

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Adequate Protection*

18

*Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief* [Docket No. 25] (the "Cash Collateral Motion"), seeking, among other things, the consensual use of the Longview Lenders' cash collateral in accordance with a 6-week budget. In connection therewith, the Debtors advised the Bankruptcy Court, the Longview Lenders, the Contractors, and other parties in interest that the Debtors would seek to draw on the Foster Wheeler LCs during the budget period provided by the Interim Cash Collateral Order in order to fund the Chapter 11 Cases and to make necessary repairs to the Power Facility. This disclosure led to a dispute between the Debtors and the Contractors over the Foster Wheeler LCs, including the Debtors' right to draw on such letters of credit and whether the Debtors, rather than one of the other Contractors, was the rightful beneficiary of the Foster Wheeler LCs.[7]

On September 18, 2013, each of the Contractors filed objections to, among other things, the Debtors' right to draw on the Foster Wheeler LCs pursuant to the Interim Cash Collateral Order or any subsequent cash collateral orders [Docket Nos. 202, 204, 210, and 211]. In addition, Foster Wheeler commenced an adversary proceeding, Foster Wheeler North America Corp. v. Longview Power, LLC, Adv. Pro. No. 13-52256 (BLS) (Bankr. D. Del.), to enjoin the Debtors' ability to draw on the Foster Wheeler LCs (the "Foster Wheeler Adversary Proceeding"). Kvaener commenced a similar adversary proceeding, Kvaerner North American Construction Inc. v. Longview Power, LLC, Adv. Pro. No. 13-52255 (BLS) Bankr. D. Del) (together with the Foster Wheeler Adversary Proceeding, the "Foster Wheeler LC Adversary Proceedings"). In these proceedings, Kvaerner and Siemens have both asserted, among other things, that the Debtors assigned their interest in the Foster Wheeler LCs, which interest constitutes cash collateral of the Longview Lenders, to Kvaerner and Siemens under the terms of a coordination agreement between the Debtors, Kvaerner, and Siemens, entered into on January 5, 2007. Foster Wheeler asserted, among other things, that the Debtors had no immediate need to draw on the Foster Wheeler LCs and that it was inappropriate to draw on such letters of credit to fund the costs of the Chapter 11 Cases. In each instance, the Contractors asserted that the matters should be determined by the Arbitration Panel and not the Bankruptcy Court. Given that the Foster Wheeler LCs constitute cash collateral of the Longview Lenders, however, the Debtors and the Steering Group believe that these matters could not be determined by the Arbitration Panel because the Longview Lenders are not party to the Arbitration.

On October 18, 2013, the Debtors' filed an omnibus reply to each of the Contractors' objections to the Debtors' ability to draw on the Foster Wheeler LCs [Docket No. 341], wherein the Debtors asserted that the Bankruptcy Court had jurisdiction to hear the issues over the Debtors' ability to draw on the Foster Wheeler LCs, that the Debtors continued to be the sole beneficiary of such letters of credit, and that the Debtors had the right to draw on the Foster Wheeler LCs. Also on October 18, 2013, the Steering Group filed a limited response (the "Limited Response") in support of certain portions of the Debtors' position [Docket No. 345], specifically those portions dealing with the Bankruptcy Court's jurisdiction to determine the relevant issues, and the Longview Credit Agreement Administrative Agent filed a joinder (the "Joinder") to the Limited Response [Docket No. 347]. In addition, the Debtors' filed responses to the complaints filed in both of the Foster Wheeler LC Adversary Proceedings.

The hearing on the Cash Collateral Motion and the various issues raised in the foregoing pleadings, including the dispute regarding the Foster Wheeler LCs, was initially scheduled for early October. After multiple adjournments, however, that hearing was continued to November 21, 2013. On November 1, 2013, the Debtors filed

---

[7]  The initial budget period under the Interim Cash Collateral Order was for the first 6 weeks of the Chapter 11 Cases. Due to the Debtors' dispute with the Contractors over the use of the Foster Wheeler LCs, the Debtors and the Longview Lenders have consensually agreed to extend the initial budget as necessary to allow the Debtors to continue to operate their business. Upon approval of the Final DIP Order, this budget will be replaced with a rolling 13-week budget and longer 24-month budget.

19

the DIP Financing Motion seeking authority to, among other things, enter into the DIP Facility, continue to use the cash collateral of the Longview Lenders, and provide adequate protection to such lenders for the use of cash collateral. The Debtors believe that subject to the Bankruptcy Court's approval of the relief requested by the DIP Financing Motion, which is addressed more fully below, the relief requested on a final basis pursuant to the Cash Collateral Motion is moot.

F.       *The Arbitration and the Contractors' Motions to Lift the Automatic Stay.*

Following the commencement of the Chapter 11 Cases and at the same time that each filed objections to the Debtors' use of cash collateral, each of the Contractors filed motions to lift the stay to proceed with the Arbitration [Docket No. 200, 205, 208, and 213]. On October 18, 2013, the Debtors' filed an omnibus reply to each of the Contractors' motions to lift the automatic stay to proceed with the Arbitration [Docket No. 341]. Also on October 18, 2013, the Steering Group filed the Limited Response and the Longview Credit Agreement Administrative Agent filed the Joinder. Numerous hearings were conducted during the initial phase of the Chapter 11 Cases regarding the various procedural issues raised in connection with these pleadings, including the determination of discovery disputes. Indeed, significant time was devoted during the first two months of the Chapter 11 Cases on the dispute regarding the Foster Wheeler LCs and the lift of stay issues raised by the Contractors. The Debtors engaged in discussions with certain of the Contractors to settle these various disputes as well as issues related to the overall Arbitration during this period. Although no settlements have been reached to date, in an effort to refocus the Chapter 11 Cases on the Debtors' financial and operational restructurings, the Debtors informed the Contractors that the Debtors and the Longview Lenders would agree to lift the automatic stay to allow the Arbitration to continue for all purposes other than for issues related to the Foster Wheeler LCs. The Debtors and the Contractors continue to discuss such a resolution of the Contractors' lift stay motions. As of the date hereof, however, the automatic stay remains in effect as to the Arbitration.

G.       *DIP Facility.*

Given the litigation surrounding the use of the Foster Wheeler LCs to fund the Chapter 11 Cases and to fix the Power Facility, the Debtors entered into hard fought negotiations with the Backstoppers over the potential path forward to emerge from chapter 11 and to fund the Chapter 11 Cases. These negotiations were ultimately successful, and the Debtors and the Backstoppers have agreed to terms on the DIP Facility, which, if approved by the Bankruptcy Court, would provide the Debtors with an up to $150 million senior, secured, priming multi-draw term loan facility. This facility includes both a DIP Facility and Exit Facility component and has, therefore, been sized to provide the Debtors with working capital and funding for the Chapter 11 Cases and the necessary repairs to fix the Power Facility. The overall facility size reflects the Debtors' current estimated capital expenditure needs of approximately $65 million to fund capital projects, plant maintenance, and other repairs with respect to the Power Facility. As noted, the DIP Facility can be converted into the Debtors' Exit Facility to fund the Debtors' operations post-emergence from the Chapter 11 Cases in certain circumstances.

The DIP Facility, if approved, is the linchpin of the Debtors' plan to emerge from chapter 11 protection. The DIP Facility is fully backstopped by the Backstoppers, who, in turn, have agreed to support the Debtors' proposed Plan and confirmation process. Moreover, the DIP Facility would be available to the Debtors upon consummation of a chapter 11 plan, therefore providing the Debtors with the ability to fund operations after exiting chapter 11 protection. The hearing to approve the DIP Facility is currently scheduled for November 21, 2013, at 9:30 a.m. prevailing Eastern Time.

H.       *The Debtors' Plan Process.*

The Debtors and the Backstoppers have reached a comprehensive agreement on all aspects of a restructuring transaction in connection with reaching agreement on the DIP Facility, which transaction was encompassed in a plan term sheet included with the DIP Financing Motion (the "<u>Plan Term Sheet</u>"). The Debtors reached an agreement on the Plan Term Sheet after extensive negotiations among the Debtors, the Backstoppers, and their respective advisors on both a pre- and postpetition basis. The proposed Plan Term Sheet includes a long-term solution on the Debtors' operational and financial requirements, including the capital required to fix the

20

Power Facility.  The Debtors and the Backstoppers seek to implement this restructuring transaction through the Debtors' proposed Plan.

In exchange for the Debtors' obligations under the Longview Credit Agreement, the Plan provides that each holder of a Longview Credit Agreement Claim, including holders of Swap and Hedge Claims, shall be entitled to receive between 85 and 90 percent of the New Common Equity in reorganized Longview Intermediate Holdings C, LLC ("Reorganized Longview") on a pro rata basis.  The remaining New Common Equity will be issued to the DIP Lenders as part of the DIP Lender Equity Distribution.  This debt-for-equity exchange will eliminate approximately $1 billion in debt from the Debtors' balance sheets.  The Plan provides the Debtors with sufficient liquidity through potential conversion of the DIP Facility to the Exit Facility to fund recoveries under the Plan, repair the Power Facility, and provide the Debtors with working capital for their ongoing operations on a post Effective Date basis as well as preserve the job of the Debtors' approximately 650 employees.

Importantly, however, conditions precedent to a successful restructuring remain, including, without limitation, issues surrounding the Debtors' ability to acquire Dunkard Creek and proposed estimation proceedings related to the Disputed Mechanics' Lien Claims.  Further, the Debtors must seek confirmation of the Plan on an expeditious timeline as the Debtors' agreement with the Backstoppers requires the Debtors to emerge from chapter 11 protection by March 7, 2014.  To that end, the Debtors have prepared this Disclosure Statement and the Plan, and seek confirmation of the value-maximizing restructuring transaction encompassed in the DIP Facility and Plan Term Sheet.

I.      *First Reserve Settlement.*

As part of the restructuring transactions proposed by the Plan Term Sheet, the Debtors, the Backstoppers, and First Reserve engaged in arm's-length negotiations over, among other issues, the Debtors' purchase of First Reserve's equity interests in Dunkard Creek and the Backstoppers' positions with regard to First Reserve.  The parties have come to terms on a settlement, which is reflected in Article IV.B of the Plan.

J.      *Estimation Process for the Disputed Mechanics' Lien Claims.*

Pursuant to Article IX.A.3 of the Plan, it is a condition precedent to consummation of the Plan that the Debtors must successfully: (a) estimate the Disputed Mechanics' Lien Claims at $0.00 in the aggregate after accounting for any defect claims, damages, counterclaims, or any other Causes of Action the Debtors have or may have against the Contractors, as determined by a Final Order by the Bankruptcy Court or other court of competent jurisdiction; or (b) obtain a Final Order from the Bankruptcy Court finding that the Disputed Mechanics' Lien Claims are junior to the Longview Credit Agreement Claims in their entirety.  The Debtors must file a motion with the Bankruptcy Court seeking such a Final Order no later than December 11, 2013, and such motion must seek estimation for all purposes, including for purposes of Allowance, pursuant to section 502(c) of the Bankruptcy Code.

