**<u>EXHIBIT B</u>**

**Draft 11/~~15~~20/2013**
**SUBJECT TO CONTINUED NEGOTIATIONS**

SENIOR SECURED SUPERPRIORITY

DEBTOR-IN-POSSESSION CREDIT AGREEMENT


Dated as of _____

among

LONGVIEW INTERMEDIATE HOLDINGS C, LLC,
as Holdings,

LONGVIEW POWER, LLC,
as Borrower,

THE LENDERS PARTY HERETO FROM TIME TO TIME

and

THE BANK OF NOVA SCOTIA,
as Administrative Agent and Synthetic L/C Issuing Bank

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

Section 1.01    Defined Terms ..................................................................................................1
Section 1.02    Terms Generally ............................................................................................35

ARTICLE II
THE CREDITS

Section 2.01    Commitments ..................................................................................................36
Section 2.02    Loans and Borrowings Generally ..................................................................36
Section 2.03    Requests for Borrowings ...............................................................................36
Section 2.04    [Reserved] ......................................................................................................37
Section 2.05    [Reserved] ......................................................................................................37
Section 2.06    [Reserved] ......................................................................................................37
Section 2.07    Synthetic Letters of Credit.............................................................................37
Section 2.08    Funding of Borrowings...................................................................................41
Section 2.09    Interest Elections ...........................................................................................42
Section 2.10    Termination and Reduction of Commitments ................................................43
Section 2.11    Repayment of Loans Generally; Evidence of Debt ........................................43
Section 2.12    Repayment of Loans.......................................................................................44
Section 2.13    Prepayment of Loans......................................................................................45
Section 2.14    Fees.................................................................................................................45
Section 2.15    Interest ............................................................................................................46
Section 2.16    Alternate Rate of Interest................................................................................47
Section 2.17    Increased Costs...............................................................................................47
Section 2.18    Break Funding Payments................................................................................48
Section 2.19    Taxes ..............................................................................................................48
Section 2.20    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.................51
Section 2.21    Mitigation Obligations; Replacement of Lenders .........................................52
Section 2.22    Illegality..........................................................................................................53
Section 2.23    [Reserved] ......................................................................................................53
Section 2.24    [Reserved] ......................................................................................................53
Section 2.25    [Reserved] ......................................................................................................53
Section 2.26    [Reserved] ......................................................................................................53
Section 2.27    [Reserved] ......................................................................................................53
Section 2.28    [Reserved] ......................................................................................................54
Section 2.29    [Reserved] ......................................................................................................54
Section 2.30    [Reserved] ......................................................................................................54
Section 2.31    Defaulting Lenders.........................................................................................54
Section 2.32    Conversion to Exit Facility ............................................................................54

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.01    Organization; Power and Authority................................................................56
Section 3.02    Ownership of Equity Interests .......................................................................56

i

Section 3.03     Authorization; No Conflict..................................................................56
Section 3.04     Enforceability........................................................................................57
Section 3.05     Governmental Approvals.......................................................................57
Section 3.06     Financial Statements.............................................................................57
Section 3.07     No Material Adverse Effect...................................................................57
Section 3.08     Title to Properties; Possession Under Leases........................................57
Section 3.09     Litigation; Compliance with Laws.........................................................59
Section 3.10     Federal Reserve Regulations.................................................................60
Section 3.11     Investment Company Act.......................................................................60
Section 3.12     Taxes......................................................................................................60
Section 3.13     Disclosure and Projections....................................................................60
Section 3.14     Employee Matters..................................................................................61
Section 3.15     Environmental Matters; Hazardous Materials.......................................61
Section 3.16     [Reserved]..............................................................................................64
Section 3.17     Single Purpose Entity; Separateness......................................................64
Section 3.18     Non-Environmental Permits..................................................................65
Section 3.19     [Reserved]..............................................................................................66
Section 3.20     Energy Regulation.................................................................................66
Section 3.21     No Default...............................................................................................66
Section 3.22     Intellectual Property..............................................................................66
Section 3.23     [Reserved]..............................................................................................66
Section 3.24     Utilities and Other Services...................................................................66
Section 3.25     Reorganization Matters.........................................................................66
**Section 3.26     Capital Leases........................................................................................67**

ARTICLE IV
CONDITIONS PRECEDENT

Section 4.01     Conditions Precedent to the Effective Date...........................................67
Section 4.02     Conditions Precedent to Each Loan.......................................................70

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.01     Use of Proceeds and Project Revenues.............................................~~70~~**71**
Section 5.02     Warranty of Title...................................................................................71
Section 5.03     Notices...................................................................................................71
Section 5.04     Financial Statements.............................................................................73
Section 5.05     Maintenance of Existence......................................................................74
Section 5.06     Maintenance of Records; Access to Properties and Inspections.................75
Section 5.07     Compliance with Laws; Applicable Longview Permits...........................75
Section 5.08     [Reserved]..............................................................................................76
Section 5.09     [Reserved]..............................................................................................76
Section 5.10     Operation of the Project; Quarterly Operating Report...........................76
Section 5.11     Preservation of Rights; Further Assurances...........................................77
Section 5.12     Maintenance of Insurance......................................................................79
Section 5.13     Taxes, Assessments and Utility Charges................................................80
Section 5.14     [Reserved]..............................................................................................80
Section 5.15     [Reserved]..............................................................................................80
Section 5.16     Separate Existence.................................................................................80
Section 5.17     [Reserved]..............................................................................................81

ii

Section 5.18    U.S.A. Patriot Act ........................................................................................ 81
Section 5.19    Water Supply ................................................................................................ 81
Section 5.20    Engineering and Contracting Executive ...................................................... 81
Section 5.21    [Reserved] .................................................................................................... 81
Section 5.22    Quarterly Calls ............................................................................................. 81
Section 5.23    [Reserved] .................................................................................................... 81
Section 5.24    [Reserved] .................................................................................................... 81
Section 5.25    Milestones .................................................................................................... 81

ARTICLE VI
NEGATIVE COVENANTS

Section 6.01    Contingent Liabilities ................................................................................... 82
Section 6.02    Liens ............................................................................................................ 82
Section 6.03    Indebtedness ................................................................................................. 83
Section 6.04    Restricted Payments ..................................................................................... 83
Section 6.05    Sale of Assets; Merger, Consolidations and Acquisition ............................ 83
Section 6.06    Business Activities ....................................................................................... 84
Section 6.07    No Subsidiaries or Joint Ventures ................................................................ 85
Section 6.08    No Liquidation, Merger or Consolidation .................................................... 85
Section 6.09    Lease Transactions ....................................................................................... 85
Section 6.10    Investments .................................................................................................. 85
Section 6.11    Transactions with Affiliates ......................................................................... 86
Section 6.12    Regulations ................................................................................................... 86
Section 6.13    ERISA .......................................................................................................... 86
Section 6.14    [Reserved] .................................................................................................... 87
Section 6.15    [Reserved] .................................................................................................... 87
Section 6.16    Amendments to Major Longview Project Contracts ..................................... 87
Section 6.17    Subcontractor ............................................................................................... 87
Section 6.18    Additional Longview Project Contracts ....................................................... 87
Section 6.19    Fiscal Year, Name, Location and EIN .......................................................... 87
Section 6.20    [Reserved] .................................................................................................... 87
Section 6.21    Hazardous Materials ..................................................................................... 87
Section 6.22    Commodity Hedging Agreements; Mepco Hedging Agreements ................. 87
Section 6.23    Prepayment or Modification of Debt ............................................................ 88
Section 6.24    Sale and Lease-back Transactions ................................................................ 88
Section 6.25    Modification of Certificate of Incorporation, By-laws, and Certain Other
               Agreements, Etc. .......................................................................................... 88
Section 6.26    [Reserved] .................................................................................................... 89
Section 6.27    Minimum Consolidated EBITDAR ............................................................. 89
Section 6.28    Budget Variance ........................................................................................... 89
Section 6.29    Chapter 11 Cases .......................................................................................... 90
Section 6.30    Communications with Bankruptcy Court ..................................................... 91

ARTICLE VII
EVENTS OF DEFAULT

Section 7.01    Events of Default .......................................................................................... 91
Section 7.02    Remedies ...................................................................................................... 95

105095838 v12105095838 v12

ARTICLE VIII
THE AGENTS

Section 8.01    Appointment.................................................................................96
Section 8.02    Nature of Duties............................................................................96
Section 8.03    Resignation by or Removal of the Agents.....................................97
Section 8.04    Each Agent in its Individual Capacity............................................97
Section 8.05    Indemnification.............................................................................97
Section 8.06    Lack of Reliance on Agents...........................................................98
Section 8.07    Protective Advances......................................................................98

ARTICLE IX
MISCELLANEOUS

Section 9.01    Notices..........................................................................................98
Section 9.02    Survival of Agreement..................................................................99
Section 9.03    Binding Effect...............................................................................99
Section 9.04    Successors and Assigns..................................................................99
Section 9.05    Expenses; Indemnity...................................................................102
Section 9.06    Right of Set-off...........................................................................103
Section 9.07    APPLICABLE LAW...................................................................103
Section 9.08    Waivers; Amendment..................................................................103
Section 9.09    Interest Rate Limitation...............................................................105
Section 9.10    Entire Agreement........................................................................105
Section 9.11    Waiver of Jury Trial....................................................................105
Section 9.12    Severability..................................................................................105
Section 9.13    Counterparts................................................................................105
Section 9.14    Headings......................................................................................105
Section 9.15    Jurisdiction; Consent to Service of Process.................................106
Section 9.16    Confidentiality.............................................................................106
Section 9.17    Communications..........................................................................107
Section 9.18    Release of Liens...........................................................................108
Section 9.19    U.S.A. Patriot Act.......................................................................108

Exhibits, Schedules and Appendices

Exhibit A                   Form of Administrative Questionnaire
Exhibit B-1                 Form of Assignment and Assumption
                           [Reserved]
                           [Reserved]
Exhibit D                   Form of Consent
                           [Reserved]
Exhibit E-2                 Form of Term Loan Note
Exhibit F                   Form of Certificate of Non-U.S. Lender
Exhibit G                   [Reserved]
Exhibit H                   Form of Final DIP Order
Exhibit I                   Form of Variance Report


Schedule 1.01(a)           Initial Interest Rate Hedging Agreements
Schedule 1.01(b)           Longview Permitted Debt
Schedule 1.01(c)           Longview Permitted Liens
Schedule 1.01(c)(i)        Longview Project Contracts
Schedule 1.01(d)           Mepco Permitted Debt
Schedule 1.01(e)           Mepco Permitted Liens
Schedule 1.01(f)           Subsidiary Guarantor
Schedule 1.01(g)           Draw Schedule
Schedule 2.01              Commitments
Schedule 3.01              Organization and Good Standing
Schedule 3.02              Ownership of Equity Interest
Schedule 3.09(a)           Litigation
Schedule 3.09(b)           Violations
Schedule 3.12              Taxes
Schedule 3.15(a)(i)        Longview Environmental Matters
Schedule 3.15(a)(ii)       Hazardous Materials
Schedule 3.15(b)(i)        Mepco Environmental Matters
Schedule 3.15(b)(ii)       Mining Financial Assurances
Schedule 3.18(a)           Permits
Schedule 3.18(c)           Pending Mine Permits
Schedule 3.23 3.26         Perfection Requirements Capital Leases
Schedule 4.01(j)           Repair Timetable
Schedule 5.12(a)           Longview Insurance
Schedule 5.12(b)           Mepco Insurance
Schedule 6.10(b)           Investment
Schedule 6.11              Transactions with Affiliates
Schedule 9.01              Notice Addresses


Appendix I-A               Updated Construction Budget
Appendix I-B               Updated Project Schedule

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of [_____] (this "Agreement"), among LONGVIEW INTERMEDIATE HOLDINGS C, LLC, a Delaware limited liability company ("Holdings") LONGVIEW POWER, LLC, a Delaware limited liability company (the "Borrower"), the LENDERS PARTY HERETO FROM TIME TO TIME, and THE BANK OF NOVA SCOTIA, as administrative agent for the Lenders (in such capacity, and together with any successor administrative agent appointed pursuant to the provisions of Section 8.03, the "Administrative Agent") and as Synthetic L/C Issuing Bank.

## W I T N E S S E T H :

WHEREAS, on August 30, 2013 (the "Petition Date"), the Borrower and the Guarantors (as defined below) (collectively, the "Debtors" and each individually, a "Debtor") commenced a case (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, the Prepetition Lenders (as defined below) provided financing to the Borrower pursuant to that certain Credit Agreement, dated as of February 28, 2007 (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Credit Agreement"), among the Borrower, Holdings, Citicorp North America, Inc., as administrative agent (in such capacity, "Prepetition Agent"), and the several banks and other financial institutions or entities from time to time party thereto (collectively, the "Prepetition Lenders");

WHEREAS, each of the Prepetition Guarantors (as defined below) guaranteed the Borrower's obligations under the Prepetition Credit Agreement pursuant to the Security Documents (as defined in the Prepetition Credit Agreement); and

WHEREAS, the Debtors have requested the Lenders make post-petition loans and advances and provide other financial or credit accommodations to the Debtors, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured multi-draw credit facility to the Borrower, comprised of an up to $150,000,000 delayed draw term loan facility of which a principal amount of $5,000,000 will be available to be drawn in a single drawing following the entry of the Final DIP Order (as defined below) and of which $30,000,000 will be available to cash collateralize letters of credit under the Synthetic L/C Facility.

NOW, THEREFORE, the Lenders are willing to extend the credit described above to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## A G R E E M E N T :

## ARTICLE I
## DEFINITIONS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"ABR" shall when used in reference to any Loan or Borrowing, mean whether such Loan or Loans, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of Article II.

"Addendum" shall mean an agreement substantially in the form of Exhibit B-2 by which an [Additional Term Loan Lender] becomes a party to this Agreement *as of the Effective Date*.

"Additional Longview Project Contract" shall mean each Longview Project Contract entered into by, or assigned to, the Borrower subsequent to the Effective Date.

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the product of (a) the LIBO Rate in effect for such Interest Period and (b) Statutory Reserves applicable to such Eurodollar Borrowing, if any, provided that, notwithstanding the foregoing, the Adjusted LIBO Rate shall be no lower than 1.50%.

"Administrative Agent" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Administrative Agent Fee Letter" shall mean the Senior Secured Debtor-in-Possession Credit and Chapter 11 Exit Financing Fee Letter dated as of November 1, 2013, between the Administrative Agent and the Borrower.

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit A.

"Affiliate" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For the avoidance of doubt, GenPower, First Reserve GP and Dunkard and each of their Affiliates are Affiliates of the Borrower.

"Agent Parties" shall have the meaning assigned to such term in Section 9.17(c).

"Agents" shall mean the Administrative Agent and the Collateral Agent.

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this agreement.

"Alternate Base Rate" shall mean, for any day, a rate *per annum* equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) 2.50%.  If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate, including the failure of the Federal Reserve Bank of New York to publish rates or the inability of the Administrative Agent to obtain quotations in accordance with the terms thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"Applicable Longview Permit" shall mean, at any time, any Permit that is (a) necessary to be obtained by or on behalf of the Borrower at such time in light of the stage of development, construction or operation of the Project to enable the Borrower to construct, test, operate, maintain, repair, own its interest in, or use the Project as contemplated by the Longview Transaction Documents, sell electricity from the Project, enter into any Longview Transaction Document or consummate and/or perform any transaction or obligation contemplated hereby or thereby, including all environmental, regulatory and other permits and approvals, (b) necessary so that none of the Lender Parties or any other Secured Party (other than the EPC Contractors) may be deemed by any Governmental Authority to be subject to regulation under the FPA or

2

PUHCA 2005 or under any state laws or regulations respecting the rates of, or the financial or organizational regulation of, electric utilities solely as a result of the Borrower's construction, ownership, operation or control of the Project or the sale of electricity therefrom, or (c) listed as such on Schedule 3.18.

"Applicable Margin" shall mean (a) with respect to any Eurodollar Loan, 7.50% and (b) with respect to any ABR Loan, 6.50%.

"Approved Fund" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by a Lender, an Affiliate of a Lender or an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Plan" shall have the meaning set forth in Section 2.32.

"Approved Disclosure Statement" shall have the meaning set forth in Section 5.25.

"Assignment and Assumption" shall mean an assignment and assumption entered into by a Lender and an assignee, accepted by the Administrative Agent and consented to by the Administrative Agent, in the form of Exhibit B-1 or such other form as shall be approved by the Administrative Agent.

["Backstoppers" shall mean Lenders that are the financial institutions party to the Commitment Letter (and any of their affiliates or any funds managed or advised by their affiliates) providing backstop commitments for the Facility to the Borrower; provided that if at any time the Backstoppers hold less than 33-1/3% of the aggregate outstanding Commitments (or if the Commitments have been reduced to $0, the aggregate outstanding principal amount of the Loans), then "Backstoppers" shall mean the Lenders holding more than [___]% of the aggregate outstanding Commitments (or if the Commitments have been reduced to $0, the aggregate outstanding principal amount of the Loans).]

"Bankruptcy Code" shall have the meaning assigned to such term in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals to this Agreement.

"Base Rate" shall mean the rate of interest published by the *Wall Street Journal* from time to time as the "prime rate".

"Black Lung Act" shall mean the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901, et seq., the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, et seq., the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978), and the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, Title 11, 95 Stat. 1643, in each case as amended.

"Black Lung Liabilities" shall mean any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law, including any Mining Law.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Boiler Island Supplier" shall mean Foster Wheeler North America Corp., a Delaware corporation.

3

"Boiler Island Supplier Parent Guarantee" shall mean the Guarantee, dated as of the Initial Closing Date, by Foster Wheeler LLC in favor of the Borrower guaranteeing the performance by the Boiler Island Supplier of all of the Boiler Island Supplier's obligations under the Boiler Supply Agreement.

"Boiler Supply Agreement" shall mean the Agreement for Boiler Island Equipment, dated as of January 26, 2007, between the Borrower and the Boiler Island Supplier.

"Borrower" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Borrowing" shall mean a group of Loans of a single Type under a single Facility and made on a single date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.03.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in the applicable currency in the London interbank market.

"Capital Lease Obligations" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP provided that any existing obligations which are classified as operating lease obligations and similar future obligations which are recharacterized or characterized as capital lease obligations due to a change in accounting rules after the Effective Date shall for all purposes of this Agreement not be treated as Capital Lease Obligations. With respect to any such characterization or recharacterization, the Borrower shall not be required to provide any notices of changes in GAAP under Section 1.02(h).  Any lease of assets that would have qualified for operating lease treatment per GAAP as of the Effective Date shall not be construed as either a Capital Lease Obligation or be included in Capital Expenditures for the purposes of this Agreement.

"Carve-Out" shall have the meaning assigned to such term in the Final DIP Order.

"Casualty Event" shall mean, with respect to any property of any Person, any loss of title with respect to such property or any loss of or damage to or destruction of, or any condemnation or other taking (including by any Governmental Authority) of, such property for which such Person or any of its Subsidiaries receives insurance proceeds or proceeds of a condemnation award or other compensation.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Effective  Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Effective Date or (c) compliance by any Lender (or, for purposes of Section 2.17(b), by any lending office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law but if not having the force of law, then being one with which the relevant party would customarily comply) of any Governmental Authority made or issued after the Effective Date; provided, however, that notwithstanding anything herein to the contrary, the

Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith as well as Basel III and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities which are enacted, adopted or issued before, on or after the Effective Date shall each be deemed to be a "Change in Law."

A "Change of Control" shall be deemed to occur if at any time (i) Holdings shall fail to own, directly, 100% of the Equity Interests of the Borrower or (ii) any Debtor fails to own, directly or indirectly, the current Equity Interests of any other Debtor that it holds as of the Effective Date.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals to this Agreement.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning assigned to such term in [the Final DIP Order].

"Collateral Agent" shall mean Union Bank, N.A.

"Collateral Agent Fee Letter" shall mean the Senior Secured Debtor-in-Possession Credit and Chapter 11 Exit Financing Fee Letter dated as of [•], 2013, between the Collateral Agent and the Borrower.

"Commitment Letter" shall mean the Commitment Letter dated November 1, 2013, among certain funds and accounts managed by or otherwise affiliated with certain financial institutions party thereto, and The Bank of Nova Scotia, as Administrative Agent, and all of the Debtors.

"Commitments" shall mean, with respect to any Lender, such Lender's commitment to make a Loan to the Borrower hereunder in a principal amount not to exceed the amount set forth opposite such Lender's name on (a) as to any Lender that becomes party to this Agreement on the Effective Date, Schedule 2.01 and (b) in the case of any Lender that becomes party to this Agreement after the Effective Date, the Assignment and Assumption pursuant to which such Lender became a party hereto and assumed a portion of the Commitments, in either case, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Commitments is $150,000,000.

"Committee" shall mean, collectively, if applicable, the official committee of unsecured creditors and any other official committee formed, appointed or approved in any Chapter 11 Case and each of such committees shall be referred to herein as a "Committee".

"Commodity Hedging Agreement" shall mean any power and/or capacity purchase and sale agreement (including but not limited to physical call options and heat rate options), hedging agreement (including each schedule or confirmation entered into pursuant to a master agreement or similar agreement) providing for any swap, cap, collar, put, call, floor, future, option, spot, forward or credit sleeve, fuel purchase and sale agreement, emissions credit or allowance purchase and sale agreement, power transmission agreement, fuel transportation agreement, fuel storage agreement, electric transmission agreement, ancillary services purchase and sale agreement, netting agreement or similar agreement entered into by the Borrower in respect of any commodity (including but not limited to natural gas and other commodities that are not purchased or sold by the Borrower in connection with the Project but that serve to hedge the price of coal or other Project inputs or sales of electricity or purchases or sales of any other

105095838 v12105095838 v12

commodities by the Borrower), any energy management agreement, and any agreement providing for credit support for any of the foregoing, in all cases whether settled physically or financially.

"Communications" shall have the meaning assigned to such term in Section 9.17(a)(i).

"Consent" shall have the meaning set forth in the Prepetition Credit Agreement.

"Consolidated Debt" at any date shall mean (without duplication) all Indebtedness consisting of Capital Lease Obligations, Indebtedness for borrowed money (other than letters of credit to the extent undrawn) and Indebtedness in respect of the deferred purchase price of property or services of Holdings and its Subsidiaries determined on a consolidated basis on such date.

"Consolidated EBITDAR" shall mean, for any period, the Consolidated Net Income of Holdings and its Subsidiaries for such period *plus*:

(a)    without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of:

(i)    Consolidated Interest Expense for such period and to the extent not reflected in Consolidated Interest Expense, costs of surety bonds in connection with financing activities,

(ii)    income, withholding, franchise and similar tax expense for such period to the extent attributable to such period (and not retroactively or prospectively),

(iii)    all amounts attributable to depreciation and amortization for such period,

(iv)    [Reserved],

(v)    the amount of any restructuring charges, fees, costs and expenses for such period (which, for the avoidance of doubt, shall include (i) retention, severance, systems establishment cost or excess pension, other post-employment benefits, curtailment or other excess charges), provided that with respect to each such restructuring charge, Holdings or the Borrower shall have delivered to the Administrative Agent and the Backstoppers an officers' certificate specifying and quantifying such expense or charge and stating that such expense or charge is a restructuring charge and (ii) any fees and expenses owing by the Debtors to the Debtors' professionals or other advisors (including, for the avoidance of doubt, fees and expenses owing to Dentons LLP) or the Lenders' professionals,

(vi)    extraordinary losses and non-recurring cash charges, severance, relocation costs and curtailments or modifications to pension and post-retirement employee benefit plans for such period, provided that, for the avoidance of doubt, any losses, charges, costs, curtailments or modifications as a result of the loss of functionality or availability of the Project or any operational issues with respect to Mepco and the Mepco Subsidiaries shall not be included in this clause (a)(vi),

(vii)    any non-cash loss attributable to the mark-to-market movement in the valuation of Hedging Agreements or other derivative instruments (to the extent the cash impact resulting from such loss has not been realized), in each case, that are not in default or subject to termination, pursuant to GAAP,

105095838 v12105095838 v12

(viii)    the minority interest expense consisting of subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary that is a Subsidiary in such period or any prior period, except to the extent of dividends declared or paid on Equity Interests held by third parties, and

(ix)    [Reserved];

plus

(b)    to the extent not otherwise included in Consolidated Net Income, all net payments received (or minus all net payments made) by Holdings or any Subsidiary under any Permitted Commodity Hedging Agreements, including any such payments received (or subtracting all net payments made) after the end of a period to the extent allocable to such period and not allocable to any other period;

*minus*

(c)    without duplication,

(i)    [Reserved];

(ii)    to the extent included in determining such Consolidated Net Income, any extraordinary gains and all non-cash items of income for such period, all determined in accordance with GAAP; provided that, the amount of any proceeds from any customer resulting from any settlement related to any causes of action shall not be included in this clause (c)(ii); and

(iii)    any non-cash gain attributable to the mark-to-market movement in the valuation of Hedging Agreements or other derivative instruments (to the extent the cash impact resulting from such gain has not been realized), in each case, that are not in default or subject to termination, pursuant to GAAP.

For the avoidance of doubt, there shall be no adjustments to Consolidated EBITDAR arising from, or otherwise in respect of, any non-cash losses or gains attributable to the early extinguishment of Indebtedness.

"Consolidated Interest Expense" shall mean, for any period, the sum of (a) the cash interest expense (including imputed interest expense in respect of Capital Lease Obligations) of Holdings and its Subsidiaries for such period with respect to Consolidated Debt (including all commissions, discounts and other fees and charges owed by Holdings and its Subsidiaries with respect to letters of credit and bankers' acceptance financing), in each case determined in accordance with GAAP, plus (b) any interest accrued during such period in respect of Consolidated Debt of Holdings and its Subsidiaries that is required to be capitalized rather than included in interest expense for such period in accordance with GAAP. Notwithstanding anything to the contrary in the foregoing, any accrued expense or other charge with respect to Indebtedness incurred by the Debtors prior to the Petition Date shall not be included in the definition of Consolidated Interest Expense.

"Consolidated Net Income" shall mean, for any period, the consolidated net income (or loss) of Holdings and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that,

7

the amount of any proceeds from any customer resulting from any settlement related to any causes of action shall not be included in Consolidated Net Income.

"Construction Services Agreement" shall mean the Construction Services Agreement, dated as of January 26, 2007, between the Borrower and the Constructor, as supplemented by the applicable Consent.

"Constructor" shall mean Aker Construction, Inc., formerly known as Aker Kvaerner Songer, Inc., a Delaware corporation.

"Constructor Parent Guarantee" shall mean the Guarantee, dated as of the Initial Closing Date, by Aker Kvaerner ASA in favor of the Borrower guaranteeing the performance by the Constructor of all of the Constructor's obligations under the Coordination Agreement and the Construction Services Agreement, as supplemented by the applicable Consent.

"Consummation Date" shall mean the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order, in form and substance reasonably satisfactory to the Backstoppers, of the Bankruptcy Court.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Conveyor Belt Documents" shall mean the Coal Conveyor System Construction and Sale/Leaseback Agreement, dated as of September 1, 2008, between the Borrower and Mepco Conveyor, LLC as amended on December 31, 2008, the Construction Easement Agreement, dated as of September 1, 2008, between the Borrower and Mepco Conveyor, LLC, the Construction Sublease Agreement, dated as of September 1, 2008, between the Borrower and Mepco Conveyor, LLC, the Memorandum of Construction  Sublease Agreement, dated September 1, 2008, between the Borrower and Mepco Conveyor, LLC and the Security Agreement, dated as of September 1, 2008, between Mepco Conveyor, LLC and the Borrower.

"Coordination Agreement" shall mean the Coordination Agreement, dated as of January 26, 2007, among the Borrower, the Turbine Island Supplier and the Constructor, as supplemented by the applicable Consent.

"Covenant Budget" shall mean, collectively, the initial Thirteen Week Budget delivered on the Effective Date of this Agreement and, subject to the following proviso, the updated Thirteen Week Budget delivered in accordance with Section 5.04(g) on [●], 2013[1] and each ~~Monday~~**Wednesday** thereafter that is four weeks after delivery of the most recent updated Thirteen Week Budget; provided, that no such updated Thirteen Week Budget shall become the Covenant Budget unless and until the Backstoppers, in their reasonable discretion, consent to such updated Thirteen Week Budget becoming the Covenant Budget.

