# **EXHIBIT C**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LONGVIEW POWER, LLC, *et al.*,[1] | ) | Case No. 13-12211 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

> **Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

Richard M. Cieri (admitted *pro hac vice*)
Paul M. Basta, P.C. (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
- and -
Ryan Preston Dahl (admitted *pro hac vice*)
Michael Weitz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
**RICHARDS, LAYTON & FINGER, P.A.**
920 North Market Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

Co-Counsel to the Debtors and Debtors in Possession

Dated as of:  May ~~2~~27, 2014

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors").  The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541.  The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ....................................................................................................1
    A.    Defined Terms ...........................................................................................1
    B.    Rules of Interpretation ............................................................................14
    C.    Computation of Time ..............................................................................15
    D.    Governing Law .......................................................................................15
    E.    Reference to Monetary Figures ...............................................................15
    F.    Controlling Document .............................................................................15

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ......................15
    A.    Administrative Claims ............................................................................15
    B.    Professional Compensation ....................................................................16
    C.    DIP Facility Claims ................................................................................17
    D.    Priority Tax Claims .................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......17
    A.    Classification of Claims and Interests ....................................................17
    B.    Treatment of Claims and Interests .........................................................18
    C.    Special Provision Governing Unimpaired Claims ..................................23
    D.    Elimination of Vacant Classes ...............................................................23
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes .............23
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................23
    G.    Subordinated Claims. ..............................................................................23

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................24
    A.    Sources of Consideration ........................................................................24
    B.    The Insurance Trust ................................................................................25
    C.    Dunkard Option ......................................................................................25
    D.    General Settlement of Claims .................................................................25
    E.    Restructuring Transactions .....................................................................26
    F.    Corporate Existence ...............................................................................26
    G.    Vesting of Assets in the Debtors ............................................................26
    H.    Intercompany Account Settlement ..........................................................27
    I.    Cancellation of Existing Securities and Agreements ..............................27
    J.    Corporate Action.....................................................................................27
    K.    New Organizational Documents. ............................................................28
    L.    Directors and Officers of the Debtors .....................................................28
    M.    Effectuating Documents; Further Transactions ......................................28
    N.    Section 1145 Exemption ........................................................................28
    O.    Section 1146 Exemption ........................................................................29
    P.    Director and Officer Liability Insurance .................................................29
    Q.    Management Equity Incentive Plan ........................................................29
    R.    Preservation of Causes of Action ...........................................................29
    S.    Foster Wheeler Reserve .........................................................................30
    T.    Foster Wheeler Rehabilitation Work.......................................................30

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............30
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........30
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ................31
    C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ................31
    D.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases ..........32
    E.    Assumption of Agreements ....................................................................32
    F.    Indemnification Obligations....................................................................32

G.	Insurance Policies ...................................................................................................... 32
H.	Modifications, Amendments, Supplements, Restatements, or Other Agreements .......... 32
I.	Reservation of Rights .................................................................................................. 33
J.	Nonoccurrence of Effective Date ................................................................................ 33
K.	Contracts and Leases Entered Into After the Petition Date .......................................... 33

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 33
A.	Timing and Calculation of Amounts to Be Distributed ................................................ 33
B.	Distributions on Account of Multiple Debtors ............................................................ 33
C.	Distributions Generally; Disbursing Agent .................................................................. 34
D.	Rights and Powers of Disbursing Agent ...................................................................... 34
E.	Distributions on Account of Claims Allowed After the Effective Date ........................ 34
F.	Delivery of Distributions and Undeliverable or Unclaimed Distributions .................... 34
G.	Manner of Payment ..................................................................................................... 35
H.	Compliance with Tax Requirements ............................................................................ 36
I.	No Postpetition Interest on Claims .............................................................................. 36
J.	Setoffs and Recoupment ............................................................................................. 36
K.	Claims Paid or Payable by Third Parties ..................................................................... 36
L.	Allocation .................................................................................................................... 37

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
	DISPUTED CLAIMS ....................................................................................... 37
A.	Allowance of Claims ................................................................................................... 37
B.	Claims Objections, Settlements ................................................................................... 37
C.	Claims Estimation ....................................................................................................... 37
D.	Disputed Claims Reserve ............................................................................................ 37
E.	Adjustment to Claims Without Objection .................................................................... 38
F.	Time to File Objections to Claims ............................................................................... 38
G.	Disallowance of Claims .............................................................................................. 38
H.	Amendments to Claims ............................................................................................... 38
I.	No Distributions Pending Allowance ........................................................................... 38
J.	Distributions After Allowance ..................................................................................... 39
K.	Foster Wheeler Arbitration .......................................................................................... 39
L.	Claims Estimation Motion ........................................................................................... 39

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................. 39
A.	Discharge of Claims and Termination of Interests ....................................................... 39
**B.	Release of Liens ........................................................................................................... 40**
**C.	Debtor Release ............................................................................................................. 40**
**D.	Foster Wheeler Release ............................................................................................... 41**
**E.	Third-Party Release ..................................................................................................... 41**
**F.	Exculpation .................................................................................................................. 42**
**G.	Injunction ..................................................................................................................... 42**
H.	Protections Against Discriminatory Treatment ............................................................ 42
I.	Setoffs ......................................................................................................................... 43
J.	Recoupment ................................................................................................................. 43
K.	Subordination Rights ................................................................................................... 43
L.	Document Retention .................................................................................................... 43
M.	Reimbursement or Contribution .................................................................................. 43

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
	THE PLAN ...................................................................................................... 43
A.	Conditions Precedent to the Confirmation Date ........................................................... 43
B.	Conditions Precedent to the Effective Date ................................................................. 44
C.	Waiver of Conditions .................................................................................................. 45
D.	Effective Date .............................................................................................................. 45

E.      Effect of Non-Occurrence of Conditions to the Effective Date ........................................45

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .....................................45
A.      Modification and Amendments..............................................................................45
B.      Effect of Confirmation on Modifications............................................................46
C.      Revocation or Withdrawal of Plan.......................................................................46

ARTICLE XI. RETENTION OF JURISDICTION .........................................................................46

ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................................48
A.      Immediate Binding Effect......................................................................................48
B.      Additional Documents............................................................................................48
C.      Payment of Statutory Fees.....................................................................................48
D.      Reservation of Rights..............................................................................................48
E.      Successors and Assigns...........................................................................................49
F.      Notices.......................................................................................................................49
G.      Term of Injunctions or Stays..................................................................................49
H.      Entire Agreement.....................................................................................................50
I.      Exhibits......................................................................................................................50
J.      Nonseverability of Plan Provisions........................................................................50
K.      Votes Solicited in Good Faith.................................................................................50
L.      Closing of Chapter 11 Cases...................................................................................50
M.      Waiver or Estoppel..................................................................................................50
N.      Conflicts....................................................................................................................50

**INTRODUCTION**

Longview Power, LLC and its affiliates Longview Intermediate Holdings C, LLC, Mepco Holdings, LLC, Mepco Intermediate Holdings A, LLC, Mepco Intermediate Holdings, LLC, Mepco, LLC, Coresco, LLC, Dana Mining Company of Pennsylvania, LLC, Dana Mining Company, LLC, Mepco Conveyor, LLC, Shannopin Materials LLC, Border Energy, LLC, and Alternate Energy, LLC, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization for the resolution of the outstanding claims against and interests in the Debtors pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and accomplishments during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs of the costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; (c) Professional Fee Claims; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code. For the avoidance of doubt, (x) a Claim asserting priority pursuant to section 503(b)(9) of the Bankruptcy Code is included in the definition of Administrative Claim and (y) in no instance shall an Intercompany Claim be an Administrative Claim.

2.      "*Administrative Claims Bar Date*" means the deadline for filing requests for payment of Administrative Claims (other than Professional Fee Claims), which shall be the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

3.      "*Administrative Claims Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the first Business Day that is 180 days following the Effective Date; provided, that, the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

4.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means with respect to Claims: (a) any Claim other than an Administrative Claim that is evidenced by a Proof of Claim which is or has been timely Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to (i) the Plan, (ii) any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or (iii) a Final Order of the Bankruptcy Court; provided, that, with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been

1

interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be.

6.      "*AMDRI*" means AMD Reclamation, Inc.

7.      "*AMDRI Claim*" means any Claim held by AMDRI against any of the Debtors, including any Claim arising from or related to the Water Supply Agreement.  For the avoidance of doubt, any AMDRI Claim arising from or related to the Water Supply Agreement shall be a General Unsecured Claim.

8.      "*Arbitration*" shall have the meaning ascribed to it in the Foster Wheeler Settlement Agreement.

9.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or similar remedies that may be brought by or on behalf of the Debtors or the Estates, including causes of action or defenses arising under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law.

10.      "*Backstop Commitment*" means that certain funding commitment provided under that certain commitment letter, dated as of November 1, 2013, by and between the Debtors and the Backstoppers, to backstop funding of the DIP Facility and Exit Facility, filed under seal with the Bankruptcy Court pursuant to the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to File Under Seal Exhibits to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing on a Priming Basis, (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to the Adequate Protection Parties, and (IV) Granting Related Relief and (B) Granting Related Relief* [Docket No. 393].

11.      "*Backstoppers*" means those certain backstoppers party from time to time to the Backstop Commitment, each solely in their capacities as such.

12.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the District of Delaware.

13.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

14.      "*Boiler Agreement*" shall have the meaning ascribed to it in the Foster Wheeler Settlement Agreement.

15.      "*BP Claim*" means any Claim arising from or related to:  (a) that certain terminated electricity price hedge pursuant to that certain ISDA Master Agreement, dated as of March 29, 2011, and a confirmation dated May 29, 2012, by and between Longview Power and BP Energy Company; or (b) that certain accession agreement, dated as of June 20, 2012, by and between Longview Power, BP Energy Company, and Union Bank, N.A.

16.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

18.     "*Causes of Action*" means any claim, cause of action (including Avoidance Actions or rights arising under section 506(c) of the Bankruptcy Code), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.   Causes of Action also include:  (a) all rights of setoff, counterclaim, cross-claim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

19.     "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Longview Power, LLC, et al., Chapter 11 Case No. 13-12211 (BLS), which are currently pending before the Bankruptcy Court.

