## EXHIBIT 1

**Disclosure Statement Supplement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LONGVIEW POWER, LLC, et al.,[1] | ) | Case No. 13-12211 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

### DISCLOSURE STATEMENT SUPPLEMENT FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

Richard M. Cieri (admitted *pro hac vice*)
Paul M. Basta, P.C. (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Ryan Preston Dahl (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Marisa A. Terranova (No. 5396)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701

*Co-Counsel to the Debtors and Debtors in Possession*

Dated as of:  May 29, 2014

This Disclosure Statement Supplement is being submitted for approval but has not been approved by the Bankruptcy Court. This is not a solicitation of acceptance or rejection of the Amended Plan. The information in the Disclosure Statement Supplement is subject to change. This Disclosure Statement Supplement is not an offer to sell any securities and is not soliciting an offer to buy any securities.

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors"). The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541. The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

THE DEBTORS ARE SENDING YOU THIS DOCUMENT (THIS "DISCLOSURE STATEMENT SUPPLEMENT") AS A SUPPLEMENT TO THE *DEBTORS' DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 672] (THE "DISCLOSURE STATEMENT") BECAUSE YOU ARE A CREDITOR THAT IS ENTITLED TO VOTE TO APPROVE THE *DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 1139] (AS MAY BE AMENDED OR MODIFIED FROM TIME TO TIME AND ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "AMENDED PLAN"), FILED ON MAY 2, 2014, WHICH HAS BEEN AMENDED WITH REGARDS TO, AMONG OTHER THINGS, THE TREATMENT OF CERTAIN CLAIMS AND THE MEANS FOR IMPLEMENTATION OF THE *DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 671] (THE "ORIGINAL PLAN").[2]

THE DEBTORS COMMENCED SOLICITING VOTES TO APPROVE THE ORIGINAL PLAN ON DECEMBER 18, 2013, PURSUANT TO THE TERMS OF THE ORDER APPROVING THE DISCLOSURE STATEMENT AND RELATED SOLICITATION PROCEDURES [DOCKET NO. 663] (THE "DISCLOSURE STATEMENT ORDER").    THIS DISCLOSURE STATEMENT SUPPLEMENT SUMMARIZES, AMONG OTHER THINGS, CERTAIN MODIFICATIONS TO THE ORIGINAL PLAN INCLUDED IN THE AMENDED PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE AMENDED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE AMENDED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE AMENDED PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SUPPLEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT SUPPLEMENT, THE AMENDED PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE AMENDED PLAN.

MOREOVER, NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE AMENDED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT.    CLAIMANTS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS, OR OTHER INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE AMENDED PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE AMENDED PLAN AND THE DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SUPPLEMENT CONTAINS A SUMMARY OF CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND EVENTS PRECEDING THE DEBTORS' FILING THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT

---

[2]    All capitalized terms used but not otherwise defined in this Disclosure Statement Supplement shall have the meaning ascribed to them in the Amended Plan or the Disclosure Statement, respectively.

i

THEY DO NOT SET FORTH EVERY DETAIL OF SUCH EVENTS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 29651014

# ARTICLE I
## SUPPLEMENTAL DISCLOSURE OF EVENTS IN THE CHAPTER 11 CASES

A.      *Foster Wheeler Settlement Agreement.*

As discussed in Article IV.D and Article V of the Disclosure Statement, the Debtors and the Contractors have been engaged in the Arbitration regarding, among other things, the design, supply, construction, commissioning, and operation of the Longview Power Facility for nearly three years.  Matters related to the Contractors and the Arbitration, including the Mechanics' Lien Claims Estimation Process, have played a significant role throughout the Chapter 11 Cases and in the Debtors' ability to successfully reorganize.  Accordingly, the Debtors have sought to resolve many of the issues related to the Arbitration during the Chapter 11 Cases.

On February 6, 2014, the Debtors entered into a settlement with Foster Wheeler (the "Foster Wheeler Settlement Agreement").  Among other things, and subject to the specific terms and conditions set forth in the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order (as defined herein), the Foster Wheeler Settlement Agreement provides that:  (1) Foster Wheeler will perform the necessary repairs to the Longview Power Facility's boiler at potentially no cost to the Debtors, and Foster Wheeler's parent entity will provide a guaranty of this work to the Debtors; (2) Foster Wheeler will keep the Foster Wheeler LCs in full force and effect, and the Debtors and Foster Wheeler will take all actions necessary to protect the Foster Wheeler LCs from any rights against the Foster Wheeler LCs asserted by the other Contractors; (3) the Debtors will release their claims against Foster Wheeler and Foster Wheeler will release its Disputed Mechanics' Lien Claims against the Debtors, which Disputed Mechanics' Lien Claims total approximately $17 million; (4) the Debtors will assign certain claims related to the rehabilitation work on the boiler to Foster Wheeler; (5) Foster Wheeler will be afforded certain protections relating to its performance of the Rehabilitation Work as set forth in the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order, including, but not limited to, Allowed Administrative Claims and the Foster Wheeler Reserve; and (6) Foster Wheeler will support the Debtors' chapter 11 plan of reorganization.

The Foster Wheeler Settlement Agreement is an important achievement in the Chapter 11 Cases, and in the Debtors' efforts to repair the Longview Power Facility and accomplish their operational restructuring.  On March 4, 2014, the Bankruptcy Court held a hearing to consider approval of the Foster Wheeler Settlement Agreement and, overruling objections thereto, the Bankruptcy Court entered an order approving the Foster Wheeler Settlement Agreement on March 7, 2014 [Docket No. 1018] (the "Foster Wheeler Settlement Order").  The Debtors and Foster Wheeler are currently in the process of implementing this vital relief.  On March 21, 2014, Kvaerner filed an appeal of the Foster Wheeler Settlement Order [Docket No. 1041].  This appeal is currently pending in the United States District Court for the District of Delaware, Civil Action No. 14-507.

B.      *Mediation.*

In an effort to consensually resolve the disputes among the parties, the Debtors, the Backstoppers and the Contractors engaged in negotiations regarding the terms of a confidential, non-binding mediation process.  The parties ultimately reached an agreement on a form of order outlining the terms of the mediation process, and the Bankruptcy Court entered an order approving that process on March 6, 2014 [Docket No. 1012] (the "Mediation Order").  Pursuant to the Mediation Order, the mediation among the Debtors, the Backstoppers and the Contractors began on March 27, 2014.  At the request of First American Title Insurance Company ("First American"), First American and its counsel have been active participants in the mediation and have participated in each mediation session.  Although no settlements have been reached as of the date hereof, the Debtors, the Backstoppers, First American, and the Contractors continue to engage in the mediation at this time and no party has sought to formally withdraw from the mediation process as of the date hereof.  The mediators for the mediation are Kenneth Gibbs, an expert in construction law mediations and arbitrations, and the Honorable Richard T. Lyons, a former bankruptcy judge for the Bankruptcy Court for the District of New Jersey.

C.      *First Energy Settlement and Contract Amendments.*

Prior to the Petition Date, a significant portion of the Mepco Debtors' coal sales were undertaken pursuant to two long term contracts with affiliates of FirstEnergy Corporation ("FirstEnergy").  As discussed in Article IV.D.3 of the Disclosure Statement, FirstEnergy Corporation announced the closure of its Hatfield Ferry

1

power plant in July 2013, and this power plant ultimately closed in October 2013. The Hatfield Ferry power plant accounted for approximately 25 percent of the Mepco Debtors' annual coal sales.

On December 13, 2013, FirstEnergy's subsidiary, Allegheny Energy, Inc. ("Allegheny"), sent a letter to the Debtors seeking to suspend the Debtors' coal deliveries to the Hatfield Ferry power plant. On December 23, 2013, the Debtors filed a motion seeking to reject the Debtors' ash disposal contract with Allegheny for the Hatfield Ferry power plant [Docket No. 689] (the "Hatfield Ferry Ash Disposal Rejection Motion"). On January 6, 2014, Allegheny filed a response to the Hatfield Ferry Ash Disposal Rejection Motion [Docket No. 714].

Both before and after these filings, the Debtors and FirstEnergy actively negotiated regarding each party's respective rights under the parties' ash removal and coal supply agreements for FirstEnergy's Hatfield Ferry and Ft. Martin power plants. Following the filing of the Hatfield Ferry Ash Disposal Rejection Motion, the parties engaged in several additional rounds of face-to-face negotiations, and ultimately reached a good-faith settlement regarding the agreements for FirstEnergy's power plants. Among other things, the Debtors and FirstEnergy agreed that: (1) the parties would terminate, and the Debtors would formally reject, the Debtors' Hatfield Ferry ash disposal and coal supply agreements in exchange for an $18 million cash payment by FirstEnergy to the Debtors; (2) the parties and their affiliates would release each other from any and all claims arising from the Hatfield Ferry ash disposal and coal supply contracts; and (3) the parties would amend the Debtors' Ft. Martin ash disposal and coal supply agreements to provide the Debtors with certainty on the payment terms and duration of such agreements.

