**Solicitation Version**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| LONGVIEW POWER, LLC, et al.,[1] | ) ) | Case No. 13-12211 (BLS) |
| Debtors. | ) ) ) | Jointly Administered |

**DISCLOSURE STATEMENT SUPPLEMENT FOR THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

| | |
|---|---|
| Paul M. Basta, P.C. (admitted *pro hac vice*) <br> **KIRKLAND & ELLIS LLP** <br> 601 Lexington Avenue <br> New York, New York 10022-4611 <br> Telephone:     (212) 446-4800 <br> Facsimile:      (212) 446-4900 <br><br> - and - <br><br> Ryan Preston Dahl (admitted *pro hac vice*) <br> Joseph M. Graham (admitted *pro hac vice*) <br> **KIRKLAND & ELLIS LLP** <br> 300 North LaSalle <br> Chicago, Illinois 60654 <br> Telephone:     (312) 862-2000 <br> Facsimile:      (312) 862-2200 | Daniel J. DeFranceschi (No. 2732) <br> Paul N. Heath (No. 3704) <br> Zachary I. Shapiro (No. 5103) <br> Marisa A. Terranova (No. 5396) <br> **RICHARDS, LAYTON & FINGER, P.A.** <br> One Rodney Square <br> 920 North King Street <br> Wilmington, Delaware 19801 <br> Telephone:     (302) 651-7700 <br> Facsimile:      (302) 651-7701 |

*Co-Counsel to the Debtors and Debtors in Possession*

Dated as of: February 18, 2015

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: (a) Longview Power, LLC (1860); and Longview Intermediate Holdings C, LLC (1008) (collectively, the "Longview Debtors"); and (b) Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428) (the foregoing excluding the Longview Debtors, collectively, the "Mepco Debtors"). The Longview Debtors' principal offices are located at 966 Crafts Run Road, Maidsville, West Virginia 26541. The Mepco Debtors' principal offices are located at 308 Dents Run Road, Morgantown, West Virginia 26501.

THE DEBTORS ARE SENDING YOU THIS DOCUMENT (THIS "DISCLOSURE STATEMENT SUPPLEMENT") AS A SUPPLEMENT TO THE *DEBTORS' DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 672] (THE "ORIGINAL DISCLOSURE STATEMENT") AND THE *SUPPLEMENT FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 1261] (THE "FIRST DISCLOSURE STATEMENT SUPPLEMENT," AND TOGETHER WITH THE ORIGINAL DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT") BECAUSE YOU ARE A CREDITOR THAT IS ENTITLED TO VOTE TO APPROVE THE *DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 1776] (AS MAY BE AMENDED OR MODIFIED FROM TIME TO TIME AND WITH ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "SECOND AMENDED PLAN"), FILED ON FEBRUARY 18, 2015, WHICH HAS BEEN AMENDED WITH REGARDS TO, AMONG OTHER THINGS, THE TREATMENT OF CERTAIN CLAIMS UNDER THE *DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 1260] (THE "FIRST AMENDED PLAN").[2]

THE DEBTORS COMMENCED SOLICITING VOTES TO APPROVE THE FIRST AMENDED PLAN ON JUNE 10, 2014, PURSUANT TO THE TERMS OF THE ORDER APPROVING THE FIRST DISCLOSURE STATEMENT SUPPLEMENT AND RELATED SOLICITATION PROCEDURES [DOCKET NO. 1214] (THE "FIRST CONTINUED SOLICITATION ORDER," AND TOGETHER WITH THE ORDER APPROVING THE ORIGINAL DISCLOSURE STATEMENT AT [DOCKET NO. 663], THE "DISCLOSURE STATEMENT ORDER"). THIS DISCLOSURE STATEMENT SUPPLEMENT SUMMARIZES, AMONG OTHER THINGS, CERTAIN MODIFICATIONS TO THE FIRST AMENDED PLAN INCLUDED IN THE SECOND AMENDED PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE SECOND AMENDED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE SECOND AMENDED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE SECOND AMENDED PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SUPPLEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT SUPPLEMENT, THE SECOND AMENDED PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE SECOND AMENDED PLAN.

MOREOVER, NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE UPDATED FINANCIAL PROJECTIONS ATTACHED AS **EXHIBIT A** HERETO (THE "UPDATED FINANCIAL PROJECTIONS") HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE UPDATED FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND

---

[2] All capitalized terms used but not otherwise defined in this Disclosure Statement Supplement shall have the meaning ascribed to them in the Second Amended Plan, the Disclosure Statement, or the 9019 Order (as defined below), respectively.

THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE UPDATED FINANCIAL PROJECTIONS OR THE LIKELIHOOD THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE UPDATED FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THEREFORE, THE UPDATED FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE SECOND AMENDED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT.  CLAIMANTS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS, OR OTHER INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE SECOND AMENDED PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN, IN THE SECOND AMENDED PLAN, AND IN THE DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SUPPLEMENT CONTAINS A SUMMARY OF CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND EVENTS PRECEDING THE DEBTORS' FILING THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH EVERY DETAIL OF SUCH EVENTS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

# ARTICLE I
# SUPPLEMENTAL DISCLOSURE OF EVENTS IN THE CHAPTER 11 CASES

A.  *First American Litigation.*

As discussed more fully in the First Disclosure Statement Supplement, on May 16, 2014, First American commenced a declaratory action against the Longview Credit Agreement Collateral Agent in the Superior Court of the State of California, County of Orange, captioned <u>First American Title Insurance Company v. Union Bank, N.A.</u>, Case No. 2014-00723753 (the "<u>State Court Action</u>"), seeking a declaratory judgment that First American does not have any obligation under the Title Insurance Policy to insure the priority of liens arising under the Longview Credit Agreement that are secured by the Longview Power Facility and related properties.

On May 23, 2014, the Debtors:  (1) commenced an adversary proceeding against First American, captioned <u>Longview Power, LLC v. First American Title Insurance Co.</u>, 14-50369 (BLS) (Bankr. D. Del) (the "<u>Title Coverage Action</u>"), seeking a declaratory judgment that proceeds from the Title Insurance Policy were available for assignment and distribution in the event that the Liens, if any, securing Allowed Siemens Mechanics' Lien Claims or Allowed Kvaerner Mechanics' Lien Claims were senior in priority to any Liens securing Longview Credit Facility Claims; and (2) filed a motion requesting that the Bankruptcy Court extend the automatic stay or, in the alternative, enter preliminary and permanent injunctive relief with respect to the State Court Action [Docket No. 1187] (the "<u>Stay Motion</u>").  On June 19, 2014, the Bankruptcy Court granted the relief requested in the Stay Motion [Docket No. 1296] (the "<u>Stay Order</u>") and, on June 27, 2014, First American filed a notice of appeal with respect to the Stay Order [Docket No. 1331] (the "<u>Stay Appeal</u>").

On June 20, 2014, First American filed motions in the Title Coverage Action:  (1) seeking to withdraw the reference to the Bankruptcy Court with respect to the Title Coverage Action [Adv. Docket No. 5] (the "<u>Reference Motion</u>"), which was transmitted to the United States District Court for the District of Delaware on July 15, 2014 [Adv. Docket No. 38]; (2) dismiss, or in the alternative, ask the Court to abstain from hearing the Title Coverage Action [Adv. Docket No. 8] (the "<u>Abstention Motion</u>"); and (3) determine the Title Coverage Action's core/non-core status [Adv. Docket No. 10] (the "<u>Core Motion</u>").  On August 12, 2014, the Bankruptcy Court issued a ruling granting, in part, and denying, in part, First American's Core Motion [Docket No. 57] and, on September 11, 2014, issued a ruling denying First American's Abstention Motion [Adv. Docket No. 77].

On September 24, 2014, First American filed an adversary proceeding against Longview Power, LLC, the Longview Credit Agreement Collateral Agent, the Contractors, and certain other parties, captioned <u>First American Title Insurance Co. v. Longview Power, LLC, et al.</u>, 14-50744 (BLS) (Bankr. D. Del.) (the "<u>Lien Priority Action</u>") seeking, among other things, a determination that the Contractors' Mechanics' Lien Claims were junior in priority to any Liens securing Longview Credit Facility Claims.

On November 24, 2014, Judge Leonard P. Stark of the United States District Court for the District of Delaware (the "<u>District Court</u>") heard oral argument on the Reference Motion and the Stay Appeal and issued oral rulings denying the relief requested in both pleadings.  On December 22, 2014, First American filed an appeal of the District Court's ruling (the "<u>Second Stay Appeal</u>").  On January 7, 2015, the United States Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") stayed the Second Stay Appeal pursuant to a joint motion filed by First American and the Debtors, pending the consummation of the First American Settlement Agreement (as defined below).

B.  *Kvaerner Appeal.*

As noted in Article I.A of the First Disclosure Statement Supplement, Kvaerner appealed the Foster Wheeler Settlement Order on March 21, 2014 (the "<u>Kvaerner Appeal</u>").  On November 24, 2014, the District Court heard oral argument on the Kvaerner Appeal and issued an oral ruling denying the relief requested in the Kvaerner Appeal.  On December 26, 2014, Kvaerner filed an appeal of the District Court's ruling (the "<u>Second Kvaerner Appeal</u>").  On January 7, 2015, the Third Circuit stayed the Second Kvaerner Appeal pursuant to a joint motion filed by Kvaerner, Foster Wheeler, and the Debtors, pending the consummation of the Kvaerner Settlement Agreement (as defined below).