Section 502 of the Bankruptcy Code provides: "There shall be estimated for purpose of allowance under this section any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ." 11 U.S.C. § 502(c) (emphasis added).  By its terms, section 502(c) of the Bankruptcy Code requires a bankruptcy court to estimate a claim where liquidation of that claim would otherwise unduly delay the reorganization process.  A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1011–12 (4th Cir. 1986) (noting that the duty to estimate contingent or unliquidated claims is "a mandatory obligation of the bankruptcy court" where otherwise the claim would cause undue delay); In re Continental Airlines, Inc., 57 B.R. 842, 844 (Bankr. S.D. Tex. 1986) (noting that several courts have held that section 502(c) of the Bankruptcy Code "creates an affirmative, mandatory duty on a Bankruptcy Court to estimate an unliquidated or contingent claim if fixing or liquidating the claim would 'unduly delay' the reorganization process").  Thus, it is clear that when a court finds that liquidating a claim in another forum would unduly delay a debtor's chapter 11 reorganization, the court must estimate that claim.  See In re Lionel L.L.C., No. 04-17324, 2007 WL 2261539, *4 (Bankr. S.D.N.Y. Aug. 3, 2007).

The Debtors believe that liquidation of the Disputed Mechanics' Lien Claims in the Arbitration will cause "undue delay" in the Chapter 11 Cases.  The Debtors do not believe that the Arbitration will conclude until the first

quarter of 2015 absent estimation. Without such a resolution of this contingency, the Debtors do not believe they will be able to either deleverage their balance sheet or obtain capital necessary to repair the Power Facility. As a result, the Debtors do not believe they will be able to consummate a chapter 11 plan, including the proposed Plan, absent such an estimation. See In re Interco Inc., 137 B.R. 993, 998 (Bankr. E.D. Mo. 1992) (estimating claims over mandatory arbitration where the debtors would be faced with "a void in the Debtors' plan formulation equation"); In re Lane, 68 B.R. 609 (Bankr. D. Haw. 1986) (recognizing that the determination of whether there is undue delay requires a determination of both (a) "how long it will take before . . . [a] claim will be liquidated and determined" by an alternative forum and (b) whether a "plan of reorganization can be confirmed so long as [the relevant] claim remains unliquidated and not estimated.").

**ARTICLE VI.**
**SUMMARY OF THE PLAN**

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.      *Administrative Claims and Priority Tax Claims.*

1.      Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim: (a) if such Administrative Claim is Allowed as of the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors' Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the OCP Order) or as provided by Article II.B of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

22

2.    Professional Compensation.

(a)    Final Fee Applications.

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on the Debtors (or the Reorganized Debtors), counsel to the Backstoppers, and counsel to the Steering Group no later than the first Business Day that is sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)    Professional Fee Escrow.

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow. Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors after all Professional Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Professional Fee Escrow shall be held in trust for the Professionals and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full. Professional Fees owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way, including with respect to any Liens, claims, or encumbrances securing the Exit Financing Facility; provided, that, the Exit Facility Lenders shall have a Lien on the Reorganized Debtors' residual interest in the Professional Fee Escrow but not the Professional Fee Escrow itself.

(c)    Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention for services rendered after such date shall terminate, and the Debtors may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    DIP Facility Claims.

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim: (1)(a) if a DIP Conversion occurs, each such Allowed DIP Facility Claim shall be exchanged for its Pro Rata share of the Reorganized Debtors' obligations under the Exit Facility or (b) if a DIP Conversion does not occur, each such Allowed DIP Facility Claim shall be paid in full, in Cash, by the Debtors on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Financing Facility; and (2) each Holder of an Allowed DIP Facility Claim shall receive its Pro Rata share (based upon such Holder's commitments to the DIP Facility on the date of entry of the Final DIP Order) of the DIP Lender Equity Distribution, which, for the avoidance of doubt, shall not be subject to dilution by the Management Equity Incentive Plan.

On the Effective Date, the DIP Lender Equity Distribution, which is payable based upon the amount of DIP Facility that was funded, shall be made. On the maturity date of the Exit Facility, the remaining DIP Lender Equity Distribution shall be made. A reserve of 5% of the New Common Equity shall be established on the Effective Date that will be available to pay any portion of the additional DIP Lender Equity Distribution on the maturity date of the Exit Facility. For the avoidance of doubt, the DIP Lender Equity Distribution shall be a payment of an Administrative Claim as a fee earned pursuant to the Final DIP Order.

23

4. <u>Priority Tax Claims.</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

B. *Classification and Treatment of Claims and Interests.*

1. <u>Classification of Claims and Interests.</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and are thus excluded from the Classes of Claims and Interests set forth in this Article III. All Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

(a)    Class Identification.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.D of the Plan. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be ten (10) Classes for each Debtor); <u>provided</u>, <u>that</u>, Class 4, Class 5, and Class 6 shall be vacant for each Debtor other than Longview Power.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 (all Debtors) | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 (all Debtors) | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 (all Debtors) | Longview Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4 (Longview Power only) | Foster Wheeler Mechanics' Lien Claims | Impaired | Entitled to Vote |
| Class 5 (Longview Power only) | Kvaerner Mechanics' Lien Claims | Impaired | Entitled to Vote |
| Class 6 (Longview Power only) | Siemens Mechanics' Lien Claims | Impaired | Entitled to Vote |
| Class 7 (all Debtors) | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 (all Debtors) | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 (all Debtors) | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

K&E 28166809

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 10 (all Debtors) | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

    (b)       Treatment of Claims and Interests.

        (i)     <u>Class 1 - Other Secured Claims.</u>

             (A)    *Classification*:  Class 1 consists of all Other Secured Claims.

             (B)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder thereof shall receive, at the option of the Reorganized Debtors, either:

                 (I)    payment in full in cash of such Holder's Allowed Other Secured Claim;

                 (II)    Reinstatement of such Holder's Allowed Other Secured Claim; or

                 (III)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

             (C)    *Voting:*  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

        (ii)    <u>Class 2 - Other Priority Claims.</u>

             (A)    *Classification*:  Class 2 consists of all Other Priority Claims.

             (B)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder thereof shall receive, at the option of the Reorganized Debtors, either:

                 (I)    payment in full in cash of such Holder's Allowed Other Priority Claim; or

                 (II)    such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

             (C)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

25

(iii)     Class 3 - Longview Credit Agreement Claims.

(A)     *Classification*:  Class 3 consists of all Longview Credit Agreement Claims.

(B)     *Treatment*:  Except to the extent that a Holder of a Longview Credit Agreement Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Longview Credit Agreement Claim, each such Holder thereof shall receive its Pro Rata share of the Prepetition Lender Equity Distribution, without duplication.

(C)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of Longview Credit Agreement Claims are entitled to vote to accept or reject the Plan.

(iv)     Class 4 - Foster Wheeler Mechanics' Lien Claims.

(A)     *Classification:*  Class 4 consists of all Foster Wheeler Mechanics' Lien Claims.

(B)     *Treatment:*  Except to the extent that a Holder of an Allowed Foster Wheeler Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Foster Wheeler Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Foster Wheeler Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

(I)     if such Allowed Foster Wheeler Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be both Secured and senior to the Longview Credit Agreement Claims and the requirement of a Disputed Mechanics' Lien Claims Resolution is otherwise waived in accordance with Article IX of the Plan,

a.     payment in full in Cash,

b.     Reinstatement of such Allowed Foster Wheeler Mechanics' Lien Claim,

c.     issuance of notes with a present value equal to the Allowed amount of such Foster Wheeler Mechanics' Lien Claim to the extent required by section 1129 of the Bankruptcy Code, or

d.     such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(II)     if such Allowed Foster Wheeler Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (including a determination that such Claim is junior to Longview Credit Agreement Claims),

26

a.    **if Class 4 votes to accept the Plan**, Cash equal to its Pro Rata share of the Unsecured Creditor Cash Pool; or

b.    **if Class 4 votes to reject the Plan**, Cash equal to its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool.

(C)    *Voting:* Class 4 is Impaired under the Plan. Holders of Allowed Foster Wheeler Mechanics' Lien Claims are entitled to vote to accept or reject the Plan.

(D)    *Reservation of Rights*: For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Foster Wheeler Mechanics' Lien Claims in all respects.

(v)    Class 5 - Kvaerner Mechanics' Lien Claims.

(A)    *Classification:* Class 5 consists of all Kvaerner Mechanics' Lien Claims.

(B)    *Treatment:* Except to the extent that a Holder of an Allowed Kvaerner Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Kvaerner Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Kvaerner Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

(I)    if such Allowed Kvaerner Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be both Secured and senior to the Longview Credit Agreement Claims and the requirement of a Disputed Mechanics' Lien Claims Resolution is otherwise waived in accordance with Article IX of the Plan,

a.    payment in full in Cash,

b.    Reinstatement of such Allowed Kvaerner Mechanics' Lien Claim,

c.    issuance of notes with a present value equal to the Allowed amount of such Kvaerner Mechanics' Lien Claim to the extent required by section 1129 of the Bankruptcy Code, or

d.    such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(II)    if such Allowed Kvaerner Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (including a determination that such Claim is junior to Longview Credit Agreement Claims),

27

a.    **if Class 5 votes to accept the Plan**, Cash equal to its Pro Rata share of the Unsecured Creditor Cash Pool; or

b.    **if Class 5 votes to reject the Plan**, Cash equal to its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool.

(C)    *Voting:*  Class 5 is Impaired under the Plan.  Holders of Allowed Kvaerner Mechanics' Lien Claims are entitled to vote to accept or reject the Plan.

(D)    *Reservation of Rights*:  For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Kvaerner Mechanics' Lien Claims in all respects.

(vi)    Class 6 - Siemens Mechanics' Lien Claims.

(A)    *Classification:*  Class 6 consists of all Mechanics' Lien Claims.

(B)    *Treatment:*  Except to the extent that a Holder of an Allowed Siemens Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Siemens Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Siemens Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

(I)    if such Allowed Siemens Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be both Secured  and senior to the Longview Credit Agreement Claims and the requirement of a Disputed Mechanics' Lien Claims Resolution is otherwise waived in accordance with Article IX of the Plan,

a.    payment in full in Cash,

b.    Reinstatement of such Allowed Siemens Mechanics' Lien Claim,

c.    issuance of notes with a present value equal to the Allowed amount of such Siemens Mechanics' Lien Claim to the extent required by section 1129 of the Bankruptcy Code, or

d.    such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(II)    if such Allowed Siemens Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (including a determination that such Claim is junior to Longview Credit Agreement Claims),

28

a.     **if Class 6 votes to accept the Plan**, Cash equal to its Pro Rata share of the Unsecured Creditor Cash Pool; or

b.     **if Class 6 votes to reject the Plan**, Cash equal to its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool.

(C)     *Voting:*  Class 6 is Impaired under the Plan.  Holders of Allowed Siemens Mechanics' Lien Claims are entitled to vote to accept or reject the Plan.

(D)     *Reservation of Rights*:  For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Siemens Mechanics' Lien Claims in all respects.

(vii)     Class 7 - General Unsecured Claims.

(A)     *Classification*:  Class 7 consists of all General Unsecured Claims.

(B)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive:

(I)     **if Class 7 votes to accept the Plan**, Cash equal to its Pro Rata share of the Unsecured Creditor Cash Pool; or

(II)     **if Class 7 votes to reject the Plan**, Cash equal to its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool;

(C)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

(viii)     Class 8 - Intercompany Claims.

(A)     *Classification*:  Class 8 consists of all Intercompany Claims.

(B)     *Treatment*:  Intercompany Claims shall be, at the option of the Reorganized Debtors, either:

(I)     Reinstated as of the Effective Date; or

(II)     cancelled without any distribution on account of such Claims.