"Debtor" shall have the meaning assigned to such term in the recitals to this Agreement.

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

---

[1] To be the ~~Monday~~**Wednesday** that is approximately 4 weeks after the Effective Date of the DIP facility.

~~105095838 v12~~**105095838 v12**

"Defaulting Lender" shall mean, subject to Section 2.31(b), any Lender that (a) has failed to (i) fund its portion of any Borrowing unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the Collateral Agent, the Synthetic L/C Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent, to confirm in writing to the Administrative Agent that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.31(b)) upon delivery of written notice of such determination to the Borrower, the Collateral Agent, the Synthetic L/C Issuing Bank and each Lender.

"DIP Motion" shall have the meaning assigned to such term in Section 4.01(c).

"Dollars" or "$" shall mean lawful money of the United States of America.

"Draw Schedule" shall mean (a) for the period from the Effective Date through March 31, 2014, the schedule of Borrowings to be made hereunder during such period, which shall have been delivered by the Borrower to the Administrative Agent and the Backstoppers not less than  [five (5)] Business Days prior to the Effective Date as set forth on Schedule 1.01(g) and in form and substance (including with respect to the timing, amount and use of proceeds of each such Borrowing) reasonably satisfactory to the Backstoppers, and (b) for all periods thereafter, a schedule of Borrowings to be made hereunder during such periods, which shall be delivered by the Borrower to the Administrative Agent, the Backstoppers and the other Lenders no later than five (5) days prior to the Consummation Date for the Approved Plan and shall be in form and substance (including with respect to the timing, amount and use of proceeds of each such Borrowing) reasonably satisfactory to the Backstoppers.  In the event that the Backstoppers do not agree to a proposed schedule of Borrowings delivered pursuant to the foregoing clause (b), the Draw Schedule for all periods subsequent to March 31, 2014 shall be deemed to provide for no Borrowings hereunder. The Draw Schedule may be updated, in the sole discretion of the Backstoppers, at the direction of, or with the approval of, the Backstoppers, to reflect updates to the Thirteen Week Budget and/or the Long Term

105095838 v12105095838 v12

Budget, in accordance with the definitions thereof; provided, that no updated Draw Schedule shall provide for any additional or increased Borrowings occurring fewer than fifteen (15) days after the date on which the Backstoppers have approved such updated Draw Schedule. For the avoidance of doubt, in no way shall anything in this definition withdraw, remove, condition or otherwise modify the Backstoppers' commitment and obligations to provide exit financing to the Debtors consistent with the Commitment Letter.

"Dunkard" shall mean Dunkard Creek Water Treatment System, LLC, a Delaware limited liability company.

"Dunkard Facilities" shall mean the "Facilities" as defined in the Water Supply Agreement.

"Effective Date" shall mean the date on which this Agreement becomes effective in accordance with its terms.

"Engineering and Contracting Executive" shall mean a person or entity reasonably acceptable to the Backstoppers and the Debtors who will, under the supervision of Charles W. Huguenard (in Mr. Huguenard's capacity as Senior Vice President & General Manager of Longview Power, LLC), work with Mr. Huguenard, the Debtors' other consultants and employees, and the Backstoppers' consultants with regard to the repair of the Project, including, among other things, participation in the selection of any subcontractors who will complete the repair, the negotiation of any agreements under which the repair will be completed (including the agreements of any of the Debtors' consultants), any design and engineering necessary to be completed, and who will, subject to such supervision, have full access to the Debtors' resources (including personnel, third parties, the Project, and information) reasonably necessary to complete all of the Engineering and Contracting Executive's responsibilities (which responsibilities shall include, among other things, reporting to the Backstoppers on a schedule to be agreed). The Engineering and Contracting Advisor will work with Mr. Huguenard, the Debtors' other consultants and employees and the Backstoppers' consultants to enter into, modify, and cancel any such agreements (to the extent necessary) in the future. The costs and expenses incurred by the Engineering and Contracting Executive in undertaking the foregoing tasks shall be in the Long Term Budget and approved by the Backstoppers.

"Environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata or sediment, natural resources such as flora and fauna or as otherwise defined in any Environmental Law.

"Environmental Consultant" shall mean [●] or another nationally recognized environmental consultant selected by the Administrative Agent and *reasonably acceptable to the* Borrower.

"Environmental Law" shall mean, collectively, all federal, state, local or foreign laws, including common law, ordinances, regulations, rules, codes, orders, judgments or other requirements or rules of law that relate to (a) the prevention, abatement or elimination of pollution, or the protection of the Environment, natural resources or human health (to the extent relating to exposure to Hazardous Materials), or natural resource damages, and (b) the use, generation, handling, treatment, storage, disposal, Release, transportation or regulation of or exposure to Hazardous Materials, including the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Clean Water Act, 33 U.S.C. §§ 1251 et seq., the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq., the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§ 11001 et seq., each as

10

amended, and their foreign, state or local counterparts or equivalents. When used with respect to the Mepco Group Members, the term "Environmental Laws" shall also includes all Mining Laws.

"Environmental or Mining Claim" shall mean any notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the Environment; (d) in connection with the Reclamation, or alleged need for Reclamation, of the Mines; or (e) in connection with any Black Lung Liability.

"Environmental or Mining Permit" shall mean any Mine Permit or other permit, approval, consent, notification, certification, registration, authorization, exemption or qualification required for coal mining (including the construction, maintenance and operation of any coal mine or related processing facilities), Reclamation or otherwise required under Environmental Law or Mining Law for the operation or occupation of the Project Site or the Improvements or any other Real Property, including the Mortgaged Property.

"Environmental Site Assessment" shall mean (a) the report entitled "'All Appropriate Inquiry' Phase I Environmental Site Assessment," dated November 2006, delivered by L. Robert Kimball & Associates, Inc. (as supplemented by the letter titled "Re: Green County Phase I ESA Comments," dated December 13, 2006, delivered by L. Robert Kimball & Associates, Inc.), and (b) the report entitled "Phase I Environmental Site Assessment Report Proposed Longview Power Properties," dated January 5, 2007, delivered by Marshall Miller & Associates, Inc. (as corrected by the letter titled "Re: Phase I Environmental Site Assessment Report for the Proposed Longview Power Properties," dated January 23, 2007, delivered by Marshall Miller & Associates, Inc. as updated by the "Phase I Environmental Site Assessment Update Longview Power Properties Morgantown, West Virginia," dated April 29, 2011, delivered by Marshall Miller & Associates, Inc.), in each case including all exhibits, appendices and any other attachments thereto.

"EPC Contractors" shall mean the Turbine Island Supplier, the Constructor and the Boiler Island Supplier.

"EPC Contracts" shall mean the Coordination Agreement, the Construction Services Agreement, the Equipment Supply Agreement and the Boiler Supply Agreement.

"EPC Documents" shall mean the EPC Contracts, the Constructor Parent Guarantee, the Turbine Island Supplier Parent Guarantee and the Boiler Island Supplier Parent Guarantee.

"Equipment Supply Agreement" shall mean the Equipment Supply Agreement, dated as of January 26, 2007, between the Borrower and the Turbine Island Supplier, as supplemented by the applicable Consent.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

11

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event; (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA, or the occurrence of any event or condition which could be reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; or (h) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to the Borrower.

"Estimation Motion" shall mean a motion to estimate the claims (including validity, amount, priority, and status as secured or non-secured) of the Mechanics' Lien Claimants, in form and substance reasonably satisfactory to the Backstoppers and the Debtors, which shall include a request for a hearing with regard thereto within 55 days of the filing of such motion. The Estimation Motion shall request that the Mechanics' Lien Claims be estimated for all purposes, including, without limitation, for plan and voting purposes.

"Eurodollar" shall, when used in reference to any Loan or Borrowing, refer to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Excess Proceeds" shall have the meaning assigned to such term in Section 2.07(b)(iv).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" shall mean, with respect to any Lender Party or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Loan Party under any Loan Document, (a) any income or franchise taxes imposed on (or measured by) its net income or net profits by the United States of America (or any political subdivision thereof) or by the jurisdiction under the laws of which such recipient is organized or in which its principal office (or other fixed place of business) is located or, in the case of any Lender, in which its applicable lending office is located or any jurisdiction in which such recipient is otherwise engaged in a trade or business as a result of transactions unrelated to the Loan Documents; (b) any branch profits tax or any similar tax that is imposed by any jurisdiction described in clause (a) above; (c) other than in the case of an assignee pursuant to a request by the Borrower under

12

105095838 v12105095838 v12

Section 2.21(b), any withholding tax imposed by the United States of American (or any political subdivision thereof) or by the jurisdiction under the laws of which the Borrower is organized or in which its principal office (or other fixed place of business) is located that is in effect (including FATCA) and would apply to amounts payable hereunder to such Lender at the time such Lender Party becomes a party to any Loan Document (or designates a new lending office), except to the extent that such Lender Party or other recipient (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.19(a) or Section 2.19(c); and (d) any withholding taxes attributable to such Lender Party's or such other recipient's failure (other than as a result of a Change in Law) to comply with Section 2.19(e), (f), (g), and (h), as applicable; provided, however, that the term "Excluded Taxes" shall not include any taxes that are imposed or otherwise due as a result of any action undertaken by one or more of such Lender Parties to collect funds due hereunder or under any other Loan Document or enforce or exercise its rights or pursue any remedy provided hereunder or under any other Loan Document.

"Exit Facility" shall mean the commitments and extensions of credit under the credit facility referred to in Section 2.32.

"Exit Facility Documentation" shall mean the definitive documentation for the Exit Facility, including the loan agreement, collateral agreements, mortgages and other security agreements, and other related documents and instruments.

"Facility" and "Facilities" shall mean (a) the Commitments and the extensions of credit made hereunder by the Lenders and/or (b) the Synthetic L/C Facility.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average (rounded upward, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average (rounded upward, if necessary, to the next 1/100 of 1%) of the quotations for the day of such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Federal Mine Safety Act" shall mean the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 931, et. seq., as amended.

"Fees" shall mean the fees payable pursuant to Section 2.14.

"FERC" shall mean the United States Federal Energy Regulatory Commission, or successor entity.

"Final DIP Order" shall mean the order entered by the Bankruptcy Court in substantially the form of Exhibit H and otherwise reasonably acceptable to the Debtors, the Administrative Agent and the Backstoppers.

"Financial Officer" of any Person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such Person.

105095838 v12105095838 v12

"First Reserve" shall mean First Reserve Fund XI, L.P., a Delaware limited partnership.

"First Reserve GP" shall mean First Reserve GP XI, L.P., a Delaware limited partnership.

"FPA" shall mean the Federal Power Act, as amended, and all rules and regulations adopted thereunder.

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, subject to the provisions of Section 1.02.

"GenPower" shall mean GenPower Holdings (Delaware), L.P., a Delaware limited partnership.

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"Governmental Rule" shall mean, with respect to any Person, any law, rule, regulation, ordinance, order, code, treaty, judgment, decree, directive, guideline, policy or similar form of decision of any Governmental Authority binding on such Person.

"Group Member" shall mean Holdings and each of its Subsidiaries.

"Guarantee" of or by any Person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take or pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guarantee issued to support such Indebtedness, or (b) any Lien on any assets of the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other Person, whether or not such Indebtedness is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement.

"Guarantee and Security Agreement" shall mean the Guarantee and Security Agreement, dated as of the date hereof, among the Borrower, the Guarantors from time to time party thereto and the Collateral Agent.

"Guarantors" shall mean collective Holdings and the Subsidiary Guarantors.

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum

14

distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature, in each case subject to regulation or which can give rise to liability under any Environmental Law.

"Hazardous Materials Activity" shall mean any activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of, or exposure to, any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedging Agreements" shall mean any Commodity Hedging Agreement or any other agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings or any of its Subsidiaries shall be a Hedging Agreement.

"Holdings" shall have the meaning assigned in the introductory paragraph of this Agreement.

"Improvements" shall have the meaning assigned to such term in the Mortgages (as defined in the Prepetition Credit Agreement) to which Longview is a party.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than trade liabilities and intercompany liabilities incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof), (e) all Guarantees by such Person of Indebtedness of others, (f) all Capital Lease Obligations of such Person, (g) all payments that such Person would have to make in the event of an early termination on the date Indebtedness of such Person is being determined in respect of outstanding Hedging Agreements (such payments in respect of any such agreements with a counterparty being calculated subject to and in accordance with any netting provisions in such agreements), and (h) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instruments in respect of which a back-to-back letter of credit has been issued under or as permitted by this Agreement) and (ii) in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Independent Engineer's Report" shall have the meaning set forth in the Prepetition Credit Agreement.

105095838 v12105095838 v12

"Information" shall have the meaning assigned to such term in Section 3.13(a).

"Interconnection Agreement" shall mean the Interconnection Service Agreement, dated as of February 26, 2009, among PJM Interconnection, L.L.C, West Penn Power Company (d/b/a Allegheny Power) and the Borrower.

"Interest Election Request" shall mean the specification by the Borrower of the Type initially applicable to a Borrowing or, as the context may require, a request by the Borrower to convert or continue a Borrowing, in each case in accordance with Section 2.09.

"Interest Payment Date" shall mean (a) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than one month's duration, each day that would have been an Interest Payment Date had successive Interest Periods of one month's duration been applicable to such Borrowing and, in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar month.

"Interest Period" shall mean, as to any Eurodollar Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1 or 3 months thereafter, as the Borrower may elect, or the date any Eurodollar Borrowing is converted to an ABR Borrowing in accordance with Section 2.09 or repaid or prepaid in accordance with Section 2.11, 2.12 or 2.13; provided that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interim Cash Collateral Order" shall mean the order entered by the Bankruptcy Court on September 5, 2013, approving the Debtors' use of cash collateral.

"Intermediate Holdco" shall mean Longview Intermediate Holdings B, LLC.

"Investment" shall have the meaning set forth in Section 6.10.

"Investment Period" shall mean, with respect to any Synthetic L/C Deposit to be invested by the Synthetic L/C Issuing Bank pursuant to Section 2.07(b)(iii), the period beginning on (and including) the date on which such Synthetic L/C Deposit is deposited or on the last day of the preceding Investment Period and ending on (but excluding) the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is three months thereafter; provided, however, that the first Investment Period after the Effective Date shall consist of the period beginning on (and including) the Effective Date and ending on December 31, 2013.

"IRS" shall mean the United States Internal Revenue Service.

"Legal Requirements" shall mean, as to any Person, any requirement under a Permit, and any Governmental Rules, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its properties is subject.

16

105095838 v12105095838 v12

"Lender" shall mean each financial institution listed on Schedule 2.01, as well as any Person that becomes a "Lender" hereunder pursuant to Section 9.04.[2]

"Lender Parties" shall mean the Lenders and the Agents.

"LIBO Rate" shall mean in relation to any Eurodollar Borrowing:

(a)    the applicable Screen Rate as of 11:00 a.m. London time on the Quotation Day for the offering of deposits in the currency of that Eurodollar Borrowing and for a period comparable to the Interest Period for that Eurodollar Borrowing; or

(b)    (if no Screen Rate is available for the currency or Interest Period of that Eurodollar Borrowing) the arithmetic mean of the rates (rounded upwards to four decimal places) as quoted by the Administrative Agent to leading banks in the London interbank market, as of 11:00 a.m. London time, on the Quotation Day for the offering of deposits in the currency of that Eurodollar Borrowing and for a period comparable to the Interest Period for that Eurodollar Borrowing.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" shall mean this Agreement, the Security Documents, any promissory note issued under Section 2.11(e), the Commitment Letter, the Administrative Agent Fee Letter and the Collateral Agent Fee Letter.

"Loan Party" shall mean Holdings, the Borrower and each Subsidiary Guarantor.

"Loans" shall mean any loan made by any Lender pursuant to this Agreement.

"Long Term Budget" shall mean (a) on the Effective Date, a budget on a month by month basis for Holdings and its Subsidiaries through March 31, 2015, which shall be in form and substance reasonably satisfactory to the Backstoppers and at all times shall be subject to modifications made by the Backstoppers in their reasonable discretion, and (b) at all times thereafter, the initial Long Term Budget with any modifications thereto that shall have been requested in writing by the Borrower and consented to by the Backstoppers in their reasonable discretion.

"Longview Capital Expenditures" shall mean, for the Borrower in respect of any period, the aggregate of all expenditures incurred by such Person during such period that, in accordance with GAAP, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such Person.

"Longview O&M Costs" shall mean all actual cash operation and maintenance costs (including (x) capital expenditures incurred in connection with required maintenance of the Project and (y) capital expenditures required by applicable Legal Requirements) incurred and paid by the Borrower for the Project

---

[2] Lenders shall include affiliates of the Backstoppers or any funds managed or advised by affiliates of the Backstoppers.

105095838 v12105095838 v12

in any particular calendar or fiscal year or other period to which said term is applicable, including payments for fuel supply and transportation, ordinary course settlement payments under any Permitted Commodity Hedging Agreement (excluding any termination or liquidation payments owed by the Borrower thereunder), costs of additives or chemicals and transportation costs related thereto, Taxes (other than those based upon the Borrower's income), payments made by the Borrower under or in respect of the PILOT Documents, the O&M Agreement and other Longview Project Contracts, insurance, consumables, spare parts, equipment, materials, repair and maintenance services, payments under any lease, payments under any parts or combustion turbine services agreement, legal fees and consulting fees and expenses in connection with the financing, management, operation or maintenance of the Project, fees paid in connection with obtaining, transferring, maintaining or amending any Permits and reasonable general and administrative expenses, including all expenditures incurred to prevent the occurrence of any default under any Longview Transaction Document or any Default or Event of Default hereunder, and/or to keep the Collateral free and clear of all Liens (other than Permitted Liens).  Longview O&M Costs shall not include (a) distributions of any kind to any Affiliate of the Borrower (other than payments under the Permitted Affiliate Contracts), (b) non-cash charges, including depreciation or obsolescence charges or reserves therefore, amortization of intangibles or other bookkeeping entries of a similar nature, (c) capital expenditures other than those (x) incurred in connection with required maintenance of the Project or (y) required by applicable Legal Requirements and (d) interest charges and charges for the payment or amortization of principal of Indebtedness of the Borrower.  For the avoidance of doubt, Longview O&M Costs shall also include any business franchise tax or similar excise tax imposed on any Affiliate of the Borrower by the State of West Virginia based on such Affiliate's direct or indirect equity investment in the Project.

"Longview Permitted Debt" shall mean:

(a)  Indebtedness incurred under the Loan Documents, as in effect on the Effective Date or as further amended in accordance with the terms thereof and any other Indebtedness existing on the Effective Date and set forth on Schedule 1.01(b);

(b)  trade or other similar Indebtedness incurred in the ordinary course of business (but not for borrowed money) and owing to any Person other than a Debtor or Affiliate of a Debtor and

(i)  not more than 90 days past due or

(ii)  being contested in good faith and by appropriate proceedings;

(c)  contingent liabilities permitted pursuant to Section 6.01 of this Agreement;

(d)  (i) leases of property by the Borrower as lessee that are accounted for as capital leases on the balance sheet of the Borrower with rents paid thereunder (whether calculated on a fixed or percentage basis) and (ii) purchase money Indebtedness incurred by the Borrower to finance the acquisition, lease or improvement of fixed or capital assets prior to, or within 270 days after, such acquisition, lease or improvement, not in excess of the amounts set forth in the Thirteen Week Budget;

(e)  obligations incurred under Permitted Commodity Hedging Agreements;

(f)  Indebtedness incurred pursuant to any insurance premium financing arrangements which have been approved by order of the Bankruptcy Court; and

18

105095838 v12105095838 v12

(g)     any other Indebtedness specifically permitted by the Thirteen Week Budget.

"Longview Permitted Liens" shall mean:

(a)     Liens granted to the Lender Parties and other Secured Parties under the Loan Documents;

(b)     Liens for any tax, assessment or other governmental charge to the extent being contested or reserved against as provided under Section 5.13 of this Agreement;

(c)     materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, arising in the ordinary course of business or in connection with the construction, operation and maintenance of the Project, which do not in the aggregate materially detract from the value of the property or assets to which they are attached or materially impair the use thereof or for amounts not yet due or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been made in accordance with GAAP;

(d)     Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and for the payment of which adequate reserves, bonds or other security reasonably acceptable to the Administrative Agent have been provided or are fully covered by insurance;

(e)     Liens, deposits or pledges to secure statutory obligations or performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or for purposes of like general nature in the ordinary course of its business, not to exceed the amounts set forth in the Thirteen Week Budget, and with any such Lien to be released within 270 days of its attachment;

(f)     other Liens incidental to the ordinary course of business that are not incurred in connection with the obtaining of any loan, advance or credit and that do not in the aggregate materially impair the use of the property or assets of the Borrower or the value of such property or assets for the purposes of such business;

(g)     Liens under capital leases or securing purchase money Indebtedness that are **permitted by clause (d) of the definition of "**Longview Permitted Debt**"** (to the extent such Liens attach only to the assets subject to the respective lease or financed by such Indebtedness, as applicable);

(h)     Liens securing insurance premium financing statements in an aggregate principal amount not to exceed the aggregate amount of such premiums as set forth in the Thirteen Week Budget, provided that such Liens are limited to the applicable insurance contracts and provided that such arrangements have been approved by order of the Bankruptcy Court;

(i)     valid, perfected, enforceable and unavoidable Liens in existence as of the Effective Date and which are senior to the Liens securing the obligations under the Prepetition Credit Agreement and valid, enforceable and unavoidable Liens in existence as of the Effective Date that are perfected subsequent to the Effective Date as permitted by section 546(b) of the Bankruptcy Code and which are senior to the Liens securing the obligations under the Prepetition Credit Agreement, in each case which are set forth on Schedule ~~1.01(c), and in all cases the aggregate amount of which is less than $[•]~~**3.26**; and

~~105095838 v12~~**105095838 v12**

(j)    Liens set forth on Schedule 1.01(c).

"Longview Project Contracts" shall mean the Major Longview Project Contracts and each other contract or agreement, as set forth on Schedule 1.01(c)(i), related to the development, construction, operation, maintenance, management, administration, ownership, repair or use of the Project, the provision of fuel, limestone, water and other inputs therefor, the sale of electricity or other products therefrom, the disposal of ash, wastewater or other outputs therefrom or the provision of services therefor, entered into by the Borrower and any other Person, or assigned to the Borrower.

"Longview Transaction Documents" shall mean the Loan Documents and the Longview Project Contracts.

"Major Longview Project Contracts" shall mean the EPC Documents, the Interconnection Agreement, the Project Coal Supply Agreement, the Water Supply Agreement and any replacement of any of the foregoing.

"Management Services Agreement" shall mean the Management Services Agreement, dated as of February 28, 2007, between GenPower Services, LLC and the Borrower.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean any change, event or occurrence, other than the commencement and continuation of the Chapter 11 Cases, and any outages which have occurred at the Project as of October 1, 2013, and which have been fully explained to the Backstoppers and their advisors, which could reasonably be expected to result in a material adverse change, in (a) the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Debtors, taken as a whole, since October 1, 2013, (b) the ability of the Borrower or the Guarantors to perform their respective material obligations under the Loan Documents and (c) the ability of the Administrative Agent, Collateral Agent and the Lenders to enforce the Loan Documents.

"Maturity Date" shall mean the earliest of (a) the Stated Maturity Date, (b) the consummation of any sale of a material portion of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) and which for purposes hereof shall be no later than the Consummation Date of a Reorganization Plan filed in the Chapter Cases that is confirmed pursuant to an order entered by the Bankruptcy Court and (d) the acceleration of the Loans and termination of the Commitments in accordance with Article VII.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Mechanics' Lien Claims" shall mean asserted and disputed mechanics' liens claims asserted by the Mechanics' Lien Claimants against certain of the Debtors' assets in an aggregate amount of approximately $360,000,000.

"Mechanics' Lien Claimants" shall mean Kvaerner North American Construction, Inc., Siemens Energy, Inc. and Foster Wheeler North America Corp.

"Mepco" shall mean Mepco Holdings, LLC, a Delaware limited liability company.

"Mepco Capital Expenditures" shall mean, for Mepco and its Subsidiaries in respect of any period, the aggregate of all expenditures incurred by such Person during such period that, in accordance with

105095838 v12105095838 v12

GAAP, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such Person.

"Mepco Group Members" shall mean collectively Mepco and each of its Subsidiaries.

"Mepco Intermediate Holdco" shall mean Mepco Intermediate Holdings, LLC, a Delaware limited liability company.

"Mepco LLC" shall mean Mepco, LLC, a Delaware limited liability company.

"Mepco Permitted Debt" shall mean:

(a)    Indebtedness existing on the Effective Date and set forth in Schedule 1.01(d) (excluding Indebtedness under clause (b));

(b)    Indebtedness created under the Loan Documents;

(c)    Indebtedness of Mepco or any Mepco Subsidiary pursuant to Hedging Agreements permitted by Section 6.22;

(d)    Indebtedness (other than Indebtedness for borrowed money) owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to Mepco or any Mepco Subsidiary in the ordinary course of business, pursuant to reimbursement or indemnification obligations to such Person, provided that upon the incurrence of Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than 30 days following such incurrence;

(e)    (i) Indebtedness of Mepco or any Mepco Subsidiary to the extent permitted by Section 6.10(b);

(f)    Indebtedness (other than Indebtedness for borrowed money) in respect of performance bonds, warranty bonds, bid bonds, appeal bonds, surety bonds and completion and performance guarantees and similar obligations, in each case provided in the ordinary course of business to secure obligations of Mepco or any Mepco Subsidiary, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and Indebtedness arising out of advances on exports, advances on imports, advances on trade receivables, customer prepayments and similar transactions in the ordinary course of business and consistent with past practice, but excluding Mining Financial Assurances; and Mining Financial Assurances in respect of, or performance bonds, Reclamation bonds, bid bonds, appeal bonds or surety bonds issued in the ordinary course of business to the extent required pursuant to, any Environmental or Mining Law having an aggregate face amount not in excess of the amounts set forth in the Thirteen Week Budget;

(g)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business, provided that (x) such Indebtedness (other than credit or purchase cards) is extinguished within three Business Days

21

of its incurrence and (y) such Indebtedness in respect of credit or purchase cards is extinguished within 60 days of its incurrence;

(h)     [Reserved];

(i)     Capital Lease Obligations and purchase money Indebtedness (other than as set forth on Schedule 1.01(d) and permitted under clause (a) of this definition) incurred by any Mepco Group Member prior to, or within 270 days after, the acquisition, lease or improvement of the equipment or other assets in order to finance such acquisition or improvement, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof would not exceed the amounts set forth in the Thirteen Week Budget;

(j)     [Reserved];

(k)     [Reserved];

(l)     Guarantees by any Loan Party of any Indebtedness of Mepco or any Mepco Subsidiary Guarantor expressly permitted to be incurred under this Agreement;

(m)     Indebtedness (other than Indebtedness for borrowed money) arising from agreements of Mepco or any Mepco Subsidiary providing for indemnification, adjustment of purchase price, earn outs or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Mepco Subsidiary, other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Mepco Subsidiary for the purpose of financing such acquisition;

(n)     Indebtedness under the Conveyor Belt Documents;

(o)     all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in paragraphs (a) through (o) above;

(p)     Indebtedness incurred pursuant to any insurance premium financing arrangements and which have been approved by an order of the Bankruptcy Court; and

(q)     Any other Indebtedness specifically permitted by the Thirteen Week Budget.