20.     "*Claim*" means any claim against the Debtors, as defined in section 101(5) of the Bankruptcy Code, including: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

21.     "*Claims Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims, pursuant to:  (a) the *Order (A) Setting Bar Dates for Filing Proofs of Claim Including Requests for Payment Under Section 503(b)(9), (B) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (C) Approving the Form of and Manner for Filing of Claim, Including Section 503(b)(9) Requests, (D) Approving Notice of Bar Dates, and (E) Granting Related Relief* [Docket No. 503]; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

22.     "*Claims Estimation Motion*" means *Longview Power, LLC's Motion for Entry of Order (A) Estimating the Claims of Kvaerner North American Construction, Inc., Siemens Energy, Inc. and Foster Wheeler North America Corp. in the Amount of Zero Dollars and (B) Granting Related Relief* [Docket No. 582].

23.     "*Claims Objection Bar Date*" shall mean the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Filed before the day that is 180 days before the Effective Date.

24.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

25.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III.B hereof pursuant to section 1122(a) of the Bankruptcy Code.

26.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

27.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

30.     "*Confirmation Objection Deadline*" shall be the day fourteen (14) days prior to the Confirmation Hearing.

31.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

32.     "*Consummation*" shall mean "substantial consummation" as defined in section 1101(2) of the Bankruptcy Code.

33.     "*Cramup Notes*" means those certain notes that may be issued pursuant to Article III.B.5 and/or Article III.B.6 hereof.

34.     "*D&O Liability Insurance Policy*" means all insurance policies for directors, members, trustees, officers, and managers' liability maintained by the Debtors' Estates as of the Effective Date.

35.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C hereof.

36.     "*DIP Agent*" means the Bank of Nova Scotia, solely in its capacity as administrative agent under the DIP Credit Agreement.

37.     "*DIP Credit Agreement*"  means that certain *Senior Secured Debtor-in-Possession Credit Agreement*, dated as of November 27, 2013, as amended, supplemented, or otherwise modified from time to time, by and among Longview Holdings, Longview Power, and the Debtors party thereto each as borrowers or guarantors, the DIP Agent, and the DIP Lenders.

38.     "*DIP Conversion*" means an election by the Backstoppers, with the consent of the Debtors (such consent not to be unreasonably withheld), to roll over and convert in full the DIP Facility in its entirety to the Exit Facility on the Effective Date.

39.     "*DIP Facility*" means that certain debtor-in-possession financing facility of up to $150.0 million entered into pursuant to the DIP Credit Agreement.

40.     "*DIP Facility Claim*" means any Claim arising under or related to the DIP Facility.

41.     "*DIP Lender Equity Distribution*" means:  (a) 10% of the New Common Equity in the event the total funded amount of the DIP or Exit Facility (in the aggregate) is less than $100.0 million; and (b) up to an additional 5% of the New Common Equity in the event the total funded amount of the DIP or Exit Facility (in the aggregate) is greater than $100.0 million, interpolated for any dollar funded over $100.0 million.  For the avoidance of doubt, the DIP Lender Equity Distribution shall not be subject to dilution by the Management Equity Incentive Plan.

42.     "*DIP Lenders*" means the lenders from time to time party to the DIP Facility, each solely in their capacities as such.

43.     "*Disbursing Agent*" means, on the Effective Date, the Debtors, their agent, or any Entity or Entities designated by the Debtors to make or facilitate distributions that are to be made on or after the Initial Distribution Date pursuant to the Plan.

44.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated December 18, 2013, as supplemented on

4

March 21, 2014 [Docket No. 1046], on [•] May 27, 2014, and as may be further amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, attached as **Exhibit 1** to the Disclosure Statement Order.  The Disclosure Statement shall be in form and substance reasonably acceptable to the Backstoppers.

45.	"*Disclosure Statement Order*" means the *Order (A) Approving the Adequacy of the Debtors' Disclosure Statement, (B) Approving the Notice and Solicitation Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (C) Approving the Form of Various Ballots and Notices In Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief*, entered on December 18, 2013, approving the Disclosure Statement and granting related relief.  The Disclosure Statement Order shall be in form and substance reasonably acceptable to the Backstoppers.

46.	"*Disputed*" means, with regard to any Claim, a Claim that is not Allowed.

47.	"*Disputed Claims Reserve*" means a Cash reserve that may be funded on or after the Effective Date pursuant to Article VII.D hereof.

48.	"*Distribution Record Date*" means the date for determining which Holders of Allowed Claims, other than Holders of Claims related to public securities, are eligible to receive distributions hereunder, which shall be (a) the Effective Date for all Claims other than the Longview Credit Agreement Claims, and (b) the Confirmation Date for all Longview Credit Agreement Claims.

49.	"*Dunkard Claim*" means any Claim held by Dunkard Creek against any of the Debtors, including any Claim arising from or related to the Water Supply Agreement.  For the avoidance of doubt, any Dunkard Claim arising from or related to the Water Supply Agreement shall be a General Unsecured Claim.

50.	"*Dunkard Creek*" means Dunkard Creek Water Treatment System, LLC.

51.	"*Dunkard Creek Lenders*" means those lenders party from time to time to the Dunkard Creek Loan Agreement.

52.	"*Dunkard Creek Lender Claims*" means all indebtedness outstanding under the Dunkard Creek Loan Agreement.

53.	"*Dunkard Creek Loan Agreement*" means  that certain credit agreement, dated as of May 18, 2009, by and among Dunkard Creek, AMDRI, and Wilmington Trust, N.A., in its capacity as successor administrative and collateral agent, as the same may have been amended, modified, or supplemented from time to time.

54.	"*Dunkard Option*" means the Debtors' option to purchase certain assets in accordance with Section 18 of the Water Supply Agreement.

55.	"*EDF Claim*" means any Claim arising from or related to:  (a) that certain terminated electricity price hedge pursuant to that certain ISDA Master Agreement, dated as of March 2, 2012, and certain confirmations entered into in June 2012, by and between Longview Power and EDF Trading North America, LLC; or (b) that certain accession agreement, dated as of March 2, 2012, by and between Longview Power, EDF Trading North America, LLC, and Union Bank, N.A.

56.	"*Effective Date*" means the day, which shall be agreed to by the Debtors and the Backstoppers, upon which the Plan's conditions to effectiveness are satisfied or waived in accordance with Article IX hereof, which shall be the day Consummation occurs.

57.	"*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

58.    "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

59.    "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*

60.    "*Exculpated Party*" means each of the Released Parties.

61.    "*Exculpation*" means the exculpation provision set forth in Article VIII.F hereof.

62.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63.    "*Existing Interests*" means any Interest in a Debtor that is not held by another Debtor, including but not limited to any Interest held by:  (a) Longview Intermediate Holdings B, LLC; or (b) James Laurita, Jr.

64.    "*Exit Facility*" means:  (a) in the event a DIP Conversion does not occur, that new senior secured credit facility to be entered into by the Debtors pursuant to the Exit Facility Agreement, including any Exit Facility Documents on terms materially consistent with the terms set forth in the Exit Facility Term Sheet and otherwise reasonably satisfactory to the Backstoppers and the Debtors; or (b) in the event a DIP Conversion does occur, the DIP Facility on the Effective Date, as amended pursuant to the terms thereof.

65.    "*Exit Facility Documents*" means, collectively, all related agreements, documents, or instruments to be executed or delivered in connection with the Exit Facility, the material terms of which shall be included as an exhibit to the Plan Supplement, and all of which shall be reasonably satisfactory to the Backstoppers and the Debtors.

66.    "*Exit Facility Lenders*" means the lenders from time to time party to the Exit Facility, each solely in their capacities as such.

67.    "*Exit Facility Term Sheet*" shall mean that certain term sheet attached as **Exhibit A** to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing on a Priming Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Adequate Protection Parties, and (IV) Granting Related Relief* [Docket No. 392].

68.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

69.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent.

70.    "*Final DIP Order*" means the *Order (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing on a Priming Basis, (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to the Adequate Protection Parties, and (IV) Granting Related Relief* [Docket No. 504], entered by the Bankruptcy Court on November 21**,** 2013.

71.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

72.    "*First Reserve*" means, collectively: (a) First Reserve Corporation; (b) FR GenPower Holdings (Onshore), L.P.; (c) GenPower Holdings GP, Ltd.; (d) GenPower Holdings (Delaware), L.P.; (e) Mepco SM, LLC; (f) Longview Intermediate Holdings A, LLC; and (g) Longview Intermediate Holdings B, LLC.

73.    "*Foster Wheeler*" means Foster Wheeler North America Corporation.

74.    "*Foster Wheeler Mechanics' Lien Claim*" means any Claim held by Foster Wheeler, its assignee(s), or its successor(s), related to or arising from certain asserted and disputed mechanics' liens filed by Foster Wheeler against any of Longview Power's assets, including but not limited to the Longview Power Facility.

75.    "*Foster Wheeler Release*" shall mean the release granted on behalf of the Debtors and their Estates to Foster Wheeler as set forth in the Foster Wheeler Settlement Agreement and in accordance with Article VIII.D hereof.

76.    "*Foster Wheeler Reserve*" shall mean the Reserve as defined in the Foster Wheeler Settlement Agreement.

77.    "*Foster Wheeler Settlement Agreement*" means that certain settlement agreement, dated as of February 10, 2014, by and between Longview Power and Foster Wheeler, and approved pursuant to the Foster Wheeler Settlement Order.

78.    "*Foster Wheeler Settlement Order*" means the *Order Authorizing Settlement Between Longview Power, LLC and Foster Wheeler North America Corp.* [Docket No. 1018], entered on March 7, 2014, approving the Foster Wheeler Settlement Agreement and granting related relief.

79.    "*General Unsecured Claim*" means any Unsecured Claim (including but not limited to any Dunkard Claim or AMDRI Claim arising from or related to the Water Supply Agreement) that is not: (a) an Administrative Claim (including, for the avoidance of doubt, any Professional Fee Claim or DIP Facility Claim); (b) a Priority Tax Claim; (c) an Other Priority Claim; and (d) an Intercompany Claim. For the avoidance of doubt, General Unsecured Claims shall not include any Unsecured Claim, including any deficiency Claim, arising under or related to the Longview Credit Agreement.

80.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

81.    "*Holder*" means an Entity holding a Claim or an Interest, as applicable.

82.    "*Impaired*" means, with respect to a Claim, or Class of Claims, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

83.    "*Initial Distribution Date*" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims pursuant to the Plan, which shall be a date selected by the Reorganized Debtors and in any event no later than seven (7) Business Days after the Effective Date, after giving effect to any Disputed Claims Reserves taken in accordance with the Plan.

84.    "*Insurance Trust*" means the trust to be established on the Effective Date in accordance with Article IV.B.2 hereof.