The Debtors memorialized the foregoing settlement in related contract amendments, and sought the Bankruptcy Court's approval of (a) a stipulation authorizing the rejection of the Debtors' Hatfield Ferry ash disposal and coal supply contracts [Docket No. 900] and (b) a motion to amend the Debtors' Ft. Martin ash disposal and coal supply contracts [Docket No. 897]. No party objected to the relief requested in such motions, and the Bankruptcy Court entered orders approving the Debtors' settlement with FirstEnergy [Docket No. 967] and the amendments to the Ft. Martin ash disposal and coal supply contracts [Docket No. 969].

D.    *Purchase of Non-Debtor Affiliates.*

As discussed in Article IV.A.1(c) of the Disclosure Statement, Dunkard Creek Water Treatment System, LLC ("Dunkard Creek"), an affiliate of the Debtors, supplies the Longview Power Facility with the water necessary for its operations through a water treatment facility owned by Dunkard Creek located in Greene County, Pennsylvania. In addition, AMD Reclamation, Inc. ("AMDRI") pumps and treats mine pool water from certain abandoned mines that, unless drained, flood the mines operated by the Mepco Debtors; AMDRI also treats discharged water from the Longview Power Facility and Dunkard Creek at a mine water treatment facility that it operates located in Greene County, Pennsylvania. Finally, the Longview Debtors' employees, including their corporate officers, are provided by GenPower Services, LLC ("GenPower Services").

The Debtors entered into good-faith, arm's-length negotiations with First Reserve, the Debtors' indirect equity owners and beneficial owners of Dunkard Creek, to secure the Debtors' access to Dunkard Creek's water treatment facility, AMDRI's water treatment and pumping services, and GenPower Services' operations. These negotiations ultimately resulted in an agreement between the Debtors and First Reserve regarding the terms of the Debtors' acquisition of these important rights and assets. On December 4, 2013, the Debtors filed a motion [Docket No. 556] (the "Dunkard-GenPower Services Acquisition Motion") to obtain Bankruptcy Court approval to, among other things, acquire: (1) a 100 percent equity interest in Dunkard Creek's parent company, DCWTS Holdings, LLC; (2) a 100 percent equity interest in GenPower Services; and (3) First Reserve's interest (including any designation or appointment rights) with respect to AMDRI.

On December 18, 2013, over the objection of the administrative and collateral agent for the Dunkard Creek Facilities (the "Dunkard Agent"), the Bankruptcy Court entered an order approving the relief requested in the Dunkard-GenPower Services Acquisition Motion [Docket No. 662]. On January 10, 2014, the Debtors closed on this acquisition and now own, inter alia, DCWTS Holdings, LLC, GenPower Services, and the rights to designate or appoint members to AMDRI's board.

2

E.      *Dunkard Creek Forbearance.*

As discussed in Article IV.A.1(c) of the Disclosure Statement, Dunkard Creek is a borrower under the Dunkard Creek Facilities, which are comprised of: (a) an approximately $105 million term loan pursuant to a credit agreement, dated as of May 18, 2009; and (b) an approximately $25 million bridge term loan pursuant to a bridge loan agreement, dated as of May 18, 2009. Pursuant to the terms of the relevant credit agreements, the outstanding obligations under the Dunkard Creek Facilities were to mature on February 28, 2014. Prior to the Petition Date, the Debtors provided indirect credit support for obligations arising under the Dunkard Creek Facilities through letters of credit issued in the amount of approximately $83.7 million under the Longview Credit Facility.

In anticipation of the Debtors' chapter 11 filing, Dunkard Creek entered into a forbearance agreement (the "First Dunkard Forbearance") with the Dunkard Agent and the lenders under the Dunkard Creek Facilities (the "Dunkard Lenders") on August 29, 2013, which provided, among other things, that the Dunkard Agent and the Dunkard Lenders would not commence proceedings related to an event of default arising under the Dunkard Creek Facilities arising from the Debtors' chapter 11 filing until February 28, 2014, if ever, subject to the conditions of the First Dunkard Forbearance. In accordance with the First Dunkard Forbearance, on September 5, 2013, the Dunkard Lenders drew down on the letters of credit provided by the Debtors to support the Dunkard Creek Facilities. At the time that the Debtors closed on the purchase of its affiliates, including Dunkard Creek's parent company, Dunkard Creek's outstanding obligations under the Dunkard Creek Facilities totaled approximately $42.6 million, which obligations were to mature on February 28, 2014.

Recognizing that the outstanding amounts under the Dunkard Creek Facilities were to come due on February 28, 2014, the Debtors, Dunkard Creek, and the Dunkard Agent entered into negotiations for a further forbearance of the Dunkard Creek Facilities. After substantial, good-faith negotiations, the Debtors, Dunkard Creek, and the Dunkard Agent agreed to terms on an additional forbearance through May 15, 2014 (the "Second Dunkard Forbearance"), which was filed with the Bankruptcy Court [Docket No. 1047]. In consideration of the Second Dunkard Forbearance, Dunkard Creek agreed to pay approximately $1.7 million in principal amortization over two separate payments as well as default interest through May 15, 2014. On May 15, 2014, the Debtors, Dunkard Creek, and the Dunkard Agent agreed to terms on an additional forbearance through May 28, 2014, which was filed with the Bankruptcy Court [Docket No. 1155] (the "Third Dunkard Forbearance"). On May 28, 2014, the Debtors, Dunkard Creek, and the Dunkard Agent agreed to terms on a fourth, long-term forbearance through December 31, 2014 (collectively with the First Dunkard Forbearance, the Second Dunkard Forbearance, and the Third Dunkard Forbearance, the "Dunkard Forbearance").

F.      *Amendments to DIP Facility.*

Pursuant to the terms of the DIP Credit Agreement, the Debtors were required to, among other things, emerge from chapter 11 protection on or before March 7, 2014. The Debtors and the Backstoppers actively sought to maintain the timeline required by the DIP Credit Agreement but due to, among other things, delays in the Debtors' Original Plan and Mechanics' Lien Claims Estimation Process, the Debtors did not meet the applicable milestones set forth in the DIP Credit Agreement. The Debtors therefore engaged the Backstoppers in good-faith negotiations about extending the milestones and other terms of the DIP Credit Agreement.

On March 21, 2014, the Debtors and the Backstoppers amended the DIP Credit Agreement, which amendment, among other things, required: (1) the hearing to confirm the Debtors' chapter 11 plan of reorganization to commence on or before May 21, 2014; (2) the Confirmation Order to be entered on or before May 28, 2014; and (3) the Effective Date of the Debtors' chapter 11 plan of reorganization to occur on or before June 11, 2014. On March 21, 2014, the Debtors caused this amendment to be filed with the Bankruptcy Court [Docket No. 1045].

The Debtors and the Backstoppers have entered into an additional amendment to the DIP Credit Agreement, which amendment, among other things, requires: (1) the hearing to confirm the Debtors' chapter 11 plan of reorganization to commence on or before September 2, 2014; (2) the Confirmation Order to be entered on or before September 9, 2014; and (3) the Effective Date of the Debtors' chapter 11 plan of reorganization to occur on or before September 23, 2014. On May 23, 2014, the Debtors caused this amendment to be filed with the Bankruptcy Court [Docket No. 1183].

G.      *Executory Contracts and Unexpired Leases.*

The Debtors have examined their operations throughout the Chapter 11 Cases, including evaluating the necessity and cost efficiency of their Executory Contracts and Unexpired Leases. As part of this process, the Debtors determined that certain Executory Contracts were unnecessary and burdensome to the Debtors' Estates and should be rejected. To that end, on January 31, 2014, the Debtors filed a motion seeking to reject approximately 31 Executory Contracts [Docket No. 817] (the "Contract Rejection Motion"). The Bankruptcy Court entered an order approving the rejection of 27 of these Executory Contracts on February 26, 2014 [Docket No. 970]. On April 10, 2014, Hope Gas, Inc., d/b/a Dominion Hope ("Dominion Hope") filed an objection to the Contract Rejection Motion [Docket No. 1095]. The Contract Rejection Motion remains pending in relation to four Executory Contracts, including two with Dominion Hope.

The Debtors, with the assistance of their advisors, also engaged in a thorough review of their Unexpired Leases. To provide sufficient time to complete this review, on December 23, 2013, the Debtors filed a motion to extend the deadline under section 365(d)(4) of the Bankruptcy Code by which they would have to assume or reject their Unexpired Leases to avoid automatic rejection (the "Section 365(d)(4) Deadline") [Docket No. 685]. On January 15, 2014, the Court entered an order extending the Section 365(d)(4) Deadline to March 31, 2014 [Docket No. 752]. After obtaining this initial extension of the Section 365(d)(4) Deadline, the Debtors, with the assistance of their advisors, completed an analysis of, among other things, the costs and benefits of each of the Unexpired Leases, as well as the costs inherent in obtaining potential extensions from the non-debtor counterparties to each of the Unexpired Leases. The Unexpired Leases include right of way agreements and easements for land used in the Debtors' coal-mining operations, coal production payment agreements, and traditional leases that provide the Debtors' access to coal reserves required by their mining operations. The Unexpired Leases also include the ground lease for the real estate occupied by the Longview Power Facility. In short, the Unexpired Leases are instrumental to the Debtors in the operation of their businesses. The Debtors therefore determined that it was in the best interests of the Debtors, their Estate, and all stakeholders to assume each of their Unexpired Leases. On March 28, 2014, the Debtors filed a motion seeking to assume each of their Unexpired Leases [Docket No. 1071] (the "Lease Assumption Motion"). At this time, the Lease Assumption Motion remains pending.