C. *The Global Settlement.*

As discussed more fully in the Disclosure Statement, the Debtors and the Contractors have been engaged in the Arbitration regarding, among other things, the design, supply, construction, commissioning, and operation of the Longview Power Facility since June 24, 2011. Matters related to the Contractors and the Arbitration, including the Mechanics' Lien Claims Estimation Process and the Title Coverage Determination, have played a significant role throughout the Chapter 11 Cases and in the Debtors' ability to successfully reorganize. In an effort to consensually resolve the disputes among the parties, the Debtors, the Backstoppers, First American, and the Contractors have been engaged in a confidential, non-binding mediation process since March 27, 2014.

On December 31, 2014, as a result of the good faith, arm's-length mediation process, the Debtors entered into settlements (the "Global Settlement") with First American (the "First American Settlement Agreement"), Kvaerner (the "Kvaerner Settlement Agreement"), and Siemens (together with the First American Settlement Agreement and the Kvaerner Settlement Agreement, the "Settlement Agreements"). On January 20, 2015, the Bankruptcy Court held a hearing to consider approval of the Settlement Agreements and on the same day entered an order approving the Settlement Agreements [Docket No. 1695] (the "9019 Order"). Among other things, and subject to the specific terms and conditions set forth in the Settlement Agreements and the 9019 Order, the Settlement Agreements and/or the 9019 Order provide that:[3]

(1) First American will contribute $41 million in cash in exchange for, among other things, a full and final resolution of all outstanding claims against First American by the Debtors, the Longview Credit Agreement Collateral Agent, and each of the Contractors;

(2) Siemens will (a) contribute $12.5 million in cash and (b) undertake and warrant repairs to the Longview Power Facility on the terms provided by the Generator Agreement with the Debtors in full and final resolution of all outstanding claims between Siemens and the Debtors;

(3) Kvaerner will receive $48 million in cash in full and final satisfaction and resolution of Kvaerner's claims asserted against the Debtors and their estates, which payment may occur prior to consummation of the Second Amended Plan;

(4) the Debtors and the Contractors, on the one hand, and the Debtors, the Contractors, and First American, on the other hand, will provide customary and mutual releases effective upon the parties' receipt of the payments contemplated by the applicable Settlement Agreements and/or the 9019 Order; and

(5) the parties commit to use commercially reasonable efforts to consummate the transactions contemplated by the Settlement Agreements (apart from repairs to the Longview Power Facility contemplated in the Generator Agreement) as soon as possible but not later than February 18, 2015, and support the Second Amended Plan.

The Debtors consummated the transactions contemplated by the Settlement Agreements on February 12, 2015 [Docket No. 1755]. For further details about the continuing arbitration between Kvaerner and Foster Wheeler, including any details regarding Longview's obligations to cooperate with respect to certain discovery matters related thereto, please refer to the Settlement Agreements.

D. *Dunkard Creek Forbearance.*

As discussed more fully in the Original Disclosure Statement, Dunkard Creek is a borrower under the Dunkard Creek Facilities, which are comprised of: (1) an approximately $105 million term loan pursuant to a credit agreement, dated as of May 18, 2009; and (2) an approximately $25 million bridge term loan pursuant to a bridge

---

[3] The summaries of the Settlement Agreements set forth in this section are qualified in their entirety by the provisions of the respective Settlement Agreements. To the extent there exists any inconsistency between this summary and the Settlement Agreements, the Settlement Agreements shall govern.

2

loan agreement, dated as of May 18, 2009. Pursuant to the terms of the relevant credit agreements, the outstanding obligations under the Dunkard Creek Facilities were to mature on February 28, 2014. Prior to the Petition Date, the Debtors provided indirect credit support for obligations arising under the Dunkard Creek Facilities through letters of credit issued in the amount of approximately $83.7 million under the Longview Credit Facility.

As further discussed in Article I.E of the First Disclosure Statement Supplement, Dunkard Creek entered into a first forbearance agreement on August 29, 2013 through February 28, 2014, a second forbearance agreement on February 28, 2014 through May 15, 2014 [Docket No. 1047], a third forbearance agreement on May 15, 2014 through May 28, 2014 [Docket No. 1155], and a fourth forbearance agreement on May 28, 2014 through December 31, 2014 [Docket No. 1219] (the "Fourth Forbearance Agreement"). Each of the forbearance agreements provided, among other things, that the Dunkard Agent and the Dunkard Lenders would not commence proceedings related to an event of default arising under the Dunkard Creek Facilities, subject to the conditions of the applicable forbearance agreement.