(C)     *Voting*:  Class 8 is Unimpaired under the Plan.  Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

K&E 28166809

(ix)  <u>Class 9 - Intercompany Interests.</u>

(A)  *Classification:*  Class 9 consists of all Intercompany Interests.

(B)  *Treatment*:  Intercompany Interests shall be, at the option of the Debtors, with the reasonable consent of the Backstoppers, either:

(I)  Reinstated as of the Effective Date; or

(II)  cancelled without any distribution on account of such Interests.

(C)  *Voting*:  Class 9 is Unimpaired under the Plan.  Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(x)  <u>Class 10 - Existing Interests.</u>

(A)  *Classification:*  Class 10 consists of all Existing Interests.

(B)  *Treatment*:  On the Effective Date, all Existing Interests shall be cancelled without any distribution on account of such Interests.

(C)  *Voting:*  Class 10 is Impaired under the Plan.  Holders of Existing Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(c)  Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

(d)  Elimination of Vacant Classes.

Any Class of Claims that does not have a Holder eligible to vote as of the Voting Deadline (as such date may be extended in accordance with the solicitation procedures approved pursuant to the Disclosure Statement Order) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(e)  Voting Classes; Presumed Acceptance by Non-Voting Classes.

If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

(f)  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.  The Debtors reserve the right

30

to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

(g)      Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

C.      *Means for Implementation of the Plan.*

1.      Dunkard Option.

On or prior to the Effective Date, the Debtors, with the consent of the Backstoppers, shall exercise the Dunkard Option by either: (a) causing the New Second Lien Notes to be issued to the Dunkard Creek Lenders; or (b) using Cash received through issuance of the New Second Lien Notes to one or more third parties. Notwithstanding anything herein to the contrary, upon the exercise of the Dunkard Option by the Debtors, any and all Dunkard Claims and AMDRI Claims arising from or related to the Water Supply Agreement or otherwise shall be deemed satisfied and shall be disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or their property, without the need for any objection by the Debtors or further notice to, action, order, or approval of the Bankruptcy Court, and all Holders of Dunkard Claims or AMDRI Claims arising from or related to the Water Supply Agreement or otherwise will accordingly not be allowed to vote on the Plan on account of such Claim or, to the extent such votes have been cast, such votes will be disregarded and have no effect.

2.      First Reserve Settlement.

To the extent not previously approved by the Bankruptcy Court, the Plan shall serve as a motion requesting the approval of the "First Reserve Settlement" among the Debtors and First Reserve providing that, among other things: (a) the Debtors shall pay $4.5 million in Cash to First Reserve or its designee; (b) First Reserve shall cause non-Debtor assets beneficially owned or controlled by First Reserve that are used in connection with the Debtors' business in the ordinary course to be contributed to the Debtors, including (i) a 100% equity interest in DCWTS Holdings, LLC, (ii) a 100% equity interest in GenPower Services, LLC, (iii) First Reserve's interest (including any designation or appointment rights) with respect to AMDRI, to the extent assignable, and (iv) any permits or assets beneficially owned or controlled by First Reserve used in connection with the foregoing; (c) First Reserve shall be deemed a Releasing Party; (d) First Reserve shall be deemed a Released Party; (e) pending consummation of the First Reserve Settlement, First Reserve shall use commercially reasonable efforts to cooperate with the Debtors with respect to the transactions contemplated by this Article IV.B and, prior to the consummation of the First Reserve Settlement (i) First Reserve shall use commercially reasonable efforts to cause Dunkard Creek to be operated in the ordinary course (and the Debtors shall use commercially reasonable efforts to honor their obligations under the Water Supply Agreement in the ordinary course) and (ii) neither First Reserve nor Dunkard Creek shall take action to give effect to or interfere with, or be obligated to act to effectuate, the transactions contemplated by Article IV.A hereof; and (f) the Debtors shall reimburse First Reserve for the reasonable and documented fees and expenses (net of any retainers, which, as of the date hereof, equal approximately $400,000) incurred by one set of counsel to First Reserve (who, for the avoidance of doubt, shall also serve as counsel to Dunkard Creek) in connection with entry into the First Reserve Settlement and the transactions contemplated thereby.

The Debtors shall obtain entry of an order of the Bankruptcy Court approving the First Reserve Settlement that is materially consistent with this Article IV.B and otherwise reasonably acceptable to the Backstoppers, First Reserve, and the Debtors prior to commencement of the Bankruptcy Court's hearing to consider approval of the Disclosure Statement (as such date may be extended by mutual agreement of the Backstoppers, the Debtors, and

31

First Reserve).  The Debtors shall request a hearing date from the Bankruptcy Court to consider the First Reserve Settlement on December 10, 2013 or as soon thereafter as the Court's calendar may permit.  Entry of such order approving the First Reserve Settlement shall be a condition to the Plan and Disclosure Statement being reasonably acceptable to the Backstoppers.

The definitive documentation with respect to the First Reserve Settlement shall be on terms materially consistent with this Article IV.B and otherwise reasonably acceptable to the Debtors, the Backstoppers, and First Reserve.  First Reserve, the Debtors, and the Backstoppers agree to work in good faith to complete such definitive document promptly after the date hereof.

First Reserve further acknowledges and agrees that, subject to completion of such definitive documentation, the Debtors (with the reasonable consent of the Backstoppers, such consent not to be unreasonably withheld) may seek approval from the Bankruptcy Court of the First Reserve Settlement by separate motion at any time prior to the Confirmation Hearing.

3.    Sources of Consideration.

The Debtors shall fund distributions under the Plan with Cash on hand, including Cash from operations, the Exit Facility, the New Second Lien Notes, and the New Common Equity.

On the Effective Date, Reorganized Longview shall issue or reserve for issuance all securities required to be issued pursuant hereto.

(a)    Exit Facility.

The Confirmation Order shall include approval of the Exit Facility (including the transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents.  The Debtors may use the Exit Facility for any purpose permitted thereunder, including but not limited to the funding of obligations under the Plan, payment of costs relating to the repair of the Power Facility, and satisfaction of ongoing working capital needs.

Upon the Confirmation Date:  (i) the Debtors are authorized to execute and deliver the Exit Facility Documents and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities; and (ii) subject to the occurrence of the Effective Date, the Exit Facility Documents shall constitute the legal, valid, and binding obligations of the Debtors and be enforceable in accordance with their respective terms.

(b)    Issuance of New Second Lien Notes.

On the Effective Date, the Debtors shall issue the New Second Lien Notes in accordance with Article IV.A of the Plan, the form and substance of which shall be reasonably satisfactory to the Debtors and the Backstoppers, and in any event on terms materially consistent with the terms set forth as an exhibit to the Plan Supplement (which, for the avoidance of doubt, shall be materially consistent with the terms set forth in the Backstop Commitment).  Confirmation shall be deemed approval of the New Second Lien Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors in connection therewith) and authorization for the Debtors to enter into and execute the New Second Lien Notes Indenture and any documents related thereto, subject to such modifications as the Debtors may deem to be reasonably necessary, with the reasonable consent of the Backstoppers, to consummate such New Second Lien Notes.

       (c)        Issuance of New Common Equity.

Existing Interests shall be cancelled and Reorganized Longview shall issue the New Common Equity for distribution to Holders of Longview Credit Agreement Claims and DIP Facility Claims. New Common Equity shall also be reserved for (i) the Management Equity Incentive Plan and (ii) the DIP Lender Equity Distribution. The issuance of the New Common Equity, including options or other equity awards, if any, reserved for the Management Equity Incentive Plan, by Reorganized Longview is authorized without the need for any further corporate action or without any further action by the Holders of Claims. Reorganized Longview shall be authorized to issue a certain number of units of New Common Equity pursuant to its New Organizational Documents. On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

Each unit of the New Common Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. In the event Reorganized Longview elects to be organized as a limited liability company, each Entity receiving a unit of the New Common Equity may be required to execute a signature page to the applicable limited liability company agreement or New Organizational Document as a condition precedent to such distribution, to the extent that such Entity is not deemed to accept any and all of such terms as a condition to receiving such distribution. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

       4.    General Settlement of Claims.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. All distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

       5.    Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, with the reasonable consent of the Backstoppers, may take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors, with the reasonable consent of the Backstoppers, to be necessary. The actions to implement the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; provided, that, none of the Debtors, nor any of the Entities acquired by any Debtor pursuant to the Plan shall make any election to be treated as an association (or corporation) on or prior to the Effective Date for U.S. federal income tax purposes unless otherwise agreed to by the Debtors and the Backstoppers; and (d) all other actions that the applicable Entities determine to be necessary, with the reasonable consent of the Backstoppers, including making filings or recordings that may be required by applicable law in connection with the Plan. For the purposes of effectuating the Plan, none of the Restructuring Transactions shall constitute a change of control under any agreement, contract, or document of the Debtors.

The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Debtors and to minimize taxes payable by the Holders of the Longview Credit Agreement Claims and Holders of DIP Facility Claims to the extent practicable.

6.    Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate limited liability company or other form, as the case may be, with all the powers of a limited liability company or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is formed and pursuant to the respective by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

7.    Vesting of Assets in the Debtors.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens securing obligations under the Exit Facility, the New Second Lien Notes, and the Liens securing obligations on account of Claims that are Reinstated, if any, pursuant to the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

8.    Intercompany Account Settlement.

The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary to enable the Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

9.    Cancellation of Existing Securities and Agreements.

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including, without limitation, the Longview Credit Agreement, the DIP Facility and any and all other credit agreements, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect to any note(s) or security and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (a) allowing Holders to receive distributions under the Plan and (b) allowing Holders of Claims to retain their respective rights and obligations vis-à-vis other Holders of Claims pursuant to the applicable loan documents; provided, further, however, that the preceding proviso shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors, as applicable; provided, further, that the foregoing shall not affect the cancellation of units issued pursuant to the Restructuring Transactions nor any other units held by one Debtor in the capital of another Debtor.

10.    Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action

34

by Holders of Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including, without limitation:  (a) adoption or assumption, as applicable, of the agreements with existing management; (b) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (c) selection of the managers and officers for the Debtors; (d) execution of and entry into the Exit Facility Documents; (e) the distribution of the New Common Equity as provided herein; (f) implementation of the Restructuring Transactions; (g) adoption of the Management Equity Incentive Plan; (h) issuance of the New Second Lien Notes; (i) the exercise of the Dunkard Option; and (j) all other acts or actions contemplated, or reasonably necessary or appropriate to properly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers, or authorized persons of the Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof), shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, including the Exit Facility Documents, the New Common Equity, and the New Second Lien Notes Indenture, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Common Equity shall be exempt from the requirements of section 16(b) of the Exchange Act (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

11.  New Organizational Documents.

On the Effective Date, Reorganized Longview and the Debtors, as applicable, shall enter into the New Organizational Documents.  Each of the Debtors will file its New Organizational Documents with the applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, each Debtor may amend and restate its respective New Organizational Documents and other constituent documents as permitted by the laws of its respective state, province, or country of incorporation and its respective New Organizational Documents.