"Mepco Permitted Liens" shall mean:

(a)     Liens on property or assets of Mepco and the Mepco Subsidiaries existing on the Effective Date and set forth on Schedule 1.01(e); provided that such Liens shall secure only those obligations that they secure on the Effective Date and shall not subsequently apply to any other property or assets of Mepco or any Mepco Subsidiary;

(b)     any Lien created under the Loan Documents;

(c)     [Reserved];

(d)     Liens for Taxes, assessments or other governmental charges or levies not yet delinquent or that are being contested in compliance with Section 5.13;

105095838 v12105095838 v12

(e)    Liens imposed by law (including Liens in favor of customers for equipment under order or in respect of advances paid in connection therewith) such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, Mepco or any Mepco Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)    (i) pledges and deposits made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance or other social security laws or regulations under U.S. or foreign law and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations to (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Mepco or any Mepco Subsidiary;

(g)    cash deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, warranty bonds, bids, government contracts, completion or performance guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business and not in connection with the incurrence of Indebtedness, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(h)    zoning restrictions, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business that do not render title unmarketable and that, in the aggregate, (i) do not interfere in any material respect with the ordinary conduct of the business of Mepco and the Mepco Subsidiaries and (ii) would not result in a Material Adverse Effect;

(i)    purchase money security interests in equipment or other property or improvements thereto hereafter acquired (or, in the case of improvements, constructed) by Mepco or any Mepco Subsidiary (including the interests of vendors and lessors under conditional sale and title retention agreements); provided that (i) such security interests secure Indebtedness permitted by clause (i) of the definition of "Mepco Permitted Debt", (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 270 days after such acquisition (or construction), (iii) the Indebtedness secured thereby does not exceed 100% of the fair market value of such equipment or other property or improvements at the time of such acquisition (or construction), including transaction costs incurred by Mepco or any Mepco Subsidiary in connection with such acquisition (or construction) and (iv) such security interests do not apply to any other property or assets of Mepco or any Mepco Subsidiary (other than to accessions to such equipment or other property or improvements); and provided, further, that individual financings of equipment provided by a single lender may be cross-collateralized to other financings of equipment provided solely by such lender;

(j)    [Reserved];

105095838 v12105095838 v12

(k)    Liens securing judgments that do not constitute an Event of Default under Section 7.01(i);

(l)    [Reserved];

(m)    title matters that are not material in amount and do not materially detract from the value of the property subject thereto or interfere in any material respect with the Mepco Group Members' ability to conduct its business as currently conducted or to utilize such properties for their intended purposes;

(n)    any interest or title of a lessor under any leases or subleases entered into by Mepco or any Mepco Subsidiary, as tenant, in the ordinary course of business;

(o)    Liens that are customary contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Mepco or any Mepco Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Mepco and any Mepco Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of Mepco or any Mepco Subsidiary in the ordinary course of business;

(p)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(q)    [Reserved];

(r)    licenses of intellectual property granted in the ordinary course of business;

(s)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(t)    Liens upon specific items of inventory or other goods and proceeds of Mepco or any Mepco Subsidiary securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(u)    Liens solely on any cash earnest money deposits made by Mepco or any Mepco Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder;

(v)    Liens arising from precautionary Uniform Commercial Code financing statement filings regarding operating leases entered into by Mepco or any Mepco Subsidiary in the ordinary course of business;

(w)    Liens securing insurance premium financing arrangements in an aggregate principal amount not to exceed the aggregate amount of such premiums as set forth in the Thirteen Week Budget, provided that such Liens are limited to the applicable insurance contracts and which have been approved by an order of the Bankruptcy Court;

(x)    Liens under the Conveyor Belt Documents;

105095838 v12105095838 v12

(y)      valid, perfected, enforceable and unavoidable Liens in existence as of the Effective Date and which are senior to the Liens securing the obligations under the Prepetition Credit Agreement and valid, enforceable and unavoidable Liens in existence as of the Effective Date that are perfected and subsequent to the Effective Date as permitted by section 546(b) of the Bankruptcy Code and which are senior to the Liens securing the obligations under the Prepetition Credit Agreement, in each case which are set forth on Schedule ~~1.01(e), and in all cases the aggregate amount of which is less than $[•]~~**3.26**; and

(z)      any Liens arising on account of any Mepco Permitted Debt other than as set forth in subsection (i) hereof.

"<u>Mepco Subsidiary</u>" shall mean, unless the context otherwise requires, a Subsidiary of Mepco.

"<u>Mepco Subsidiary Guarantor</u>" shall mean each Subsidiary of Mepco that is a Subsidiary Guarantor.

"<u>Mines</u>" shall mean the 4 West Mine, the Prime No. 1 Mine, the Crawdad Portal B No. 8 Mine, the Mable Hill Mine and the Arco Mine, all other active mines owned by the Mepco Group Members as of the Effective and all additional mines opened or reopened by Mepco or any Mepco Subsidiaries after the Effective Date.

"<u>Mine Permits</u>" has the meaning assigned to such term in Section 3.18(c).

"<u>Mining Claims</u>" shall mean any notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person arising (a) in connection with the Reclamation, or alleged need for Reclamation, of the Mines or (b) in connection with any Black Lung Liability

"<u>Mining Financial Assurances</u>" shall have the meaning assigned to such term in Section 3.29(b).

"<u>Mining Laws</u>" shall mean any and all applicable current or future foreign or domestic, federal, state or local (or any other subdivision) laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements (including common law), regulating, relating to or imposing liability or standards of conduct concerning surface or subsurface mining operations and activities, coal processing, coal transport, beneficial use or disposal of coal by-products, coal refuse disposal activities, and collection, treatment or disposal of mine drainage. Mining Laws shall include, but not be limited to, the Federal Coal Leasing Amendments Act, 30 U.S.C. §§181 et seq.; SMCRA; all other applicable land reclamation and use statutes and regulations; the Federal Mine Safety Act; the Black Lung Act; and the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§9701 et seq., each as amended, and any comparable state and local laws or regulations.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>Mortgaged Property</u>" shall mean all Real Property that constitutes Collateral.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA subject to the provisions of Title IV of ERISA and in respect of which the Borrower or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"<u>Net Cash Proceeds</u>" shall mean:

~~105095838 v12~~**105095838 v12**

(a) in connection with any sale or lease of assets (other than sales of inventory and other assets made by the Debtors in the ordinary course of business, including pursuant to Section 6.05(a)(i) and Section 6.05(b)(i)(x)), the proceeds thereof in the form of cash (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness (other than the Loans), including premium or penalty, if any, and interest, secured by a Lien expressly permitted hereunder on any asset that is the subject of such sale or lease of and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and net of a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such sale or lease undertaken by applicable Loan Party in connection with such sale or lease, underlined provided that no such net proceeds shall constitute Net Cash Proceeds unless the aggregate amount of all such net proceeds together with the aggregate amount of net proceeds, awards, and compensation referred to in clause (d) below, shall exceed $500,000 in the aggregate, in which case such excess shall constitute Net Cash Proceeds,

(b) in connection with any issuance or sale of Equity Interests, the cash proceeds received from such issuance, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith, and

(c) 100% of the cash proceeds from the incurrence, issuance or sale by any Loan Party of any Indebtedness (other than all Indebtedness permitted to be incurred under Section 6.01), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

(d) with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event, to the extent such net proceeds, awards or compensation, together with the aggregate amount of net proceeds referred to in clause (a) above, exceed $500,000 in the aggregate.

"Net Income" shall mean, with respect to any Person, the net income (or loss) of such Person, determined in accordance with GAAP.

"Non-Appealable" shall mean, with respect to any specified time period allowing an appeal of any ruling under any constitutional provision, law, statute, rule, regulation, ordinance, treaty, order, decree, judgment, decision, certificate, holding or injunction that such specified time period has elapsed without an appeal having been brought.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.21(c).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-U.S. Lender" shall have the meaning assigned to such term in Section 2.19(e).

"Notice of L/C Activity" shall mean a request by the Borrower in accordance with the terms of Section 2.07 and substantially in form and substance reasonably satisfactory to the Synthetic L/C Issuing Bank.

"<u>O&M Agreement</u>" shall mean the Operation and Maintenance Agreement, dated as of June 20, 2011, between the Borrower and GenPower Services, LLC, as operator.

"<u>Obligations</u>" shall mean all amounts owing to any of the Lender Parties pursuant to the terms of this Agreement or any other Loan Document.

"<u>Other Taxes</u>" shall mean any and all present or future stamp or documentary taxes or any other excise or property, intangible or mortgage recording taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Loan Documents, except any such Other Taxes that are imposed with respect to an assignment (other than an assignment under Section 2.21).

"<u>Participant</u>" shall have the meaning assigned to such term in Section 9.04(c).

"<u>Participant Register</u>" shall have the meaning assigned to such term in Section 9.04(c).

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"<u>Pending Mine Permits</u>" shall have the meaning assigned to such term in Section 3.05(b).

"<u>Permits</u>" shall mean any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required under any Governmental Rule.

"<u>Permitted Affiliate Contracts</u>" shall mean the Water Supply Agreement, the Management Services Agreement, the Project Coal Supply Agreement, the O&M Agreement and the Conveyor Belt Documents.

"<u>Permitted Commodity Hedging Agreements</u>" shall mean each Commodity Hedging Agreement, whether physical or financial, that is (a) not for speculative purposes and is entered into to hedge reasonably anticipated commodity price and availability risks associated with the Project, (b) in the best interest of, and on terms fair and reasonable to, the Borrower and could not reasonably be expected to have a Material Adverse Effect, in the case of (a) and (b) above, as certified by a Responsible Officer of the Borrower and (c) approved by the Backstoppers.

"<u>Permitted Investments</u>" shall mean:

(a)    direct obligations of the United States of America or any agency thereof or obligations guaranteed by the United States of America or any agency thereof, in each case with maturities not exceeding two years;

(b)    time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, or any state thereof having capital, surplus and undivided profits in excess of $250,000,000 and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher) by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

27

(c)    repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)    commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Borrower) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-1 (or higher) according to Moody's or A-1 (or higher) according to S&P;

(e)    securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A-2 by Moody's;

(f)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)    money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $500,000,000;

(h)    time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of 1/2 of 1% of the total assets of the Borrower as of the end of the Borrower's most recently completed fiscal year; and

(i)    any other investments specifically permitted by the Thirteen Week Budget.

"Permitted Liens" shall mean collectively Longview Permitted Liens and Mepco Permitted Liens.

"Permitted Mepco Encumbrances" shall mean with respect to each Real Property, those Liens and other encumbrances permitted by Section 6.02(b), pursuant to clauses (a), (b), (d), (e), (h), (i), (j), (k), (m), (n), (v), (x) and (y) of the definition of "Mepco Permitted Liens", provided, however, that in the case of those Liens and other encumbrances permitted by clause (n) of the definition of "Mepco Permitted Liens", in the event any Loan Party shall constitute the lessor under any such lease or sublease, no Lien or encumbrance created or permitted to be incurred thereby shall be permitted hereunder except to the extent such Lien or encumbrance would otherwise constitute a Permitted Mepco Encumbrance.

"Person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Petition Date" shall mean August 30, 2013.

"PILOT Documents" shall mean (a) the Payment in Lieu of Taxes Agreement, dated as of June 18, 2003, among the Borrower, the County Commission of Monongalia County, West Virginia, the Board of Education of the County of Monongalia, West Virginia, the Sheriff of Monongalia County, West Virginia, and the Assessor of Monongalia County, West Virginia, (b) the Lease, dated as of February 20, 2007, among Monongalia County Development Authority, County Commission of Monongalia County, West Virginia, and the Borrower, (c) the Deed, dated as of February 20, 2007, between the Borrower, as grantor, and Monongalia County Development Authority, as grantee, (d) the Deed, dated as of February 20, 2007,

105095838 v12105095838 v12

between Monongalia County Development Authority, as grantor, and the Borrower, as grantee, and (e) the Deed, dated as of February 20, 2007, between Monongalia County Development Authority, as grantor, and County Commission of Monongalia County, West Virginia, as grantee.

"Plan" shall mean any employee pension benefit plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and in respect of which the Borrower or any ERISA Affiliate is (or if such plan were terminated would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Term Sheet" shall mean the Preliminary Restructuring Term Sheet Summary of Terms and Conditions for the Debtors filed with the Bankruptcy Court on November 1, 2013.

"Platform" shall have the meaning assigned to such term in Section 9.17(b).

"Pledgor" shall have the meaning assigned to such term in the recitals to this Agreement.

"Prepetition Agent" shall have the meaning assigned to such term in the recitals to this Agreement.

"Prepetition Credit Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Prepetition Indebtedness" shall mean all Indebtedness existing under the Prepetition Credit Agreement and prior to the filing of the Chapter 11 Cases.

"Prepetition Lenders" shall have the meaning assigned to such term in the recitals to this Agreement.

"Project" shall mean the approximately 695 net megawatt coal-fired power generation facility developed and constructed by or behalf of the Borrower pursuant to and in accordance with the EPC Contracts in Monongalia County, West Virginia, together with all buildings, structures or improvements erected on the Mortgaged Property of the Borrower, all alterations thereto or replacements thereof, all fixtures, attachments, appliances, equipment, machinery and other articles attached thereto or used in connection therewith and all parts which may from time to time be incorporated or installed in or attached thereto, all Longview Project Contracts, all leases of real or personal property related thereto, all other real and tangible and intangible personal property owned by the Borrower and placed upon the Mortgaged Property of the Borrower (or used in connection with the power generation facility located thereon), the Mortgaged Property of the Borrower, the Permits required in connection with (or otherwise related to) the Project, any electrical or gas interconnections, water intake structure or pipelines owned by the Borrower, and to the extent not included in the foregoing, all Collateral granted by the Borrower.

"Project Coal Supply Agreement" shall mean that certain Amended and Restated Coal Supply Agreement entered into as of March 22, 2009 by and between Mepco LLC and the Borrower.

"Project Site" shall mean the approximately 227-acre parcel of land located in Monongalia County, West Virginia on which the Project is located.

"Projections" shall mean projections and any forward-looking statements (including any financial analysis and assumptions directly related to and furnished with such projections and forward-looking statements) furnished to the Lender Parties by, or as directed by, the Borrower in connection with transactions contemplated by the Loan Documents.

29

105095838 v12105095838 v12

"Prudent Utility Practice" shall mean, as to the Project, those practices, methods, equipment, specifications and standards of safety and performance, as the same may change from time to time, as are commonly used by power generation facilities in the United States of America of a type and size similar to the Project, including as to fuel type and configuration, as good, safe and prudent engineering practices in connection with operation, maintenance, repair, improvement and use of electrical and other equipment, facilities and improvements of such power generation facilities, with commensurate standards of safety, performance, dependability, efficiency and economy. Prudent Utility Practices does not necessarily mean one particular practice, method, equipment specification or standard in all cases, but is instead intended to encompass a broad range of acceptable practices, methods, equipment specifications and standards.

"Prudent Coal Industry Practice" shall mean those reasonable practices, methods and acts which (a) are commonly used by a prudent coal mine operator in the United States to manage, operate and maintain a coal mine and associated equipment and processing facilities of the type that comprise the Mines (giving due regard to the location of the Mines and any surrounding mines and other hazards), safely, reliably, and efficiently and in compliance in all material respects with applicable laws, codes and standards, manufacturers' warranties and manufacturers' recommendations and (b) are necessary in the exercise of reasonable judgment, skill, diligence, foresight and care expected of a prudent coal mine operator in the United States, in order to efficiently accomplish the desired result consistent with safety standards, applicable laws, codes and standards, manufacturers' warranties and manufacturers' recommendations.

"PUHCA 2005" shall mean the Public Utility Holding Company Act of 2005 and all rules and regulations adopted thereunder.

"Quotation Day" shall mean, in relation to any period for which an interest rate is to be determined, two Business Days before the first day of such period.

"Real Property" shall mean, collectively, all right, title and interest of the Borrower or any Mepco Group Member in and to any and all parcels of real property owned, leased or operated by the Borrower or any Mepco Group Member together with all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof, including in the case of the Borrower, the Project Site.

"Reclamation" shall mean the reclamation and restoration of land, water and any future, current, abandoned or former mines, and of any other Environment affected by such mines, as required pursuant to any Mining Law or any Environmental or Mining Permit.

"Register" shall have the meaning assigned to such term in Section 2.11(c).

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" shall mean any placing, spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or depositing in, into or onto the Environment.

105095838.v12105095838.v12

"Remaining Present Value" shall mean, as of any date with respect to any lease, the present value as of such date of the scheduled future lease payments with respect to such lease, determined with a discount rate equal to a market rate of interest for such lease reasonably determined at the time such lease was entered into.

"Reorganization Plan" shall mean a plan of reorganization filed by the Debtors in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period has been waived, with respect to a Plan.

"Responsible Officer" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in, or subordinated Indebtedness  of, the Borrower or any Mepco Group Member, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity Interests in, or subordinated Indebtedness of, the Borrower or any Mepco Group Member or any option, warrant or other right to acquire any such Equity Interest in, or subordinated Indebtedness of, the Borrower or any Mepco Group Member.

"S&P" shall mean Standard & Poor's Ratings Group, Inc.

"Sale and Lease-Back Transaction" shall have the meaning assigned to such term in Section 6.25.

"Screen Rate" shall mean, in relation to the LIBO Rate, the British Bankers' Association Interest Settlement Rate for the relevant currency and period, displayed on Reuters Screen LIBOR01 page.  If the agreed page is replaced or service ceases to be available, the Administrative Agent may specify another page or service displaying the appropriate rate after consultation with the Borrower and the Lenders.

"Secured Obligations" shall have the meaning assigned to such term in the Guarantee and Security Agreement.

"Secured Parties" shall have the meaning assigned to such term in the Guarantee and Security Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean the Guarantee and Security Agreement, the Final DIP Order and each of the security agreements and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.11.

"SMCRA" shall mean the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq., as amended.

"Sponsors" shall mean First Reserve and GenPower.

31

105095838 v12105095838 v12

"Stated Maturity Date" shall mean [ ], 2015.[3]

"Statutory Reserves" shall mean, with respect to any currency, any reserve, liquid asset or similar requirements established by any Governmental Authority of the United States of America or of the jurisdiction of such currency or any jurisdiction in which loans in such currency are made to which banks in such jurisdiction are subject for any category of deposits or liabilities customarily used to fund loans in such currency or by reference to which interest rates applicable to loans in such currency are determined.

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held by such Person.

"Subsidiary Guarantor" shall mean each Subsidiary of Holdings, other than the Borrower, required to become a Loan Party.  Schedule 1.01(f) sets forth each Subsidiary Guarantor as of the Effective Date.

"Superpriority Claim" shall mean a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, subject to the Carve-Out in all respects.

"Synthetic L/C Availability Period" shall mean the period from the Effective Date to but excluding the Synthetic L/C Termination Date.

"Synthetic L/C Deposit" shall mean the deposits of proceeds of Loans made by the Borrower in the Synthetic L/C Deposit Account pursuant to Section 2.07(b)(i).

"Synthetic L/C Deposit Account" shall mean one or more operating and/or investment accounts of, and established by, the Synthetic L/C Issuing Bank under its sole and exclusive control and maintained at the office of the Synthetic L/C Issuing Bank, in each case that shall be used for the purposes set forth in Section 2.07.  As of the Effective Date, the Synthetic L/C Deposit Account is as follows:

| | |
|---|---|
| Bank Name: | [_____] |
| Account Name: | [_____] |
| Account No.: | [_____] |
| ABA No.: | [_____] |

"Synthetic L/C Disbursement" shall mean a payment or disbursement made by the Synthetic L/C Issuing Bank pursuant to a Synthetic Letter of Credit, including, for the avoidance of doubt, a payment or disbursement made by the Synthetic L/C Issuing Bank pursuant to a Synthetic Letter of Credit upon or following the reinstatement of such Synthetic Letter of Credit.

---

[3] 24 months after the closing date.

105095838 v12105095838 v12

"Synthetic L/C Exposure" shall mean at any time the sum of (a) the aggregate undrawn amount of all Synthetic Letters of Credit outstanding at such time and (b) the aggregate principal amount of all Synthetic L/C Disbursements that have not yet been reimbursed at such time.

"Synthetic L/C Facility" shall mean the Synthetic L/C Deposits and the Synthetic Letters of Credit issued hereunder.

"Synthetic L/C Issuing Bank" shall mean The Bank of Nova Scotia, in its capacity as an issuer of Synthetic Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.07(j). The Synthetic L/C Issuing Bank may, in its discretion, arrange for one or more Synthetic Letters of Credit to be issued by its Affiliates, in which case the term "Synthetic L/C Issuing Bank" shall include any such Affiliate with respect to Synthetic Letters of Credit issued by such Affiliate.

"Synthetic L/C Issuing Commitment" shall mean, with respect to the Synthetic L/C Issuing Bank, the commitment of the Synthetic L/C Issuing Bank to issue Synthetic Letters of Credit pursuant to Section 2.07, expressed as a Dollar amount, as such commitment may be ratably reduced from time to time. The amount of the Synthetic L/C Issuing Bank's Synthetic L/C Issuing Commitment as of the Effective Date is $30,000,000.

"Synthetic L/C Reimbursement Obligation" shall mean the Borrower's obligation to repay Synthetic L/C Disbursements as provided in Sections 2.07(f).

"Synthetic L/C Termination Date" shall mean the earlier to occur of (a) five Business Days prior to the Stated Maturity Date and (b) the date of termination of the Synthetic L/C Issuing Commitment.

"Synthetic Letter of Credit" shall mean any letter of credit issued pursuant to Section 2.07.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, withholdings (including backup withholding), assessments, fees or other charges (including ad valorem charges) imposed by any Governmental Authority and any and all interest, additions to, or penalties applicable thereto.

"Test Period" shall mean, (a) with respect to Sections 6.28(a) and (b), (i) initially, the one week period commencing on [●], 2013 and ending on [●], 2013, (ii) thereafter, the two week period commencing on [●], 2013 and ending on [●], 2013, (iii) thereafter, the three week period commencing on [●], 2013 and ending on [●], 2013, (iv) thereafter, the four week period commencing on [●], 2013 and ending on [●], 2013, and (v) thereafter, each rolling four week period commencing on each Saturday thereafter and (b) with respect to Sections 6.28(c) and (d), the period commencing on [●], 2013 and ending on each Friday after the Effective Date.

"Thirteen Week Budget" shall mean (a) initially, the 13-week forecast of the Debtors delivered on the Effective Date in form and substance reasonably satisfactory to the Backstoppers, and (b) thereafter, the most recent update to such forecast delivered in accordance with Section 5.04(g), in each case, in form and substance reasonably satisfactory to the Backstoppers.

"Transaction Documents" shall mean the Loan Documents.

"Transactions" shall mean, collectively, (a) the execution, delivery and performance by the Borrower and each other Loan Party of the Loan Documents to which it is a party, (b) the borrowings hereunder and the use of proceeds of each of the foregoing, (c) the granting of the Liens pursuant to the

33

Security Documents, (d) the Guarantees provided by the Guarantors and (g) any other transactions entered into by the Loan Parties in connection with the foregoing, to the extent permitted under the Loan Documents.

"Turbine Island Supplier" shall mean Siemens Power Generation, Inc., a Delaware corporation.

"Turbine Island Supplier Parent Guarantee" shall mean the Guarantee, dated as of the Initial Closing Date, by Siemens Corporation in favor of the Borrower guaranteeing the performance by the Turbine Island Supplier of all of the Turbine Island Supplier's obligations under the Coordination Agreement and the Equipment Supply Agreement, as supplemented by the applicable Consent.

"Type," when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" shall include the Adjusted LIBO Rate and the Alternate Base Rate.

"UCC" shall mean (a) the Uniform Commercial Code as in effect in the applicable state of jurisdiction and (b) certificate of title or other similar statutes relating to "rolling stock" or barges as in effect in the applicable jurisdiction.

"U.S. Lender" shall have the meaning assigned to such term in Section 2.19(f).

"U.S.A. Patriot Act" shall mean, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (signed into law on October 26, 2001).

"U.S. Trustee" shall mean the United States Trustee for the Chapter 11 Cases assigned by the Bankruptcy Court.

"Variance Report": a report, in each case certified by a Responsible Officer of the Borrower, in a form satisfactory to the Backstoppers, delivered in accordance with Section 5.04(f), substantially in the form of Exhibit [    ]I for the applicable Test Period as of the Wednesday of the week immediately preceding the week during which such Variance Report is delivered and setting forth the variances (as a percentage and as a dollar amount) between actual results and the corresponding anticipated amounts set forth in the Covenant Budget and demonstrating compliance or non-compliance with the covenants set forth in Section 6.28.

"Water Supplier" shall mean Dunkard.

"Water Supply Agreement" shall mean the Second Amended and Restated Water Supply Agreement, dated as of May 18, 2009, among the Water Supplier, AMD Reclamation, Inc., a Pennsylvania non-profit corporation, and the Borrower.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Wholly Owned Subsidiary" of any Person shall mean a subsidiary of such Person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

105095838 v12105095838 v12

Section 1.02    Terms Generally.  Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Loan Documents:

(a)    the definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    all references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require;

(e)    except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time;

(f)    the term "or" is not exclusive;

(g)    [Reserved]; and

(h)    except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Backstoppers request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

**ARTICLE II**
**THE CREDITS**

Section 2.01    Commitments.

(a)    Subject to the terms and conditions set forth herein and the Final DIP Order, each Lender agrees, solely to the extent requested by the Borrower pursuant to Section 2.03, to make Loans to the Borrower, from time to time prior to the Maturity Date, in principal amounts, for the purposes and on the dates set forth in the Draw Schedule; provided that, no such Loan will result in such Lender's Loans exceeding such Lender's Commitment; and provided further that, for the avoidance of doubt, no Borrowings designated in the Draw Schedule as being for the purpose of obtaining Synthetic Letters of Credit shall be made for any other purpose and no Borrowings designated in the Draw Schedule as other than for the purpose of obtaining Synthetic Letters of Credit shall be made for the purpose of obtaining Synthetic Letters of Credit. Notwithstanding anything herein to the contrary, the aggregate amount of Loans made by the Lenders on the Effective Date shall be $5,000,000.

35

(b)         Amounts borrowed under this Section 2.1 and repaid or prepaid may not be re-borrowed.

Section 2.02         Loans and Borrowings Generally.

(a)         The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)         Subject to Section 2.16, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.

(c)         At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount in accordance with the amount set forth for such Borrowing in the Draw Schedule.  At the time of each ABR Borrowing, such Borrowing shall be in an aggregate amount in accordance with the amount set forth for such Borrowing in the Draw Schedule.

(d)         Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03         Requests for Borrowings. The Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 10:00 A.M., New York City time five Business Days before the proposed date of Borrowing. Each such Borrowing Request shall specify the following information in compliance with Sections 2.02 and 4.02:

(i)         the aggregate amount of the requested Borrowing, which shall be $10,000,000 or any integral multiple of $1,000,000 in excess thereof, provided that the initial Borrowing made on the Effective Date shall be $5,000,000;

(ii)         the date of such Borrowing, which shall be a Business Day;

(iii)         whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)         in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto;

(v)         the account to which the proceeds of such Borrowing are to be disbursed, which shall be the Synthetic L/C Deposit Account in the case of a Borrowing the proceeds of which are to be deposited therein pursuant to Section 2.07(b)(i) in connection with the requested issuance of a Synthetic Letter of Credit; and

(vi)         certifications as to compliance with the conditions set forth in Section 4.02(a), (b), (c), (d) and (e).

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following

36

105095838 v12105095838 v12

receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall promptly notify each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    [Reserved].

Section 2.05    [Reserved].

Section 2.06    [Reserved].

Section 2.07    Synthetic Letters of Credit.

(a)    General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Synthetic Letters of Credit, for its own account in a form reasonably acceptable to the Synthetic L/C Issuing Bank, at any time and from time to time during the Synthetic L/C Availability Period and prior to the date that is five Business Days prior to the Stated Maturity Date.  Synthetic Letters of Credit may be issued solely for the purposes set forth in Section 5.01(d).  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Synthetic L/C Issuing Bank relating to any Synthetic Letter of Credit, the terms and conditions of this Agreement shall control.

(b)    Synthetic L/C Deposit Account.

(i)    As a condition to the Synthetic L/C Issuing Bank issuing any Synthetic Letter of Credit, the Borrower shall deposit proceeds of Loans in an amount equal to the face amount of the requested Synthetic Letter of Credit in the Synthetic L/C Deposit Account.

(ii)    The Synthetic L/C Deposits shall be held by the Synthetic L/C Issuing Bank in the Synthetic L/C Deposit Account, and no party other than the Synthetic L/C Issuing Bank shall have a right of withdrawal from the Synthetic L/C Deposit Account or any other right or power with respect to the Synthetic L/C Deposits.