85.    "*Insurance Trust Agreement*" means the agreement governing, among other things, the retention and duties of the Insurance Trustee, which shall be in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Backstoppers and included as an exhibit to the Plan Supplement, and which shall be entered into on or before the Effective Date, as determined by the Backstoppers, the Longview Credit Agreement Collateral Agent, and the Debtors.

7

86.    "*Insurance Trust Assets*" means the Title Policy Proceeds, which may be assigned by the Longview Credit Agreement Collateral Agent to the Insurance Trust on the Effective Date in accordance with Article IV.B.2 hereof.

87.    "*Insurance Trustee*" means the party identified in the Plan Supplement to serve as the trustee for the Insurance Trust, which party shall be determined by the Backstoppers and which shall be reasonably acceptable to the Debtors.

88.    "*Intercompany Claim*" means any Claim held by a Debtor against any Debtor, including, for the avoidance of doubt, all prepetition and postpetition Claims.

89.    "*Intercompany Interest*" means any Interest held by a Debtor in a Debtor.

90.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in the Debtors (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any claims against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

91.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [Docket No. 250], entered by the Bankruptcy Court on September 24, 2013.

92.    "*J. Aron Claim*" means any Claim arising from or related to:  (a) that certain terminated interest rate swap agreement pursuant to that certain ISDA Master Agreement, dated as of February 28, 2007, by and between Longview Power and J. Aron & Company; or (b) that certain accession agreement, dated as of December 21, 2012, by and between Longview Power, J. Aron & Company, and Union Bank, N.A.

93.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

94.    "*Kvaerner*" means Kvaerner North American Construction, Inc.

95.    "*Kvaerner Mechanics' Lien Claim*" means any Claim held by Kvaerner, its assignee(s), or its successor(s) related to or arising from certain asserted and disputed mechanics' liens filed by Kvaerner against any of Longview Power's assets, including but not limited to the Longview Power Facility.

96.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

97.    "*Local Bankruptcy Rules*" means the local rules for the United States Bankruptcy Court for the District of Delaware.

98.    "*Longview Credit Agreement*" means that certain credit agreement, dated as of February 28, 2007, by and among Longview Power, as borrower, Longview Holdings and certain subsidiaries of Longview Holdings as guarantors, the Longview Lenders, the Longview Credit Agreement Administrative Agent, and the Longview Credit Agreement Collateral Agent, as amended, restated, or otherwise modified from time to time, including pursuant to that first amendment to the Longview Credit Agreement, dated as of June 20, 2011, and that certain waiver and second amendment to the Longview Credit Agreement, dated as of April 29, 2013, and including all security and collateral agreements related thereto.

99.    "*Longview Credit Agreement Administrative Agent*" shall mean Citicorp North America, Inc., in its capacity as administrative agent under the Longview Credit Agreement.

KE 28255669

100.     "*Longview Credit Agreement Claim*" means any Claim arising under or related to the Longview Credit Agreement, including but not limited to:  (a) any deficiency Claim arising under or related to the Longview Credit Agreement; and (b) the Swap and Hedge Claims.

101.     "*Longview Credit Agreement Collateral Agent*" shall mean Union Bank, N.A. (formerly known as Union Bank of California, N.A.), in its capacity as collateral agent under the Longview Credit Agreement.

102.     "*Longview Credit Facility*" means that certain credit facility entered into pursuant to the Longview Credit Agreement.

103.     "*Longview Executive Agreements*" means either:  (a) (i) that certain employment agreement, dated as of June 1, 2007, as amended, by and between GenPower Services, LLC and Jeffery L. Keffer; (ii) that certain employment agreement, dated as of December 1, 2011, as amended, by and between GenPower Services, LLC and Mark A. Joensen; and (iii) that certain employment agreement, dated as of January 31, 2008, by and between GenPower Services, LLC and Mark Cardano; or (b) (i) agreements for Mark A. Joensen and Mark Cardano that shall provide severance for each individual for no less than six (6) months at existing compensation levels and which shall include health coverage and customary benefits and (ii) an agreement for Jeffery L. Keffer that shall provide severance for no less than twelve (12) months at existing compensation levels and which shall include health coverage and customary benefits.

104.     "*Longview Holdings*" means Longview Intermediate Holdings C, LLC.

105.     "*Longview Lenders*" shall mean the lenders party to the Longview Credit Agreement from time to time, solely in their capacities as such.

106.     "*Longview Power*" means Longview Power, LLC.

107.     "*Longview Power Facility*" means that certain 700 net megawatt supercritical coal-fired power generation facility owned by Longview Power and located in Maidsville, West Virginia.

108.     "*Management Equity Incentive Plan*" means the management equity incentive plan to be either (a) determined by the New Boards after the Effective Date or (b) adopted by the New Boards on the Effective Date, the form of which shall be included in the Plan Supplement, and which shall be in form and substance reasonably satisfactory to the Debtors and the Backstoppers.  The amount of New Common Equity to be set aside for the Management Equity Incentive Plan shall be determined by the Debtors and the Backstoppers prior to the Confirmation Hearing.

109.     "*Mechanics' Lien Claim*" means any Claim that is a:  (a) Foster Wheeler Mechanics' Lien Claim; (b) Kvaerner Mechanics' Lien Claim; or (c) Siemens Mechanics' Lien Claim.

110.     "*Mechanics' Lien Claimant*" means:  (a) Foster Wheeler; (b) Kvaerner; and/or (c) Siemens.

111.     "*Mepco Emergence Incentive Plan*" means that certain incentive plan substantially in the form filed at [Docket No. 688] in the Chapter 11 Cases.

112.     "*Mepco Severance Agreements*" means that certain form of severance agreement substantially in the form filed at [Docket No. 700] in the Chapter 11 Cases.

113.     "*New Board*" means the board or boards of managers of Reorganized Longview and any other Debtor, if applicable, on and after the Effective Date to be appointed in accordance with Article IV.L hereto.

114.     "*New Common Equity*" means common equity in Reorganized Longview to be issued on the Effective Date as provided herein.

115.    "*New Organizational Documents*" means such certificates or articles of incorporation, by-laws, or such other applicable formation documents of some or all of the Reorganized Debtors, which form shall be included in the Plan Supplement, and which shall be in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

116.    "*New Second Lien Indenture*" means the indenture for the New Second Lien Notes, the form of which shall be included in the Plan Supplement, and which shall be in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

117.    "*New Second Lien Notes*" means the new notes to be distributed in satisfaction of the Dunkard Option in accordance with Article IV.C hereof, the form of which shall be included in the Plan Supplement, and which shall have terms consistent with those set forth in the Backstop Commitment, unless otherwise agreed to by the Backstoppers and the Debtors.

118.    "*Non-Released Parties*" means:  (a) Kvaerner; (b) Siemens; and (c) those parties identified on the Non-Released Parties Schedule from time to time.

119.    "*Non-Released Parties Schedule*" means that certain schedule of Non-Released Parties, which shall be included in the Plan Supplement.

120.    "*Notice and Claims Agent*" means Donlin, Recano & Company, Inc., in its capacity as notice and claims agent and administrative advisor for the Debtors' Estates.

121.    "*OCP Order*" means the *Order Authorizing the Debtors to Employ and Pay Professionals Utilized in the Ordinary Course of Business* [Docket No. 252].

122.    "*Other Priority Claim*" means a Claim asserting a priority described in section 507(a) of the Bankruptcy Code that is not:  (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim or DIP Facility Claim); or (b) a Priority Tax Claim.

123.    "*Other Secured Claim*" means a Secured Claim that is not:  (a) a Longview Credit Agreement Claim; or (b) a Mechanics' Lien Claim (to the extent such Claim has been determined by a Final Order of the Bankruptcy Court to be Secured).

124.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

125.    "*Petition Date*" means August 30, 2013, the date on which the Debtors commenced the Chapter 11 Cases.

126.    "*Plan*" means this *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, as may be further amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

127.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, which the Debtors shall use commercially reasonable efforts to cause to be Filed seven (7) days prior to (but in no event later than) the Confirmation Objection Deadline, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, and which is comprised of, among other documents, the following:  (a) New Organizational Documents; (b) Rejected Executory Contract and Unexpired Lease Schedule; (c) a schedule of retained Causes of Action; (d) the Exit Facility Agreement; (e) the Exit Facility Documents; (f) the Non-Released Parties Schedule; (g) the Management Equity Incentive Plan; (h) the Longview Executive Agreements; (i) the Foster Wheeler Settlement Agreement; (j) the form of Cramup Note; (k) the New Second Lien Indenture (if applicable); (l) the form of the New Second Lien Notes (if any); (m) the identity of the New Board for Reorganized Longview; (n) the Mepco Emergence Incentive Plan; and (o) the Mepco Severance Agreements.  Any reference to the Plan

Supplement in the Plan shall include each of the documents identified above as (a) through (o).  The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article IX hereof.  Each and every document that is included in the Plan Supplement, and any supplements, amendments, or modifications thereto, shall be in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

128.    "*Prepetition Lender Equity Distribution*" means the Remaining New Common Equity, subject to dilution from the Management Equity Incentive Plan, to be distributed to Holders of the Longview Credit Agreement Claims in accordance with Article III.B hereof.  For the avoidance of doubt, the Prepetition Lender Equity Distribution may be increased by any New Common Equity placed in reserve on the Effective Date and ultimately not distributed pursuant to the DIP Lender Equity Distribution on the maturity date of the Exit Facility.

129.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

130.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes (or sub-Classes, as the case may be) entitled to share in the same recovery as such Allowed Claim under the Plan; provided, that, solely for purposes of this definition of Pro Rata as used in Article II.C hereof, the term Class shall also include a category for Holders of DIP Facility Claims.

131.    "*Professional*" means any Entity:   (a) retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

132.    "*Professional Fee Claims*" means all Claims for accrued fees and expenses (including success fees) for services rendered and expenses incurred by a Professional from the Petition Date through and including the Effective Date, which Claims are evidenced by applications for compensation filed with the Bankruptcy Court, to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

133.    "*Professional Fee Escrow*" means an interest bearing escrow account to be funded on the Effective Date with Cash proceeds from the Exit Facility or Cash on hand in an amount equal to all Professional Fee Claims; provided, that, the Professional Fee Escrow shall be increased to the extent fee applications are filed after the Effective Date in the amount thereof.

134.    "*Project*" shall have the meaning ascribed to it in the Foster Wheeler Settlement Agreement.

135.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

136.    "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

137.    "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date.

138.    "*Rehabilitation Work*" shall have the meaning ascribed to it in the Foster Wheeler Settlement Agreement.