H.      *Mepco Reimbursements.*

In connection with preparing the Debtors' Schedules, the Debtors and their advisors became aware that certain of the Mepco Debtors' executives previously received reimbursements from Mepco, LLC, a Debtor, on account of political contributions made to federal, state, and local politicians identified by the Mepco Debtors' former Chief Executive Officer, James Laurita, Jr. The Debtors and their advisors have taken steps to ensure that this practice was discontinued, and the Debtors do not believe any such reimbursements have been made since the Petition Date.

The Debtors disclosed the reimbursements in question in Statement 3(c) of the applicable Debtor's statement of financial affairs [Docket No. 425] and specifically identified the basis for such payments in the global notes to the Debtors' Schedules. (See Schedules, pg. 13.) In addition, the Debtors have been cooperating with governmental authorities regarding these matters.

I.      *The Original Plan Process.*

On December 18, 2013, the Bankruptcy Court entered the Disclosure Statement Order, which authorized the Debtors to solicit acceptances and rejections of the Original Plan. The Debtors initially set a hearing to confirm the Original Plan for February 11, 2014. The Debtors, in consultation with the Backstoppers, elected to adjourn confirmation with respect to the Original Plan to consider all aspects of the Debtors' restructuring and path to emergence from chapter 11 protection [Docket Nos. 781, 784, 935] (collectively, the "Adjournment Notices"). The Debtors' election to adjourn their confirmation process with respect to the Original Plan reflected, among other things, the Debtors' evaluation of the then-present opportunities and challenges arising with respect to pursuing plan confirmation at that time, including with respect to the claims estimation process described in the Disclosure Statement and herein, as well as negotiations with Foster Wheeler that ultimately resulted in the Foster Wheeler Settlement Agreement described herein.

4

J.    *Mechanics' Lien Claims Estimation Process and Contractors' Claim Objections.*

As discussed in the Disclosure Statement, the Original Plan contemplated, among other things, a debt-for-equity transaction, whereby the Holders of Claims arising under the Longview Credit Agreement would exchange their debt for the overwhelming majority of the equity in the Reorganized Debtors. Due to disputes regarding, among other things, the priority of the Disputed Mechanics' Liens Claims and the validity of claims asserted by the Contractors, the Plan also required the Debtors to obtain entry of an order from the Court estimating the Disputed Mechanics' Lien Claims at $0.00 for all purposes pursuant to section 502(c) of the Bankruptcy Code. The Mechanics' Lien Claims Estimation Process was a significant component of the Original Plan, and was a condition precedent to the Debtors' emergence from chapter 11. To that end, and as discussed more fully in Article V.J of the Disclosure Statement, on December 11, 2013, the Debtors filed the Claims Estimation Motion [Docket No. 582] to estimate each of the Contractors' Disputed Mechanics' Lien Claims at $0.00 for all purposes. On December 11, 2013, the Debtors also commenced an adversary proceeding, captioned Longview Power, LLC v. Kvaerner North American Construction, Inc., Adv. Pro. No. 13-52531 (BLS) (Bankr. D. Del.), against Kvaerner and Siemens to determine the maximum potential extent of Kvaerner's and Siemens' Disputed Mechanics' Lien Claim (the "Contractor Adversary Proceeding"). The Mechanics' Lien Claims Estimation Process was set for a hearing with the Bankruptcy Court on February 7, 2014. The Debtors, over Kvaerner's objection, adjourned the matter as part of the Foster Wheeler Settlement Agreement. The Mechanics' Lien Claims Estimation Process has, to date, resulted in numerous contested hearings, extended discovery, and substantial motion practice before the Bankruptcy Court. The Claims Estimation Motion and the Contractor Adversary Proceeding remain pending at this time, although pursuant to the Amended Plan, these proceedings will be held in abeyance pending the Debtors' prosecution of the Amended Plan. Any prosecution of the Claims Estimation Motion is subject to the terms of the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order as set forth in the Amended Plan and described in Article II.E.3 hereof.

On February 1, 2014, the Debtors filed objections to the Disputed Mechanics' Lien Claims of Foster Wheeler [Docket No. 827] (the "Foster Wheeler Claim Objection"), Siemens [Docket No. 828] (the "Siemens Claim Objection"), and Kvaerner [Docket No. 829] (the "Kvaerner Claim Objection," and collectively, the "Contactor Claim Objections"). The substantive basis for the Debtors' objections as memorialized in the Contractor Claims Objections are set forth more fully in the Debtors' Estimation Motion, and the Estimation Motion should be consulted for the Debtors' legal and factual arguments with respect thereto. The Contractor Claim Objections remain pending at this time, although the Debtors withdrew the Foster Wheeler Claim Objection on March 11, 2014 in accordance with the Foster Wheeler Settlement Agreement [Docket No. 1023]. For the avoidance of doubt, the Debtors have not conceded the amount, validity, or priority of the Disputed Mechanics' Lien Claims for which the Contractor Claim Objections have not been withdrawn.

K.    *Amended Plan.*

In addition to the operational restructuring challenges described herein, the Debtors remain focused on implementing a balance sheet solution and emerging from chapter 11 protection as a financially stronger company. The Debtors, recognizing the delays related to the Original Plan, have therefore discussed multiple chapter 11 plan structures with their stakeholders, including the Backstoppers and Foster Wheeler. The potential chapter 11 plan structures have guided the Debtors in both the mediation process with the Contractors and First American and their ongoing discussions with the Dunkard Agent and Dunkard Lenders regarding the repayment of Dunkard Creek's debt.

The Debtors have reached an agreement with the Backstoppers to modify the terms of their proposed chapter 11 plan of reorganization, which agreement is the basis for the Amended Plan. As described more fully herein, and subject in all respects to the terms of the Amended Plan itself, the Amended Plan, among other things: (1) provides for the creation of a trust (the "Insurance Trust") for the benefit of Kvaerner and Siemens, which Insurance Trust will hold certain of the cash proceeds (the "Title Insurance Proceeds") from that certain *Policy of Title Insurance*, number A40008468 (the "Title Insurance Policy"), issued by First American, which Title Insurance Proceeds shall be assigned by the Longview Credit Agreement Collateral Agent to the Insurance Trust;[3] (2) provides

---

[3]    For the avoidance of doubt, and as a technical matter, the Title Insurance Proceeds will first be assigned to the Debtors pursuant to the Assignment Agreement (as defined herein), which is discussed in Article I.L hereof.

for the issuance to Siemens and Kvaerner of new secured notes (the "Cramup Notes"), which Cramup Notes may be issued if the Title Insurance Proceeds are otherwise insufficient to satisfy the Kvaerner's and/or Siemens' Disputed Mechanics' Lien Claims in full; and (3) implements the provisions of the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order. Importantly, the Debtors will hold the Claims Estimation Motion, the Contractor Adversary Proceeding, and the Contractor Claim Objections in abeyance, to the extent not withdrawn, during the pendency of the Amended Plan.

If Siemens' and Kvaerner's Disputed Mechanics' Lien Claims are determined to be allowed claims that are junior in priority to Longview Credit Agreement Claims, it is the Debtors' position that Siemens' and Kvaerner's Disputed Mechanics' Lien Claims will be entitled to a recovery as general unsecured creditors of the Debtors' Estates, as set forth in Article III of the Plan. The Debtors may elect to commence a proceeding in the Bankruptcy Court for a determination regarding the priority of Siemens' and Kvaerner's Disputed Mechanic's Lien Claims. See 28 U.S.C. § 157(b)(2)(K); Fed. R. Bankr. P. 7001(2). The Debtors reserve all rights with respect to the manner in which such lien priority might be prosecuted or determined, and Siemens and Kvaerner also reserve all rights with respect to the manner in which such lien priority might be prosecuted or determined and with respect to the implications of such determinations.

The Debtors believe that Confirmation of the Amended Plan represents the best avenue for the Debtors to reorganize and maximize the value of their assets for the benefit of all stakeholders. The Debtors have therefore prepared this Disclosure Statement Supplement to seek confirmation of the value-maximizing restructuring transactions encompassed in the Amended Plan and described herein and in the Disclosure Statement.

Siemens and Kvaerner reserve all rights with respect to Confirmation of the Amended Plan, including but not limited to issues related to valuation and lien priority. The Debtors also reserve all rights.

L.    *Title Insurance Determination.*

The Amended Plan requires the Debtors to obtain entry of an order of the Bankruptcy Court on terms materially consistent with the Amended Plan and otherwise reasonably satisfactory to the Backstoppers, the Longview Credit Agreement Collateral Agent, and the Debtors determining that proceeds from the Title Insurance Policy are available for assignment and distribution in accordance with the Amended Plan in the event that the Liens, if any, securing Allowed Siemens Mechanics' Lien Claims or Allowed Kvaerner Mechanics' Lien Claims, if any, are senior in priority to any Liens securing Longview Credit Facility Claims (the "Title Coverage Determination"). To this end, on May 23, 2014, the Debtors commenced an adversary proceeding against First American, captioned Longview Power, LLC v. First American Title Insurance Co., 14-50369 (BLS) (Bankr. D. Del). By this proceeding, the Debtors have sought a declaratory judgment to cause the Title Coverage Determination to occur, and this proceeding remains pending as of the date hereof.