Recognizing that the Fourth Forbearance Agreement was set to expire under its terms on December 31, 2014, the Debtors, Dunkard Creek, and the Dunkard Agent entered into negotiations for a further forbearance of the Dunkard Creek Facilities. After substantial, good-faith negotiations, the Debtors, Dunkard Creek, and the Dunkard Agent agreed to an additional forbearance through March 31, 2015 (the "Fifth Dunkard Forbearance"), which was filed with the Bankruptcy Court on January 5, 2015 [Docket No. 1673]. In consideration for the Fifth Dunkard Forbearance, Dunkard Creek agreed to pay approximately $6.5 million in principal amortization over four separate payments as well as default interest through March 31, 2015.

Approximately $27.6 million remains outstanding under the Dunkard Creek Facilities as of the date hereof, and the Debtors project that approximately $22.1 million will remain outstanding under the Dunkard Creek Facilities as of March 31, 2015.

Pursuant to Article IV.A.3 of the Second Amended Plan, on or immediately prior to the Effective Date, Longview Holdings shall cause Dunkard Creek to repay in full in Cash the then-outstanding balance of the Dunkard Creek Lender Claims with proceeds from the DIP Facility or the Exit Facility, as applicable, on terms reasonably acceptable to the Backstoppers.

E.   *Consent Decrees.*

1. Sierra Club Consent Decree.

On September 4, 2014, the Debtors filed a motion [Docket No. 1485] seeking entry of an order approving a consent decree (the "Sierra Club Consent Decree") between certain of the Debtors, the West Virginia Highlands Conservancy, Inc., and the Sierra Club. The Sierra Club Consent Decree sought to resolve claims that certain of the Debtors had discharged pollutants in excess and in violation of certain of their regulatory permits. Pursuant to the Sierra Club Consent Decree, the Debtors agreed to, among other things, provide funding for treatment of certain pollutant discharges during the length of the Sierra Club Consent Decree. On September 18, 2014, the Bankruptcy Court entered an order approving the Debtors' entry into the Sierra Club Consent Decree [Docket No. 1501].

2. PADEP Consent Decree.

On October 8, 2014 the Debtors filed a motion [Docket No. 1532] seeking entry of an order approving a consent decree (the "PADEP Consent Decree") between Dana Mining Company of Pennsylvania, LLC, one of the above-captioned Debtors, non-Debtor affiliate AMD Reclamation, Inc., and the Pennsylvania Department of Environmental Protection ("PADEP"). The PADEP Consent Decree sought to resolve negotiations between the Debtors and PADEP regarding the renewal of a discharge permit, which allows the Debtors and their non-Debtor affiliates to pump and treat discharges from certain mine pools. Pursuant to the PADEP Consent Decree, the Debtors agreed to, among other things, comply with certain effluent limits set forth in the PADEP Consent Decree. On October 27, 2014, the Bankruptcy Court entered an order approving the Debtors' entry into the PADEP Consent Decree [Docket No. 1555].

F.   *Amendments to the DIP Facility.*

As set forth in the Disclosure Statement, as of the date of the filing of the First Disclosure Statement Supplement, the Debtors and the Backstoppers had entered into three amendments to DIP Credit Agreement, which, among other things, extended the milestones set forth in the DIP Credit Agreement.

On September 30, 2014, the Debtors and the Backstoppers amended the DIP Credit Agreement, which amendment, among other things, required: (1) the hearing to confirm the Debtors' chapter 11 plan of reorganization to commence on or before November 24, 2014; (2) the Confirmation Order to be entered on or before December 1, 2014; and (3) the Effective Date of the Debtors' chapter 11 plan of reorganization to occur on or before December 15, 2014. On October 3, 2014, the Debtors caused this amendment to be filed with the Bankruptcy Court [Docket No. 1530].

On November 28, 2014, the Debtors and the Backstoppers further amended the DIP Credit Agreement, which amendment, among other things, requires: (1) the hearing to confirm the Debtors' chapter 11 plan of reorganization to commence on or before February 15, 2014; (2) the Confirmation Order to be entered on or before March 1, 2014; and (3) the Effective Date of the Debtors' chapter 11 plan of reorganization to occur on or before March 15, 2014. On December 8, 2014, the Debtors caused this amendment to be filed with the Bankruptcy Court [Docket No. 1628].

The Debtors anticipate requesting an additional amendment to the DIP Credit Agreement further extending these milestones in the near term.

G.   *Updated Financial Projections and Liquidation Analysis.*

As discussed more fully in the Original Disclosure Statement, to demonstrate compliance with the Bankruptcy Code's requirements that the Plan be financially feasible and that it satisfy the "best interests" test, the Debtors had prepared financial projections and a liquidation analysis, attached as Exhibit B and Exhibit C, respectively, thereto.

The Debtors determined it would be appropriate to update the financial projections and liquidation analysis set forth in the Original Disclosure Statement to: (1) provide an update based on the settlements that have been reached; and (2) demonstrate that the Second Amended Plan meets the financial feasibility and "best interests" test. Accordingly, the Debtors have prepared: (1) Updated Financial Projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit A**; and (2) an updated Liquidation Analysis, attached hereto as **Exhibit B** (the "Updated Liquidation Analysis").