12.  Directors and Officers of the Debtors.

As of the Effective Date, all managers, directors, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board.  The New Board of Reorganized Longview shall consist of that number of managers determined by the Backstoppers, and the New Boards of the other Reorganized Debtors shall consist of the number of directors or managers, as applicable, provided for by such Reorganized Debtor in its respective New Organizational Documents, with the reasonable consent of the Backstoppers.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the New Boards.  To the extent any such director or officer of the Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Debtors.

13.  Effectuating Documents; Further Transactions.

On and after the Effective Date, the Debtors and the managers, officers, authorized persons, and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit Facility Agreement, the New Second Lien Indenture, the New Organizational Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

14.  Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Equity, as contemplated by Article III.B of the Plan, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan, including the New Common Equity, and any and all agreements incorporated herein, shall be subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (c) the restrictions, if any, on the transferability of such Securities and instruments, including those set forth in the New Organizational Documents; and (d) applicable regulatory approval, if any.

15.  Section 1146 Exemption.

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Exit Facility Documents shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct and shall be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.  Such exemption specifically applies, without limitation, to:  (a) the creation of any mortgage, deed of trust, Lien, or other security interest; (b) the making or assignment of any lease or sublease; (c) any Restructuring Transaction; (d) the issuance, distribution, and/or sale of any of the New Common Equity and any other Securities of the Debtors or the Reorganized Debtors; and (e) the making or delivery of any deed or other instrument of transfer in furtherance of or in connection with the Plan, including without limitation (i) any merger agreements, (ii) agreements of consolidation, restructuring, disposition, liquidation, or dissolution, (iii) deeds, (iv) bills of sale, and (v) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

16.  Director and Officer Liability Insurance.

To the extent that the D&O Liability Insurance Policies are deemed to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect

36

to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

17. <u>Management Equity Incentive Plan.</u>

On the Effective Date, the Reorganized Debtors shall adopt the Management Equity Incentive Plan.

18. <u>Preservation of Causes of Action.</u>

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Debtors and the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Debtors' and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors and the Reorganized Debtors will not pursue any and all available Causes of Action against such Entity. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action, including with respect to rejected Executory Contracts and Unexpired Leases, against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

19. <u>Reclamation Claims.</u>

Pursuant to section 546(c) of the Bankruptcy Code, a seller of goods that sold good to a debtor in the ordinary course of such seller's business may reclaim such goods if the debtors received the goods while insolvent within 45 days of commencement of a bankruptcy case (each such claim, a "<u>Reclamation Claim</u>"). Section 546(c) of the Bankruptcy Code requires that the seller demand, in writing, reclamation of such goods not later than 45 days after the date of receipt of such goods by the debtor or not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of a case. The Plan does not include any recovery for Reclamation Claims. Rather, pursuant to section 546(c) of the Bankruptcy Code, Reclamation Claims are subject to the prior perfected liens held by the Longview Lenders on the Debtors' inventory. Accordingly, the Debtors do not believe that any valid Reclamation Claims exist, and any losses on account of such claims would be a General Unsecured Claim.

D.    *Treatment of Executory Contracts and Unexpired Leases.*

1. <u>Assumption and Rejection of Executory Contracts and Unexpired Leases.</u>

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (a) previously were assumed or rejected by the Debtors; (b) are identified on the Rejected Executory Contract and Unexpired Lease Schedule; or (c) are the subject of a motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease Schedule pursuant to sections 365(a) and 1123 of the

Bankruptcy Code.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Debtors in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Backstoppers, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease Schedule at any time through and including 45 days after the Effective Date.

     2.    <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases.</u>

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court no later than 30 days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or their property, without the need for any objection by the Debtors or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

     3.    <u>Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.</u>

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (a) the amount of any payments to cure such a default; (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the cure amount required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; <u>provided</u>, <u>that</u> the Reorganized Debtors may settle any dispute regarding the amount of any such cure amount without any further notice to any party or any action, order, or approval of the Bankruptcy Court; <u>provided</u>, <u>further</u>, <u>that</u>, notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any dispute and approving the assumption and assignment of such Executory Contract or Unexpired Lease, the Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease which is subject to dispute, whether by amending the Rejected Executory Contract and Unexpired Lease Schedule in accordance with Article V.A of the Plan or otherwise.

At least seven (7) days prior to the Confirmation Objection Deadline, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court; <u>provided</u>, <u>that</u>, the Debtors reserve all rights

38

with respect to any such proposed assumption and proposed cure amount in the event of an objection or dispute. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors and the Backstoppers no later than thirty (30) days after service of the notice providing for such assumption and related cure amount. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute and be deemed to constitute the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to, action, order, or approval of the Bankruptcy Court.**

4.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contract or Unexpired Lease.

5.    Assumption of Longview Executive Agreements.

Notwithstanding anything herein or the Plan Supplement to the contrary, the Debtors shall be deemed to have assumed the Longview Executive Agreements pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of the Longview Executive Agreements.

6.    Indemnification Obligations.

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, board resolutions, indemnification agreements, or employment contracts) for the current and former directors, managers, officers, employees (each of the foregoing serving in such capacity after the Petition Date), attorneys, accountants, investment bankers, and other professionals, and the Debtors shall be assumed by the Debtors, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such indemnification obligation is executory, unless such indemnification obligation previously was rejected by the Debtors pursuant to a Final Order or is the subject of a motion to reject pending on the Effective Date; provided, that, in no event shall the Debtors assume, retain, or honor any indemnification agreement, provision, or obligation with respect to a Non-Released Party. Each indemnification obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

7.    Insurance Policies.

Each of the Debtors' insurance policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article IV.O herein) and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan or the Plan Supplement, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

8.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if

39

any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.    Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease nunc pro tunc to the Confirmation Date.

10.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

11.    Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

E.    *Provisions Governing Distributions.*

1.    Timing and Calculation of Amounts to Be Distributed.

Unless otherwise provided in the Plan, on the Initial Distribution Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Initial Distribution Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), and except as otherwise set forth herein, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Initial Distribution Date.  New Common Equity shall be deemed to be issued as of the Effective Date to the Holders of Claims entitled to receive the New Common Equity hereunder without the need for further action by the Disbursing Agent, the Debtors (including Reorganized Longview), or any other Debtor, including, without limitation, the issuance and/or delivery of any certificate evidencing any such units, units, or interests, as applicable. For the avoidance of doubt, New Common Equity shall be deemed to be issued to (a) Holders of DIP Facility Claims upon distribution to the DIP Agent, and (b) to Holders of Longview Credit Agreement Claims upon distribution to the Longview Credit Agreement Administrative Agent.

40

2.    Distributions on Account of Multiple Debtors.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that, for the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

3.    Distributions Generally; Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.

4.    Rights and Powers of Disbursing Agent.

(a)    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:   (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable, actual, and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable, actual, and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

5.    Distributions on Account of Claims Allowed After the Effective Date.

(a)    Payments and Distributions on Account of Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the the applicable Quarterly Distribution Date after they have actually been made, unless the Reorganized Debtors and the applicable Holder of such Claim agree otherwise.

(b)    Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or Final Order; provided, that, if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

41

6.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

    (a)    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

    (b)    Delivery of Distributions in General.

        (i)    Initial Distribution Date.

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, that, the manner of such distributions shall be determined at the discretion of the Disbursing Agent; provided, further, that, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

        (ii)    Quarterly Distribution Date.

Except as otherwise determined by the Reorganized Debtors in their sole discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Quarterly Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.A of the Plan.

    (c)    De Minimis Distributions; Minimum Distributions.

No fractional units of New Common Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of units of New Common Equity that is not a whole number, the actual distribution of units of New Common Equity shall be rounded as follows:  (1) fractions of one-half (½) or greater shall be rounded to the next higher whole number; and (2) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized units of New Common Equity to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

No Cash payment valued at less than $50.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

    (d)    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, that, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

7.    Manner of Payment.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

8.    Compliance with Tax Requirements.

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanism it believes is reasonable and appropriate. The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

9.    Allocation.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

10.    No Postpetition Interest on Claims.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

11.    Setoffs and Recoupment.

The Debtors may, but shall not be required to, setoff against or recoup from a Claim (including, for the avoidance of doubt, the Dunkard Claims and the Mechanics' Lien Claims) any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

12.    Claims Paid or Payable by Third Parties.

(a)    Claims Paid by Third Parties.

The Debtors, after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

43

(b)        Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)        Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary (including, without limitation, Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.        *Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.*

1.        Allowance of Claims.

On or after the Effective Date, each of the Debtors shall have and shall retain any and all rights and defenses such Debtor had with respect to any Claim immediately prior to the Effective Date.

2.        Claims Objections, Settlements.

The Reorganized Debtors shall have the exclusive authority to:  (a) File objections to Claims, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (b)  settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c)  administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.        Claims Estimation.

On or after the Effective Date, the Reorganized Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

44

    4.    <u>Adjustment to Claims Without Objection.</u>

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    5.    <u>Time to File Objections to Claims.</u>

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

    6.    <u>Disallowance of Claims.</u>

Any Claims held by any Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE REORGANIZED DEBTORS, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

    7.    <u>Amendments to Claims.</u>

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

    8.    <u>No Distributions Pending Allowance.</u>

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise agreed to by the Reorganized Debtors.

    9.    <u>Distributions After Allowance.</u>

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

G.    *Settlement, Release, Injunction, and Related Provisions.*

    1.    <u>Discharge of Claims and Termination of Interests.</u>

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to

45

the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

2.    **Release of Liens.**

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for any Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Debtor and its successors and assigns.**

3.    **Debtor Release.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Debtors and their Estates shall release, and each Released Party shall be deemed released and discharged by the Debtors and their Estates, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Exit Facility, the Longview Credit Facility, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any**

46

Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, bad faith, or gross negligence, each solely to the extent determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the Debtor Release shall not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.    **Third-Party Release.**

As of the Effective Date, except as otherwise provided in the Plan, Releasing Parties shall release, and each of the Debtors, their Estates, and the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facility, the Exit Facility, the Longview Credit Facility, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, bad faith, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the Third-Party Release shall not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Third-Party Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

5.    **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the New Organizational Documents, the Restructuring Transactions, the DIP Facility, the Exit Facility, the Longview Credit Facility, the New Second

47

**Lien Indenture, the issuance, distribution, and/or sale of the New Second Lien Notes or any units of the New Common Equity or any other security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; <u>provided</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; <u>provided</u>, <u>further</u>, that the foregoing Exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct.**

6. **<u>Injunction.</u>**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Exit Facility, the New Second Lien Indenture, the New Common Equity, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold claims, interests, or Liens that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to Article VIII.B of the Plan, Article VIII.C of the Plan, or Article VIII.D of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

7. <u>Protections Against Discriminatory Treatment.</u>

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

8. <u>Setoffs.</u>

Except as otherwise expressly provided for in the Plan or in any court order, each Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim  (including for the avoidance of doubt the Dunkard Claims and the Mechanics' Lien Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or

48

settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, that, neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor of any such claims, rights, and Causes of Action that such Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to setoff any Claim against any claim, right, or Cause of Action of any of the Debtors unless such Holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the applicable Reorganized Debtor and a Holder of a Claim; provided, that, where there is no written agreement between the applicable Reorganized Debtor and a Holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the Debtors' rights, as applicable, to assert that any Holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

9.    Recoupment.

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of any of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10.    Subordination Rights.

The classification and treatment of all Claims under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan.

11.    Document Retention.

On and after the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors (or the Reorganized Debtors, as the case may be).