(iii)    Each of the Borrower, the Administrative Agent, the Synthetic L/C Issuing Bank and each Lender hereby acknowledges and agrees that the Borrower is funding the Synthetic L/C Deposits to the Synthetic L/C Issuing Bank for application in the manner contemplated by Section 2.07(f).  The Synthetic L/C Issuing Bank shall invest the Synthetic L/C Deposits (except during periods when the Synthetic L/C Deposits, or funds advanced by or on behalf of the Synthetic L/C Issuing Bank against the Synthetic L/C Deposits, are used to cover unreimbursed Synthetic L/C Disbursements in accordance with Section 2.07(f)) so as to earn a return on the Synthetic L/C Deposits at least equal to the Adjusted LIBO Rate in effect for the applicable Investment Period or, during the continuation of any period for which the same cannot be determined, the Federal Funds Effective Rate in effect during such period; provided that the Synthetic L/C Issuing Bank does not guarantee any particular rate of return on the Synthetic L/C Deposits invested pursuant to this Section.  The amount of such return earned on the Synthetic L/C Deposits, less any expenses incurred, and any customary fees charged in connection with such investing activity, by the Synthetic L/C Issuing Bank will be paid by the Synthetic L/C Issuing Bank to the Borrower quarterly in arrears on the last Business Day of each calendar quarter, unless a Default shall have occurred and be continuing at such time, in which case such amount will continue to be held in the Synthetic L/C Deposit Account and treated as part of the Synthetic L/C

37

Deposits for all purposes hereof until the occurrence, if any, of a last Business Day of a calendar quarter on which no Default shall be continuing, at which time such amount will be paid by the Synthetic L/C Issuing Bank to the Borrower.

(iv)    The Borrower shall have no right, title or interest in or to the Synthetic L/C Deposit Account or the Synthetic L/C Deposits and no obligations with respect thereto (except as expressly provided herein).  Upon termination or reduction of  any Synthetic Letter of Credit and after payment in full of any outstanding Synthetic L/C Reimbursement Obligations with respect to such Synthetic Letter of Credit, the Synthetic L/C Issuing Bank will remit funds in the Synthetic L/C Deposit Account in an amount equal to the face amount of such Synthetic Letter of Credit less any Synthetic L/C Reimbursement Obligations with respect to such Synthetic Letter of Credit, or, in the case of a reduction, the face amount of such reduction (such proceeds, "Excess Proceeds"), to the Borrower to be used solely for purposes satisfactory to the Backstoppers in their sole discretion; provided, however, that if either (A) a Default shall have occurred and be continuing at such time or (B) all or a portion of a mandatory prepayment previously required to be made hereunder was not made as a result of the operation of Section 2.12(c) with respect to proceeds of Loans comprising Synthetic L/C Deposits, such Excess Proceeds (or, in the case of the foregoing clause (B), an amount of such Excess Proceeds equal to the lesser of the entire amount thereof and the amount referred to in such clause (B)) shall instead be remitted by the Synthetic L/C Issuing Bank to the Administrative Agent to repay outstanding Loans in accordance with Section 2.12(c).   Upon expiration or termination of the Synthetic L/C Issuing Commitment and termination of all Synthetic Letters of Credit, and after payment in full of any outstanding Synthetic L/C Reimbursement Obligations, the Synthetic L/C Issuing Bank will remit all amounts then remaining in the Synthetic L/C Deposit Account to the Administrative Agent to repay Loans in accordance with Section 2.12(c). In the event that any Synthetic Letters of Credit remain outstanding on the Maturity Date after all Loans and the other Obligations have been paid in full, funds in the Synthetic L/C Deposit Account will continue to be held therein for application to any Synthetic L/C Reimbursement Obligations arising thereafter, except to the extent such Synthetic Letters of Credit expire undrawn or are otherwise replaced and terminated in a manner satisfactory to the Synthetic L/C Issuing Bank, and when all Synthetic L/C Reimbursement Obligations have been satisfied any funds remaining in the Synthetic L/C Deposit Account shall be promptly remitted to the Administrative Agent for application to any accrued and unpaid interest on the Loans the proceeds of which had been held in the Synthetic L/C Deposit Account, with any remaining balance of such funds being remitted to the Borrower.

(c)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Synthetic Letter of Credit (or the amendment, renewal (other than an automatic renewal in accordance with paragraph (d) of this Section) or extension of an outstanding Synthetic Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Synthetic L/C Issuing Bank) to the Synthetic L/C Issuing Bank and the Administrative Agent (two Business Days in advance of the requested date of issuance, amendment, renewal or extension) a Notice of L/C Activity requesting the issuance of a Synthetic Letter of Credit, or identifying the Synthetic Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Synthetic Letter of Credit is to expire (which shall comply with paragraph (d) of this Section), the amount of such Synthetic Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to issue, amend, renew or extend such Synthetic Letter of Credit.  If requested by the Synthetic L/C Issuing Bank, the Borrower also shall submit a Synthetic Letter of Credit application on the Synthetic L/C Issuing Bank's standard form in connection with any request for a

38

Synthetic Letter of Credit.  A Synthetic Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Synthetic Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, (i) the total Synthetic L/C Exposure shall not exceed the total Synthetic L/C Deposits and (ii) the aggregate available amount of all Synthetic Letters of Credit shall not exceed the Synthetic L/C Issuing Bank's Synthetic L/C Issuing Commitment.

(d)     Expiration Date.  Each Synthetic Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Synthetic Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Stated Maturity Date; provided that any Synthetic Letter of Credit with a one-year tenor may provide for the automatic renewal thereof for additional one-year periods (which in no event shall extend beyond the date referred to in clause (ii) of this paragraph (d)).

(e)     [Reserved].

(f)     Reimbursement of Synthetic L/C Disbursements. If the Synthetic L/C Issuing Bank shall make any Synthetic L/C Disbursement, the Synthetic L/C Issuing Bank shall withdraw the amount of such Synthetic L/C Disbursement from the Synthetic L/C Deposit Account and apply such amount to reimburse itself for such Synthetic L/C Disbursement.  The Synthetic L/C Issuing Bank shall notify the Administrative Agent of any such withdrawal, and the Administrative Agent shall give notice of any such withdrawal to the Lenders.

(g)     Liability.  Neither the Administrative Agent, the Lenders nor the Synthetic L/C Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Synthetic Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Synthetic Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Synthetic L/C Issuing Bank; provided that the foregoing shall not be construed to excuse the Synthetic L/C Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are determined by a court having jurisdiction to have been caused by (i) the Synthetic L/C Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Synthetic Letter of Credit comply with the terms thereof or (ii) the Synthetic L/C Issuing Bank's refusal to issue a Synthetic Letter of Credit in accordance with the terms of this Agreement.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Synthetic L/C Issuing Bank, the Synthetic L/C Issuing Bank shall be deemed to have exercised care in each such determination and each refusal to issue a Synthetic Letter of Credit.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Synthetic Letter of Credit, the Synthetic L/C Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Synthetic Letter of Credit.

(h)     Disbursement Procedures.  The Synthetic L/C Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a

105095838 v12105095838 v12

Synthetic Letter of Credit.  The Synthetic L/C Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Synthetic L/C Issuing Bank has made or will make a Synthetic L/C Disbursement thereunder.

(i)        [Reserved].

(j)        Replacement of the Synthetic L/C Issuing Bank.  The Synthetic L/C Issuing Bank may resign as Synthetic L/C Issuing Bank by giving not less than thirty (30) days' prior notice of such resignation to the Borrower and the Lender Parties. Upon such resignation, the Synthetic L/C Issuing Bank shall be replaced by written agreement among the Borrower, the Administrative Agent, the replaced Synthetic L/C Issuing Bank and the successor Synthetic L/C Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Synthetic L/C Issuing Bank.  At the time any such replacement shall become effective, (i) the Borrower shall pay all unpaid fees accrued for the account of the replaced Synthetic L/C Issuing Bank pursuant to Section 2.14 and (ii) the replaced Synthetic L/C Issuing Bank shall transfer the Synthetic L/C Deposit Account to the successor Synthetic L/C Issuing Bank; provided that the replaced Synthetic L/C Issuing Bank shall retain an amount in its Synthetic L/C Deposit Account equal to the aggregate stated amount of all outstanding Synthetic Letters of Credit issued by the replaced Synthetic L/C Issuing Bank.  From and after the effective date of any such replacement, (i) the successor Synthetic L/C Issuing Bank shall have all the rights and obligations of the replaced Synthetic L/C Issuing Bank under this Agreement with respect to Synthetic Letters of Credit to be issued thereafter and (ii) references herein to the term "Synthetic L/C Issuing Bank" shall be deemed to refer to such successor or to any previous Synthetic L/C Issuing Bank, or to such successor and all previous Synthetic L/C Issuing Banks, as the context shall require.  After the replacement of a Synthetic L/C Issuing Bank hereunder, the replaced Synthetic L/C Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Synthetic L/C Issuing Bank under this Agreement with respect to the Synthetic Letters of Credit issued by it prior to such replacement but shall not be required to issue additional Synthetic Letters of Credit.  Upon the termination of, or reduction in the stated amount of, any Synthetic Letter of Credit issued by the replaced Synthetic L/C Issuing Bank, the replaced Synthetic L/C Issuing Bank shall transfer, from the Synthetic L/C Deposit Account it holds, to the Agent for repayment of the Loans in accordance with Section 2.12(c), an amount equal to the reduction in the aggregate amount available to be drawn under the Synthetic Letters of Credit issued by the replaced Synthetic L/C Issuing Bank.

(k)        [Reserved].

(l)        Reporting.  Unless otherwise requested by the Administrative Agent, the Synthetic L/C Issuing Bank shall (i) provide to the Administrative Agent copies of any notice received from the Borrower pursuant to Section 2.07(c) no later than the next Business Day after receipt thereof and (ii) report in writing to the Administrative Agent (who shall in turn promptly provide notice of same to all Lenders in accordance with Section 9.17(b)) (A) on or prior to each Business Day on which the Synthetic L/C Issuing Bank expects to issue, amend, renew or extend any Synthetic Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Synthetic Letters of Credit to be issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension occurred (and whether the amount thereof changed), and the Synthetic L/C Issuing Bank shall be permitted to issue, amend, renew or extend such Synthetic Letter of Credit if the Administrative Agent shall not have advised the Synthetic L/C Issuing Bank that such issuance, amendment renewal or extension would not be in conformity with the requirements of this Agreement, (B) on each Business Day on which the Synthetic L/C Issuing Bank makes any Synthetic L/C Disbursement, the date of such Synthetic L/C Disbursement and the amount of such Synthetic L/C Disbursement and (C) on any other Business Day, such other information as the Administrative Agent shall reasonably request,

40

105095838 v12105095838 v12

including information regarding amounts on deposit in the Synthetic L/C Deposit Account, the investment of funds in the Synthetic L/C Deposit Account and prompt verification of such information as may be requested by the Administrative Agent.

Section 2.08    Funding of Borrowings.

(a)    Not later than 12:00 Noon, New York City time, on the requested Borrowing date, each Lender with a Commitment shall make available to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders an amount in immediately available funds equal to the Loans to be made by such Lender.  The Administrative Agent shall credit the account of the Borrower on the books of such office of the Administrative Agent with[, or, if so directed by the Borrower in the applicable Borrowing Request, shall promptly remit to such other account at a bank in the United States specified by the Borrower (so long as such account is subject at such time to a first-priority, perfected security interest in favor of the Collateral Agent),] the aggregate of the amounts made available to the Administrative Agent by the Lenders in immediately available funds.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of (x) the Federal Funds Effective Rate and (y) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.09    Interest Elections.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect, in the case of a Borrowing, to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

41

(c)     Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)   whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election.

If any such Interest Election Request made by the Borrower requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period, the Borrower shall be deemed to have converted such Borrowing to a one-month Interest Period Eurodollar Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Backstoppers, so notifies the Borrower, then, so long as an Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

(f)     Notwithstanding anything to the contrary set forth herein, no Interest Election Request may be made that would result in more than five Interest Periods being in effect at any time.

Section 2.10   Termination and Reduction of Commitments.

(a)     Unless previously terminated or extended, the Commitments shall terminate at 5:00 p.m., New York City time, on the Maturity Date.

(b)     The Borrower may at any time terminate, or from time to time reduce, the Commitments; provided that each reduction of the Commitments under any Facility shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 (or, if less, the remaining amount of the applicable Commitments).

(c)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce Commitments under paragraph (b) of this Section at least three Business Days prior to the effective

42

105095838 v12105095838 v12

date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this paragraph (c) shall be irrevocable; provided that a notice of termination of Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of Commitments shall be permanent. Each reduction of Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

Section 2.11    Repayment of Loans Generally; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain a register (the "Register") in which it shall record (i) the names and addresses of the Lenders and the Commitments, of each Lender, (ii) the amount of each Loan made hereunder, the Facility and Type thereof and the Interest Period (if any) applicable thereto, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iv) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement. The Borrower and the Lender Parties shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(e)    Any Lender may request that Loans made by it to the Borrower be evidenced by a promissory note substantially in the form of Exhibit E. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in the applicable form. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.12    Repayment of Loans.

(a)    [Reserved].

105095838 v12105095838 v12

(b)    To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.

(c)    Mandatory and voluntary prepayments of Loans made pursuant to Section 2.13(b) or otherwise shall be applied on a pro rata basis, to any outstanding Loans (other than Loans the proceeds of which are at the time deposited in the Synthetic L/C Deposit Account, it being understood that such Loans are subject to the mandatory prepayment provisions hereof once the proceeds thereof are no longer held in the Synthetic L/C Deposit Account in accordance with the terms hereof and, for the avoidance of doubt, must be repaid in full on the Maturity Date to the extent outstanding on such date). Mandatory and voluntary prepayments of Loans may not be re-borrowed.

(d)    [Reserved].

(e)    [Reserved].

(f)    Prior to any repayment of any Borrowing hereunder, the Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by telephone (confirmed by telecopy) of such selection not later than 2:00 p.m., New York City time, three Business Days before the scheduled date of such repayment.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

Section 2.13    Prepayment of Loans.

(a)    Voluntary Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium other than as described below or penalty (but subject to Section 2.18), in an aggregate principal amount that is an integral multiple $500,000 and not less than $1,000,000, if less, the amount outstanding, subject to prior notice in accordance with Section 2.12(f).

(b)    Mandatory Prepayments.  The Borrower shall make the following mandatory prepayments:

(i)    [Reserved].

(ii)    [Reserved].

(iii)    [Reserved].

(iv)    [Reserved].

(v)    [Reserved].

(vi)    [Reserved].

(vii)    [Reserved].

(viii)    [Reserved].

44

105095838 v12105095838 v12

(ix)    No later than the fifth Business Day following the date of receipt by the Borrower or any other Loan Party of any Net Cash Proceeds, the Borrower shall apply or cause to be applied any such Net Cash Proceeds to the prepayment of Loans in accordance with Section 2.12(c), with any excess to be retained by the Borrower.

(x)    [Reserved].

(c)    [Reserved].

(d)    [Reserved].

Section 2.14    Fees.

(a)    The Borrower agrees to pay all fees set forth in the Administrative Agent Fee Letter and the Collateral Agent Fee Letter at the times when such payments are due and payable.

(b)    The Borrower agrees to pay to each Backstopper a fee in the amount of its pro rata share (based on commitments for the Facility under the Commitment Letter) of 3% of the total commitments for the Facility under the Commitment Letter, in cash or original issue discount, at the election of each Backstopper made by notice given to the Administrative Agent no later than [four Business Days] prior to the Effective Date.  Such fee will be fully earned as of November 1, 2013 and shall be payable on the initial funding of Loans under this Agreement.

(c)    The Borrower agrees to pay to each Lender (or to cause each Lender to be paid) a fee in the amount of its pro rata share (based on Commitments on the date the Final DIP Order is entered) of (a) 10% of the New Common Interests (as defined in the Plan Term Sheet) of Reorganized Longview (as defined in the Plan Term Sheet) so long as the aggregate total funded amount (including, for the avoidance of doubt, the amount of all issued Synthetic Letters of Credit) of the Facility and the Exit Facility (without duplication) is less than or equal to $100,000,000 and (b) up to an additional 5% of New Common Interests of Reorganized Longview if any amount greater than $100,000,000 in the aggregate is funded (including, for the avoidance of doubt, the amount of all issued Synthetic Letters of Credit) under the Facility and the Exit Facility (without duplication), interpolated for any dollar funded over $100,000,000 (in each case, such New Common Interests shall not be subject to dilution by the MEIP (as defined in the Plan Term Sheet)).  Such fee will be fully earned upon entry of the Final DIP Order and will be payable to the Lenders as of the Effective Date, but shall only be payable (1) upon the Consummation Date for the Approved Plan, for any equity fee to be paid based upon the amount of the Facility that was drawn prior to the Consummation Date of the Approved Plan, and (2) upon the maturity date or other termination of the Exit Facility, for any equity fee to be paid based upon the amount of the Exit Facility that was drawn prior to the maturity date or other termination of the Exit Facility.  Holdings and the Borrower each acknowledge and agree that the amount of such fee is predicated upon there being no Indebtedness of the Debtors on the Consummation Date for the Approved Plan other than under this Facility, the Exit Facility and any Indebtedness issued on account of the [Dunkard buyout], which shall be in an amount not greater than $[42,600,000].

(d)    Once paid, none of the Fees shall be refundable under any  circumstances.

Section 2.15    Interest.

(a)    The Borrower shall pay interest on the unpaid principal amount of each ABR Loan made to the Borrower at the Alternate Base Rate plus the Applicable Margin.

105095838 v12105095838 v12

(b)     The Borrower shall pay interest on the unpaid principal amount of each Eurodollar Loan made to the Borrower at the Adjusted LIBO Rate for the Interest Period in effect for such Eurodollar Loan plus the Applicable Margin.

(c)     Notwithstanding the foregoing, if any Event of Default shall have occurred and is continuing, the Borrower shall pay interest, after as well as before judgment, at a rate *per annum* equal to (x) in the case of principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (y) in the case of any other amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section; provided that this paragraph (c) shall not apply to any Event of Default that has been waived by the Lenders pursuant to Section 9.08.

(d)     Accrued interest on each Loan shall be payable by the Borrower in arrears (i) on each Interest Payment Date for such Loan and (ii) on the Maturity Date; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.16     Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(b)     the Administrative Agent is advised by the Backstoppers that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and such Borrowing shall be converted to an ABR Borrowing on the last day of the Interest Period applicable thereto, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing or shall be made as a Borrowing bearing interest at such rate as the Backstoppers shall agree adequately reflects the costs to the applicable Lenders of making the Loans comprising such Borrowing.

Section 2.17     Increased Costs.

(a)     If any Change in Law shall:

46

105095838 v12105095838 v12

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender (except, in each case, for Taxes);

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) to the Borrower or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) (except, in each case, for Taxes), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or any of the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section, such Lender shall notify the Borrower thereof.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; and provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.18    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.21, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that

47

105095838 v12105095838 v12

would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurodollar Loan, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in Dollars of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.19    <u>Taxes</u>.

(a)    Any and all payments by or on account of any obligation of the Borrower or any other Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes; <u>provided</u> that if any Taxes are required by law (as determined in the good faith discretion of the applicable Loan Party) to be deducted or withheld from such payments by a Loan Party, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to Taxes payable under this Section 2.19) any Lender Party receives an amount equal to the sum it would have received had no such deductions for Taxes been made, (ii) the Borrower shall make such deductions and timely pay or cause to be paid the full amount deducted to the relevant Governmental Authority in accordance with applicable law, and (iii) the Borrower shall promptly forward to the Administrative Agent (for delivery to the appropriate Lender Party) an official receipt or other documentation satisfactory to the Administrative Agent evidencing such payment to such authorities.

(b)    In addition, the Borrower shall pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Borrower shall indemnify each Lender Party for and hold it harmless against the full amount of any Indemnified Taxes (including, without limitation, Taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.19) imposed on or paid or remitted by such Lender Party and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto. This indemnification shall be made within 10 days from the date such Lender Party makes written demand therefor with appropriate supporting documentation. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender Party (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of another Lender Party, shall be conclusive absent manifest error.

(d)    Within 30 days after after any payment of Indemnified Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Administrative Agent. In the case of any payment hereunder or under the Notes or any other documents to be delivered hereunder by or on behalf of the Borrower through an account or branch outside the United States or by or on behalf of the Borrower by a payor that is not a United States person, if the Borrower determines that no Taxes are payable in respect thereof, the Borrower shall furnish, or shall cause such payor to furnish, to the Administrative Agent an opinion of counsel reasonably acceptable to the Administrative Agent stating that such payment is exempt from Taxes. For purposes of this paragraph (d) and paragraph (e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Code.

105095838 v12105095838 v12

(e)      Any Lender Party that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), to the extent such Lender Party is legally entitled to do so, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as may reasonably be requested by the Borrower to permit such payments to be made without such withholding Tax or at a reduced rate; provided that no Lender Party shall have any obligation under this paragraph (e) with respect to any withholding Tax imposed by any jurisdiction other than the United States if in the reasonable judgment of such Lender Party such compliance would subject such Lender Party to any material unreimbursed cost or expense or would otherwise be prejudicial to such Lender Party in any material respect.

(f)      Each Lender Party that is not a "U.S. Person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver (to the extent such Lender Party is legally able to do so) to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) (i) two duly completed and executed originals of IRS Form W-8BEN, Form W-8ECI or From W-8IMY, as applicable (together with any necessary attachments), or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F and the applicable Form W-8, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding Tax on payments under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement.  In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(g)      Each Lender Party that is a "U.S. Person" as defined in Section 7701(a)(30) of the Code (a "U.S. Lender") shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two duly completed and executed originals of IRS Form W-9 (or any successor form) certifying that such Lender Party is not subject to U.S. federal withholding Tax. In addition, each U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such U.S. Lender. Each U.S. Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(h)      If a payment made to a Lender Party under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender Party were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender Party shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower and the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower and the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for the purposes of this subsection (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

49

105095838 v12105095838 v12

(i)        If any Lender Party determines, in its sole discretion, that it has actually and finally received a refund of any Taxes paid or reimbursed by the Borrower pursuant to subsection (a) or (c) above in respect of payments under this Agreement or the other Loan Documents, such Lender Party shall pay to the Borrower, with reasonable promptness following the date on which it actually receives such refund, an amount equal to such refund, net of all out-of-pocket expenses in securing such refund; provided, that the Borrower, upon the request of such Lender Party, agrees to repay the amount paid (with interest and penalties) over to the Borrower to such Lender Party if such Lender Party is required to repay such amount to such Governmental Authority.  This Section 2.19(i) shall not be construed to require any Lender Party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrowers or any other person.

(j)        Each party's obligations under this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender Party, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.20        <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)        Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.17, 2.18 or 2.19, or otherwise) prior to 2:00 p.m., New York City time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent, except that payments pursuant to Sections 2.17, 2.18, 2.19 and 9.05 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof, and any such payments not so distributed by the Administrative Agent within one Business Day of receipt thereof shall bear interest at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder of (i) principal or interest in respect of any Loan, or (ii) any other amount due hereunder or under any other Loan Document shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)        If at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) <u>first</u>, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) <u>second</u>, towards payment of principal then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim, through the application of any proceeds of Collateral or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or its Subsidiaries or Affiliates (as to which the provisions of this paragraph (c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.08(b) or 2.20(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.21    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.17, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.19, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.17 or 2.19, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

51

(b)     If any Lender requests compensation under Section 2.17, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.19, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.17 or payments required to be made pursuant to Section 2.19, such assignment will result in a reduction in such compensation or payments.  Nothing in this Section shall be deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender.

(c)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.08 requires the consent of all of the Lenders affected and with respect to which the Backstoppers shall have granted their consent, then provided no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and Commitments to one or more assignees reasonably acceptable to the Administrative Agent; provided that (a) any such Non-Consenting Lender must be replaced with a Lender that grants the applicable consent, (b) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment and (c) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(c).  In connection with any such assignment, the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 9.04.

Section 2.22     Illegality.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Effective Date that it is unlawful, for any Lender or its applicable lending office to make or maintain any Eurodollar Loans, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue Eurodollar Loans or to convert ABR Borrowings to Eurodollar Borrowings, as the case may be, shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), convert all such Eurodollar Borrowings of such Lender to ABR Borrowings, on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 2.23     [Reserved].

105095838 v12105095838 v12

Section 2.24    [Reserved].

Section 2.25    [Reserved].

Section 2.26    [Reserved].

Section 2.27    [Reserved].

Section 2.28    [Reserved].

Section 2.29    [Reserved].

Section 2.30    [Reserved].

Section 2.31    <u>Defaulting Lenders.</u>

(a)    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender, to the extent permitted by applicable law:  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Administrative Agent and the Collateral Agent hereunder, *second*, to the payment of any amounts owing by such Defaulting Lender to the Synthetic L/C Issuing Bank, *third*, as the Borrower may request (and so long as no Default or Event of Default exists), to the funding of any Borrowing in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time with the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to payments made by or on

53

behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

Section 2.32    Conversion to Exit Facility.

(a)    Upon the satisfaction or amendment or waiver by the Backstoppers of the conditions precedent set forth in section 2.32(b) below and in the Commitment Letter, at the sole option of the Backstoppers, which option shall be exercised no later than 10 days prior to the confirmation hearing for the Approved Plan, (i) the Borrower, in its capacity as a reorganized Debtor, and each Guarantor, in its capacity as a reorganized Debtor, to the extent such Person is required under the Exit Facility Documentation to continue to be a guarantor of the Exit Facility, shall assume all Obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) all, but not less than all, outstanding Loans shall be continued as Loans under the Exit Facility, (iii) each Lender hereunder shall be a lender under the Exit Facility, (iv) accrued and unpaid interest on the Loans shall be payable in cash on the Consummation Date and (v) this Agreement and the Loan Documents shall be superseded and replaced by the Exit Facility Documentation. For the avoidance of doubt, in the event the Backstoppers do not elect to convert all outstanding Loans hereunder to Loans under the Exit Facility, that in no way withdraws, removes, conditions or otherwise modifies the Backstoppers' obligation to provide exit financing to the Debtors to the extent set forth in the Commitment Letter.

(b)    The effectiveness of the Exit Facility shall be subject to the following conditions precedent:

(i)    Negotiation, execution and/or delivery of definitive Exit Facility Documentation, consistent with the terms set forth in the Commitment Letter and otherwise in form and substance reasonably satisfactory to the Backstoppers and the Borrower and the satisfaction of the conditions precedent set forth therein.

(ii)    the Reorganization Plan shall be in form and substance materially consistent with the Plan Term Sheet and otherwise reasonably satisfactory to the Backstoppers and the Debtors (such Reorganization Plan, an "Approved Plan");

(iii)    the confirmation order for the Approved Plan shall be entered in form and substance reasonably satisfactory to the Backstoppers and the Debtors;

(iv)    there shall be no Default or Event of Default under this Agreement;

(v)    the tax structure of the reorganized Debtors shall be reasonably satisfactory to the Backstoppers;

(vi)    the Consummation Date with respect to the Approved Plan shall have occurred on a date to be agreed to by the Backstoppers and the Borrower;

(vii)    the amount and treatment of the Mechanics' Lien Claims shall be satisfactory to the Backstoppers, and the resolution of the Mechanics' Lien Claims shall be reasonably satisfactory to the Backstoppers;

105095838 v12105095838 v12

(viii)    the fees payable pursuant to <u>Section 2.14(c)</u> shall have been paid;

(ix)    the Loan Parties shall have obtained a public facility level rating and a public recovery rating from each of Standard & Poor's and Moody's; and

(x)    delivery and filing of UCC financing statements required to provide the agent under the Exit Facility Documentation with fully perfected security interests in the Collateral (to the extent such security interests can be perfected by the filing of the UCC financing statements) with the priority contemplated by the Commitment Letter and the delivery to the agent under the Exit Facility Documentation of any certificated securities that constitute Collateral (provided that, any additional actions required or advisable to obtain valid security interests in the Collateral may be post-closing obligations, with timeframes to be agreed by the Debtors and the Backstoppers).