139.    "*Rehabilitation Work Claim*" shall mean any Claim on account of Rehabilitation Work performed by Foster Wheeler prior to the Effective Date.

KE 28255669

140.    "*Reinstated*" or "*Reinstatement*" means:  (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired; or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim (other than a Debtor or an insider (as defined in section 101(31) of the Bankruptcy Code)) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder.

141.    "*Rejected Executory Contract and Unexpired Lease Schedule*" means the schedule (as may be amended in accordance with the terms set forth in Article V hereof) of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the provisions of Article V hereof, as determined by the Debtors, the form and substance of which shall be reasonably satisfactory to the Backstoppers and the Debtors and will be included in the Plan Supplement.

142.    "*Released Party*" means, collectively, in each case solely in their capacity as such:  (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) First Reserve; (d) the Backstoppers; (e) the DIP Lenders; and (f) solely with respect to the Entities identified in subsections (a) and (b) herein, each of such Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; <u>provided</u>, <u>that</u>, in no event shall a Non-Released Party be a Released Party.

143.    "*Releasing Parties*" means each of the following in its capacity as such:  (a) all Holders of Claims who vote to accept the Plan <u>and</u> who do not opt out of the release provided by the Plan; (b) all Holders of Claims who are deemed to accept the Plan; (c) the DIP Agent; (d) the Longview Credit Agreement Administrative Agent; (e) the Longview Credit Agreement Collateral Agent; (f) the Backstoppers; and (g) First Reserve.

144.    "*Remaining New Common Equity*" means the New Common Equity units remaining after the DIP Lender Equity Distribution has occurred in accordance with Article II.C hereof, which may be increased after all amounts placed in reserve have been distributed.

145.    "*Reorganized Debtors*" means each of the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including Reorganized Longview and Reorganized Longview Power.

146.    "*Reorganized Longview*" means reorganized Longview Intermediate Holdings C, LLC.

147.    "*Reorganized Longview Power*" means Longview Power, LLC, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

148.    "*Reserved Claims*" shall have the meaning ascribed to it in the Foster Wheeler Settlement Agreement.

149.    "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, the Exit Facility, the New Second Lien Indenture (if applicable), the New Second Lien Notes (if any), and the various agreements and other documentation formalizing the Plan, each of which shall be in form and substance reasonably satisfactory to the Debtors and the Backstoppers.

150. "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, equity issuance, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate to implement the Plan, it being understood that any and all Restructuring Transactions shall occur with the Backstoppers' consent (such consent not to be unreasonably withheld).

151. "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be or may have been amended, modified, or supplemented from time to time.

152. "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a Secured Claim.

153. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

154. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

155. "*Settlement Agreement Termination*" means Termination (as defined in the Foster Wheeler Settlement Agreement).

156. "*Siemens*" means Siemens Energy, Inc.

157. "*Siemens Mechanics' Lien Claim*" means any Claim held by Siemens, its assignee(s), or its successor(s) related to or arising from certain asserted and disputed mechanics' liens filed by Siemens against any of Longview Power's assets, including but not limited to the Longview Power Facility.

158. "*Steering Group*" means that certain group of Longview Lenders advised by Akin Gump Strauss Hauer & Feld, LLP and Houlihan Lokey Capital, Inc.

159. "*Swap and Hedge Claims*" means, collectively:  (a) the BP Claims; (b) the EDF Claims; and (c) the J. Aron Claims.

160. "*Third-Party Release*" means the release provision set forth in Article VIII.E hereof.

161. "*Title Coverage Determination*" shall have the meaning set forth in Article IV.B.1 hereof.

162. "*Title Policy*" means that certain *Policy of Title Insurance*, number A40008468 issued by First American Title Insurance Company, issued to the Longview Credit Agreement Collateral Agent on March 9, 2007.

163. "*Title Policy Proceeds*" means all proceeds from the Title Policy.

13

164.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

165.    "*Unimpaired*" means, with respect to a Class of Claims, a Class of Claims that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

166.    "*Unsecured Creditor Cash Pool*" means, with respect to each Debtor, Cash in the amounts set forth on **Exhibit A** attached hereto, for purposes of disbursements to Holders of Allowed Claims in Classes 4, 5, 6, and 7, in each case solely to the extent such Class votes to accept the Plan, in accordance with Article III.B hereof. For the avoidance of doubt, a Holder of an Allowed Claim in Classes 4, 5, 6, or 7 shall be entitled to a Pro Rata recovery on account of such Allowed Claim only with respect to the Unsecured Creditor Cash Pool applicable to the Debtor subject to such Claim. The amounts set forth in each Unsecured Creditor Cash Pool may be re-allocated among the Debtors in their reasonable business judgment to recalibrate for, among other things, the claims asserted against the Debtors' estates after the occurrence of the Claims Bar Date.

167.    "*Unsecured Rejecting Creditor Cash Pool*" means, with respect to each Debtor, Cash in the amounts set forth on **Exhibit A** attached hereto, for purposes of disbursements to Holders of Allowed Claims in Classes 4, 5, 6, and 7, each solely to the extent such Class votes to reject the Plan, in accordance with Article III.B hereof. For the avoidance of doubt, a Holder of an Allowed Claim in Classes 4, 5, 6, or 7 shall be entitled to a Pro Rata recovery on account of such Allowed Claim only with respect to the Unsecured Rejecting Creditor Cash Pool applicable to the Debtor subject to such Claim. The amounts set forth in each Unsecured Rejecting Creditor Cash Pool may be re-allocated among the Debtors in their reasonable business judgment to recalibrate for, among other things, the claims asserted against the Debtors' estates after the occurrence of the Claims Bar Date.

168.    "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

169.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

170.    "*Unsecured*" means not Secured.

171.    "*Voting Deadline*" shall mean [•],July 15, 2014, at 54:00 p.m. (prevailing Eastern time).

172.    "*Water Supply Agreement*" means that certain second amended and restated water supply agreement, dated as of May 18, 2009, by and between Longview Power, AMDRI, and Dunkard Creek, as the same may have been amended from time to time.

*B.    Rules of Interpretation*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used

in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; and (14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  References in the Plan to the Debtors shall mean the Debtors, prior to and on the Effective Date, and the Reorganized Debtors after the Effective Date.

C.      *Computation of Time*

        The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

E.      *Reference to Monetary Figures*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Controlling Document*

        In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan Supplement shall control unless stated otherwise in such Plan Supplement document.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

A.      *Administrative Claims*

        Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim either:  (1) if such Administrative Claim is Allowed as of the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors' Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

15

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the OCP Order) or as provided by Article II.B hereof, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

In accordance with section 11(c) of the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order, Rehabilitation Work Claims shall be Allowed Administrative Claims to the extent provided by the Foster Wheeler Settlement Agreement, and such Claims (x) shall be junior in priority to all DIP Facility Claims and (y) shall have all the protections provided by sections 364(b) and 364(e) of the Bankruptcy Code as provided for in the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order. Notwithstanding anything herein to the contrary, if a Settlement Agreement Termination occurs prior to the Effective Date, such Allowed Administrative Claims shall be paid in full in Cash no later than seven (7) days after the Effective Date. If a Settlement Agreement Termination occurs after the Effective Date, then within seven (7) business days after Foster Wheeler provides to Reorganized Longview Power documentation required by the Foster Wheeler Settlement Agreement supporting its Rehabilitation Work Claims, Reorganized Longview Power will pay to Foster Wheeler any undisputed amounts without further order of the Bankruptcy Court. To the extent that Foster Wheeler and Reorganized Longview Power are unable to reach agreement on payment of the remaining unpaid amounts of the Rehabilitation Work Claims, then either or both may seek an order from the Bankruptcy Court resolving the dispute and authorizing payment.

B.    *Professional Compensation*

1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on the Debtors (or the Reorganized Debtors), counsel to the Backstoppers, and counsel to the Steering Group no later than the first Business Day that is sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

2.    <u>Professional Fee Escrow</u>

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow. Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors after all Professional Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Professional Fee Escrow shall be held in trust for the Professionals and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full. Professional Fees owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way, including with respect to any Liens, claims, or encumbrances securing the Exit Financing Facility; <u>provided</u>, <u>that</u>, the Exit Facility Lenders shall have a Lien on the Reorganized Debtors' residual interest in the Professional Fee Escrow but not the Professional Fee Escrow itself.

3.    <u>Post-Effective Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in

16

seeking retention for services rendered after such date shall terminate, and the Debtors may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *DIP Facility Claims*

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim:  (1)(a) if a DIP Conversion occurs, each such Allowed DIP Facility Claim shall be exchanged for its Pro Rata share of the Reorganized Debtors' obligations under the Exit Facility or (b) if a DIP Conversion does not occur, each such Allowed DIP Facility Claim shall be paid in full, in Cash, by the Debtors on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Financing Facility; and (2) each Holder of an Allowed DIP Facility Claim shall receive its Pro Rata share (based upon such Holder's commitments to the DIP Facility on the date of entry of the Final DIP Order) of the DIP Lender Equity Distribution, which, for the avoidance of doubt, shall not be subject to dilution by the Management Equity Incentive Plan.

On the Effective Date, the DIP Lender Equity Distribution, which is payable based upon the amount of DIP Facility that was funded, shall be made.  On the maturity date of the Exit Facility, the remaining DIP Lender Equity Distribution shall be made.  A reserve of 5% of the New Common Equity shall be established on the Effective Date that will be available to pay any portion of the additional DIP Lender Equity Distribution on the maturity date of the Exit Facility.  For the avoidance of doubt, the DIP Lender Equity Distribution shall be a payment of an Administrative Claim as a fee earned pursuant to the Final DIP Order.

D.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and are thus excluded from the Classes of Claims and Interests set forth in this Article III.  All Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.D hereof.  For all purposes under the Plan, each

Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be ten (10) Classes for each Debtor); provided, that, Class 4, Class 5, and Class 6 shall be vacant for each Debtor other than Longview Power.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 (all Debtors) | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 (all Debtors) | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 (all Debtors) | Longview Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4 (Longview Power only) | Foster Wheeler Mechanics' Lien Claims | Impaired | Entitled to Vote |
| Class 5 (Longview Power only) | Kvaerner Mechanics' Lien Claims | Impaired | Entitled to Vote |
| Class 6 (Longview Power only) | Siemens Mechanics' Lien Claims | Impaired | Entitled to Vote |
| Class 7 (all Debtors) | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 (all Debtors) | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 (all Debtors) | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 10 (all Debtors) | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

    1.    Class 1 - Other Secured Claims

        (a)    *Classification*:  Class 1 consists of all Other Secured Claims.