Unless the condition required by the Title Coverage Determination is waived by the Debtors and the Backstoppers, the Debtors will be unable to confirm their Amended Plan unless that condition is otherwise waived or unless Siemens' and Kvaerner's Mechanics' Lien Claims are determined to be junior in priority to Liens securing Longview Credit Facility Claims. Specifically, Article IX.A.5 of the Amended Plan requires the Debtors to obtain the Title Coverage Determination as a condition precedent to Confirmation of the Amended Plan unless this requirement is waived by the Backstoppers.

On May 28, 2014, Longview Power entered into an assignment of proceeds agreement with the Longview Credit Agreement Collateral Agent (the "Assignment Agreement"), pursuant to which the Longview Credit Agreement Collateral Agent, at the direction of the applicable first lien secured parties pursuant to the Intercreditor Agreement (as defined in the Assignment Agreement), agreed to, among other things, assign the Title Insurance Proceeds to Longview Power in accordance with the Amended Plan and subject to the terms and conditions set forth in the Assignment Agreement. On May 28, 2014, the Debtors caused notice of the Assignment Agreement to be filed with the Bankruptcy Court [Docket No. 1211]. The Debtors expect to seek Bankruptcy Court approval of the Assignment Agreement in the near term.

KE 29651014

M.      *California State Court Proceeding*

On May 16, 2014, First American commenced a declaratory action against the Longview Credit Agreement Collateral Agent in the Superior Court of the State of California, County of Orange, captioned First American Title Insurance Company v. Union Bank, N.A., Case No. 2014-00723753 (the "State Court Proceeding"). Through the State Court Proceeding, First American has sought a declaratory judgment that it does not have any obligation under the Title Insurance Policy to insure the priority of liens arising under the Longview Credit Agreement that are secured by the Longview Power Facility and related properties.

The Debtors believe that, by commencing the State Court Proceeding, First American has wrongly sought to exercise control over the Debtors' interest in certain of the Title Insurance Proceeds in violation of the automatic stay arising under section 362(a) of the Bankruptcy Code. In addition, the Debtors believe that, through the State Court Proceeding, First American would expose these chapter 11 estates to a material risk of collateral estoppel and issue preclusion on fundamental aspects of these chapter 11 estates. The Debtors therefore filed a motion requesting that the Bankruptcy Court extend the automatic stay or, in the alternative, enter preliminary and permanent injunctive relief with respect to the State Court Proceeding [Docket No. 1187] (the "Stay Extension Motion"). The Stay Extension Motion is pending before the Bankruptcy Court at this time, and the Debtors have requested that the Stay Extension Motion be heard by the Court on June 10, 2014 pursuant to a separate motion filed with the Court at [Docket No. 1188].

## ARTICLE II
## SUMMARY OF PLAN MODIFICATIONS

This section provides a summary of the material modifications to the structure and means for implementation of the Amended Plan and the classification and treatment of Claims and Interests under the Amended Plan, and is qualified in its entirety by reference to the Amended Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement Supplement include summaries of the provisions contained in the Amended Plan and in the documents referred to therein. The statements contained in this Disclosure Statement Supplement do not purport to be precise or complete statements of all the terms and provisions of the Amended Plan or documents referred to therein, and reference is made to the Amended Plan and to such documents for the full and complete statement of such terms and provisions of the Amended Plan or documents referred to therein.

The Amended Plan controls the actual treatment of Claims against, and Interests in, the Company under the Amended Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Amended Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement Supplement, the Disclosure Statement, and the Amended Plan or any other operative document, the terms of the Amended Plan and/or such other operative document shall control.

A.      *Modifications to the Treatment of Administrative Claims.*

In addition to the provisions related to Administrative Claims in the Original Plan, Article II.A of the Amended Plan has been amended to provide that in accordance with section 11(c) of the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order, Rehabilitation Work Claims shall be Allowed Administrative Claims to the extent provided by the Foster Wheeler Settlement Agreement, and such Claims (x) shall be junior in priority to all DIP Facility Claims and (y) shall have all the protections provided by sections 364(b) and 364(e) of the Bankruptcy Code as provided for in the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order. Notwithstanding anything herein to the contrary, if a Settlement Agreement Termination occurs prior to the Effective Date, such Allowed Administrative Claims shall be paid in full in Cash no later than seven (7) days after the Effective Date. If a Settlement Agreement Termination occurs after the Effective Date, then within seven (7) business days after Foster Wheeler provides to Reorganized Longview Power documentation required by the Foster Wheeler Settlement Agreement supporting its Rehabilitation Work Claims, Reorganized Longview Power will pay to Foster Wheeler any undisputed amounts without further order of the Bankruptcy Court. To the extent

7

that Foster Wheeler and Reorganized Longview Power are unable to reach agreement on payment of the remaining unpaid amounts of the Rehabilitation Work Claims, then either or both may seek an order from the Bankruptcy Court resolving the dispute and authorizing payment.

B.      *Modifications to the Treatment of Claims.*

The treatment of Claims and Interests against each Debtor (as applicable) pursuant to the Amended Plan has been modified solely as set forth below.

1.      <u>Class 4 – Foster Wheeler Mechanics' Lien Claims.</u>

    (a)      *Classification*: Class 4 consists of all Foster Wheeler Mechanics' Lien Claims.

    (b)      *Treatment*:

        (i)      if the Effective Date occurs <u>before</u> the Foster Wheeler Settlement Order becomes a Final Order, the Reorganized Debtors shall fully fund the Foster Wheeler Reserve in accordance with the Foster Wheeler Settlement Agreement and upon such funding, Foster Wheeler shall, within three (3) days of such funding, release and discharge any and all Liens securing the Foster Wheeler Mechanics' Lien Claims in accordance with the Foster Wheeler Settlement Agreement; <u>and</u>

        (ii)      if the Effective Date occurs <u>after</u> the Foster Wheeler Settlement Order becomes a Final Order, Foster Wheeler shall, within three (3) days of the Foster Wheeler Settlement Order becoming a Final Order, release and discharge any and all Liens securing the Foster Wheeler Mechanics' Lien Claims in accordance with the Foster Wheeler Settlement Agreement.

    (c)      *Voting*: Class 4 is Impaired under the Amended Plan. Holders of Allowed Foster Wheeler Mechanics' Lien Claims are entitled to vote to accept or reject the Amended Plan.

2.      <u>Class 5 – Kvaerner Mechanics' Lien Claims.</u>

    (a)      *Classification*: Class 5 consists of all Kvaerner Mechanics' Lien Claims.

    (b)      *Treatment*: Except to the extent that a Holder of an Allowed Kvaerner Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Kvaerner Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Kvaerner Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

        (i)      if such Allowed Kvaerner Mechanics' Lien Claim is determined by a Final Order to be both Secured and senior to the Longview Credit Agreement Claims,

            (A)      payment in full in Cash, with any such distribution coming in full from the Insurance Trust, <u>or</u>

            (B)      if proceeds from the Insurance Trust Assets are otherwise insufficient to satisfy the Allowed Kvaerner Mechanics' Lien Claims in full, at the Reorganized Debtors' election, with the Backstoppers' consent:

(1)    notes (a) secured by the Liens securing the Kvaerner Mechanic' Lien Claims to the extent required by section 1129(b)(2)(A)(i)(I) and (b) with a present value equal to the Allowed amount of such Kvaerner Mechanics' Lien Claim (or to the extent such Claim is not otherwise satisfied with a distribution from the Insurance Trust Assets) to the extent required by section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, <u>or</u>

(2)    such other treatment necessary to satisfy section 1129(b)(2)(A)(i) of the Bankruptcy Code.

(ii)    if such Allowed Kvaerner Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (which may include, for such purposes, a determination that such Claim is junior to Longview Credit Agreement Claims),

(A)    <u>if Class 5 votes to accept the Amended Plan</u>, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Creditor Cash Pool or (y) 22.07% of its Allowed Kvaerner Mechanics' Lien Claim; <u>or</u>

(B)    <u>if Class 5 votes to reject the Amended Plan</u>, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool or (y) 5.52% of its Allowed Kvaerner Mechanics' Lien Claim.

(c)    *Voting*: Class 5 is Impaired under the Amended Plan. Holders of Allowed Kvaerner Mechanics' Lien Claims are entitled to vote to accept or reject the Amended Plan.

(d)    *Reservation of Rights*: For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Kvaerner Mechanics' Lien Claims in all respects.

3.    <u>Class 5 – Siemens Mechanics' Lien Claims.</u>

(a)    *Classification*: Class 6 consists of all Siemens Mechanics' Lien Claims.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Siemens Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Siemens Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Siemens Mechanics' Lien Claim, each Holder thereof shall receive, as determined by the Reorganized Debtors with the Backstoppers' reasonable consent:

(i)    if such Allowed Siemens Mechanics' Lien Claim is determined by a Final Order to be both Secured and senior to the Longview Credit Agreement Claims,

(A)    payment in full in Cash, with any such distribution coming in full from the Insurance Trust, <u>or</u>

(B)    if proceeds from the Insurance Trust Assets are otherwise insufficient to satisfy the Allowed Kvaerner Mechanics' Lien Claims in full, at the Reorganized Debtors' election, with the Backstoppers' consent:

9

<table>
<tr><td>(1)</td><td>notes (a) secured by the Liens securing the Siemens Mechanic' Lien Claims to the extent required by section 1129(b)(2)(A)(i)(I) and (b) with a present value equal to the Allowed amount of such Siemens Mechanics' Lien Claim (or to the extent such Claim is not otherwise satisfied with a distribution from the Insurance Trust Assets) to the extent required by section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, <u>or</u></td></tr>
</table>

        (2)    such other treatment necessary to satisfy section 1129(b)(2)(A)(i) of the Bankruptcy Code.