H.   *The First Amended Plan Process.*

On May 29, 2014, the Bankruptcy Court entered the First Continued Solicitation Order, which authorized the Debtors to solicit acceptances and rejections of the First Amended Plan. The Debtors initially set a hearing to confirm the First Amended Plan for September 3, 2014. The Debtors, in consultation with the Backstoppers, elected to indefinitely adjourn confirmation with respect to the First Amended Plan to allow for the trial to occur regarding the Title Coverage Action [Docket No. 1354].

I.   *Second Amended Plan.*

The Debtors have revised the First Amended Plan to reflect the terms of the Global Settlement among the Debtors, First American, Siemens, and Kvaerner, and the Debtors' respective settlements with those parties. As described more fully herein, and subject in all respects to the terms of the Second Amended Plan itself, the Second Amended Plan, among other things, provides that Kvaerner and Siemens will receive the treatments set forth in each party's respective Settlement Agreement. The Second Amended Plan also includes a potential cash payment to the Longview Lenders, depending on the results of the Debtors' exit financing efforts.

The Debtors believe that Confirmation of the Second Amended Plan represents the best avenue for the Debtors to reorganize and maximize the value of their assets for the benefit of all stakeholders.  The Debtors have therefore prepared this Disclosure Statement Supplement to seek confirmation of the value-maximizing restructuring transactions encompassed in the Second Amended Plan and described herein and in the Disclosure Statement.

J.   *DIP Lender Equity Distribution*

For purposes of the Second Amended Plan, it is currently anticipated that the total funded amount of the DIP Facility will be $150 million prior to the Debtors' emergence from chapter 11.  The Debtors and the Backstoppers reserve all rights with respect to the Backstop Commitment.

## ARTICLE II
## SUMMARY OF PLAN MODIFICATIONS

This section provides a summary of the material modifications to the structure and means for implementation of the Second Amended Plan and the classification and treatment of Claims and Interests under the Second Amended Plan, and is qualified in its entirety by reference to the Second Amended Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement Supplement include summaries of the provisions contained in the Second Amended Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement Supplement do not purport to be precise or complete statements of all the terms and provisions of the Second Amended Plan or documents referred to therein, and reference is made to the Second Amended Plan and to such documents for the full and complete statement of such terms and provisions of the Second Amended Plan or documents referred to therein.

The Second Amended Plan controls the actual treatment of Claims against, and Interests in, the Company under the Second Amended Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Second Amended Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement Supplement, the Disclosure Statement, and the Second Amended Plan or any other operative document, the terms of the Second Amended Plan and/or such other operative document shall control.

A.   *Modifications to the Treatment of Claims.*

The treatment of Claims and Interests against each Debtor (as applicable) pursuant to the Second Amended Plan has been modified solely as set forth below.

   1.   <u>DIP Facility Claims.</u>  Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim: (1) each such Allowed DIP Facility Claim shall be paid in full, in Cash, by the Debtors on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Financing Facility; and (2) each Holder of an Allowed DIP Facility Claim shall receive its Pro Rata share (based upon such Holder's commitments to the DIP Facility on the date of entry of the Final DIP Order) of (a) the DIP Lender Equity Distribution, which, for the avoidance of doubt, shall not be subject to dilution by the Management Equity Incentive Plan and (b)  to the extent applicable, its Pro Rata share of the Cash Distribution.[4]

---

[4]   "<u>Cash Distribution</u>" means a Cash payment in an amount to be determined by the Debtors (with the consent of the Backstoppers) and to be set forth in the Plan Supplement which, if such amount is greater than zero, shall be made available to the DIP Lenders, on the one hand, and Holders of Longview Credit Agreement Claims, on the other hand, on a Pro Rata basis calculated by reference to the pro forma allocation of New Common Equity or Remaining New Common Equity, as the case may be, to be issued on the Effective Date as between the DIP Lenders on account of the DIP Lender Equity Distribution and Holders of Longview Credit Agreement Claims on account of the the Prepetition Lender Equity Distribution.

On the Effective Date, the DIP Lender Equity Distribution, which is payable based upon the amount of DIP Facility that was funded, shall be made. It is currently anticipated that $150 million of the DIP Facility will be funded prior to the Effective Date. For the avoidance of doubt, the DIP Lender Equity Distribution shall be a payment of an Administrative Claim as a fee earned pursuant to the Final DIP Order.

2. Class 3 – Longview Credit Agreement Claims.

   (a) *Classification*: Class 3 consists of all Longview Credit Agreement Claims.

   (b) *Treatment*: Except to the extent that a Holder of a Longview Credit Agreement Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Longview Credit Agreement Claim, each such Holder *thereof* shall receive its Pro Rata share of (a) the Prepetition Lender Equity Distribution, without duplication and (b) to the extent applicable, the Cash Distribution.