12.    Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:   (a) such Claim has been adjudicated as non-contingent; or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

H.    *Conditions Precedent to Confirmation and Consummation of the Plan.*

1.    Conditions Precedent to the Confirmation Date.

It shall be a condition precedent to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

> (a)    the Disclosure Statement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Backstoppers;

> (b)    the Disclosure Statement Order shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Backstoppers;

(c) the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with this Plan and otherwise reasonably acceptable to the Debtors and the Backstoppers;

(d) the Plan Supplement, and all of the schedules, documents, and exhibits contained therein, shall be in a form and substance materially consistent with this Plan and otherwise reasonably satisfactory to the Debtors and the Backstoppers and Filed; or

(e) the hearing on estimation with respect to the Mechanics' Lien Claims shall have commenced.

2. <u>Conditions Precedent to the Effective Date.</u>

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

(a) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been in a form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Debtors and the Backstoppers and Filed;

(b) the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with this Plan and otherwise reasonably acceptable to the Debtors and the Backstoppers;

(c) the Disputed Mechanics' Lien Claims Resolution shall have occurred;

(d) all actions, documents, Certificates, and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been in a form and substance reasonably satisfactory to the Debtors and the Backstoppers and effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws;

(e) the Debtors shall have consummated the transactions contemplated by exercising the Dunkard Option, including entering into the New Second Lien Indenture and issuing the New Second Lien Notes, all in a manner and in form and substance reasonably acceptable to the Backstoppers and the Debtors;

(f) the Professional Fee Escrow shall have been established and funded in accordance with Article II.B of the Plan;

(g) the Debtors shall have issued the New Common Equity;

(h) the Debtors and First Reserve shall have executed the First Reserve Settlement and the First Reserve Settlement shall have been approved by the Bankruptcy Court;

(i) all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been received, and shall all be in form and substance reasonably acceptable to the Debtors and the Backstoppers;

(j) the Debtors shall have entered into the Exit Facility, which shall be in form and substance reasonably acceptable to the Debtors and the Backstoppers; and

(k)    all of the reasonable and documented fees and expenses of the advisors to the Steering Group, the Backstoppers, the DIP Agent, and the Longview Credit Agreement Administrative Agent shall have been paid in full in Cash.

3.    Waiver of Conditions.

The conditions to Confirmation and Consummation set forth in this Article IX may be waived only by consent of the Debtors and the Backstoppers, and may be waived without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

4.    Effective Date.

The Effective Date shall be (a) the first Business Day upon which all of the conditions specified in Article IX.B have been satisfied or waived and (b) a date consented to by the Backstoppers, such consent not to be unreasonably withheld.  Consummation of the Plan shall be deemed to occur on the Effective Date.

5.    Effect of Non-Occurrence of Conditions to the Effective Date.

If the Effective Date does not occur prior to a date to be mutually agreed to by the Debtors and the Backstoppers, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any claims held by the Debtors, Claims, or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

I.    *Modification, Revocation, or Withdrawal of the Plan.*

1.    Modification Amendments.

Except as otherwise specifically provided in the Plan, the Debtors, with the reasonable consent of the Backstoppers, reserve the right to modify the Plan, whether such modification is material or immaterial, and, with the reasonable consent of the Backstoppers, seek Confirmation consistent with the Bankruptcy Code and, as appropriate, with the reasonable consent of the Backstoppers, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the reasonable consent of the Backstoppers, expressly reserve their rights to alter, amend, or modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

2.    Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.    Revocation or Withdrawal of Plan.

The Debtors, with the reasonable consent of the Backstoppers, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise

51

embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan or Disclosure Statement shall:  (i) constitute a waiver or release of any claims held by the Debtor, Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

J.      *Retention of Jurisdiction.*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or Allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for Allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure amounts pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, the Rejected Executory Contract and Unexpired Lease Schedule; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to sections 502(c), 502(j), or 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Disclosure Statement or the Plan;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

K&E 28166809

11.       issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.       resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, Exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, Exculpations, and other provisions;

13.       resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1 of the Plan;

14.       enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.       determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.       adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.       consider any modifications of the Plan to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.       determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.       hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.       hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII of the Plan and including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.       except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

23.       hear and determine all applications for allowance and payment of Professional Fee Claims;

24.       enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan;

25.       enter an order or Final Decree concluding or closing the Chapter 11 Cases;

26.       enforce all orders previously entered by the Bankruptcy Court; and

27.       hear any other matter not inconsistent with the Bankruptcy Code.

53

K.      *Miscellaneous Provisions.*

1.      Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.      Additional Documents.

On or before the Effective Date, the Debtors, with the reasonable consent of the Backstoppers, may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Reorganized Debtors and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.      Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Disbursing Agent on behalf of each of the Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

4.      Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims prior to the Effective Date.

5.      Successors and Assigns.

Unless otherwise provided herein, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, advisor, beneficiaries, or guardian, if any, of each Entity.

6.      Notices.

All notices, requests, pleadings, and demands to or upon the Debtors or the Backstoppers to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Longview Power Intermediate Holdings C, LLC
966 Crafts Run Road
Maidsville, WV 26541
Facsimile:  304-599-1673
Attention:  Jeffery Keffer, President and Chief Executive Officer

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile:  (212) 446-4900
Attention:  Paul M. Basta, P.C. and Ray C. Schrock, P.C.

-and-

Kirkland & Ellis LLP
300 North LaSalle St.
Chicago, Illinois 60654
Facsimile:  (312) 862-2200
Attention:  Ryan Preston Dahl, Esq. and Michael W. Weitz, Esq.

-and-

counsel to the Backstoppers
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Facsimile:  (212) 872-1002
Attention:  Ira Dizengoff, Esq. and Arik Preis, Esq.


7.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

8.    Entire Agreement.

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan on the Effective Date.

9.    Exhibits.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

10.    Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to

55

make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' and the Backstoppers' consent; and (c) nonseverable and mutually dependent.

11.    Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

12.    Closing of Chapter 11 Cases.

The Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

13.    Waiver or Estoppel.

Each Holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

14.    Conflicts.

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order and the DIP Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control in all respects.

### ARTICLE VII.
### STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for February 10, 2014, at [__]:00 [_].m., prevailing Eastern Time.**  The

56

Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures. Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth below no later than the Plan Objection Deadline.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

| Co-Counsel to the Debtors | |
| --- | --- |
| Richard M. Cieri (admitted *pro hac vice*) <br> Paul M. Basta, P.C. (admitted *pro hac vice*) <br> Ray C. Schrock, P.C. (admitted *pro hac vice*) <br> **KIRKLAND & ELLIS LLP** <br> 601 Lexington Avenue <br> New York, New York 10022-4611 <br><br> - and - <br><br> Ryan Preston Dahl (admitted *pro hac vice*) <br> Joseph M. Graham (*pro hac vice* pending) <br> **KIRKLAND & ELLIS LLP** <br> 300 North LaSalle <br> Chicago, Illinois 60654 | Daniel J. DeFranceschi (No. 2732) <br> Paul N. Heath (No. 3704) <br> Zachary I. Shapiro (No. 5103) <br> Marisa A. Terranova (No. 5396) <br> **RICHARDS, LAYTON & FINGER, P.A.** <br> One Rodney Square <br> 920 North King Street <br> Wilmington, Delaware 19801 |
| Co-Counsel to the Backstoppers | |
| Ira Dizengoff (admitted *pro hac vice*) <br> Arik Preis (admitted *pro hac vice*) <br> **AKIN GUMP STRAUSS HAUER & FELD LLP** <br> One Bryant Park <br> New York, New York 10036 | Laura Davis Jones (No. 2436) <br> Colin R. Robinson (No. 5524) <br> **PACHULSKI STANG ZIEHL & JONES LLP** <br> 919 N. Market Street, 17th Floor <br> P.O. Box 8705 <br> Wilmington, Delaware 19899-8705 |
| U.S. Trustee | |
| Office Of The United States Trustee <br> The District of Delaware <br> 844 King Street, Suite 2207 <br> Wilmington, Delaware 19801 <br> Attn:  Tiiara Patton, Esq. | |

B.      *Confirmation Standards.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

57

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than 30 days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

1.    The Third-Party Release.

     Article VIII.D of the Plan provides for releases of certain claims and Causes of Action against non-Debtors in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third-Party Release").  The non-Debtor released parties are: (a) each Debtor and Reorganized Debtor; (b) the

Debtors' current and former officers, directors, and managers; (c) First Reserve; (d) the Backstoppers; (e) the DIP Lenders; and (f) solely with respect to the Entities identified in subsections (a) and (b) herein, each of such Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; provided, that, in no event shall a Non-Released Party be a Released Party.  For the avoidance of doubt, the following Entities shall be Non-Released Parties:  (a) Foster Wheeler; (b) Kvaerner; (c) Siemens; (d) those parties identified on the Non-Released Parties Schedule from time to time to be filed as part of the Plan Supplement; and (5) any and all of each of their respective predecessors, successors and assigns, current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

The Holders of Claims and Interests who are releasing certain claims and  Causes of Action against non-Debtors under the Third-Party Release include:  (a) all Holders of Claims who vote to accept the Plan and who do not opt out of the release provided by the Plan; (b) all Holders of Claims who are deemed to accept the Plan; (c) the DIP Agent; (d) the Longview Credit Agreement Administrative Agent; (e) the Longview Credit Agreement Collateral Agent; and (f) the Backstoppers.  The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan.  The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.

In addition, the Debtors believe the Third-Party Release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware.  See In re Indianapolis Downs, LLC, 486 B.R. 286, 304–06 (Bankr. D. Del. 2013).

2.    Best Interests of Creditors Test—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit C**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

3.    Investment Analysis.

The Plan and the Backstoppers' agreement to commit new capital to the Debtors' operations represent the culmination of several months of negotiations concerning, among other things, a capital investment in the Debtors to cover the repairs necessary to fix the Power Facility and to restructure the Debtors' balance sheets.  Pursuant to the Plan, the Backstoppers have agreed to provide the Reorganized Debtors with access to loans up to $150 million in the aggregate through the DIP Facility and Exit Facility, which accounts for the Debtors' current estimated capital expenditure needs of approximately $65 million to fund capital projects, plant maintenance, and other repairs with respect to the Power Facility.

The Debtors and Lazard believe the new capital commitment and post-reorganization capital structure proposed pursuant to the Plan is currently the best measure of the Debtors' value in light of, among other things: (a) the Debtors' and their advisors' belief that a substantial capital commitment is necessary for the Debtors to reorganize and to fund necessary repairs to the Power Facility; (b) the robust and comprehensive negotiations that culminated in the financing facility and Plan through which the Backstoppers have agreed to provide access to the capital necessary to consummate the Plan and for the Debtors to reorganize, (c) the fact that the Backstop Commitment remains subject to the Debtors' fiduciary duties, and the Debtors retain their ability to accept any higher or otherwise better offers; (d) the fact that the Plan is subject to the plan confirmation and disclosure statement requirements in the Bankruptcy Code; and (e) the Debtors received no viable inbound inquiries from any other third party, which makes it unlikely that additional parties with serious interest in providing the Debtors with the access to the needed level of capital will emerge.

4.    Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared certain Financial Projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit B**.  Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement.  Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan.  The Debtors have already secured a commitment for the Exit Facility and believe that they will have sufficient availability under the Exit Facility to provide for the distributions under the Plan.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan.  A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and more than one-half in number actually voting cast their ballots in favor of acceptance, subject to Article III of the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.