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

Each of Holdings and the Borrower represents and warrants to each Lender Party that:

Section 3.01    <u>Organization; Power and Authority</u>.  Except as set forth on Schedule 3.01, Holdings and each of its Subsidiaries (a) is duly organized, validly existing and (if applicable) in good standing under the laws of the jurisdiction of its organization, (b) subject to any restriction arising on account of Holdings' or each of its Subsidiaries' status as a "debtor" under the Bankruptcy Code, has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business and in good standing in each jurisdiction where such qualification is required, except where the failure to so qualify or be in good standing could not reasonably be expected to have a Material Adverse Effect, and (d) subject to entry of the Final DIP Order, has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents to which it is a party and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder.

Section 3.02    <u>Ownership of Equity Interests</u>.  The Equity Interests in each Loan Party have been duly authorized and validly issued and are fully paid and non-assessable.  As of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which any Loan Party is a party requiring, and there is no membership interest in or other Equity Interest in any Loan Party outstanding which upon conversion or exchange would require, the issuance by any Loan Party of any additional membership interests or other Equity Interests in any Loan Party, or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase a membership interest or other Equity Interest in any Loan Party.  As of the Effective Date, 100% of the Equity Interests in the Borrower are owned by Holdings and Schedule 3.02 sets forth as of the Effective Date the name and jurisdiction of incorporation, formation or organization of Mepco and each Mepco Subsidiary and the percentage of each class of Equity Interests owned by Holdings or any of its Subsidiary, indicating the ownership thereof.

Section 3.03    <u>Authorization; No Conflict</u>.  Subject to entry of the Final DIP Order, the execution, delivery and performance by each Loan Party of each of the Loan Documents to which it is a party, the borrowings and other extensions of credit hereunder and the Transactions (a) have been duly authorized by all corporate, stockholder, limited liability company or partnership action required to be taken or obtained by such Loan Party and (b) will not (i) violate (A) any provision of any Legal Requirement or of the certificate or articles of incorporation, the limited liability agreement or other constitutive documents or by-laws of such Loan Party, (B) any applicable order of any court or any rule, regulation or order of any

55

105095838 v12105095838 v12

Governmental Authority or (C) any provision of any indenture, lease, agreement or other instrument to which such Loan Party is a party or by which any of it or any of its property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, lease, agreement or other instrument, where any such conflict, violation, breach or default referred to in clause (i) or (ii) could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by such Loan Party, other than Permitted Liens.

Section 3.04    Enforceability.  This Agreement has been duly executed and delivered by Holdings and the Borrower and, upon entry of the Final DIP Order by the Bankruptcy Court and subject thereto, constitutes, and each other Loan Document that has been executed and delivered by each Loan Party that is a party thereto constitutes, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to (a) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (b) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (c) implied covenants of good faith and fair dealing.

Section 3.05    Governmental Approvals.  Except for the entry of the Final DIP Order, no action, consent or approval of, registration or filing with, Permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with (a) the due execution, delivery and performance by the Loan Parties of the Loan Documents, (b) the operation and repair of the Project as contemplated by the Longview Transaction Documents, (c) the consummation of the Transactions by each Loan Party or (d) the grant by each Loan Party of the Liens granted under the Security Documents or the validity, perfection and enforceability thereof or for the exercise by the Collateral Agent of its rights and remedies thereunder, except (i) the filing of UCC financing statements, (ii) such as have been made or obtained and are in full force and effect, (iii) any Permits that are not yet Applicable Longview Permits, and (iv) in the case of clauses (b) and (c) above, such actions, consents and approvals where the failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

Section 3.06    Financial Statements.

(a)    Holdings and the Borrower have delivered (i) the audited consolidated balance sheet of Mepco Intermediate Holdco and its Subsidiaries as at December 31, 2010, 2011 and 2012 and the unaudited consolidated balance sheet of Mepco Intermediate Holdco and its Subsidiaries as at September 30, 2013 and the related consolidated statements of operation, cash flows and owners' equity for the fiscal years ended on such dates, which were prepared in accordance with GAAP consistently applied and fairly presents the consolidated financial position of Mepco Intermediate Holdco and its Subsidiaries as of the date thereof and the consolidated results of operations and cash flows for the respective fiscal years then ended  and (ii) the audited consolidated balance of the Borrower as at December 31, 2010, 2011 and 2012 and the unaudited consolidated balance sheet of the Borrower as at September 30, 2013 and the related consolidated statements of operation, cash flows and owners' equity for the fiscal years ended on such dates, which were prepared in accordance with GAAP consistently applied and fairly presents the financial position of the Borrower as of the date thereof and the consolidated results of operations and cash flows for the respective fiscal years then ended.

(b)    [Reserved].

Section 3.07    No Material Adverse Effect.  There has been no Material Adverse Effect.

105095838 v12105095838 v12

Section 3.08    Title to Properties; Possession Under Leases.

(a)     The Borrower has good and insurable title to, or valid leasehold interests in, all its material properties and assets (including all Real Property of the Borrower), except for (i) Longview Permitted Liens and (ii) minor defects in title that, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere in any material respect with the Borrower's ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.  The Project is free from material structural defects and all systems contained therein are in good working order and condition, ordinary wear and tear excepted, suitable for the purposes for which they are currently being used.  No portion of the Real Property of the Borrower has suffered any material damage by fire or other casualty loss that has not heretofore been completely repaired and restored to its original condition to the extent required by this Agreement.

(b)     Mepco and the Mepco Subsidiaries have good and marketable record title to the respective surface parcels and Sewickley Coal parcels and a valid leasehold interest in all other Mortgaged Properties, subject solely to Permitted Mepco Encumbrances and those partial interest tracts and adverse title matters that are not material in amount and do not materially detract from the value of the property subject thereto or interfere in any material respect with the Mepco Group Members' ability to conduct business as currently conducted or to utilize such properties for their intended purposes. Mepco and the Mepco Subsidiaries have maintained, in all material respects and in accordance with normal industry practice, all of the machinery, equipment, vehicles, facilities and other tangible personal property now owned or leased by Mepco and the Mepco Subsidiaries that is necessary to conduct their business as it is now conducted. All such Mortgaged Properties of Mepco and the Mepco Subsidiaries are free and clear of Liens, other than Permitted Mepco Encumbrances.

(c)     As of the Effective Date, Mepco and the Mepco Subsidiaries have good and marketable title to or valid leasehold interests (subject solely to Permitted Mepco Encumbrances and those partial interest tracks and adverse title matters that are not material in amount and do not materially detract from the value of the property subject thereto or interfere in any material respect with the Mepco Group Members' ability to conduct its business as currently conducted or to utilize such properties for their intended purposes) in all real property, except where the failure to own or lease could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and such real property represents all real property as is reasonably necessary for Mepco and the Mepco Subsidiaries to conduct their business and operations as currently conducted.

(d)     The Borrower, and, to the knowledge of the Borrower, each other party thereto, has complied in all material respects with all obligations under all material leases to which it is party and all such leases are legal, valid, binding and in full force and effect and are enforceable in accordance with their terms. The Borrower enjoys peaceful and undisturbed possession under all such material leases.  No landlord Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any lease payment under any material lease.  Other than as contemplated by the PILOT Documents, none of the Real Property of the Borrower is subject to any lease, sublease, license or other agreement granting to any person any right to the use, occupancy, possession or enjoyment of the Real Property of the Borrower or any portion thereof.

(e)     Mepco and the Mepco Subsidiaries have complied with all obligations under all leases to which they are a party, except where the failure to comply would not have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Mepco and the Mepco Subsidiaries enjoy peaceful and

57

105095838 v12105095838 v12

undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No landlord Lien has been filed, and to the knowledge of Holdings, no claim is being asserted with respect to any lease payment under any lease, except claims which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)     The Borrower has not received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Real Property of the Borrower or any sale or disposition thereof in lieu of condemnation, and as of the Effective Date, Holdings has not received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Real Property of Mepco and the Mepco Subsidiaries or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Effective Date.

(g)     The Borrower is not obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Real Property of the Borrower or any interest therein and none of Mepco or any Mepco Subsidiary is obligated on the Effective Date under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Real Property of Mepco and the Mepco Subsidiaries or any interest therein, except as permitted under Section 6.02 or Section 6.05.

(h)     There are no pending or, to the knowledge of the Borrower, proposed special or other assessments for public improvements or otherwise affecting any material portion of the owned Real Property of the Borrower, nor are there any contemplated improvements to such owned Real Property of the Borrower that may result in such special or other assessments.  The Borrower has not suffered, permitted or initiated the joint assessment of any owned Real Property of the Borrower with any other real property constituting a separate tax lot.  Each owned parcel of Real Property of the Borrower is composed of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot.

(i)     The Mortgaged Property of the Borrower has been properly subdivided in accordance with all applicable Legal Requirements or entitled to exception therefrom, and for all purposes the Mortgaged Property of the Borrower may be mortgaged, conveyed and otherwise dealt with as a separate lot or parcel.

(j)     As of the Effective Date, no material portion of the Collateral is located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

Section 3.09     Litigation; Compliance with Laws.

(a)     Except with respect to Environmental Laws, which are addressed exclusively in Section 3.15, and except for the Chapter 11 Cases and as set forth on Schedule 3.09(a), there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending against, or, to the knowledge of Holdings or the Borrower, threatened in writing against or affecting, Holdings or any of its Subsidiaries or any business, property or rights of Holdings or any of its Subsidiaries (i) as of the Effective Date, that involve any Longview Transaction Document or the Transactions or (ii) which individually could reasonably be expected to have a Material Adverse Effect or which could reasonably be expected, individually or in the aggregate, to materially adversely affect the Transactions.  Neither Holdings or any of its Subsidiaries nor, to the knowledge of Holdings or the Borrower, any of their Affiliates is in violation of any laws relating to terrorism or money laundering,

105095838 v12105095838 v12

including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001, and the U.S.A. Patriot Act.

(b)      Except with respect to Environmental Laws, which are addressed exclusively in Section 3.15, and except as set forth on Schedule 3.09(b), none of Holdings or any of its Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any currently applicable Legal Requirements (including any zoning, building, or environmental law, mine safety law, ordinance, code or approval or any building permit) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.10      Federal Reserve Regulations.

(a)      None of Holdings or any of its Subsidiaries is engaged principally, or as one of their important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)      No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

Section 3.11      Investment Company Act. None of Holdings or any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12      Taxes.  Except as set forth on Schedule 3.12, each of Holdings and its Subsidiaries (a) has timely filed or caused to be timely filed all U.S. and non-U.S. federal, state, local and other tax returns required to have been filed by it that are material to such company taken as a whole and each such tax return is true and correct in all material respects and (b) has timely paid or caused to be timely paid all taxes shown thereon to be due and payable by it and all other material taxes, except taxes that are being contested in good faith by appropriate proceedings in accordance with Section 5.13 and for which Holdings of any of its Subsidiaries (as the case may be) has set aside on its books adequate reserves.

Section 3.13      Disclosure and Projections.

(a)      All written information (other than the Projections and estimates and information of a general economic nature) (the "Information") concerning the Borrower, the Transactions and any other transactions contemplated by this Agreement and provided in connection with this Agreement prepared by, or as directed by, the Debtors or any of their representatives and made available to any Lender Party in connection with the Transactions or the other transactions contemplated by this Agreement, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Lender Parties and as of the Effective Date, and did not contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made.

59

(b)     The Projections and estimates and information of a general economic nature prepared, or as directed by, the Debtors or any of their representatives and that have been made available to any Lender Party in connection with the Transactions or the other transactions contemplated by this Agreement as of date delivered and provided as of the date delivered in connection with this Agreement (including the Long Term Budget and the Thirteen Week Budgets) (i) have been prepared in good faith based upon assumptions believed by the Debtors to be reasonable as of the date delivered and (ii) as of the Effective Date, have not been modified in any material respect by the Debtors (it being understood that the Projections and any estimates made available to any Lender Party are not to be viewed as facts and are subject to significant uncertainties and contingencies, that no assurance can be given that the Projections or estimates will be realized, that actual results may differ from projected results and such differences may be material).

Section 3.14     Employee Matters.

(a)     None of the Borrower or any Mepco Group Member is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against the Borrower or any Mepco Group Member, or to Holdings' or the Borrower's knowledge, threatened against the Borrower or any Mepco Group Member before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Borrower or any Mepco Group Member or, to Holding's or the Borrower's knowledge, threatened against the Borrower or any Mepco Group Member, (ii) no strike or work stoppage in existence or threatened involving the Borrower or any Mepco Group Member or the Project, and (iii) to the Borrower's knowledge, no union representation question existing with respect to the employees at the Project and, to the Borrower's knowledge, no union organization activity that is taking place at the Project, except (with respect to any matter specified in clause (i), (i) or (iii) above, either individually or in the aggregate) such that could not reasonably be expected to have a Material Adverse Effect.

(b)     Each Plan has been administered in compliance with all applicable provisions and requirements of applicable law, ERISA and the Code and the regulations and published interpretations thereunder, except for failures to so comply which could not reasonably be expected to have a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur, that, when taken together with all other ERISA Events which have occurred or for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  As of the Effective Date, the excess of the present value of all benefit liabilities under each Plan of Holdings and its Subsidiaries and their respective ERISA Affiliates (based on those assumptions used to fund such Plan), as of the last annual valuation date applicable thereto for which a valuation is available, over the value of the assets of such Plan could not reasonably be expected to have a Material Adverse Effect, and the excess of the present value of all benefit liabilities of all underfunded plans (based on those assumptions used to fund each such plan) as of the last annual valuation dates applicable thereto for which valuations are available, over the value of the assets of all such underfunded Plans could not reasonably be expected to have a Material Adverse Effect.

(c)     Mepco and each Mepco Subsidiary are in compliance with the Black Lung Act and the Federal Mine Safety Act, and any regulations promulgated thereunder, except for such noncompliance that could not reasonably be expected to have a Material Adverse Effect.

Section 3.15     Environmental Matters; Hazardous Materials.

(a)     In the case of the Borrower:

60

105095838 v12105095838 v12

(i)        The Borrower (1) is in compliance with all applicable Environmental Laws; (2) holds all Environmental or Mining Permits (each of which is in full force and effect and is not subject to appeal) required for any of their current operations or for any Real Property owned, leased, or otherwise operated by any of them, including all Environmental or Mining Permits required for the Project Site or any active construction or expansion thereof; (3) is in compliance with all Environmental or Mining Permits; and (4) has caused all contractors, lessees and other Persons occupying or using the Project Site, the Improvements of the Borrower, the Mortgaged Property, or any other Real Property owned or leased by the Borrower, to comply with all Environmental Laws and obtain all Environmental or Mining Permits required for the operation of the Project Site;

(ii)        The Borrower has previously delivered to the Administrative Agent the Independent Engineer's Report and the Environmental Site Assessment.  Except as set forth in the Independent Engineer's Report or on Schedule 3.15(a)(i),:  (i) neither the Borrower nor Holdings is or has in the past been in violation of (or received any notice that it is in violation of) any Environmental Law which violation would reasonably be expected to subject any Secured Party to liability or to result in a liability to either the Borrower or any other Loan Party or their respective properties and assets; (ii) neither the Borrower nor Holdings has (or has received any notice that it or any third party has) used, Released, discharged, generated, manufactured, produced, stored or disposed of in, on, under or about the Project Site or the Improvements or any other Real Property owned or leased by the Borrower, or transported thereto or therefrom, any Hazardous Materials that would reasonably be expected to subject the Borrower, Holdings or any Secured Party to liability under any Environmental Law; (iii) there are no underground tanks, whether operative or temporarily or permanently closed, located on the Project Site, the Improvements of the Borrower, the Mortgaged Property, or any other Real Property owned or leased by the Borrower; and (iv) there are no Hazardous Materials used, stored or present at, on or near the Project Site, the Improvements of the Borrower, the Mortgaged Property, or any other Real Property owned or leased by the Borrower, except as used, stored or present in the ordinary course of business and in material compliance with Environmental Laws, in each case of (i) through (iv) above that would reasonably be expected to result in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law.

(iii)        Except as set forth on Schedule 3.15(a)(ii), there is no pending or threatened action or proceeding by any Governmental Authority (including the U.S. Environmental Protection Agency, the West Virginia Department of Environmental Quality and any other state or local analogs) or any other third party with respect to the presence or Release of Hazardous Materials in, on, from or to the Project Site, the Improvements of the Borrower, the Mortgaged Property, or any other Real Property owned or leased by the Borrower that would reasonably be expected to have a Material Adverse Effect result in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law.

(iv)        After as set forth in the Environmental Site Assessment, no  past or existing violations of any Environmental Laws by any person relating in any way to the Project Site, the Improvements of the Borrower, the Mortgaged Property or any other Real Property owned or leased by the Borrower, in the Borrower's reasonable judgment, would reasonably be expected to result in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law.  The Environmental Site Assessment is the most recent environmental site assessment with respect to

any and all properties of the Borrower including any other property to be acquired by the Borrower in connection with the Project.  The Borrower has delivered to the Administrative Agent a copy of all other environmental site assessments and similar documents (including evaluations of wetlands, endangered species or cultural resources) in the Borrower's possession or control which relate to any properties owned by Mepco, Inc. or the Water Supplier.

      (b)      In the case of Mepco and the Mepco Subsidiaries:

      (i)      Except as to matters set forth on <u>Schedule 3.15(b)(i)</u>:

      (A)      Mepco, Mepco Subsidiary and the Mines (1) are in compliance with all applicable Environmental Laws; (2) hold all Environmental or Mining Permits (each of which is in full force and effect and is not subject to appeal) required for any of their current operations or for any Real Property owned, leased, or otherwise operated by any of them, including all Environmental or Mining Permits required for the Mines or any active construction or expansion thereof; (3) are in compliance with all of their Environmental or Mining Permits; and (4) have caused all contractors, lessees and other Persons occupying or using the Mines or any other Real Property owned by them to comply with all Environmental Laws and obtain all Environmental or Mining Permits required for the operation of the Mines;

      (B)      there has been no Hazardous Materials on, under, in, or about the Mines or any other Real Property now or formerly owned, leased or operated by Mepco or any Mepco Subsidiary, or at any other location (including any location to which Hazardous Materials have been sent for re-use or recycling or for treatment, storage, or disposal), other than any such Hazardous Materials to the extent reasonably related to any coal mining, processing and selling activities and that are in compliance with Environmental Law;

      (C)      there are no pending or threatened Environmental or Mining Claims related to the Mines, Mepco or any Mepco Subsidiary;

      (D)      there are, and have been, no landfills or coal refuse disposal areas located at, on, in or under the Mines or any other current or former Real Property owned or operated by or on behalf of Mepco or any Mepco Subsidiary, except for those coal refuse disposal facilities authorized under Environmental or Mining Permits;

      (E)      none of the Mines has any associated acid mine drainage, other than any such acid mine drainage which is currently receiving treatment in compliance with Environmental Law and for which there are, and have been, no Environmental or Mining Claims;

      (F)      written accident response plans for the Mines have been developed as required by all applicable Mining Laws, the Mines are operated in compliance therewith and the Mines contain all safety equipment, and Mepco has provided all worker training, required thereunder or otherwise required under applicable Mining Laws; and

      (G)      except for the agreements set forth on <u>Schedule 3.15(b)(i)</u>, neither Mepco nor any Mepco Subsidiary has assumed or retained, by contract or operation of law,

105095838 v12<b>105095838 v12</b>

any current liabilities of any kind, fixed or contingent, under any Environmental Law or with respect to any Hazardous Material.

(ii)    Mepco or the Mepco Subsidiaries will obtain all performance bonds, surety bonds, payments or prepayments, letters of credit, certificates of deposit or other sums or assets required to be posted under any Mining Law for Reclamation or otherwise in the amounts and forms required thereunder with respect to the Mines or other Real Property owned by Mepco or the Mepco Subsidiaries (collectively, "Mining Financial Assurances").  All such Mining Financial Assurances as of the Effective Date are listed on Schedule 3.15(b)(ii).

(iii)    No Mepco Group Member that is a Loan Party, and no officer, director, or person who owns more than ten percent of a Loan Party's security interests, has (i) been barred for a period of 30 or more consecutive days from receiving surface or underground Environmental or Mining Permits pursuant to the permit blockage provisions of SMCRA, and the regulations promulgated thereunder, or pursuant to any other Environmental Law or Mining Law, (ii) been notified by any Governmental Authority of potential ineligibility to receive any Environmental or Mining Permits or (iii) been subject to any injunction or closure order pursuant to any Mining Law or pursuant to any Environmental or Mining Permit.

(iv)    Each Mepco Group Member that is a Loan Party has provided the Administrative Agent or their agents or consultants with access to all material records and files in the possession, custody or control of, or otherwise reasonably available to, such Loan Party concerning compliance with or liability under any Environmental or Mining Permit, Environmental Law or Mining Law, including those concerning any Hazardous Materials Activity at the Mines.

(v)    There are no Black Lung Liabilities pending or threatened against any Mepco Group Member that is a Loan Party, nor have any Black Lung Liabilities been assumed by any such Loan Party.

(vi)    There have been no accidents, explosions, implosions, collapses or flooding at or otherwise related to the Mines that have, directly or indirectly, resulted in (i) any fatality, (ii) the trapping of any Person in the Mines for more than 24 hours or (iii) any Environmental or Mining Claim, except for any such Environmental or Mining Claim that could not reasonably be expected to, individually or in the aggregate, result in or lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law.

Section 3.16    [Reserved].

Section 3.17    Single Purpose Entity; Separateness.

(a)    The Borrower has not conducted any business other than the business contemplated by the Transaction Documents, has no outstanding Indebtedness or other material liabilities other than Indebtedness or other material liabilities pursuant to or allowed by the Transaction Documents, and is not a party to or bound by any material contract other than the Transaction Documents to which it is a party.

(b)    The Borrower is not a general partner or a limited partner in any general or limited partnership or a joint venturer in any joint venture.

63

105095838 v12105095838 v12

(c)        The Borrower has no subsidiaries (other than in accordance with this Agreement).

(d)        The Borrower maintains separate bank accounts and separate books of account from Holdings, Intermediate Holdco, the Sponsors and all other Persons.  The separate liabilities of the Borrower are readily distinguishable from the liabilities of Holdings, Intermediate Holdco, the Sponsors and all other Persons.

(e)        The Borrower conducts its business solely in its own name in a manner not misleading to other Persons as to its identity.

(f)        Except to the extent that the Guarantee and Security Agreement may be construed as a guarantee to the extent of the Obligations and otherwise expressly contemplated by the Loan Documents, the Equity Interests pledged or commitments made thereunder, none of Holdings, Intermediate Holdco or either Sponsor guarantees any of the obligations of the Borrower.

Section 3.18    Non-Environmental Permits.

Except with respect to Environmental Laws and Permits required by Environmental Laws, which are addressed exclusively in Section 3.15:

(a)        To the Borrower's knowledge after due inquiry, there are no Permits under existing Governmental Rules as the Project is currently designed and contemplated to be constructed and operated that are or will become Applicable Longview Permits other than the Permits described in Schedule 3.18(a) hereto (other than those the failure of which to obtain or maintain would not reasonably be expected to have a Material Adverse Effect).  Except as disclosed on Schedule 3.18(a), each Applicable Longview Permit listed in Schedule 3.18(a) has been issued to or made by the Borrower, is in full force and effect and is not subject to any current legal proceeding (including administrative or judicial appeal, permit renewals or modification) or, to the Borrower's knowledge after due inquiry, to any unsatisfied condition that would reasonably be expected to have a Material Adverse Effect, and all statutorily prescribed appeal periods with respect to the issuance of such Permits have expired.  The Borrower is in compliance with all Applicable Longview Permits except such non-compliance as would not reasonably be expected to have a Material Adverse Effect.

(b)        Each Permit listed in Schedule 3.18(a) which has not yet been obtained is not yet an Applicable Longview Permit and is of a type that is reasonably expected to be granted upon application. Each such Permit is timely obtainable without material cost, difficulty or delay prior to the time that it will become an Applicable Longview Permit.

(c)        Mepco and the Mepco Subsidiaries have obtained or made all Permits and other actions, consents and approvals of, registrations and filings with or any other action by any Governmental Authority or any other Person required for the ownership, use, maintenance and operation of, or production of coal from, the Mines by the Mepco Group Members (or otherwise required in the operation and conduct of the business of Mepco or any of the Mepco Subsidiaries) (collectively, the "Mine Permits"), and all such Mine Permits are in full force and effect and Non-Appealable in all material respects, except for (i) such Mine Permits as are listed in Schedule 3.18(c) (the "Pending Mine Permits"), (ii) such Mine Permits the failure to be obtained or made which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (iii) such Mine Permits that are not currently required and that Mepco reasonably expect to obtain or make in the normal course of business as and when required, including notice and other informational filings under, and applications and approvals with respect to the renewal of, existing Mine Permits. With respect to each Pending Mine Permit that has not yet been validly

105095838 v12105095838 v12

issued to or made by Mepco and the Mepco Subsidiaries or is not yet in full force and effect and Non-Appealable in all material respects, (i) such Pending Mine Permit is not currently necessary for the operation of the Mines by Mepco and the Mepco Subsidiaries, (ii) Mepco and the Mepco Subsidiaries have made all necessary filings and applications to have such Pending Mine Permit be validly issued to Mepco and the Mepco Subsidiaries and be in full force and effect and Non-Appealable in all material respects and (iii) Mepco expects that such Pending Mine Permit will be validly issued to Mepco and the Mepco Subsidiaries and be in full force and effect and Non-Appealable in all material respects in a timely manner without material delay, expense or adverse conditions.

Section 3.19    [Reserved].

Section 3.20    Energy Regulation. The Borrower is in compliance with the FPA and PUHCA 2005 and all Governmental Rules with respect to the ownership, operation, control and sale of electricity from the Project, and where failure to be in such compliance would not reasonably be expected to have a Material Adverse Effect. The Borrower has obtained blanket authorization from FERC to make wholesale sales of electric energy, capacity and ancillary services at market-based rates, and the blanket authorizations and waivers typically granted to entities with market-based rate authorization, including but not limited to blanket authorization to issue securities and assume liabilities under Section 204 of the FPA. None of the Lender Parties will become subject to regulation under the FPA or PUHCA 2005 or under any state laws or regulations respecting the rates of, or the financial or organizational regulation of, electric utilities solely as a result of the Transactions.

Section 3.21    No Default. No Default or Event of Default has occurred and is continuing which has not been disclosed by the Borrower to the Administrative Agent.

Section 3.22    Intellectual Property. The Borrower owns or has the right to use all patents, trademarks, service marks, trade names, copyrights, licenses and other rights which are necessary for the development, construction, ownership and operation of the Project in accordance with the Transaction Documents, in each case, as to which the failure of the Borrower to so own or have the right to use would reasonably be expected to have a Material Adverse Effect. No material product, process, method, substance, part or other material presently contemplated to be sold or employed by the Borrower in connection with its business will infringe any patent, trademark, service mark, trade name, copyright, license or other right owned by any other Person.

Section 3.23    [Reserved].

Section 3.24    Utilities and Other Services. The Borrower has (or is reasonably expected to have as and when necessary for the construction and operation of the Project and on commercially reasonable terms) all utility services, roadway and railway access and other services and materials necessary for the development, construction, operation and maintenance of the Project, including sufficient supplies of water and coal to enable the Project to operate at design capacity in accordance with Projections delivered to the Backstoppers on or prior to the Effective Date.

Section 3.25    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice of (x) the motion seeking approval of the Loan Documents and the Final DIP Order and (y) the hearing for the approval of the Final DIP Order has been given; provided that the Borrower shall give, on a timely basis as specified in the Final DIP Order, all notices required to be given to all parties specified in the Final DIP Order.

65

105095838 v12105095838 v12

(b)      After the entry of the Final DIP Order and pursuant to and to the extent permitted in the Final DIP Order, the Obligations will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrower and other Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, in all respects, to the Carve-Out.

(c)      After the entry of the Final DIP Order and pursuant to and to the extent provided in the Final DIP Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, in all respects, to the Carve-Out.

(d)      The Final DIP Order (with respect to the period on and after entry of the Final DIP Order) is in full force and effect has not been reversed, stayed, modified or amended without the Administrative Agent's, the Collateral Agent's, Borrower's and Backstoppers' consent.