        (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder thereof shall receive, at the option of the Reorganized Debtors, either:

            (i)    payment in full in cash of such Holder's Allowed Other Secured Claim;

            (ii)    Reinstatement of such Holder's Allowed Other Secured Claim; or

            (iii)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

        (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

KE 28255669

2.  Class 2 - Other Priority Claims

    (a)    *Classification*: Class 2 consists of all Other Priority Claims.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder thereof shall receive, at the option of the Reorganized Debtors, either:

        (i)    payment in full in cash of such Holder's Allowed Other Priority Claim; or

        (ii)    such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

    (c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.  Class 3 - Longview Credit Agreement Claims

    (a)    *Classification*: Class 3 consists of all Longview Credit Agreement Claims.

    (b)    *Treatment*: Except to the extent that a Holder of a Longview Credit Agreement Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Longview Credit Agreement Claim, each such Holder thereof shall receive its Pro Rata share of the Prepetition Lender Equity Distribution, without duplication.

    (c)    *Voting*: Class 3 is Impaired under the Plan. Holders of Longview Credit Agreement Claims are entitled to vote to accept or reject the Plan.

4.  Class 4 - Foster Wheeler Mechanics' Lien Claims

    (a)    *Classification:* Class 4 consists of all Foster Wheeler Mechanics' Lien Claims.

    (b)    *Treatment:*

        (i)    if the Effective Date occurs <u>before</u> the Foster Wheeler Settlement Order becomes a Final Order, the Reorganized Debtors shall fully fund the Foster Wheeler Reserve in accordance with the Foster Wheeler Settlement Agreement and upon such funding, Foster Wheeler shall, within three (3) days of such funding, release and discharge any and all Liens securing the Foster Wheeler Mechanics' Lien Claims in accordance with the Foster Wheeler Settlement Agreement; <u>and</u>

        (ii)    if the Effective Date occurs <u>after</u> the Foster Wheeler Settlement Order becomes a Final Order, Foster Wheeler shall, within three (3) days of the Foster Wheeler Settlement Order becoming a Final Order, release and discharge any and all Liens securing the Foster Wheeler Mechanics' Lien Claims in accordance with the Foster Wheeler Settlement Agreement.

    (c)    *Voting:* Class 4 is Impaired under the Plan. Holders of Allowed Foster Wheeler Mechanics' Lien Claims are entitled to vote to accept or reject the Plan.

KE 28255669

5. <u>Class 5 - Kvaerner Mechanics' Lien Claims</u>

    (a)    *Classification:* Class 5 consists of all Kvaerner Mechanics' Lien Claims.

    (b)    *Treatment:* Except to the extent that a Holder of an Allowed Kvaerner Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Kvaerner Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Kvaerner Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

        (i)    if such Allowed Kvaerner Mechanics' Lien Claim is determined by a Final Order to be both Secured and senior to the Longview Credit Agreement Claims,

            (A)    payment in full in Cash, with any such distribution coming in full from the Insurance Trust, <u>or</u>

            (B)    if proceeds from the Insurance Trust Assets are otherwise insufficient to satisfy the Allowed Kvaerner Mechanics' Lien Claims in full, at the Reorganized Debtors' election, with the Backstoppers' consent:

                1)    notes (i) secured by the Liens securing the Kvaerner Mechanic' Lien Claims to the extent required by section 1129(b)(2)(A)(i)(I) and (ii) with a present value equal to the Allowed amount of such Kvaerner Mechanics' Lien Claim (or to the extent such Claim is not otherwise satisfied with a distribution from the Insurance Trust Assets) to the extent required by section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, <u>or</u>

                2)    such other treatment necessary to satisfy section 1129(b)(2)(A)(i) of the Bankruptcy Code.

        (ii)    if such Allowed Kvaerner Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (which may include, for such purposes, a determination that such Claim is junior to Longview Credit Agreement Claims),

            (A)    **if Class 5 votes to accept the Plan**, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Creditor Cash Pool or (y) 22.07% of its Allowed Kvaerner Mechanics' Lien Claim; <u>or</u>

            (B)    **if Class 5 votes to reject the Plan**, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool or (y) 5.52% of its Allowed Kvaerner Mechanics' Lien Claim.

    (c)    *Voting:* Class 5 is Impaired under the Plan. Holders of Allowed Kvaerner Mechanics' Lien Claims are entitled to vote to accept or reject the Plan.

    (d)    *Reservation of Rights:* For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Kvaerner Mechanics' Lien Claims in all respects.

KE 28255669

6.   Class 6 - Siemens Mechanics' Lien Claims.

    (a)    *Classification:*  Class 6 consists of all Siemens Mechanics' Lien Claims.

    (b)    *Treatment:*  Except to the extent that a Holder of an Allowed Siemens Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Siemens Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Siemens Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

        (i)    if such Allowed Siemens Mechanics' Lien Claim is determined by a Final Order to be both Secured and senior to the Longview Credit Agreement Claims,

            (A)    payment in full in Cash, with any such distribution coming in full from the Insurance Trust, <u>or</u>

            (B)    if proceeds from the Insurance Trust Assets are otherwise insufficient to satisfy the Allowed Siemens Mechanics' Lien Claims in full, at the Reorganized Debtors' election, with the Backstoppers' consent:

                1)    notes (i) secured by the Liens securing the Siemens Mechanic' Lien Claims to the extent required by section 1129(b)(2)(A)(i)(I) and (ii) with a present value equal to the Allowed amount of such Siemens Mechanics' Lien Claim (or to the extent such Claim is not otherwise satisfied with a distribution from the Insurance Trust Assets) to the extent required by section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, <u>or</u>

                2)    such other treatment necessary to satisfy section 1129(b)(2)(A)(i) of the Bankruptcy Code.

        (ii)    if such Allowed Siemens Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (which may include, for such purposes, a determination that such Claim is junior to Longview Credit Agreement Claims),

            (A)    **if Class 6 votes to accept the Plan**, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Creditor Cash Pool or (y) 22.07% of its Allowed Siemens Mechanics' Lien Claim; <u>or</u>

            (B)    **if Class 6 votes to reject the Plan**, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool or (y) 5.52% of its Allowed Siemens Mechanics' Lien Claim.

    (c)    *Voting:*  Class 6 is Impaired under the Plan.  Holders of Allowed Siemens Mechanics' Lien Claims are entitled to vote to accept or reject the Plan.

    (d)    *Reservation of Rights*:  For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Siemens Mechanics' Lien Claims in all respects.

7.   Class 7 - General Unsecured Claims

    (a)   *Classification*:  Class 7 consists of all General Unsecured Claims.

    (b)   *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive:

        (i)   **if Class 7 votes to accept the Plan**, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Creditor Cash Pool or (y) 22.07% of its Allowed General Unsecured Claim; <u>or</u>

        (ii)   **if Class 7 votes to reject the Plan**, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool or (y) 5.52% of its Allowed General Unsecured Claim.

    (c)   *Voting*:  Class 7 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.   Class 8 - Intercompany Claims

    (a)   *Classification*:  Class 8 consists of all Intercompany Claims.

    (b)   *Treatment*:  Intercompany Claims shall be, at the option of the Reorganized Debtors, either:

        (i)   Reinstated as of the Effective Date; or

        (ii)   cancelled without any distribution on account of such Claims.

    (c)   *Voting*:  Class 8 is Unimpaired under the Plan.  Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.   Class 9 - Intercompany Interests

    (a)   *Classification:*  Class 9 consists of all Intercompany Interests.

    (b)   *Treatment*:  Intercompany Interests shall be, at the option of the Debtors, with the reasonable consent of the Backstoppers, either:

        (i)   Reinstated as of the Effective Date; or

        (ii)   cancelled without any distribution on account of such Interests.

    (c)   *Voting*:  Class 9 is Unimpaired under the Plan.  Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10. Class 10 - Existing Interests

     (a)     *Classification:*  Class 10 consists of all Existing Interests.

     (b)     *Treatment*:  On the Effective Date, all Existing Interests shall be cancelled without any distribution on account of such Interests.

     (c)     *Voting:*   Class 10 is Impaired under the Plan.   Holders of Existing Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.     *Elimination of Vacant Classes*

Any Class of Claims that does not have a Holder eligible to vote as of the Voting Deadline (as such date may be extended in accordance with the solicitation procedures approved pursuant to the Disclosure Statement Order) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.     *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration*

The Debtors shall fund distributions under the Plan with Cash on hand, including Cash from operations, the Exit Facility, proceeds from the Insurance Trust Assets, the New Common Equity, the New Second Lien Notes, and the Cramup Notes (if any).

1.    Exit Facility

The Confirmation Order shall include approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents.  The Debtors may use the Exit Facility for any purpose permitted thereunder, including but not limited to the funding of obligations under the Plan, payment of costs relating to the repair of the Power Facility, and satisfaction of ongoing working capital needs.

Upon the Confirmation Date:  (a) the Debtors are authorized to execute and deliver the Exit Facility Documents and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities; and (b) subject to the occurrence of the Effective Date, the Exit Facility Documents shall constitute the legal, valid, and binding obligations of the Debtors and be enforceable in accordance with their respective terms.

2.    Issuance of New Common Equity

Existing Interests shall be cancelled and Reorganized Longview shall issue the New Common Equity for distribution to Holders of Longview Credit Agreement Claims and DIP Facility Claims.  New Common Equity shall also be reserved for (a) the Management Equity Incentive Plan and (b) the DIP Lender Equity Distribution.  The issuance of the New Common Equity, including options or other equity awards, if any, reserved for the Management Equity Incentive Plan, by Reorganized Longview is authorized without the need for any further corporate action or without any further action by the Holders of Claims.  Reorganized Longview shall be authorized to issue a certain number of units of New Common Equity pursuant to its New Organizational Documents.  On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

Each unit of the New Common Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  In the event Reorganized Longview elects to be organized as a limited liability company, each Entity receiving a unit of the New Common Equity may be required to execute a signature page to the applicable limited liability company agreement or New Organizational Document as a condition precedent to such distribution, to the extent that such Entity is not deemed to accept any and all of such terms as a condition to receiving such distribution. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.    Issuance of Cramup Notes

The Confirmation Order shall include approval and authorization for the Debtors to issue the Cramup Notes, if any, in accordance with the Plan, regardless of whether the Cramup Notes (if any) are issued on or after the Effective Date (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Debtors to enter into and execute such

documents as may be required to effectuate the treatment afforded to the recipients of Cramup Notes (if any) in accordance with the Plan.