    (ii)    if such Allowed Siemens Mechanics' Lien Claim is determined by a Final Order of the Bankruptcy Court to be Unsecured (which may include, for such purposes, a determination that such Claim is junior to Longview Credit Agreement Claims),

        (A)    <u>if Class 6 votes to accept the Amended Plan</u>, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Creditor Cash Pool or (y) 22.07% of its Allowed Siemens Mechanics' Lien Claim; <u>or</u>

        (B)    <u>if Class 6 votes to reject the Amended Plan</u>, Cash in an amount equal to the lesser of (x) its Pro Rata share of the Unsecured Rejecting Creditor Cash Pool or (y) 5.52% of its Allowed Siemens Mechanics' Lien Claim.

  (c)    *Voting*: Class 6 is Impaired under the Amended Plan. Holders of Allowed Siemens Mechanics' Lien Claims are entitled to vote to accept or reject the Amended Plan.

  (d)    *Reservation of Rights*: For the avoidance of doubt, the Debtors reserve all rights to dispute the amount, allowance, validity, and priority of the Siemens Mechanics' Lien Claims in all respects.

C.    *Modifications to the Means for Implementation of the Amended Plan.*

In addition to the modifications to the treatment of Claims and Interests set forth in Article II.A of this Disclosure Statement Supplement, the following modifications have been made to the Amended Plan:

  1.    <u>Issuance of Cramup Notes.</u>

Article IV.A.3 of the Amended Plan provides for the approval and authorization for the Debtors, with the consent of the Backstoppers, to issue the Cramup Notes, if any, in accordance with the Amended Plan, regardless of whether the Cramup Notes (if any) are issued on or after the Effective Date (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Debtors to enter into and execute such documents as may be required to effectuate the treatment afforded to the recipients of Cramup Notes (if any) in accordance with the Amended Plan.

The Debtors will file the proposed material terms of the Cramup Notes with the Plan Supplement, which the Debtors will use commercially reasonable efforts to cause to be filed on June 24, 2014.

  2.    <u>Insurance Trust.</u>

In connection with the Longview Credit Agreement, First American Title Insurance Company issued the Title Insurance Policy for the benefit of the Longview Lenders in the amount of $825 million. The Title Insurance

10

Policy covers defects in title arising from, among other things, mechanics' liens that existed when the Debtors and the Longview Lenders closed on the Longview Credit Agreement on February 28, 2007. As a result, any losses incurred by the Longview Lenders arising by virtue of the mechanics' liens being senior to the liens securing the Longview Credit Facility will be recoverable against the Title Insurance Policy. To facilitate the settlements and compromises incorporated in the Amended Plan, the Longview Credit Agreement Collateral Agent will contribute certain of the Title Insurance Proceeds to the Insurance Trust to fund distributions to the Contractors if the Contractors are entitled to such a distribution pursuant to the terms of the Amended Plan. To confirm the availability of the Title Insurance Proceeds, the Debtors have initiated the Title Insurance Determination, and expect to have the Title Coverage Determination heard on or before the hearing to confirm the Amended Plan. The Title Coverage Determination is a condition precedent to Confirmation of the Amended Plan.

To this end, Article IV.B.1 of the Amended Plan provides that Consummation of the transactions contemplated by the Amended Plan shall require entry of an order of the Bankruptcy Court on terms materially consistent with the Amended Plan and otherwise reasonably satisfactory to the Backstoppers, the Longview Credit Agreement Collateral Agent, and the Debtors determining that certain of the proceeds from the Title Policy are available for assignment and distribution in accordance with the Amended Plan in the event that the Liens, if any, securing Allowed Siemens Mechanics' Lien Claims or Allowed Kvaerner Mechanics' Lien Claims, if any, are senior in priority to the Liens securing Longview Credit Facility Claims.

In addition, Article IV.B.2 of the Amended Plan provides that on or prior to the Effective Date, the Debtors will execute the Insurance Trust Agreement and will take all other steps necessary to establish the Insurance Trust pursuant to the Insurance Trust Agreement. On or prior to the Effective Date, in accordance with and pursuant to the terms of the Amended Plan and in exchange for the good and valuable consideration provided under the Amended Plan, the Longview Credit Agreement Collateral Agent will transfer to the Insurance Trust all of its rights, title, and interests in the Title Policy Proceeds; provided, that, if the Title Coverage Determination does not occur, the Longview Credit Agreement Collateral Agent shall not transfer to the Insurance Trust any rights, title, or interests in the Title Policy Proceeds to the Insurance Trust.

For the avoidance of doubt, the Longview Credit Agreement Collateral Agent will formally assign certain of the Title Insurance Proceeds to the Debtors pursuant to an assignment agreement to be filed with the Bankruptcy Court in the near term. The Debtors will also file the proposed form of the Insurance Trust Agreement with the Plan Supplement, which the Debtors will use commercially reasonable efforts to cause to be filed on June 24, 2014.

      3.     <u>Foster Wheeler Reserve.</u>

Article IV.S of the Amended Plan provides that the Foster Wheeler Reserve shall be administered by the Reorganized Debtors in accordance with the Foster Wheeler Settlement Agreement and shall be funded on the Effective Date. Any Cash held in the Foster Wheeler Reserve after satisfaction of the Reorganized Debtors' obligations under the Foster Wheeler Settlement Agreement shall revert to the Reorganized Debtors. Funds held in the Foster Wheeler Reserve shall only be released upon the earlier of (1) the Foster Wheeler Settlement Order becoming a Final Order or (2) the final adjudication and satisfaction of the Reserved Claims in the Arbitration.

      4.     <u>Foster Wheeler Rehabilitation Work.</u>

Article IV.T of the Amended Plan provides that if a Settlement Agreement Termination occurs, Reorganized Longview Power shall, to the extent provided by section 11(b) of the Foster Wheeler Settlement Agreement reimburse Foster Wheeler for the Rehabilitation Work performed up to the date of such Settlement Agreement Termination. For the avoidance of doubt, such reimbursement shall not be used by Reorganized Longview Power as an offset in the Arbitration, and, upon such reimbursement by Reorganized Longview Power, Reorganized Longview Power shall have the unencumbered, full ownership, use, and benefit of the portions of the supplies, materials, and equipment relating to the Rehabilitation Work performed by Foster Wheeler and paid for by Reorganized Longview Power prior to the occurrence of such Settlement Agreement Termination. Further, Longview Power, or Reorganized Longview Power, as applicable, shall comply with any payment or compensation obligations to Foster Wheeler as set forth in section 1 of the Foster Wheeler Settlement Agreement.

KE 29651014

D.     *Modification to the Treatment of Executory Contracts and Unexpired Leases.*

Article V.E of the Amended Plan has been modified to expressly provide for the assumption of the Foster Wheeler Settlement Agreement (for the avoidance of doubt, any such assumption is expressly subject to the releases provided for in section 6 of the Foster Wheeler Settlement Agreement).

E.     *Modifications to the Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.*

1.     <u>Disputed Claims Reserve.</u>

Article VII.D of the Amended Plan provides that on or prior to the Effective Date, the Reorganized Debtors or the Disbursing Agent shall be authorized, but not directed, to established one or more Disputed Claims Reserves, which Disputed Claims Reserve shall be administered by the Reorganized Debtors or the Disbursing Agent, as applicable.

The Reorganized Debtors or the Disbursing Agent may, in their sole discretion, hold Cash in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date, including with respect to the Kvaerner Mechanics' Lien Claims and the Siemens Mechanics' Lien Claims to the extent the Title Coverage Determination has occurred but there has not yet been a determination as to whether the Liens, if any, securing such claims are senior to Liens securing Longview Credit Agreement Claims. The Reorganized Debtors shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date.

2.     <u>Foster Wheeler Arbitration.</u>

Article VII.K of the Amended Plan provides that, as set forth in section 11(a) of the Foster Wheeler Settlement Agreement, in the event a Settlement Agreement Termination occurs, Foster Wheeler shall have the right to assert any and all Claims against Longview Power or Reorganized Longview Power, as applicable, in the Arbitration (other than any Claims that relate to the breach of the Foster Wheeler Settlement Agreement, which Claims may only be asserted in the Bankruptcy Court), unless the Arbitration has been completed prior to such Settlement Agreement Termination, in which case Foster Wheeler may commence a new arbitration proceeding against Longview Power or Reorganized Longview Power, as applicable, and Longview Power or Reorganized Longview Power, as applicable, shall have the right to assert any and all claims against Foster Wheeler in the Arbitration (other than any claims that relate to the breach of the Foster Wheeler Settlement Agreement, which claims may only be asserted in the Bankruptcy Court), unless the Arbitration has been completed prior to such Settlement Agreement Termination, in which case Longview Power or Reorganized Longview Power, as applicable, may commence a new arbitration proceeding against Foster Wheeler.