   (c) *Voting*: Class 3 is Impaired under the Plan. Holders of Longview Credit Agreement Claims are entitled to vote to accept or reject the Plan.

3. Class 5 – Kvaerner Mechanics' Lien Claims.

   (a) *Classification*: Class 5 consists of all Kvaerner Mechanics' Lien Claims.

   (b) *Treatment*: Except to the extent that a Holder of an Allowed Kvaerner Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Kvaerner Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Kvaerner Mechanics' Lien Claim, each such Holder thereof shall receive the treatment set forth in the Kvaerner Settlement Agreement and the 9019 Order.

   (c) *Voting*: Class 5 is Impaired under the Second Amended Plan. Holders of Allowed Kvaerner Mechanics' Lien Claims are entitled to vote to accept or reject the Second Amended Plan.

4. Class 6 – Siemens Mechanics' Lien Claims.

   (a) *Classification*: Class 6 consists of all Siemens Mechanics' Lien Claims.

   (b) *Treatment*: Except to the extent that a Holder of an Allowed Siemens Mechanics' Lien Claim agrees to a less favorable treatment of its Allowed Siemens Mechanics' Lien Claim (which agreement, for the avoidance of doubt, must be agreed to by the Debtors and the Backstoppers), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Siemens Mechanics' Lien Claim, each Holder thereof shall receive the treatment set forth in the Siemens Settlement Agreement and the 9019 Order.

   (c) *Voting*: Class 6 is Impaired under the Second Amended Plan. Holders of Allowed Siemens Mechanics' Lien Claims are entitled to vote to accept or reject the Second Amended Plan.

B.  *Modifications to the Means for Implementation of the Second Amended Plan.*

In addition to the modifications to the treatment of Claims and Interests set forth in Article II.A of this Disclosure Statement Supplement, in light of the Settlement Agreements reached with First American, Kvaerner, and Siemens, the following modifications have been made to the Second Amended Plan:

1.  Removal of Issuance of Cramup Notes and Insurance Trust.

Article IV of the Second Amended Plan has been amended to remove the following provisions for implementation of the Second Amended Plan: (a) Article I.A.3 of the First Amended Plan, which provided for the approval and authorization for the Debtors to issue the Cramup Notes under certain conditions; and (b) Article IV.C.1 of the First Amended Plan, which provided that Consummation of the transactions contemplated by the First Amended Plan required entry of an order of the Bankruptcy Court determining that certain of the proceeds from the Title Policy were available for assignment and distribution in accordance with the First Amended Plan.

C.  *Modifications to the Third-Party Release*

Article VIII.E of the Second Amended Plan has been amended to include Siemens as a beneficiary of the Third-Party Release.

D.  *Modifications to the Conditions Precedent to the Confirmation Date.*

1.  Removal of Conditions Precedent to the Confirmation Date.

Article IX.A of the Second Amended Plan has been amended to remove the condition set forth in Article IX.A.5 of the First Amended Plan, which provided that, among other things, the Title Coverage Determination shall have occurred prior to Confirmation.

2.  Addition of Conditions Precedent to the Confirmation Date.

In addition to the provisions related to the conditions precedent to the Confirmation Date in the First Amended Plan (other than Article IX.A.5 of the First Amended Plan), Article IX.A of the Second Amended Plan has been amended to provide that: (a) the 9019 Order shall have been entered by the Bankruptcy Court and shall be a Final Order; and (b) the Settlement Agreements shall be in full force and effect and shall not have been terminated.

E.  *Modifications to the Conditions Precedent to the Effective Date.*

3.  Removal of Conditions Precedent to the Effective Date.

Article IX.B of the Second Amended Plan has been amended to remove the following conditions: (a) the condition in Article IX.B.6 of the First Amended Plan that, if applicable, the Debtors shall have issued the Cramup Notes, which shall be in form and substance, and with terms and conditions, acceptable to the Backstoppers in their sole discretion; and (b) the condition in Article IX.B.9 of the First Amended Plan that the Insurance Trust Assets shall have been transferred to the Insurance Trust and the Insurance Trustee Agreement shall have been executed and become effective.

F.  *Modifications to the Retention of Jurisdiction.*

Article XI of the Second Amended Plan has been amended to remove the Bankruptcy Court's exclusive jurisdiction to: (1) adjudicate any dispute with respect to the priority of the Liens securing the Kvaerner Mechanics' Lien Claims or the Siemens Mechanics' Lien Claims, as set forth in Article XI.4 of the First Amended Plan; and (2) adjudicate any dispute regarding the scope of coverage available under the Title Policy and the availability of Title Proceeds to effectuate distributions contemplated by the First Amended Plan, including, as set forth in Article XI.5 of the First Amended Plan.

Article XI of the Second Amended Plan has been further amended to add the Bankruptcy Court's exclusive jurisdiction to adjudicate any dispute regarding the Settlement Agreements and the Foster Wheeler Letters of Credit.