Article III.E of the Plan provides in full: "If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class."  Such "deemed acceptance" by an impaired class in which

60

no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code. In re Tribune Co., 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); see In re Adelphia Commc'ns Corp., 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007).

D.      *Confirmation without Acceptance by All Impaired Classes.*

        Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided, however,* the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

        1.      No Unfair Discrimination.

        The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

        2.      Fair and Equitable Test.

        The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery.

        (a)     Secured Claims.

        The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

        (b)     Unsecured Claims.

        The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

61

(c)      Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under (i) no class of interests junior to the non-accepting class may receive a distribution under the plan.

## ARTICLE VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.      *Risk Factors that May Affect the Debtors' Ability to Consummate the Plan.*

1.      The Debtors Must Successfully Estimate the Disputed Mechanics' Lien Claims for Purposes of Allowance Pursuant to Section 502(c) of the Bankruptcy Code.

Pursuant to Article IX.A.3 of the Plan, it is a condition precedent to consummation of the Plan that the Disputed Mechanics' Lien Claims Resolution shall have occurred.  Such resolution will require the Debtors to successfully estimate the Disputed Mechanics' Lien Claims as discussed more fully Article V.I hereof.  There is no guarantee that the Disputed Mechanics' Lien Claims Resolution will occur, and the failure to obtain such a resolution may cause the Debtors to be unable to consummate the Plan by March 7, 2014, if at all.  The Debtors cannot guarantee that the DIP Lenders would agree to amend the consummation milestone beyond March 7, 2014, to allow additional time to obtain the Disputed Mechanics' Lien Claims Resolution if such time is necessary.  To the extent that the terms or conditions of the DIP Agreement are not satisfied, or to the extent events giving rise to termination of the DIP Agreement occur, the DIP Agreement may terminate prior to the Confirmation of the Plan, which could result in the loss of financing for both the DIP and Exit Facility and/or support for the Plan by the Debtors' primary creditor constituent necessary to confirm the Plan. Any such loss of financing and/or support could adversely affect the Debtors' ability to reorganize and confirm and consummate the Plan.

2.      The Debtors Must Successfully Implement Dunkard Option.

Pursuant to Article IX.A.5 of the Plan, it is a condition precedent to consummation of the Plan that the Debtors must successfully exercise the Dunkard Option, whereby the Debtors would purchase Dunkard Creek's assets in accordance with Section 18 of the Water Supply Agreement.  To exercise such option, the Debtors must either (a) cause the Dunkard Creek Lenders to accept the New Second Lien Notes issued by the Debtors or (b) use the cash obtained from the issuance of the New Second Lien Notes to third parties to fund the purchase under the Dunkard Option.

Acquiring Dunkard Creek is a material element of the Plan and necessary to provide the Debtors' Power Facility and coal mines with water and waste disposal necessary for their operations.  There is no guarantee, however, that the Debtors will be able to successfully exercise the Dunkard Option and acquire the Dunkard Creek Facilities because, among other issues, the Dunkard Creek Lenders may object to receiving the New Second Lien Notes as repayment of their debt obligations or the Debtors may be unable to raise the funds necessary to exercise the Dunkard Option through the issuance of the New Second Lien Notes to third parties.  Because Dunkard Creek's assets are material to the Debtors' operations, failure to exercise the Dunkard Option may cause the Debtors to be unable to consummate the Plan.

3. The Debtors May Not Be Able to Secure Plan Confirmation Within the Milestones Currently Required by the DIP Agreement.

The Debtors may not be able to secure confirmation of the Plan within the milestones currently contemplated by the DIP Agreement, which require, among other things, for the Bankruptcy Court to enter an order confirming the Plan by February 19, 2014, unless extended. In the event the Debtors are unable to obtain, among other things, the Disputed Mechanics' Lien Claims Resolution as described above, the Debtors may not be able obtain confirmation of the Plan by February 19, 2014. The Debtors cannot guarantee that the DIP Lenders would agree to amend the DIP Agreement to extend the confirmation milestone beyond February 19, 2014. To the extent that the terms or conditions of the DIP Agreement are not satisfied, or to the extent events giving rise to termination of the DIP Agreement occur, the DIP Agreement may terminate prior to the Confirmation of the Plan, which could result in the loss of financing and/or support for the Plan by important creditor constituents. Any such loss of financing and/or support could adversely affect the Debtors' ability to reorganize and confirm and consummate the Plan.

B. *Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and Allowed Interests Under the Plan.*

1. Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims and Allowed Interests.

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims and Allowed Interests set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary significantly from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan and the Reorganized Debtors' ability to meet their financial projections.

2. The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.

To the extent that the Debtors are unable to satisfy the conditions precedent to consummation of the Plan, including, without limitation, the requirement to estimate the Disputed Mechanics' Lien Claims and the acquisition of Dunkard Creek, the Debtors may be unable to consummate the Plan and the Backstoppers may terminate their support for the Plan prior to the Confirmation or Consummation of the Plan. This loss would result in the loss of support for the Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3. The Reorganized Debtors May Not Be Able to Meet the Projected Financial Results.

The Reorganized Debtors may not be able to meet their current projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned, may be unable to service their debt obligations, and may not be able to meet its working capital and operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) generating and growing revenues; (b) repairing and maintaining the Power Facility; (c) making the necessary capital expenditures to the Debtors' mines and related operations; (d) taking advantage of future business opportunities; and (e) responding to competitive pressures.

4. Mr. Laurita's Resignation May Harm the Debtors' Business Operations.

As discussed in Article V.C of this Disclosure Statement, James Laurita, Jr., the Mepco Debtors' former President and Chief Executive Officer, resigned from his positions with the Mepco Debtors. Mr. Laurita's resignation may have an impact on the Debtors' operations. If the Debtors experience any employee, vendor, or

customer disruptions, among other potential issues, related to Mr. Laurita's departure, the Debtors may be unable to meet their projected financial results, which could adversely affect the Debtors' business and creditor recoveries.

     5.    <u>Certain Tax Implications of the Debtors' Bankruptcy.</u>

    Holders of Allowed Claims should carefully review Article X of this Disclosure Statement, "Certain United States Federal Tax Income Consequences" to determine the tax implications of the Plan and the Chapter 11 Cases.

C.    *Risk Factors that Could Negatively Affect the Debtors' Business.*

    The Debtors are subject to a number of risks, including (1) bankruptcy-related risk factors and (2) general business and financial risk factors.  Any or all such factors, which are enumerated below, may have a materially adverse effect on the business, financial condition, or results of operations of the Debtors.

     1.    <u>Certain Bankruptcy Law Considerations.</u>

    The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

     (a)    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

    Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

     (b)    Failure to Satisfy Vote Requirements.

    In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  There can be no assurance that the Debtors will receive the requisite votes from the Longview Lenders' Class to constitute acceptance of the Plan by such Class, despite having the approval of Holders of more than 60 percent of the debt under the Longview Credit Agreement, because Holders of at least two-thirds in dollar amount and more than one-half in number of Claims in such Class must vote to accept the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

     (c)    The Debtors May Not Be Able to Secure Confirmation of the Plan.

    The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

    There can be no assurance that the requisite acceptances to confirm the Plan will be received.  For example, the Plan contemplates that the Longview Lenders will receive equity in exchange for the Longview Credit

Agreement Claims.  The Debtors, however, cannot compel the Class of Longview Lenders to receive equity under the Plan absent the consent of such Class.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

(d)      Parties in Interest May Object to the Releases Provided by the Plan.

Certain creditors may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases from third parties established by the United States Court of Appeals for the Third Circuit.

(e)      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

(f)      The Debtors May Object to the Amount or Classification of a Claim.

Except as provided in the Plan, the Debtors reserve the right, under the Plan, to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection.  Any Holder of a Claim that is or may be subject to an objection, thus, may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(g)      Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

(h)      Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.  The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests

65

under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

2.    Bankruptcy Related Risk Factors.

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy.  These risks include:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and their ability to operate.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' services and attract customers to their business.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for fees and other expenses associated with the Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their business and may restrict their ability to pursue other business strategies.  Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens.  These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities.  The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake during the pendency of the Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees.  In addition, so long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations.  The Debtors intend to finance their operations during their reorganization using funds from operations and the DIP Facility.  There can be no assurance that the Debtors are able to operate pursuant to the terms of the DIP Facility, including the financial covenants and restrictions contained therein, or to negotiate and obtain necessary approvals, amendments, waivers, or other types of modifications, and to otherwise fund and execute the Debtors' business plans throughout the duration of the Chapter 11 Cases.

- There can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate the Plan with respect to the Chapter 11 Cases that are acceptable to the Bankruptcy Court and the Debtors' creditors, equityholders, and other parties in interest.

- Additionally, third parties may seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm the Plan, to appoint a chapter 11 trustee, or to convert the cases to chapter 7 cases.

- In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern.  Continuing on a going-concern basis of the Debtors' business is dependent upon, among other

66

things, obtaining Bankruptcy Court approval of a chapter 11 plan, maintaining the support of key vendors and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control.  Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, distributions from the estate for prepetition liabilities and postpetition liabilities must comply with section 1129 of the Bankruptcy Code.  The ultimate recovery to Holders of Claims or Interests, if any, will not be determined until Confirmation of the Plan or an alternative chapter 11 plan.   No assurance can be given as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they will receive.

3.    General Business and Financial Risk Factors.

(a)    General Economic Conditions.

In its financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years.  The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism, natural disasters, and other such factors.  Any one of these or other economic factors could have a significant effect on the operating performance of the Debtors.

(b)    Implementation of Business Plan.

The Debtors believe that the Reorganized Debtors will succeed in implementing and executing its business plan and financial restructuring.  There are risks, however, that the goals of the Reorganized Debtors' going-forward business plan and financial restructuring strategy will not be achieved.  In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(c)    Repairs to the Power Facility.

The Debtors believe that the Reorganized Debtors will succeed in repairing the Power Facility, which will allow the Power Facility to operate at or near full capacity.  There are risks, however, that such repairs will be unsuccessful and that the Reorganized Debtors may continue to suffer loss of cash flow due to operational issues at the Power Facility.  In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(d)    Mepco Operations.

A significant portion of the Debtors' coal sales are pursuant to two long term contracts with affiliates of FirstEnergy.  In October 2013, FirstEnergy closed one of the power plants that was a buyer under one of these long term contracts, which accounted for approximately 25 percent of the Debtors' coal sales.  The Reorganized Debtors may be unable to find alternative buyers at economically feasible prices for their coal, which could increase operational costs and cause a material adverse effect on the Reorganized Debtors' business, financial condition, and results of operations.

(e)    Seasonality.

The Debtors' principal sources of revenue are revenues generated by power generation and coal mining and processing.  The Debtors' experience seasonal revenue patterns similar to those of the power generation and coal mining industry in general.  This seasonality can be expected to also cause fluctuations in the Reorganized Debtors' revenues, cash flows, profit margins, and net income.

K&E 28166809

(f)        Competition.

The power generation and coal mining industries are highly competitive, which may affect the Reorganized Debtors' ability to compete successfully for customers with their industry competitors. The Debtors generally operate in markets that contain numerous competitors. The Reorganized Debtors' ability to remain competitive requires the Reorganized Debtors to offer their electricity and coal at competitive prices vis-à-vis the national and regional markets. If the Reorganized Debtors are unable to compete successfully in these areas, this may limit their respective operating margins, diminish their market share, and reduce their earnings.