(e)      The Long Term Budget, each Thirteen Week Budget and all projected consolidated balance sheets, income statements and cash flow statements of Holdings and its Subsidiaries delivered to the Administrative Agent were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by Holdings to be fair in light of the conditions existing at the time of delivery of such report or projection (it being understood that any projections or estimates made in the items described in this subsection (e) are not to be viewed as facts and are subject to significant uncertainties and contingencies, that no assurance can be given that any such projections or estimates will be realized, that actual results may differ from projected results and such differences may be material).

**Section 3.26      Capital Leases. Schedule 3.26 hereto lists all Liens in existence** *as of the Effective Date***, which pursuant to the Final DIP Order, are senior to the Liens securing the obligations under the Prepetition Credit Agreement, including (a) in respect of capital leases or securing purchase money Indebtedness and (b) Liens arising from or evidenced by precautionary Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower, Mepco or any Mepco Subsidiary.**

## ARTICLE IV
## CONDITIONS PRECEDENT

Section 4.01      Conditions Precedent to the Effective Date.  This Agreement shall become effective on the date on which the following conditions precedent have been satisfied:

(a)      Credit Agreement; Guarantee and Collateral Agreement. The Administrative Agent shall have received the following, each of which shall be in form and substance reasonably acceptable to the Backstoppers:

(i)      this Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person that is a Lender as of the Effective Date;

(ii)      the Guarantee and Security Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor;

66

(iii)    the Administrative Agent Fee Letter, executed and delivered by the Administrative Agent and the Borrower; and

(iv)    the Collateral Agent Fee Letter, executed and delivered by the Collateral Agent and the Borrower.

(b)    _Financial Statements_. The Lenders shall have received the financial statements described in Section 3.06(~~d~~a).

(c)    _Final DIP Order_. The Final DIP Order (which shall include the provision of adequate protection to the Prepetition Lenders and Prepetition Agent under the Prepetition Credit Agreement) shall have been entered by the Bankruptcy Court and shall be materially consistent with Exhibit H hereto and otherwise reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Backstoppers.  The Final DIP Order shall contain provisions, among other things, (i) acknowledging the validity and enforceability of the Prepetition Credit Agreement and the other Loan Documents (as defined therein), the debt outstanding thereunder and the liens granted in connection therewith, (ii) waiving Bankruptcy Code sections 506(c) and the "equities of the case" exception of section 552 as such may pertain to the claims and liens of the Prepetition Agent and Prepetition Lenders under the Prepetition Credit Agreement and (iii) approving the fee payable to the Lenders pursuant to Section 2.14(c).

(d)    _Approvals; No Restrictions_. All governmental and third party approvals necessary or required in connection with the transactions contemplated to occur on the Effective Date and the continuing operations of the Borrower and its Subsidiaries (including shareholder approvals, if any) shall have been obtained and be in full force and effect. The Borrower and its Affiliates and Subsidiaries (A) shall not be subject to contractual or other restrictions that would be violated by the execution and delivery of the Loan Documents or the initial extension of credit hereunder and (B) shall not be subject to any litigation, action, investigation or proceeding pending or threatened in any court or before any arbitrator or governmental agency that would restrain, prevent or otherwise adversely affect the Facility.

(e)    _Fees_.  The Administrative Agent, the Collateral Agent and Backstoppers shall have received all reasonable fees required to be paid, and all expenses for which invoices have been presented (including the reasonable and short-form invoiced fees and expenses of legal counsel, financial advisors and consultants), on or before the Closing Date.

(f)    _No Default_. The Backstoppers shall be satisfied that there shall not occur as a result of, and after giving effect to, the initial extension of credit under this Agreement, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrower's or the Guarantors' debt instruments and other agreements which would permit any counterparty thereto to exercise remedies thereunder on a postpetition basis.

(g)    _No Material Adverse Effect_. No Material Adverse Effect shall have occurred.

(h)    _Security Interest in the Collateral_. (i) The Lenders shall have a valid and perfected first priority lien on and security interest in the Collateral, subject to the Carve-Out and any Permitted Liens which are senior to the security interests and liens granted to the Lenders under the Final DIP Order or the Loan Documents, (ii) the Loan Parties shall have delivered UCC financing statements and shall have executed and delivered intellectual property security agreements, in each case, in suitable form for filing, and (iii) provisions reasonably satisfactory to the Backstoppers for the payment of all fees and taxes for such filings shall have been duly made.

105095838 v12**105095838 v12**

(i)  <u>Insurance</u>. The Administrative Agent and the Collateral Agent shall have received insurance certificates and endorsements (to the extent such endorsements can be delivered prior to the Effective Date after the exercise of commercially reasonable efforts) naming the Administrative Agent, on behalf of itself and the Lenders, ~~as an additional insured,~~ and/**or** the Collateral Agent, on behalf of itself and the other Secured Parties, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the Collateral.

(j)  <u>Budget and Other Information</u>. The Backstoppers shall have received the Long Term Budget and a Thirteen Week Budget, which Long Term Budget will be in form and substance reasonably satisfactory to the Backstoppers and the Debtors. The Backstoppers shall be reasonably satisfied with the Borrower's plans to repair the Project, including but not limited to timetable as set forth on <u>Schedule 4.01(j)</u>, costs, and choice of subcontractor (to the extent such choice has been made prior to the Effective Date).

(k)  <u>Ratings</u>. At the sole cost and expense of the Loan Parties, the Loan Parties shall have used commercially reasonable best efforts to obtain a public facility level rating and a public recovery rating (including a DIP recovery rate) from each of Standard & Poor's and Moody's, it being understood that such condition shall be satisfied by the Loan Parties' using such commercially reasonable efforts, without regard to whether such ratings are actually obtained prior to the Effective Date.

(l)  <u>Engineering and Contracting Executive</u>. The Debtors shall have appointed an Engineering and Contracting Executive.

(m)  <u>Cash Management and Adequate Protection Orders</u>. All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection and other motions and documents filed with the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Administrative Agent, the Collateral Agent and Backstoppers; provided that any motions and documents filed with the Bankruptcy Court prior to the date hereto shall be deemed to be in form and substance satisfactory to the Administrative Agent, the Collateral Agent and Backstoppers for the purpose of this Section 4.01(m), and any order that is reasonably consistent with the interim cash management order entered by the Bankruptcy Court on September 4, 2013 shall satisfy this condition.

(n)  <u>Plan and Disclosure Statement</u>. The Debtors shall have filed the Approved Plan and Approved Disclosure Statement and motion to approve the adequacy of the Approved Disclosure Statement, in each case, in form and substance reasonably satisfactory to the Backstoppers, with the Bankruptcy Court on or prior to November 12, 2013.

(o)  ~~Financial Projections~~[**Additional Filings**]. The Debtors shall have filed with the Bankruptcy Court ~~(i) the finalized financial projections provided to the Backstoppers,~~ *in form, substance and level of detail materially consistent with financial projections customarily filed with a disclosure statement,* ~~and (ii)~~ such other information to be mutually agreed between the Debtors and the Backstoppers, each in their reasonable discretion.]

(p)  <u>Patriot Act</u>. The Lenders and the Administrative Agent shall have received prior to the Effective Date all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act; provided that such information is requested at least ~~4~~2 Business Days prior to the Effective Date.

(q)  <u>Initial Borrowing</u>. The Borrowing to be made on the Effective Date shall not be less than $5,000,000.

68

Section 4.02    Conditions Precedent to Each Loan.  The agreement of (a) each Lender to make any extension of credit requested to be made by it on any date (including, without limitation, any Loans on the Effective Date) and (b) the Synthetic L/C Issuing Bank to issue any Synthetic Letter of Credit hereunder, are subject to satisfaction of the following conditions precedent:

(a)    No Default. There shall exist no Default or Event of Default under the Loan Documents.

(b)    Representations and Warranties. The representations and warranties of the Borrower and each Guarantor herein and in the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding.

(c)    No Restrictions. The making of such Loan, the issuance of such Synthetic Letter of Credit or the funding of such Synthetic L/C Deposit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(d)    Final DIP Order. The Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Backstoppers.

(e)    Compliance. The borrowing shall not cause the aggregate amount of the Loans to exceed the amount then authorized by the Final DIP Order, or any order modifying, reversing, staying or vacating such order shall have been entered. The amount of the borrowing shall comply with the terms of the Long Term Budget and be consistent in amount, timing and use of proceeds with the Draw Schedule.

(f)    Notice of L/C Activity. In the case of an issuance of a Synthetic Letter of Credit, the Synthetic L/C Issuing Bank and the Administrative Agent shall have received a Notice of L/C Activity as and when required by Section 2.07.

(g)    Notice of Borrowing. In the case of a Loan, the Administrative Agent shall have received a notice of borrowing pursuant to Section 2.03.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Each of Holdings and the Borrower covenants and agrees with each Lender Party that so long as this Agreement shall remain in effect and until the Commitments have been terminated, the principal of and interest on each Loan and all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full and all Synthetic L/C Deposits shall have been returned, each of Holdings and the Borrower shall, and shall cause each of its Subsidiaries to:

Section 5.01    Use of Proceeds and Project Revenues.

(a)    In accordance with the Long Term Budget, Covenant Budget and Draw Schedule, apply proceeds of the Loans solely for, as applicable, (i) the repair of the Project, (ii) general corporate purposes of the Loan Parties during the Chapter 11 Cases (including payment of fees and expenses in connection with the transactions contemplated hereby, adequate protection payments and working capital), (iii) general corporate purposes of the Loan Parties after the conclusion of the Chapter 11 Cases, and (iv)

105095838 v12105095838 v12

certain transaction fees, costs and expenses and certain other costs and expenses with respect to the administration of the Chapter 11 Cases, and expenses benefiting from the Carve-Out.

(b)     [Reserved];

(c)     [Reserved];

(d)     Use Synthetic Letters of Credit solely (i) to renew or replace existing letters of credit or (ii) for general corporate purposes in the ordinary course of business.

Section 5.02     Warranty of Title.  Maintain (a) good, marketable (subject to the terms of the Longview Transaction Documents) and insurable title in its real property interest in the Mortgaged Property, subject only to Permitted Liens, and (b) good, marketable (subject to the terms of the Longview Transaction Documents) and insurable title to all of its other properties and assets (that are individually or in the aggregate material), subject only to Permitted Liens.

Section 5.03     Notices.

(a)     Promptly, upon acquiring notice or giving notice, as the case may be, or obtaining knowledge thereof, give written notice to the Administrative Agent and each Lender of:

(i)     the filing or commencement of, or any written threat or written notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration (including any Environmental or Mining Claim), against Holdings, the Borrower, or any Debtor or involving the Project as to which an adverse determination is reasonably probable and which, if adversely determined, could result in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law;

(ii)     any dispute between any of the Debtors and any Governmental Authority involving the revocation, modification, failure to renew or the like of any material Applicable Longview Permit or the imposition of additional material conditions with respect thereto;

(iii)     (A) any Event of Default or Default or (B) any breach or default under any Major Longview Project Contract other than the EPC Contracts and other than any default arising on account of the Chapter 11 Cases;

(iv)     any casualty, damage or loss to the Project, whether or not insured, through fire, theft, other hazard or casualty, or any act or omission of the Borrower, its employees, agents, contractors, consultants or representatives, or of any other Person, if such casualty, damage or loss affects the Borrower or the Project in excess of $250,000 for any one such event or in the aggregate in any policy period;

(v)     any early cancellation or material change in the terms, coverage or amounts of any insurance described in Schedules 5.12(a) or 5.12(b);

(vi)     any material event of force majeure asserted under any Longview Project Contract and, to the extent reasonably requested by the Administrative Agent and reasonably

105095838 v12105095838 v12

available to the Borrower, copies of related invoices, statements, supporting documentation, schedules, data or affidavits delivered under such Longview Project Contract;

(vii)    any condemnation, taking by eminent domain or other taking or seizure by a Governmental Authority with respect to a material portion of the Project;

(viii)    any (i) fact, circumstance, condition or occurrence at, on or arising from the Project Site, the Improvements of the Borrower, the Mortgaged Property, or any other Real Property owned or leased by the Borrower, that results in material noncompliance with any Environmental Law or any Release of Hazardous Materials on or from the Project Site, the Improvements of the Borrower, the Mortgaged Property, or any other Property owned or leased by the Borrower that has resulted in material personal injury or material property damage or resulted in an Environmental or Mining Claim, or otherwise lead to liability, or required investigation, remediation, or corrective action under, any Environmental Law and (ii) pending or, to the Borrower's knowledge, threatened, material Environmental or Mining Claim against the Borrower or, to the Borrower's knowledge, any of its Affiliates, contractors, lessees or any other Persons, arising in connection with its or their occupying or conducting operations on or at the Project, the Project Site or the Improvements of the Borrower, in each case which could reasonably be expected to impose liability on any Secured Party or result in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law;

(ix)    the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect;

(x)    the occurrence of any accidents, explosions, implosions, collapses or flooding at or otherwise related to the Mines that could reasonably be expected to, directly or indirectly, result in (i) any fatality, (ii) the trapping of any Person in the Mines for more than 24 hours or (iii) any Environmental or Mining Claim, except for any such Environmental or Mining Claim that could not reasonably be expected to have, individually or in the aggregate, lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law;

(xi)    any matter or occurrence that could reasonably be expected to result in an injunction or the issuance of any closure order pursuant to any Mining Law or pursuant to any Environmental or Mining Permit that could reasonably be expected to directly or indirectly result in the closure or cessation of operation of the Mines for a period of more than 30 consecutive days; and

(xii)    any other development specific to Holdings or any of its Subsidiaries or the Project that is not a matter of general public knowledge and that has had, or could reasonably be expected to have, a Material Adverse Effect, which, for purposes of this covenant, shall include any adverse development with regard to any of the current or former officers or directors of any of the Debtors.

(b)    The Borrower shall provide, with reasonable promptness, to the Administrative Agent and the Backstoppers, any other information with respect to the Borrower or the Project as is reasonably requested by the Administrative Agent or any Lender (which request shall be made through the Administrative Agent or by the Backstoppers).

Section 5.04    Financial Statements; Other Information.  Deliver or cause to be delivered to the Administrative Agent and the Backstoppers:

(a)    within 90 days after the end of each fiscal year, a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal year and the consolidated results of their operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year all audited by independent public accountants of recognized national standing reasonably acceptable to the Administrative Agent and accompanied by an opinion of such accountants to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP;

(b)    within 45 days after the end of each fiscal quarter of each fiscal year, consolidated and consolidating balance sheets and related statements of operations and cash flows showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal quarter and the consolidated and consolidating results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all certified by a Financial Officer of Holdings, on behalf of Holdings, as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated and consolidating basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes);

(c)    (i) concurrently with any delivery of financial statements under (a) or (b) above or under (d) below, a certificate of a Financial Officer of Holdings (A) certifying that no Event of Default or Default has occurred or, if an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (B) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the covenant set forth in Section 6.27, and (ii) concurrently with any delivery of financial statements under (a) above, a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default under the covenant set forth in Section 6.27 (which certificate (x) may be limited to accounting matters and disclaim responsibility for legal interpretations and (y) shall not be required to be delivered if such accounting firm is not delivering certificates of such type as a matter of national policy applied consistently to its clients);

(d)    Within 20 days after the end of each month, (i) consolidated and consolidating balance sheets and related statements of operations and cash flows showing the financial position of Holdings and its Subsidiaries as of the close of such month and the consolidated and consolidating results of their operations during such month, all certified by a Financial Officer of Holdings, on behalf of Holdings, as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated and consolidating basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) [and (ii) an operating report with respect to such month, in form and scope substantially equivalent to the monthly operating reports delivered pursuant to the Prepetition Credit Agreement];

(e)    promptly upon request by the Administrative Agent, copies of: (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed with the IRS with respect to a Plan; (ii) the most recent actuarial valuation report for any Plan; (iii) all notices received from a Multiemployer Plan sponsor or a Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such

72

105095838 v12105095838 v12

other documents or governmental reports or filings relating to any Plan or Multiemployer Plan as the Administrative Agent shall reasonably request;

(f)    as soon as available, but in any event no later than Wednesday of each calendar week (commencing with the calendar week starting after the Effective Date), a Variance Report for the applicable Test Period as of the end of the immediately preceding calendar week;

(g)    as soon as available, but in any event no later than Wednesday of each calendar week, commencing with [●], 2013[4], a Thirteen Week Budget in form and substance reasonably satisfactory to the Backstoppers setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated forecast of the information contained in the initial Thirteen Week Budget and a written set of supporting assumptions; provided that, at the request of the Backstoppers, the Borrower shall hold a conference call with the Administrative Agent and the Backstoppers (and/or, at the Backstoppers' discretion, the advisors to the Backstoppers) promptly after the delivery of the Thirteen Week Budget for such week;

(h)    as soon as available, but in any event no later than the 10 Business Days after the end of each month, a certificate of a Financial Officer of Holdings setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the covenant set forth in Section 6.27.

(i)    copies of all monthly reports, projections, or other information respecting Borrower's or any other Loan Party's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of any Debtor with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee; it being agreed that service on counsel to the Administrative Agent and any Backstopper's counsel via the Bankruptcy Court's ECF system constitutes adequate delivery for purposes of this subsection;

(j)    any information and financial statements required to be delivered pursuant to the Interim Cash Collateral Order;

(k)    on a bi-weekly basis, a report from the Debtors and/or the Engineering and Contracting Executive setting forth an update with respect to the repair of the Project and any items related thereto, presented in a format reasonably satisfactory to the Backstoppers; and

(l)    promptly, such additional financial and other information as any Lender may from time to time reasonably request.

Section 5.05    Maintenance of Existence.  Maintain and preserve its legal existence and all material rights, privileges and franchises necessary or desirable in the normal conduct of its business and engage only in the business consistent with Section 6.06, except as otherwise expressly permitted under this Agreement and the other Transaction Documents.

---

[4] To be the ~~Monday~~**Wednesday** of the fou~~i~~r~~st~~**th** week following the Effective Date.

~~105095838 v12~~**105095838 v12**

Section 5.06    <u>Maintenance of Records; Access to Properties and Inspections</u>.  Maintain all financial records in accordance with GAAP and permit any Persons designated by the Administrative Agent or Backstoppers or, upon the occurrence and during the continuation of an Event of Default, any Lender to visit and inspect Holding's or any Subsidiaries' financial records, the Project and the other properties of the Borrower and the Mepco Group Members at reasonable times, upon reasonable prior notice to the Holdings or the Borrower (as applicable), and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any Persons designated by the Administrative Agent or Backstoppers or, upon the occurrence and during the continuation of an Event of Default, any Lender upon reasonable prior notice to Holdings or the Borrower to discuss the affairs, finances and condition of Holdings and its Subsidiaries with the officers thereof and independent accountants therefor (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract).

Section 5.07    <u>Compliance with Laws; Applicable Longview Permits</u>.

(a)    In the case of the Borrower:

(i)    comply and the Project to be operated and maintained in compliance, in all material respects, with Environmental Laws, except such non-compliance as would not, in the aggregate, reasonably be expected to result in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law;

(ii)    with the exception of compliance with Environmental Laws, which is addressed in 5.07(a), comply and the Project to be operated and maintained in compliance, in all material respects, with all Legal Requirements, including Legal Requirements relating to equal employment opportunity, employee benefit plans and employee safety, and exercise diligent good faith efforts to make such alterations to the Project and each Mortgaged Property of the Borrower as may be required for such compliance, except such non-compliance as would not, in the aggregate, reasonably be expected to have a Material Adverse Effect;

(iii)    obtain, maintain in full force and effect and comply with all Applicable Longview Permits, except to the extent that a failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(iv)    deliver to the Administrative Agent, concurrently with the delivery of financial statements under Section 5.04(a), a certificate of a Responsible Officer of the Borrower certifying that the Borrower is in compliance with the provisions of Section 5.07(a) or, if the Borrower is not so in compliance, the nature and extent of the non-compliance and any corrective action taken or proposed to be taken with respect thereto.

(b)    In the case of Mepco and the Mepco Subsidiaries:

(i)    comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property (owned or leased), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; provided that this Section 5.07(b)(i) shall not apply to Environmental Laws, which are the subject of Section 5.07(b)(ii) and 5.07(b)(iii);

105095838 v12105095838 v12

(ii)      comply, and make commercially reasonable efforts to cause all contractors, lessees and other Persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; obtain and renew all Environmental or Mining Permits required or reasonably necessary for its operations and the Mines; except, in each case with respect to this Section 5.07(b)(ii), to the extent the failure to do so could not reasonably be expected to result, individually or in the aggregate, in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law;

(iii)      promptly take any and all actions necessary to (i) cure any violation of applicable Environmental Laws or Mining Laws that would reasonably be expected to result, individually or in the aggregate, in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law, and (ii) make an appropriate response to any Environmental or Mining Claim against Mepco or any Mepco Subsidiary and discharge any obligations it may have to any Person thereunder where failure to do so would reasonably be expected result, individually or in the aggregate, in an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law; and

(iv)      at all times maintain and preserve all property necessary for the normal conduct of its business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as expressly permitted by this Agreement); and cause the Mines to be operated and maintained in compliance with the terms and provisions of all Mine Permits and in accordance with Prudent Coal Industry Practice; in each case in this clause (iv) except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.08      [Reserved].

Section 5.09      [Reserved].

Section 5.10      Operation of the Project; Quarterly Operating Reports.  In the case of the Borrower:

(a)      (i) Keep the Project, or cause the same to be kept, in good operating condition consistent in all material respects with all Applicable Longview Permits, this Agreement, the material provisions of the Longview Project Contracts and Prudent Utility Practice, and make or cause to be made all repairs (structural and non-structural, extraordinary or ordinary (ordinary wear and tear excepted)) necessary to keep the Project in such condition, and (ii) operate and maintain the Project, or cause the same to be operated and maintained, in a manner consistent with the Longview Project Contracts, the Long Term Budget, the then current Covenant Budget and Prudent Utility Practice, unless a failure to so operate and maintain the Project would not reasonably be expected to have a Material Adverse Effect.

(b)      [Reserved].

(c)      Deliver to the Administrative Agent within 60 days after the end of each fiscal quarter a report, in form and substance to be mutually developed by the Backstoppers and the Borrower,

75

with respect to such fiscal quarter, summarizing (i) any Longview Project Contract entered into or terminated during such fiscal quarter (whether by expiration in accordance with its terms or otherwise), (ii) revenue, fuel, emissions and operating data, (iii) the actual level of dispatch and duration of the Project, capacity factors and other operating and performance data and (iv) the Longview O&M Costs incurred during such fiscal quarter with a comparison to budgeted amounts for such costs.

(d)     Deliver to the Administrative Agent within 60 days after the end of each fiscal quarter after the Effective Date, a report, in form and substance to be mutually developed by the Backstoppers and Mepco, with respect to such fiscal quarter, summarizing with resepct to Mepco and its Subsidiaries (i) total coal production, total tons of coal sold, revenue from coal sales, total cash production costs, depletion, depreciation and amortization, fully loaded costs and cash from operations, (ii) Capital Expenditures with respect to the prior fiscal quarter and (iii) material environmental and health and safety developments.

Section 5.11     Preservation of Rights; Further Assurances.

(a)     In the case of the Borrower, perform and observe its covenants and obligations, and preserve, protect and defend its rights, under all Major Longview Project Contracts, including prosecution of suits to enforce any right of the Borrower thereunder and enforcement of any claims with respect thereto, except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)     From time to time, (i) execute, acknowledge, record, register, deliver and/or file all such notices, statements, instruments and other documents (including any memorandum of lease or other agreement, UCC financing statement or continuation statement, certificate of title or estoppel certificate) relating to the Secured Obligations, stating the interest and charges then due and any known defaults, and (ii) take such other steps as may be reasonably necessary or advisable to render fully valid and enforceable under all applicable laws the rights, liens and priorities of the Secured Parties with respect to all Collateral and other security from time to time furnished under this Agreement and the other Loan Documents or intended to be so furnished, in each case in such form and at such times as shall be reasonably satisfactory to the Administrative Agent and the Collateral Agent, and pay all reasonable fees and expenses (including reasonable attorneys' fees) incident to compliance with this Section.

(c)     [Reserved].

(d)     (A) If any Loan Party shall at any time acquire any real property or leasehold or other interest in real property located in the United States not covered by the mortgages, promptly notify the Administrative Agent of such acquisition and if required by the Administrative Agent promptly (but no later than 60 days after such request), execute, deliver and record a supplement to the applicable mortgages, reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent, subjecting such real property or leasehold or other interests to the lien and security interest created by such mortgages, and (B) deliver a completed Federal Emergency Management Agency Standard Flood Hazard Determination and obtain flood insurance in such total amount as the Administrative Agent and the Collateral Agent may from time to time reasonably require, if at any time the area in which any improvements located on any such additional real property or on any portion of the Mortgaged Property is designated a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time. With respect to any such additional property of the Borrower, if requested by the Administrative Agent, obtain an appropriate endorsement or supplement to the title policy insuring the Lien of the Collateral

76

Agent in such additional property, subject only to the Permitted Liens and other exceptions to title approved by the Administrative Agent.

(e)    Perform, upon the reasonable request of the Administrative Agent or the Collateral Agent, reasonable acts as may be necessary to carry out the intent of this Agreement and the other Loan Documents.

(f)    With respect to any new Subsidiary created or acquired after the Effective Date, within 5 Business Days after the date such Subsidiary is acquired or created, notify the Administrative Agent and the Collateral Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest or Indebtedness of such Subsidiary owned by or on behalf of the Loan Parties.

(g)    [Reserved].

(h)    For purposes of this Agreement and the other Loan Documents, "Collateral and Guarantee Requirement" shall mean the requirement that:

(i)    in the case of any Person that becomes a Grantor (as defined in the Guarantee and Security Agreement) after the Effective Date, the Collateral Agent shall have received a supplement to the Guarantee and Security Agreement, in the form specified therein, duly executed and delivered on behalf of such Grantor;

(ii)    after the Effective Date and within the time period set forth in Section 5.11(e), all the outstanding Equity Interests directly owned by a Grantor of any Person that becomes a Subsidiary after the Effective Date shall have been pledged pursuant to the Guarantee and Security Agreement, and the Collateral Agent shall have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank, or shall have otherwise received a pledge over such Equity Interests;

(iii)    all Indebtedness (other than intercompany liabilities among the Debtors incurred in the ordinary course of business in connection with the cash management operations of Holdings and its Subsidiaries) that is owing to any Person that becomes a Grantor shall be evidenced by a promissory note or an instrument and shall have been pledged pursuant to the Guarantee and Security Agreement, and the Collateral Agent shall have received all such promissory notes or instruments, together with  note powers or other instruments of transfer with respect thereto endorsed in blank to the extent required pursuant to the Guarantee and Security Agreement;

(iv)    all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent or Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been filed, registered or recorded or delivered to the Collateral Agent for filing, registration or recording concurrently with, or promptly following, the execution and delivery of each such Security Document; and

105095838 v12105095838 v12

(v)     each Grantor shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents (or supplements thereto) to which it is a party, the granting by it of the Liens thereunder and the performance of its obligations thereunder, including consents and approvals contemplated by the proviso to Section 5.11(f).

provided that, with respect to each of the items identified in this definition of "Collateral and Guarantee Requirement", the Backstoppers (in their sole discretion), in each case, may extend such date.

Section 5.12     Maintenance of Insurance.

(a)     In the case of the Borrower:

(i)     without cost to the Lenders, maintain or cause to be maintained on its behalf in effect at all times the types of insurance required pursuant to Schedule 5.12(a), in the amounts and on the terms and conditions specified therein.  If the Borrower fails to take out or maintain the full insurance coverage required by this Section, the Administrative Agent, upon 10 Business Days' prior notice (unless the aforementioned insurance would lapse within such period or has already lapsed, in which event notice shall not be required) to the Borrower of any such failure, may (but shall not be obligated to) take out the required policies of insurance and pay the premiums on the same.  All amounts so advanced by the Administrative Agent shall become Secured Obligations and the Borrower shall forthwith pay such amounts to the Administrative Agent, together with interest from the date of payment by the Administrative Agent at the rate specified in Section 2.15(c).