    4.   <u>Issuance of New Second Lien Notes</u>

On the Effective Date, the Debtors shall issue the New Second Lien Notes in accordance with Article IV.A hereof, the form and substance of which shall be reasonably satisfactory to the Debtors and the Backstoppers, and in any event on terms materially consistent with the terms set forth as an exhibit to the Plan Supplement (which, for the avoidance of doubt, shall be materially consistent with the terms set forth in the Backstop Commitment). Confirmation shall be deemed approval of the New Second Lien Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors in connection therewith) and authorization for the Debtors to enter into and execute the New Second Lien Indenture and any documents related thereto, subject to such modifications as the Debtors may deem to be reasonably necessary, with the reasonable consent of the Backstoppers, to consummate such New Second Lien Notes.

B.    *The Insurance Trust*

    1.   <u>Title Coverage Determination</u>

Consummation of the transactions contemplated by the Plan shall require entry of an order of the Bankruptcy Court on terms materially consistent with the Plan and otherwise reasonably satisfactory to the Backstoppers, the Longview Credit Agreement Collateral Agent, and the Debtors determining that proceeds from the Title Policy are available for assignment and distribution in accordance with the Plan in the event that the Liens, if any, securing Allowed Siemens Mechanics' Lien Claims or Allowed Kvaerner Mechanics' Lien Claims, if any, are senior in priority to any Liens securing Longview Credit Facility Claims (the "<u>Title Coverage Determination</u>").

    2.   <u>The Insurance Trust Agreement</u>

On or prior to the Effective Date, the Debtors will execute the Insurance Trust Agreement and will take all other steps necessary to establish the Insurance Trust pursuant to the Insurance Trust Agreement. On or prior to the Effective Date, in accordance with and pursuant to the terms of the Plan and in exchange for the good and valuable consideration provided under the Plan, the Longview Credit Agreement Collateral Agent will transfer to the Insurance Trust all of its rights, title, and interests in the Title Policy Proceeds; <u>provided</u>, <u>that</u>, if the Title Coverage Determination does not occur, the Longview Credit Agreement Collateral Agent shall not transfer to the Insurance Trust any rights, title, or interests in the Title Policy Proceeds to the Insurance Trust.

C.    *Dunkard Option*

On or prior to the Effective Date, the Debtors, with the consent of the Backstoppers, shall exercise the Dunkard Option by either: (1) causing the New Second Lien Notes to be issued to Dunkard Creek; or (2) using Cash received through issuance of the New Second Lien Notes to one or more third parties or through any other source of financing available. Notwithstanding anything herein to the contrary, upon the exercise of the Dunkard Option by the Debtors, any and all Dunkard Claims and AMDRI Claims arising from or related to the Water Supply Agreement or otherwise shall be deemed satisfied and shall be disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or their property, without the need for any objection by the Debtors or further notice to, action, order, or approval of the Bankruptcy Court, and all Holders of Dunkard Claims or AMDRI Claims arising from or related to the Water Supply Agreement or otherwise will accordingly not be allowed to vote on the Plan on account of such Claim or, to the extent such votes have been cast, such votes will be disregarded and have no effect.

D.    *General Settlement of Claims*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the

KE 28255669

Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  All distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

E.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, with the reasonable consent of the Backstoppers, may take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.  The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors, with the reasonable consent of the Backstoppers, to be necessary.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; provided, that, none of the Debtors, nor any of the Entities acquired by any Debtor pursuant to the Plan shall make any election to be treated as an association (or corporation) on or prior to the Effective Date for U.S. federal income tax purposes unless otherwise agreed to by the Debtors and the Backstoppers; and (4) all other actions that the applicable Entities determine to be necessary, with the reasonable consent of the Backstoppers, including making filings or recordings that may be required by applicable law in connection with the Plan.  For the purposes of effectuating the Plan, none of the Restructuring Transactions shall constitute a change of control under any agreement, contract, or document of the Debtors.

The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Debtors and to minimize taxes payable by the Holders of the Longview Credit Agreement Claims and Holders of DIP Facility Claims to the extent practicable.

F.    *Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate limited liability company or other form, as the case may be, with all the powers of a limited liability company or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is formed and pursuant to the respective by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

G.    *Vesting of Assets in the Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens securing obligations under the Exit Facility, the New Second Lien Notes, the Cramup Notes, if any, that are issued pursuant to the Plan, any Liens securing obligations arising under the Foster Wheeler Settlement Agreement, and Liens securing Claims that are Reinstated, if any, pursuant to the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*H.*     *Intercompany Account Settlement*

The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary to enable the Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

*I.*     *Cancellation of Existing Securities and Agreements*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including, without limitation, the Longview Credit Agreement, the DIP Facility and any and all other credit agreements, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect to any note(s) or security and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (1) allowing Holders to receive distributions under the Plan and (2) allowing Holders of Claims to retain their respective rights and obligations vis-à-vis other Holders of Claims pursuant to the applicable loan documents; provided, further, however, that the preceding proviso shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors, as applicable; provided, further, that the foregoing shall not affect the cancellation of units issued pursuant to the Restructuring Transactions nor any other units held by one Debtor in the capital of another Debtor.

*J.*     *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including, without limitation:   (1) adoption or assumption, as applicable, of the agreements with existing management; (2) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (3) selection of the managers and officers for the Debtors; (4) execution of and entry into the Exit Facility Documents; (4) the distribution of the New Common Equity as provided herein; (5) issuance and distribution of the Cramup Notes, if applicable; (6) implementation of the Restructuring Transactions; (7) adoption of the Management Equity Incentive Plan; (8) adoption of the Mepco Emergence Incentive Plan; (9) execution of the Mepco Severance Agreements; (10) the exercise of the Dunkard Option; (11) issuance of the New Second Lien Notes; and (12) all other acts or actions contemplated, or reasonably necessary or appropriate to properly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers, or authorized persons of the Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof), shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, including the Exit Facility Documents, the Cramup Notes, if any, the New Second Lien Notes, the New Common Equity, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law. The issuance of the Cramup Notes, if any, and the New Common Equity shall be exempt from the requirements of section 16(b) of the Exchange Act (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

K.      *New Organizational Documents.*

On the Effective Date, Reorganized Longview and the Debtors, as applicable, shall enter into the New Organizational Documents. Each of the Debtors will file its New Organizational Documents with the applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, each Debtor may amend and restate its respective New Organizational Documents and other constituent documents as permitted by the laws of its respective state, province, or country of incorporation and its respective New Organizational Documents.

L.      *Directors and Officers of the Debtors*

As of the Effective Date, all managers, directors, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board. The New Board of Reorganized Longview shall consist of that number of managers determined by the Backstoppers, and the New Boards of the other Reorganized Debtors shall consist of the number of directors or managers, as applicable, provided for by such Reorganized Debtor in its respective New Organizational Documents, with the reasonable consent of the Backstoppers.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the New Boards. To the extent any such director or officer of the Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Debtors.

M.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Debtors and the managers, officers, authorized persons, and members of the boards of managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit Facility Agreement, the New Organizational Documents, the New Second Lien Indenture, and any securities issued pursuant to the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Cramup Notes (if any) and the New Common Equity, as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan, including the New Common Equity, and any and all agreements incorporated herein, shall be subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (3) the restrictions, if any, on the transferability of such Securities and instruments, including those set forth in the New Organizational Documents; and (4) applicable regulatory approval, if any.

O.      *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the Exit Facility Documents shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct and shall be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.  Such exemption specifically applies, without limitation, to:  (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution, and/or sale of any of the New Common Equity and any other Securities of the Debtors or the Reorganized Debtors; and (5) the making or delivery of any deed or other instrument of transfer in furtherance of or in connection with the Plan, including without limitation (i) any merger agreements, (ii) agreements of consolidation, restructuring, disposition, liquidation, or dissolution, (iii) deeds, (iv) bills of sale, and (v) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

P.      *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are deemed to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.      *Management Equity Incentive Plan*

The amount of New Common Equity to be set aside for the Management Equity Incentive Plan shall be determined by the Debtors and the Backstoppers prior to the Confirmation Hearing.  The Management Equity Incentive Plan shall either be:  (a) determined by the New Boards after the Effective Date; or (b) adopted by the New Boards on the Effective Date.  The Confirmation Order shall include, as applicable, approval of the Management Equity Incentive Plan and shall authorize the New Boards to adopt and enter into the Management Equity Incentive Plan.

R.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Debtors and the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Debtors' and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors and the**

**Reorganized Debtors will not pursue any and all available Causes of Action against such Entity. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action, including with respect to rejected Executory Contracts and Unexpired Leases, against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

S.      *Foster Wheeler Reserve*

The Foster Wheeler Reserve shall be administered by the Reorganized Debtors in accordance with the Foster Wheeler Settlement Agreement and shall be funded on the Effective Date. Any Cash held in the Foster Wheeler Reserve after satisfaction of the Reorganized Debtors' obligations under the Foster Wheeler Settlement Agreement shall revert to the Reorganized Debtors. Funds held in the Foster Wheeler Reserve shall only be released upon the earlier of (1) the Foster Wheeler Settlement Order becoming a Final Order or (2) the final adjudication and satisfaction of the Reserved Claims in the Arbitration.

T.      *Foster Wheeler Rehabilitation Work*

If a Settlement Agreement Termination occurs, Reorganized Longview Power shall, to the extent provided by section 11(b) of the Foster Wheeler Settlement Agreement reimburse Foster Wheeler for the Rehabilitation Work performed up to the date of such Settlement Agreement Termination. For the avoidance of doubt, such reimbursement shall not be used by Reorganized Longview Power as an offset in the Arbitration, and, upon such reimbursement by Reorganized Longview Power, Reorganized Longview Power shall have the unencumbered, full ownership, use, and benefit of the portions of the supplies, materials, and equipment relating to the Rehabilitation Work performed by Foster Wheeler and paid for by Reorganized Longview Power prior to the occurrence of such Settlement Agreement Termination. Further, Longview Power, or Reorganized Longview Power, as applicable, shall comply with any payment or compensation obligations to Foster Wheeler as set forth in section 1 of the Foster Wheeler Settlement Agreement.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease Schedule; or (3) are the subject of a motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Debtors in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be

deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Backstoppers, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease Schedule at any time through and including 45 days after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court no later than 30 days after notice of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or their property, without the need for any objection by the Debtors or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G hereof, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B hereof.