3.     <u>Claims Estimation Motion.</u>

Article VII.K of the Amended Plan provides that notwithstanding any determination by the Bankruptcy Court of the Mechanics' Lien Claims pursuant to the Claims Estimation Motion, (1) any and all Claims of Foster Wheeler against Longview Power and any and all claims of Longview Power against Foster Wheeler shall be determined solely as set forth in the Foster Wheeler Settlement Agreement and (2) any determination by the Bankruptcy Court in connection with the Claims Estimation Motion or otherwise, including with respect to any claims and/or defenses made in the Arbitration or the Chapter 11 Cases, shall have no preclusive, collateral estoppel, or res judicata effect on Foster Wheeler in the Arbitration or any other case or proceeding. For the avoidance of doubt, all intercreditor claims, cross-claims, counter-claims and causes of action as between Foster Wheeler and any third party shall be finally determined in the Arbitration.

KE 29651014

F.     *Modifications to the Discharge of Claims and Termination of Interests.*

    1.     <u>Discharge of Claims and Termination of Interests.</u>

In addition to the provisions related to the discharge in the Original Plan, Article VIII.A of the Amended Plan provides that notwithstanding anything herein to the contrary, the discharge, release, exculpation, or injunction relating to any and all Claims held by Foster Wheeler as provided for herein is subject in its entirety to the terms of the Foster Wheeler Settlement Agreement.

    2.     <u>Debtor Release.</u>

In addition to the provisions related to the Debtor Release in the Original Plan, Article VIII.C of the Amended Plan provides that, for the avoidance of doubt, the Debtors and their Estates do not release any claims that have been assigned to Foster Wheeler pursuant to the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order.

    3.     <u>Foster Wheeler Release.</u>

Article VIII.D of the Amended Plan provides that except as otherwise provided in the Foster Wheeler Settlement Agreement, the Debtors and their Estates release and forever discharge Foster Wheeler from any and all actions, claims, proceedings, counter-claims, third-party claims, mechanics' liens, liabilities, damages, demands, defenses, costs, expenses, fees (including attorney fees) whatsoever, known or unknown, foreseen or unforeseen, liquidated or unliquidated, arising under federal, state, or local laws, rules, regulations, or ordinances, whether in tort, contract, or otherwise have arisen or might arise out of or relate in any way to the Boiler Agreement and Foster Wheeler's performance on the Project, all of which shall be forever barred pursuant to the terms of the Foster Wheeler Settlement Agreement; <u>provided</u> <u>that</u> the foregoing will not release Foster Wheeler from any contractual obligation owed by Foster Wheeler to the Debtors or the Reorganized Debtors, as applicable, under the Foster Wheeler Settlement Agreement.

G.     *Modifications to the Conditions Precedent to the Effective Date.*

    1.     <u>Conditions Precedent to the Confirmation Date.</u>

In addition to the provisions related to the conditions precedent to the Confirmation Date in the Original Plan, Article IX.A of the Amended Plan provides that the Title Coverage Determination shall have occurred <u>or</u>, in the event the Title Coverage Determination has not occurred, there shall have been a determination (in the form of an order in form and substance reasonably satisfactory to the Debtors and the Backstoppers) by the Bankruptcy Court that the Liens, if any, securing Allowed Siemens Mechanics' Lien Claims or Allowed Kvaerner Mechanics' Lien Claims, if any, are junior in priority to any Liens securing Longview Credit Facility Claims.

    2.     <u>Conditions Precedent to the Effective Date.</u>

In addition to the provisions related to the conditions precedent to the Effective Date in the Original Plan, Article IX.B of the Amended Plan provides the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Amended Plan on or before the Effective Date: (1) the Foster Wheeler Reserve shall have been established and funded in accordance with the Foster Wheeler Settlement Agreement; (2) if applicable, the Debtors shall have issued the Cramup Notes, which shall be in form and substance, and with terms and conditions, acceptable to the Backstoppers in their sole discretion; and (3) the Insurance Trust Assets shall have been transferred to the Insurance Trust and the Insurance Trustee Agreement shall have been executed and become effective.

H.     *Modifications to the Retention of Jurisdiction.*

Article XI of the Amended Plan has been amended to include the Bankruptcy Court's exclusive jurisdiction to:  (1) adjudicate any dispute with respect to the priority of the Liens securing the Kvaerner Mechanics' Lien

Claims or the Siemens Mechanics' Lien Claims; (2) adjudicate any dispute regarding the scope of coverage available under the Title Policy and the availability of Title Proceeds to effectuate distributions contemplated by the Amended Plan, including, without limitation, the Debtors' recent adversary proceeding against First American; or (3) hear any disputes relating to the Foster Wheeler Settlement Agreement to the extent provided therein.

## ARTICLE III
## CONTINUED SOLICITATION AND VOTING PROCEDURES

On May 29, 2014, the Bankruptcy Court entered the *Order Granting Debtors' Motion for Entry of an Order (A) Approving the Debtors' Continued Solicitation and the Adequacy of the Supplemental disclosure in Connection Therewith, (B) Establishing Certain Deadlines and Procedures in Connection with Plan Confirmation, and (C) Granting Related Relief* [Docket No. [__]] (the "Continued Solicitation Order"). Among other things, the Continued Solicitation Order provides the following dates and deadlines related to confirmation of the Amended Plan:

- **Voting Deadline**:  July 15, 2014, at 4:00 p.m., prevailing Eastern Time.  All votes to accept or reject the Amended Plan must be received by the Notice and Claims Agent at Longview Power, LLC c/o Donlin, Recano & Company, Inc., 419 Park Avenue South, New York, New York 10016, by the Voting Deadline.

- **Amended Plan Objection Deadline**:  July 15, 2014, at 4:00 p.m., prevailing Eastern Time (the "Amended Plan Objection Deadline").  All objections to confirmation of the Amended Plan must be filed with the Bankruptcy Court and served on the Debtors, counsel to the Backstoppers, and certain other parties in interest in accordance with the Continued Solicitation Order and the Disclosure Statement Order (including the Solicitation Procedures) so that they are **actually received** on or before the Amended Plan Objection Deadline.

- **Confirmation Hearing**:  September 3, 2014, at 10:00 a.m., prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (each such hearing, a "Confirmation Hearing").  A Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Amended Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing.  The Amended Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Amended Plan without further notice to parties in interest.

Other than as set forth in the Continued Solicitation Order, all provisions of the Disclosure Statement Order remain in full force and effect, including without limitation paragraph E.3(f) of Solicitation Procedures, which states that "the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot." Accordingly, if a Holder of a Claim timely submits a new Ballot on the Amended Plan, such Ballot will replace any previously submitted Ballot on the Original Plan or the Amended Plan.

The Amended Plan, the Disclosure Statement, the Continued Solicitation Order, the Disclosure Statement Order, and all other pleadings in the Chapter 11 Cases may also be obtained:  (a) from the Debtors' Notice and Claims Agent by (i) visiting http://www.donlinrecano.com/longview, (ii) writing to Longview Power, LLC, c/o Donlin, Recano & Company, Inc., 419 Park Avenue South, New York, New York 10016, or (iii) calling (800) 967-4614; or (b) for a fee via PACER (except for ballots) at http://www.deb.uscourts.gov.

# ARTICLE IV
## ADDITIONAL RISK FACTORS

A.    *Repairs to the Longview Power Facility.*

The Debtors believe that the Reorganized Debtors will succeed in repairing the Longview Power Facility in accordance with the currently contemplated schedule, including the boiler pursuant to the terms of the Foster Wheeler Settlement Agreement, which will allow the Longview Power Facility to operate at or near full capacity by the end of the second quarter of 2015. There are risks, however, that such repairs will be unsuccessful, or will take longer than expected, and that the Reorganized Debtors may continue to suffer loss of cash flows due to operational issues at the Longview Power Facility. In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in the Disclosure Statement or this Disclosure Statement Supplement, or become subject to further insolvency proceedings.

B.    *Mepco Operations.*

The Debtors provide approximately 50 percent of their coal to FirstEnergy pursuant to a long-term coal supply agreement. Notwithstanding the items mentioned elsewhere in this Disclosure Statement Supplement, if the Debtors or FirstEnergy end this relationship, the Debtors or the Reorganized Debtors, as applicable, may be unable to find alternative buyers at economically feasible prices for their coal, which could increase operational costs and cause a material adverse effect on, as applicable, the Debtors' or the Reorganized Debtors' business, financial condition, and results of operations.

C.    *The Debt Outstanding under the Dunkard Facilities May Mature Prior to Confirmation.*

Indebtedness outstanding under the Dunkard Creek Facilities matured on February 28, 2014, and is currently in forbearance until December 31, 2014, subject to the terms of the Dunkard Forbearance.

If Dunkard Creek does not repay or restructure the outstanding indebtedness under the Dunkard Creek Facilities by December 31, 2014, if Dunkard Creek and/or the Debtors do not enter into a further forbearance agreement with the Dunkard Lenders or Dunkard Agent, or if an event of default occurs under the credit agreements for the Dunkard Creek Facilities, the Dunkard Agent may seek to: (a) foreclose on, and take possession of, Dunkard Creek's water treatment and supply facilities and related assets; (b) foreclose on Dunkard Creek's assets; (c) transfer Dunkard Creek's water facility and related assets to the collateral agent for the Dunkard Facilities; (d) exercise Dunkard Creek's rights under the Water Supply Agreement, including terminating the water supply for the Longview Power Facility upon any non-payment by the Debtors under the Water Supply Agreement; and (e) take any other action that the Dunkard Agent deems necessary or desirable to protect or realize upon its security interests.