## ARTICLE III
## CONTINUED SOLICITATION AND VOTING PROCEDURES

On February 18, 2015, the Bankruptcy Court entered the *Order Granting Debtors' Motion for Entry of an Order (A) Approving the Debtors' Continued Solicitation and the Adequacy of the Supplemental Disclosure in Connection Therewith, (B) Establishing Certain Deadlines and Procedures in Connection with Plan Confirmation, and (C) Granting Related Relief* [Docket No. 1771] (the "Second Continued Solicitation Order"). Among other things, the Second Continued Solicitation Order provides the following dates and deadlines related to confirmation of the Second Amended Plan:

- **Voting Deadline**: March 9, 2015, at 4:00 p.m., prevailing Eastern Time. All votes to accept or reject the Second Amended Plan must be received by the Notice and Claims Agent at Longview Power, LLC c/o Donlin, Recano & Company, Inc., 6201 15th Ave., Brooklyn, NY 11219, by the Voting Deadline.

- **Second Amended Plan Objection Deadline**: March 9, 2015, at 4:00 p.m., prevailing Eastern Time (the "Second Amended Plan Objection Deadline"). All objections to confirmation of the Second Amended Plan must be filed with the Bankruptcy Court and served on the Debtors, counsel to the Backstoppers, and certain other parties in interest in accordance with the Second Continued Solicitation Order and the Disclosure Statement Order (including the Solicitation Procedures) so that they are **actually received** on or before the Second Amended Plan Objection Deadline.

- **Confirmation Hearing**: March 16, 2015, at 11:00 a.m., prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (each such hearing, a "Confirmation Hearing"). A Confirmation Hearing may be continued from time to time, with the consent of the Backstoppers, without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Second Amended Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing. The Second Amended Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Second Amended Plan without further notice to parties in interest, with the consent of the Backstoppers.

Other than as set forth in the Second Continued Solicitation Order, all provisions of the Disclosure Statement Order remain in full force and effect, including without limitation paragraph E.3(f) of Solicitation Procedures, which states that "the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot." Accordingly, if a Holder of a Claim timely submits a new Ballot on the Second Amended Plan, such Ballot will replace any previously submitted Ballot on the First Amended Plan or the Debtors' original plan (filed at [Docket No. 671]).

The Second Amended Plan, the Disclosure Statement, the Second Continued Solicitation Order, the Disclosure Statement Order, and all other pleadings in the Chapter 11 Cases may also be obtained: (a) from the Debtors' Notice and Claims Agent by (i) visiting http://www.donlinrecano.com/longview, (ii) writing to Longview Power, LLC, c/o Donlin, Recano & Company, Inc., 6201 15th Ave., Brooklyn, NY 11219, or (iii) calling (800) 967-4614; or (b) for a fee via PACER (except for ballots) at http://www.deb.uscourts.gov.

# ARTICLE IV
# ADDITIONAL RISK FACTORS

A. *The Debtors May Not Be Able to Consummate the Transactions Contemplated by the Settlement Agreements.*

In the event that the Settlement Agreements are terminated in accordance with their terms, the Debtors may be unable to consummate the Second Amended Plan and the Backstoppers may terminate their support for the Second Amended Plan prior to the Confirmation or Consummation of the Second Amended Plan. This loss would result in the loss of support for the Second Amended Plan by an important creditor constituent. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Second Amended Plan.

B. *Repairs to the Longview Power Facility.*

The Debtors believe that the Reorganized Debtors will succeed in repairing the Longview Power Facility in accordance with the currently contemplated schedule, including with respect to the repairs contemplated by the terms of the Foster Wheeler Settlement Agreement, the Siemens Settlement Agreement, and the Generator Agreement, which will allow the Longview Power Facility to operate at or near full capacity by the end of the second quarter of 2015. There are risks, however, that such repairs will be unsuccessful, or will take longer than expected, and that the Reorganized Debtors may continue to suffer loss of cash flows due to operational issues at the Longview Power Facility. In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in the Disclosure Statement or this Disclosure Statement Supplement, or become subject to further insolvency proceedings after Consummation of the Second Amended Plan.

C. *The Debt Outstanding under the Dunkard Facilities May Mature Prior to Confirmation.*

Indebtedness outstanding under the Dunkard Creek Facilities matured on February 28, 2014, and is currently in forbearance until March 31, 2015, subject to the terms of the Fifth Dunkard Forbearance.