(g)        Operational Costs.

Many of the expenses associated with owning and operating the Power Facility and the Debtors' coal mining and processing operations, such as debt-service payments, property taxes, insurance, and utilities, are relatively inflexible and do not necessarily decrease in tandem with a reduction in the Reorganized Debtors' revenue. The Reorganized Debtors' expenses also will be affected by inflationary increases and certain costs may exceed the rate of inflation in any given period. In the event of a significant decrease in demand for electricity or coal mining and processing services, the Reorganized Debtors may be unable to reduce the size of their workforces to decrease wages and benefits or to offset any such increased expenses with higher electricity or coal prices. As a result, any of the Reorganized Debtors' efforts to reduce operating costs or failure to make scheduled capital expenditures also could adversely affect the future growth of their business and the value of the Reorganized Debtors' assets and it is possible that increased operational costs may decrease the Reorganized Debtors' net revenues.

(h)        Terrorist Attacks, Future War, or Risk of War may Adversely Impact the Debtors' Results of Operations, their Ability to Raise Capital, or their Future Growth.

As power generators, the Debtors may face an above-average risk of an act of terrorism, which could include either a direct act against the Power Facility or an inability to operate as a result of systemic damage resulting from an act against the transmission and distribution infrastructure that they use to transport their power. If such an attack were to occur, the Reorganized Debtors' business, financial condition, and results of operations could be materially adversely impacted. In addition, such an attack could impact their ability to service their indebtedness, their ability to raise capital, and their future growth opportunities.

(i)        Potential Costs to Comply with Environmental Laws.

The Reorganized Debtors' activities are subject to complex and stringent energy, environmental, and other governmental laws and regulations which could adversely affect their operations. The construction and operation of power generation facilities and coal mines require numerous permits, approvals, and certificates from appropriate federal, state, and local governmental agencies, as well as compliance with environmental protection legislation and other regulations. Although the Reorganized Debtors believe that they have obtained the requisite approvals and permits for their existing operations and that their business is operated in accordance with applicable laws, the Reorganized Debtors remain subject to a varied and complex body of laws and regulations that both public officials and private individuals may seek to enforce. Existing laws and regulations may be revised or reinterpreted, or new laws and regulations may become applicable to the Reorganized Debtors that may have a negative effect on their business and results of operations. In addition, regulatory compliance for the construction and operation of the Power Facility and the Debtors' coal mines can be a costly and time-consuming process. Intricate and changing environmental and other regulatory requirements may necessitate substantial expenditures to obtain and maintain permits. If a project is unable to function as planned due to changing requirements, loss of required permits or regulatory status, or local opposition, it may create expensive delays, extended periods of non-operation, or significant loss of value in a project.

Environmental regulations have had and will continue to have an impact on the Reorganized Debtors' operations and their investment decisions. The Reorganized Debtors are subject to complex and stringent energy, environmental, and other governmental laws and regulations at the federal, state, and local levels in connection with the development, ownership, and operation of the Power Facility and the Debtors' coal mines, and in connection

with the purchase and sale of electricity. Federal laws and regulations govern, among other things, transactions by electric companies, the ownership of the Power Facility, and access to and service on the electric transmission grid. There have been a number of federal legislative and regulatory actions that have recently changed, and will continue to change, how the energy markets are regulated. Additional legislative and regulatory initiatives may occur. The Reorganized Debtors cannot provide assurance that any legislation or regulation ultimately adopted would not adversely affect the Reorganized Debtors or their customers, thus potentially negatively affecting the Reorganized Debtors' cash flows.

(j)      Employee and Labor Relations Issues.

The Reorganized Debtors may be subject to many of the costs and risks generally associated with the power plant and coal mining labor forces. Although none of the Debtors' employees are currently represented by a collective bargaining agreement, there can be no guarantees that this condition will continue in the future. In such an event, from time to time, the Debtors' operations may be disrupted as a result of strikes, lockouts, public demonstrations, or other negative actions. The Reorganized Debtors may also incur increased legal costs and indirect labor costs as a result of contract disputes or other events. The resolution of labor disputes or re-negotiated labor contracts could lead to increased labor costs, either by increases in wages or benefits or by changes in work rules that raise operating costs. The Reorganized Debtors may not have the ability to affect the outcome of these negotiations.

(k)      Capital Expenditures.

The Debtors will have an ongoing need to make potentially significant capital expenditures to remain competitive in the power generation and coal mining and processing marketplaces or to comply with applicable laws or regulations. The timing and costs of such capital expenditures may result in reduced operating performance during construction and may not improve the return on these investments. These capital expenditures may also reduce the availability of cash for other purposes and are subject to cost overruns and delays.

(l)      Pending and Future Litigation.

There is, or may be in the future, certain litigation that could result in a material judgment against the Debtors or the Reorganized Debtors. Such litigation and any judgment in connection therewith could have a material negative effect on the Debtors or the Reorganized Debtors.

D.      *Risks Related to the New Common Equity.*

1.      An Active Trading Market May Not Develop for the New Common Equity.

The New Common Equity is a new issue of securities and, accordingly, there is currently no established public trading market for the New Common Equity. It is not currently contemplated to apply to list the New Common Equity on any national securities exchange and, as such, there can be no assurance that an active trading market for the New Common Equity will develop. If there is no active trading market in the New Common Equity, the market price and liquidity of the New Common Equity may be adversely affected. If a trading market does not develop or is not maintained, holders of New Common Equity may experience difficulty in reselling such securities at an acceptable price or may be unable to sell them at all. Even if a trading market were to exist, such market could have limited liquidity and the New Common Equity could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, or prospects and investor expectations thereof. As a result, there may be limited liquidity in any trading market that does develop for the New Common Equity. In addition, the New Organizational Documents may also contain restrictions on the transferability of the New Common Equity (such as rights of first refusal/offer, tag-along rights, and/or drag-along rights, among others), which may adversely affect the liquidity in the trading market for the New Common Equity.

2.    <u>A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors.</u>

Consummation of the Plan may result in a small number of holders owning a significant percentage of the shares of the outstanding the New Common Equity in Reorganized Longview.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.

3.    <u>The Issuance of New Common Equity under the Management Equity Incentive Plan will Dilute the New Common Equity.</u>

On the Effective Date, [__] percent of the New Common Equity will be reserved for issuance as grants of options in connection with the Management Equity Incentive Plan.  If the Reorganized Debtors distribute such equity-based awards to management pursuant to the Management Equity Incentive Plan, it is contemplated that such distributions will dilute the New Common Equity issued on account of Claims under the Plan and the ownership percentage represented by the New Common Equity distributed under the Plan.

4.    <u>The New Common Equity is an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors.</u>

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity would rank below all debt claims against the Reorganized Debtors.  As a result, holders of New Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of its obligations to its debt holders have been satisfied.

5.    <u>Certain Holders of New Common Equity May Be Restricted in Their Ability to Transfer or Sell Their Securities.</u>

To the extent that the New Common Equity issued under the Plan is covered by section 1145(a)(1) of the Bankruptcy Code, it may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities.  Resales by Persons who receive New Common Equity pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act of 1933 or other applicable law.  Such Persons would only be permitted to sell such securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act or another applicable exemption.

E.    *Liquidity Risks.*

1.    <u>Adverse Effect of Indebtedness on Financial Health and Operating Flexibility.</u>

The Reorganized Debtors' Exit Facility and Second Lien Notes may affect their value, by, among other things:  (a) limiting  their ability to borrow additional amounts for working capital, capital expenditures, debt service requirements, execution of business strategy, to support surety bonds required for constructions, and development or other purposes; (b) limiting the Reorganized Debtors' ability to use operating cash flows in other areas of the business or to pay dividends; (c) increasing the vulnerability of the Reorganized Debtors to general adverse economic and industry conditions, including increases in interest rates; (d) limiting the Reorganized Debtors' ability to capitalize on business opportunities, reinvest in and develop the Reorganized Debtors' assets, and to react to competitive pressures and adverse changes in government regulation; (e) limiting the Reorganized Debtors' ability, or increasing the costs, to restructure funded indebtedness; (f) limiting the Reorganized Debtors' ability to enter into marketing and hedging transactions by reducing the number of potential counterparties to such transactions as well as the volume of those transactions; and (g) giving secured lenders the ability to foreclose on assets.

2.    <u>Debt Restrictions and Covenants.</u>

The terms of the Reorganized Debtors' Exit Facility and Second Lien Notes may require the Reorganized Debtors to satisfy certain customary affirmative and negative covenants and to meet financial ratios and tests,

70

including ratios and tests based on leverage, interest coverage, and net worth. In addition, the covenants and other restrictions under such Exit Facility's credit agreement or the Second Lien Notes' indenture may limit the ability of the Reorganized Debtors to, among other things, incur indebtedness, create liens on assets, sell assets, manage cash flows, transfer assets to other subsidiaries, make capital expenditures, engage in mergers and acquisitions, and make distributions to equity holders.

Due to the current lending environment, the Chapter 11 Cases, the Debtors' financial condition, and general economic factors, the Reorganized Debtors' Exit Facility may contain certain terms which are less attractive than the terms contained in the Longview Credit Agreement. Such terms may include more restrictive operational and financial covenants, restrictions on the distribution of cash flows from properties serving as collateral for the debt, and, in certain limited instances, higher interest rates. These fees and cash flow restrictions may affect the ability of the Reorganized Debtors to fund their respective ongoing operations from operating cash flows and may significantly limit the operating and financial flexibility of the Reorganized Debtors as well as their ability to respond to business changes or competitive activities.

      3.   <u>Continuing Leverage and Ability to Service Debt.</u>

The Debtors believe that, following Consummation of the Plan, the Reorganized Debtors will be able to meet their anticipated future operating expenses, capital expenditures, and debt service obligations. However, the Reorganized Debtors' ability to meet their debt service obligations and to carry out capital spending that is important to their growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan. These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors that are beyond the Reorganized Debtors' control.

F.     *Risks Associated with Forward Looking Statements.*

**<u>The financial information contained in this Disclosure Statement has not been audited</u>**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

G.    *Disclosure Statement Disclaimer.*

      1.   <u>Information Contained in this Disclosure Statement Is for Soliciting Votes.</u>

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

      2.   <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.</u>

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

      3.   <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement.</u>

**<u>This Disclosure Statement is not legal advice to you.</u>** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters

K&E 28166809

concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.    No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, the Backstoppers, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

5.    Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.    No Waiver of Right to Object or Right to Recover Transfers and Assets.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

7.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

8.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.    No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

K&E 28166809

H.      *Liquidation Under Chapter 7.*

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtors' Liquidation Analysis is set forth in Article VII of this Disclosure Statement, "*Statutory Requirements for Confirmation of the Plan,*" and the Liquidation Analysis attached hereto as **Exhibit C**.

## ARTICLE IX.
## SECURITIES LAW MATTERS

Under the Plan, shares of New Common Equity will be distributed to Holders of Claims in Class 3 and the New Second Lien Notes will be distributed to either (1) the Dunkard Lenders or (2) third parties to exercise the Dunkard Option.  In addition, pursuant to the Final DIP Order and the Confirmation Order, the DIP Lenders will also receive shares of New Common Equity.