(ii)     within 30 days of each annual policy renewal date, deliver to the Administrative Agent a certificate of a Responsible Officer of the Borrower, certifying that (i) the insurance requirements of this Section (including Schedule 5.12(a)) have been implemented and are being complied with in all material respects, (ii) the Borrower has paid all insurance premiums then due and payable, and (iii) the Borrower is in compliance in all material respects with the Borrower's insurance policies.

(b)     In the case of the Mepco Group Members:

(i)     (A) keep its insurable properties insured at all times by financially sound and reputable insurers in such amounts as shall be customary for similar businesses and maintain such other reasonable insurance (including, to the extent consistent with past practices, self-insurance), of such types, to such extent and against such risks, as is customary with companies in the same or similar businesses and maintain such other insurance as may be required by law or any other Loan Document, including the coverages set forth on Schedule 5.12(b) and (B) otherwise comply with the requirements set forth in Schedule 5.12(b);

(ii)     deliver original or certified copies of all such policies or a certificate of an insurance broker with respect thereto to the Administrative Agent;

(iii)     notify the Administrative Agent promptly whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.12(b) is taken out by the Mepco Group Members; and promptly deliver to the

78

105095838 v12105095838 v12

Administrative Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto;

(iv)    In connection with the covenants set forth in this Section 5.12(b), it is understood and agreed that:

(A)    none of the Administrative Agent, the Collateral Agent, the Lenders or their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 5.12(b), it being understood that (x) Mepco and the other Loan Parties shall look solely to their insurance companies or any parties other than the aforesaid parties for the recovery of such loss or damage and (y) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Collateral Agent, the Lenders or their agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then Holdings hereby agrees, to the extent permitted by law, to cause the Mepco Group Members to waive its right of recovery, if any, against the Administrative Agent, the Collateral Agent, the Lenders and their agents and employees; and

(B)    the designation of any form, type or amount of insurance coverage by the Administrative Agent under this Section 5.12(b) shall in no event be deemed a representation, warranty or advice by the Administrative Agent, the Collateral Agent or the Lenders that such insurance is adequate for the purposes of the business of the Mepco Group Members or the protection of their properties.

Section 5.13    Taxes, Assessments and Utility Charges.  In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, Holdings and each Subsidiary shall pay and discharge promptly when due all material Taxes imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; provided, however, that such payment and discharge shall not be required with respect to any such Tax or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings, and Holdings or the applicable Subsidiary shall have set aside on its books reserves in accordance with GAAP with respect thereto; provided further, that each Debtor shall not be required to pay and discharge or to cause to be paid and discharged any such Tax or claim so long as (i) payment or discharge thereof shall be stayed by section 362(a)(8) of the Bankruptcy Code, and the applicable Debtor shall have set aside on its books reserves in accordance with GAAP with respect thereto.

Section 5.14    [Reserved].

Section 5.15    [Reserved].

Section 5.16    Separate Existence.

(a)    In the case of the Borrower, (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of the Borrower, (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of the Borrower and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve the Borrower's actions, which meetings will be separate from those of other entities.

105095838 v12105095838 v12

(b)     In the case of Mepco and its Subsidiaries, (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of the Mepco (other than the Mepco Group Members), (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of the Mepco (other than the Mepco Group Members) and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve the Mepco's or any such Subsidiary's actions, which meetings will be separate from those of other entities.

Section 5.17     [Reserved].

Section 5.18     U.S.A. Patriot Act.  Provide the Lender Parties with all information required by the Lender Parties to comply with the U.S.A. Patriot Act.

Section 5.19     Water Supply. In the case of the Borrower and subject to any necessary approvals from the Bankruptcy Court, exercise its rights under Section 14.2 of the Water Supply Agreement to take over and control the management and operation of the Dunkard Facilities upon the occurrence of any of the events described in Sections 13.2 and 14.2 of the Water Supply Agreement.

Section 5.20     Engineering and Contracting Executive.  Cause a person or entity reasonably acceptable to the Backstoppers and the Debtors to continue (x) in the role of Engineering and Contracting Executive, at the sole expense of the Debtors, and (y) to have the access, structure, scope and duties as described in the definition of Engineering and Contracting Executive, or as set forth in any employment agreement agreed to by the Debtors, the Backstoppers, and the Engineering and Contracting Executive.

Section 5.21     [Reserved].

Section 5.22     Quarterly Calls. In the case of each of the Borrower and Mepco, promptly after the delivery of the financial statements required to be delivered pursuant to Section 5.04(a) and (b) for each fiscal quarter (in each case following at least five Business Days notice thereof to each Lender Party), hold a conference call with senior management of the Borrower or Mepco, as applicable, and the Lender Parties.

Section 5.23     [Reserved].

Section 5.24     [Reserved].

Section 5.25     Milestones.  Subject to the availability of the Bankruptcy Court, comply with the following milestones (unless extended or waived by the Backstoppers in their reasonable discretion):

(a)     On or prior to November 12, 2013, filing by the Debtors of the Approved Plan and a disclosure statement with respect thereto (the "Approved Disclosure Statement"), and motion to approve the adequacy of the Approved Disclosure Statement, all in form and substance reasonably satisfactory to the Backstoppers.

(b)     On or prior to November 21, 2013, entry of Final DIP Order by the Bankruptcy Court, in form and substance materially consistent with Exhibit H and otherwise reasonably satisfactory to the Backstoppers and the Debtors.

(c)     On or prior to December 11, 2013, filing by the Debtors of the Estimation Motion.

105095838 v12105095838 v12

(d)     On or prior to December 22, 2013, entry of an order approving the Approved Disclosure Statement materially consistent with the Approved Disclosure Statement and otherwise in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

(e)     On or prior to February 8, 2014, commencement of a hearing with regard to the Estimation Motion.

(f)     On or prior to February 12, 2014, commencement of a hearing to confirm the Approved Plan.

(g)     On or prior to February 19, 2014, entry by the Bankruptcy Court of an order confirming the Approved Plan materially consistent with the Approved Plan and otherwise in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

(h)     On or prior to March 2, 2014 (or if earlier, within three Business Days after the Debtors receive notice that the $59,000,000 letters of credit posted by Foster Wheeler North America Corp. are expiring prior to June 30, 2014), filing by the Debtors of a motion to draw down on the $59,000,000 letters of credit posted by Foster Wheeler North America Corp., or, in the alternative, to draw down on such letters of credit and move such proceeds into escrow, pending final resolution of any determination as to whether such letters of credit constitute "property of estate".

(i)     On or prior to March 7, 2014, the Consummation Date of the Approved Plan.

## ARTICLE VI
## NEGATIVE COVENANTS

The Borrower covenants and agrees with each Lender Party, and Holdings covenants and agrees with each Lender Party solely with respect to Section 6.06, that so long as this Agreement shall remain in effect and until the Commitments have been terminated, the principal of and interest on each Loan, and all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full and all Synthetic L/C Deposits shall have been returned, the Borrower will not, and Holdings will not cause or permit any of its Subsidiaries to (and in the case of Section 6.06, Holdings will not):

Section 6.01     <u>Contingent Liabilities</u>. Except as provided in or permitted under this Agreement, become liable under contract as a surety, guarantor or accommodation endorser for or upon the obligation of any other Person; provided, however, that this Section shall not be deemed to prohibit (a) the acquisition or sale of goods, supplies or merchandise in the normal course of its business, (b) normal trade credit, (c) the endorsement of negotiable instruments received in the normal course of its business, (d) indemnities provided under the Transaction Documents, (e) ordinary course indemnities under agreements that are not Transaction Documents and (f) Longview Permitted Debt and Mepco Permitted Debt.

Section 6.02     <u>Liens</u>.

(a)     In the case of the Borrower, create, assume or suffer to exist (i) any Lien on or with respect to its assets except Longview Permitted Liens or (ii) any Lien on its Equity Interests, except the Lien granted under the Guarantee and Security Agreement.

(b)     In the case of Mepco and any Mepco Subsidiary, create, assume or suffer to exist (i) any Lien on or with respect to its assets except Mepco Permitted Liens or (ii) any Lien on its Equity Interests, except the Lien granted under the Guarantee and Security Agreement.

81

Section 6.03    Indebtedness.

(a)    In the case of the Borrower, incur, create, assume or permit to exist any Indebtedness except Longview Permitted Debt.

(b)    In the case of Mepco and any Mepco Subsidiary, create, assume or permit to exist any Indebtedness except Mepco Permitted Debt.

Section 6.04    Restricted Payments.

(a)    Make payments which are Restricted Payments.

Section 6.05    Sale of Assets; Merger, Consolidations and Acquisition.

(a)    In the case of the Borrower, sell, lease, transfer or otherwise dispose of any of its assets, except for (i) sales of electric capacity or energy or ancillary services to the extent permitted under Section 6.18 and (ii) sales of materials and equipment which are worn out, obsolete or no longer useful to the Debtors.

(b)    In the case of Mepco and the Mepco Subsidiaries, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets (whether now owned or hereafter acquired), or issue, sell, transfer or otherwise dispose of any Equity Interests of Mepco or any Mepco Subsidiary (including preferred equity interests), or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of or any Equity Interests of any other Person, except that this Section shall not prohibit:

(i)    (x) the purchase of coal reserves, the purchase and sale of coal and other inventory, the purchase of supplies, materials and equipment and the purchase and sale of contract rights to, or licenses or leases of, intellectual property, in each case in the ordinary course of business by Mepco or any Mepco Subsidiary consistent with Prudent Coal Industry Practice, (y) the sale of surplus, obsolete or worn out equipment or other property in the ordinary course of business by Mepco or any Mepco Subsidiary or (z) the sale of Permitted Investments in the ordinary course of business;

(ii)    if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (x) the merger of any Mepco Subsidiary into Mepco in a transaction in which Mepco is the surviving entity, (y) the merger or consolidation of any Mepco Subsidiary into or with any Mepco Subsidiary Guarantor in a transaction in which the surviving or resulting entity is a Mepco Subsidiary Guarantor and, in the case of each of clauses (x) and (y), no Person other than Mepco or a Mepco Subsidiary Guarantor receives any consideration or (z) the liquidation or dissolution (other than of Mepco) or change in form of entity of Mepco or any Mepco Subsidiary if Mepco determines in good faith that such liquidation or dissolution or change in form of entity is in the best interests of Mepco and is not materially disadvantageous to the Lenders and the assets of the dissolved or liquidated entity are transferred to Mepco or a Mepco Subsidiary Guarantor;

(iii)    sales, transfers, leases or other dispositions to Mepco or any Mepco Subsidiary Guarantor (upon voluntary liquidation or otherwise);

105095838 v12105095838 v12

(iv)    [Reserved];

(v)    Investments permitted by Section 6.10, Liens permitted by Section 6.02 and Distributions permitted by Section 6.04;

(vi)    the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(vii)    [Reserved];

(viii)    [Reserved];

(ix)    Licensing and cross-licensing arrangements involving any technology or other intellectual property of Mepco or any Mepco Subsidiary in the ordinary course of business;

(x)    abandonment, cancellation or disposition of any intellectual property of Mepco or any Mepco Subsidiary in the ordinary course of business; and

(xi)    sales, transfers, leases or other dispositions under the Conveyor Belt Documents.

Notwithstanding anything to the contrary contained in Section 6.05(b) above, (i) no sale, transfer or other disposition of assets shall be permitted by this Section 6.05(b) (other than sales, transfers, leases or other dispositions to Mepco and the Mepco Subsidiary Guarantors pursuant to paragraph (b)(iii) hereof) unless such disposition is for fair market value and (ii) no sale, transfer or other disposition of assets shall be permitted by paragraph (i), (vi) or (x) of this Section 6.05(b) unless such disposition is for at least 75% cash consideration.

Section 6.06    Business Activities.

(a)    In the case of the Borrower, engage in activities other than the ownership, development, construction, operation, maintenance and financing of the Project and any activities incidental to the foregoing (including activities relating to Dunkard and any other Subsidiary if applicable).

(b)    In the case of the Mepco Group Members, engage at any time in any business or business activity other than any business or business activity conducted by Mepco Group Members on the Effective Date and any business or business activity incidental or related thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

(c)    In the case of Holdings, engage in any activity other than ownership of the Equity Interests, directly or indirectly, of the Borrower, Mepco and its other Subsidiaries and activities reasonably incidental thereto and the performance if its obligations and exercise of its rights under this Agreement and other Loan Documents to which it is a party.

Section 6.07    No Subsidiaries or Joint Ventures. In the case of the Borrower, create, form or acquire any Subsidiary or enter into any partnership or joint venture; provided that the Borrower may organize any other new Subsidiary that is a Wholly-Owned Subsidiary reasonably necessary in connection

with the operation of its business that becomes a Subsidiary Guarantor and complies with the Collateral and Guarantee Requirement.

Section 6.08    No Liquidation, Merger or Consolidation. In the case of the Borrower, liquidate, wind-up or dissolve, or sell, lease or otherwise transfer or dispose of all or substantially all of its property, assets or business or combine, merge or consolidate with or into any other entity, or change its legal form, or modify its existing organizational documents after the Effective Date (which organizational documents in effect on the Effective Date and previously delivered to the Administrative Agent shall be deemed to be approved and in compliance with the provisions of this Section 6.08) or implement any material acquisition or purchase of assets consisting of a business or line of business from any Person (other than as permitted under Section 6.07).

Section 6.09    Lease Transactions.  In the case of the Borrower, enter into any transaction for the lease of any assets, whether operating leases, capital leases or otherwise, other than (a) rail car leases entered into in connection with the transportation of coal supply for the Project in accordance with the provisions of Section 6.18, (b) transactions contemplated by the PILOT Documents, (c) any lease constituting Longview Permitted Debt, (d) leases of operating equipment, automobiles, office equipment or the like as set forth in the Long Term Budget and (e) any such transactions consented to by the Administrative Agent and the Backstoppers (such consent not to be unreasonably withheld or delayed).

Section 6.10    Investments.

(a)    In the case of the Borrower, make any Investments other than Permitted Investments; provided that the Borrower may make intercompany Investments in any Subsidiary formed pursuant to Section 6.07; and provided, further, that, notwithstanding anything to the contrary herein, the Borrower shall at all times be permitted to distribute proceeds of Loans to Mepco and the Mepco Subsidiary Guarantors to the extent such distributions are set forth in the Long Term Budget and any such distribution or issuance shall not be deemed an "Investment" for purposes of this Agreement and the other Loan Documents, and Mepco and the Mepco Subsidiary Guarantors shall at all times be permitted to repay in any manner such Loans, regardless of the manner in which such proceeds are contributed.

(b)    In the case of Mepco and the Mepco Subsidiaries, purchase, hold or acquire (including pursuant to any merger with a Person that is not a Wholly Owned Subsidiary) any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances (other than intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of Holdings and its Subsidiaries) to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, an "Investment"), any other Person, except:

(i)    Investments (including, but not limited to, Investments in Equity Interests, intercompany loans and Guarantees of Indebtedness otherwise expressly permitted hereunder) after the Effective Date by Loan Parties in Mepco and the Mepco Subsidiary Guarantors and by Mepco and the Mepco Subsidiary Guarantors in the Borrower;

(ii)    Permitted Investments and Investments that were Permitted Investments when made;

(iii)    Investments arising out of the receipt by Mepco or any Mepco Subsidiary of non-cash consideration for the sale of assets permitted under Section 6.05(b);

105095838 v12105095838 v12

(iv)     [Reserved];

(v)     accounts receivable arising and trade credit granted in the ordinary course of business and any securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(vi)     Hedging Agreements permitted pursuant to Section 6.22;

(vii)     Investments existing on the Effective Date and set forth on <u>Schedule 6.10(b)</u>;

(viii)     Investments resulting from pledges and deposits referred to in clauses (f) and (g) of the definition of "Mepco Permitted Liens";

(ix)     [Reserved];

(x)     [Reserved];

(xi)     [Reserved];

(xii)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business;

(xiii)     [Reserved]; and

(xiv)     Guarantees by Mepco or any Mepco Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by any Mepco Subsidiary Guarantor in the ordinary course of business.

Section 6.11     <u>Transactions with Affiliates</u>.

(a)     Directly or indirectly enter into any transaction or series of transactions with or for the benefit of any of its Affiliates (including, for the avoidance of doubt, the Sponsors and Dunkard), except for (i) transactions that are consented to by the Backstoppers and (ii) ordinary course transactions consistent with past practice pursuant to the agreements set forth on Schedule 6.11; <u>provided</u> that this paragraph (i) shall not apply to transactions among the Borrower, Mepco and the Mepco Subsidiary Guarantors.

Section 6.12     <u>Regulations</u>.  Directly or indirectly apply any part of the proceeds of any Loan or other extensions of credit hereunder or other revenues to the purchasing or carrying of any Margin Stock.

Section 6.13     <u>ERISA</u>.  Engage in or suffer any ERISA Event that would subject the Borrower or any Mepco Group Member to any Tax, penalty or other liabilities in excess of $250,000.

Section 6.14     <u>[Reserved]</u>.

Section 6.15     <u>[Reserved]</u>.

105095838 v12**105095838 v12**

Section 6.16    <u>Amendments to Major Longview Project Contracts</u>.  In the case of the Borrower:

(a)    Amend or otherwise modify, or grant any waiver or consent under, any Major Longview Project Contract unless (i) such amendment, modification, waiver or consent is in the best interest of the Borrower and could not reasonably be expected to have a Material Adverse Effect, as certified by a Responsible Officer of the Borrower, (ii) such amendment, modification, waiver or consent is consented to by the Administrative Agent and the Backstoppers (such consent not to be unreasonably withheld or delayed) and (iii) the form of such amendment, modification waiver or consent shall have been provided to each Lender Party (whether by posting to Intralinks or otherwise) at least 10 Business Days prior to the proposed effective date of such amendment, modification waiver or consent.

(b)    Permit the termination (or effective termination resulting from an assignment of the Borrower's rights) of any Major Longview Project Contract (other than upon expiration in accordance with the terms thereof) unless such termination is consented to by the Administrative Agent and the Backstoppers (such consent not to be unreasonably withheld or delayed).

Section 6.17    <u>Subcontractor/Project Repair</u>. (a) Engage a subcontractor to conduct the repair of the Project without the reasonable consent of the Backstoppers, (b) enter into any agreements relating to repair of the Project (including, without limitation, any agreements with the Debtors' consultants or any employment agreements) without the reasonable consent of the Backstoppers, (c) fail to comply with the milestones, or any other obligation, set forth in any agreement relating to the repair of the Project, or (d) make any expenditures with regard to the repair of the Project without the reasonable consent of the Backstoppers, other than expenditures with regard to insignificant repairs in the ordinary course of business.

Section 6.18    <u>Additional Longview Project Contracts</u>.  In the case of the Borrower, enter into, become a party to, or become liable under any Additional Longview Project Contract; <u>provided</u> that any Commodity Hedging Agreement shall be governed solely by Section 6.22.

Section 6.19    <u>Fiscal Year, Name, Location and EIN</u>.  In the case of the Borrower, (a) change its fiscal year, name or its federal employer identification number without the Administrative Agent's consent (such consent not to be unreasonably withheld or delayed) or (b) change the location of its chief executive office or principal place of business without providing to the Administrative Agent at least 30 days' prior written notice of any such change.

Section 6.20    [Reserved].

Section 6.21    <u>Hazardous Materials</u>.  In the case of the Borrower, store, transport, use or Release any Hazardous Materials in violation of any Environmental Laws, other Legal Requirements or Applicable Longview Permits or in a manner that would reasonably be expected to subject the Secured Parties to an Environmental or Mining Claim, or otherwise lead to liability, or require investigation, remediation, or corrective action under, any Environmental Law.

Section 6.22    <u>Commodity Hedging Agreements; Mepco Hedging Agreements</u>.  (a) In the case of the Borrower, enter into or become a party to any Commodity Hedging Agreement other than a Permitted Commodity Hedging Agreement.

(b)    In the case of Mepco and the Mepco Subsidiaries, enter into any Hedging Agreement, other than (a) Hedging Agreements entered into in the ordinary course of business for non-speculative purposes in accordance with Prudent Coal Industry Practice to hedge against or mitigate

105095838 v12**105095838 v12**

risks to which Mepco or any Subsidiary is exposed in the conduct of its business or the management of its liabilities, underlined provided that such provision shall not prevent any Mepco Group Member from entering into coal purchase and sale agreements in the ordinary course of business for non-speculative purposes, and (b) Hedging Agreements entered into for non-speculative purposes in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest- bearing liability or investment of any Mepco Group Member subject, in the case of (a) and (b) above, to the approval of the Backstoppers.

Section 6.23    Prepayment or Modification of Debt.  Except as otherwise allowed pursuant to the Final DIP Order or any order of the Bankruptcy Court, (i) make any payment or prepayment or redemption or acquisition for value or any cancellation or other retirement of any Prepetition Indebtedness or other pre-Petition Date obligations of any Loan Party, (ii) pay any interest on any Prepetition Indebtedness of any Loan Party (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection) on property of the Loan Parties, or apply to the Bankruptcy Court for the authority to do any of the foregoing, or permit any of its Domestic Subsidiaries to do any of the foregoing; provided that (x) the Borrower and the Guarantors may make payments for administrative expenses that are allowed and approved by the Bankruptcy Court and payable under sections 330, 331 and 503 of the Bankruptcy Code, (y) the Borrower may prepay the obligations under the Loan Documents and make payments permitted by the "first day" orders, and (z) the Borrowers may make payments to such other claimants and in such amounts as may be approved by the Bankruptcy Court.  In addition, no Loan Party shall permit any of its Subsidiaries to make any payment, redemption or acquisition on behalf of such Loan Party which such Loan Party is prohibited from making under the provisions of this Section 6.23.

Section 6.24    Sale and Lease-back Transactions.  In the case of Mepco or any Mepco Subsidiary, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "Sale and Lease-Back Transaction").

Section 6.25    Modification of Certificate of Incorporation, By-laws, and Certain Other Agreements, Etc..

(a)    In the case of Mepco or any Mepco Subsidiary, amend or modify in any manner, or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Lenders), the articles or certificate of incorporation, certificate of limited partnership or formation, or by-laws or partnership agreement or limited liability company operating agreement of Mepco or any Mepco Subsidiaries, or permit any Mepco Subsidiary to do any of the foregoing, in the case of any such amendment or modification, after the Effective Date (which organizational documents in effect on the Effective Date and previously delivered to the Administrative Agent shall be deemed to be approved and in compliance with the provisions of this Section 6.25(a));

(b)    In the case of Mepco or any Mepco Subsidiary, enter into, or permit any Mepco Subsidiary to enter into, any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions, or the making of cash advances by such Mepco Subsidiary, to Holdings or the Mepco Group Member that is a direct or indirect parent of such Mepco Subsidiary or (ii) the granting of Liens by Mepco or such Mepco Subsidiary to secure the Obligations on a perfected, first priority basis (subject to Permitted Liens), in each case other than those arising under any Loan Document, except restrictions existing by reason of:

87

105095838 v12105095838 v12

(i)        restrictions imposed by applicable law;

(ii)        contractual encumbrances or restrictions in effect on the Effective Date under any agreements related to any permitted renewal, extension or refinancing of any Indebtedness existing on the Effective Date that does not expand the scope of any such encumbrance or restriction;

(iii)        customary restrictions and conditions imposed pursuant to an agreement entered into for the sale or other disposition of assets or Equity Interests as permitted under Section 6.05(b) pending the closing of such sale or disposition;

(iv)        customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(v)        any restrictions imposed by any agreement relating to Indebtedness permitted under clause (i) of the definition Mepco Permitted Debt to the extent that such restrictions apply only to the property or assets securing such Indebtedness as permitted under clause (i) of the definition of "Mepco Permitted Liens";

(vi)        customary provisions contained in leases or licenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(vii)        customary provisions restricting subletting or assignment of any lease governing a leasehold interest, _provided_ that Mepco or such Mepco Subsidiary shall use commercially reasonable efforts to have such provisions waived or eliminated; or

(viii)        customary provisions restricting assignment of any agreement entered into in the ordinary course of business, _provided_ that Mepco or such Mepco Subsidiary shall use commercially reasonable efforts to have such provisions waived or eliminated.

Section 6.26        [Reserved].

Section 6.27        Minimum Consolidated EBITDAR. As of the last day of each month, permit there to be in excess of the greater of (i) 10% negative variance and (ii) $250,000 negative variance between actual Consolidated EBITDAR and the projected Consolidated EBITDAR as set forth in the Long Term Budget for the applicable month.

Section 6.28        Budget Variance.

(a)        For each Test Period, beginning with the Test Period ending on [●], 2013, permit there to be in excess of the greater of (i) 10% negative variance and (ii) $250,000 negative variance between actual "Rolling Net Cash Flow" (excluding the amount of any proceeds received from any customer resulting from any settlement related to any causes of action) and the projected "Rolling Net Cash Flow" (excluding the amount of any proceeds received from any customer resulting from any settlement related to any causes of action) for the Borrower as set forth in the Covenant Budget for the applicable Test Period.

(b)        For each Test Period, beginning with the Test Period ending on [●], 2013, permit there to be in excess of the greater of (i) 10% negative variance and (ii) $250,000 negative variance between actual "Mepco Rolling Net Cash Flow" (excluding the amount of any proceeds received from any customer

88

105095838 v12105095838 v12

resulting from any settlement related to any causes of action) and the projected "Mepco Rolling Net Cash Flow" (excluding the amount of any proceeds received from any customer resulting from any settlement related to any causes of action) for Mepco and its Subsidiaries as set forth in the Covenant Budget for the applicable Test Period.[5]

(c)    For each Test Period, beginning with the Test Period ending on [●], 2013, permit, on a cumulative basis, there to be in excess of 10% positive variance between actual "Capex" incurred from and after the Effective Date and the projected "Capex" to be incurred from and after the Effective Date for the Borrower as set forth in the Covenant Budget for the applicable Test Period

(d)    For each Test Period, beginning with the Test Period ending on [●], 2013, permit, on a cumulative basis, there to be in excess of 10% positive variance between actual "Capital Expenditures" incurred from and after the Effective Date and the projected "Capital Expenditures" to be incurred from and after the Effective Date for Mepco and its Subsidiaries as set forth in the Covenant Budget for the applicable Test Period.

Section 6.29    Chapter 11 Cases.

(a)    Except for the Carve-Out, incur, create, assume, suffer to exist or permit any other Superpriority Claim which is *pari passu* with or senior to the claims of the Administrative Agent, the Collateral Agent and Lenders against the Loan Parties or the adequate protection Liens or claims, if any, of the Prepetition Agent or Prepetition Lenders against the Loan Parties, except as set forth in the Final DIP Order.

(b)    Without limiting subsection (c) below, make or permit to be made any change to the Final DIP Order without the consent of the Backstoppers.

(c)    File an application for the approval of any Superpriority Claim or any Lien in any of the Chapter 11 Cases that is *pari passu* with or senior to the Liens securing the Obligations, Liens securing the obligations under the Prepetition Credit Agreement, or any Liens granted by the Bankruptcy Court to the Prepetition Agent on behalf of itself and the Prepetition Lenders as adequate protection for the Prepetition Agent's prepetition Liens  without the consent of the Administrative Agent, the Collateral Agent, the Backstoppers and the Prepetition Agent.

(d)    Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against Administrative Agent, the Collateral Agent, any Lender, the Prepetition Agent or any Prepetition Lender with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Credit Agreement, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby.

(e)    Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice

---

[5] For the avoidance of doubt, "Rolling Net Cash Flow" and "Mepco Rolling Net Cash Flow" shall not include professional fees and fees and expenses of the arbitration involving the EPC Contractors.

105095838 v12105095838 v12

and a hearing and (b) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Covenant Budget.

(f)     File any motion with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Debtors without consulting with the Backstoppers and providing the Backstoppers prior (in any case, not less than 5 Business Days) notice and the opportunity to review and comment on such motion.

Section 6.30    Communications with Bankruptcy Court.  Fail to use commercially reasonable efforts to (a) provide prior notice to the Administrative Agent and counsel to the Backstoppers of any communications, whether oral or written, with the Bankruptcy Court or the office of the U.S. Trustee, to allow for such parties to participate in such communications, or (b)  permit the Backstoppers to participate in any communications, whether oral or written, involving any of the Debtors with the Bankruptcy Court, or the office of the U.S. Trustee**; [provided that, in each of cases (a) and (b), such efforts shall not be required for any ordinary chapter 11 communications, such as scheduling, etc].**

# ARTICLE VII
# EVENTS OF DEFAULT

Section 7.01    Events of Default.  The occurrence of any of the following events shall constitute an event of default hereunder (each, an "Event of Default"):

(a)     Misrepresentations.  Any representation or warranty made or deemed made by any Loan Party in any Loan Document, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other document furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect **(and in all respects for the representation and warranty contained in Section 3.26)** when so made, deemed made or furnished by such Loan Party.