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any payments to cure such a default; (2) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure amount required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided, that the Reorganized Debtors may settle any dispute regarding the amount of any such cure amount without any further notice to any party or any action, order, or approval of the Bankruptcy Court; provided, further, that, notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any dispute and approving the assumption and assignment of such Executory Contract or Unexpired Lease, the Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease which is subject to dispute, whether by amending the Rejected Executory Contract and Unexpired Lease Schedule in accordance with Article V.A hereof or otherwise.

At least seven (7) days prior to the Confirmation Objection Deadline, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court; provided, that, the Debtors reserve all rights with respect to any such proposed assumption and proposed cure amount in the event of an objection or dispute. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors and the Backstoppers no later than thirty (30) days after service of the notice providing for such assumption and related cure amount.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute and be deemed to constitute the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time

prior to the effective date of assumption.  **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to, action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contract or Unexpired Lease.

E.    *Assumption of Agreements*

Notwithstanding anything herein or the Plan Supplement to the contrary, the Debtors shall be deemed to have assumed the Longview Executive Agreements and the Foster Wheeler Settlement Agreement (for the avoidance of doubt, any such assumption expressly is subject to the releases provided for in section 6 of the Foster Wheeler Settlement Agreement which relate in any way to the Boiler Agreement and Foster Wheeler's performance on the Project) pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of the Longview Executive Agreements and Foster Wheeler Settlement Agreement.

F.    *Indemnification Obligations*

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, board resolutions, indemnification agreements, or employment contracts) for the current and former directors, managers, officers, employees (each of the foregoing serving in such capacity after the Petition Date), attorneys, accountants, investment bankers, and other professionals, and the Debtors shall be assumed by the Debtors, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such indemnification obligation is executory, unless such indemnification obligation previously was rejected by the Debtors pursuant to a Final Order or is the subject of a motion to reject pending on the Effective Date; provided, that, in no event shall the Debtors assume, retain, or honor any indemnification agreement, provision, or obligation with respect to a Non-Released Party.  Each indemnification obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

G.    *Insurance Policies*

Each of the Debtors' insurance policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article IV.P herein) and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan or the Plan Supplement, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

H.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.        *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease nunc pro tunc to the Confirmation Date.

J.        *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.        *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.        *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Initial Distribution Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), and except as otherwise set forth herein, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Disbursing Agent.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Initial Distribution Date.  New Common Equity shall be deemed to be issued as of the Effective Date to the Holders of Claims entitled to receive the New Common Equity hereunder without the need for further action by the Disbursing Agent, the Debtors (including Reorganized Longview), or any other Debtor, including, without limitation, the issuance and/or delivery of any certificate evidencing any such units, units, or interests, as applicable.  For the avoidance of doubt, New Common Equity shall be deemed to be issued to (1) Holders of DIP Facility Claims upon distribution to the DIP Agent, and (2) to Holders of Longview Credit Agreement Claims upon distribution to the Longview Credit Agreement Administrative Agent.

B.        *Distributions on Account of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that, for the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

C.      *Distributions Generally; Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.

D.      *Rights and Powers of Disbursing Agent*

1.   Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:   (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.   Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable, actual, and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable, actual, and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

E.      *Distributions on Account of Claims Allowed After the Effective Date*

1.   Payments and Distributions on Account of Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the ~~the~~ applicable Quarterly Distribution Date after they have actually been made, unless the Reorganized Debtors and the applicable Holder of such Claim agree otherwise.

2.   Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or Final Order; provided, that, if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

F.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.   Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    Delivery of Distributions in General

(a)    Initial Distribution Date

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, that, the manner of such distributions shall be determined at the discretion of the Disbursing Agent; provided, further, that, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

(b)    Quarterly Distribution Date

Except as otherwise determined by the Reorganized Debtors in their sole discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Quarterly Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.A hereof.

3.    De Minimis Distributions; Minimum Distributions

No fractional units of New Common Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of units of New Common Equity that is not a whole number, the actual distribution of units of New Common Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized units of New Common Equity to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

No Cash payment valued at less than $50.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, that, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

G.    Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

H.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanism it believes is reasonable and appropriate.  The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

I.     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.     *Setoffs and Recoupment*

The Debtors may, but shall not be required to, setoff against or recoup from a Claim (including, for the avoidance of doubt, the Dunkard Claims and the Mechanics' Lien Claims) any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

K.     *Claims Paid or Payable by Third Parties*

1.     <u>Claims Paid by Third Parties</u>

The Debtors, after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.     <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary

(including, without limitation, Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.      *Allocation*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT,
### UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims*

On or after the Effective Date, each of the Debtors shall have and shall retain any and all rights and defenses such Debtor had with respect to any Claim immediately prior to the Effective Date.

B.      *Claims Objections, Settlements*

The Reorganized Debtors shall have the authority to:  (1) File objections to Claims, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Claims Estimation*

On or after the Effective Date, the Reorganized Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Disputed Claims Reserve*

On or prior to the Effective Date, the Reorganized Debtors or the Disbursing Agent shall be authorized, but not directed, to established one or more Disputed Claims Reserves, which Disputed Claims Reserve shall be administered by the Reorganized Debtors or the Disbursing Agent, as applicable.

The Reorganized Debtors or the Disbursing Agent, may, in their sole discretion, hold Cash in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date, including with respect to Kvaerner Mechanics' Lien Claims and Siemens Mechanics' Lien Claims to the extent the Title Coverage Determination has occurred but there has not yet been a determination as to whether the Liens, if any, securing such claims are senior to Liens securing Longview Credit Agreement Claims. The Reorganized Debtors shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date.

E.       Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors to the maximum extent provided by applicable law without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.       Time to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

G.       Disallowance of Claims

Any Claims held by any Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE REORGANIZED DEBTORS, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

H.       Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

I.       No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise agreed to by the Reorganized Debtors.

*J.*        *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

*K.*        *Foster Wheeler Arbitration*

As set forth in section 11(a) of the Foster Wheeler Settlement Agreement, in the event a Settlement Agreement Termination occurs, Foster Wheeler shall have the right to assert any and all Claims against Longview Power or Reorganized Longview Power, as applicable, in the Arbitration (other than any Claims that relate to the breach of the Foster Wheeler Settlement Agreement, which Claims may only be asserted in the Bankruptcy Court), unless the Arbitration has been completed prior to the such Settlement Agreement Termination, in which case Foster Wheeler may commence a new arbitration proceeding against Longview Power or Reorganized Longview Power, as applicable, and Longview Power or Reorganized Longview Power, as applicable, shall have the right to assert any and all claims against Foster Wheeler in the Arbitration (other than any claims that relate to the breach of the Foster Wheeler Settlement Agreement, which claims may only be asserted in the Bankruptcy Court), unless the Arbitration has been completed prior to such Settlement Agreement Termination, in which case Longview Power or Reorganized Longview Power, as applicable, may commence a new arbitration proceeding against Foster Wheeler.

*L.*        *Claims Estimation Motion*

Notwithstanding any determination by the Bankruptcy Court of the Mechanics' Lien Claims pursuant to the Claims Estimation Motion, (1) any and all Claims of Foster Wheeler against Longview Power and any and all claims of Longview Power against Foster Wheeler shall be determined solely as set forth in the Foster Wheeler Settlement Agreement and (2) any determination by the Bankruptcy Court in connection with the Claims Estimation Motion or otherwise, including with respect to any claims and/or defenses made in the Arbitration or the Chapter 11 Cases, shall have no preclusive, collateral estoppel, or res judicata effect on Foster Wheeler in the Arbitration or any other case or proceeding.  For the avoidance of doubt, all intercreditor claims, cross-claims, counter-claims and causes of action as between Foster Wheeler and any third party shall be finally determined in the Arbitration.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A.*        *Discharge of Claims and Termination of Interests*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim

39

or Interest has accepted the Plan.  Any default by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

Notwithstanding anything herein to the contrary, the discharge, release, exculpation, or injunction relating to any and all Claims held by Foster Wheeler as provided for herein is subject in its entirety to the terms of the Foster Wheeler Settlement Agreement.

## B.    Release of Liens

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for any Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Debtor and its successors and assigns.**

## C.    Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Debtors and their Estates shall release, and each Released Party shall be deemed released and discharged by the Debtors and their Estates, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Exit Facility, the Longview Credit Facility, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, bad faith, or gross negligence, each solely to the extent determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the Debtor Release shall not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

KE 28255669

For the avoidance of doubt, the Debtors and their Estates do not release any claims that have been assigned to Foster Wheeler pursuant to the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.    **Foster Wheeler Release**

Except as otherwise provided in the Foster Wheeler Settlement Agreement, the Debtors and their Estates release and forever discharge Foster Wheeler from any and all actions, claims, proceedings, counter-claims, third-party claims, mechanics' liens, liabilities, damages, demands, defenses, costs, expenses, fees (including attorney fees) whatsoever, known or unknown, foreseen or unforeseen, liquidated or unliquidated, arising under federal, state, or local laws, rules, regulations, or ordinances, whether in tort, contract, or otherwise have arisen or might arise out of or relate in any way to the Boiler Agreement and Foster Wheeler's performance on the Project, all of which shall be forever barred pursuant to the terms of the Foster Wheeler Settlement Agreement; provided that the foregoing will not release Foster Wheeler from any contractual obligation owed by Foster Wheeler to the Debtors or the Reorganized Debtors, as applicable (including, under the Foster Wheeler Settlement Agreement).,.

E.    **Third-Party Release**

As of the Effective Date, except as otherwise provided in the Plan, Releasing Parties shall release, and each of the Debtors, their Estates, and the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facility, the Exit Facility, the Longview Credit Facility, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, bad faith, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the Third-Party Release shall not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

F.      *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the New Organizational Documents, the Restructuring Transactions, the DIP Facility, the Exit Facility, the Longview Credit Facility, the New Second Lien Indenture, the issuance, distribution, and/or sale of the New Second Lien Notes, the Cramup Notes (if any), or of any units of the New Common Equity or any other security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; <u>provided</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; <u>provided</u>, <u>further</u>, that the foregoing Exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct.**

G.      *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Exit Facility, the New Second Lien Indenture, the Cramup Notes (if any), the New Common Equity, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold claims, interests, or Liens that have been discharged pursuant to Article VIII.A, released pursuant to Article VIII.B, Article VIII.C, Article VIII.D, or Article VIII.E, or are subject to exculpation pursuant to Article VIII.F are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

H.      *Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.        *Setoffs*

Except as otherwise expressly provided for in the Plan or in any court order, each Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim  (including for the avoidance of doubt the Dunkard Claims and the Mechanics' Lien Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, that, neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor of any such claims, rights, and Causes of Action that such Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to setoff any Claim against any claim, right, or Cause of Action of any of the Debtors unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff.