D.    *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Amended Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to consummation of the Amended Plan, including the Title Coverage Determination, the Debtors may be unable to consummate the Amended Plan and the Backstoppers may terminate their support for the Amended Plan prior to the Confirmation or Consummation of the Amended Plan. This loss would result in the loss of support for the Amended Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Amended Plan.

E.    *The Bankruptcy Court May Not Retain Jurisdiction over Disputes Related to Proceeds from the Insurance Trust.*

Although the Debtors expect that the Bankruptcy Court will exercise jurisdiction over any and all disputes related to the Title Insurance Proceeds and the coverage of the Title Insurance Policy, the Bankruptcy Court may abstain from exercising such jurisdiction or may determine that it does not have jurisdiction to consider such a

KE 29651014

dispute. In such a case, the operation of a key provision of the Amended Plan may occur without Bankruptcy Court oversight.

F.     *The Debtors May Be Unable to Stay the State Court Proceeding*

Through the State Court Proceeding, First American has sought a declaration from a California state court that First American is not obliged to honor its obligations under the Title Insurance Policy. In this action, First American has alleged as the basis for such relief, among other things, that: (1) the Debtors have in fact allowed Siemens' and Kvaerner's Disputed Mechanics' Lien Claims, notwithstanding the Contractor Claim Objections pending in this Court and the currently pending Arbitration; (2) the Amended Plan violates applicable law; and (3) the Debtors have in fact assigned over their claims, counterclaims and defenses with respect to Siemens and Kvaerner's Disputed Mechanics' Lien Claims. The Debtors filed the Stay Motion in response to the State Court Proceeding.

Although the Debtors vigorously dispute both First American's factual assertions and the jurisdiction of a California state court over such matters vital to the administration of these chapter 11 cases, the Debtors' Stay Motion may not be granted and the Debtors may otherwise be unable to stay the State Court Proceeding. In this instance, the California state court may determine that the coverage is unavailable under the Title Insurance Policy, thereby eliminating such asset from these chapter 11 estates. In this instance, the Debtors may be unable to confirm their Amended Plan. In addition, factual findings from the California state court with respect to, among other things, the allowance of Siemens' and Kvaerner's Disputed Mechanics' Lien Claims, whether the Amended Plan violates applicable law, and that the Debtors previously assigned their claims, defenses and/or counterclaims with respect to such parties would materially prejudice the Debtors' prosecution of their chapter 11 cases and their ultimate ability to reorganize.

G.     *The Investigations Into the Reimbursements May Result in Civil or Criminal Penalties or Fines.*

The Mepco Debtors are currently under investigation by federal authorities for the reimbursements discussed at Article I.H of this Disclosure Statement Supplement and may in the future be subject to investigations by other authorities. Any such investigation may ultimately result in the Debtors paying penalties or fines to the applicable authorities, which could adversely affect the Debtors' business and creditor recoveries. If the Debtors incur civil or criminal penalties, such penalties may not be dischargeable in the Chapter 11 Cases.

H.     *The Loss of Any of the Mepco Debtors' Executives May Harm the Debtors' Business Operations.*

The Mepco Debtors' executives and the Mepco Debtors are currently under investigation for the reimbursements discussed at Article I.H this Disclosure Statement Supplement. If any of the Mepco Debtors' executives leave the Debtors' employ, including due to the investigations, such a loss may have an impact on the Debtors' operations. If the Debtors experience any employee, vendor, or customer disruptions, among other potential issues, related to any such departure, the Debtors may be unable to meet their projected financial results, which could adversely affect the Debtors' business and creditor recoveries.

## ARTICLE V
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the modifications to the treatment of claims in Classes 4, 5, and 6 as modified under the Amended Plan to certain U.S. Holders (defined below). The following discussion does not address the U.S. federal income tax consequences to Holders in Classes other than Classes 4, 5, and 6. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement Supplement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the

tax consequences of the Amended Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement Supplement.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, and regulated investment companies and those holding, or who will hold, Claims as part of a hedge, straddle, conversion, or constructive sale transaction). Furthermore, the following summary of certain U.S. federal income tax consequences of the Amended Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., or other tax law. Lastly, the following discussion assumes (i) each Holder of a Claim holds its Claim as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the IRC, (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against, and (iii) the debt obligation(s) underlying each Allowed Claim is recourse debt. The U.S. federal income tax law on whether debt is recourse or non-recourse is unclear, especially in the case of debt held by (or treated as held by) a partnership.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Amended Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE AMENDED PLAN.**

**IRS CIRCULAR 230 DISCLOSURE**

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

KE 29651014

A.     *Consequences to U.S. Holders of Allowed Claims in Class 4.*

Under the Amended Plan, Holders of Allowed Class 4 Claims shall have their Class 4 Claims released and discharged in accordance with the Foster Wheeler Settlement Agreement and Foster Wheeler Settlement Order. The tax treatment of an Allowed Class 4 Claim depends on the specific terms of the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order. Holders of Allowed Class 4 Claims should contact their own tax advisors with respect to the tax implications of the Foster Wheeler Settlement Agreement and Foster Wheeler Settlement Order, including the tax treatment of the release and discharge of an Allowed Class 4 Claim.

B.     *Consequences to U.S. Holders of Allowed Claims in Classes 5 and 6.*

Under the Amended Plan, if an Allowed Claim in Class 5 or 6 is determined to be Secured and senior to the Longview Credit Agreement Claims by a Final Order of the Bankruptcy Court, a Holder of any such Claim may receive, in full settlement of their Claim: (1) Cash, to the extent available from the Insurance Trust, or (2) to the extent proceeds from the Insurance Trust are insufficient to satisfy their Claim, the Cramup Notes or other treatment necessary to satisfy section 1129 of the Bankruptcy Code. Generally, any U.S. Holder of a Claim receiving Cash will have the same tax consequences described in Article X.B.3 of the Disclosure Statement. Generally, any U.S. Holder of a Claim receiving a Cramup Note will be treated as recognizing income gain or loss equal to the difference between (1) the "issue price" of the Cramup Note received in satisfaction of such Claim and (2) such U.S. Holder's tax basis in such Claim. The character of such gain or loss as capital gain (subject to the "Market Discount" rules described in Article X.B.5 of the Disclosure Statement) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such Holder's hands, the extent that a portion of the consideration received in exchange for the Claims or Interests is allocable to accrued but unpaid interest (see the discussion on "Accrued Interest" in Article X.B.4 of the Disclosure Statement), whether the Claim or Interest constitutes a capital asset in the hands of the U.S. Holder, whether the Claim or Interest was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt or worthlessness deduction with respect to its Claim or Interest.

Under the Amended Plan, if an Allowed Claim in Class 5 or 6 is determined to be Unsecured (and junior to the Longview Credit Agreement Claims) by a Final Order of the Bankruptcy Court, the Holder of such Claim will receive Cash equal to either its share of the Unsecured Accepting Creditor Cash Pool or its share of the Unsecured Rejecting Creditor Cash Pool. Generally, any U.S. Holder of a Claim receiving Cash will be subject to the tax consequences described in Article X.B.3 of the Disclosure Statement.

## ARTICLE VI
## RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Amended Plan is preferable to the alternatives described in this Disclosure Statement Supplement and the Disclosure Statement because it provides for a larger distribution to the Holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Amended Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Amended Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Amended Plan support Confirmation of the Amended Plan and vote to accept the Amended Plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 29651014

Dated as of: May 29, 2014

Longview Intermediate Holdings C, LLC (for itself and all Debtors)

By: _____
Name:    Jeffery L. Keffer
Title:    President and Chief Executive Officer

Prepared by:

Richard M. Cieri (admitted *pro hac vice*)
Paul M. Basta, P.C. (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Ryan Preston Dahl (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Marisa A. Terranova (No. 5396)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

*Co-Counsel to the Debtors and Debtors in Possession*

KE 29651014

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LONGVIEW POWER, LLC, et al.,[1] | ) | Case No. 13-12211 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### NOTICE OF ORDER (A) APPROVING THE DEBTORS' CONTINUED SOLICITATION OF THE AMENDED PLAN AND THE ADEQUACY OF THE SUPPLEMENTAL DISCLOSURE IN CONNECTION THEREWITH, (B) ESTABLISHING CERTAIN DEADLINES AND PROCEDURES IN CONNECTION WITH PLAN CONFIRMATION, AND (C) GRANTING RELATED RELIEF

**TO ALL HOLDERS OF CLAIMS AND INTERESTS AND PARTIES IN INTEREST:**

1. **Court Approval of the Disclosure Statement and the Solicitation Procedures.** On December 18, 2013, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (A) Approving the Adequacy of the Debtors' Disclosure Statement, (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (C) Approving the Form of Various Ballots and Notices in Connection Therewith, (D) Scheduling Certain Dates with Respect Thereto, and (E) Granting Related Relief* [Docket No. 663] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 672] (as may be amended from time to time and including all exhibits and supplements thereto, the "Disclosure Statement"), as containing adequate information, as required under section 1125(a) of the title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes with regard to the acceptance or rejection of the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 671] (as may be amended from time to time and including all exhibits and supplements thereto, the "Plan").