If Dunkard Creek does not repay or restructure the outstanding indebtedness under the Dunkard Creek Facilities by March 31, 2015, if Dunkard Creek and/or the Debtors do not enter into a further forbearance agreement with the Dunkard Lenders or Dunkard Agent, or if an event of default occurs under the credit agreements for the Dunkard Creek Facilities, the Dunkard Agent may seek to: (a) foreclose on, and take possession of, Dunkard Creek's water treatment and supply facilities and related assets; (b) foreclose on Dunkard Creek's assets; (c) transfer Dunkard Creek's water facility and related assets to the collateral agent for the Dunkard Facilities; (d) exercise Dunkard Creek's rights under the Water Supply Agreement, including terminating the water supply for the Longview Power Facility upon any non-payment by the Debtors under the Water Supply Agreement; and (e) take any other action that the Dunkard Agent deems necessary or desirable to protect or realize upon its security interests. If the Dunkard Agent seeks to take any of the foregoing actions, the Debtors believe their business may be harmed and may not be able to consummate their Second Amended Plan.

D. *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Second Amended Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to consummation of the Second Amended Plan, the Debtors may be unable to consummate the Second Amended Plan and the Backstoppers may terminate their support for the Second Amended Plan prior to the Confirmation or Consummation of the Second Amended Plan. This loss would result in the loss of support for the Second Amended Plan by an important creditor constituent. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Second Amended Plan.

E.  *The Bankruptcy Court May Not Retain Jurisdiction Over Disputes Related to the Settlement Agreements.*

Although the Debtors expect that the Bankruptcy Court will exercise jurisdiction over any and all disputes related to the Settlement Agreements, the Bankruptcy Court may abstain from exercising such jurisdiction or may determine that it does not have jurisdiction to consider such disputes.  In such a case, the operation of a key provision of the Second Amended Plan may occur without Bankruptcy Court oversight.

## ARTICLE V
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the modifications to the treatment of claims in Classes 5 and 6 as modified under the Second Amended Plan to certain U.S. Holders (defined below).  The following discussion does not address the U.S. federal income tax consequences to Holders in Classes other than Classes 5 and 6.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement Supplement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Second Amended Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement Supplement.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, and regulated investment companies and those holding, or who will hold, Claims as part of a hedge, straddle, conversion, or constructive sale transaction).  Furthermore, the following summary of certain U.S. federal income tax consequences of the Second Amended Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., or other tax law.  Lastly, the following discussion assumes (i) each Holder of a Claim holds its Claim as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the IRC, (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against, and (iii) the debt obligation(s) underlying each Allowed Claim is recourse debt.  The U.S. federal income tax law on whether debt is recourse or non-recourse is unclear, especially in the case of debt held by (or treated as held by) a partnership.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity.  Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Second Amended Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE SECOND AMENDED PLAN.**

---

**IRS CIRCULAR 230 DISCLOSURE**

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT SUPPLEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

---

A.  *Consequences to U.S. Holders of Allowed Claims in Classes 5 and 6.*

Under the Second Amended Plan, Holders of Allowed Claims in Class 5 or 6 shall have their Claims released and discharged in accordance with their respective Settlement Agreements and the 9019 Order.  The tax treatment of an Allowed Claim in Class 5 or Class 6 depends on the specific terms of the applicable Settlement Agreement and the 9019 Order.  Holders of Allowed Claims in Class 5 and Class 6 should contact their own tax advisors with respect to the tax implications of the applicable Settlement Agreement and 9019 Order, including the tax treatment of the release and discharge of an Allowed Claim in Class 5 or Class 6.

## ARTICLE VI
## RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Second Amended Plan is preferable to the alternatives described in this Disclosure Statement Supplement and the Disclosure Statement because it provides for a larger distribution to the Holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Second Amended Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Second Amended Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Second Amended Plan support Confirmation of the Second Amended Plan and vote to accept the Second Amended Plan.  Pursuant to the Settlement Agreements, and the Foster Wheeler Settlement Agreement and subject to the terms therein, Foster Wheeler, Siemens, Kvaerner, and First American have agreed to support confirmation of the Second Amended Plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 34564321

| | |
|---|---|
| Dated as of: February 18, 2015 | Longview Intermediate Holdings C, LLC (for itself and all Debtors)<br><br>By:   */s/ Jeffery L. Keffer*<br>Name:   Jeffery L. Keffer<br>Title:   President and Chief Executive Officer |

Prepared by:

| | |
|---|---|
| Paul M. Basta, P.C. (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022-4611<br>Telephone:   (212) 446-4800<br>Facsimile:   (212) 446-4900<br><br>- and -<br><br>Ryan Preston Dahl (admitted *pro hac vice*)<br>Joseph M. Graham (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:   (312) 862-2200 | Daniel J. DeFranceschi (No. 2732)<br>Paul N. Heath (No. 3704)<br>Zachary I. Shapiro (No. 5103)<br>Marisa A. Terranova (No. 5396)<br>**RICHARDS, LAYTON & FINGER, P.A.**<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Telephone:   (302) 651-7700<br>Facsimile:   (302) 651-7701 |

*Co-Counsel to the Debtors and Debtors in Possession*

KE 34564321