A.      *New Common Equity and Section 1145 of the Bankruptcy Code.*

The Reorganized Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer, issuance, and distribution of the New Common Equity. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (A) with a view to distributing those securities, and (B) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that Entities who receive the New Common Equity are deemed to be "underwriters," resales by those Entities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those Entities would, however, be permitted to sell New Common Equity or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

Under certain circumstances, holders of New Common Equity deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws.  Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met.  These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities

73

be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that notice of the resale be filed with the Securities Exchange Commission.

B.    *New Second Lien Notes*

The Debtors and their advisors expect to issue the New Second Lien Notes pursuant to an exemption provided under Section 4(a)(2) of the Securities Act.

# ARTICLE X.
# CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims or Interests.  The following discussion does not address the U.S. federal income tax consequences to non-Debtors and to Holders (i) whose Claims or Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, and regulated investment companies and those holding, or who will hold, Claims or Interests as part of a hedge, straddle, conversion, or constructive sale transaction).  Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., or other tax law.  Lastly, the following discussion assumes (i) each Holder of a Claim or Interest holds its Claim or Interest as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the IRC, (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against, and (iii) the debt obligation(s) underlying each Allowed Claim is recourse debt.  The U.S. federal income tax law on whether debt is recourse or non-recourse is unclear, especially in the case of debt held by (or treated as held by) a partnership.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity.  Partners (or other owners) of partnerships (or other

74

pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

---

**IRS CIRCULAR 230 DISCLOSURE**

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

---

A.      *Certain U.S. Federal Income Tax Consequences of the Debtors and Holders of Existing Interests.*

For U.S. federal income tax purposes, Mepco Holdings, LLC ("Mepco Holdings") is treated as a partnership and each Debtor (other than Mepco Holdings) is treated as a disregarded entity (the "Disregarded Debtors"). For U.S. federal income tax purposes, all of the assets and liabilities of the Disregarded Debtors (other than Longview Power and Longview Intermediate Holdings C, LLC) are treated as owned by Mepco Holdings. Mepco Holdings is owned primarily by Longview Intermediate Holdings C, LLC, which is itself a debtor. Longview Intermediate Holdings C, LLC, is itself a disregarded entity for U.S. federal income tax purposes. As such, all of its assets and liabilities (which does include Longview Power and its interest in Mepco Holdings) are deemed for U.S. federal income tax purposes to be owned by its owner, Longview Intermediate Holdings B, LLC, which is a non-debtor. For U.S. federal income tax purposes, Longview Intermediate Holdings B, LLC, is treated as a partner and majority owner of Mepco Holdings. Accordingly, the U.S. federal income tax consequences of the Plan will generally not be borne by the Debtors, but will be borne by the partners of Longview Intermediate Holdings B, LLC and any direct partners in Mepco Holdings (in each case, assuming the partner itself is not a disregarded entity or a partnership for U.S. federal income tax purposes).

In general, absent an exception, a taxpayer will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the sum of (a) the issue price of any new indebtedness of the taxpayer issued and (b) the fair market value of any other consideration (including any new equity) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or to the extent that the taxpayer is insolvent when the COD Income arises (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer debtor generally must reduce its tax attributes by up to the amount of COD Income that it excluded from gross income. Under Section 108(d)(6) of the IRC, when an entity that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception or Insolvency Exception (and related attribute reduction) is applied at the partner level (assuming the partner itself is not a disregarded entity or a partnership for U.S. federal income tax purposes) rather than at the entity level. Accordingly, the partners of Longview Intermediate Holdings B, LLC and partners of Mepco Holdings, as the direct and indirect Holders of Existing Interests in the Debtors, will be treated as receiving their allocable share of the

75

COD Income realized by the Debtors, and the application of the Bankruptcy Exception and the Insolvency Exception will occur at the partner level.

Because the Plan provides that Holders of Allowed Longview Credit Agreement Claims will receive shares of the New Common Equity, the amount of COD Income to be allocated to the Holders of Existing Interests will depend on the fair market value of the New Common Equity.  This value cannot be known with certainty at this time.

Longview Intermediate Holdings B, LLC, and Mepco Holdings will recognize gain or loss pursuant to consummation of the Plan equal to the difference between the tax basis in their assets and their fair market value as of the Effective Date.  Such gain or loss will be allocated to the current existing partners of Longview Intermediate Holdings B, LLC, and Mepco Holdings in accordance with their respective partnership agreements.  The character of such gain or loss will be determined by a number of factors, including the character of each of the assets and whether there is any recapture of prior deductions.

Once the Plan becomes effective, Reorganized Longview will have a tax basis in its assets equal to the fair market value of those assets on the Effective Date.  After the Effective Date, it is expected that Reorganized Longview will make an election to be taxed as a corporation.  As such, going forward, Reorganized Longview will recognize taxable income or loss based on the results of its operations, and to the extent it has taxable income, it will owe federal income tax at applicable marginal rates.

B.      *Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Claims Entitled to Vote.*

     1.      Consequences to the U.S. Holders of Allowed Claims in Class 3.

Pursuant to the Plan, each Holder of an Allowed Longview Credit Agreement Claim shall receive between 85 and 90 percent of the New Common Equity in Reorganized Longview on a pro rata basis.  The exchange of an Allowed Longview Credit Agreement Claim for New Common Equity should be a taxable exchange under Section 1001 of the IRC.  A U.S. Holder of an exchanged Claim will generally recognize income gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the Holder's share of New Common Equity and (b) such Holder's adjusted basis in its Claims surrendered therefore.  Such gain or loss may be capital in nature (subject to the "Market Discount" rules described below) and may be long-term capital gain or loss if the Claims were held for more than one year.  To the extent that a portion of the consideration received represents accrued but unpaid interest that the U.S. Holder has not already taken into income, the U.S. Holder may recognize ordinary interest income (see the "Accrued Interest" discussion below).

     2.      Consequences to the U.S. Holders of Allowed Claims in Classes 4, 5, and 6.

Under the Plan, if an Allowed Claim in Class 4, 5, or 6 is determined to be Secured and senior to the Longview Credit Agreement Claims by a Final Order of the Bankruptcy Court and the Disputed Mechanics' Lien Claims Resolution is otherwise waived, the Holder of any such Claim may receive, in full settlement of their Claim: (a) Cash; (b) Reinstatement of such Claim; or (c) a replacement note with a present value equal to the Allowed Amount of such Claim or other treatment necessary to satisfy section 1129 of the Bankruptcy Code.  Generally, any U.S. Holder of a Claim receiving Cash will have the same tax consequences described in the section below under "Holders of Allowed Claims in Class 7."  Generally, Reinstatement of a U.S. Holder's full Allowed Claim is not a taxable event.  Generally, any U.S. Holder of a Claim receiving a replacement note will be treated as recognizing income gain or loss equal to the difference between (i) the "issue price" of the note received in satisfaction of such Claim and (ii) such Holder's tax basis in such Claim.  The character of such gain or loss as capital gain (subject to the "Market Discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such Holder's hands, the extent that a portion of the consideration received in exchange for the Claims or Interests is allocable to accrued but unpaid interest (see the discussion on "Accrued Interest" below), whether the Claim or Interest constitutes a capital asset in the hands of the U.S. Holder, whether the Claim or Interest was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt or worthlessness deduction with respect to its Claim or Interest.

Under the Plan, if an Allowed Claim in Class 4, 5, or 6 is determined to be Unsecured (and junior to the Longview Credit Agreement Claims) by a Final Order of the Bankruptcy Court, the Holder of such Claim will receive Cash equal to either its Pro Rata share of the Unsecured Creditor Cash Pool or its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool.  Generally, any U.S. Holder of a Claim receiving Cash will be subject to the tax consequences described in the section below on "Holders of Allowed Claims in Class 7."

3.    Consequences to the U.S. Holders of Allowed Claims in Class 7.

Under the Plan, Holders of Allowed General Unsecured Claims will receive Cash equal to either its Pro Rata share of the Unsecured Creditor Cash Pool or its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool in full satisfaction of their Claims.  In this case, a U.S. Holder will be treated as exchanging its Allowed General Unsecured Claim for cash in a fully taxable exchange.  A Holder of a General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) such Holder's tax basis in its General Unsecured Claim and (b) the amount of Cash received pursuant to the Plan, reduced by the amount of accrued but previously untaxed interest on the debt underlying such Claim (see the discussion on "Accrued Interest" below).  The character of such gain or loss as capital gain (subject to the "Market Discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such Holder's hands, whether the Claim or Interest was purchased at a discount, and whether and to what extent such Holder has previously claimed a bad debt or worthlessness deduction with respect to its Claim or Interest.

4.    Accrued Interest.

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest in such event.

5.    Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

77

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

6.    Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

7.    Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For noncorporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

C.    *Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims*

1.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims.

This following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Equity, as applicable.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

(a)    Gain Recognition.

Any gain realized by a Non-U.S. Holder on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will

78

be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

       (b)       Accrued but Untaxed Interest.

Payments made to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of Reorganized Longview and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

       2.      <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Equity.</u>

       (a)       Dividends on New Common Equity.

Any distributions made with respect to New Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Longview's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  Except as described below, dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)        Sale, Redemption, or Repurchase of New Common Equity.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Equity unless:

(i)        such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)        such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)        Reorganized Longview is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Equity.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The Debtors consider it unlikely, based on Reorganized Longview's current business plans and operations, that Reorganized Longview will become a "U.S. real property holding corporation" in the future.

3.    FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), which was enacted in 2010, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Equity), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Equity).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Although these provisions are currently effective by statute, withholding on U.S.-source interest, dividends, and certain other types of income will not apply until after June 30, 2014, and withholding on gross proceeds will not apply until after December 31, 2016.  In addition, the IRS has released final Treasury regulations and other guidance to be used by it in implementing the FATCA provisions.  The Treasury regulations and guidance contain a number of phased-in dates for compliance with their various rules and additional guidance (including the forms to be used to determine compliance with the FATCA provisions) is forthcoming.  It is uncertain when all necessary guidance regarding the FATCA provisions will be released.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of New Common Equity.

D.    *Information Reporting and Backup Withholding*

The Debtors and Reorganized Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder,

such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 28 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XI.
## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

K&E 28166809

Dated:  November 13, 2013            Longview Power, LLC (for itself and all Debtors)

By: _____
Name:     Jeffery L. Keffer
Title:      President and Chief Executive Officer


Prepared by:

Richard M. Cieri (admitted *pro hac vice*)          Daniel J. DeFranceschi (No. 2732)
Paul M. Basta, P.C. (admitted *pro hac vice*)       Paul N. Heath (No. 3704)
Ray C. Schrock, P.C. (admitted *pro hac vice*)      Zachary I. Shapiro (No. 5103)
**KIRKLAND & ELLIS LLP**                             Marisa A. Terranova (No. 5396)
601 Lexington Avenue                                 **RICHARDS, LAYTON & FINGER, P.A.**
New York, New York 10022-4611                        One Rodney Square
Telephone:      (212) 446-4800                       920 North King Street
Facsimile:      (212) 446-4900                       Wilmington, Delaware 19801
                                                     Telephone:      (302) 651-7700
- and -                                              Facsimile:      (302) 651-7701

Ryan Preston Dahl (admitted *pro hac vice*)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

82