(b)     Principal Payment Default.  Default shall be made in the payment of any principal of any Loan or Synthetic L/C Reimbursement Obligation when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise.

(c)     Interest Payment Default.  Default shall be made in the payment of any interest on any Loan or Synthetic L/C Reimbursement Obligation or in the payment of any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of two Business Days.

(d)     Immediate Covenant Default.  Default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Section 5.01, 5.03(a)(iii)(A), 5.05 (with respect to the Borrower and Mepco), 5.12, 5.16 5.20, 5.25 or in Article VI.

(e)     Covenant Defaults with Cure.

(i)     Default shall be made in the due observance or performance by any Loan Party of any other covenant, condition or agreement in any Loan Document (other than those listed in paragraphs (b), (c) and (d) above) and such default shall continue unremedied for a period of three days after notice thereof from any Lender Party to such Loan Party.

90

105095838 v12**105095838 v12**

(f)      Non-Payment; Cross-Acceleration.  (i) A default shall occur in the payment when due (subject to any applicable grace period) which is not stayed by the filing of the Chapter 11 Cases, whether by acceleration or otherwise, of any Indebtedness (other than Loans and Letters of Credit) of any Loan Party in an aggregate principal amount exceeding $250,000 or (ii) a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of such Indebtedness which is not stayed by the filing of the Chapter 11 Cases.

(g)      [Reserved].

(h)      [Reserved].

(i)      Judgments.  One or more judgments or orders for the payment of money in excess of $250,000 (taking into account any insurance proceeds payable under a policy where the insurer has accepted coverage without reservation) shall be rendered against any Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect with respect to such Loan Party.

(j)      ERISA.  One or more ERISA Events shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect.

(k)      Loan Documentation.  (i) Any Loan Document shall cease to be in full force and effect or shall be declared void by a Governmental Authority, or any party thereto (other than a Lender Party) shall claim such unenforceability or invalidity or (ii) any security interest in the Collateral purported to be created by any Security Document shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that (A) any such loss of validity, perfection or priority results from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents or to file UCC continuation statements, (B) such loss is covered by the Title Policy (as defined in the Prepetition Credit Agreement) or (C) any such loss of validity, perfection or priority results from the failure of the Collateral Agent to take any action required to be taken by it to secure the validity, perfection or priority of the security interests.

(l)      Project Repair Related Events.  (i) Any material contract related to the repair of the Project (including, for the avoidance of doubt, the employment agreement of the Engineering and Contracting Executive) shall have been terminated or work on the repair of the Project shall have ceased for three consecutive Business Days, in each case, except as otherwise consented to by the Backstoppers within five Business Days of the occurrence of such event, (ii) the Debtors shall have failed to meet the agreed upon timeline for repairs to the Project delivered pursuant to Section 4.01(j) or otherwise as required by this Agreement, which shall remain unremedied for five Business Days, (iii) the Debtors shall fail to provide the Engineering and Contracting Executive full access to any requested information, personnel, third parties, documents or other resources or (iv) the Debtors shall have breached or otherwise defaulted under any material contract related to the repair of the Project (including any such contract with consultants), and such breach or other default shall continue unremedied for a period of three days.

(m)      Abandonment of Project.  The operation of the Project shall have been abandoned for a period of at least three consecutive days.

105095838 v12105095838 v12

(n)     Major Longview Project Contracts; Air Permit.

(i)     (A) A breach shall have occurred under any Major Longview Project Contract or (B) any Person other than the Water Supplier or the Borrower shall assume ownership or control of the Facilities (as defined in the Water Supply Agreement) and/or the Water Supplier whether by foreclosure, other exercise of remedies or otherwise, unless the obligations of the Water Supplier under the Water Supply Agreement in favor of the Borrower are continuing to be performed, unless, in each case, a Responsible Officer of the Borrower certifies that such breach or assumption, as applicable, could not reasonably be expected to have a Material Adverse Effect.

(ii)     Any Major Longview Project Contract shall terminate or otherwise cease to be valid and binding on any party thereto (except upon expiration in accordance with its terms or full performance by such party of its obligations thereunder).

(iii)     Any court or other Governmental Authority having jurisdiction shall have issued an order or taken other action either (A) suspending, terminating or cancelling the Air Permit or (B) granting an injunction or restraining order or other relief with respect to the Air Permit the effect of which is to cause the Air Permit no longer to be in full force and effect, and in the case of either (A) or (B) both (1) the effect of such order or other action is to make unlawful the Borrower's continued construction or operation of the Project and (2) either (x) such order or other action shall not have been vacated, stayed, revoked, overturned (on appeal or otherwise) or otherwise made ineffective within one year after the date of issuance of such order or the taking of such other action or (y) the Borrower shall have ceased to continue diligently pursuing an appeal or other appropriate proceeding for review or reconsideration of such order or other action at any time within such one-year period.

(o)     Loss Events.  Any material portion of the Borrower's property is damaged, seized or appropriated without fair value being paid therefor such as to allow replacement of such property and/or prepayment of Secured and to allow the Borrower to continue satisfying its obligations hereunder and under the other Longview Transaction Documents.

(p)     The Final DIP Order shall have not been entered by the Bankruptcy Court on or prior to November 21, 2013.

(q)     (i) any of the Chapter 11 Cases concerning the Loan Parties shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the dismissal or conversion of any of the Chapter 11 Cases concerning the Loan Parties under section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a Responsible Officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases; or any Loan Party shall file a motion or other pleading or shall consent to a motion or other pleading filed by any other Person seeking any of the foregoing; or

(ii)     the existence of any other Superpriority Claim (other than the Carve-Out) in any of the Chapter 11 Cases which is *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties against any Loan Party hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim (other than the Carve-Out); or

92

105095838 v12**105095838 v12**

(iii)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to proceed against, including foreclosure (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Borrowers or the Guarantors that have a value in excess of $250,000 in the aggregate; or

(iv)    an order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered (A) reversing, staying or vacating the Final DIP Order, (B) without the written consent of the Backstoppers, amending, supplementing or modifying the Final DIP Order or (C) denying or terminating the use of cash collateral by the Borrower or the Guarantors pursuant to the Final DIP Order; or any Loan Party shall file a motion or other pleading or shall consent to a motion or other pleading filed by any other Person seeking any of the foregoing; or

(v)    default in any material respect shall be made by Borrower or any Guarantor in the due observance or performance of any term or condition contained in the Final DIP Order; or

(vi)    a final non-appealable order of the Bankruptcy Court shall be entered that provides for the recovery from any portions of the Collateral of any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or any Loan Party shall bring a motion in the Chapter 11 Cases seeking, or otherwise consent to, authority from the Bankruptcy Court (i) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code or (ii) to effect any other action or actions (x) materially adverse to the Administrative Agent, the Collateral Agent or Lenders or their rights and remedies hereunder or their interest in the Collateral or (y) inconsistent with the Loan Documents; or

(vii)    the Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a Reorganization Plan and solicit acceptances thereof; or

(viii)    the Loan Parties, or any Person claiming by or through the Loan Parties, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent, the Collateral Agent or any of the Lenders relating to the Facility, unless (i) such suit or other proceeding is in connection with the enforcement of the Loan Documents against the Administrative Agent, the Collateral Agent or Lenders or (ii) such suit or other proceeding is stayed pursuant to section 362 of the Bankruptcy Code or an order of the Bankruptcy Court and is released upon the "Effective Date" of the Reorganization Plan, as defined therein, and the order confirming such Reorganization Plan provides that any such suit or proceeding shall be dismissed with prejudice; or

(ix)    After the order confirming a Reorganization Plan (the "Confirmation Order") shall have been entered by the Bankruptcy Court, any Loan Party shall fail to satisfy in full all Obligations under the Loan Documents on or after the effective date of such plan or reorganization or fail to comply in any material respect with the Confirmation Order, or the Confirmation Order shall have been revoked, remanded, vacated, reversed, rescinded or modified or amended in any manner that is materially adverse to the Administrative Agent's, the Collateral Agent's or the Lenders' interests or inconsistent with the Loan Documents; or

93

(x)       the commencement of any adversary proceeding, contested matter or other action by any Loan Party or any other party either asserting any claims and defenses or otherwise against any of the Prepetition Agent or the Prepetition Lenders under the Prepetition Credit Agreement with respect to the obligations of any Loan Party thereunder or the liens granted to such agent to secure the obligations under the Prepetition Credit Agreement, except as may be permitted under the Final DIP Order; or

(xi)       the Bankruptcy Court shall enter an order estimating that the Mechanics Liens claims (A) exceed $0.00 in the aggregate after accounting for any defect claims, damages, counterclaims, or any other causes of action the Debtors have or may have against or on account of the Mechanics' Lien Claimants, and (B) are senior to the claims of the Prepetition Lenders under the Prepetition Credit Agreement in their entirety.

(r)       The Debtors shall have failed to obtain a public facility level rating and a public recovery rating (including a DIP recovery rate) from each of Standard & Poor's and Moody's on or prior to the date that is fifteen Business Days after the Effective Date.

(s)       <u>Change of Control</u>. A Change of Control shall have occurred.

**(t)       [Financial Projections. The Debtors shall not have filed with the Bankruptcy Court financial projections, in form and substance** *reasonably acceptable to the* **Backstoppers, and** *in form, substance and level of detail materially consistent with financial projections customarily filed with a disclosure statement,* **on or prior to December 4, 2013.]**

Section 7.02       <u>Remedies</u>.  Except as otherwise provided in the Final DIP Order, upon the occurrence and during the continuation of an Event of Default, and at any time thereafter during the continuation of such Event of Default, without further order of or application to the Bankruptcy Court, the Administrative Agent, at the request of the Backstoppers, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times:  (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and (iii) direct the Collateral Agent to exercise the rights and remedies under the Security Documents.  In addition, except as otherwise provided in the Final DIP Order, upon the occurrence and during the continuation of an Event of Default, the Administrative Agent, the Collateral Agent and the Applicable Secured Parties shall have the remedies available pursuant to the Security Documents and under applicable law.

**ARTICLE VIII**
**THE AGENTS**

Section 8.01       <u>Appointment</u>.

(a)       The Bank of Nova Scotia is hereby appointed to act as the Administrative Agent and Union Bank, N.A. is hereby appointed to act as Collateral Agent.  Each of the Lenders and each assignee of any such Lender hereby irrevocably authorizes each such Agent to take such actions on behalf of such Lender or assignee and to exercise such powers as are specifically delegated to such Agent by the terms and provisions hereof and of the other Loan Documents, together with such actions and powers as are

reasonably incidental thereto. Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized by the Lenders, without hereby limiting any implied authority, (A) to receive on behalf of the Lenders all payments of principal of and interest on the Loans and all other amounts due to the Lenders hereunder, and promptly to distribute to each Lender its proper share of each payment so received (and any such payments not so distributed by the Administrative Agent within one Business Day of receipt thereof shall bear interest at a rate equal to the greater of (x) the Federal Funds Effective Rate and (y) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation); (B) to give notice on behalf of each of the Lenders of any Event of Default specified in this Agreement of which the Administrative Agent has actual knowledge acquired in connection with the performance of its duties as Administrative Agent hereunder; and (C) to distribute to each Lender (including by use of the Platform in accordance with Section 9.17(b)) copies of all notices, financial statements and other materials delivered by the Borrower pursuant to this Agreement as received by the Administrative Agent.

(b)    Neither the Agents nor any of their respective Related Parties shall be liable as such for any action taken or omitted by any of them except for its or their own gross negligence or willful misconduct, or be responsible for any statement, warranty or representation herein or the contents of any document delivered in connection herewith, or be required to ascertain or to make any inquiry concerning the performance or observance by the Borrower or any other Loan Party of any of the terms, conditions, covenants or agreements contained in any Loan Document. The Agents shall not be responsible to the Lenders for the due execution, genuineness, validity, enforceability or effectiveness of this Agreement or any other Loan Documents or other instruments or agreements. The Agents shall in all cases be fully protected in acting, or refraining from acting, in accordance with written instructions signed by the Backstoppers and, except as otherwise specifically provided herein, such instructions and any action or inaction pursuant thereto shall be binding on all the Lenders. Each Agent shall, in the absence of knowledge to the contrary, be entitled to rely on any instrument or document believed by it in good faith to be genuine and correct and to have been signed or sent by the proper Person. Neither the Agents nor any of their Related Parties shall have any responsibility to the Borrower or any other party hereto or to any other Loan Document on account of the failure, delay in performance or breach by, or as a result of information provided by, any Lender of any of its obligations hereunder or to any Lender on account of the failure of or delay in performance or breach by any other Lender or the Borrower or any other Loan Party of any of their respective obligations hereunder or under any other Loan Document or in connection herewith or therewith.

Section 8.02    Nature of Duties. The Lenders hereby acknowledge that no Agent shall be under any duty to take any discretionary action permitted to be taken by it pursuant to the provisions of this Agreement unless it shall be requested in writing to do so by the Backstoppers. The Lenders further acknowledge and agree that so long as an Agent shall make any determination to be made by it hereunder or under any other Loan Document in good faith, such Agent shall have no liability in respect of such determination to any Person. Notwithstanding any provision to the contrary elsewhere in this Agreement, (i) neither Agent shall have any duties or responsibilities except those expressly set forth herein, (ii) neither Agent shall be deemed to have any fiduciary relationship with any Lender or any other Agent, and (iii) no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into the Loan Documents or otherwise exist against either Agent. No Agent shall be required to take any action which exposes or could reasonably be expected to expose such Agent to personal liability or which is contrary to this Agreement, any other Loan Document, or applicable law. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents, employees, or any sub-agent appointed by it, and may consult with third party professionals in the exercise of such powers, rights and remedies and the performance of such duties. Each Agent shall be entitled to rely upon the advice of legal counsel selected by it with respect to all matters arising hereunder and shall not be liable for any action taken or suffered in good

95

faith by it in accordance with the advice of such counsel. The Administrative Agent and the Collateral Agent shall be entitled to hire third party professionals (including, for the avoidance of doubt, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants and turnaround consultants) as it deems reasonably necessary to execute its duties hereunder and perform services in connection with the Loans, and expenses incurred by the Administrative Agent and the Collateral Agent related to such professionals shall be reimbursed in accordance with Section 8.05.

Section 8.03    Resignation by or Removal of the Agents.  Subject to the appointment and acceptance of a successor Agent as provided below, any Agent may resign at any time by notifying the Lenders and the Borrower.  The Backstoppers shall have right to remove any Agent for cause.  Upon any such resignation or removal, the Backstoppers shall have the right to appoint a successor.  If no successor shall have been so appointed by the Backstoppers and shall have accepted such appointment within 45 days after the retiring Agent gives notice of its resignation or the Backstoppers vote to remove an Agent, then the retiring or removed Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York and an office in London, England (or a bank having an Affiliate with such an office) having a combined capital and surplus that is not less than $500,000,000 or an Affiliate of any such bank.  Upon the acceptance of any appointment as Agent hereunder by a successor bank, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Agent and the retiring or removed Agent shall be discharged from its duties and obligations hereunder.  After an Agent's resignation or removal hereunder, the provisions of this Article, Section 8.05 and Section 9.05 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.  If the Administrative Agent is removed for cause hereunder, the Synthetic L/C Issuing Bank shall be replaced in accordance with Section 2.07(j).

Section 8.04    Each Agent in its Individual Capacity.  With respect to its Commitments, Loans and Synthetic L/C Deposit, as applicable, each Agent in its individual capacity and not as Agent shall have the same rights and powers as any other Lender and may exercise the same as though it were not an Agent, and the Agents and their Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or its Affiliates as if it were not an Agent.

Section 8.05    Indemnification.  Each Lender agrees (a) to reimburse the Agents, on demand, in the amount of its pro rata share (based on its Commitments hereunder (or if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of its applicable outstanding Loans)) of any reasonable expenses incurred by the Agents, including reasonable counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, which shall not have been reimbursed by the Borrower, and (b) to indemnify and hold harmless each Agent and any of its Related Parties, on demand, in the amount of such pro rata share, from and against any and all liabilities, Taxes, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against it in its capacity as Agent or any of them in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by it or any of them under this Agreement or any other Loan Document, to the extent the same shall not have been reimbursed by the Borrower; provided that no Lender shall be liable to an Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from the gross negligence or willful misconduct of such Agent or any of its Related Parties.

Section 8.06    Lack of Reliance on Agents.  Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as

105095838 v12105095838 v12

it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Section 8.07    Protective Advances.  Notwithstanding anything herein to the contrary, the Administrative Agent shall not be required to fund any protective advances or to fund any advances on behalf of any Lender.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01    Notices.

(a)    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, to the applicable address set forth in Schedule 9.01.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures set forth in Section 9.17 or as otherwise approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent, the Collateral Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; and provided, further, that approval of such procedures may be limited to particular notices or communications.

(c)    All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, sent by telecopy or (to the extent permitted by paragraph (b) above) electronic means or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section or in accordance with the latest unrevoked direction from such party given in accordance with this Section.

(d)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02    Survival of Agreement.  All covenants, agreements, representations and warranties made by the Borrower in this Agreement and the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans and the Synthetic L/C Deposits, the execution and delivery of the Loan Documents and the issuance of the Synthetic Letters of Credit, regardless of any investigation made by such Persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or Synthetic L/C Disbursement or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated and the Synthetic L/C Deposits have not been returned.  Without prejudice to the survival of any other agreements contained herein, the indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.17, 2.19, 8.05 and 9.05) shall survive the payment in full of the principal

97

105095838 v12105095838 v12

and interest hereunder, the expiration of the Synthetic Letters of Credit and the termination of the Commitments or this Agreement and the return of the Synthetic L/C Deposits.

Section 9.03    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Agents and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Borrower, each Lender Party and their respective permitted successors and assigns.

Section 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Lender Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required for any assignment of Loans and Commitments under the Facility to a Lender, an Affiliate of a Lender or an Approved Fund with respect to a lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, an assignment of the entire remaining amount of the assigning Lender's Commitment or contemporaneous assignments to related Approved Funds that equal at least $1,000,000 in the aggregate, the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless Administrative Agent otherwise consents (which consent may be granted or withheld by the Administrative Agent in its sole discretion); provided that related Approved Funds shall be aggregated for purposes of determining compliance with such minimum assignment amounts;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Facility;

105095838 v12105095838 v12

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption and shall represent therein or in a separate writing addressed to the Administrative Agent that the assignee is not a Person referred to in Section 9.04(b)(ii)(E), and the Administrative Agent shall be entitled conclusively to rely on such representation;

(D)    the assignee, if it shall not already be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations that is requested by the Administrative Agent;

(E)    no such assignment shall be made to (x) a Defaulting Lender, (y) the Borrower or any of its Affiliates or (z) any Mechanics' Lien Claimant or its Affiliates until such time as any outstanding litigation is adjudicated or settled with respect to such Mechanics' Lien Claimant; and

(F)    the Administrative Agent shall have received a $3,500 processing fee from such assigning Lender or assignee.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender hereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.17, 2.18, 2.19 and 9.05).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder) and any written consent to such assignment required by paragraph (b)(i) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower and the Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument (oral or written) pursuant to which a Lender sells such a

99

105095838 v12105095838 v12

participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided that (x) such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 9.04(a)(i) or clause (i) , (ii) , (iii) , (iv) , (v), (vi) or (vii) of the first proviso to Section 9.08(b) that affects such Participant and (y) no other agreement (oral or written) with respect to such Participant may exist between such Lender and such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.17, 2.18 and 2.19 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided such Participant agrees to be subject to Section 2.20(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure to such Person is necessary to establish to a Governmental Authority that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations as a result of a request or inquiry by such Governmental Authority.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.17, 2.18 or 2.19 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (which shall not be unreasonably withheld).  A Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 2.19 to the extent such Participant fails to comply with Section 2.19(e) as though it were a Lender.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    Expenses; Indemnity.

(a)    The Borrower agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Agents or the Backstoppers in connection with the preparation of this Agreement and the other Loan Documents, or by the Agents or the Backstoppers in connection with the syndication of the Commitments or the administration of this Agreement and the other Loan Documents (including expenses incurred in maintaining the Platform and expenses incurred in connection with due diligence and initial and ongoing Collateral examination and the reasonable fees, disbursements and the charges for counsel in each jurisdiction where Collateral is located) or in connection with any amendments,

105095838 v12105095838 v12

modifications or waivers of the provisions hereof or thereof (whether or not the Transactions hereby contemplated shall be consummated) or in connection with the ongoing monitoring of the Chapter 11 Cases or incurred by any Lender Party in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents, in connection with the Loans made or the Synthetic Letters of Credit issued hereunder, including the reasonable fees, charges and disbursements of (i) Luskin, Stern & Eisler, LLP, counsel to The Bank of Nova Scotia, as Administrative Agent and Synthetic L/C Issuing Bank, (ii) Akin Gump Strauss Hauer & Feld LLP, counsel to the Backstoppers, (iii) Hughes, Hubbard & Reed LLP, counsel to Union Bank, N.A., as Collateral Agent, (iv) Houlihan Lokey, Capital, Inc., financial advisor to the Backstoppers, (v) SAIC Energy, Environment & Infrastructure, LLC, (vi) CH2M HILL, and (vii) any other consultant or advisor retained by the Backstoppers, and, in connection with any such enforcement or protection, the reasonable fees, charges and disbursements of any other counsel (including the reasonable and documented allocated costs of internal counsel) for any Lender Party (but no more than one such counsel for each Lender).

(b)    Holdings and the Borrower each agrees to indemnify the Synthetic L/C Issuing Bank and each Lender Party and each of their respective directors, trustees, officers, employees, investment advisors and agents (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations hereunder or thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Loans or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses result primarily from the gross negligence or willful misconduct of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction (treating, for this purpose only, any Lender Party and any of their respective Related Parties as a single Indemnitee).  Subject to and without limiting the generality of the foregoing sentence, the Borrower agrees to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented counsel or consultant fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (A) any Environmental or Mining Claim to the extent related in any way to the Borrower, or (B) any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on or from any Real Property, any property owned, leased or operated by any predecessor of the Borrower, or, to the extent related in any way to the Borrower, any property at which the Borrower has sent Hazardous Wastes for treatment, storage or disposal; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses result from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties, as determined by the final judgment of a court of competent jurisdiction.  The provisions of this Section shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Lender Party.  All amounts due under this Section shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)    [Reserved].

(d)        This Section 9.05 shall not apply to Taxes.

Section 9.06        Right of Set-off.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower, against any and all obligations of the Borrower, now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

Section 9.07        APPLICABLE LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 9.08        Waivers; Amendment.

(a)        No failure or delay of any Lender Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce any such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower or any Loan Party in any case shall entitle the Borrower or any Loan Party to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Backstoppers and (y) in the case of any other Loan Document (other than the Administrative Agent Fee Letter and the Collateral Agent Fee Letter, in each case, which may only be amended, waived or modified in accordance with their respective terms), pursuant to an agreement or agreements in writing entered into by any party thereto required by the terms to consent thereto and consented to by the Backstoppers; provided, however, that no such agreement shall:

(i)        decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, any Loan without the prior written consent of each Lender directly affected thereby;

(ii)        increase or extend any Commitment of any Lender or decrease the Fees of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory

102

reduction in the aggregate Commitments shall not constitute an increase of the Commitments of any Lender);

(iii)    extend or waive any date for payment of principal of any Loan or reduce the amount due on any such date or extend any date on which payment of interest on any Loan or any Fee is due, without the prior written consent of each Lender adversely affected thereby  (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the aggregate Commitments shall not constitute a waiver of payment of any Lender);

(iv)    amend or modify the provisions of Section 2.12(c), 2.20(b) or 2.20(c) in a manner that would by its terms alter the pro rata sharing of payments required thereby, without the prior written consent of each Lender adversely affected thereby;

(v)    amend or modify the provisions of this Section or the definition of "Backstoppers" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby;

(vi)    [Reserved];

(vii)    release all or substantially all the Collateral without the consent of each Lender;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or Synthetic L/C Issuing Bank hereunder without the prior written consent of the Administrative Agent or Synthetic L/C Issuing Bank, as applicable.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section and any consent by any Lender pursuant to this Section shall bind any assignee of such Lender.

(c)    Without the consent of any Lender, the Borrower, and the Administrative Agent and/or the Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to or protect any security interest for the benefit of the Secured Parties in any property or so that the security interests therein comply with applicable law.

Section 9.09    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate, provided that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

105095838 v12105095838 v12

Section 9.10    Entire Agreement.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Notwithstanding the foregoing, the Administrative Agent Fee Letter and Collateral Agent Fee Letter shall survive the execution and delivery of this Agreement and remain in full force and effect. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 9.11    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12    Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03.  Delivery of an executed counterpart to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed original.

Section 9.14    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15    Jurisdiction; Consent to Service of Process.

(a)    Each of Holdings and the Borrower and each Lender Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court, or, if applicable, such New York State Court or, in the extent permitted by law, in such federal court.  Each of Holdings and the Borrower further irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any

105095838 v12105095838 v12

parties thereto by registered or certified mail, postage prepaid, to Holdings or the Borrower (as applicable) at the address specified for Holdings or the Borrower (as applicable) on Schedule 9.01. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Lender Party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or its properties in the courts of any jurisdiction.

(b)    Each of Holdings and the Borrower and each Lender Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any court refered to above in clause (a). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each of Holdings and the Borrower hereby waives, to the maximum extent not prohibited by law, right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, indirect, exemplary, punitive or consequential damages.

Section 9.16    Confidentiality. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, members of its bodies and committees, agents, advisors, consultants, auditors, accountants and other representatives (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable requirements of law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations or (iii) any rating agency for the purpose of obtaining a credit rating applicable to any Lender, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

Section 9.17    Communications.

(a)    Delivery.

(i)    The Borrower hereby agrees that it will use all reasonable efforts to provide to the Administrative Agent and the Collateral Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent and the Collateral Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new, or a conversion of an existing, borrowing or other extension of credit (including any election of an interest rate or interest period

105095838 v12105095838 v12

relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications collectively, the "Communications"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at the address referenced on Schedule 9.01. Nothing in this Section shall prejudice the right of any Lender Party or the Borrower to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document.

(ii)       The Administrative Agent agrees that receipt of the Communications by the Administrative Agent at the email address referenced in Schedule 9.01 shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such email address.

(b)       Posting. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks, SyndTrak or a substantially similar electronic transmission system (the "Platform").

(c)       The Platform is provided "as is" and "as available". The Agent Parties (as defined below) do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Affiliates or any of their respective officers, directors, employees, agents advisors or representatives (collectively, "Agent Parties") have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of communications through the internet, except to the extent the liability of any Agent Party is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Agent Party's gross negligence or willful misconduct.

Section 9.18       Release of Liens. In the event that the Borrower or any Mepco Group Member conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of its assets in a transaction not prohibited by Section 6.05, the Administrative Agent and the Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and the Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower or any Mepco Group Member, as applicable, and at the Borrower's expense to release any Liens created by any Loan Document in respect of such assets. In addition, the Administrative Agent agrees to take such actions as are reasonably requested by the Borrower or any Mepco Group Member, as applicable, and at the Borrower's expense to terminate the Liens and security interests created by the Loan Documents when all

106

105095838 v12**105095838 v12**

the Obligations are paid in full and all Commitments are terminated and all Synthetic L/C Deposits returned.  Any representation, warranty or covenant contained in any Loan Document relating to any such assets shall no longer be deemed to be made once such assets are so conveyed, sold, leased, assigned, transferred or disposed of.

Section 9.19    U.S.A. Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the U.S.A. Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lenders to identify the Borrower in accordance with the U.S.A. Patriot Act.

[*Signature pages follow*]

105095838 v12105095838 v12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

[*Signature pages will be circulated separately*]