J.        *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of any of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.        *Subordination Rights*

The classification and treatment of all Claims under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan.

L.        *Document Retention*

On and after the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors (or the Reorganized Debtors, as the case may be).

M.        *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.        *Conditions Precedent to the Confirmation Date*

It shall be a condition precedent to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    the Disclosure Statement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Backstoppers;

2.    the Disclosure Statement Order shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Backstoppers;

3.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with this Plan and otherwise reasonably acceptable to the Debtors and the Backstoppers;

4.    the Plan Supplement, and all of the schedules, documents, and exhibits contained therein, shall be in a form and substance materially consistent with this Plan and otherwise reasonably satisfactory to the Debtors and the Backstoppers and Filed; and

5.    the Title Coverage Determination shall have occurred or, in the event the Title Coverage Determination has not occurred, there shall have been a determination (in the form of an order in form and substance reasonably satisfactory to the Debtors and the Backstoppers) by the Bankruptcy Court that the Liens, if any, securing Allowed Siemens Mechanics' Lien Claims or Allowed Kvaerner Mechanics' Lien Claims, if any, are junior in priority to any Liens securing Longview Credit Facility Claims.

B.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been in a form and substance materially consistent with this Plan and otherwise reasonably satisfactory to the Debtors and the Backstoppers and Filed;

2.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with this Plan and otherwise reasonably acceptable to the Debtors and the Backstoppers;

3.    all actions, documents, Certificates, and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been in a form and substance reasonably satisfactory to the Debtors and the Backstoppers and effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws;

4.    the Debtors shall have consummated the transactions contemplated by exercising the Dunkard Option, including entering into the New Second Lien Indenture and issuing the New Second Lien Notes, all in a manner and in form and substance reasonably acceptable to the Backstoppers and the Debtors;

5.    the Professional Fee Escrow shall have been established and funded in accordance with Article II.B hereof;

6.    the Foster Wheeler Reserve shall have been established and funded in accordance with the Foster Wheeler Settlement Agreement;

7.    if applicable, the Debtors shall have issued the Cramup Notes, which shall be in form and substance, and with terms and conditions, acceptable to the Backstoppers in their sole discretion;

8.    the Debtors shall have issued the New Common Equity;

9.    all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been received, and shall all be in form and substance reasonably acceptable to the Debtors and the Backstoppers;

44

10. the Debtors shall have entered into the Exit Facility, which shall be in form and substance reasonably acceptable to the Debtors and the Backstoppers;

11. subject to Article IV.B.2 hereof, the Insurance Trust Assets shall have been transferred to the Insurance Trust and the Insurance Trust Agreement shall have been executed and become effective; and

12. all of the reasonable and documented fees and expenses of the advisors to the Steering Group, the Backstoppers, the DIP Agent, and the Longview Credit Agreement Administrative Agent shall have been paid in full in Cash.

C.        *Waiver of Conditions*

Except for the condition set forth in Article IX.B.6 above, the conditions to Confirmation and Consummation set forth in this Article IX may be waived only by consent of both the Debtors and the Backstoppers, and may be waived without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  The condition to Confirmation and Consummation set forth in Article IX.B.6 hereof may only be waived by consent of the Debtors, Backstoppers, and Foster Wheeler.

D.        *Effective Date*

The Effective Date shall be (1) the first Business Day upon which all of the conditions specified in Article IX.B have been satisfied or waived and (2) a date consented to by the Backstoppers, such consent not to be unreasonably withheld.  Consummation of the Plan shall be deemed to occur on the Effective Date.

E.        *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur prior to a date to be mutually agreed to by the Debtors and the Backstoppers, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or the Disclosure Statement shall:   (a) constitute a waiver or release of any claims held by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.        *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the reasonable consent of the Backstoppers, reserve the right to modify the Plan, whether such modification is material or immaterial, and, with the reasonable consent of the Backstoppers, seek Confirmation consistent with the Bankruptcy Code and, as appropriate, with the reasonable consent of the Backstoppers and unless otherwise ordered by the Bankruptcy Court, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the reasonable consent of the Backstoppers, expressly reserve their rights to alter, amend, or modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

KE 28255669

B.       *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of Plan*

The Debtors, with the reasonable consent of the Backstoppers, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any claims held by the Debtor, Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

# ARTICLE XI.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.       allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or Allowance of Claims;

2.       decide and resolve all matters related to the granting and denying, in whole or in part, any applications for Allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.       resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure amounts pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the Rejected Executory Contract and Unexpired Lease Schedule; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.       adjudicate any dispute with respect to the priority of the Liens securing the ~~the~~ Kvaerner Mechanics' Lien Claims or the Siemens Mechanics' Lien Claims;

5.       adjudicate any dispute regarding the scope of coverage available under the Title Policy and the availability of Title Policy Proceeds to effectuate distributions contemplated by the Plan;

6.       ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

7.       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

46

8.    adjudicate, decide, or resolve any and all matters related to Causes of Action;

9.    adjudicate, decide, or resolve any and all matters related to sections 502(c), 502(j), or 1141 of the Bankruptcy Code;

10.  enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Disclosure Statement or the Plan;

11.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

12.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

13.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

14.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, Exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary to implement such releases, injunctions, Exculpations, and other provisions;

15.  hear any disputes relating to the Foster Wheeler Settlement Agreement to the extent provided therein;

16.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1 hereof;

17.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18.  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

19.  adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

20.  consider any modifications of the Plan to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

21.  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

22.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

23.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof and including any dispute relating to any liability arising out of the termination of employment or the termination of any

47

employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

25. except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

26. hear and determine all applications for allowance and payment of Professional Fee Claims;

27. enforce the injunction, release, and exculpation provisions set forth in Article VIII;

28. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

29. enforce all orders previously entered by the Bankruptcy Court; and

30. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtors, with the reasonable consent of the Backstoppers, may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Reorganized Debtors and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee and the Reorganized Debtors.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims prior to the Effective Date.

E.    *Successors and Assigns*

Unless otherwise provided herein, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, advisor, beneficiaries, or guardian, if any, of each Entity.

F.    *Notices*

All notices, requests, pleadings, and demands to or upon the Debtors or the Backstoppers to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Longview Power Intermediate Holdings C, LLC
> 966 Crafts Run Road
> Maidsville, WV 26541
> Facsimile:  304-599-1673
> Attention:  Jeffery Keffer, President and Chief Executive Officer
>
> with copies to:
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Facsimile:  (212) 446-4900
> Attention:  Paul M. Basta, P.C. and Ray C. Schrock, P.C.
>
> -and-
>
> Kirkland & Ellis LLP
> 300 North LaSalle St.
> Chicago, Illinois 60654
> Facsimile:  (312) 862-2200
> Attention:  Ryan Preston Dahl, Esq. and Michael W. Weitz, Esq.
>
> -and-
>
> counsel to the Backstoppers
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, New York 10036
> Facsimile:  (212) 872-1002
> Attention:  Ira Dizengoff, Esq. and Arik Preis, Esq.

G.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan on the Effective Date.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Backstoppers' consent; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.      *Closing of Chapter 11 Cases*

The Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      *Waiver or Estoppel*

Each Holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

N.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order and the DIP Order) referenced in the Plan

50

(or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control in all respects.

KE 28255669

Dated as of:  May ~~2~~27, 2014

Respectfully submitted,

LONGVIEW POWER INTERMEDIATE HOLDINGS C, LLC
(for itself and on behalf of each of its affiliated debtors)


By: _/s/_____
Name:  Jeffery Keffer
Title:  President and Chief Executive Officer

Prepared by:

Richard M. Cieri
Paul M. Basta, P.C.
Ray C. Schrock, P.C
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

-and-

Ryan Preston Dahl
Michael Weitz
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Daniel J. DeFranceschi
Paul N. Heath
Zachary I. Shapiro
Marisa A. Terranova
**RICHARDS, LAYTON & FINGER, P.A.**
920 North Market Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701


Co-Counsel to the Debtors and Debtors in Possession

**Exhibit A**

**General Unsecured Cash Pools**

**Unsecured Creditor Cash Pool**

     The following recoveries are set forth for purposes of Pro Rata disbursements to Holders of Allowed Claims in Classes 4, 5, 6, and 7, in each case solely to the extent such Class votes to **accept** the Plan, in accordance with Article III.B of the Plan; provided, that, such recoveries may be re-allocated among the Debtors in their reasonable business judgment to recalibrate for, among other things, the claims asserted against the Debtors' estates after the occurrence of the Claims Bar Date.

| Debtor | Cash Pool |
|---|---|
| Alternate Energy, LLC | $108,015 |
| Border Energy, LLC | $27,185 |
| Coresco, LLC | $71,799 |
| Dana Mining Company, LLC | $174,722 |
| Dana Mining Company of Pennsylvania, LLC | $232,943 |
| Longview Intermediate Holdings C, LLC | $0 |
| Longview Power, LLC | $125,101 |
| Mepco, LLC | $245,518 |
| Mepco Conveyor, LLC | $9,064 |
| Mepco Holdings, LLC | $0 |
| Mepco Intermediate Holdings, LLC | $4,768 |
| Mepco Intermediate Holdings A, LLC | $0 |
| Shannopin Materials LLC | $884 |
|  |  |
| **Total** | $1,000,000 |

**Unsecured Rejecting Creditor Cash Pool**

     The following recoveries are set forth for purposes of Pro Rata disbursements to Holders of Allowed Claims in Classes 4, 5, 6, and 7, in each case solely to the extent such Class votes to **reject** the Plan, in accordance with Article III.B of the Plan; provided, that, such recoveries may be re-allocated among the Debtors in their reasonable business judgment to recalibrate for, among other things, the claims asserted against the Debtors' estates after the occurrence of the Claims Bar Date.

| Debtor | Cash Pool |
|---|---|
| Alternate Energy, LLC | $27,004 |
| Border Energy, LLC | $6,796 |
| Coresco, LLC | $17,950 |
| Dana Mining Company, LLC | $43,681 |
| Dana Mining Company of Pennsylvania, LLC | $58,236 |
| Longview Intermediate Holdings C, LLC | $0 |
| Longview Power, LLC | $31,275 |
| Mepco, LLC | $61,380 |
| Mepco Conveyor, LLC | $2,266 |
| Mepco Holdings, LLC | $0 |
| Mepco Intermediate Holdings, LLC | $1,192 |
| Mepco Intermediate Holdings A, LLC | $0 |
| Shannopin Materials LLC | $221 |
|  |  |
| **Total** | $250,000 |