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors"). The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541. The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

2.   **Court Approval of the Disclosure Statement Supplement.**  On [_____], 2014, the Court entered the *Order (A) Approving the Debtors' Continued Solicitation of the Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, (B) Establishing Certain Deadlines and Procedures in Connection With Plan Confirmation, and (C) Granting Related Relief* [Docket No. \_\_\_\_]  (the "Continued Solicitation Order") that, among other things: (a) approved the *Disclosure Statement Supplement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1145-2] (as may be further supplemented or modified, the "Disclosure Statement Supplement"), as containing adequate information, as required under section 1125(a) of the Bankruptcy Code; and (b) authorized the Debtors to continue soliciting votes with regard to the acceptance or rejection of the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1139] (as may be further amended and modified and including all exhibits and supplements thereto, the "Amended Plan").[2]

3.   **Plan Confirmation Schedule.**  The Court has approved the following Plan Confirmation Schedule:

| Event | Date |
|---|---|
| Voting Deadline | July 15, 2014 at 4:00 p.m. prevailing Eastern Time |
| Plan Objection Deadline | July 15, 2014 at 4:00 p.m. prevailing Eastern Time |
| Deadline to File Voting Report | On or before July 31, 2014 at 4:00 p.m. prevailing Eastern Time |
| Deadline to File Confirmation Reply Brief | August 25, 2014, ~~or a date not later than three Business Days before the Confirmation Hearing~~ |
| Confirmation Hearing | September 2, 2014, at 10:00 a.m. prevailing Eastern Time, and day to day thereafter as may be necessary |

4.   **Voting Deadline.**  If you held a Claim against one of the Debtors as of the Voting Record Date and are entitled to vote on the Amended Plan, you have received a Ballot and voting instructions appropriate for your Claim(s) or Interest(s).  For your vote to be counted in connection with Confirmation of the Amended Plan, you must follow the appropriate voting instructions, complete all required information on the Ballot, and execute and return the completed Ballot so that it is actually received in accordance with the voting instructions by July 15, 2014, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings set forth in the Disclosure Statement Order, the Continued Solicitation Order, the Disclosure Statement Supplement, or the Amended Plan, as applicable.

vote on the Plan.  For the avoidance of doubt, if you previously cast a vote on the Original Plan, you may cast a new vote on the Amended Plan, which new vote will supersede such previously cast vote on the Original Plan.

5.    **Objections to the Plan.**  The Court has established July 15, 2014, at 4:00 p.m. (prevailing Eastern Time), as the deadline for filing and serving objections to the Confirmation of the Amended Plan (the "Plan Objection Deadline").  Any objection to the Amended Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim; (d) state with particularity the basis and nature of any objection to the Amended Plan; (e) propose a modification to the Amended Plan that would resolve such objection (if applicable); and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified herein by the Plan Objection Deadline:

| *Co-Counsel to the Debtors* | |
|---|---|
| Richard M. Cieri (admitted *pro hac vice*)<br>Paul M. Basta, P.C. (admitted *pro hac vice*)<br>Ray C. Schrock, P.C. (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022-4611<br><br>- and -<br><br>Ryan Preston Dahl (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | Daniel J. DeFranceschi (No. 2732)<br>Paul N. Heath (No. 3704)<br>Zachary I. Shapiro (No. 5103)<br>Marisa A. Terranova (No. 5396)<br>**RICHARDS, LAYTON & FINGER, P.A.**<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801 |
| *Co-Counsel to the Backstoppers* | |
| Ira Dizengoff (admitted *pro hac vice*)<br>Arik Preis (admitted *pro hac vice*)<br>**AKIN GUMP STRAUSS HAUER & FELD LLP**<br>One Bryant Park<br>New York, New York 10036 | Laura Davis Jones (No. 2436)<br>Colin R. Robinson (No. 5524)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 |
| *U.S. Trustee* | |
| Office Of The United States Trustee<br>The District of Delaware<br>844 King Street, Ste. 2207<br>Wilmington, Delaware 19801<br>Attn:  Tiiara Patton, Esq. | |

6.    **Confirmation Hearing.**  A hearing to confirm the Amended Plan (the "Confirmation Hearing") will commence on September 2, 2014, at 10:00 a.m. (prevailing Eastern Time) and continue from day to day as necessary before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware.

3

Please be advised that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the Local Rules or otherwise. In accordance with the Amended Plan, the Debtors may make non-substantive modifications to the Amended Plan, if necessary, prior to, during, or as a result of the Confirmation Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Court or any other Entity (except for the Backstoppers).

7.  **Supplemental Solicitation Packages.** The Supplemental Solicitation Package (except the Ballots) may be obtained at no charge from Donlin, Recano & Company, Inc., the administrative advisor retained by the Debtors in the Chapter 11 Cases (the "Administrative Advisor") by: (a) accessing the Administrative Advisor's website at http://www.donlinrecano.com/longview; (b) writing to the Administrative Advisor at Longview Power, LLC, c/o Donlin, Recano & Company, Inc., 419 Park Avenue South, New York, New York 10016; or (c) calling the Administrative Advisor at (212) 771-1128. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov. The Administrative Advisor will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

8.  **Release, Exculpation, and Injunction Language in the Plan.** Please be advised that Article VIII of the Amended Plan contains the following release, exculpation, and injunction provisions:

**ARTICLE VIII.C: RELEASES OF THIRD PARTIES BY THE DEBTOR. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Amended Plan, for good and valuable consideration, on and after the Effective Date, the Debtors and their Estates shall release, and each Released Party shall be deemed released and discharged by the Debtors and their Estates, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Exit Facility, the Longview Credit Facility, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Amended Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, bad faith, or gross negligence, each solely to the extent determined by a Final**

4

Order. Notwithstanding anything to the contrary in the foregoing, the Debtor Release shall not release any obligations of any party under the Amended Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

For the avoidance of doubt, the Debtors and their Estates do not release any claims that have been assigned to Foster Wheeler pursuant to the Foster Wheeler Settlement Agreement and the Foster Wheeler Settlement Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**ARTICLE VIII.D: RELEASE OF FOSTER WHEELER BY THE DEBTORS.** Except as otherwise provided in the Foster Wheeler Settlement Agreement, the Debtors and their Estates release and forever discharge Foster Wheeler from any and all actions, claims, proceedings, counter-claims, third-party claims, mechanics' liens, liabilities, damages, demands, defenses, costs, expenses, fees (including attorney fees) whatsoever, known or unknown, foreseen or unforeseen, liquidated or unliquidated, arising under federal, state, or local laws, rules, regulations, or ordinances, whether in tort, contract, or otherwise have arisen or might arise out of or relate in any way to the Boiler Agreement and Foster Wheeler's performance on the Project, all of which shall be forever barred pursuant to the terms of the Foster Wheeler Settlement Agreement; provided that the foregoing will not release Foster Wheeler from any contractual obligation owed by Foster Wheeler to the Debtors or the Reorganized Debtors, as applicable, under the Foster Wheeler Settlement Agreement.

**ARTICLE VIII.E: RELEASES OF THIRD PARTIES BY OTHERS.** As of the Effective Date, except as otherwise provided in the Amended Plan, Releasing Parties shall release, and each of the Debtors, their Estates, and the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facility, the Exit Facility, the Longview Credit Facility, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released

5

Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, bad faith, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the Third-Party Release shall not release any obligations of any party under the Amended Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Amended Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

**ARTICLE VIII.F: EXCULPATION.**  Except as otherwise specifically provided in the Amended Plan, no Exculpated Party shall have or incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Amended Plan, or consummating the Amended Plan, the Disclosure Statement, the New Organizational Documents, the Restructuring Transactions, the DIP Facility, the Exit Facility, the Longview Credit Facility, the New Second Lien Indenture, the issuance, distribution, and/or sale of the New Second Lien Notes, the Cramup Notes (if any), or of any units of the New Common Equity or any other security offered, issued, or distributed in connection with the Amended Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Amended Plan or any other related document, instrument, or agreement; provided, further, that the foregoing Exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct.

**ARTICLE VIII.F: RELEASE AND INJUNCTION.** Except as otherwise expressly provided in the Amended Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Exit Facility, the New Second Lien Indenture, the Cramup Notes (if any), the New Common Equity, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold

6

claims, interests, or Liens that have been discharged pursuant to Article VIII.A of the Amended Plan, released pursuant to Article VIII.B of the Amended Plan, Article VIII.C of the Amended Plan, Article VIII.D of the Amended Plan, or Article VIII.E of the Amended Plan, or are subject to exculpation pursuant to Article VIII.F of the Amended Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Amended Plan.


**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE AMENDED PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

KE 31805656

Wilmington, Delaware
Dated:  [_____], 2014

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Marisa A. Terranova (No. 5396)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    defranceschi@rlf.com
    heath@rlf.com
    shapiro@rlf.com
    terranova@rlf.com

- and -

Richard M. Cieri (admitted *pro hac vice*)
Paul M. Basta, P.C. (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    richard.cieri@kirkland.com
    paul.basta@kirkland.com
    ray.schrock@kirkland.com

- and -

Ryan Preston Dahl (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    ryan.dahl@kirkland.com

*Co-Counsel for the*
*Debtors and Debtors in Possession*

KE 31805656